UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

MARIANNE ANNISZKIEWICZ,

                              Plaintiff,

           -against-

THE CITY OF ROCHESTER, a municipal entity,
POLICE OFFICER BRIAN CALA, SERGEANT
JENNIFER TRENTON,

                              Defendants.

Case no. 20-cv-6629 (FPG)(MWP)

_____


# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'

## MOTION FOR SUMMARY JUDGMENT

## ON THE ENTIRE COMPLAINT

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

STATEMENT OF FACTS ........................................................................................ 1

LEGAL STANDARD ................................................................................................ 1

ARGUMENT ................................................................................................................ 2

I.  THE COURT MUST ENTER SUMMARY JUDGMENT ON PLAINTIFF'S UNREASONABLE SEARCH CLAIM ................................................................ 2

    A.  PLAINTIFF FAILED TO PLEAD A SEARCH, BECAUSE SHE DOES NOT ALLEGE ANY INFORMATION-GATHERING ........................................................ 2

    B.  PLAINTIFF HAS NO EVIDENCE THAT A SEARCH OF HER YARD OCCURRED .......... 3

    C.  PLAINTIFF AUTHORIZED THE OFFICERS TO ENTER HER YARD. ........................... 4

II.  THE COURT SHOULD ENTER SUMMARY JUDGMENT ON THE UNLAWFUL SEIZURE CLAIM, BASED ON THE TOTALITY OF THE CIRCUMSTANCES ................................................................................................ 5

III.  THE COURT SHOULD GRANT QUALIFIED IMMUNITY TO OFFICER CALA FOR THE ALLEGED UNLAWFUL SEIZURE ........................ 10

IV.  THE COURT SHOULD ENTER SUMMARY JUDGMENT ON THE ALLEGED MUNICIPAL LIABILITY FOR UNLAWFUL SEIZURE ................... 11

    A.  NO MUNICIPAL LIABILITY EXISTS WITH AN UNDERLYING CONSTITUTIONAL VIOLATION. ................................................................ 11

    B.  PLAINTIFF DOES NOT PURSUE MUNICIPAL LIABILITY BASED ON A POLICY ................................................................................................ 11

    C.  NO CUSTOM OF UNLAWFUL SEIZURE FOR ANY ALLEGED CONSTITUTIONAL VIOLATION EXISTS ................................................. 12

    D.  NO DELIBERATE INDIFFERENCE FOR ANY ALLEGED CONSTITUTIONAL VIOLATION EXISTS ................................................................................ 13

        1.  Plaintiff cannot establish deliberate indifference through a failure to train. ....................................................................... 14

            a.  Plaintiff does not have evidence of knowledge by a specific policymaker. .............................................................. 14

            b.  The City of Rochester has implemented adequate training to its officers regarding dog encounters. ...................... 15

i

2.      Plaintiff cannot establish that the City failed to supervise or discipline its employees regarding dog seizures. ...............................18

a.      Plaintiff failed to sufficiently plead a failure to discipline or supervise. ...............................................................18

b.      Plaintiff failed to prove a failure to discipline or supervise. ..................................................................................18

V.      THE COURT SHOULD ENTER SUMMARY JUDGMENT ON THE ALLEGED MUNICIPAL LIABILITY FOR UNLAWFUL SEARCH. ...................20

A.      PLAINTIFF MAY NOT PROCEED WITH *MONELL* LIABILITY IF NO UNDERLYING CONSTITUTIONAL VIOLATION EXISTS. .........................................20

B.      PLAINTIFF ABANDONED MUNICIPAL LIABILITY FOR UNLAWFUL ENTRIES BASED ON A POLICY ...........................................................................20

C.      PLAINTIFF CANNOT PROVE ELEMENTS OF DELIBERATE INDIFFERENCE OR RATIFICATION REGARDING ALLEGED UNCONSTITUTIONAL SEARCHES ..........................................................................................................20

CONCLUSION ............................................................................................................22

**INTRODUCTION**

Defendants move for summary judgment, because the evidence demonstrates that Plaintiff cannot prove these claims at trial.

**STATEMENT OF FACTS**

On September 2018, Ms. Anniszkiewicz called the police for assistance, after her neighbor tried to run her and a stray dog over with her car. Rochester Police Department ("RPD") officer's Brian Cala and Jennifer Trenton responded along with a civilian ride along, Delaney Glaze. The three entered Ms. Annisz's yard after Sgt. Trenton shook the fence gate, and none of them saw any dogs or people respond to the noise. Sgt. Trenton, followed by Officer Cala and Ms. Glaze, entered the yard, and proceeded to the porch and front door in order to contact the caller about the neighbor dispute and stray dog. Shortly thereafter, two large dogs ran toward the trio. Officer Cala believed one was the stray dog. Officer Cala and Ms. Glaze began to retreat, interpreting the dogs' barking and teeth baring to be aggressive. The dogs paused on the porch. When the black dog lunged at Officer Cala, he shot the dog, killing it. The second dog ran away.

Plaintiff brought claims for unlawful seizure of her personal property (the dog), unlawful search of her yard, and municipal liability for both. Summary judgement is appropriate on the entire complaint.

**LEGAL STANDARD**

A district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine issue of material fact exists where the evidence is such that a reasonable jury could decide in the non-movant's favor. *Raiser v. City of Buffalo*, No. 17-cv-0639, 2020 U.S. Dist. LEXIS 181597, at *4 (W.D.N.Y Sept. 29, 2020). The Court should award summary judgment to the moving party if "little or no evidence" supports the non-moving party's case (*Gallo v. Prudential*

*Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223-24 (2d Cir. 1994)), even when deciding all ambiguities and all factual inferences in favor of the non-moving party (*Azurdia v. City of New York*, No. 18-cv-4189, 2021 U.S. Dist. LEXIS 188891, at *7- 8 (E.D.N.Y. Sept 30, 2021)).

The parties' relative burdens are also relevant to summary judgment. When the non-moving party has the burden at trial, the moving party can demonstrate the appropriateness of summary judgment by showing that the evidence submitted would be insufficient to satisfy the non-moving party's burden of proof. *Johnson v. Xerox Corp.*, 838 F. Supp. 2d 99, 103 (W.D.N.Y. 2001), citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). See also *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010)(explaining that summary judgment is appropriate when the party with the burden of proof does not have sufficient evidence on which a reasonable jury would return a verdict in their favor).

## ARGUMENT

I. **THE COURT MUST ENTER SUMMARY JUDGMENT ON PLAINTIFF'S UNREASONABLE SEARCH CLAIM.**

A. **PLAINTIFF FAILED TO PLEAD A SEARCH, BECAUSE SHE DOES NOT ALLEGE ANY INFORMATION-GATHERING.**

While Plaintiff entitled her second claim for relief as "Unreasonable Search of Curtilage" (Complaint, Exhibit, ¶¶ 130-143), Plaintiff alleges only that officers Trenton and Cala "entered" her yard/curtilage without consent, a warrant, exigent circumstances (Complaint ¶¶ 132, 140), and without announcing their presence (Complaint ¶¶ 136). Throughout her entire Complaint, Plaintiff only claims that that Defendants unlawfully "entered" her fenced-in property" (Complaint ¶¶ 1, 13, 20).

The Fourth Amendment to the Constitution protects against "unreasonable searches and seizures," not unreasonable entries or trespasses. An entry, without more, does not constitute a search

that would come within the purview of the Fourth Amendment. Searches require seeking or attempting to gather evidence or information. *United States v. Jones*, 565 U.S. 400, 404, 409-410. Because Plaintiff does not allege that officers sought information, this conduct does not, as a matter of law, constitute a search.

**B.      PLAINTIFF HAS NO EVIDENCE THAT A SEARCH OF HER YARD OCCURRED.**

Because Plaintiff has not obtained any evidence that officers engaged in any sort of seeking, information-gathering, or inspection[1] that is necessary for a search (*United States v. Jones*, 565 U.S. 400, 404 (2012)), her claim fails as a matter of law and summary judgment is appropriate. *See e.g.*, *Gursslin v. City of Rochester et al*, No. 20-cv-06508-EAW, 2024 WL 4198154, at *5-7 (W.D.N.Y. Sept. 16, 2024)("Because there is nothing in the record before the Court to support the conclusion that Nellist and Kelly physically intruded on Plaintiff's property on September 6, 2018, in order to obtain information, the Court finds as a matter of law that there was no 'search' of Plaintiff's property for purposes of the Fourth Amendment.")

When reviewing Sgt. Trenton's Body Worn Camera Video with her, Plaintiff never discussed whether or not she searched the yard. Trenton Tr. 105:6 - 116:5. Sgt. Trenton explained that upon entering the gate, she walked to and then ascended the porch stairs and approached the front door. Trenton Tr. 112: 13-23. None the transcript pages containing the term search pertain to her actions while in the yard. Trenton word index for search and searching; Trenton Tr. 43:12, 23; 44:5-14; 45:6; 62:8; 148:25.

Similarly, Plaintiff has no evidence that Officer Cala searched her [Plaintiff's] yard. Plaintiff did not inquire into whether or not he searched the yard when reviewing his actions step-by-step in the deposition (Cala Tr. 34:7 - 46:20; 66:21 - 70:23), and no version of the word search appears in

---

[1] Defendants use various synonyms of "search" throughout their papers.

3

the Officer Cala's transcript. Cala Word Index for pg. 14 (Request to Shields). Instead, Officer Cala twice described his conduct as *"enter[ing]"* the property in response to a call for service. Cala Tr. 53:12-13; 57:9-11 (emphasis added).

The Supreme Court made clear that physical presence *when* coupled with information-gathering constituted a search. *United States v. Jones*, 565 U.S. at 406-407. As Plaintiff has no evidence that either officer intended or effectuated evidence-gathering or exploration of the yard, the Court must enter summary judgment for Defendants on Plaintiff's unreasonable search claim.

### C.   PLAINTIFF AUTHORIZED THE OFFICERS TO ENTER HER YARD.

If the Court concludes that the officers' entry may implicate the Fourth Amendment or alternatively is unlawful is some way, summary judgment is still appropriate. Plaintiff granted officers a license to enter by calling for the police.

Importantly, all United States residents generally enjoy an implied license to knock on the front door of a home in an attempt to contact a resident, absent signage or cues to the contrary. *Florida v. Jardines*, 569 U.S. 1, 8 (2013). An officer may, therefore, approach a front door without a warrant, because any private resident can do the same. *Florida v. Jardines*, 569 U.S. 1, 8 (2013). In *Florida v Jardines*, the law enforcement officers exceeded that general license when they brought a trained police dog to sniff the front porch. *Jardines*, 569 U.S. at 3. The Court was emphatic that [t]here [wa]s no customary invitation to do *that*." *Jardines*, 569 U.S. at 9 (emphasis in original).

The officers here, however, did not search the porch; they entered the yard to approach the front door and knock—as anyone else would do and acted consistent with general license to enter. Plaintiff also has no evidence that Plaintiff rescinded this general license via no trespassing signs or something similar.

The officers approached the front door. Plaintiff Anniszkiewicz confirmed that (when viewing the house from Hollis Street[2]) the door on the left was the front door. Annisz. Tr. 38:25 - 39:13; Annisz. Deposition Exhibit 2. Sgt. Trenton's Body Worn Camera shows that this is the door she approached. Trenton BWC at 11:41:56 - 11:42:06.

Plaintiff Anniszkiewicz also gave an implied license to the officers when she called the police for assistance. *United States v. Iverson*, 897 F.3d 450, 457 (2d Cir. 2018). It is undisputed that Ms. Anniszkiewicz called the police about her neighbor (Annisz. Tr. 44:8-12), who was trying to run over her and a stray or loose[3] dog with her car. Trenton Tr. 84:19-25; Annisz. Tr. 45:2-5, 46:5-17; Scherbyn Tr. 32:4-24. Even the 911 job card[4] reported that a neighbor was trying to hit a loose dog *and the caller* [Ms. Anniszkiewicz] with her [the neighbor's] car. Cala Deposition Exhibit B, pg. 1. Consistent with the license the officers "entered the yard in an attempt to respond to a 911 call for service." Cala Tr. 53:12-13; 57:9-11.

## II.     THE COURT SHOULD ENTER SUMMARY JUDGMENT ON THE UNLAWFUL SEIZURE CLAIM.

In *Carroll v. County of Monroe*, the Second Circuit held that the unreasonable killing of a companion animal constitutes an unconstitutional seizure of personal property under the Fourth Amendment. *Carroll v. County of Monroe*, 712 F.3d 649, 651 (2d Cir. 2013). To determine reasonableness, the court "balance[s] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interest alleged to justify the intrusion and determine[s] whether the totality of the circumstances justified [the] particular sort of .

---

[2] Plaintiff described Exhibit 2 as the view of her house at 236 Belknap from Hollis Street side. Annisz. Tr. 33:17 - 34:7.

[3] Sgt. Trenton used the term "loose dog" and Plaintiff used the term "stray."

[4] Officer Cala described Exhibit B as the "job card." Cala Tr. 146:6-12.

. . seizure." *Carroll*, 712 F.3d at 651, quoting *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985) (internal quotation marks omitted).

The reasonableness inquiry "is an objective one: the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them" at the time, and not with "the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396-397 (1989), quoted in *Matteson v. Hall*, no. 18-cv-6772, 2019 WL 219502 (W.D.N.Y. May 21, 2019).

The killing of a pet dog is an intrusion and usually severe given the emotional attachment between dog and owner. (*Carroll*, 712 F.3d at 651), but on the other hand, the safety of officers and residents is an undeniably significant governmental interest. (*Carroll*, 712 F.3d at 651).

The Second Circuit recognized that courts will find the seizure of a dog displaying aggressive behavior—or that the officer believes to be a threat to himself or the community—to be reasonable. *Carroll*, 712 F.3d at 651. However, an "officer may not utilize deadly force against a dog unless there is an actual basis to believe that the dog posed an imminent threat." *Azurdia v. City of New York*, No. 18-cv-4189, 2019 WL 1406647, at *8 (E.D.N.Y. March 28, 2019)(deciding motion to dismiss)(quotations and citations omitted). RPD General Order 340 authorizes officers to discharge their firearm at animals when they are presenting as an imminent danger. Exhibit H, pg. 3.

Courts have considered many factors in assessing the totality of the circumstances and reasonableness of a seizure of a dog: the dog's breed; whether the dog was roaming or inside a residence; whether the officer knew a dog was present prior to the encounter; whether the owner was available and willing to control the dog; whether police presence was known; whether the police had instructed the owner to restrain the dog; the manner and speed of the dog's approach; whether the dog was barking, growling, and/or baring its teeth; whether there was time to utilize other solutions to control the dog; whether nonlethal means were available; and whether the dog posed a danger to the

officer or the public. *Matteson*, 2019 WL 2192502, at *7-8; *Aljoe v. Adams*, No. 18-cv-01043, 2020 WL 12188842, at *5-7 (W.D.N.Y. Nov. 5, 2020); *Azurdia v. City of New York*, no. 18-cv-4189, 2021 WL 4480655, at *4-5 (W.D.N.Y. September 30, 2021).

For seizure claims, the plaintiff must prove it was unreasonable given "the totality of the circumstances" of the intrusion versus the "importance of the governmental interest alleged."

On the day in question, three people were present: Sgt. Trenton, Officer Cala, and Delaney Glaze. Glaze Affidavit ¶ 15. Ms. Glaze was a civilian, who was riding-along with Officer Cala. Glaze Affidavit ¶ 4. Cala Tr. 149:20-23; 150:21-23. Plaintiff Anniszkiewicz had called 911, because her neighbor was trying to run her [Plaintiff] and a stray dog over with her [neighbors'] car Annisz. Tr. 44:7-12, 45:2-5, 46:5-17; Cala Deposition Exhibit B. pg. 1; Trenton Tr. 84:19-25. The officers had an obligation to intervene in this dispute among neighbors, so they entered to respond to the 911 call for service. Cala Tr. 53:12-13, 57:9-11.

At the time they entered the yard, they did not know if/whether Animal Control had responded to the scene (Cala Tr. 43:14-19) and they did not know whether the caller had a dog (Annisz. Tr. 46:22-24). The 911 caller said the stray dog was "running around the neighborhood," which, to Officer Cala, meant it "could be anywhere." Cala Tr. 42:11 - 43:6. Officer Cala did not see any dogs upon arriving and entering the yard. Cala Tr. 40:8-19. Similarly, Ms. Glaze did not see any indication of dogs or people present as they entered the yard. Glaze Affidavit ¶ 4. Even though she did not see any dogs or indicia of dogs, Sgt. Trenton shook the fence before entering the gate. Exhibit P, Trenton Interrogatory Response, pgs. 2-3, no. 4; Trenton Tr. 83:25 - 84:18; Trenton BWC 11:41:48 -11:41:50.

Not long after entering the yard (Cala Tr. 150:6-8), they "spotted two large dogs hurling themselves towards us at a fast pace from the other side of the yard" (Glaze Affidavit ¶ 16; Cala Tr.

99:18-22) ("two dogs… that were rapidly closing distance")). He believed that one of the dogs was the stray dog the police officers had been called about. Cala Tr. 35:2-6. Ms. Glaze believed the dogs to be a large Newfoundland and a large pitbull. Glaze Affidavit ¶ 17. In addition to their speed, Officer Cala could see that the dog was baring its teeth. Cala Tr. 100:5-9.

The dogs were barking at the trio, but stationary, and officer Cala and Ms. Glaze considered the dogs to be aggressive. Glaze Affidavit ¶¶ 20-21; Cala Tr. 67:12-21. Ms. Glaze and Officer Cala retreated towards the fence they had recently entered. Glaze Affidavit ¶ 18; Cala Tr. 68:22 - 69:3. Officer Cala testified that the dog paused and then became aggressive again (Cala Tr. 99:22 - 100:4; Cala BWC at 11:42:08 - 11:42:10), again barking and baring its teeth (Cala Tr. 100:14-20). Officer Cala reattempted to walk backwards when the dogs paused. Cala Tr. 99:25 - 100:2. Ms. Glaze was "very scared" and decided to leave the yard. Glaze Affidavit ¶ 19.

When the black Newfoundland dog "lunged aggressively" toward them, Officer Cala discharged his firearm and killed the dog. Glaze Affidavit ¶¶ 22-23; Cala Tr. 70:16-23. Following the gunshot, the pitbull ran away, which caused Ms. Glaze to be scared again because someone shouted the dog was outside the fence, where she was. Glaze Affidavit ¶ 24. Officer Cala was clearly concerned for everyone's safety—even after one dog was shot. After the shooting, Mr. Scherbyn believed that Officer Cala was concerned about the other dog and ensuring that it was secured Sherbyn Tr. 43:22 - 44:10.

Ms. Glaze averred that, "[a]lthough seeing that dog shot was not pleasant, there was not any doubt in my mind, and to this day, there is no doubt in my mind, that had Officer Cala not discharged his weapon on that dog, someone would have been seriously injured or killed that day." Glaze Affidavit ¶ 30.

It is undisputed that Officer Cala acted reasonably to protect himself, Ms. Glaze, and his colleague from two aggressive dogs when he discharged his firearm. No other evidence besides Officer Cala, Sgt. Trenton, and Ms. Glaze sworn statements exist regarding when the dog was shot. Annisz. Tr. 55:15-24. Plaintiff alleged that her six-year old grandson saw the event. Annisz. Tr. 55:15-24. The grandson was not deposed, however, and Plaintiff did not produce any statements from him in response to Defendants' Request for Production for witness statements. Exhibit I, Defendants' RFPs, pg. 3, no. 8.  Plaintiff Anniszkiewicz was inside her home—and not near any windows—when the officers entered her yard and shot her dog. Annisz. Tr. 51:7-14, 52:19 -54:7. She did not see the dog shooting (Annisz. Tr. 53:5-7), so she cannot offer any evidence regarding the incident. Ms. Anniszkiewicz testified that Mr. Michael Scherbyn, a visitor to her home, saw the dog shooting and attempted to intervene (Annisz Tr. 55:15-18, 62:16 – 63:16), but Mr. Scherbyn testified that he did not [do either] (Scherbyn Tr. 45:22-24, 48:10-12), and moreover, did not have a line of sight from his location to where the dog was shot (Scherbyn Tr. 34:19-23).

Plaintiff may never the less argue that Officer Cala's actions were unreasonable because he could have acted differently.

Any officers' opinions in hindsight about how they could have handled this situation differently (Cala Tr. 58:6-11) are irrelevant to whether or not the actions were reasonable. Officer Cala could have circled the entire corner property before entering (Cala Tr. 53:19-23); the officers' could have called Ms. Anniszkiewicz prior to entering the gate (Cala Tr. 54:7-10); they could have called Animal Control (Cala Tr. 43:14-19; 55:5-8); and they could have proceeded slower, because this wasn't an emergency (Cala Tr. 54:3-6). Shoulda, woudla, coulda is not the standard of evaluating Fourth Amendment actions. *Graham v. Connor,* 490 U.S. 386b, 396-397(1989).

In these circumstances, it was reasonable for Officer Cala to discharge his firearm at *two* aggressive, approaching dogs to protect both himself, his colleague, and his civilian rider from harm. Ms. Glaze had "no doubt" that harm would have occurred had Officer Cala not shot one of the dogs Glaze Affidavit ¶ 30. The Court should, grant summary judgment on the unreasonable seizure.

## III.   THE COURT SHOULD GRANT QUALIFIED IMMUNITY TO OFFICER CALA FOR THE ALLEGED UNLAWFUL SEIZURE.

"A government official is entitled to immunity from suit whenever (1) his conduct did not violate clearly established law, or (2) it was objectively reasonable for the official to believe that his action did not violate such law." *Naumovski v. Norris*, 934 F.3d 200, 210 (2d Cir. 2019); *Plumhoff v. Rickard*, 572 U.S. 765, 766-777 (2014). Clearly established law must be "particularized" to the facts of the case; precedent must establish that an officer acting under similar circumstances had violated the Constitution. *White v. Pauly*, 580 U.S. 73, 793 (2017).

The Second Circuit recognized that courts will find the seizure of a dog displaying aggressive behavior—or that the officer believes to be a threat to himself or the community—to be reasonable. *Carroll*, 712 F.3d at 651. The dogs' behavior was considered aggressive by Officer Cala and Ms. Glaze:  they were rapidly approached while barking and baring teeth. Glaze Affidavit ¶ 16; Cala Tr. 99:18-22, 100:5-9. Officer Cala also testified that the dog paused and then became aggressive again, resumed barking and baring its teeth. Cala Tr. 99:22 - 100:4, 14-20. Only after the Newfoundland dog "lunged aggressively" toward them did Officer Cala discharge his weapon and kill the dog. Glaze Affidavit ¶¶ 22-23; Cala Tr. 70:16-23. Ms. Glaze averred that "there was not any doubt in [her] mind, and to this day, there is no doubt in [her] mind, that had Officer Cala not discharged his weapon on that dog, someone would have been seriously injured or killed that day." Glaze Affidavit ¶ 30. Given these circumstances—which Plaintiff cannot contest or dispute—Officer Cala acted reasonably and is entitled to qualified immunity.

IV.    **THE COURT SHOULD ENTER SUMMARY JUDGMENT ON THE ALLEGED MUNICIPAL LIABILITY FOR UNLAWFUL SEIZURE.**

A.    No municipal liability exists without an underlying constitutional violation.

*Monell* established a theory of *liability*, under which plaintiffs may assert municipal liability for constitutional violations by municipal employees. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). As such, plaintiffs must plead and prevail on a constitutional violation before attempting to establish municipal liability. *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) ("*Monell* does not provide a separate cause of action […]; it extends liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation.").

When the Court enters summary judgment against Plaintiff's unlawful seizure claim (and not simply grants qualified immunity to Officer Cala[5]), the Court must also enter summary judgment on municipal liability for that seizure. Without an unlawful seizure, there is nothing for which to hold the municipality liable.

B.    Plaintiff does not pursue municipal liability based on a policy.

Plaintiff alleges, in various ways, that the City has an unconstitutional policy regarding when an officer may permissibly shoot a dog. Complaint ¶¶ 48, 49, 51, 76, 101, 102.

_____

[5] In related dog cases, Plaintiff's counsel has repeatedly responded that municipal liability is still available if an officer is granted qualified immunity. This is correct. Defendants argue that the Court must dismiss any municipal liability claim based on dog seizures if/when the Court enters summary judgment and dismisses Plaintiff's unlawful seizure claim (and not simply awards qualified immunity)

Plaintiff has, however, abandoned this claim, as she represented that her municipal liability claim was based on deliberate indifference and not a policy. Exhibit F, Plaintiff's [March 2023] Responses to Interrogatories, no. 13.

### C. No custom of unlawful seizure for any alleged constitutional violation.

Plaintiff cannot establish that the City has a custom of unlawfully seizing dogs. Complaint ¶ 125.

For a custom, "the employee[s'] unconstitutional conduct must be so manifest as to imply the constructive acquiescence of senior policy-making officials." *Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 297–98 (2d Cir. 2020)(internal quotations omitted). Customs are either "persistent and widespread practices" or "permanent and well settled." *Douglas v. City of Peekskill*, No. 21-cv-10644, 2023 WL 2632217 at *8 (S.D.N.Y. March 24, 2023).

"[T]here must be sufficient instances of tolerant awareness by supervisors of abusive conduct to support an inference that they had a policy, custom or usage of acquiescence in such abuse." *Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 298 (2d Cir. 2020)(internal quotations omitted)(overruling district court grant of summary judgment due to "severity and scope" of sexual harassment and "awareness by multiple employees).

Unconstitutional seizures of dogs do not readily occur in the City of Rochester. Let's assume for the sake of argument that Plaintiff's data is accurate: (1) "[b]etween 2013 and 2018, RPD officers shot and killed approximately 50 dogs" (Complaint ¶ 9); and (2) "dogs reside in more than 50% of households in Rochester" (*id.* at ¶111). We know that RPD responded to over 650,000 calls for service from July 1, 2016 to June 30, 2018. Exhibit F, RPD calls for service.[6] Assuming half of those calls

---

[6] RPD responded to 339,630 calls for service in the 2016-2017 (July 1, 2016 – June 30, 2017) budget year (Exhibit F, pg. 1); 333,918 in 2017-2018 (*id.* at pg. 2), which totals to 673,548.

involved households with dogs (i.e., 336,774) and officers shot fifty dogs,[7] RPD officers shot dogs in 0.01% of those dog encounters. The percentage of fatal dog encounters rises only to 0.02% if only one-third of those calls involved dog encounters (i.e., 224,516). It is therefore undisputed that a minuscule percentage[8] of residents potentially have their pet dogs shot in RPD encounters, no frequent deprivation exists that would support a failure to train argument. Summary judgment for Defendants on municipal liability pursuant a custom required, because Plaintiff cannot demonstrate a persistent and widespread practice of seizing dogs.

### D.   NO DELIBERATE INDIFFERENCE FOR ALLEGED UNCONSTITUTIONAL SEIZURES EXISTS.

Plaintiff also failed to establish municipal liability by showing "deliberate indifference." "Liability for deliberate indifference can be based upon a failure to train or a failure to supervise or discipline." *Rodriguez v. City of New York*, 607 F. Supp. 3d 285, 293 (E.D.N.Y. 2022). Under both theories it remains a "stringent standard of fault," because a litigant must show a policymaker "disregarded a known or obvious consequence of his action." *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

Plaintiff has failed to establish deliberate indifference under both the failure to train and the failure to supervise theories of municipal liability for the seizure, and therefore, the Court must enter summary judgment for Defendants for these theories of municipal liability.

---

[7] Defendants acknowledge that they only have data of calls for service for July 2016 until June 2019, but have nevertheless utilized the number of dog shootings from 2014-2019.

[8] We could also perform those calculating using only the number of non-discretionary calls. RPD non-discretionary calls from July 1, 2016 to June 30, 2018 totaled 396,475. RPD would have shot dogs in 0.025% of dog encounters if one-half (i.e., 198,238) of households had dogs and 0.038% if one-third (i.e., 132,158) of households had dogs.

1.      Plaintiff cannot establish deliberate indifference through a failure to train.

"Under the failure to train theory, a municipality may be liable when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, but the policymakers choose to retain that program." *Rodriguez v. City of New York*, 607 F. Supp. 3d 285, 293 (E.D.N.Y. 2022)(internal quotations omitted).

Plaintiff must show that the constitutional "injury [would] have been avoided had the employee been trained under a program that was *not* deficient in the identified respect"—not that "better or more training" was advisable, the City had negligently administered the training program, or that a particular officer was inadequately trained. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 391 (1989). The identified training deficiency, moreover, "must be closely related to the ultimate injury." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 391 (1989).

a.      Plaintiff does not have evidence of knowledge by a specific policymaker.

During discovery, Plaintiff identified former RPD Chief Michael Ciminelli and (former) RPD Deputy Chief of Operations ("DCO") Scott Peters as the policymakers who would have been aware of these alleged unconstitutional seizures. Exhibit H, Plaintiff's Supplemental Interrogatory Responses to no. 11. Yet neither Chief Ciminelli nor DCO Peters were deposed in this matter (or any of the related dog shooting cases[9])—and Plaintiff does not plan to call either one at trial, as neither

---

[9] *Anniszkiewicz v. City of Rochester* (20-cv-6629-FPG-MWP); Barnes *v. City of Rochester* (22-6524-EAW-FPG), which was voluntarily dismissed in August 2024; *Cox v. City of Rochester* (22-cv-6207-FPG-MJP); *Dempsey v. City of Rochester* (19-cv-6780-EAW-MJP); *Gursslin v. City of Rochester* (20-cv-6508-EAW-MJP); *McGill v. City of Rochester* (22-cv-6523-EAW-MWP); and *Preston v. City of Rochester* (22-cv-6525-EAW-MJP).

are included in Plaintiff's Rule 26 Disclosures (Exhibit J, pgs. 1-6; Jones Decl. ¶¶ 6-7). Plaintiff also declined to depose the current RPD Chief, Deputy Chiefs, Commanding Officers of Professional Standards Section and Professional Development Section. Jones Decl. ¶¶ 8-9. Plaintiff, therefore, does not have any evidence, consistent with her allegations, that any alleged policymakers knew about unconstitutional dog shootings and declined to take action.

> b.  The City of Rochester has implemented adequate training to its officers regarding dog encounters.

The City of Rochester, moreover, is not deliberately indifferent to residents' constitutional rights and has trained its officers to follow the Constitution and New York State law.

In 2014, Rochester Police Department ("RPD") devoted a 2014 in-service training to appropriate responses to aggressive dogs. City Deposition Exhibit 5 (Dog Bite Prevention for Law Enforcement) and City Tr. 145:10-14 (in-service), 141:7-21. All RPD officers were mandated and scheduled to attend it. Exhibit E, List of attendees to 2014 Training; City Tr. 145:10-14, 146:2-19; Trenton Tr. 9:24 - 10:2.

Mr. Reno DiDomenico, a twenty-two -year veteran of the Monroe County Sheriff's Office (DiDomenico Tr. 13:21-25), developed this training at the request of the Monroe County Sheriff's Office (*id.* at 28:12 - 29:16) and in conjunction with Monroe County Sheriff's Deputy Sheriff Dave Phelps and the Humane Society/Lollypop Farm Behaviorist Rebecca Lohnes [10] (*id.* at 29:9-14, 27:14-25).

The DiDomenico-Phelps-Lohnes team incorporated information from the U.S. Department of Justice ("US DOJ") Office of Community Oriented Policing Services booklet "It's the Problem of Dog-Related Incidents and Encounters" (DiDomenico Tr. 32:16 - 34:19, 36:9-13) and a training

---

[10] Mr. DiDomenico believed her name was spelled Lohoes, but it is spelled Lohnes.

provided by animal behavior expert Robert Lockwood (DiDomenico Tr. 31:9-25). They created a PowerPoint Presentation (Exhibit D) and a handout with dog postures, both of which were provided to trainees to permit them to take notes and keep a copy. DiDomenico Tr. 8:22 - 9:11, 38:15 (posture handout).

Mr. DiDomenico recognized that officers revert to training (DiDomenico Tr. 35:15), so he wanted to provide officers with options in dealing with dogs besides shooting (*id.* at 35:14-20, 43:3-17), and get them to rethink how they approach a dog situation (*id.* at 45:21 - 46:11 DiDomenico instructed officers on dog behaviors. DiDomenico Tr. 32:23 - 34:9, 43:10-17, 51:12-13; City Tr. 151:9-11; Laureano Tr. 43:3-21 (indicia of aggressiveness, e.g., growls and posture); Trenton Tr. 12:13-24, 13:7-18. RPD officers reported that they were taught how to identify an aggressive dog and mitigate risk (Romig Tr. 67:9 - 68:8; Laureano Tr. 131:9-20; Trenton Tr. 11:11-15),  provided with non-lethal responses to an aggressive dog (Laureano Tr. 44:15-22; Cala Tr. 22:13-23, 27:4-20); instructed on dog behaviors and how you can escape a dog (Horowitz Tr. 80:18 - 82:13) taught tactics to use in dog interactions (Algarin Tr. 85:11 - 86:2), and taught how to recognize different dog behaviors in dog encounters and utilize the tools on their belt to respond (Rudolph Tr. 124:7 - 125:22). The training was a PowerPoint presentation with videos (Horowitz Tr. 80:18 - 82:13; Trenton Tr. 11:2-10), and lasted approximately three hours long (Trenton Tr. 8:9-18).

RPD subsequently incorporated this training into the Police Academy, so that all newly hired police officers would receive the training.  City Tr. 230:7 - 230:22 (regarding when the training began in the Academy). The City also retrained its officers in December 2019, when the Aggressive Dog

training was the subject of a roll call training[11]. City Deposition Exhibit 6 ("Roll Call Training December 2019 LE Dog Bite Prevention for Law Enforcement) and City Tr. 141:22 - 142:9.

Plaintiff relies almost exclusively on purported expert James Crosby to demonstrate the Citys' deliberate indifference through "failure to train". Mr. Crosby stated that the City both violated best practices, good and accepted police practices, and professional standards of care and exhibited deliberate indifference by failing to provide any of the free and effective trainings that were available and accessible. Exhibit K, Crosby Report, Opinions 1, 3, 14, 23, pgs. 14, 15, 17, 19.

The evidence establishes, however, that Mr. DiDomenico incorporated information from one "free and effective training," "It's the Problem of Dog-Related Incidents and Encounters" into his training. DiDomenico Tr. 32:16 - 34:19, 36:9-13; Exhibit K, Crosby Gursslin ("G") Tr. 73:5-19.

Mr. Crosby takes issue with the (short) length of the training, and the absence of any opportunities to practice [taught] techniques or interact with the content (Crosby G Tr. 74:2-25; 81:18-25). Mr. Crosby, therefore, argues that the City should have provided more (longer) or better (more interactive) training on dog encounters than it did. This does not satisfy the deliberate indifference standard. *Reynolds v. Giuliani*, 506 F.3d 183, 193 (2d Cir. 2007)("A training program must be quite deficient in order for the deliberate indifference standard to be met; the fact that training is imperfect or not in the precise form a plaintiff would prefer is insufficient to make such a showing.")(citation omitted). Furthermore, "failure-to-train liability is concerned with the substance of the training, not the particular instructional format" (*Connick v. Thompson*, 563 U.S. 51, 68 (2011)), and the City's declination to regurgitate one of the free trainings available goes to the form, not substance.

---

[11] During roll call, all officers are presented with a condensed version previous training and/or reminded important principles and points for exercising their duties. Roll calls are repeated until every officer on a given shift hears the training. Ciulla Depo. Tr. 218:15-20.

The RPD-wide training in no way reflects an agency that is deliberately indifferent to the constitutional rights of residents and their pets. Summary judgment for Defendants is appropriate under the failure to train theory.

> 2.   Plaintiff cannot establish that the City failed to supervise or discipline its employees, regarding dog seizures.

For a failure to supervise or discipline, a plaintiff must plead and prove that a municipal policymaker "had notice of a potentially serious problem of unconstitutional conduct, such that the need for corrective action or supervision was obvious, *and* the policymaker's failure to investigate or rectify the situation evidences deliberate indifference, rather than mere negligence or bureaucratic inaction." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 128 (2d Cir. 2004).

> a.   Plaintiff failed to sufficiently plead a failure to discipline or supervise.

The Court must also enter summary judgment for Defendants under the failure to discipline or supervise theory of municipal liability, because Plaintiff failed to plead that a specific policymaker declined to act after notice of problematic misconduct. Plaintiff addressed a failure to supervise or discipline for unlawful seizures in six paragraphs in the Complaint (¶¶ 56, 112, 116-119); but she never alleged that any particular individual—let alone, a policymaker—had notice of unconstitutional conduct and that the policymaker chose to ignore or permit the situation. Because she failed to meet the pleading standard, this claim must be dismissed.

> b.   Plaintiff failed to prove a failure to discipline or supervise.

During discovery, Plaintiff identified former RPD Chief Michael Ciminelli and (former) RPD Deputy Chief of Operations ("DCO") Scott Peters as the policymakers who would have been aware of these alleged unconstitutional seizures. Exhibit H, Plaintiff's Supplemental Interrogatory Responses to no. 11. Yet neither Chief Ciminelli nor DCO Peters were deposed in this matter (or any of the related dog shooting cases)—and Plaintiff does not plan to call either one at trial, as neither are

included in Plaintiff's Rule 26 Disclosures Exhibit J, pgs. 1-6; Jones Decl. ¶¶ 6-9. Plaintiff, therefore, does not have any evidence that the alleged City policymakers did actually know about these dog shootings and declined to supervise and discipline involved officers.

Plaintiff has asserted that the fact that few, if any, officers have been disciplined for shooting a dog is tantamount to failing to supervise or discipline. Complaint ¶¶ 56, 112. Not so. Very little discipline has occurred, because Defendants neither had nor saw any need to discipline or make adjustments in that area. Despite receiving the Incident Reports for every firearm discharge report from 2015 to 2022, Plaintiff has identified only one [August 2019] incident in which an officer allegedly violated City policy or the Constitution, and/or should have been the subject of discipline. *Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 409-410 (1997). See also Exhibit L (Plaintiff's Opposition to Summary Judgment in *Cox v. City of Rochester*), pgs. 4-5; Exhibit M (Plaintiff's Opposition to Summary Judgment in *Gursslin v. City of Rochester*), pg. 4; and Exhibit N (Plaintiff's Opposition to Summary Judgment in *Dempsey v. City of Rochester*), pg. 4, in which Plaintiff's counsel uses the same, single example to demonstrate a failure to discipline.

Plaintiff cannot establish that any manager or City policymaker saw or was aware of any potential constitutional problems. Neither has Plaintiff highlighted situations that a policymaker should have recognized as problematic and an "obvious" need for corrective action or supervision. The Court must grant Defendants' summary judgment motion on the failure to supervise or discipline theory of municipal liability from allegedly unconstitutional seizure of dogs.

## V.    THE COURT SHOULD ENTER SUMMARY JUDGMENT ON THE ALLEGED MUNICIPAL LIABILITY FOR UNLAWFUL SEARCH.

### A.    PLAINTIFFS MAY NOT PROCEED WITH *MONELL*, IF NO UNDERLYING CONSTITUTIONAL VIOLATION EXISTS (OR CAN BE PROVEN).

As explained above, the Court must enter summary judgment on related municipal liability when the Court concludes that no constitutional violation occurred. *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006). *Monell* liability is not a separate cause of action; it only extends liability. *Id.*

### B.    PLAINTIFF ABANDONED MUNICIPAL LIABILITY FOR UNLAWFUL ENTRIES BASED ON A POLICY.

Just as she did for unlawful seizures, Plaintiff pled the City's unconstitutional policy regarding officers' entry into residential properties. (Complaint ¶¶ 47, 62-63, 121), but then abandoned it.

In March 2023, Plaintiff represented that her municipal liability claim (for unlawful entries) was based on deliberate indifference and not a policy. Exhibit G, Plaintiff's Responses to Interrogatories, no. 14.

### C.    PLAINTIFF CANNOT PROVE ELEMENTS OF DELIBERATE INDIFFERENCE OR RATIFICATION REGARDING ALLEGED UNCONSTITUTIONAL SEARCHES.

First, the pattern of constitutional violations used to give notice must be similar to the constitutional violation alleged by the Plaintiff. *White v. Pauly*, 580 U.S. 73, 793 (2017). Plaintiff has not pled a pattern of *constitutional* violations. She pled only multiple *trespasses*—a state law claim—that were, at best, related to dog shootings. Complaint ¶¶ 104 - 106.[12]

Second, both deliberate indifference theories (for unlawful entries) and ratification fail for the same reason as deliberate indifference for unlawful seizures: Plaintiff has not identified an involved

---

[12] Plaintiff also alleged that dogs were shot on two other occasions: twice when executing a warrant (Complaint, ¶¶ 107, 111) and twice while responding to calls for service (Complaint, ¶¶ 108 - 110).

municipal policymaker. For both ratification and deliberate indifference, plaintiffs must prove that a municipal policymaker ratified unlawful actions or was deliberately indifferent to unconstitutional occurrences.

> Ratification of a subordinate's acts can be demonstrated by showing that municipal policymakers explicitly approved of the act, or by showing that a policymaker was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them. […] Deliberate indifference to a constitutional violation may be demonstrated through proof of a policymaker's failure to respond to repeated complaints of civil rights violations.

*Manville v. Town of Greece*, 892 F. Supp. 2d 469, 474 (W.D.N.Y. 2012).

Plaintiff identified former RPD Chief Michael Ciminelli and (former) RPD Deputy Chief of Operations ("DCO") Scott Peters as the policymakers who would have been aware of these alleged constitutional violations. Exhibit H, Plaintiff's Supplemental Interrogatory Responses to nos. 11-12. Yet neither Chief Ciminelli nor DCO Peters were deposed in this matter (or any of the related dog shooting cases)—and Plaintiff does not plan to call either one at trial, as neither are included in Plaintiff's Rule 26 Disclosures (Exhibit J, pgs. 1-6; Jones Decl. ¶¶ 6 - 7). Plaintiff also declined to depose the current RPD Chief, any RPD Deputy Chief or Commander, or the Commanding Officer of PSS or the Professional Development Section ("PDS"). Jones Decl. ¶¶ 8-9.

Plaintiff, again, does not have any evidence that any municipal policymaker knew about unlawful searches and declined to take action through either training or discipline.

**CONCLUSION**

For the foregoing reasons, the Defendants respectfully request that the Court grant summary judgment on Plaintiff's entire Complaint.

Date: September 26, 2024

PATRICK BEATH
CORPORATION COUNSEL

By: _____

Peachie L. Jones, Esq., Of Counsel
*Attorneys for Defendants*
30 Church Street, Room 400A
Rochester, NY  14614
(585) 428-7992
Peachie.Jones@CityofRochester.gov