# James W. Crosby M.S.

1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com

**Exhibit K**

Elliot Shields, Esq.
Roth & Roth, LLP
192 Lexington Ave., Suite 802
New York, New York 10016

EXPERT REPORT

RE:

MARIANNE ANNISZKIEWICZ

vs.

THE CITY OF ROCHESTER, a municipal entity, POLICE
OFFICER BRIAN CALA, SERGEANT JENNIFER
TRENTON

Case number: 20-cv-6629

**NOTE: THIS REPORT IS PRELIMINARY. FURTHER DETAILED OPINIONS MAY FOLLOW AS ADDITIONAL INFORMATION IS PRESENTED. EXPERT OPINIONS ARE NOT LIMITED TO THE OPINIONS PRESENTED BELOW. I EXPLICITLY RESERVE THE RIGHT TO AMEND, EXPAND, AMPLIFY OR CLARIFY THESE OPINIONS IF MORE DATA IS PRESENTED.**

April 8, 2024

All my opinions herein are rendered to a reasonable degree of professional certainty, and are informed by the type of evidence on which professionals in my field typically rely. I have been retained in the case of  Anniszkiewicz et al. vs. The City of Rochester et al, where a pet dog known as Sampson was shot by Defendant Brian Cala during police action on the home property of Ms. Anniszkiewicz located at 236 Belknap, Rochester, New York.

To summarize my qualifications: I have been recognized as an expert on dog behavior, dog aggression, and dog bite investigation in many courts based on my extensive experience and training. I hold a Ph.D. in Veterinary Medical Science from the College of Veterinary Medicine, University of Florida, with specialization in Veterinary Forensics; a Master of Science degree from the College of Veterinary Medicine, University of Florida, with specialization in Veterinary Forensics. I am a Certified Behavior Consultant-Canine-Knowledge Assessed. I have been working with aggressive and dangerous dogs for over ten years. I provide training for police departments and animal control agencies regarding dangerous dogs, dog aggression, use of force in canine encounters and the investigation of dog-related incidents. Agencies that I have instructed

1

# James W. Crosby M.S.

1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com

have included the Florida Animal Control Association, the Alabama Animal Control Association, the National Animal Control Association, the Alberta Animal Control and Bylaw Officers' Association, the London Metropolitan Police and their Status Dog Unit, and other public and private conferences. My sworn reports and testimony have been accepted as expert materials in many states, US Federal Courts, and in the Crown Court of the United Kingdom.

I have attended many seminars and training sessions addressing canine behavior. These are listed in the attached CV and include, but are not limited to, advanced canine behavior training, obedience instructor training, dog behavior evaluation, Bite Prevention for Law Enforcement Officers, and course work taken through the University of Florida on Forensic Animal Behavior Analysis.

I have trained police departments in the proper and effective use of less- and non-lethal force; recognition of canine body language, behavior, and dog bite risk analysis; and methods for safe engagement with domestic dogs across the United States. Most recently I trained academy staff for the Miami-Dade County Police Department (2023) so they could disseminate the training within their agency.

During my studies at the College of Veterinary Medicine, University of Florida, I completed coursework in Forensic Animal Behavior Analysis, Animal Crime Scenes/Clandestine Grave Investigation, Bite Mark Analysis, Interpersonal Violence and Animal Abuse, Veterinary Forensic Pathology, Veterinary Forensic Osteology, Animal Law, Scientific and Legal Principles of Evidence, Veterinary Pathology in Practice (Advanced), and Forensic Crime Scene Analysis. I have taught canine behavior and assessing canine behavior problems and aggression across the United States, England, Italy, Poland, Australia, and Canada.

I served as the acting Chief of Animal Care and Protective Services for the City of Jacksonville, Florida from March through December of 2016. My duties included, but were not limited to, overall management and oversight of Jacksonville Animal Care and Protective Services (ACPS); supervision of all Animal Control Enforcement personnel; oversight and approval of criminal investigations; oversight of the Veterinary Department of ACPS; oversight and supervision of the behavior section of ACPS; sitting as Special Hearing Officer for any and all appeals of Dangerous Dog declarations for the City of Jacksonville; interaction with other City divisions and outside agencies, civil and Law Enforcement; accountability and responsibility for the lawful and proper operation of the agency, and other duties as they arose. I still serve as Division Management Consultant as needed for Jacksonville ACPS. I am a Certified Animal Control Officer in the State of Florida, and I served as the Animal Control Division Manager for Bay County, Florida, from February 2008 to September 2010. During my tenure at Bay County Animal Control, my duties included daily shelter management, assuring the safe handling and humane treatment of animals in the care of Bay County Animal Control, investigating complaints of animal neglect and cruelty, overseeing and assisting in animal rescue and capture, response to calls to assisting police in animal related calls, and performing investigations and making findings of fact regarding the declaration of Dangerous Dogs under Florida Statute. My training and experience also includes certification, training, and experience in humane euthanasia of animals and the legal restrictions on methods

# James W. Crosby M.S.

1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com

and reasons for such euthanasia. I have investigated many complaints about dogs and dog behavior

My agencies were members of the Florida Animal Control Officers' Association. I taught portions of the Florida Animal Control Association curriculum for the certification of Animal Control Officers including perception of threat and use of force in animal cases. I was a member of the Board of Directors of the Florida Animal Control Association and, as such, was privy to the discussions regarding establishment of Standards regarding the curriculum. I continue to provide training to members of the Florida Animal Control Association and other agencies. I am a Charter Member of the International Veterinary Forensic Science Association and an Associate Member of the American Academy of Forensic Sciences.

I served as a Police Officer with the Jacksonville Sheriff's Office from 1977 to 1999, performing twenty-two years of active service. During my career, I served as a Patrolman, a Sergeant, and a Lieutenant. My duties as a Patrolman included patrol duties, emergency response, and investigations.

As a Sergeant, my duties involved day to day on-scene supervision of call response, major calls and investigations, allegations of misconduct, critical incident response and accountability, and investigating complaints regarding use of force by my officers. Some of these investigations did result in administering or recommending disciplinary action against officers for violating Departmental guidelines and proper procedures for said use of force.

As a Lieutenant, my immediate span of control as a Watch Commander ranged up to four (4) Sergeants and forty (40) officers, plus officers in training, at any one time. I served on the Firearms Review Board for the Jacksonville Sheriff's Office, the designated Board that determined whether a discharge of firearms case was justified and reasonable under legal requirements and Department guidelines. I have attached a CV to this report detailing my work experience.

As both a Sergeant and a Lieutenant, I was trained and designated as a Field Training Officer Supervisor and had day to day responsibility to oversee the training of new officers and new supervisors in Department procedures, job tasks, and supervisory issues including the use of force and investigating cases thereof. During my career, I have made many arrests and have had many occasions to make on-scene decisions as to what level of force would be necessary under the totality of the circumstances.

## MATERIAL REVIEWED:

In forming my opinions about this case, I have reviewed the documents, videos, photographs, deposition transcripts, and items listed in Appendix "A", which include pleadings, motions and discovery materials exchanged in:

1. Dempsey v. City Of Rochester, et al., 19-cv-6780 (EAW)(MWP)

# James W. Crosby M.S.

1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com

2. Gursslin v. City of Rochester, 20-cv-6508 (EAW)(MJP)
3. Anniszkiewicz v. City of Rochester, 20-cv-6629 (FPG)(MWP)
4. Cox v. City of Rochester, 22-cv-6207 (FPG)(MJP)
5. McGill v. City of Rochester, 22-cv-6523 (EAW)(MWP)
6. Barnes v. City of Rochester, 22-cv-6524 (EAW)(MWP)
7. Preston v. City of Rochester, 22-cv-6525 (EAW)(MWP)
8. Strong v. Perrone, 17-CV-6183 (FPG)

**SUMMARY OF INCIDENT:**

Sampson Anniszkiewicz was a healthy, spayed, vaccinated three-and-a-half-year old, companion Tibetan Mastiff/Chow mixed breed type of dog. Sampson was healthy and no significant health history is noted.

On June 10, 2018, Plaintiff Marianne Anniszkiewicz lived at 236 Belknap Street, Rochester, NY, with her three dogs: Sampson a Tibetan mastiff chow mix; "Angelina" or Angel, a brown pitt bull, and Sonny a black rottweiler mix. 236 Belknap Street was a corner property that was funny enclosed by a chain link fence, so the dogs could roam freely in the yard around the house, from the front to the back. Moreover, the chain link fence had an additional 12-inches of additional wire fencing installed on the top of the fence to prevent the dogs from jumping over the fence, and to warn visitors that there were dogs on the property.

On June 10, 2018, at approximately 11:00 a.m., Plaintiff Marianne Anniszkiewicz called 911 to report that her neighbor, Sharon Strickland, was attempting to strike a stray dog with her vehicle on Hollis Street. Animal Control responded and took away the stray dog.

Approximately an hour later, Rochester Police Department ("RPD") Officers Brian Cala and Jennifer Trenton responded to Ms. Anniszkiewicz's house at 236 Belknap Street, which is approximately one city block from the location on Hollis Street where she had informed the 911 operator that Ms. Strickland was attempting to hit the stray dog in the street. When they arrived, Officers Cala and Trenton parked their vehicle on Belknap Street in the front of Ms. Anniszkiewicz's house and immediately approached the front gate to her yard.

Cala and Trenton, accompanied by a civilian ride-along observer, arrived at the Anniszkiewicz home and entered the fenced residential yard by the front gate. When they approached, Sonny was present in the front yard lying under a bush.

When they approached the gate, Trenton apparently saw a Sonny lying under the bush, as she stated, "I don't know if this dog is deaf or not." Trenton then shook the gate for approximately one second, then immediately entered the yard with Cala and the ride along companion, without contacting Ms. Anniszkiewicz to secure the dog or taking any other precautions whatsoever.

# James W. Crosby M.S.

1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com

At the time, Ms. Anniszkiewicz was inside her home, but her niece, her neice's uncle, and her two grandchildren—ages seven (7) and four (4) years old—were present in her yard for recreation and the erection of an above-ground private pool.

Additionally, Ms. Anniszkiewicz three dogs were also in the fenced yard in the company of the human gathering. As stated above, one of those dogs, "Sonny", was located within the fenced front yard and was observed by the officers when they entered the yard. That notice is confirmed by Trenton's observation recorded on her Body Worn Camera record that "I don't know if this dog is deaf or what" since Sonny did not seem to take note of their presence. The other two dogs, Sampson and Angel, were in the back of the yard when the officers entered the front gate.

Cala and Trenton proceeded to walk through the gate and up the walking path to a side porch, which led to Ms. Anniszkiewicz's front door. Trenton entered onto the porch and approached the front door when she observed Sampson trotting from behind the house towards the porch and she stated, "there it is, there it is." Apparently, Trenton believed that Sampson was the stray dog that had already been picked up by animal control.

Sampson ascended the stairs onto the porch, walked past Trenton, and approached Cala. When Sampson first approached the officers, he was not barking, growling, snarling, lowering his head, hunching shoulders, or exhibiting any other signs that a reasonably trained officer could have interpreted as threatening or aggressive. The body worn camera video shows that Sampson was trotting and wagging his tail in a friendly manner.

Upon seeing Sampson, Cala unholstered his gun and pointed it at Sampson—even though Sampson was not growling or exhibiting any other signs that a reasonably trained officer could have interpreted as threatening or aggressive. Sampson paused and Cala yelled, "back the fuck up"; when Sampson barked in response, Cala fired one shot, striking Sampson in the head, killing him.

When Cala fired his weapon, Ms. Anniszkiewicz's two minor grandchildren, her niece, and her neice's uncle were all in the back of the home, downrange from the gunfire.

At the time of the incident, Cala had pepper spray and a baton on his person, but he testified that he did not consider either of these readily available less lethal options.

Prior to this incident, Cala had shot three other dogs while working as an RPD officer. However, Cala had never been disciplined or required to undergo any additional training as a result of these prior dog shooting incidents.

## OBSERVATIONS IN POLICY, TRAINING, AND SUPERVISION:

A. Training on interactions with dogs.

# James W. Crosby M.S.

1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com

Between 2014 and 2022, RPD officers have shot and killed at least 66 pet dogs. In some of those cases, using deadly force against the dog in question may have been objectively reasonable under the circumstances. Since officers' judgment is relied on to determine when it is necessary to shoot a dog, because they reasonably fear for their own safety or the safety of another person, and they regularly must make split-second, decisions in highly stressful situations, they need proper training to evaluate each dog encounter. Many dog shootings occur when officers mistake the behavior of a friendly, curious dog for aggression. In many of these cases, if the officers had been properly trained in animal behavior and nonlethal tactics, they instead may have been able to manage the perceived threats without causing harm to any of the dogs or humans involved.

The only training provided to RPD officers on interactions with dogs is a one and a half to two hour "awareness course"[1] designed by Reno DiDomenico—a former Monroe County Sheriff's Deputy who is now employed by the Humane Society of Greater Rochester—entitled Dog Bite Prevention for Law Enforcement.[2] DiDomenico developed the training in 2013 at the request of the Monroe County Sheriff's Office after the Second Circuit's decision in *Caroll v. County of Monroe*. The training was first given to the RPD at an in-service in November 2014. The training was added to the RPD's police academy in approximately 2017.

DiDomenico has no specialized training for conducting any kind of law enforcement training; is not certified by any organizations as a dog trainer; is not a certified animal behavior consultant; is not a certified applied animal behaviorist; is not a certified animal welfare administrator; and is not a member of any of the leading national dog training organizations like the Association of Professional Dog Trainers, the International Association of Canine Professionals, the Pet Professional Guild, the Animal Behavior Society, the International Veterinary Forensic Science Association, or a scientific organization specializing in forensic science like the American Academy of Forensic Scientists.

DiDomenico testified that officers are "usually trained to just shoot dogs", and that his training was not a "do not shoot the dog" training, or a "dog behavior" training, but instead a "police survival tactics" training.

Only about 40 minutes, or less than half of the training, is devoted to using nonlethal force against a dog. DiDomenico emphasizes that putting a barrier between the officer and the dog is the most effective option, but that they also talk about the use of batons, flashlights, poles, sticks, CapStun or Pepper Spray, and Tasers.

DiDomenico teaches officers that most of the time when a dog charges them, it is a "bluff charge" and not an attack, so the dog does not pose an imminent threat. However, he does not teach officers how to tell the difference between a "bluff charge" and an "attack", and he does not teach

---

[1] DiDomenico Tr. 33:21-34:3 ("[T]his was just an awareness course. This isn't – I'm not going to make anybody an expert in dog behavior."); 35:20-21 ("So basically it's an awareness course for officers."); 56:20-57:9.

[2] A condensed 10-15 minute version of this training was also provided to officers at roll call in 2019.

# James W. Crosby M.S.

1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com

officers to use non-lethal options if a dog is charging at them.

Thus, DiDomenico teaches officers that if they perceive that a dog is attacking them, then they can shoot the dog, which is what the department already trains them to do. This is despite the fact that officers are almost never seriously injured if they are bitten by a dog, no officer has been killed in the United States by a dog attack since 1932, and that a dog charging at them is "a nonemergency-type situation."

DiDomenico explained that when officers do shoot a dog, they must justify their actions, and that is why he added slides to his PowerPoint about qualified immunity and dog body postures.

Notably, none of the RPD officers who testified in these seven cases could remember specifics about DiDomenico's training—other than the dog body postures. (See e.g., Cala Tr. 71:17-94:20; Trenton Tr. 128:20-1293; Brock Tr. 9:13-12:21; Leach Tr. 42:25-43:6; Alexander Tr. 114:16-23, 146:13-24, 149:18-150:5, 152:8-153:15, 157:8-14; Horowitz Tr. 108:13-113:24; Romig Tr. 67:9-68:8). Generally, most officers could remember that nonlethal options were discussed, but they could not remember specifics about the nonlethal options that were taught. For example, in documents examined in this case, Officer Javier Algarin was a defendant in another pending case against the Rochester Police Department and provided a deposition in that case. Algarin, who took the class as part of his police academy training, remembered that the training discussed using a baton against a dog, but did not remember that the training included a discussion of using OC (Oleoresin capsicum or pepper spray) against a dog. (Algarin Tr. 85:17-86:14, 91:15-21) Between his academy training in 2017 and the date of the deposition in July 2022, Algarin testified that he had not received any additional training whatsoever on interactions with dogs. (Algarin Tr. 91:22-92:1).

Algarin testified that he did not remember any training about how to avoid shooting a dog. (Algarin Tr. 92:19-93:24) Algarin testified that he was taught that officers were permitted to shoot a dog if it posed an imminent threat of serious bodily injury or death to the officer, but that he was not taught that a dog running at him constituted an imminent threat, and that he was unaware of any RPD officer ever being seriously injured as a result of a dog attack. (86:24-88:7) Notably, other than the Humane Society training at the academy, Algarin testified that the only other training he received about interactions with dogs was in firearms training. (Algarin Tr. 90:8-91:4)

In the deposition transcript of Defendant Police Officer Brian Cala regarding the shooting of Sampson in this case, Officer Cala discussed his training on interacting with dogs and his decision-making process during the incident. Officer Cala could not recall specific academy or in-service training focused on non-lethal methods such as using pepper spray or a baton to manage aggressive dogs. He indicated that while he was aware of various options to handle potentially dangerous situations with dogs, including creating space, using physical barriers, or deploying pepper spray, these were not emphasized as mandatory steps before resorting to deadly force.

Regarding the incident with Sampson, Officer Cala testified that on the day of the shooting, he had non-lethal options available, including a baton and pepper spray. However, he did not

# James W. Crosby M.S.

1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com

consider using these less lethal options during the encounter with Sampson. His decision was influenced by his training and judgment at the moment, which led him to use his firearm without attempting non-lethal measures first. This testimony highlights a gap in the explicit training or protocols on engaging less lethal methods when dealing with dogs, relying instead on officers' discretion and assessment of the immediate threat. Officer Cala's responses suggest a reliance on subjective judgment in high-stress situations, without clear directives to prioritize non-lethal options when facing aggressive animals.

Most officers testified that the RPD should provide additional training on how to safely interact with dogs, such as a training simulator like the one offered by Virtra, which includes the Law Enforcement Dog Encounter Training simulation.[3] (See, e.g., Horowitz Tr. 120:4-9, 129:19-130:3; Cala Tr. 134:11-17; Algarin Tr. 175:22-176:8; Gorman 158:22-24; Leach Tr. 213:15-21; Clark Tr. 117:9-14).

In Rochester, the training provided was insufficient and fell below good or best accepted practices for law enforcement training on dog interactions.

Best practices are established by the US Department of Justice Community Oriented Policing Services (COPS) division, which, in August of 2011, issued a publication The Problem of Dog-Related Incidents and Encounters, a document that recommended best professional policing practices for officer encounters with pet dogs (Dempsey 1578-1629). This was issued over eight (8) years prior to the shooting of Sampson and was made available at no cost by the COPS Office to Law Enforcement agencies across the United States. The Rochester Police Department should have been expected to take advantage of this free material and thereby establish low-cost humane training for dog encounters.

In 2013, COPS also released a five-part video series, "Police and Dog Encounters", as an example of best practices in police dog encounters. That program was also widely known in police training circles and was available at no cost over six (6) years prior to the shooting of Sampson, yet the Rochester Police Department did not avail itself of this free training.

In 2015 and also available at no cost to law enforcement agencies was the training program "Dog Encounters: Keeping Officers Safe" sponsored and approved by the California Commission on POST. That program was also widely known in police training circles and was available at no cost over four (4) years prior to the shooting of Sampson, yet the Rochester Police Department did not avail itself of this free training.

The US Department of Justice Community Oriented Policing Services (COPS) Division also recognizes the training "Law Enforcement Dog Encounter Training" (LEDET)—authored by this

---

[3] See, **360° Video Inside VirTra's V-300 LE Simulator | Dog Encounter Training,** https://www.youtube.com/watch?v=xcOudK8HWwU; Paul Peluso, *Preparing for the Bark*, OFFICER.COM (Apr. 26, 2022), https://www.officer.com/training-careers/training-simulators/article/21260885/preparing-for-the-bark.

# James W. Crosby M.S.

1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com

expert—as embodying best practices and best training for Law Enforcement Officers of any level.
The LEDET training was published in 2019, the same year Sampson was shot, and is available
for free to law enforcement agencies; yet, again, the Rochester Police Department has not availed
itself of this free training since its publication.

DiDomenico acknowledged that the free training published by DOJ, and the related 5-part video
series (Dempsey 6479-6483), established best practices for training law enforcement officers
regarding dog encounters; however, he did not include any of the DOJ's materials as handouts
and did not show any of the videos at his trainings. (DiDomenico Tr. 36:14-25) RPD Commander
Fabian Rivera also acknowledged that the DOJ training established best practices nationally and in
New York State—particularly where, as here, there is no State-mandated training by the
Division of Criminal Justice Services or the Municipal Police Training Counsel. In fact, Rivera
testified that the DOJ establishes a baseline for the foundation of what training requires, and that
the RPD is not permitted to go below their standard. (Rivera Tr. 88:11-18, 191:7-24). Rivera
testified that in the absence of State mandated training, the DOJ training "would be a course that
… if offered, it should be taken." (Rivera Tr. 106:21-107:25). Nevertheless, the RPD never
offered the DOJ training to its officers. (Rivera Tr. 108:2-5).

RPD officers also do not have any scenario-based training where they must decide whether to use
a firearm or a less lethal weapon against a dog; don't have any "shoot / don't shoot" training
involving dogs; and the RPD does not utilize any simulation-based training involving dogs.
(Leach Tr. 41:3-12; Laureano Tr. 146:25-147:12; Rivera Tr. 188:23-189:17; Cala Tr. 133:21-
134:7; Springer Tr. 210:19-211:16) Moreover, differentiating between situations where it is
appropriate to shoot versus where officers should use less lethal force is not something that
DiDomenico emphasizes in the training he provides to RPD officers. (DiDomenico Tr. 226:19-
227:21)

As statistics from several major cities now demonstrate, when police officers are equipped with
such training, they are more likely to react in ways that preserve public safety without incurring
the significant emotional, physical, and financial costs associated with unnecessarily using deadly
force against dogs they encounter in the line of duty.

For example, in Buffalo, in 2014, in response to a similar epidemic of police shooting pet dogs,
the Buffalo Police Department implemented department-wide training on best practices for law
enforcement encounters with pet dogs. At this simple day-long in service training, the Buffalo
Police Department showed its officers the five short training videos regarding how to safely
interact with dogs while engaging in law enforcement activities, that were developed by the DOJ.
After the training, there was an immediate precipitous drop in the number of pet dogs shot by
police in Buffalo: the number of dogs shot by police dropped 62%—with 10 dogs shot in 2017,
down from 26 in 2013.[4] Notably, Buffalo implemented this training five (5) years prior to the

---

[4] Danny Spewak, *As training expands, BPD shooting fewer dogs*, WRGZ 2 NEWS (Nov. 14,
2017), https://www.wgrz.com/article/home/as-training-expands-bpd-shooting-fewer-dogs/71-
491804514.

# James W. Crosby M.S.

1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com

shooting of Sampson and the Rochester Police Department, as a professional organization, should have been expected to be aware of this training and its benefits, especially considering the fact that the BPD is the most analogous police department to the RPD.

Similarly, in Milwaukee, the number of dogs killed by police fell from 48 to 28 within just the first year of training officers to interpret dogs' behavior and use less-lethal force.[5] Notably, the City of Chicago achieved a 67% drop in the number of police officers shooting at dogs after it finally instituted comprehensive animal encounter training along with updated policies and procedures— falling from 73 incidents in 2014 to 24 in 2017.[6]

After Texas passed statewide legislation in 2015 requiring officers to have 4 hours of animal encounter training, the number of dogs shot by police in that state fell from 281 in 2014 to 32 in 2018—a drop of over 90%.[7]

The Los Angeles Police Department, a leader in advancing police methodology and contemporary police practices, recognized in 2009 that proper training and procedures for officer encounters with pet dogs was essential for the safety of its officers and the protection of pets from excessive force. They issued Directive 7 (Dempsey 1684-1686), instructing their officers on proper use of less- and non-lethal force options with pets. This occurred ten (10) years prior to the shooting of Sampson and the Rochester Police Department, as a professional organization, should have been expected to be aware of such policy from a leading department in the field.  Other police departments have followed suit, including the Austin Police Department (Policy 202, see Dempsey 1687); the Baltimore Police Department (Policy 1115, see Dempsey 1688); the Chicago Police Department (Policy G03-02, see Dempsey 1688); the Las Vegas Metropolitan Police Department (Policy 6/002.00, see Dempsey 1689-90); and the Denver Sheriff's Department (Policy 5011, see Dempsey 1690); among others.  Many states require similar policies of their police departments.

The International Association of Chiefs of Police (IACP) is a well-recognized and well-respected organization that recommends best practices for Law Enforcement agencies. The IACP provides general and specific guidance for Police Departments regarding important legal and procedural

---

[5] Dinesh Ramde, *Milwaukee Police No Longer Shooting as Many Dogs, Thanks in Part to Training*, ST. PAUL PIONEER PRESS (June 14, 2014), https://www.twincities.com/2014/06/14/milwaukee-police-no-longer-shooting-as-many-dogs-thanks-in-part-to-training/.

[6] Dawn Turner Trice & Jeremy Gorner, *Are police too quick on the draw against dogs?*, CHICAGO TRIB. (Aug. 6, 2013), https://www.chicagotribune.com/news/ct-xpm-2013-08-06-ct-met-cops-shooting-dogs-20130806-story.html. One Chicago police officer candidly credited the new training and scrutiny for the dramatic drop in the number of dogs shot in 2017, stating, "In the past, you saw a dog, you shot it. Now, there is a thought process." *Id.*

[7] Resolution 103A, Report of the Tort Trial and Insurance Practice Section, American Bar Association at 11 (Feb. 17, 2020), https://www.americanbar.org/content/dam/aba/directories/policy/midyear-2020/2020-midyear-103a.pdf

# James W. Crosby M.S.

1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com

issues. (See Dempsey 1654).

The International Association of Chiefs of Police (IACP) has published a Model Policy on canine encounters. In their Model Policy, the IACP puts forth procedures for force escalation as it applies specifically for canines.  It states in part:

> *"C.  Force Mitigation*
>
> *…*
>
> *If the foregoing does not appear effective, officers should do the following:*
>
> *Say "Stop" in a deep, low, and loud voice.*
>
> *If the canine continues to move aggressively, use OC spray to the eyes and mouth.  OC spray is extremely effective for stopping and stunning canines.*
>
> *Use electronic control weapons fired horizontally and at a distance of less than 10 feet, to ensure the best chances of making contact with the canine's body mass.*
>
> *If the canine comes within arm's reach, present a target, such as a baton, night stick, or flashlight held sideways, and allow the canine to bite on it while moving away.*
>
> *Provide distractions such as food, which may also help by providing time to move away from the canine to a safe location.*
>
> *Utilize commonly available items, such as clipboards, to block or redirect an attack.*
>
> *Consider the use of any position, location, or physical object that creates a barrier between the officers and the canine.*
>
> *Take advantage of the patrol vehicle's fire extinguisher to effectively repel an aggressive canine."*

# James W. Crosby M.S.

1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com

Peer reviewed literature and training provides that dog teeth should not be considered as weapons. <u>The Problem of Dog-Related Incidents and Encounters</u>, published by the Community Oriented Policy Services U.S. Department of Justice, states, on page 27:

> *"Officers should understand that no single dog presents a plausible risk of fatality to an able-bodied adult accompanied by other humans. In fact, only a very few dogs of the very largest types can match the force potential of even an unarmed human. A dog's teeth can only be characterized as "weapons" in the sense that human fists can be so characterized."*

<u>The Problem of Dog-Related Incidents and Encounters</u> also states that even when a dog bites, the "overwhelming majority of dog bites are minor, causing either no injury at all or injuries so minor that no medical care is required." (p. 3.) This opinion is supported by many sources and peer-reviewed studies across the United States and other countries.

It is widely recognized within the Police profession, and clearly and widely accepted as proper contemporary police practices, that deadly force should be a **last resort** for multiple reasons, not the least of which is that every time a firearm is discharged, unintended injury or death may result.

As statistics from several major cities now demonstrate, when police officers are equipped with such training, they are more likely to react in ways that preserve public safety without incurring the significant emotional, physical, and financial costs associated with unnecessarily using deadly force against dogs they encounter in the line of duty.

> *The Los Angeles Police Department, a leader in advancing police methodology and contemporary police practices, recognized in 2009 that proper training and procedures for officer encounters with pet dogs was essential for the safety of its officers and the protection of pets from excessive force. They issued Directive 7 (Dempsey 1684-1686), instructing their officers on proper use of less- and non-lethal force options with pets. This occurred ten (10) years prior to the shooting of Sampson, and the Rochester Police Department, as a professional organization, should have been expected to be aware of such policy from a leading department in the field. Other police departments have followed suit, including the Austin Police Department (Policy 202, see Dempsey 1687); the Baltimore Police Department (Policy 1115, see Dempsey 1688); the Chicago Police Department (Policy G03-02, see Dempsey 1688); the Las Vegas Metropolitan Police Department (Policy 6/002.00, see Dempsey 1689-90); and the*

12

# James W. Crosby M.S.

1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com

*Denver Sheriff's Department (Policy 5011, see Dempsey 1690); among others. Many states require similar policies of their police departments.*

*The US Department of Justice Community Oriented Policing Services (COPS) division issued, in August of 2011, a publication* The Problem of Dog-Related Incidents and Encounters*, a document that recommended best professional policing practices for officer encounters with pet dogs (Dempsey 1578-1629). This was issued over* eight (8) *years prior to the shooting of Sampson and was made available at no cost by the COPS Office to Law Enforcement agencies across the United States. The Rochester Police Department should have been expected to take advantage of this free material and thereby establish low-cost humane training for dog encounters.*

*The International Association of Chiefs of Police (IACP) is a well-recognized and well-respected organization that recommends best practices for Law Enforcement agencies. The IACP provides general and specific guidance for Police Departments regarding important legal and procedural issues. (See Dempsey 1654).*

## EFFECTIVENESS OF LESS- AND NON-LETHAL TOOLS

Oleoresin capsicum (OC or "pepper spray") spray is a highly effective tool to use on dogs. The Baltimore Police Department conducted a study wherein OC spray was used in 20 incidents where dogs posed a danger to officers, including large dogs that weighed more than 50 lbs. OC spray was effective nearly 100% of the time, and no officers using this method were injured. (The Problem of Dog-Related Incidents and Encounters, p. 29. Yet, despite the recognized effectiveness of O.C. spray, Cala never attempted to use that or any other less- or non-lethal strategy in his encounter with Sampson.

Use of a baton, either collapsible or rigid, is also widely recognized as an effective less-lethal tool for ensuring officer safety from an approaching dog. Although they may be used in extremis as impact weapons, in dog encounters they are better and more reasonably used to maintain safe space between an officer and a dog.

## SUMMARY OF OPINIONS:

The opinions that I render in this matter are based on my professional experience, training, education and personal observations, and my application of those items to my review of the

# James W. Crosby M.S.

1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com

materials from this case.

1) In the case at hand, Cala and Trenton were responding to a 911 call regarding a stray dog. However, they were not informed that animal control had responded and seized the stray dog before they arrived at Ms. Anniszkiewicz's home. They also did not make any attempt to locate the stray dog on Hollis Street when they arrived at Ms. Anniszkiewicz's home. Cala and Trenton failed to devise any plan whatsoever to deal with any stray dogs they might encounter when they arrived at Ms. Anniszkiewicz property—and they failed to make any plan to deal with any other dogs they might encounter. Good and accepted best practices require that when responding to a 911 call about a stray dog (or other call involving a dog)—where the officers know they will likely encounter a dog—the officers must devise a non-lethal plan for dealing with a dog they might encounter. Many jurisdictions have equipped officers with catch poles that they must keep in their police vehicles for calls involving dogs; however, the Rochester Police Department does not train its officers on the use of catch poles (other than members of the SWAT team). Here, Cala and Trenton failed to devise any non-lethal plan for dealing with any stray dog or other dog they might encounter when responding to Ms. Anniszkiewicz's property. This was, based on my training, experience, education, and numerous personal responses to 911 calls involving stray dogs, as both a police officer and as an animal control officer, reckless and in direct contravention to accepted best practices for police officers.

2) In the case at hand, according to the statements of Cala and Trenton, they entered the Anniszkiewicz yard to address the call regarding the alleged criminal assault with a vehicle of Ms. Anniszkiewicz by a neighbor, and the related attempt of the neighbor to criminally cause harm to a dog not belonging to Ms. Anniszkiewicz. Cala and Trenton were unaware that the stray had been retrieved by Animal Control. On entering the yard they did observe the dog Sonny, apparently asleep under a bush, and noted (see Trenton Body Worn Camera record) that the dog was possibly deaf due to apparent unresponsiveness.

3) Despite acknowledging the presence of at least one pet dog at large within the property, Cala and Trenton took no steps to prepare for contact with any dog, perhaps more responsive or reactive than Sonny. To wit,  they failed to use proper care to ensure they could respond if there were other dog(s) by preparing for the deployment of available and immediately accessible less- or non-lethal force options. Proper care measures would have included, but not be limited to: holding a collapsible baton in their non-gun hands; placing a canister of Oleoresin Capsicum spray in their non-gun hand for quick deployment: or preparing other options for less-lethal disengagement means should another dog appear. This was, based on my training, experience, education, and numerous

14

# James W. Crosby M.S.

1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com

personal encounters with unfamiliar dogs in my careers as both a police officer and as an animal control officer, reckless and in direct contravention to accepted best practices for police officers.

4) There was no exigent need for Cala and Trenton to immediately enter the Anniszkiewicz yard. A number of adults and children were outside and easily accessible from without the chain linked fence. There were numerous objective facts that should have alerted Cala and Trenton to the presence or possible presence of dogs in the yard. First, they noted Sonny's presence before entering the yard. Second, the additional 12-inches of wire fencing on top of the four-foot chain linked fence is a clear indication that dogs resided at the property. Third, the fact that the property was a corner lot that was completely enclosed by chain linked fencing was an indication that that dogs resided at the property, and that the dogs could freely roam from the yard in the back of the house to the yard in the front of the house. Thus, even if they had not noticed Sonny, best and safe practices should have been to withdraw and try to gain the attention of the homeowner or other people outside before entering the yard. If that was not successful it would have been cautious and proper to have the dispatch center call Ms. Anniszkiewicz back and ask her to come out front, as they had done on prior occasions when Ms. Anniszkiewicz called 911. Taking those simple precautionary steps would have, in my opinion, eliminated the necessity for contact with Sampson or the other dog present Angel. That would have further eliminated any chance of frightening or "spooking" the dog Sonny who was known to be nearby, loose, in the yard. Failure to do so was reckless, improper, and led directly to the needless death of the dog Sampson.

5) Due to the reckless and needless entry of Cala and Trenton into the Anniszkiewicz yard, it is clear that RPD did not appropriately train its officers on how to appropriately assess whether there might possibly be dogs present in a residential yard, or what precautions to take when there are objective indications that there might be a dog present in a residential yard prior to entering in non emergency situations. For example, the body worn camera recordings demonstrate that when Cala and Trenton initially approached the front gate, Trenton perfunctorily "shook" the front gate, but did not do so in a manner that would have been loud enough for any dogs that were not present in the immediate vicinity to hear. The body worn camera footage shows that instead of waiting any period of time to see if any dogs responded to the shaking of the fence, Trenton immediately opened the gate, entered the yard, and proceeded to walk up the path towards the side porch and front door of the house. Trenton and Cala took no other precautions before entering the gate, like providing verbal warnings that they were going to enter the yard. Failure to do so was reckless, improper, and led directly to the needless death of the dog Sampson.

15

# James W. Crosby M.S.

1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com

6) Due to the reckless and needless entry of Cala and Trenton into the Anniszkiewicz yard, it is clear that RPD did not appropriately train its officers on the criteria for rendering a determination as to when an exigency existed that would justify the entry into a private residential yard. From the standpoint of any reasonable officer, the fact that Ms. Anniszkiewicz was indeed the victim of a reported criminal assault did not serve as an exigent circumstance that would validate an Officer's decision to enter a private yard wherein they could see a loose dog of unknown temperament, and thereby inviting all the risks that come from entry into a strange private residential yard in such a manner.

7) Due to the reckless and needless entry of Cala and Trenton into the Anniszkiewicz yard, it is clear that RPD did not appropriately train its officers on the criteria for rendering a determination as to when they have an implied license to enter a private residential property. Here, the totality of the circumstances demonstrated that Ms. Anniszkiewicz had not provided them with implied license to enter the property. While Ms. Anniszkiewicz had called 911, she had done so more than an hour before Cala and Trenton arrived at her home, and animal control had already arrived and seized the stray dog. Moreover, the objective features of Ms. Anniszkiewicz's property indicated that dogs resided there, and that members of the general public were not invited to enter the fenced in gate and approach her front door. Indeed, Ms. Anniszkiewicz testified that on prior occasions when she had called 911, officers never entered her fenced in yard, but instead had dispatch call her to exit her yard and meet them outside the gate.

8) It is my professional opinion that the continued entry into the private and fenced yard, especially once an unfamiliar pet dog was noted, was needless, incautious, and likely to allow or even encourage an unexpected encounter with that or another dog. Yet Cala and Trenton failed to recognize or act on this clear information. Instead they pursued an entry that they should have known was likely to provoke an encounter.

9) Cala and Trenton had no plan for the use of less-lethal or non-lethal force regarding encountering Sampson, or indeed any dog, in this incident. That included failing to plan for any eventuality that might occur if the observed dog Sonny changed his demeanor. Cala and Trenton callously and recklessly failed to prepare even a small amount for any encounter that they were likely to provoke.

10) Further, Cala and Trenton were unaware that animal control had responded and seized the stray dog. This was another reason that they should have been cautious and devised a plan for the use of less-lethal or non-lethal force prior to entering Ms. Anniszkiewicz's yard.

16

# James W. Crosby M.S.

1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com

11) Additionally, Cala and Trenton had young woman with them who was a civilian ride-along. Thus, knowing that they were responding to a call regarding an unknown stray dog, and a violent neighbor who had attempted to hit Ms. Anniszkiewicz and the stray dog with her car, should have indicated to Cala and Trenton that they needed to take extra precautions to protect the young woman who was the civilian ride-along from the known possibility of a potentially dangerous, volatile and/or violent encounter with the stray dog or the neighbor. Instead of taking extra precautions, Cala and Trenton took no precautions whatsoever.

12) When Sampson exited the back yard of the home onto the porch, he walked past Trenton, and was within just several feet of her. Yet Sampson did not engage, threaten, contact, or otherwise come into conflict with Trenton. In fact, during the entire encounter Sampson never threatened or caused Trenton to fire or use deadly force. This should have been an indication to Cala that Sampson was not, in any way, a valid threat of injury or death. As such, Sampson did not, in my professional opinion, present behavior that a well-trained and reasonable officer would have seen as justifying or requiring the deployment of deadly force.

13) Trenton's behavior of backing up to the front door and not firing her weapon indicates that she did exercise more appropriate restraint and did not panic and shoot the dog Sampson.

14) Defendant Cala opened fire on sight of Sampson after a single command of "Back the fuck up" while Sampson was still on and within the confines of his and Ms. Anniszkiewicz's porch, rather than attempting, even momentarily, an alternative control measure, such as using his baton or pepper spray. "Back the fuck up" is not a recognized or commonly accepted obedience or control command that a normal pet would understand. Instead, commands such as "sit", "stay", or simply "no!" would have been proper and more likely to be understood.

15) The body worn camera video and Cala's testimony about the dog suggests he shot Sampson out of surprise and fear as opposed to making any kind of proper determination that the dog posed an actual threat to him. Without the establishment of a credible and immediate threat, there was no justification for Cala to fire his sidearm.

16) Cala fired without regard for any potential collateral risk to person(s) that might have been behind Sampson or within the home. Defendant Cala never checked for other occupants in the home, nor did he contact the Plaintiffs to ascertain whether there were other animals or persons within the home lawfully. Cala fired his sidearm in Ms. Anniszkiewicz's front yard, and the occupants of the

# James W. Crosby M.S.

1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com

home (Ms. Anniszkiewicz), porch (Trenton) and back yard (Ms. Anniszkiewicz's two grandchildren, her niece, and her niece's uncle) were all downrange from his shot. In my professional opinion an experienced Police Officer such as Cala should have recognized that a distinct possibility existed that a human or other animal subject could have been within the home or yard and were also visible in close proximity, and thereby were needlessly and recklessly exposed to injury or death from one or more of the bullets fired. Cala was therefore in my opinion, reckless in discharging his firearm at a dog while callously disregarding the safety and well-being of the other present, including his Sergeant.

17) In my professional opinion, the use of immediate deadly force against the dog Sampson was needless and reckless as seen from the standpoint of any reasonable police officer. The deployment of deadly force was contrary to what any reasonable, well-trained officer would or should do in such a circumstance, and was in conflict with recognized professional practices and statutes that require a clear and valid threat before the implementation of deadly force.

18) Despite recognized, nationally respected professional policing organizations that have produced training materials to establish awareness of the need for proper handling of officer-canine encounters and the duty to protect the property rights of companion animal owners, the Rochester Police Department and in particular Defendant Cala, has failed to recognize contemporary police practices and has instead used deadly force against a companion animal despite the presence of effective less-lethal and non-lethal means. Best professional policing practices are established by the US Department of Justice Community Oriented Policing Services (COPS) division, which, in August of 2011, issued a publication The Problem of Dog-Related Incidents and Encounters, a document that recommended best professional policing practices for officer encounters with pet dogs (Dempsey 1578-1629). This was issued over eight (8) years prior to the shooting of Sampson and was made available at no cost by the COPS Office to Law Enforcement agencies across the United States. The Rochester Police Department should have been expected to take advantage of this free material and thereby establish low-cost humane training for dog encounters.

19) The US Department of Justice Community Oriented Policing Services (COPS) Division did, prior to the time of this incident, recognize "Police and Dog Encounters", released in 2013, as being an example of best practices in police dog encounters. That program was also widely known in police training circles and was available at no cost. The RPD did not avail itself of this information and training, which was a deficient act not in accord with police best practices. The Rochester Police Department should have been expected to take advantage

18

# James W. Crosby M.S.

1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com

of this free material and thereby establish low-cost humane training for dog encounters.

20) Released in 2015 and available at no cost was the training program "Dog Encounters: Keeping Officers Safe" sponsored and approved by the California Commission on POST. The RPD likewise did not avail itself of this information and training, which was a deficient act not in accord with police best practices. The Rochester Police Department should have been expected to take advantage of this free material and thereby establish low-cost humane training for dog encounters.

21) The Rochester Police Department did not take advantage of any of these examples of best police practices on police dog encounters despite them being no-cost and easily available to train RPD officers. The fact that the Buffalo Police Department availed itself of the DOJ training in 2014, five (5) years before Cala shot Sampson, and saw an immediate precipitous drop in the number of dogs shot by police, demonstrates that the Rochester Police Department could and should have availed itself of the same or similar training.

22) In my professional opinion, this evidences an abrogation of the RPD's responsibility to provide safe and effective services to their citizens. It is suggested that such abrogation was a factor in Cala shooting/killing Sampson. Certainly, in this instance, his objectively unreasonable and dangerous conduct was what directly led to the death of, from all accounts, a very beloved and friendly companion animal, aka Sampson.

23) The Rochester Police Department still fails to adequately train, supervise and discipline its officers regarding how to safely and lawfully interact with dogs on residential properties. The training provided by Reno DiDomenico through the Humane Society falls short of good and accepted best practices. First, the training is only 1 ½ to 2 hours long; best practices require at least a four-hour training. Second, the training does not emphasize how to safely interact with dogs, for example, by using less lethal tools such as OC spray, beanbag guns, batons, etc. At a minimum, the RPD should have provided its officers with the same training that the Buffalo Police Department provided to its officers in 2014—the free training published by the U.S. Department of Justice, through its Community Oriented Policing Services (COPS) Learning Portal, The Problem of Dog-Related Incidents and Encounters, and the five-part video series, along with the other available programs listed above and other trainings that may have since been developed.

24) In my professional opinion, the Rochester Police Department's failure to adequately train its officers regarding how to safely interact with dogs was a proximate cause of Cala shooting and killing Sampson.

# James W. Crosby M.S.

1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com

**OTHER DOCUMENTS AND PUBLICATIONS CONSULTED DURING THIS CASE:**

1. Beaver, B. et al, AVMA Task Force on Canine Aggression and Human-Canine Interactions. A community approach to dog bite prevention. JAVMA 2001; 218: 1732-1749.
2. Pets Advisor Special Report "Gunned Down: Why Are So Many Dogs Being Shot By Police", petadvisor.com, May 2013
3. Maddox, Gary P. PhD "Officer Safety Corner: Dogs and the Police Response: A Guide for Safe, Successful, and Humane Encounters", Police Chief Magazine, July 2014.
4. Bathhurst, Cynthia et al, The Problem of Dog Related Incidents and Encounters, US Department of Justice Publication, Community Oriented Policing Services, 2011
5. Los Angeles Police Department Use of Force Tactics Directive, Directive Number 7, "Dog Encounters" July, 2009
6. International Association of Chiefs of Police "IACP Model Policy, Law Enforcement Interactions with Canines", IACP Policy Center, 2015.
7. Haag, Lucien, Shooting Incident Reconstruction, Library of Congress Cataloging-in-Publication Data, 2006.

COMPENSATION
In this case, I have applied the following fee structure. That is:

Fatal dog bite investigations, bite consultation, use of force review: cases are billed as follows:

Initial investigation, review of facts, consultations, and all other duties through the issuance of a final incident/investigation report except for travel and lodging if needed, is at a flat rate of $3000.00, to be paid at a rate of $1500.00 at acceptance of the case and $1500.00 at case conclusion.

Deposition testimony is billed at $200.00 per hour, three (3) hour minimum payment regardless of time actually in deposition less than three (3) hours. Further hours are billed at $200.00 per hour or part thereof. Payment for deposition by opposing counsel is expected at the time of the deposition, or payable in full no more than thirty (30) days after the conclusion of the deposition.

Travel time is billed as travel expense plus the hourly rate for airline listed flight time.

**LIST OF PUBLICATIONS AUTHORED BY Dr. JAMES W. CROSBY**

Canine Aggression Blog-online at canineaggression.blogspot.com

Public Service announcements broadcast on WKGC Radio, Panama City, Florida, as part of a

# James W. Crosby M.S.

1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com

recurring program giving pet advice from 2008 through 2009.

"The Specific Use of Evidence in the Investigation of Dog Bite Related Human Fatalities", (2016) submitted in partial fulfillment of the Degree of Master of Science to the University of Florida.

Chapters "Investigating Serious and Fatal Dog Attacks" and "Bite Mark Analysis and Interpretation" for the book Dog Aggression, (2017) edited by Mills and Westgarth, 5M Publishing, Benchmark House, Sheffield, England

"Review of the Literature: Law Enforcement Use of Deadly Force Against Domestic Dogs" (2018), United States Department of Justice Publications, Office of Community Oriented Policing Services (in print).

"Law Enforcement Dog Encounter Training", 2018, National Law Enforcement Center on Animal Abuse/National Sheriffs' Association/United States Department of Justice, Office of Community Oriented Policing Services.

"Dangerous Dog Investigations", in Humane Animal Control: Effective Enforcement, Shelter Management, Local Government Support and Community Engagement, (2018) Best Friends Animal Society, Kanab, Utah

Dog Bite Related Human Fatalities: A Scientific Study (2023), published by ProQuest Publishing, Ann Arbor, MI.

## PREVIOUS EXPERT TESTIMONY

Court cases Dr. James W. Crosby has testified in or provided expert opinion over the past 4 years are all contained and listed in Dr. Crosby's full CV.

I explicitly reserve the right and ability to amend, modify, or expand this opinion based on the introduction of additional evidence or items not in my possession. I also reserve the right to research and examine other materials not listed above to assist in establishing further opinions as such may become known or necessary.

Respectfully submitted,

James W. Crosby, CBCC-KA, Consultant

# James W. Crosby M.S.

1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com

### APPENDIX A: MATERIALS REVIEWED

1. The following deposition transcripts:

   a. Anniszkiewicz - Corey Clark transcript.pdf

   b. Anniszkiewicz v City of Rochester et al - Officer Brian Cala_full_ex.pdf

   c. Anniszkiewicz v City of Rochester et al - Sergeant Jennifer Trenton_full_ex.pdf

   d. Barnes - Celentano transcript 704512-001.pdf

   e. Cox - Brock transcript 714669-001[33].pdf

   f. Cox - Caruso transcript (cox) 711632-001.pdf

   g. COX - Paszko 10-5-23 Job 717065[42].pdf

   h. Cox - Vanbrederode deposition 701583-001.pdf

   i. Cox v City of Rochester et al - Officer Kenneth A Pinckney_full_ex.pdf

   j. Dempsey - 30b6 Lt Michael Cuilla- hardcopy-25954.pdf

   k. Dempsey - PO Adam Gorman-23806.pdf

   l. Dempsey - Rudolph Transcript 677795-001[83].pdf

   m. Dempsey v City of Rochester et al - Officer Jason Horowitz_Full_ex.pdf

   n. Dempsey v City of Rochester et al - Officer Javier Algarin_full_ex.pdf

   o. Di Domenico transcript.pdf

   p. Gursslin - Nigrelli transcript 162516 11-1 SP).pdf

   q. Gursslin v City of Rochester et al - Chief Fabian Rivera_full_ex.pdf

   r. Gursslin v City of Rochester et al - Deputy Chief Aaron Springer_Full_ex.pdf

   s. Gursslin v City of Rochester et al - Officer Herbert McClellan_full_ex.pdf

   t. Gursslin v City of Rochester et al - Officer Jeremy Nellist_Full_ex.pdf

   u. Gursslin v City of Rochester et al - Officer Jonathan Kent_full_ex.pdf

# James W. Crosby M.S.

1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com

    v.   Gursslin v City of Rochester et al - Officer Jonathan P Laureano_Full_ex.pdf

    w.   Gursslin v City of Rochester et al - Sergeant Eric Alexander_full_ex.pdf

    x.   Gursslin v City of Rochester et al - Sergeant Joshua Paul Kelly_Full_ex.pdf

    y.   Gursslin v City of Rochester et al - Sergeant Ryan J Romig_full_ex.pdf

    z.   Preston -  Mitchell Leach ebt trancript-25872.pdf

    aa. Strong - Joseph Perrone Deposition Testimony.pdf

    bb. Cabisca v City of Rochester et al - Jason Prinzi

    cc. Plaintiff Charles Dempsey

    dd. Plaintiff Leona Dempsey

9.   Documents Produced by the Plaintiff in Dempsey:

    a.   Dempsey 1369 to 1530 (Gursslin 481 to 642).pdf

    b.   Dempsey 1531 to 1826 (policies etc).pdf

    c.   Dempsey 1827 to 1900 (50 h transcript).pdf

    d.   Dempsey 1901 to 1915 (reciepts).pdf

    e.   Dempsey 1916 to 1918 (Riverside Vet).pdf

    f.   Dempsey 1919 (FB post).pdf

    g.   Dempsey 1920-2386 (FDRs 2015 to 2022).pdf

    h.   Dempsey 2387-2440 (Perrone transcript).pdf

    i.   Dempsey 2441-2499 (LeePolice-PetsArticle-FINAL).pdf

    j.   Dempsey 2500-2502 (SH14_05_Blaney_Officer involved Shooting with Dogs).pdf

    k.   Dempsey 2503-2538 (Canine Encounters August 2021 (Texas instructor

# James W. Crosby M.S.

1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com

guide)).pdf

l.   Dempsey 2539-2559 (gunned-down-report-new).pdf

m.  Dempsey 2560-2563 (Dog census helps track population, safety).pdf

n.   Dempsey 6378 - 6478 (More Monell documents).pdf

o.   Dempsey 6484 (Buffalo Subpoena response dogshootings).pdf

p.   Dempsey 6479 (An Overview Assessing the Situation)

q.   Dempsey 6480 (Communicating with Dogs and Police and Dog Body Language)

r.   Dempsey 6481 (Legal Considerations and Liability, Reporting and Documentation)

s.   Dempsey 6482 (Tactical Considerations)

t.   Dempsey 6483 (Use of Force Considerations)

u.   6522 - 6596 (DEMPSEY) M26 Animal Certification.pdf

v.   6597 - 6781 (DEMPSEY) M26 User V18.ppt

w.  6782-7015 (DEMPSEY) X2 User V19.ppt

x.   7016 - 7237 (DEMPSEY) X2 User Course V20.ppt

y.   7238 - 7394 (DEMPSEY) X26P User Course v21.pptx

z.   7395-7551 (DEMPSEY) X26 User Course_Embedded Videos Version v22.pptx

aa. 7552 - 7887 (DEMPSEY) V23 - TASER Energy Weapon Instructor - All Weapons.pptx


10. Documents produced by the City in Dempsey:

a.   COR 1-58

b.   COR 109 - COR000243 (Dog IRs Aug 2016-Feb 2021 (Dempsey # 31 and 35)) Redacted.pdf

24

# James W. Crosby M.S.

1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com

c.  COR 000244 - COR000580 (Person shot when shooting at dog - PSS 2016-0974 (Dempsey # 36 and 37) CONFIDENTIAL.pdf

d.  COR 000581 - COR00753 (Complaints and NOCs (Dempsey #40 and 41).pdf

e.  COR 000754 - COR000822 (Bites by dogs (Dempsey #42) CONFIDENTIAL).pdf

f.  COR 000823 - COR000976 (Search policies (Dempsey #49)).pdf

g.  COR 000977 – COR 001168 (PDS files Gorman and Algarin (Dempsey #50)).pdf

h.  COR 001169 – COR 001243 (Search policies 2 (Dempsey #51, 53, 58)).pdf

i.  COR 001244 - COR001267 (Dog bite prevention training (Dempsey #55-59 and 62)).pdf

j.  COR 001268 - (Licensed Dogs in the City of Rochester (Dempsey #39, 60 and 61)).pdf

k.  COR 1268-1291 (48 - Dog IRs Aug 2021-May 2022).pdf

l.

m.  COR 2943-2985 (21-153129 photos)

n.  COR 2986 – 3039 (21-167110 photos)

o.  COR 3040 – 3111 (21-182525 photos)

p.  COR 3112-3114 (22-088233 photos)

q.  COR 3115 - 3128 (2 - CR 21-1531299 - CONFIDENTIAL).pdf

r.  COR 3129 - 3131 (6 - Perrone IR).pdf

s.  COR 3132 - 3141 (2nd RFP #7 - Cala IRs) CONFIDENTIAL.pdf

t.  COR 3132 - 3141 (7 - Cala IRs).pdf

u.  COR 3142 - 3145 (11 - Laureano).pdf

v.  COR 3146-3148 (12 - Leach (IR 20-032660).pdf

w.  COR 3149 - 3175 (14 - GOs).pdf

# James W. Crosby M.S.

1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com

    x.   COR 3176-3179 (Calls for Service 2016 to 2020).pdf

    y.   COR DEM 3384 -3410 – Gos

    z.   COR DEM 3411 - 3414 - Calls for Service 2016 to 2020

    aa. COR DEM 3411 - 3420 Supporting Depos

    bb. COR DEM 3421 - 3424 - Calls for Service 2016 to 2020

    cc. COR DEM 3425 - 3427 - Section 33 re Inservice

    dd. COR DEM 3524 - 3528 -  Debour + GO Discipline

    ee. COR DEM 3529 - 3534  - Taser training re dogs

    ff.  COR DEM 3535 - 3538 - Tesla Emergency Vet Records

    gg. COR DEM 3539 - 3689 Incident Reports (Reviewed By) – CONFIDENTIAL

11. Body Worn Camera Recordings of various incidents produced by the City in Dempsey:

    a.   17-118125

    b.   17-231172

    c.   18-1330 CR2018-00308639

    d.   18-1354 CR2018-00312631

    e.   18-053628

    f.   18-090117 bwc

    g.   18-136420

    h.   18-146235

    i.   18-175296

    j.   18-175299

    k.   18-182525

# James W. Crosby M.S.

1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com

l.   18-308639

m.  19-0802 CR2019-00178495

n.   19-0864 CR2019-00189267

o.   19-1162 CR2019-00258580

p.   19-1354 CR2019-00297233

q.   19-015118

r.   19-112122

s.   19-178373 and 19-178495

t.   19-00258580

u.   19-297233

v.   20-018706

w.  20-023354 bwc (Barnes)

x.   20-025684

y.   20-032660 bwc (Preston)

z.   20-082217 (Celentano other incident)

aa. 20-082740 (domestic)

bb. 20-183239

cc. 20-269976

dd. 21-00025684

ee. 21-153129

ff.  21-153129 and 21-273883 (dog jumped out window)

gg. 21-167110 (McGill)

hh. 21-171271

ii.  21-182525

# James W. Crosby M.S.

1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com

jj.  21-182525

kk. 21-189988

ll.  22-088233 2019-00112122

mm.      RPD BWC FOIL RR19-05553 2


12. Documents produced by the Plaintiff in Gursslin:

a.  Gursslin - 1-379.pdf

b.  Gursslin - 380-737.pdf

c.  Gursslin - 738-824 042616 Cabisca v City of Rochester et al - Jason Prinzi_full.pdf


13. Documents produced by the City in Gursslin:

a.  COR 1-3 (1747 St. Paul IR).pdf

b.  COR 4-27 (SWAT Plan) [12-14-22][49]

c.  COR 28-32 (Tech Docs).pdf

d.  COR 33-43 (Photos).pdf

e.  COR 44-92 (Entry-Search Policies).pdf

f.  COR 93-108 (GO 340).pdf

g.  COR 109-112 (SWAT HRSW 1771 St Paul AAR)[97]

h.  COR 113-117 (ECD Job Card)

i.  48 - More IRs (COR 1268-1291).pdf

j.  55, 58 Trespass + Unlawful Entry Claims COR 188-254 + CONFIDENTIAL.pdf

k.  57 Strong v Perrone File - COR 118-177.pdf

# James W. Crosby M.S.

1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com

l.   72 SWAT Training - COR 178-187.pdf

m.   2 - CR 21-273883  (Gursslin COR 1268-1291) - CONFIDENTIAL.pdf

n.   2 - CR 21-1531299 - CONFIDENTIAL ( COR DEM 3115 - 3128).pdf

o.   6 - Perrone IR (COR DEM 3129 - 3131).pdf

p.   7 - Cala IRs (COR DEM 3132 - 3141).pdf

q.   11 - Laureano (COR DEM 3142 - 3145).pdf

r.   12 - Leach (IR 20-032660) - COR DEM 3146-3148.pdf

s.   14 - GOs (COR DEM 3149 - 3175).pdf

t.   COR GUR 1655 - 1668  View History + 2014 Rosters

u.   COR 1669 - 1710 - SWAT PPT Observ Surveill Communic [redacted]

v.   COR 1713 - 1724 - GO 465 + SIS Attendees

w.   RFP 2-12 SWAT Plans [Confidential] COR GUR 1292 – 1381

14. Documents produced by the Plaintiff in Anniszkiewicz:

a.   Anniszkiewicz 1-230

15. Documents produced by the City in Anniszkiewicz

a.   [Audio A1] 01 - TC08  00027.mp3

b.   [Audio A2] 02 - RPD W Primary Dispatch 00027.mp3

c.   [Audio A3] 03 - RPD W Admin Dispatch 00027.mp3

d.   [Audio A4] 04 - RPD TAC 00027.mp3

e.   [BWC A1] 00119_JT165020180610114145_0005.MP4

f.   [BWC A2] 00507_BC109420180610114152_0004.MP4

g.   [BWC A3] 00111_EL207520180610115026_0007.MP4

# James W. Crosby M.S.

1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com

h.   [BWC A4] 00111_EL207520180610115506_0008.MP4

i.   [BWC A5] 00111_EL207520180610120655_0009.MP4

j.   [BWC A6] 00111_EL207520180610122153_0010.MP4

k.   [BWC A7] 00742_CC145920180610115926_0001.MP4

l.   [BWC A8] 00750_JI092720180610115014_0001.MP4

m.   [BWC A9] 00750_JI092720180610120506_0002.MP4

n.   [BWC A10] 00750_JI092720180610124159_0003.MP4

o.   [BWC A11] 00768_MR092820180610115536_0006.MP4

p.   [BWC A12] 00768_MR092820180610120850_0007.MP4

q.   [BWC A13] 00781_BS184920180610115537_0008.MP4

r.   [BWC A14] 00804_MT059320180610115226_0003.MP4

s.   02-25-2022 Discovery Produced.pdf

t.   COR ANN 0309-404  [01-27-2023].pdf

u.   Photo A0001.JPG

v.   Photo A0002.JPG

w.   Photo A0003.JPG

x.   Photo A0004.JPG

y.   Photo A0005.JPG

z.   Photo A0006.JPG

aa. Photo A0007.JPG

bb. COR ANN 411 - 412 DiDomenico Resume


16. Documents produced by the Plaintiff in Cox:

a.   Cox 1-84

30

# James W. Crosby M.S.

1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com

17. Documents produced by the City in Cox

    a.   COR Cox 1-81

18. Documents produced by the Plaintiff in Barnes:

    a.   Barnes 1-23

19. Documents produced by the City in Barnes

    a.   COR BARN 1-37

20. Documents produced by the Plaintiff in McGill:

    a.   McGill 1-7

21. Documents produced by the City in McGill

    a.   COR McG 1-136

22. Documents produced by the Plaintiff in Preston:

    a.   Preston 1-77

23. Documents produced by the City in Preston

    a.   COR PRE 1-61