**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

**Exhibit N**

---

CHARLES DEMPSEY, individually, and
L.D. by her father and natural guardian,
CHARLES DEMPSEY,

**19-cv-6780 (EAW)(MWP)**

Plaintiffs,

-against-

THE CITY OF ROCHESTER, a municipal
entity, JAVIER ALGARIN, "JOHN DOE"
RPD OFFICER RESPONSIBLE FOR
TRAINING JAVIER ALGARIN,

Defendants.

---

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

Elliot Dolby Shields
Roth & Roth, LLP
192 Lexington Avenue, Suite 802
New York, New York 10016

(S.D.N.Y. Mar. 14, 2023) (denying summary judgment due to non-compliant Rule 56.1 statement, noting its necessity to streamline consideration and avoid forcing court to search record for undisputed facts); *Ringel v. County of Nassau*, No. 18-CV-4221, 2021 WL 2117183 (E.D.N.Y. May 25, 2021) (denying summary judgment for deficient 56.1 statement, emphasizing compliance is essential to determining genuine issues of material fact).

Defendants' Rule 56.1 statement does not include any facts regarding the unlawful policy of officers trespassing or "backtracking" through residential properties after the conclusion of a hot pursuit. Similarly, Defendants Rule 56.1 statement only has four paragraphs related to the City's policies and practices regarding shooting dogs (ECF 95-29 ¶¶ 20-23), which is insufficient to demonstrate entitlement to summary judgment on this portion of Plaintiffs' *Monell* claim.

Defendants' failure to include any material facts related to the *Monell* claims warrants denial of their motion, as they have failed to show the absence of a genuine issue for trial.

**VIII.   *MONELL* LIABILITY MAY BE FOUND EVEN IF THE OFFICERS ARE GRANTED IMMUNITY.**

Contrary to Defendants' claim, it is well-settled in this Circuit that, even if Algarin and Gorman are granted qualified immunity, municipal liability can still be imposed. *See Askins v. Doe*, 727 F.3d 248, 253-54 (2d Cir. 2013); *see also Barrett v. Orange County Human Rights Comm'n*, 194 F.3d 341, 350 (2d Cir. 1999). Notably, the only case cited by Defendants for the erroneous proposition that *Monell* liability may not be found in the absence of individual liability is a district court decision from 2006 that predates the Second Circuit's 2013 holding in *Askins v. Doe*. See Dkt. 95-1 p. 27 (citing, *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006).

**IX.   THE *MONELL* CLAIM REGARDING DOG SHOOTINGS MUST PROCEED TO THE JURY**

A.   **The City's "Shoot First" Policy Is Unconstitutional**

15

The City's argument that its policy regarding use of force against dogs is facially constitutional misses the point. Plaintiffs have presented substantial evidence of an unwritten custom or policy of permitting officers to shoot dogs with alarming frequency, without sufficient justification, in situations where non-lethal alternatives are available and effective.

An official policy is one in which "a deliberate choice to follow a course of action is made ... by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483-84 (1986). However, the policy need not be part of an "explicitly adopted rule or regulation." *Sorlucco v. New York City Police Dep't*, 971 F.2d 864, 870 (2d Cir.1992).

The inclusion of "custom" along with "policy" recognizes that the practices of government officials can, "[a]lthough not authorized by written law[,] ... be so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Monell*, 436 U.S. at 691 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-68 (1970)); see generally *Pangburn v. Culbertson*, 200 F.3d 65, 71-72 (2d Cir.1999) (discussing evidence plaintiffs might present to show such an unwritten policy exists).

Importantly, as noted in *Meli v. City of Burlington*, expert testimony is not required to show deficiencies in municipal policies or practices when there is sufficient evidence for a jury to infer the existence of a custom or practice. 585 F. Supp. 3d 615, 643-45 (D. Vt. 2022). Here, the evidence is sufficient without any expert testimony based on the firearm discharge reports (Exhibit 24) the number of shootings between 2004 and 2009 (Exhibit 23) and 2013 to 2021, and the testimony of the numerous RPD officers (see e.g., Exhibits 37-46, 55-56), the testimony of the City of Buffalo's Rule 30(b)(6) witness Peter Nigrelli (Exhibit 54), and the testimony of the City of Rochester's Rule 30(b)(6) witness Michael Cuilla (Exhibit 19).

16

The statistics paint a disturbing picture. Between 2004 and 2009, RPD officers shot at 87 dogs, killing 35. (¶ 126). Between 2013 and 2018, they killed approximately 50 dogs, averaging nearly one dog per month. (¶ 127). As Dr. Crosby details in his expert report, between 2014 and 2022, RPD officers shot and killed at least 66 pet dogs (Ex 11, Crosby Report, p. 7). This averages to nearly one dog killed per month over an 8-year period.

Yet during this time, no RPD officer was ever disciplined or required to undergo additional training for shooting a dog (¶ 160). This pattern persisted despite clear examples of unreasonable force, like the August 2019 incident where RPD Officer Kenneth Pinckney shot a dog that was not advancing or attacking (¶¶ 181-190). The failure to address such incidents through discipline or retraining reflects a de facto policy of permitting unnecessary shootings.

Moreover, the City's policies instruct officers to use lethal force against dogs even when non-lethal tools like TASERs are available and effective (¶¶ 128, 132-133). This directly contradicts manufacturer guidance and accepted best practices (¶¶ 129-131; Ex 11, Crosby Report, pp. 17-18). Since 2003, TASER has informed all departments that, based on an analysis of 37 incident reports involving animals (mostly dogs), there was a 92% success rate. (Ex 25, TASER Animal Certification). Nevertheless, the City explicitly instructs its TASER-certified officers to ignore this training and to instead shoot dogs. (¶¶ 132-133)

This TASER policy is a clear example of the RPD's "shoot first" policy—or its broader custom or policy that permits and even encourages the use of lethal force against dogs, even when there is no imminent threat and effective non-lethal alternatives are available. By instructing officers to disregard TASER training and manufacturer guidance, the RPD is effectively sanctioning the unnecessary use of deadly force against animals. This policy demonstrates a

systemic disregard for the constitutional protections against unreasonable seizures, as it prioritizes lethal force over readily available and highly effective non-lethal alternatives.

The policy is indicative of a pattern of deliberate indifference to the rights of pet owners and the lives of their animals. The direction to use firearms instead of TASERs is strong evidence of the RPD's de facto policy that treats all dog encounters as situations warranting lethal force. This blanket approach fails to account for the specific circumstances of each encounter and ignores the Fourth Amendment's requirement that seizures be reasonable. The fact that the RPD maintains this policy despite clear evidence of the effectiveness of non-lethal alternatives strongly supports the existence of an unconstitutional custom or policy regarding dog shootings—and a jury should determine whether the evidence demonstrates the existence of said policy.

Dr. Crosby's expert report provides further evidence of the RPD's shoot first policy. Crucially, Dr. Crosby discusses the City's shoot first policy of instructing officers to use lethal force against dogs even when non-lethal tools like TASERs are available and effective. He specifically cites Michael Cuilla's testimony that the RPD directs its Taser-certified officers to ignore TASER training about the use of non-lethal measures and instead to shoot dogs with their firearms (¶138). Dr. Crosby emphatically states that this directive "is a violation of good and accepted best practices" (Ex 11, Crosby Report, p. 17).

B. **A Jury Must Decide If The City Was Deliberately Indifferent To The RPD Shooting Pet Dogs**.

*1. Whether the City failed to properly train its officers is a jury question.*

There is substantial evidence to support Plaintiff's claim that the City is liable under a deliberate indifference, failure to train theory of municipal liability. Courts in the Second Circuit have articulated the elements of deliberate indifference for such a claim as follows:

18