UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

MARIANNE ANNISZKIEWICZ,

                                  Plaintiff,

-against-

THE CITY OF ROCHESTER, a municipal entity, POLICE OFFICER BRIAN CALA, SERGEANT JENNIFER TRENTON,

                                  Defendants.

**COMPLAINT**

**CASE NO.:**

"Dogs are not our whole life, but they make our lives whole."

– Roger Caras (photographer and writer)

## I. PRELIMINARY STATEMENT

Plaintiff MARIANNE ANNISZKIEWICZ, by her attorneys, ROTH & ROTH, LLP, complaining of the defendants, respectfully allege as follows:

1. Plaintiff brings this action for compensatory damages, punitive damages and attorney's fees pursuant to 42 U.S.C. §§ 1983 and 1988 for violations of her civil rights, when Defendants unlawfully entered her fenced-in property on June 10, 2018, at approximately 5:00 p.m., and shot and killed her dog, Sampson.

## II. Venue and Jurisdiction

2. This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the Fourth and Fourteenth Amendments to the United States Constitution. Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1343(a)(3) and (a)(4) and the aforementioned statutory and constitutional provisions.

3. Venue is proper for because the events occurred in this district.

## III. JURY DEMAND

4. The plaintiff respectfully demands a trial by jury of all issues in this matter.

## VI. PARTIES

5. Plaintiff, MARIANNE ANNISZKIEWICZ, is a citizen of the United States and a resident of the County of Wayne, State of New York.

6. Defendant CITY OF ROCHESTER ("CITY") is a municipal entity created and authorized under the laws of the State of New York. It is authorized by law to maintain a police department, which acts as its agent in the area of law enforcement and for which it is ultimately responsible. Defendant CITY assumes the risks incidental to the maintenance of a police force and the employment of police officers as said risks attach to the public consumers of the services provided by the RPD.

7. Defendants Rochester Police Department ("RPD") POLICE OFFICER ("P.O.") BRIAN CALA and P.O. JENNIFER TRENTON (collectively, "Defendant RPD OFFICERS," individually, "Defendant RPD OFFICER"), are and were at all times relevant herein, officers, employees and agents of the Defendant CITY and the RPD.

8. The Defendant RPD Officers are being sued in their individual and official capacities.

9. At all times relevant herein, the individual Defendant RPD OFFICERS were acting under color of state law in the course and scope of their

- 2 -

duties and functions as agents, servants, employees and officers of the Defendant CITY OF ROCHESTER, and otherwise performed and engaged in conduct incidental to the performance of their lawful functions in the course of their duties. They were acting for and on behalf of the RPD at all times relevant herein, with the power and authority vested in them as officers, agents and employees of the RPD and incidental to the lawful pursuit of their duties as officers, employees and agents of the RPD.

10. The individual Defendant RPD OFFICERS' acts hereafter complained of were carried out intentionally, recklessly, with malice, and in gross disregard of plaintiff's rights.

11. At all relevant times, the individual defendants were engaged in joint ventures, assisting each other in performing the various actions described herein and lending their physical presence in support and the authority of their offices to one another.

## V. STATEMENT OF FACTS

12. On June 10, 2018, Ms. Anniszkiewicz's lived at 236 Belknap Street, Rochester, New York, with her three dogs: Sampson, Angle, and Sunny. Ms. Anniszkiewicz owned the property.

13. On June 10, 2018, at approximately 5:00 p.m., Rochester Police Department ("RPD") Officer BRIAN CALA shot and killed Sampson after he and Officer JENNIFER TRENTON unlawfully entered Ms. Anniszkiewicz's fenced-in front yard.



*Sampson, age three.*

14. About an hour before the incident, Ms. Anniszkiewicz had called 911 to report that her neighbor, "Sharon", was attempting to run over a stray dog on Hollis Street with her car.

15. After Ms. Anniszkiewicz called 911, Animal Control responded and took away the stray dog.

16. Thereafter, Officers CALA and TRENTON responded to Ms. Anniszkiewicz's house at 236 Belknap Street, which is a corner property and is surrounded by a tall chain-linked fence.

17. When CALA and TRENTON responded, Ms. Anniszkiewicz was inside her home, and her daughter in-law, her daughter-in-law's uncle, her three grandchildren—ages 4, 7 and 9—and her three dogs were in her backyard.

18. Ms. Anniszkiewicz entire property is surrounded by one fence, and so the children and the dogs could freely move from the back yard to the front yard.

19. When they arrived, Officers CALA and TRENTON parked their vehicle on Belknap Street in the front of Ms. Anniszkiewicz's house and immediately entered the front gate to her yard.

20. Officers CALA and TRENTON entered Ms. Anniszkiewicz's yard without a warrant, without her consent, without calling the telephone number she provided to 911 operators, and without the exigent circumstances *and* probable cause required to legally do so.

21. Prior to entering the gate, Officers CALA and TRENTON failed to contact the Emergency Communication Department to determine whether Animal Control had secured the loose dog.

22. Prior to entering the gate, Officers CALA and TRENTON failed to call Ms. Anniszkiewicz to ask her to come outside to speak with them or to ask permission to enter her fenced-in yard.

23. Prior to the date of the incident, Ms. Anniszkiewicz had called the police to complain about her neighbor Sharon on multiple prior occasions, and on each of those prior occasions, when the police arrived at her home, they called her at the number she provided to the 911 operator and asked her to come outside to speak

- 5 -

45. The City and RPD trained CALA and TRENTON that if they encountered a dog during the performance of their police duties, they were permitted to shoot and kill the dog, even if the dog did not pose an objectively reasonable threat to the officers or others.

46. The City and RPD never implemented a policy regarding the safe handling of dogs encountered during law enforcement activities.

47. The City and RPD never implemented a policy regarding not trespassing on residential properties during law enforcement activities.

48. The City and RPD never implemented a policy regarding safely interacting with dogs encountered while trespassing on residential properties.

49. The City and RPD never implemented a policy regarding safely interacting with dogs encountered during law enforcement activities at residential properties.

50. The City and RPD knew that dogs were often encountered during law enforcement activity.

51. CALA and TRENTON knew the City and RPD did not provide them with a policy or training regarding how to safely interact with and/or secure a dog while engaged in law enforcement activity at a residential property.

52. CALA and TRENTON failed to devise a plan for the safe handling of any dog encountered when they entered Ms. Anniszkiewicz yard.

53. The Defendants' only plan when they entered Ms. Anniszkiewicz's property was to wing it and/or kill any dog that they encountered.

54. Defendants should have reasonably expected that when they entered Ms. Anniszkiewicz's property that a dog would likely approach them, as the tall fence surrounding her entire property indicated that she owned dogs, and because more than one-in-two households in Rochester have dogs.

55. The actual and proximate cause of CALA shooting and killing Sampson was the unlawful entry onto Ms. Anniszkiewicz's property.

56. Another actual and proximate cause of CALA shooting and killing Sampson was the City and RPD's unlawful policies and training permitting their officers to shoot and kill any dog that officers encounter during their police duties, and the failure to discipline officers for these unjustified killing.

57. Sampson's shooting death was a foreseeable consequence of the unlawful entry.

58. CALA's shooting of Sampson constitutes an unreasonable Fourth Amendment seizure.

59. CALA's shooting of Sampson constitutes an unreasonable Fourteenth Amendment deprivation of property without due process of law.

60. The City appears to train its officers that if they subjectively feel fear, however minor the cause of that fear may be, they are entitled to kill anyone or anything who makes them have that subjective feeling. The City does not train its officers that they have a duty to question whether there is a rational basis for their fear before using deadly force.

61. Sampson was killed because the City fails to train its officers not to trespass in residential properties and because the City fails to train its officers how to safely interact with dogs.

62. Instead, the City appears to train its officers to trespass in residential properties as a matter of course, without announcing their presence, and then to shoot and kill any dog they may encounter while trespassing on the innocent person's property.

63. This is a bad policy, that kills innocent people and dogs. In this case, it killed Sampson. It could have killed Ms. Anniszkiewicz or her young grandchildren. The City should take responsibility for the bullets fired by CALA.

## VI. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### MUNICIPAL LIABILITY UNDER *MONELL*
### UNDER 42 U.S.C. § 1983
### (Against the City)

64. Plaintiff re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

65. Plaintiff's constitutional injuries resulted from several interrelated unconstitutional municipal policies and the City is liable to her pursuant to *Monell v. Department of Social Services of New York*, 436 U.S. at 658, 694 (1978).

66. The City and RPD are aware that police officers routinely enter residential property without a warrant, consent or the probable cause <u>and</u> exigent circumstances required to legally do so.

101. As a direct result of the City's deficient policy and training, City officers have routinely used excessive force, including deadly force, when encountering non-threatening dogs; as happened in this matter.

102. In the alternative, as a direct result of the City's deficient policy, when City officers encountered dogs on residential properties, they routinely used excessive force, often immediately resorting to the use of deadly force, instead of lesser objectively reasonable force; as happened in this matter.

103. Based on the pattern of past excessive force incidents involving canines, the City was on notice that absent additional and/or different policies and training, City officers would routinely use excessive and/or deadly force against non-threatening canines or aggressive canines when not objectively reasonable.

104. For example, on October 19, 2018, RPD Officer Javier Algarin unlawfully entered Charles Dempsey's fenced-in back yard by jumping the fence, without a warrant, consent or exigent circumstances. Algarin also did not knock or announce his presence. After jumping the fence, he encountered a four-year-old black Labrador Retriever. Algarin had the time and opportunity to avoid using lethal force, but instead, he shot Tesla twice, killing her. But for Algarin's trespass, he would not have shot and killed Tesla. But for Algarin's failure to knock and announce, he would not have killed Tesla.

105. On September 6, 2018, two RPD officers unlawfully entered Erin Gursslin's back yard at 1747 St. Paul Street, Rochester, New York, by climbing over a fence, without a warrant, consent or exigent circumstances. The officers entered

Ms. Gursslin's yard as part of a SWAT operation, in order to provide "protective overwatch" for officers executing a search warrant at a home several lots away. During the pre-operation plan and investigation, they failed to determine whether any dogs lived at the property. The officers also did not knock or announce their presence. While they were unlawfully present in the fenced-in back yard, Ms. Gursslin entered the yard with Nina, her four-year-old pit bull, so that Nina could relieve herself. The officers had the time and opportunity to avoid using lethal force, but instead, the officers shot Nina twice, killing her. But for the officer's trespass, they would not have shot and killed Nina. But for the officer's failure to announce their presence or otherwise warn Ms. Gursslin they were on her property, they would not have killed the dog.

106. On September 16, 2016, Officer Tito Batson entered the backyard of 39 Lenox Street, Rochester, New York without a warrant, exigent circumstances, or consent. While trespassing in the yard, Baston encountered a dog from approximately 30 feet away, and fired a total of seven shots from his department-issued firearm, while a resident of the property was on the back porch in the yard. Luckily, neither the dog nor the person was shot, but the Officer's trespass and reckless conduct created an unreasonable risk that the person or dog could have been shot and killed.

107. On July 21, 2018, Officer James Breen, while executing a warrant at 14 Bauer Street, Rochester, New York fired two shots at a dog, striking it once. Officer Breen had the time and opportunity to use pepper spray or other non-lethal

- 18 -

force but chose instead to shoot the dog with his department-issued Glock semi-automatic handgun.

108. On June 20, 2018, Officer Derek Sterling shot a dog while responding to a 911 call in the vicinity of 105 Ambrose Street, Rochester, New York. Sterling first saw the dog from approximately 50 feet away and had the time and opportunity to avoid using any force against the dog and could have used non-lethal force. Instead, Sterling chose not to retreat to safety or use non-lethal force, and fired two rounds from his department-issued Glock semi-automatic handgun, striking the dog at least once.

109. On April 22, 2018, Officer Justin Whitmore shot a dog while responding to a 911 call in the vicinity of 339 First Street, Rochester, New York. Whitmore had the time and opportunity to avoid using any force against the dog and could have used non-lethal force. Instead, Whitmore chose to shoot the dog with his department-issued Glock semi-automatic handgun, striking the dog in the head.

110. On March 9, 2018, Officer Connor Edwards responded to a report of an abandoned dog at 222 Spencer Street, Rochester, New York, a vacant property. The only reason the officers were at the property is because of the report of an abandoned dog. Nevertheless, the officers apparently devised no plan for what to do when they encountered the dog, other than to shoot it. Upon entering and searching the property, Edwards encountered the dog and fired three rounds of buckshot with his department-issued shotgun at the dog, hitting the dog with one round. Edwards could have easily avoided using lethal force by devising a plan of what to do when

they encountered the dog, but the officers chose to enter the property with no plan other than to simply shoot the dog. Moreover, Edwards had the time and opportunity to avoid using any force against the dog and could have used non-lethal force. Their actions were in direct contravention of Training Bulletin P-78-17, which requires that the police officers "stand by" and wait until an Animal Control Officer arrives; and then to defer to the Animal Control Officer as to how to assist.

111. On January 18, 2018, Investigator Burgoon and Sergeant Lee shot a dog while executing a search warrant at 856 North Plymouth Avenue, Rochester, New York. Investigator Burgoon shot the dog once with a shotgun, and Sergeant Lee shot the dog once with his handgun. Prior to executing the warrant, the officers did not develop a plan for how to safely handle any dog they might encounter upon entering the property, despite knowing there was a one-in-two chance that they would encounter a dog.

112. Upon information and belief none of the above officers were disciplined or provided any additional training to make sure these unnecessary dog shootings would happen again.

113. According to publicly available information, between 2013 and 2018, there were at least 40 other incidents where RPD officers discharged their firearms at dogs in various scenarios in the line of duty. Numerous times these incidents involved officers responding to calls regarding dogs, but the officers devised no plan for interacting with the dog other than shooting it. At least 10 of those incidents involved officers who entered a property to execute a warrant and apparently lacked

any plan for how to safely deal with any dog they encountered during the execution of the warrant.

114. Despite it being plainly obvious to the City that additional and/or different policies and training was necessary to protect civil rights, the City did not adopt or implement the additional and/or different policies and training.

115. The actions of CALA and TRENTON in this case, and the above examples, demonstrate that the City and the RPD do not require their officers to comply with Training Bulletin P-78-17, "Police Response to Animal Scenes,"[1] which states, in pertinent part, that:

> a. "Police officers must assess the situation upon arriving on any scene at which an animal is present";
>
> b. "Determine if companion animal is secured, confined, or restrained";
>
> c. "If owner is present, instruct owner to secure companion animal";
>
> d. For loose dogs, "Stand by and monitor until ACO arrives"; "if dog is confined within a fenced area, defer to ACO; ACO will seize; do not enter fenced area unless ACO requests assistance;"
>
> e. "Destruction of the animal should be a last resort."

---

[1] Available at: https://data-rpdny.opendata.arcgis.com/datasets/p-78-17-police-response-to-animal-scenes.

- 21 -

116. Upon information and belief, CALA and TRENTON were not disciplined, retrained, or reprimanded in any way for violation of RPD's training and policies in this incident.

117. Upon information and belief, none of the RPD officers cited in the other examples of dog shooting incidents were disciplined, retrained, or reprimanded in any way for violation of RPD's training and policies.

118. The City did not adopt, implement, or enforce, an effective internal affairs or disciplinary procedure/program to promote and require lawful conduct from its police officers, ensure accountability to citizens, and protect the rights of citizens—and especially dog owners.

119. The City's policy of having a deficient internal affairs/disciplinary procedure/program, was also a moving force behind the Defendant RPD Officers' unlawful conduct because they learned that City officers were permitted to use excessive force against canines and that would not suffer any negative employment or criminal consequence as a result of same.

120. Despite committing a trespass, using unlawful force, and intentionally submitting a false and/or misleading report to a law enforcement agency, the City has not criminally charged CALA or TRENTON or disciplined them in any way.

121. The City maintains an official policy of permitting its officers to trespass on residential properties in the course of their law enforcement duties, in violation of residents' Fourth Amendment right against unreasonable searches.

122. In fact, the City, through the RPD, apparently trains its officers that they are permitted to enter residential properties without a warrant, consent, or the probable cause <u>and</u> exigent circumstances required to lawfully do so.

123. The City and RPD have ratified this unconstitutional policy by failing to discipline officers for trespassing on residential property—even when damage is caused to a resident's person, pet or property as a result of the unlawful entry.

124. The City, through the RPD, maintains an official policy that RPD officers may shoot and kill any dog they encounter in the course of their law enforcement duties, even if it is not objectively reasonable for the officer to believe the dog poses a threat of physical harm to the officer or others—in violation of resident's Fourth Amendment rights against unreasonable seizures.

125. Even if it did not rise to the level of an "official policy", the City tolerated or adopted an unofficial custom of permitting its officers to shoot and kill any dog they encounter in the course of their law enforcement duties, even if it is not objectively reasonable for the officer to believe the dog poses a threat of physical harm to the officer or others—in violation of resident's Fourth Amendment rights against unreasonable seizures.

126. The City and RPD have also exhibited deliberate indifference to the longstanding and pervasive practice of RPD officers violating residents' Fourth Amendment right against unreasonable seizures by shooting dogs in the course of their law enforcement duties by its failure to implement remedial training or discipline any of the offending officers.

127. These are bad policies that kill innocent people and dogs. In this case, it killed Sampson. It could have killed Ms. Anniszkiewicz, her daughter in law, her daughter-in-law's uncle, or her three young grandchildren. The City should take responsibility for the bullets fired by CALA.

128. As a result of Defendants' impermissible conduct, Plaintiff was injured and harmed.

129. The Plaintiff is are entitled to compensatory and punitive damages in an amount to be determined at trial, together with attorney's fees and costs.

## SECOND CLAIM FOR RELIEF
## UNREASONABLE SEARCH OF CURTILAGE
## UNDER 42 U.S.C. § 1983

130. Plaintiff re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

131. The Fourth Amendment provides, in relevant part, that, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]"

132. When CALA and TRENTON entered the privacy fence and entered Plaintiff's yard, they did not have consent, a warrant, or the probable cause *and* exigent circumstances required to lawfully do so.

133. CALA and TRENTON failed to call Ms. Anniszkiewicz prior to entering her yard, even though they were responding to a 911 call regarding a loose dog.

134. Ms. Anniszkiewicz reported to 911 that her neighbor was trying to hit the loose dog on Hollis Street, and so there was no reason for them to enter her property.

135. The Animal Control Officer had removed the loose dog prior to CALA and TRENTON arriving, so there was no reason for them to enter Ms. Anniszkiewicz's property.

136. CALA and TRENTON did not knock and announce their presence before entering Plaintiff's backyard, or otherwise warn Plaintiff that they were in her yard.

137. Had Defendants announced their presence, they would have realized that multiple people, children, and dogs were present in Plaintiff's yard.

138. No objectively reasonable police officer would have believed it was lawful to enter into Plaintiff's fenced-in yard when responding to an animal scene, without even checking for any animals in the yard first, and without contacting the homeowner.

139. By entering the fence into Plaintiff's yard and approaching within feet of Plaintiff's home, CALA and TRENTON entered the home's curtilage.

140. CALA and TRENTON's entry into the curtilage without a warrant constituted an unreasonable search in violation of Plaintiff's rights as guaranteed by the Fourth Amendment to the United States Constitution.

141. This violation of Plaintiff's constitutional rights caused the loss of Sampson and the other harms identified herein.

142. As a result, the Plaintiff suffered physical and emotional injuries, monetary losses, and loss of the present and future value of her property, as well as other damages to be set forth and proved at trial.

143. The Plaintiff is entitled to compensatory and punitive damages in an amount to be determined at trial, together with attorney's fees and costs.

THIRD CLAIM FOR RELIEF
UNLAWFUL SEIZURE OF PERSONAL PROPERTY
FOURTH AND FOURTEENTH AMENDMENTS
UNDER 42 U.S.C. § 1983

144. Plaintiff re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

145. The Fourth Amendment provides, in relevant part, that, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]"

146. "Effects," as referenced in the Fourth Amendment, includes, personal property. *See United States* v. *Place*, 462 U.S. 696, 701 (1983).

147. A Fourth Amendment "seizure" of personal property occurs when "there is some meaningful interference with an individual's possessory interests in that property." *United States* v. *Jacobsen*, 466 U.S. 109, 113 (1984).

148. The destruction of personal property has been determined to be a meaningful interference with an individual's possessory interest in that property. *See id.* at 124–25.

149. As such, the Second Circuit has held that "the unreasonable killing of a companion animal constitutes an unconstitutional 'seizure' of personal property