**Exhibit S**

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NEW YORK

---

MARIANNE ANNISZKIEWICZ,

Plaintiff,

-vs-

Case No. 20CV6629

THE CITY OF ROCHESTER, A MUNICIPAL ENTITY, POLICE OFFICER BRIAN CALA, SERGEANT JENNIFER TRENTON,

Defendants.

---

Examination Before Trial held at the Office of the Corporation Counsel, 30 Church Street, Room 400A City Hall, Rochester, New York on September 20, 2023, commencing at 10:10 a.m.

DEPOSITION OF: Marianne Anniszkiewicz

REPORTED BY: SANDRA L. BOUCHARD

A P P E A R A N C E S:

ROTH & ROTH, LLP
Appearing on Behalf of the Plaintiff
192 Lexington Avenue
Suite 802
New York, New York 10016
BY: ELLIOT D. SHIELDS, ESQ.

OFFICE of the CORPORATION COUNSEL
Appearing on Behalf of the Defendants
30 Church Street
Room 400A City Hall
Rochester, New York 14614
BY: PEACHIE L. JONES, ESQ.

ALSO PRESENT: Michelle Anuszkiewicz

Civil Procedure;

IT IS FURTHER STIPULATED AND AGREED that all rights provided to all parties by the Federal Rules of Civil Procedure shall not be deemed waived and the appropriate sections of the Federal Rules of Civil Procedure shall be controlling with respect thereto;

AND FURTHER STIPULATED AND AGREED that SANDRA L. BOUCHARD, as Notary Public, may swear in the witness.

M A R I A N N E   A N N I S Z K I E W I C Z, called herein as a witness, having first been duly sworn, was examined and testified as follows:

EXAMINATION BY MS. JONES:

Q. Good morning. My name is Peachie Jones. I'm an attorney with the City of Rochester. Thank you for being here so I can take your deposition.
You were just sworn in. Do you have any concerns about telling the truth today?
A. Absolutely not, no.
Q. Because you're obligated to tell the truth, I just want to make sure that you hear and understand all of my questions. So to make sure you hear the entire question, will you wait until I finish before you

Q. So I'm going to show you what's been marked as No. 1, Exhibit 1. Do you recognize what's in this picture?
A. My house.
Q. When you say "my house," are you referring to 236 Belknap?
A. Yes.
Q. You don't live there still, right?
A. No.
Q. If I'm standing in the road and seeing your house from this perspective, which road am I standing on?
A. Belknap.
MR. SHIELDS: Can we go off the record for a second?
(Off-the-record discussion.)
Q. I will take this back. I'm going to show you Exhibit 2. Do you recognize what this picture depicts?
A. The side of my house.
Q. When you say "my house" --
A. Belknap Street.
Q. -- you're referring to the house at 236 Belknap?
A. Yes.
Q. And you said -- I didn't hear actually what you said, so we will start over. Do you recognize what this

picture depicts?
A. Yes, the side of my house.
Q. The side of your house. So if I'm standing in the street and seeing 236 Belknap from this perspective, which street am I standing on?
A. Hollis Street, H-O-L-L-I-S.
Q. Okay. We are going to stay with Exhibit 2 for a second. Does this picture reflect how this side of your house would have looked in June of 2018?
A. No.
Q. How is it different?
A. I had gardens in 2018, flower gardens.
Q. Anything else?
A. No.
Q. When I look at this picture, I see a path that goes from the fence -- or the gate on Hollis Street up to the house?
A. Yes.
Q. Did you have that path that went from the Hollis Street side up to the house --
A. Yes.
Q. -- in June of 2018?
A. Yes.
Q. Were there any plants on the outside of the

the extension on the fence?

MR. SHIELDS: Objection to form.

A. No.

Q. So when I look at this picture, I see a path from the fence on the Hollis Street side that leads up to your house?

A. Yes.

Q. Was that path there in 2018?

A. Yes.

Q. Okay. Okay. I'm going to take back Exhibit 1, sorry. I'm going to give you Exhibit 2 again.

So when I look at Exhibit 2, I see like a wooden structure that's brown next to the house. What do you call this?

A. Porch.

Q. A porch, okay. I'm going to give you Exhibit 1 again. Okay. So this path that I see in this picture, you said it was there in June of 2018?

A. Yes.

Q. Okay. Does this path lead up to the porch?

A. Yes.

Q. Did it lead up to the porch in June of 2018?

A. Yes.

Q. I'm taking back Exhibit 1, and I'm going to give you

Exhibit 2 again.

So this is, again, from the Hollis Street side. So this path that we talked about a minute ago that led from the fence up to the house from the Hollis Street side, what does it lead to?

A. Side door.

Q. So you consider this the side door?

A. Yes.

Q. So is the porch -- excuse me. Is the door on or in front of the porch what you consider the -- how would you describe that?

A. Front door.

Q. The front door, okay. Not that it matters, but I'm sorry they took out the flower gardens.

Okay. Now I think I'm done with the Exhibit 1 and 2. In June of 2018, did you have any pets?

A. Yes.

Q. How many?

A. Three.

Q. What were their names?

A. Angel, Sonny, and Sampson.

Q. Was that -- is Angel the registered or given name of that pet?

A. Angelina.

A. Homeschooled.
Q. Did Sampson, Sonny, or Angelina respond to commands?
A. Yes.
Q. Did they respond to commands from anyone else besides you?
A. No.
Q. Okay. Let's talk about the June 2018 incident. Why did the police come to your home that day?
A. I called them.
Q. Why did you call the police?
A. There was an incident with my neighbor.
Q. What's the name of the neighbor that you're referring to?
A. Sharon Strickland.
Q. I didn't write down Sharon Strickland in my list of friends and neighbors that you talked to about the incident.
A. She wasn't a friend.
Q. Have you talked with Sharon Strickland about the incident since it happened?
A. No.
Q. Where did Sharon Strickland live as of June 10th, 2018?
A. 157 Maltby Street, Rochester.

                    Q. Can you explain what you specifically wanted assistance with?

A. She was trying to run down a stray dog and me with her vehicle.

Q. How was she trying to run over you with her vehicle?

A. I was securing the dog so it wouldn't get hurt. I was in the other side of my gate in my driveway, and she was in her vehicle. And she pulled right into my driveway as I was holding the dog to find identification, and she came within inches of me and the dog.

Q. She pulled into your driveway?

A. Yes.

Q. So I believe that there is a chain-link gate that can stretch across your driveway?

A. Yes.

Q. So when she pulled into your driveway, would she have pulled past where the chain-link fence would cross your driveway?

A. No.

MS. JONES: To the best of your memory, what did you -- actually, take that back.

Q. How do you refer to the person who answers the 911 call, a dispatcher, 911 employee? What do you call

them?

MR. SHIELDS: Objection to form.

A. 911.

Q. Okay. So to the best of your memory, what did you say to the 911 employee when you called for assistance?

A. I said -- I'm trying to remember. She was blaring the horn. I said, my neighbor is trying to hit me and a dog in her vehicle, and I need help.

Q. Did you ask for animal control to come to the location?

A. No, I didn't.

Q. You just asked for help generally?

A. Yes.

Q. Did you specifically ask for police officers?

A. Yes.

Q. Did you ask the 911 employee to relay any specific information to the officers prior to them coming to your house?

A. No.

Q. Did you tell the 911 employee that you also had a dog?

A. No.

Q. Can you describe the dog that Sharon Strickland was

Q. Okay. What happened when the Rochester Police Department officers arrived to your house at 236 Belknap?

MR. SHIELDS: Objection to form.

A. At which time?

Q. Good question. What happened when -- sorry. What happened when the RPD officers arrived to 236 Belknap on June 10th, 2018?

A. Oh, okay. I didn't even know that they had arrived.

Q. Okay. When did you first realize that the RPD officers had arrived in response to your 911 call?

A. When my Kaylie came running in the house crying that they shot Sampson.

Q. I don't know if I told you at the beginning that you're welcome to ask for a break if you ever need one. Sorry.

A. No, I'm fine. Thank you.

Q. You're just blowing your nose. I didn't know if you were crying or just have a cold.

Did you hear any part of the dog shooting?

MR. SHIELDS: Objection to form.

A. I thought I heard a pop, but I didn't know what it was.

Q. Where were you in the house when Kaylie came in to

tell you what happened?
A. In the kitchen.
Q. Does the kitchen have a window?
A. Yes.
Q. What does the window look out onto?
A. Hollis Street.
Q. Can you see the kitchen -- I'm going to show you Exhibit 2 again. Can you see the kitchen window in Exhibit 2?
A. (Indicating.)
Q. Okay. So you pointed to the window on the first level?
A. Yes.
Q. That's next to the side door?
A. Yes.
Q. That is not over the porch?
A. Right.
Q. Okay. Did you look out the kitchen window when you heard the pop?
A. I don't remember.
Q. Were you at the window -- at or near the kitchen window any time in the minutes before Kaylie came in and told you what happened?
A. I believe I was at the table making -- putting

together the lunch for everyone.
Q. Does the table face the window?
A. No.
Q. So did you see any of the circumstances that related to the dog shooting?
A. No.
MR. SHIELDS: Objection.
Q. Did you hear anything else besides a pop?
A. No -- screaming.
Q. When did you hear screaming?
A. Right after the pop.
Q. Do you know who was screaming?
A. No.
Q. You said Kaylie came in to tell you what happened. Was she crying or screaming when she came in?
A. Yes, she was crying.
Q. Did you see animal control come and get the stray dog?
A. No.
Q. So did you see your dogs approach the officers at all?
A. No.
Q. Do you have -- or excuse me. I will start again.
Did you have surveillance video or a door cam on

your front door as of June in 2018?
A. No.
Q. Did you ask any of your neighbors after the incident if their homes had any sort of door cam that would have captured the incident?
A. No.
Q. Do you know if any of your neighbors have like a door cam that would have captured the incident?
A. I don't think anyone did.
Q. Have you seen the dog shooting incident?
A. No.
MR. SHIELDS: Objection to form.
A. No.
Q. So did you watch the body-worn camera of any of the officers involved?
A. No.
Q. What did Kaylie tell you when she came into the house?
A. She was crying and screaming and said, they shot Sampson.
Q. What else did she say?
A. Don't come out.
Q. Did anyone else come in to talk to you about what happened?

A. No.

Q. Mr. Sherbine didn't come in and tell you what happened?

A. No.

Q. Did Kaylie -- sorry. We are talking about Kaylie Wright, correct?

A. Yes.

Q. Did Kaylie tell you that she saw when the officer shot the dog?

MR. SHIELDS: Objection to form.

A. No.

Q. Do you know if Kaylie saw the actual dog shooting?

A. No.

Q. Did anyone see -- I guess besides the officers and the dogs themselves, see when the officer shot the dog?

A. I believe my young grandson and Mike Sherbine.

Q. Sherbine. I think I'm still saying his name wrong. Okay. You said your young grandson. Your young grandson that you're referring to is Kaylie's child?

A. Yes.

Q. How old was he on the day?

A. Six.

Q. I'm sorry, your grandson was six in June of 2018?

to -- I'm going to stick with 20. I don't -- can I say "I don't know"?

Q. Yes, you can. I thought 20 was fair. I just wanted to make sure that you understood the distance that I was referring to, because I kind of guessed myself in my head. I was like, that probably would be about 15 for me, but I'm taller.

Okay. But you did -- but you understood the distance that I was referring to when I said the base of the porch stairs closest to the side door to the edge of the driveway?

A. Yes.

Q. Okay, great. Do you know if anyone saw -- correction.

Do you know if anyone besides your grandson saw when the RPD officer shot the dog?

A. I believe Mike Sherbine.

Q. And why do you think Mike Sherbine saw the dog shooting?

A. I heard someone -- when I was in the house, I heard someone scream "no" before I heard the pop. It turns out it was Mike that screamed "no" at the cop.

Q. What do you mean by "it turns out"?

A. When I went outside into the commotion that was

happening, he told me.

Q. "He" being Mike Sherbine?

A. Mike Sherbine.

Q. What did Mike Sherbine tell you?

A. That he screamed "no." He tried to run to stop what was going to happen, but it was too late.

Q. Did he tell you anything else about what he saw?

A. Not at that time. There was too much going on.

Q. Did he tell you anything else about what he saw on a subsequent occasion?

A. Later that evening we talked about what happened. Just everybody felt so bad. I mean, he just was -- for a grown man, he was as close to tears as I have ever seen a grown man be because he couldn't prevent it.

Q. Did Mr. Sherbine tell you anything else about what he saw prior to trying to prevent the shooting?

A. No.

Q. Did Mr. Sherbine tell you anything else about what he did to try and prevent the shooting?

A. No.

Q. So just so that my notes are clear, it sounds like Mr. Sherbine screamed "no" and tried to run over and stop it?

157:15 161:17 165:25

**scenarios** 26:5 128:23 129:2,3,16

**scene** 40:18 41:3,4 42:2 43:3,7,10,15 86:2,15,21,24 87:14,21 90:12,25 91:5 92:5 141:15 144:3,6 153:17 157:14,19 172:18 173:4

**scenes** 85:21

**school** 16:14,15,16 17:3,4,6,8

**score** 66:14 68:18 69:19

**scored** 66:19 68:19

**screen** 21:25 33:19,22 51:16 53:21 54:19,24 89:15,16 90:6 92:25 105:9 121:14 171:6

**screens** 124:9

**scroll** 121:20 136:22

**seal** 179:17

**search** 43:12,23 44:5,7,8,13,14 45:6 62:8 148:25

**searching** 148:17,20

**secondary** 30:25

**seconds** 97:23,25 100:4 105:12,25 106:4,8,14 107:23 108:4,6,17 109:9 110:22 112:12,14 113:12,15,21 149:19 150:13,16

**secretary's** 56:14

**section** 10:5 47:24 49:4 61:2 80:21,25 81:4 137:13 171:24 173:2,9

**sections** 17:24

**secure** 36:20 164:5

**secured** 106:23 127:23

**seek** 81:4

**sees** 51:2

**self-inflicted** 123:3

**sends** 90:4

**sense** 99:24

**separate** 42:14 88:23 89:24,25 112:4 139:19,20 144:10

**separated** 157:24

**separately** 40:25

**September** 18:11

**sergeant** 1:8,12 5:1,6,10 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1,4 17:1 18:1,2,4,19 19:1 20:1 21:1,25 22:1,20 23:1 24:1 25:1 26:1 27:1 28:1,10 29:1 30:1 31:1 32:1 33:1,20 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1,6 53:1,4,6,19 54:1,23 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1,18 65:1,9,11,24 66:1,8,20 67:1 68:1 69:1,12 70:1,22 71:1,8 72:1,25 73:1 74:1 75:1,11,23 76:1,11 77:1,16 78:1,14 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1,23 93:1,10 94:1 95:1,3 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1,12 104:1,9 105:1,20 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1,20 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1,3,7,13 122:1 123:1 124:1,18 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1,15 137:1 138:1 139:1,4 140:1 141:1 142:1 143:1,14 144:1 145:1 146:1 147:1 148:1 149:1,21 150:1,17 151:1 152:1 153:1 154:1 155:1,7,16,19 156:1 157:1 158:1 159:1 160:1,19 161:1 162:1 163:1 164:1 165:1,23 166:1 167:1 168:1,4,10 169:1 170:1,13 171:1 172:1 173:1,20,24 179:3,9,13 180:3

**sergeant's** 9:7 65:21 68:23 71:9 73:10

**sergeants** 141:25 165:23

**serial** 108:24

**servant** 123:16,23

**serve** 43:23 44:14

**service** 69:10,20 70:6 71:21 74:17,25 75:19 104:16

**Services** 7:19 14:4 42:10,12 43:14 45:16,21 156:6

**serving** 43:11

**set** 15:20 45:16 112:18,21 125:17 176:9 179:16

**setup** 145:24

**Sgt** 175:5

**shake** 98:4 99:8 100:23 102:5,20 106:12,14 107:20 127:22 164:23 165:2

**shaking** 97:20 98:13 99:5,25 105:21,24 107:7 108:3 116:18 156:3 162:5

**shared** 11:8

**shed** 58:2

**sheet** 58:17,22 60:10,14,18 179:6

**Shields** 2:3 5:1,3,9,12 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1,17 23:1,6 24:1,18,24 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1,5,10 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1,21 52:1,10,13 53:1,3,5,16 54:1 55:1,7 56:1 57:1 58:1 59:1 60:1 61:1 62:1,12,17 63:1 64:1,16 65:1 66:1,23 67:1,10,15,20 68:1,3,10,13,25 69:1,4 70:1,8,14 71:1,6,22 72:1,3,7,13,18,21 73:1 74:1,18 75:1,4,6,9,16,18,21 76:1,16 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1,5 94:1,5,12,16,19,24 95:1,9 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1,21,23 104:1,5,10 105:1 106:1 107:1 108:1 109:1 110:1 111:1,18 112:1 113:1,19 114:1 115:1 116:1 117:1 118:1 119:1 120:1,18,23 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1,6 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1,2 151:1 152:1 153:1 154:1,20 155:1,14,17 156:1 157:1 158:1 159:1 160:1 161:1 162:1,23 163:1 164:1 165:1 166:1 167:1 168:3 170:8 173:19 175:5 178:5

**shift** 27:12,15 38:8 41:10 58:6

**shirt** 57:5,6

**shook** 82:23 84:4 97:18 102:4,9,12 106:24 108:11,14 117:11

**shoot** 19:15,23 25:24 35:23 36:9 131:13,24 158:18

**shooting** 25:7,14 32:12 35:8,16,18,19 72:8 80:16 145:3 151:20 158:8 165:7,12

**shootings** 11:22

**short** 51:19

**shorthand** 181:7

**shot** 5:13 32:16,21 114:2,7 115:10,12 118:6 132:23 135:2,6,11,19,25 139:7,17 140:4,10 141:10 151:2 153:2,22 154:18 155:21 160:24 164:9,11

**shots** 34:21 35:2 138:2 143:22 151:2,4,9

**show** 41:5 98:17 127:5 170:6

**showed** 124:15 127:12 159:12,13

**showing** 91:4,16

**shown** 63:11 173:14

**shows** 98:22

**shrubbery** 99:19

**sic** 160:2

**side** 85:15 92:14 93:14,18 96:20 107:16 117:4 138:4 144:15 149:12 150:20

**sight** 83:23 115:7