**Exhibit V**

1

2                     UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF NEW YORK
3        - - - - - - - - - - - - - - - - - - - - - - - -
        MARIANNE ANNISZKIEWICZ,
4
                Plaintiff,
5        v.
                            Index:  20-cv-6629 (FPG)(MWP)
6

7        THE CITY OF ROCHESTER, a Municipal Entity, POLICE
        OFFICER BRIAN CALA, SERGEANT JENNIFER TRENTON,
8

9                Defendants.
        - - - - - - - - - - - - - - - - - - - - - - - -
10

11       Deposition Upon Oral Examination of:

12                       Officer Brian Cala

13
        Location:        The Powers Building
14                        16 West Main Street, 8th Floor
                         Rochester, New York 14614
15

16
        Date:            November 8, 2022
17

18
        Time:            10:00 a.m.
19

20

21

22       Reported By:   CHRISTINE VIGNA

23                       Alliance Court Reporting, Inc.

24                       109 South Union Street, Suite 400

25                       Rochester, New York 14607



2

```
 1
 2                    A P P E A R A N C E S
 3   Appearing on Behalf of Plaintiff:
 4   Elliot D. Shields, Esq.
 5        Roth & Roth LLP
 6        192 Lexington Avenue, Suite 802
 7        New York, New York  10016
 8        eshields@rothandrothlaw.com
 9
10   Appearing on Behalf of Defendants:
11   Peachie L. Jones, Esq.
12        City of Rochester Law Department
13        City Hall, Room 400A
14        30 Church Street
15        Rochester, New York  14614
16        peachie.jones@cityofrochester.gov
17                        *      *      *
18
19
20
21
22
23
24
25
```



4

```
1                OFFICER BRIAN CALA - BY MR. SHIELDS
2     for their certified transcript charge, including any
3     expedite or other related production charges;
4                AND IT IS FURTHER STIPULATED, that the
5     Notary Public, CHRISTINE VIGNA, may administer the
6     oath to the witness.
7                        *      *      *
8     OFFICER BRIAN CALA,
9            called herein as a witness, first being sworn,
10           testified as follows:
11           EXAMINATION BY MR. SHIELDS:
12           Q.  Good morning, Officer.  My name is Elliot
13    Shields.  I represent a woman whose dog was shot and
14    killed.  I'm going to ask you some questions today.
15                First I'm just going to go over the ground
16    rules for a deposition.  Will you tell me if you don't
17    understand my question?
18           A.  Yes.
19           Q.  And will you tell me if you find my
20    question confusing?
21           A.  Yes.
22           Q.  And will you tell me if I've assumed an
23    incorrect fact in a question?
24           A.  Yes.
25           Q.  And will you tell me if you don't know the
```



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

1           OFFICER BRIAN CALA - BY MR. SHIELDS

2           A.  When you say "at the academy," do you mean

3      prior to graduating the police academy or do

4      you -- are you referring to any academy training such

5      as in-service or continued training?

6           Q.  Let's take at the academy first.

7           A.  So, I'm sorry.  One more time with the

8      question.

9           Q.  Sure.

10          At the academy, were you provided any

11     other training about how to avoid shooting a dog?

12          A.  Not that I recall at the academy.

13          Q.  Okay.  After graduating from the academy

14     at your in-service training, were you provided any

15     training about how to avoid shooting a dog?

16          A.  There were other options that were

17     mentioned as potential ways to deal with an aggressive

18     dog.

19          Q.  What do you remember those options to be?

20          A.  Trying to get space between you and the

21     dog.  Striking the dog with something.  Putting

22     something in the dog's mouth.  Potentially

23     cap -- spraying the dog with pepper spray.

24          Q.  Anything else?

25          A.  Not that I recall at this time.



27

```
 1              OFFICER BRIAN CALA - BY MR. SHIELDS
 2    training you had received mentioned pepper spray?
 3         A.   Yes.
 4         Q.   Were you taught that pepper spray is
 5    effective on dogs?
 6         A.   I was taught that it is not always
 7    effective on dogs.
 8         Q.   Sometimes it's effective on dogs?
 9         A.   Sometimes it's effective on dogs, yes.
10         Q.   Did they tell you when it might be
11    effective on dogs versus when it might not be
12    effective on dogs?
13         A.   No.
14         Q.   What do you remember about them making
15    that distinction at that training?
16         A.   Just that pepper spray affects dogs
17    differently.  Different breeds of dogs are affected
18    differently.  And it's -- it's an unknown as to
19    whether pepper spray would be effective when deployed
20    against an animal.
21              (The following exhibit was marked for
22              identification:  Number EXH 2.)
23         Q.   Okay.  I'm going to switch to some
24    questions about the incident itself.
25              First I want to play the 911 call from the
```



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

```
1              OFFICER BRIAN CALA - BY MR. SHIELDS
2         Q.   People can view the same set of facts
3    differently?
4         A.   Yes.   That's correct.
5         (The following exhibit was marked for
6         identification:   Number EXH 4.)
7         Q.   Okay.   So I want to play the beginning of
8    your body camera from this incident for you, which we
9    will mark as Exhibit 4 for this deposition.
10             So we're going to go back to the very
11   beginning.   We are at the beginning of the video,
12   which starts at 11 a.m., 41 minutes and 52 seconds.
13             And before we start, Officer Cala, do you
14   recognize that -- from the numbers in the bottom right
15   corner as being your body-worn camera?
16        A.   Yes, I do.
17        Q.   Okay.   And is it the same body-worn camera
18   footage that you viewed in preparation for your
19   testimony today?
20        A.   Yes, it is.
21        Q.   And depicted before we start the video, is
22   that Sergeant Trenton with the gate open?
23        A.   That's correct.
24        Q.   All right.   I'm going to hit play and then
25   I'm going to ask you some questions after I pause it.
```



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER BRIAN CALA - BY MR. SHIELDS
 2                   I paused at 15 seconds into the video and
 3    the time stamp is 11:42 and 7 seconds.
 4                   When you said "There it is.  There it is,"
 5    you believed that that was the stray dog that --
 6              A.  That's correct.
 7              (The following exhibit was marked for
 8              identification:  Number EXH 5.)
 9              Q.  Okay.  We'll come back to your video in a
10    little bit.  That was my only question on that for
11    now.
12                   I want to put up as Exhibit 5 your
13    interrogatory responses in this case and ask a couple
14    of questions on that for now.  There we go.
15                   All right.  The interrogatory responses
16    will be Exhibit 5 for this deposition.  And, Officer
17    Cala, just looking at the first page there, do you
18    recognize these as being your interrogatory responses?
19              A.  Yes.
20              Q.  And I'm first going to go down to
21    interrogatory number 5.  And that says "Describe in
22    detail everything you did prior to entering
23    Ms. Anniszkiewicz's fenced-in yard to determine if
24    there were any dogs present in Ms. Anniszkiewicz's
25    yard."
```



```
 1              OFFICER BRIAN CALA - BY MR. SHIELDS
 2                   And your answer was "After Sergeant
 3      Trenton shook the fence and we did not hear or see
 4      anything, I followed Sergeant Trenton through the
 5      gate."
 6          A.   Yes.
 7          Q.   Okay.  One second.
 8               Okay.  So that's all.  Anything else?
 9          A.   Nope.
10          Q.   Okay.  And I just want to play Sergeant
11      Trenton's video from the beginning.  So that's Exhibit
12      3 where she shook the gate.
13               Okay.  This is Exhibit 3 starting from the
14      beginning of the video.  The time stamp is 11:41 and
15      45 seconds.
16               Okay.  And we paused that video at 8
17      seconds in.  And the time stamp is 11:41 and 53
18      seconds.  Officer Cala, can you just basically
19      describe what you saw in those first 8 seconds?
20          A.   It appears that Sergeant Trenton
21      approached the gate and shook the gate.
22          Q.   And then what happened?
23          A.   And then she -- nothing happened.  She
24      opened it.
25          Q.   So she shook the gate and then she opened
```



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

1          OFFICER BRIAN CALA - BY MR. SHIELDS
2    the gate?
3          A.   Within that eight-second time frame, yes.
4          Q.   For the -- in the first few seconds, she
5    approached the gate before she started to shake it; is
6    that accurate?
7          A.   That's accurate.
8          Q.   So she shook the fence.  Here, let's just
9    watch again.  I want you to try to pay attention when
10   she started to shake the gate and then when she opened
11   it.
12          Okay.  So we're at four seconds into the
13   video right now, right?
14          A.   Uh-huh.
15          Q.   Had she started to shake the gate yet?
16          A.   She just put her hand on the gate.
17          Q.   So at four seconds she just put her hand
18   on the gate.
19          I'm going to hit play again.  The time
20   stamp is 11:41 and 48 seconds.
21          I paused it at 8 seconds again.  That's
22   11:41 and 52 seconds.  And at this point, has she
23   started to open the gate?
24          A.   Yes.
25          Q.   So in that four-second time period,



**ALLIANCE**
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

38

```
 1              OFFICER BRIAN CALA - BY MR. SHIELDS
 2    Sergeant Cala shook the gate and began to open the
 3    gate, right?
 4              A.   Sergeant Trenton.
 5              Q.   I'm sorry.
 6                   Sergeant Trenton?
 7              A.   Yes.
 8              Q.   How long did you wait before opening the
 9    gate?
10              A.   I didn't open the gate.  She -- I don't
11    know how long she waited.  A couple of seconds.
12              Q.   Okay.  In that four-second period,
13    Sergeant Trenton shook the gate and opened the gate,
14    correct?
15              A.   That's correct.
16              Q.   And then started to open the gate,
17    correct?
18              A.   Yes.
19              Q.   And then when you said maybe waited a
20    couple seconds, do you mean after the gate was opened?
21    What we haven't watched yet?
22              A.   Did I say "waited a couple seconds"?
23              Q.   I'm sorry.  That's what I understood your
24    prior answer to be.
25                   Why don't we -- let me withdraw that.
```



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER BRIAN CALA - BY MR. SHIELDS
 2              So how many seconds did you and Sergeant
 3    Trenton wait after shaking the fence before opening
 4    the gate?
 5         A.   It appears there was two or three seconds
 6    that elapsed.
 7         Q.   After she stopped shaking the gate before
 8    she started to open the gate?
 9         A.   It looks like there was two seconds from
10    the time she shook the gate until the time the gate
11    was started to be opened.
12         Q.   Okay.  For a total of about four seconds?
13         A.   I would think so, yes.
14         Q.   Okay.  Was that long enough to determine
15    if there were any dogs in the yard?
16         A.   Apparently not.
17         Q.   Were you ever trained to wait a certain
18    amount of time after shaking the fence?
19         A.   No.
20         Q.   Okay.  That's not something that was
21    covered in that Humane Society training that you
22    talked about?
23         A.   No.
24         Q.   I'm going to back it up again and ask you
25    a couple more questions about the beginning here.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1                OFFICER BRIAN CALA - BY MR. SHIELDS
 2                     Did you hear Officer -- I'm
 3      sorry -- Sergeant Trenton say "I don't know if this
 4      dog is deaf or not"?
 5           A.   I did hear her say that.
 6           Q.   Do you know what she was referring to?
 7           A.   I don't.
 8           Q.   Do you know if it was the dog that she saw
 9      in the yard?
10                MS. JONES:  Objection.
11           A.   I -- I don't -- I really don't know what
12      she was referring to.  I didn't see a dog prior to
13      approaching the gate.
14           Q.   Okay.  If a dog was deaf, then shaking the
15      gate wouldn't have helped, right?
16           A.   Correct.
17           Q.   But you didn't see a dog in the yard prior
18      to entering the yard, right?
19           A.   No.
20           Q.   If she was concerned about a potentially
21      deaf dog in the yard, then you should have done a more
22      thorough visual inspection of the yard prior to
23      entering, right?
24                MS. JONES:  Objection.
25                You know, Sergeant Trenton was here
```



```
 1              OFFICER BRIAN CALA - BY MR. SHIELDS
 2   yesterday.  You could have asked her what she thought
 3   about --
 4              MR. SHIELDS:  No one is asking questions
 5   about the dog being deaf right now.
 6              MS. JONES:  You're asking about her
 7   concern --
 8              MR. SHIELDS:  I'm not asking anything
 9   about Sergeant Trenton or what she thought.
10              Okay.  We don't need to fight.
11         Q.  Can you please answer the question,
12   Officer?
13         A.  Can you repeat it, please?
14         Q.  Sure.
15              If you were concerned about a dog being
16   deaf in the yard, then prior to entering the yard you
17   and Sergeant Trenton should have conducted a more
18   thorough visual inspection to see if there were any
19   dogs present in the yard; is that fair?
20              MS. JONES:  Objection.
21         A.  I would say that's fair.  But I would also
22   say that I wasn't concerned about a dog being deaf.  I
23   don't know where that -- again, I don't know what she
24   meant by that comment or why she would be concerned
25   about a dog being deaf.
```



42

```
 1                  OFFICER BRIAN CALA - BY MR. SHIELDS
 2          Q.  Okay.  But in general, if a dog can't
 3   hear, shaking a gate isn't going to do anything,
 4   right?
 5          A.  I would say that's correct.
 6          Q.  Okay.  I'm going to play -- I'm just going
 7   to play from the beginning again because there's
 8   another comment that I want to ask you about.  So I'm
 9   going back to the beginning of the video and hitting
10   play.
11              Did you hear yourself say "They said it
12   was running loose in the neighborhood"?
13          A.  Yes.
14          Q.  Okay.  Who are you referring to when you
15   say "they"?
16          A.  The caller, the information that we got
17   off the 911 dispatch card.
18          Q.  So that's from the 911 dispatch card?
19          A.  From the card, right.  Obviously, I didn't
20   hear the tape or speak to the call taker.
21          Q.  Okay.  So when you entered the yard, you
22   thought that there could possibly be the dog in the
23   yard, the stray dog that had been called in?
24          A.  Well, I said they were -- it was running
25   around the neighborhood.  So they -- basically that it
```



```
1              OFFICER BRIAN CALA - BY MR. SHIELDS
2    could be anywhere.
3            Q.  It could be anywhere?
4            A.  Right.
5            Q.  Including in the yard?
6            A.  Sure.
7            Q.  Okay.  We're paused at eight seconds.  I'm
8    just going to back up one more time to the beginning
9    and ask you about one other comment.
10               And then Sergeant Trenton said "I saw
11   animal control pull down here too, but I don't know
12   where they went"; is that accurate?
13           A.  It is.
14           Q.  And did you speak with animal control
15   prior to entering the yard?
16           A.  No, I didn't.
17           Q.  Did you have any idea whether or not
18   animal control had responded to the scene?
19           A.  No.  I had no clue.
20           Q.  Okay.  I'm going to fast-forward in
21   Sergeant Trenton's video to time stamp 11
22   minutes -- or I mean 11 a.m. -- 11:54 and 55 seconds.
23               I got it paused at 11:54 a.m. and 3
24   seconds and it's 12 minutes and 19 seconds into the
25   video.  So I'm going to hit play and then ask you some
```



1                    OFFICER BRIAN CALA - BY MR. SHIELDS
2        questions about the conversation.  Okay?
3              A.  Uh-huh.
4              Q.  Did you hear yourself say "And that's why
5        we were inside the fence because after checking the
6        area we didn't see anything"?
7              A.  Yes.
8              Q.  Can you tell me everything you did to
9        check the area before you entered the fence?
10             A.  I was observing the area as we arrived on
11       scene at the call.  I didn't see a dog.  I didn't see
12       a vehicle that was chasing a dog.  So that's what I
13       meant when I said checked the area.
14             Q.  Okay.  So did you get out of your car?
15             A.  Prior to approaching the house?
16             Q.  Correct.
17             A.  No.
18             Q.  So when you say checking the area, you
19       mean when you drove up to 236 Belknap in your vehicle?
20             A.  That's correct.
21             Q.  Did you do anything else to check the
22       area?
23             A.  I visually inspected the area as I
24       approached the house on foot.
25             Q.  Okay.  Do you remember the route that you



45

```
 1            OFFICER BRIAN CALA - BY MR. SHIELDS
 2    drove in your vehicle when you approached the house?
 3            A.  I don't.  I don't remember where I was
 4    coming from prior to that.
 5            Q.  Do you know if you drove down on Hollis
 6    Street?
 7                MS. JONES:  Objection.
 8            A.  I don't remember the -- the route at all
 9    to be honest with you.
10            Q.  So the extent of checking the area was
11    just driving up to the house and looking out the
12    windows of your vehicle?
13            A.  As I -- correct.  As I approached the house.
14            Q.  Okay.  So you didn't get out of your car
15    and talk to anyone, right?
16            A.  That's correct.
17            Q.  And you aren't sure if you drove down
18    Hollis Street?
19                MS. JONES:  Objection.
20            A.  That's correct.
21            Q.  And you didn't see the stray dog in the
22    area as you approached the house, correct?
23            A.  I did not.
24                (The following exhibit was marked for
25                identification:  Number EXH 6.)
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER BRIAN CALA - BY MR. SHIELDS
 2          Q.  I want to just -- mostly to keep my
 3     exhibits straight -- put up the incident report which
 4     will be Exhibit 6 to this deposition.
 5              Officer Cala, do you recognize this as the
 6     incident report that you reviewed prior to coming here
 7     today?
 8          A.  Yes, I do.
 9          Q.  It says that the date was June 10, 2018;
10     is that correct?
11          A.  Yes.
12          Q.  And the address was 236 Belknap Street?
13          A.  Yes.
14          Q.  Okay.  So it says the time is 11:43, which
15     would be a.m., right?
16          A.  That's correct.
17          Q.  Okay.  And do you know -- do you know if
18     the property was located at a corner property or
19     something else?
20          A.  I do believe it was at a corner, yes.
21          Q.  Okay.  It's the corner of Belknap and
22     Hollis Street?
23              MS. JONES:  Objection.
24              (The following exhibit was marked for
25              identification:  Number EXH 7.)
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER BRIAN CALA - BY MR. SHIELDS
 2    100 percent a dog that resides at that residence.
 3         Q.  Okay.  Before entering the property, did
 4    you consider that the trees and bushes in the yard
 5    might make it harder and impossible even to see
 6    whether there were any dogs in the yard?
 7         A.  Yes.
 8         Q.  And knowing that it was harder or
 9    impossible to see if there were any dogs in the yard,
10    what did you do?
11         A.  I was aware that you -- I may have
12    encountered a dog.  I entered the property in an
13    attempt to speak with the caller.
14         Q.  So you entered the property.
15              And when you entered the property, you
16    knew that there was a possibility that you might
17    encounter a dog?
18         A.  That's correct.
19         Q.  Okay.  Knowing that you might encounter a
20    dog, you didn't think about walking around to the side
21    of the property to confirm whether or not there were
22    any dogs in the yard?
23         A.  No.  I -- I obviously did not.
24         Q.  But you would have had time to do that,
25    right?
```



54

```
 1              OFFICER BRIAN CALA - BY MR. SHIELDS
 2         A.   Yes.
 3         Q.   Like this wasn't an emergency.  There was
 4    no rush to get inside and save someone's life,
 5    correct?
 6         A.   That's correct.
 7         Q.   And you could have called
 8    Ms. Anniszkiewicz on the number that she had given to
 9    the dispatcher prior to entering the property?
10         A.   Yes.
11         Q.   But you chose not to do that?
12         A.   I don't know that it was a conscious
13    decision to do that or not.  But I entered the
14    property.
15         Q.   You could have waited longer after
16    jiggling the fence to see if any people or dogs came
17    up?
18         A.   Yes.
19         Q.   You could have announced your presence,
20    yelled out police entering the yard before entering
21    the property?
22         A.   Yes.
23         Q.   Is there anything else that you could have
24    done?
25         A.   Not that I can think of right now.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
1              OFFICER BRIAN CALA - BY MR. SHIELDS
2         Q.  Does animal control usually respond to
3    calls about stray dogs?
4         A.  Yes.
5         Q.  Did you -- but you didn't reach out to
6    animal control to see whether or not they had
7    responded prior to entering the property?
8         A.  No, I didn't.
9         Q.  Do you ever call animal control to enter
10   the property with you when you're concerned that there
11   might be dogs there?
12        A.  Not if I'm concerned that there might be
13   dogs.  But if there's a confirmed dog in the property,
14   then I would, yes.
15        Q.  Okay.  I'm going to go back to your
16   interrogatory responses which are Exhibit 5.
17             I'm going to fast-forward to number 6
18   which says "Describe in detail the plan you devised
19   prior to entering Ms. Anniszkiewicz's yard, if any,
20   for what to do if you encountered a dog in
21   Ms. Anniszkiewicz's yard."
22             Your answer was "I did not devise a formal
23   plan with Sergeant Trenton prior to entering the yard.
24   We sought to contact the caller in order to provide
25   the requested assistance."
```



57

```
 1              OFFICER BRIAN CALA - BY MR. SHIELDS
 2      to -- for what to do if you encountered a dog.  It
 3      doesn't say ops plan.
 4              A.  We encounter dogs frequently.  Many things
 5      on this job change rapidly, frequently.  So
 6      it's -- there was -- I interpreted that question to
 7      mean did you come up with a plan of how you were going
 8      to enter the yard.  No.
 9              We entered the yard in an attempt to
10      respond to a 911 call for service that was placed by a
11      person who needed the police.
12              Q.  And it's important when you're carrying
13      out your police duties to be careful, right?
14              A.  That's correct.
15              Q.  And it's important not to unnecessarily
16      put people in danger, right?
17              A.  That's correct.
18              Q.  And it would be important not to
19      unnecessarily put people's pets in danger too, right?
20              MS. JONES:  Objection.
21              A.  That's correct.
22              Q.  So if you've got indications that you
23      might more likely encounter a dog than in a different
24      situation when you know that you're not going to,
25      shouldn't you have some kind of plan for how to safely
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

58

```
 1              OFFICER BRIAN CALA - BY MR. SHIELDS
 2      handle that situation?
 3              MS. JONES:  Objection.
 4          A.  Yes.  I would want to handle every
 5      situation safely.
 6          Q.  How would you have handled this situation
 7      more safely prior to entering the yard?
 8          A.  I guess I would have walked around the
 9      fenced area to observe whether there was a dog in the
10      yard on the other side that was not visible from the
11      side that I was entering.
12          Q.  And it's my understanding that the
13      Rochester Police Department does not provide what are
14      called catch poles to its officers.  Is that your
15      understanding?
16          A.  That is correct.
17          Q.  Do you know what a catch pole is?
18          A.  I'm assuming it's the pole that's used by
19      animal control.
20          Q.  Correct.
21              So you've never used a catch pole
22      yourself?
23          A.  No, I haven't.
24          Q.  Okay.  Do you think it would be a good
25      idea for the Rochester Police Department to train its
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

1               OFFICER BRIAN CALA - BY MR. SHIELDS
2               MS. JONES:  Objection.
3          A.  Depending on where in the backyard.  I
4     believe I was in the side yard or the front yard at
5     the time of the shot.
6          Q.  And you were in front of a few small steps
7     that led to a porch, correct?
8          A.  That's correct.
9          Q.  And could you see if there was anyone
10    behind the porch in the yard?
11         A.  I could see past the porch, yes.
12         Q.  But there were still obstructions past the
13    porch in the yard?
14         A.  There were -- there was a lot of foliage
15    in the yard.  I don't -- I do not remember seeing any
16    people as a backdrop.  I don't remember seeing any
17    human beings behind the animal.
18         Q.  Do you remember seeing a driveway past the
19    porch in the yard?
20         A.  Yes.
21         Q.  And do you remember seeing a four-year-old
22    child standing in the driveway?
23         A.  No, I don't.
24              MS. JONES:  Objection.
25         Q.  If there had been a four-year-old child in



66

```
 1              OFFICER BRIAN CALA - BY MR. SHIELDS
 2   weapon if there are potentially children nearby?
 3              MS. JONES:  Objection.
 4         A.  That is correct.
 5         Q.  And in your interrogatory response number
 6   8 which asks "State whether you've ever owned a dog
 7   and if so identify each and every dog that you've
 8   owned, breed and how long you owned it," and you say
 9   "My family has had a Maltese for 13 years but she's
10   more of my wife's dog."
11         A.  That's correct.
12         Q.  How would your wife feel if somebody
13   entered your property and shot your dog?
14         A.  I'm sure she would not feel great about
15   it.
16         Q.  Do you think she might bring a lawsuit?
17              MS. JONES:  Objection.
18         A.  I -- I don't know.
19         Q.  Depends on the circumstances?
20         A.  She may.
21         Q.  I want to play your body-worn camera and
22   ask you some questions.
23              So we had paused your body-worn camera
24   previously right at the time stamp 11:42 and 7 seconds
25   and that 15 seconds into this video.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

67

```
 1                OFFICER BRIAN CALA - BY MR. SHIELDS
 2                As it's paused right here, can you see the
 3    dog in the video?
 4         A.  Yes.
 5         Q.  And the dog is at the bottom of
 6    those -- it looks like there's steps on the back of
 7    the porch?
 8         A.  Correct.
 9         Q.  So I'm going to hit play and then I'm
10    going to pause it.  And then I'm going to ask you some
11    questions.
12                Can you tell me what happened?
13         A.  The dog advanced up the back stairs and
14    across the porch area towards where I was.  And I was
15    standing on -- on the ground, which appears to be two
16    steps -- two to three steps below the level of where
17    the dog was.  The dog took a short pause when it got
18    to the -- the edge of the porch right directly in
19    front of where I was standing and was barking and then
20    crouched down.  And it appeared to start barking
21    again.  And at that point is when I shot the dog.
22         Q.  Do you see the dog crouched down in the
23    video?
24         A.  If -- I believe you do if you watch it
25    frame by frame, so reversing from that point.
```



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

68

```
1              OFFICER BRIAN CALA - BY MR. SHIELDS
2         Q.  We'll rewind and go slo-mo.
3              Okay.  So we went back.  Let's see.  We're
4    at 15 seconds.  I'll go very slowly.  So now we're
5    still at 15 seconds.
6              You can see the dog.  And it looks like in
7    this -- at 11:42 and 7 seconds in the time stamp you
8    had -- the dog is on the porch and you had pulled your
9    gun out?
10        A.  Correct.
11        Q.  When you entered the property, your gun
12   was still in its holster?
13        A.  Yes, it was.
14        Q.  Is this the moment when you pulled out
15   your gun or was it slightly before this?
16        A.  I'm assuming that's the moment that I
17   pulled it out.
18        Q.  Okay.  So if we go through this one second
19   right here, the dog comes up onto the porch.  You
20   immediately pull out your gun, right?
21        A.  That's correct.
22        Q.  So just going slowly.  Fast-forwarding.
23   And now at 11 minutes and 42 seconds or 11:42 and 10
24   seconds, you're off the porch, correct?
25        A.  Yes.  That's what it appears.  I'm
```



**ALLIANCE**
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

69

```
 1              OFFICER BRIAN CALA - BY MR. SHIELDS
 2    assuming that I am.  It looks like I'm retreating away
 3    from the dog.
 4         Q.  And now we're at 11:42 and 11 seconds.
 5              Okay.  It looks like the dog is shot at
 6    this point, right?
 7         A.  I guess you can't see in the video.
 8         Q.  So you can't see in the video the dog
 9    crouching at all.
10              But you can see in the video that the dog
11    had paused for a second, correct?
12         A.  Correct.
13         Q.  And do you think in that one second if you
14    hadn't had your gun out but something else that the
15    dog would have attacked you after it paused?
16         A.  I don't -- are you implying the dog
17    attacked me because I had my gun out or if I had a
18    baton in my hand the dog wouldn't have attacked?
19         Q.  You know what, that was a bad question.
20              But what I want to know is when the dog
21    paused, if you handled the situation differently at
22    that moment, do you think you could have avoided
23    shooting the dog?
24              MS. JONES:  Objection.
25         A.  Well, it's hard to tell what would have
```



```
 1                OFFICER BRIAN CALA - BY MR. SHIELDS
 2    happened after that moment.  So whether I struck the
 3    dog or -- I don't know if that would have been
 4    effective in ceasing the dog's aggression or -- and
 5    the dog would have been shot anyway or if the dog
 6    wouldn't have been shot.  It's impossible to know
 7    that.
 8         Q.  The dog wasn't charging at you, right?  It
 9    stopped its forward movement, right?
10              MS. JONES:  Objection.
11         A.  In that one second which is not when I
12    shot the dog.
13         Q.  So you paused?
14         A.  Correct.
15         Q.  The dog paused.
16              And you believed after that that the dog
17    was going to attack you?
18         A.  That's correct.
19         Q.  And why did you believe that?
20         A.  Because of the -- because of the dog's
21    aggression and the fact that he looked as
22    though -- the dog looked as though the dog was going
23    to lunge towards my direction.
24         Q.  And have you ever been trained on how to
25    handle a situation like this where a dog is
```



73

```
 1                OFFICER BRIAN CALA - BY MR. SHIELDS
 2      record clear.
 3                A.  Yes.  Yes.
 4                Q.  This third page is just a bunch of
 5      officers with dogs.
 6                     The fourth page "Objectives.  Know the
 7      common dog encounter scenarios that lead to dog bites.
 8      Give four signs or actions to perform to determine
 9      whether dogs are on the property.  Identify how to
10      avoid dog bites.  Recognize three physical signs of
11      aggressive dogs.  Be familiar with improvised tools
12      for dealing with aggressive dogs.  Known techniques to
13      minimize personal injury in the event you are
14      attacked."
15                     So after reading the title of the
16      PowerPoint and the objectives, is it fair to say that
17      the main focus of this training was on avoiding dog
18      bites?
19                MS. JONES:  Objection.
20                A.  That -- it appears to be part of it.
21                Q.  If we just go back to the first page, the
22      title of the program is "Dog Bite Prevention for Law
23      Enforcement," correct?
24                A.  Okay.  Yes.
25                Q.  And before we go through all the slides,
```



**ALLIANCE**

COURT REPORTING, INC.

*Videography · Remote · Deposition Suites*

www.alliancecourtreporting.net · 585.546.4920

74

```
 1              OFFICER BRIAN CALA - BY MR. SHIELDS
 2    is that what you recall the focus of the training to
 3    be?
 4              A.  I -- I guess so.  I don't...
 5              Q.  As opposed to something else like hey,
 6    this training is about specifically dog behavior?
 7              A.  Right.  How to avoid -- sure.  How to
 8    avoid being bit by a dog while in the performance of
 9    your duties.
10              Q.  That's the main focus of the training,
11    correct?
12              A.  It appears to be based on the title.
13              Q.  Thank you.
14              Okay.  And is this the slide that you were
15    referring to earlier?
16              A.  Yes, it was.
17              Q.  Which says in slide number 5 "Officers
18    will encounter a dog in at least one of three
19    residences."
20              Now, do you remember if that is specific
21    to the County of Monroe, to the City of Rochester, to
22    the United States of America or something else?
23              A.  I don't know what the context of that
24    statement is.
25              Q.  Okay.  And this training, do you know if
```



```
 1              OFFICER BRIAN CALA - BY MR. SHIELDS
 2         A.   He began barking and rapidly closing the
 3    distance between the dog and the officer.
 4         Q.   The dog charged at the officer?
 5         A.   That's -- yeah.  That's an accurate
 6    description.
 7         Q.   Did it appear that the dog ever paused as
 8    it approached the officer?
 9         A.   No.
10         Q.   It was running continuously at the officer
11    from the yard until the officer shot the dog, right?
12         A.   Yes.
13         Q.   And that dog was approaching Officer
14    Cummings in a more aggressive manner than Sampson was
15    approaching you on the date of the incident, right?
16              MS. JONES:  Objection.
17         A.   I don't see that as the case, no.
18         Q.   Can you explain the difference or the lack
19    of any difference?
20         A.   The dog -- first of all, there were two
21    dogs on the date of my incident that were rapidly
22    closing distance.  And Sampson did take a pause and
23    then became aggressive again.  And after monitoring
24    that situation and not shooting the dog as the dog
25    took a pause, I continued to try to back away from the
```



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER BRIAN CALA - BY MR. SHIELDS
 2     dog in my case.  The dog then became aggressive on a
 3     second -- in a second offensive and -- and was a
 4     threat again.
 5              Q.  How was Sampson aggressive before the
 6     pause?
 7              A.  Before the pause, he rapidly closed the
 8     distance charging towards me while barking and showing
 9     teeth.  As he approached the stairwell, went up the
10     stairs on his side, proceeded towards me across the
11     porch area and then -- and then took a pause as he was
12     at the top of the porch area near the stairs coming
13     down on the west side of the -- of the porch.
14              Q.  So your testimony is that before the
15     pause, Sampson barked and showed his teeth?
16                   MS. JONES:  Objection.
17                   That mischaracterizes his testimony.
18                   MR. SHIELDS:  Well, that's why I asked.
19              A.  Yes.  That did occur before and after the
20     pause.
21              Q.  Do you remember yelling at Sampson after
22     he paused?
23              A.  I remember saying something to the effect
24     of get the fuck back.
25              Q.  And then Sampson barked at you?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

1               OFFICER BRIAN CALA – BY MR. SHIELDS

2    don't really remember anything from the training.

3               MS. JONES:  Objection.

4          A.   I testified that I don't remember specific

5    conversations that were held during the training.  I

6    remember going to the training.  And I have since

7    reviewed training materials.

8          Q.   Is the only time that you've reviewed the

9    training materials in preparation for your deposition

10   today?

11         A.   Yes.

12         Q.   Are you aware of any of the training the

13   City of Buffalo has done regarding police officer

14   interactions with dogs?

15         A.   I'm not.

16         Q.   If I told you that in 2014 they

17   implemented specific training, in-service eight-hour

18   training that every officer in the City of Buffalo on

19   patrol is required to take and then immediately the

20   number of dogs shot by Buffalo Police Officers

21   drastically decreased, would that sound like the type

22   of training that could be helpful to the Rochester

23   Police Department?

24               MS. JONES:  Objection.

25         A.   Yes.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER BRIAN CALA - BY MS. JONES
 2   you're on scene?
 3         A.  Correct.
 4         Q.  Okay.  And then underneath that, I think
 5   it's row 5, there's a dollar sign and 221B.  Does that
 6   mean that Sergeant Trenton now is on scene?
 7         A.  Correct.
 8         Q.  And the time of that is 11:40:30; is that
 9   right?
10         A.  Yes.
11         Q.  So underneath that, I see in the comment
12   line "MISC:, REQ BOSS AND TECH."  What does that mean?
13         A.  That means that the dispatcher put on the
14   job card as a miscellaneous comment request boss and
15   tech.
16         Q.  Why would a boss and tech be requested?
17         A.  Because of the discharge of a weapon, I
18   requested a supervisor and a technician respond to the
19   scene.
20         Q.  And what time did that occur?
21         A.  11:43 and 37 seconds.
22         (The following exhibits were marked for
23         identification:  Letters EXH A and B.)
24         Q.  Okay.  That's all I have on that page.
25              Do you want to hand your copy to
```



**ALLIANCE**
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

146

```
 1              OFFICER BRIAN CALA - BY MS. JONES
 2    Ms. Stenographer so she has it for her records?
 3                 And I want to show you what we produced as
 4    COR203.
 5                 So the first one we went over as COR201 is
 6    Defendants' A and then B is the second one.  That is
 7    COR203.
 8                 Officer Cala, can you tell me what this
 9    is, what this document is?
10         A.  So this -- so I'm incorrect on this
11    first -- identifying the first.  The second document
12    is the job card.  The first document appears to
13    be -- how do I explain this?  Showing the job card in
14    a new system that was -- that was implemented after
15    this incident took place.  A new CAD system,
16    computer-aided dispatch system.
17                 So it's showing roughly the same
18    information, but in a different format.  The first
19    document being in the new system.  The second document
20    being in the old system.
21         Q.  So which one is closer to what you would
22    have seen at the time of the incident?
23         A.  The second document.
24         Q.  So COR203 in the bottom right-hand corner?
25         A.  Yes.  Correct.
```



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER BRIAN CALA - BY MS. JONES
 2    further back behind Sampson.
 3         Q.   Is Sampson the black dog?
 4         A.   Yes.
 5         Q.   Where did the other dog go after Sampson
 6    was shot?
 7         A.   That dog turned around and proceeded to
 8    head east in the yard towards the driveway.
 9         Q.   Do you remember anything else about the
10    other dog's behavior, actions or appearance in
11    addition to what you've already said?
12         A.   Just that the dog -- just that both dogs
13    were advancing at rapid pace and barking.
14         Q.   A few more follow-up questions on the job
15    card.  My apologies.
16              If I'm understanding this correctly, it
17    looks like you and Sergeant Trenton arrived in
18    separate vehicles?
19         A.   That's correct.
20         Q.   Was anyone with you in your vehicle?
21         A.   Yes.
22         Q.   Okay.  Who was that?
23         A.   I had a civilian rider with me that day.
24         Q.   Do you know the name of that civilian?
25         A.   I don't remember her first name.  But she
```



150

```
 1              OFFICER BRIAN CALA - BY MR. SHIELDS
 2   was the daughter of one of my field training officers.
 3         Q.  Did the civilian rider get out of the car
 4   with you on the date of the incident?
 5         A.  Yes, she did.
 6         Q.  Did she -- did the civilian proceed into
 7   the yard with you and Sergeant Trenton?
 8         A.  Yes, she did.
 9              MS. JONES:  That's all the questions from
10   me.
11              MR. SHIELDS:  I just have a couple of
12   follow-ups.
13              RE-EXAMINATION BY MR. SHIELDS:
14         Q.  When you said that you saw
15   Ms. Anniszkiewicz's second dog, did you also see her
16   third dog in the yard?
17         A.  No.
18         Q.  Okay.  So in total, you only saw two dogs
19   when you were on the property?
20         A.  That's correct.
21         Q.  The fact that you had the civilian
22   rider -- Delaney Glaze, that was her name, right?
23         A.  Yes.  That's her name.
24         Q.  The fact that she entered this property
25   with you and you were showing her how you executed
```



**request** 96:11 98:2 145:14
155:3 158:12

**requested** 55:25 145:16,18
155:6

**requests** 3:16

**require** 113:16,22 114:23

**required** 19:21 20:5,10
21:22 25:6,23,24 95:16
112:2 134:19,23 135:15
137:3,11,23 141:19

**requirement** 11:23,24
136:23 137:6,7

**requires** 110:15,23 113:25
138:5,11

**reserved** 3:12

**reside** 52:23

**resided** 52:10

**residence** 17:17 53:2

**residences** 16:14 17:5,6,24
74:19

**residential** 101:19 108:3

**resides** 53:2 107:6

**respective** 3:7

**respond** 32:14 55:2 57:10
93:9,10 95:16 97:14,19
145:18

**responded** 17:16 43:18
55:7 61:10 101:4 117:10,11
120:5 123:9 127:6

**responder** 95:11

**responding** 14:4 32:24
56:13 59:7 60:3 93:22 95:20
96:14 109:15

**response** 66:5 95:3,10
101:15 122:23 126:11
136:19 139:5 154:6

**responses** 35:13,15,18
55:16 60:11 96:5 101:12
153:11

**responsible** 3:25

**responsiveness** 3:12

**rest** 116:20

**restrained** 95:13,20,25

**result** 19:21 133:17

**resumes** 88:19

**retain** 110:18 115:22

**retained** 154:9,11

**retains** 112:8

**retreating** 69:2

**returned** 3:20 154:11

**returning** 137:5

**reversing** 67:25

**review** 3:16 8:8 9:16,19
10:2,5,7 126:12 158:12

**reviewed** 6:2 9:22 17:10,11
28:15 46:6 82:22 141:7,8
142:22

**reviewing** 8:12 47:16

**revolving** 138:10

**rewind** 68:2

**rider** 149:23 150:3,22

**right-hand** 146:24

**rights** 139:6

**rip** 112:16

**Risk** 75:16

**risks** 59:15

**road** 91:24 102:11,12,13
114:16,17,20 135:25 142:16

**Rob** 123:21

**Rochester** 1:7,14,25 2:12,
15 6:2 12:6,11 16:14,18
18:4 58:13,25 71:22 74:21
75:2,10 141:22 142:3
158:17

**rolled** 138:12,14

**Rolled-up** 91:23

**Room** 2:13

**rope** 105:19,20

**Roth** 2:5

**roughly** 146:17

**round** 117:14 118:5 127:12,
14

**rounds** 120:10 124:12,14

**route** 44:25 45:8 144:3,13

**row** 145:5 147:20

**RPD** 12:24 16:9,13 19:20
52:8 59:24 61:3 79:5 95:2
97:5,13 101:17 102:21,23
103:6 110:14,22 113:8,16,
22,25 129:3 133:24 134:20
136:23 137:19 154:5

**RPD's** 114:5,11,22 115:17
142:24

**RR22-03355** 98:6

**rule** 110:14,22 111:25

**rules** 3:15 4:16 5:5 113:8,16

**run** 33:7 135:11

**running** 42:12,24 99:10
147:5

**runs** 49:16 50:12,21

**rush** 54:4

———————————
**S**

**safe** 24:22 26:3,6

**safely** 23:5,7,10 57:25 58:5,
7 91:4 140:18

**safer** 25:23,25 63:14 65:15,
20,23,25

**safety** 59:15 91:5 96:8
108:4

**Sampson** 60:23,25 61:2
99:14,22 100:5,15,21,25
132:19 149:2,3,5

**save** 54:4 112:14

**scenario** 134:6

**scenarios** 73:7

**scene** 14:5 43:18 44:11
59:6,11 60:3,20 95:16 96:8,
14 98:10 123:22 144:22,23
145:2,6,19 148:4

**Scenes** 95:3 154:6

**scheduled** 137:8,10,21

**school** 10:18,20 11:8

**scope** 18:21

**Scottsville** 102:12,13

**Scratch** 87:25

**scream** 94:9

**screen** 85:16 98:9

**scroll** 24:8

**scrolling** 82:13

**seal** 156:17

**seconds** 29:5,9,11,14,24,
25 30:6,7,9 31:8 32:5 34:12
35:2,3 36:15,17,18,19 37:4,
12,17,20,21,22 38:11,20,22
39:2,5,9,12 43:7,22,24
66:24,25 68:4,5,7,23,24
69:4 98:15,16,19 145:21
147:12 148:7

**section** 24:9 89:25 125:6,8,
9 129:16 143:25 144:11

**secured** 90:11 95:13,19,25

**security** 11:10,11

**sees** 83:20

**seizure** 77:9

**self-inflicted** 75:17

**sense** 14:22

**separate** 117:5 135:23,25
149:18

**Sergeant** 1:7 6:15,18 8:5,
14 10:7 28:25 29:5 34:22
36:2,4,10,20 38:2,4,6,13
39:2 40:3,25 41:9,17 43:10,
21 55:23 90:16 122:7,10,16
143:18 145:6 149:17 150:7
153:9

**servant** 76:7

**service** 57:10 96:6 101:22

**set** 34:2 156:16

**seventh** 76:5

**shake** 37:5,10,15 87:25
90:10

**shaking** 39:3,7,18 40:14
42:3 107:16

**sheet** 156:6

**Shepherd** 120:9

**Shields** 2:4 4:1,11,13 5:1
6:1 7:1,17,21,24 8:1 9:1,9,
14 10:1 11:1 12:1 13:1 14:1
15:1 16:1 17:1 18:1,8,15
19:1,2,12 20:1,16,21,25