**Exhibit Y**

```
 1

 2                 UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF NEW YORK
 3   - - - - - - - - - - - - - - - - - - - - - - -
     MARIANNE ANNISZKIEWICZ,
 4
             Plaintiff,
 5
                            Index No. 20-cv-6629
 6                                (FPG)(MWP)
     v.
 7
     THE CITY OF ROCHESTER, a municipal entity,
 8   POLICE OFFICER BRIAN CALA,
     SERGEANT JENNIFER TRENTON,
 9
             Defendants.
10   - - - - - - - - - - - - - - - - - - - - - - -

11

     Video-recorded Deposition Upon Oral Examination of:
12
                   Sergeant Jennifer Trenton
13

14   Location:       Powers Building
                     16 West Main Street, 8th Floor
15                   Rochester, New York 14614

16

17   Date:           November 7, 2022

18

19   Time:           10:00 a.m.

20

21

22   Reported By:    MICHELLE MUNDT ROCHA

23                   Alliance Court Reporting, Inc.

24                   109 South Union Street, Suite 400

25                   Rochester, New York 14607
```



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

2

```
 1                    A P P E A R A N C E S
 2    Appearing on Behalf of Plaintiff:
 3    Elliot D. Shields, Esq.
 4        Roth & Roth LLP
 5        192 Lexington Avenue, Suite 802
 6        New York, New York  10016
 7        eshields@rothandrothlaw.com
 8
 9    Appearing on Behalf of Defendants:
10    Peachie L. Jones, Esq.
11        City of Rochester Law Department
12        City Hall, Room 400A
13        30 Church Street
14        Rochester, New York  14614-1224
15        peachie.jones@cityofrochester.gov
16
17    Appearing as the Videographer:
18    Benjamin Parrow
19        Studio80 ROC
20        277 North Goodman Street
21        Rochester, New York 14607
22
23                         *      *      *
24
25
```



5

```
         1            SERGEANT JENNIFER TRENTON - BY MR. SHIELDS
10:09    2    Jennifer Trenton.  Also present in the room for this
10:09    3    deposition are Plaintiff's attorney, Elliot Shields --
10:09    4    Defendant's attorney, Peachie Jones; and the court
10:09    5    stenographer, Michelle Rocha.
10:10    6    SERGEANT JENNIFER TRENTON,
         7            called herein as a witness, first being sworn,
         8            testified as follows:
10:10    9            EXAMINATION BY MR. SHIELDS:
10:10   10       Q.  Good morning, Sergeant.
10:10   11       A.  Good morning.
10:10   12       Q.  My name is Elliot Shields.  I represent a
10:10   13    woman whose dog was shot and killed, and I'm going to
10:10   14    ask you some questions today.
10:10   15       A.  Okay.
10:10   16       Q.  First let me just go over some ground
10:10   17    rules for the deposition.
10:10   18            Will you tell me if you don't understand
10:10   19    my question?
10:10   20       A.  Yes.
10:10   21       Q.  And will you tell me if you find my
10:10   22    questions to be confusing?
10:10   23       A.  Yes.
10:10   24       Q.  And will you tell me if I've assumed an
10:10   25    incorrect fact in a question?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

8

```
          1        SERGEANT JENNIFER TRENTON - BY MR. SHIELDS
10:12     2            But when you say "in-service," can you
10:12     3    explain a little more right now about the PowerPoint
10:12     4    in-service training?
10:12     5         A.  Do you want to know what was included in
10:12     6    it or what was talked about or, like, what in-service
10:12     7    is in general?
10:12     8         Q.  I'm sorry.  That was a bad question.
10:12     9            Can you tell me, was that in-service done
10:13    10    in the morning, or was it, like, an all-day training?
10:13    11         A.  It was part of a day.  I don't recall if I
10:13    12    had the morning portion or the afternoon portion.  So
         13    it would have been a split day of two different
10:13    14    topics, so that was one of the topics included in that
10:13    15    day.
10:13    16         Q.  How long did that training last?
10:13    17         A.  Approximately three to four hours, I would
10:13    18    say.
10:13    19         Q.  Who sponsored the training?
10:13    20         A.  It was through the department, but the
10:13    21    Humane Society was -- sent an officer who actually
10:13    22    conducted the in-service.
10:13    23         Q.  I believe in your responses to
10:13    24    interrogatories you stated that you found that
10:13    25    PowerPoint in your files; is that right?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

|       |    | SERGEANT JENNIFER TRENTON - BY MR. SHIELDS |
|-------|----|---|
| 10:13 | 2  | A. Yes, there was a PowerPoint that I found. |
| 10:13 | 3  | Q. When you say you found it in your files, |
| 10:13 | 4  | did you find a hard copy or an electronic copy? |
| 10:13 | 5  | A. I believe I had an electronic copy -- I'm |
| 10:13 | 6  | sorry -- a hard copy that I had -- I had a binder that |
| 10:14 | 7  | I had prepared for studying for the sergeant's exam, |
| 10:14 | 8  | and that was some of the information that I had |
| 10:14 | 9  | printed out for that. |
| 10:14 | 10 | Q. Okay. So you printed that out from the |
| 10:14 | 11 | computer somewhere? |
| 10:14 | 12 | A. At one point in time in preparation for |
| 10:14 | 13 | the exam I did. |
| 10:14 | 14 | Q. Okay. They didn't give you a copy of that |
| 10:14 | 15 | PowerPoint, then, as a handout at the training? |
| 10:14 | 16 | A. There may have been, but I don't recall |
| 10:14 | 17 | that. |
| 10:14 | 18 | Q. Okay. Did they give you any other |
| 10:14 | 19 | handouts at that training? |
| 10:14 | 20 | A. I don't recall any other handouts. |
| 10:14 | 21 | Q. Do you remember when you took that |
| 10:14 | 22 | training? |
| 10:14 | 23 | A. So that would have been around 2014. |
| 10:14 | 24 | Q. And was that training something that |
| 10:14 | 25 | everyone in the department had to take? |



10

```
        1           SERGEANT JENNIFER TRENTON - BY MR. SHIELDS
10:14   2           A.  Correct.
10:14   3           Q.  Is there any record of you taking that
10:14   4      training?
10:14   5           A.  The professional development section of
10:15   6      our department.  They take attendance for all
10:15   7      inservices that we attend.
10:15   8           Q.  Okay.  So PDS should have an attendance
10:15   9      record for you and everyone else who attended that
10:15  10      training; correct?
10:15  11           A.  Correct.
10:15  12           Q.  And does it just list the names of the
10:15  13      trainings that you took, the dates that you took the
10:15  14      training?  Is that --
10:15  15           A.  I don't know what they do after they get
10:15  16      the attendance records, but basically for any type of
10:15  17      in-person in-service that we have, there's an
10:15  18      attendance book.
10:15  19           So it would have had everybody
10:15  20      alphabetized in that book.  You initial it and date it
       21      or sign it and date it, whatever it is for that one.
10:15  22           And like I said, I'm not sure what happens
10:15  23      with that attendance book, but it's a new attendance
10:15  24      book for every in-service that you go to.  So
10:15  25      obviously they go somewhere; I just don't know where.
```



|       |    |                                                            |
|-------|----|------------------------------------------------------------|
|       | 1  | SERGEANT JENNIFER TRENTON - BY MR. SHIELDS                  |
| 10:15 | 2  | Q.  Okay.  Can you just tell me everything                 |
| 10:16 | 3  | that you remember from that training?                      |
|       | 4  | A.  Mm-hmm.                                                 |
| 10:16 | 5  | (There was a discussion off the record.)                   |
| 10:16 | 6  | A.  There were several videos that were from               |
| 10:16 | 7  | other departments that involved officers' interactions     |
| 10:16 | 8  | with dogs.  He shared some of his personal experiences     |
| 10:16 | 9  | as a humane officer in regards to his interactions         |
| 10:16 | 10 | with dogs.                                                 |
| 10:16 | 11 | There was some pictures, I would say, of                   |
| 10:16 | 12 | what a dog may look like when they're possible that        |
| 10:16 | 13 | they could attack, when they're calm or playful or         |
| 10:16 | 14 | different ways that a dog may present themselves           |
| 10:16 | 15 | towards someone other than their owner.                    |
| 10:16 | 16 | Q.  Do you remember why the training was given             |
| 10:16 | 17 | when it was, which to your recollection you said was       |
| 10:16 | 18 | 2014?                                                       |
| 10:16 | 19 | A.  I'm not sure why it was conducted, no.                 |
| 10:17 | 20 | Q.  Do you know if the training had any effect            |
| 10:17 | 21 | within the department in terms of reduction in dog         |
| 10:17 | 22 | shootings?                                                 |
| 10:17 | 23 | A.  I don't --                                             |
| 10:17 | 24 | MS. JONES:  Objection.                                      |
| 10:17 | 25 | But you can answer.  Sorry.                                 |



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
        1          SERGEANT JENNIFER TRENTON - BY MR. SHIELDS
10:17   2          A.  I don't have that data.
10:17   3          Q.  In your personal experience, did it seem
10:17   4    to you like officers responded differently to
10:17   5    situations where dogs were present on residential
10:17   6    properties after the training?
10:17   7              MS. JONES:  Objection.
10:17   8          A.  I don't have that information.
10:17   9          Q.  So your answer is you don't know?
10:17  10          A.  Correct.  I don't know what any -- I mean,
10:17  11    we have 400-plus officers on the road.  I don't have
10:17  12    interactions with them during those situations ever.
10:17  13          Q.  When you -- did the training help you to
10:18  14    interact differently or safer in situations where you
10:18  15    responded to a residence and there was a dog present?
10:18  16          A.  Yes.  I believe the biggest thing that I
10:18  17    took out of that was a lot of the still-frame pictures
10:18  18    of different ways that dogs act towards people.
10:18  19              I mean, there was hackles.  I didn't know
10:18  20    what a dog hackle was prior to that and knowing that
10:18  21    if it's raised, that that could mean that they could
10:18  22    be attacking.
10:18  23              So there was definitely a lot of things
10:18  24    that I did take away from that training.
10:18  25          Q.  Did you take anything else away from the
```



13

SERGEANT JENNIFER TRENTON - BY MR. SHIELDS

10:18 2   training?

10:18 3          A.   I mean, I think all of it was useful.  I

10:18 4   don't necessarily have any other highlights that I

10:18 5   have out of it.  I mean, that was one of the biggest

10:18 6   things that I still carry with me to this day.

10:18 7          Q.   And just to reiterate what you mean when

10:18 8   you say "one of the biggest things," are you referring

10:19 9   to what you just referenced in terms of a dog's

10:19 10  hackles?

10:19 11         A.   Hackles and its body positioning towards

10:19 12  people.

10:19 13         Q.   And "its body positioning" meaning

10:19 14  aggressive body positioning?

10:19 15         A.   Aggressive or playful or calm or -- I

10:19 16  can't remember the other terminology that was used in

10:19 17  it, but it's also part of the training bulletin that

10:19 18  we have as well that has those pictures on it.

10:19 19         Q.   Other than speaking with Ms. Jones twice,

10:19 20  did you speak with anybody else in preparation for

10:19 21  today's deposition?

10:19 22         A.   I did not.

10:19 23         Q.   Other than the documents you just

10:19 24  referenced, did you review any other documents in

10:19 25  preparation for today's deposition?



43

|       | 1  | SERGEANT JENNIFER TRENTON - BY MR. SHIELDS |
|-------|----|--------------------------------------------|

10:56  2  you've had to make calls after the fact for animal

10:56  3  control to come to a scene, is that --

10:56  4      A.  Correct.

10:56  5      Q.  And what kind of situations do you make

10:56  6  calls to after the fact for animal control to come to

10:56  7  the scene?

10:56  8      A.  So I could be responding to a house for

10:56  9  any given situation, and maybe I observe a loose dog

10:56 10  either at that scene or while en route to that scene.

10:56 11      Other situations could be maybe serving a

10:57 12  search warrant on a house, and prior to going there

10:57 13  you know that there's going to be animals inside the

10:57 14  house.  We would make sure that Animal Services was on

10:57 15  scene with us before you make entry into that house.

10:57 16      I mean, we've had other situations where

10:57 17  maybe we've had a barricaded gunman or a burglary in

10:57 18  progress where you have a house surrounded, and maybe

10:57 19  we hear animals inside.  And, again, we know we're

10:57 20  going to make entry into that house, and we would have

10:57 21  them stand by to assist us with containing the dog

10:57 22  either while making entry or prior to entry.

10:57 23      Q.  How often do you serve search warrants?

10:57 24      A.  Again, it's going to vary.  Maybe over the

10:57 25  course of my career -- maybe 10 to 15 times over the



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

|       |    |                                                            |
|-------|----|------------------------------------------------------------|
|       | 1  | SERGEANT JENNIFER TRENTON - BY MR. SHIELDS                  |
| 10:58 | 2  | course of my career.                                       |
| 10:58 | 3  | Q.  And so regular patrol officers that aren't             |
| 10:58 | 4  | members of the SWAT team would the RPD also execute        |
| 10:58 | 5  | search warrants?                                           |
| 10:58 | 6  | A.  Low-level and basically less dangerous                 |
| 10:58 | 7  | search warrants I would say.                               |
| 10:58 | 8  | Q.  And what would lead to a search warrant                |
| 10:58 | 9  | being classified as low-level or less dangerous?           |
| 10:58 | 10 | A.  You don't have that information that                   |
| 10:58 | 11 | there's a weapon involved, a gun involved, either          |
| 10:58 | 12 | within the house or with the crime that occurred that      |
| 10:58 | 13 | led you to the search warrant.                             |
| 10:58 | 14 | Q.  Before you serve that search warrant, are              |
| 10:58 | 15 | you required to do some sort of surveillance before        |
| 10:59 | 16 | entering the property?                                      |
| 10:59 | 17 | A.  You're basically doing your homework on                |
| 10:59 | 18 | it.  You're either -- you have some form of possibly a     |
| 10:59 | 19 | witness or a victim or somebody who has knowledge of       |
| 10:59 | 20 | that house that you're getting that information from.      |
| 10:59 | 21 | It could come from surveillance, or it could come from     |
| 10:59 | 22 | another party that you're getting that information         |
| 10:59 | 23 | from.  Maybe layout of the house, children, animals,       |
| 10:59 | 24 | number of adults, that sort of thing, before you go        |
| 10:59 | 25 | into the house.                                            |



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
         1          SERGEANT JENNIFER TRENTON - BY MR. SHIELDS
10:59    2          Q.  Is it a requirement to try to figure out
10:59    3   whether or not there's a dog in the property?
10:59    4          A.  That's always one of the questions.
10:59    5          Q.  What do you do if there is a dog to
10:59    6   prepare how to handle the dog when executing a search
10:59    7   warrant?
10:59    8          MS. JONES:  Objection.
10:59    9          A.  So, again, there would be lots of
10:59   10   questions once you get that yes answer for a dog.  Is
10:59   11   it normally crated?  Is it kept and contained in a
10:59   12   certain room?  How many?  The breed?  Is it -- how
11:00   13   friendly is it?  All those type of things would come
11:00   14   into play with that.
11:00   15          And, again, that would be starting Animal
11:00   16   Services to be there to set up, formulate some type of
11:00   17   a plan to either go in with you upon entry or somehow
11:00   18   be able to get the dog contained where they can come
11:00   19   in and assist you with controlling the dog.
11:00   20          Q.  So if you know there's a dog, then you're
11:00   21   supposed to have Animal Services with you when the
11:00   22   warrant is executed?
11:00   23          A.  Correct.
11:00   24          Q.  In addition to animal control being there,
11:00   25   what types of precautions would RPD require if they
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
         1              SERGEANT JENNIFER TRENTON - BY MR. SHIELDS
11:26    2         A.  I did.
11:26    3         Q.  Have you ever destroyed any of your
11:26    4    department-issued notepads?
11:26    5         A.  I have not.
11:26    6         Q.  And so we're going to call for production
11:26    7    of your notes.  So we'd ask that after this
11:26    8    deposition, you go and conduct another search.
11:27    9         A.  Okay.
11:27   10         (Document request -- Officer Trenton's notes)
11:27   11              MS. JONES:  Objection.
11:27   12              MR. SHIELDS:  I'll follow up in writing
11:27   13    about that.
11:27   14              MS. JONES:  Objection.  She just said
11:27   15    under sworn testimony that she looked and could not
11:27   16    find those.
11:27   17              MR. SHIELDS:  I'll follow up in writing.
11:27   18    Thank you, Peachie.
11:27   19              MS. JONES:  Okay.
11:27   20         Q.  And you said that there's no general rule
11:27   21    about the method of storage of these notepads after
11:27   22    they're full, but the rule states that you're not
11:27   23    allowed to destroy them; right?
11:27   24         A.  Yes.
11:27   25         Q.  Did you create any other writings related
```



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

|  | 1 | SERGEANT JENNIFER TRENTON - BY MR. SHIELDS |
|---|---|---|

12:05   2          Did I read that question and your answer

12:05   3   accurately?

12:05   4          A.   Yes.

12:05   5          Q.   And can you tell me what you remember

12:05   6   about Ms. Anniszkiewicz's yard?

12:05   7          A.   So her yard was a corner lot.  It was

12:05   8   completely fenced in with a 4-foot-high chain-link

12:05   9   fence.  There was a lot of trees and bushes and such

12:05  10   in the yard, so it was -- it was difficult to see

12:06  11   completely into the yard.

12:06  12          Q.   Okay.  Do you remember anything else about

12:06  13   her property?

12:06  14          A.   Not anything specifically.  If there is

12:06  15   anything specific that you want me to elaborate on, I

12:06  16   can try to.

12:06  17          Q.   Okay.  Before I ask any specifics,

12:06  18   generally does anything else about the property come

12:06  19   to mind when you think about this case?

12:06  20          A.   It was a two-story house.  I could -- from

12:06  21   where I was standing by the chain link fence, I could

12:06  22   observe a porch connected to the house.  And that was

12:06  23   pretty much all I had from my line of sight from the

12:06  24   front of the house on Belknap Street.

12:06  25          Q.   And in your answer to number 4, which



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

|       | 1  | SERGEANT JENNIFER TRENTON - BY MR. SHIELDS |
|-------|----|-------------------------------------------|
| 12:06 | 2  | asked, you know, what you did to determine if there |
| 12:06 | 3  | were any dogs prior to entering the gate, you said |
| 12:07 | 4  | that you shook the fence and waited; right? |
| 12:07 | 5  | A.  Yes, I did. |
| 12:07 | 6  | Q.  Did you do anything else? |
| 12:07 | 7  | A.  So the other things that I would have done |
| 12:07 | 8  | were observations.  There was no Beware of Dog or |
| 12:07 | 9  | anything that indicated -- like a sign on the exterior |
| 12:07 | 10 | of the fence that would have indicated that there was |
| 12:07 | 11 | an animal on the property. |
| 12:07 | 12 | Again, just kind of scanning the lawn |
| 12:07 | 13 | approaching the house, I saw no indications of |
| 12:07 | 14 | anything else that really stood out that there was a |
| 12:07 | 15 | dog in the yard, like a toy laying near the entryway |
| 12:07 | 16 | gate or a water dish or something like that.  I saw |
| 12:07 | 17 | nothing that really alerted me -- alerted to me that |
| 12:07 | 18 | there was a dog inside. |
| 12:07 | 19 | Q.  Did you -- what did you do -- well, let me |
| 12:07 | 20 | withdraw that question. |
| 12:08 | 21 | Why did you go to the property? |
| 12:08 | 22 | A.  The original 911 call was for a neighbor |
| 12:08 | 23 | trouble in progress.  The information that we had at |
| 12:08 | 24 | that time was that there was a loose dog and the |
| 12:08 | 25 | neighbor was trying to run it over. |



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

105

|       |    |                                                          |
|-------|----|----------------------------------------------------------|
|       | 1  | SERGEANT JENNIFER TRENTON - BY MR. SHIELDS               |
| 12:34 | 2  | make that phone call to do that.                         |
| 12:34 | 3  | That's something that another admin.                     |
| 12:34 | 4  | channel dispatcher would do for you to make those        |
| 12:34 | 5  | calls.  It's not something that you would do yourself.   |
| 12:35 | 6  | Q.  Okay.  So let's watch your body-worn                 |
| 12:35 | 7  | camera video, and I'll just ask you some questions       |
| 12:35 | 8  | about it.  Give me one second to put it onto the         |
| 12:35 | 9  | screen.                                                  |
| 12:35 | 10 | So this is the version that was produced                 |
| 12:35 | 11 | in FOIL.  So this is the very end of Cala's video at     |
| 12:35 | 12 | 18 minutes and 58 seconds into the                       |
| 12:35 | 13 | 41-minute-and-57-second video, and it will switch over   |
| 12:35 | 14 | to your camera in one second.                            |
| 12:35 | 15 | A.  And just to clarify, so then it switches             |
| 12:35 | 16 | to mine back at the start time; correct?                 |
| 12:35 | 17 | Q.  Correct.                                             |
| 12:35 | 18 | A.  And then goes through?  Okay.                        |
| 12:35 | 19 | Q.  And I'm hitting Play.                                |
| 12:36 | 20 | Okay.  And, Sergeant Trenton, does the                   |
| 12:36 | 21 | video depict you walking up and shaking the gate?        |
| 12:36 | 22 | A.  It does.                                             |
| 12:36 | 23 | Q.  And then how long did you wait between               |
| 12:36 | 24 | shaking the gate and opening it?                         |
| 12:36 | 25 | A.  I counted two seconds.  I don't...                   |



106

1       SERGEANT JENNIFER TRENTON - BY MR. SHIELDS

12:36  2       Q.  Let's do that again.  Okay.

12:36  3            So I rewound the video to 18 minutes and

12:36  4  59 seconds, which is, again, the end of Cala's

12:36  5  body-worn camera video, and I'm going to hit Play

12:36  6  again.

12:36  7            So I'm pausing right at 19 minutes and 2

12:36  8  seconds.

12:36  9            Do you know if you touched the gate yet?

12:36 10       A.  From hearing, no, I don't -- I can't --

12:36 11       Q.  So I'm going to hit Play and Pause real

12:36 12  quick when you start to shake.  Okay.

12:37 13            Is it fair to say that at 19 minutes and 4

12:37 14  seconds into the video you just started to shake the

12:37 15  gate?

12:37 16            MS. JONES:  Objection.

12:37 17       A.  I mean, I think there might have been a

12:37 18  little movement before there, but within the 19:03 to

12:37 19  19:04 time range, yes.

12:37 20       Q.  And I paused it at 19:07 into the video.

12:37 21  Had you started to open the gate at that point?

12:37 22       A.  So from the video it looks like I hit the

12:37 23  secured latch up at that point.

12:37 24       Q.  Okay.  So is it fair to say that you shook

12:37 25  the gate and then you immediately opened the latch to



|       | 1  | SERGEANT JENNIFER TRENTON - BY MR. SHIELDS |
|-------|----|--------------------------------------------|
| 12:37 | 2  | start to open the gate? |
| 12:37 | 3  | MS. JONES:  Objection. |
| 12:37 | 4  | A.  So, again, the latch is making noise as |
| 12:37 | 5  | well.  So as I'm doing that and still visually |
| 12:37 | 6  | watching and listening and that, I'm lifting the gate, |
| 12:37 | 7  | which, again, is part of, in my mind, the shaking of |
| 12:37 | 8  | the fence and a possible noise that could cue a dog |
| 12:38 | 9  | into somebody entering their property. |
| 12:38 | 10 | Q.  Okay.  So I'm going to hit Play again real |
| 12:38 | 11 | quick. |
| 12:38 | 12 | And now we've paused at 19:09, and the |
| 12:38 | 13 | gate is completely open; right? |
| 12:38 | 14 | A.  Not completely.  I'd say it's |
| 12:38 | 15 | three-quarters.  If it was completely open, I'd say it |
| 12:38 | 16 | would be on the other side of Officer Cala. |
| 12:38 | 17 | Q.  So is it fair to say that you've opened |
| 12:38 | 18 | the gate to begin to enter the yard? |
| 12:38 | 19 | A.  Yes. |
| 12:38 | 20 | Q.  So you started to shake the gate at 19:03, |
| 12:38 | 21 | 19:04 into the video; is that correct? |
| 12:38 | 22 | A.  Correct. |
| 12:38 | 23 | Q.  And then by six seconds later the gate's |
| 12:38 | 24 | open, and you're starting to enter the yard? |
| 12:38 | 25 | A.  Correct. |



108

            1        SERGEANT JENNIFER TRENTON - BY MR. SHIELDS

12:38   2        Q.  Can you tell me where you waited to see if

12:38   3    anybody responded to you shaking the gate?

12:38   4        A.  During those six seconds.  That was the

12:38   5    time frame that I waited.

12:38   6        Q.  How far can you travel in six seconds?

12:38   7            MS. JONES:  Objection.

12:39   8        A.  I have no idea.  I'm sorry.  I don't know

12:39   9    if I can give you an accurate feet, yard, meter

12:39  10    response on that.

12:39  11        Q.  Would you say that you shook the gate

12:39  12    really loudly or something else?

12:39  13            MS. JONES:  Objection.

12:39  14        A.  I feel like I shook the gate like I would

12:39  15    on any other time that I've done the same thing.

12:39  16        Q.  So we've got the video paused right now at

12:39  17    19 minutes and 9 seconds into this video which -- let

12:39  18    me just back up and ask you.

12:39  19            On the bottom right-hand corner of the

12:39  20    video do you see those numbers there?

12:39  21        A.  I do.

12:39  22        Q.  And can you just generally tell me what

12:39  23    those numbers are that start with 00119?

12:39  24        A.  So the 00119 would have been the serial

12:39  25    number to the body-worn camera that I had, and then



|       |    |                                                        |
|-------|----|--------------------------------------------------------|
|       | 1  | SERGEANT JENNIFER TRENTON - BY MR. SHIELDS             |
| 12:39 | 2  | there's an underscore that goes into JT1650, my        |
| 12:39 | 3  | initials followed by my IBM.                           |
| 12:39 | 4  | The second row is going to give you the                |
| 12:39 | 5  | date. So 2018 -- I don't know if there's a 2 there     |
| 12:40 | 6  | because it's kind of paused blurry. But it's either    |
| 12:40 | 7  | stating 2018, 6 for June, 10 for the day, and then the |
| 12:40 | 8  | time stamp on the video. So at that point it's 11:41   |
| 12:40 | 9  | and 53 seconds.                                        |
| 12:40 | 10 | Q. Thank you. So you recognize this as the             |
| 12:40 | 11 | body-worn camera that you had on during the day, that  |
| 12:40 | 12 | day?                                                   |
| 12:40 | 13 | A. I do.                                               |
| 12:40 | 14 | Q. If you take a look at the fence, is there           |
| 12:40 | 15 | anything that you notice about this fence?             |
| 12:40 | 16 | A. The attached -- the attachment onto the             |
| 12:40 | 17 | top of it is not something that you would see normally |
| 12:40 | 18 | on a fence.                                            |
| 12:40 | 19 | Q. Do you have any idea why that attachment            |
| 12:40 | 20 | was included on the top of that fence?                 |
| 12:40 | 21 | A. I do not know.                                      |
| 12:40 | 22 | Q. Do you have any estimate for how high that          |
| 12:40 | 23 | attachment is to the top of the fence?                 |
| 12:40 | 24 | MS. JONES: Objection.                                  |
| 12:40 | 25 | A. So I know that a normal chain-link fence            |



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

|   | 1 | SERGEANT JENNIFER TRENTON - BY MR. SHIELDS |
|---|---|---|
| 12:40 | 2 | is approximately 4 feet high.  So I would say the |
| 12:41 | 3 | fence that we're looking at is 4 feet, and then I |
| 12:41 | 4 | would estimate from looking at it right now that maybe |
| 12:41 | 5 | that's another foot or 12 inches on top of that fence. |
| 12:41 | 6 | So I would say that that may bring it up to 5 feet, |
| 12:41 | 7 | approximately, in total. |
| 12:41 | 8 | Q.  Is that something you thought about before |
| 12:41 | 9 | you entered the yard? |
| 12:41 | 10 | A.  I did not. |
| 12:41 | 11 | Q.  As we sit here today, can you think of any |
| 12:41 | 12 | reasons why there might be an additional foot added to |
| 12:41 | 13 | the top of that fence? |
| 12:41 | 14 | MS. JONES:  Objection. |
| 12:41 | 15 | A.  I mean, possibly that they have a child |
| 12:41 | 16 | that either likes to climb or an animal that likes to |
| 12:41 | 17 | jump would be my guess at this point in time. |
| 12:41 | 18 | Q.  But that's not something that you |
| 12:41 | 19 | considered before you entered the yard? |
| 12:41 | 20 | A.  I didn't even think twice of it, honestly. |
| 12:41 | 21 | Q.  All right.  I'm going to hit Play again |
| 12:41 | 22 | now at 19 minutes and 9 seconds into the video. |
| 12:41 | 23 | I'm sorry.  Right before that, did you |
| 12:41 | 24 | hear yourself say that you thought you saw animal |
| 12:41 | 25 | control? |



111

| | 1 | SERGEANT JENNIFER TRENTON - BY MR. SHIELDS |

12:41  2      A.  I did say that.

12:42  3      Q.  Does that refresh your recollection at all

12:42  4  about whether or not you saw animal control on that

12:42  5  day?

12:42  6      A.  Yes.  So I would have -- I saw them in the

12:42  7  general area when we were pulling up.  I can't recall

12:42  8  what street they would have been on, but I did observe

12:42  9  an animal control vehicle in the area.

12:42 10      Q.  Okay.  After seeing that animal control

12:42 11  vehicle in the area, did you reach out to them at all?

12:42 12      A.  I did not.  At that time I was unaware of

12:42 13  an animal control job in the system at the same time

12:42 14  as ours.

12:42 15      Q.  Okay.  Even though it was a call for a

12:42 16  stray dog?

12:42 17          MS. JONES:  Objection.

12:42 18          MR. SHIELDS:  I'll withdraw that question.

12:42 19      Q.  Even though it was a call that involved a

12:42 20  dog and a neighbor dispute?

12:42 21      A.  Correct.  I did not know that they were

12:42 22  dispatched as well.

12:42 23      Q.  When you saw animal control in the

12:42 24  neighborhood, did you think that it could have been

12:42 25  related to the call that you were dispatched for?



**ALLIANCE**
COURT REPORTING, INC.
*Videography • Remote • Deposition Suites*
www.alliancecourtreporting.net • 585.546.4920

112

|       |    |                                                                    |
|-------|----|--------------------------------------------------------------------|
|       | 1  | SERGEANT JENNIFER TRENTON - BY MR. SHIELDS                          |
| 12:42 | 2  | MS. JONES:  Objection.                                             |
| 12:42 | 3  | A.  I was not sure if it was amongst us, if it                    |
| 12:43 | 4  | was a separate job that they were dealing with or if              |
| 12:43 | 5  | they were just proactively doing something at that                |
| 12:43 | 6  | point in time.  I had no idea what they were doing.               |
| 12:43 | 7  | Q.  And you didn't do anything active to                          |
| 12:43 | 8  | figure that out?                                                   |
| 12:43 | 9  | MS. JONES:  Objection.                                            |
| 12:43 | 10 | A.  I did not.                                                     |
| 12:43 | 11 | Q.  I'm going to hit Play again at 19 minutes                     |
| 12:43 | 12 | and 12 seconds into this video.                                    |
| 12:43 | 13 | And as we're paused right now at 19                               |
| 12:43 | 14 | minutes and 19 seconds into the video, can you just               |
| 12:43 | 15 | kind of describe what you did after entering the gate             |
| 12:43 | 16 | up to this point?                                                  |
| 12:43 | 17 | A.  So there's the attached porch that goes                       |
| 12:43 | 18 | along the house.  I went up the first set of stairs.              |
| 12:43 | 19 | Immediately to my left I observed -- I'm going to                 |
| 12:43 | 20 | describe it as like an alcove.  It's like the house               |
| 12:43 | 21 | set in a little bit to where the door was.                        |
| 12:44 | 22 | And I began to approach that door to                             |
| 12:44 | 23 | attempt to make contact with somebody in the house.              |
| 12:44 | 24 | Q.  And where we're paused right now, what do                    |
| 12:44 | 25 | you see from the angle your body camera video is                  |



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

113

|       |    |                                                         |
|-------|----|---------------------------------------------------------|
|       | 1  | SERGEANT JENNIFER TRENTON - BY MR. SHIELDS              |
| 12:44 | 2  | pointing?                                               |
| 12:44 | 3  | A.  So past me now I know I see more yard with          |
| 12:44 | 4  | a driveway and at least one vehicle in the driveway     |
| 12:44 | 5  | that I believe from now, from standing there, is        |
| 12:44 | 6  | connected to that house.                                |
| 12:44 | 7  | Q.  All right.  I'm going to hit Play -- well,          |
| 12:44 | 8  | before I hit Play again, up to this point, you hadn't   |
| 12:44 | 9  | observed any people or any dogs in the backyard of the  |
| 12:44 | 10 | house; is that right?                                   |
| 12:44 | 11 | A.  I have not at this point.                           |
| 12:44 | 12 | Q.  And now 19 minutes and 19 seconds I'm              |
| 12:44 | 13 | going to hit Play again.                                |
| 12:45 | 14 | Okay.  So I'm pausing at 19 minutes and 59            |
| 12:45 | 15 | seconds into the video.                                 |
| 12:45 | 16 | MS. JONES:  Just for the record, the time             |
| 12:45 | 17 | stamp on the BWC is 11:42:43.  It's just a little more  |
| 12:45 | 18 | helpful.                                                |
| 12:45 | 19 | MR. SHIELDS:  Thank you.                               |
| 12:45 | 20 | Q.  And, Sergeant Trenton, at where we're            |
| 12:45 | 21 | paused at 19 minutes and 59 seconds into this video,    |
| 12:45 | 22 | or 11:42:43 on the time stamp, now you're back outside  |
| 12:46 | 23 | of the yard; correct?                                   |
| 12:46 | 24 | A.  Correct.                                           |
| 12:46 | 25 | Q.  And while you were in the yard, Officer          |



114

```
         1          SERGEANT JENNIFER TRENTON - BY MR. SHIELDS
12:46    2    Cala shot the dog?
12:46    3          A.  It was inside of the yard, yes.
12:46    4          Q.  And that was scary; right?
12:46    5          A.  It was.
12:46    6          Q.  Can you tell me how you felt when Officer
12:46    7    Cala shot the dog?
12:46    8          A.  Do you only want to know my feelings at
12:46    9    that point, or can I go and let you know my feelings
12:46   10    prior to having the dog charge past me?
12:46   11          Q.  Sure.  Why don't we start with when you
12:46   12    first saw the dog, how did you feel?
12:46   13          A.  Okay.  So as I'm about to make contact
12:46   14    onto the door, I'm attempting to knock on the door,
12:46   15    the dog appears.  Large, long-haired, black dog.
12:46   16          I became a little nervous at that point,
12:47   17    hoping maybe that the dog would stay, but
12:47   18    unfortunately the dog kept coming.  So I -- my first
12:47   19    instinct was to try to kind of remove myself from --
12:47   20    to step back.
12:47   21          As I take a step back, the dog appears to
12:47   22    not either notice me or -- I don't know what the
12:47   23    thought process was, obviously, and it charges past
12:47   24    me.  So I'm clearly nervous, as you can see, where I
12:47   25    kind of, like, gasp or something as I move back toward
```



|   |   | SERGEANT JENNIFER TRENTON - BY MR. SHIELDS |
|---|---|---|

```
        1        SERGEANT JENNIFER TRENTON - BY MR. SHIELDS
12:47   2    the door.  And then I'm trying to stay against that
12:47   3    door to not make movement to try to startle the dog at
12:47   4    that point.
12:47   5              And as the dog is past me, another dog
12:47   6    approaches, and I see a gray -- darker gray dog out of
12:47   7    my line of sight.  So then I'm becoming concerned on
12:47   8    the approach of where that dog's going to go, if he's
12:47   9    going to come toward me.
12:48  10              And that's when I hear the shot ring out.
12:48  11    So I'm nervous as to, you know, what happened at that
12:48  12    point.  That shot did scare the other dog, so that dog
12:48  13    was able to retreat at that point.  And then I just
12:48  14    stayed still to make sure that I wasn't getting in a
12:48  15    line of fire or something, to protect myself at that
12:48  16    point before I moved.  And I asked if it was --
12:48  17    basically if it was safe to move at that point.
12:48  18         Q.  So the whole situation sounds pretty
12:48  19    terrifying.
12:48  20         A.  It is.
12:48  21         Q.  There are two dogs?
12:48  22         A.  Correct.
12:48  23         Q.  At least that you saw?
12:48  24         A.  Correct.
12:48  25         Q.  And there's a gunshot?
```



116

```
         1              SERGEANT JENNIFER TRENTON - BY MR. SHIELDS
12:48    2         A.  Correct.
12:48    3         Q.  And that was scary?
12:48    4         A.  All of it put together was definitely a
12:48    5  scary situation.
12:48    6         Q.  And what could you have done to avoid that
12:48    7  situation?
12:48    8              MS. JONES:  Objection.
12:48    9         A.  I mean, more specifically, like, overall?
12:49   10  I feel like that's a pretty broad question.  I don't
12:49   11  want to answer it out of line here without a little
12:49   12  bit more.
12:49   13         Q.  Overall, what could you have done to avoid
12:49   14  having put yourself in that terrifying situation?
12:49   15              MS. JONES:  Objection.
12:49   16         A.  I guess if we want to Monday morning
12:49   17  quarterback my thought process at that point, possibly
12:49   18  shaking the fence longer, maybe yelling to announce
12:49   19  our presence.  Other than that, once I'm inside the
12:49   20  gate, I don't have any -- I'm comfortable with what
12:49   21  happened once I'm inside of there.
12:49   22         Q.  What else could you have done before
12:49   23  entering the yard?
12:49   24              MS. JONES:  Objection.
12:49   25         A.  Other than what I just said?  I did just
```



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

1          SERGEANT JENNIFER TRENTON - BY MR. SHIELDS

01:29  2     technically I would have one, but mine would be 811650

01:29  3     to correspond to my IBM number.  Because my IBM number

01:29  4     is 1650.

01:29  5          Q.  Okay.  So they just basically changed your

01:29  6     IBM number -- or you still have both.  You have both

01:29  7     your IBM number and then a corresponding ID number?

01:29  8          A.  Right.  So mine lines up with my IBM.

01:29  9     Theirs does not.  So it's very confusing to try to

01:29 10     look up stuff under that because those last four

01:29 11     digits don't correspond to whatever his IBM number is.

01:29 12          Q.  Okay.  So do you know what IBM number is

01:29 13     used for versus what an ID number like this is used

01:29 14     or --

01:29 15          MS. JONES:  Objection.

01:30 16          Q.  -- other than body-worn cameras?

01:30 17          A.  Again, searching for reports in our

01:30 18     reporting system.  I would have to look it up under

01:30 19     that 817 number for him.  Or for those officers.

01:30 20          Q.  Okay.  So searching for written reports

01:30 21     you use the ID number?

01:30 22          A.  Yes.  For the newer officers.

01:30 23          Q.  Okay.  And for you, for example, what

01:30 24     would you use?

01:30 25          A.  In our reporting system search?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920