UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

MARIANNE ANNISZKIEWICZ,

Plaintiff,

- against -

THE CITY OF ROCHESTER, a municipal entity, POLICE OFFICER BRIAN CALA, SERGEANT JENNIFER TRENTON,

Defendants.

**Case No.: 20-cv-6629 (GWC)(CDH)**

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION TO PRECLUDE**

**DEFENDANT CITY OF ROCHESTER**

**FROM RELITIGATING MONELL LIABILITY BASED ON THE**

***DEMPSEY v. CITY OF ROCHESTER* JURY VERDICT**

Elliot Dolby Shields
Roth & Roth, LLP
192 Lexington Avenue, Suite 802
New York, New York 10016

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................................... ii

INTRODUCTION ......................................................................................................................... 1

RELEVANT BACKGROUND ...................................................................................................... 1

    I.    The Anniszkiewicz Claims Against the City ................................................................. 1

    II.    The Dempsey Trial and Verdict............................................................................... 2

    III.    Identity of Evidence Between the Two Cases ................................................... 3

    IV.    Summary of the Dempsey Trial Testimony on the *Monell* Claims ............................ 4

ARGUMENT................................................................................................................................. 8

    I.    Legal Standard for Offensive Collateral Estoppel............................................................ 8

    II.    Federal Courts Have Applied Offensive Collateral Estoppel to Preclude Municipalities from Relitigating *Monell* Liability After Prior Jury Verdicts...................................... 8

        A.    *Kluppelberg v. Burge*, 276 F. Supp. 3d 773 (N.D. Ill. 2017)....................................... 8

        B.    *Cousik v. City & County of Denver*, No. 22-cv-01213-NYW-KAS, 2024 WL 4929272 (D. Colo. Dec. 2, 2024)................................................................................................ 11

    III.    All Four Elements of Collateral Estoppel Are Satisfied............................................... 13

        A.    The Issues Are Identical......................................................................................... 14

        B.    The Issues Were Actually Litigated and Essential to the Judgment.......................... 16

        C.    The City Had a Full and Fair Opportunity to Litigate ............................................. 17

    IV.    Application of Estoppel Is Not Unfair......................................................................... 18

    V.    Practical Effect of Granting This Motion ...................................................................... 20

CONCLUSION............................................................................................................................. 20

## TABLE OF AUTHORITIES

**Cases**

*Allen v. McCurry,* 449 U.S. 90 (1980) ............................................................................ 8

*Astoria Fed. Sav. & Loan Ass'n v. Solimino,* 501 U.S. 104 (1991) .............................. 19

*Chi. Truck Drivers v. Century Motor Freight, Inc.,* 125 F.3d 526 (7th Cir. 1997) ........ 8

*Cousik v. City & County of Denver,* No. 22-cv-01213-NYW-KAS, 2024 WL 4929272 (D. Colo. Dec. 2, 2024) ........................................................................................... *passim*

*Faulkner v. Nat'l Geographic Enters. Inc.,* 409 F.3d 26 (2d Cir. 2005) ........................ 8

*Frandsen v. Westinghouse Corp.,* 46 F.3d 975 (10th Cir. 1995) .................................... 12, 16, 17

*Gelb v. Royal Globe Ins. Co.,* 798 F.2d 38 (2d Cir. 1986) ........................................... 8

*Kluppelberg v. Burge,* 276 F. Supp. 3d 773 (N.D. Ill. 2017) ................................... passim

*Murdock v. Ute Indian Tribe,* 975 F.2d 683 (10th Cir. 1992) ....................................... 8

*Parklane Hosiery Co. v. Shore,* 439 U.S. 322 (1979) ............................................... *passim*


**Statutes**

42 U.S.C. § 1983 .......................................................................................................... 2, 9, 11

ii

## INTRODUCTION

Plaintiff Marianne Anniszkiewicz, by and through her attorneys, Roth & Roth, LLP, respectfully submits this motion to preclude Defendant City of Rochester (the "City") from relitigating its *Monell* liability on Plaintiff's First Claim for Relief in the Complaint (ECF 1), the Fourth Amendment municipal liability claims regarding the unconstitutional seizure of her dog, Sampson. Plaintiff seeks to apply the doctrine of offensive collateral estoppel—also known as non-mutual offensive issue preclusion—based on the unanimous jury verdict entered on January 30, 2026, in *Dempsey v. City of Rochester*, et al., No. 6:19-cv-06780-MJP (W.D.N.Y.) (ECF No. 229).

In *Dempsey*, a jury found the City of Rochester liable on two *Monell* theories: (1) that the City maintained an unconstitutional policy, custom, or practice regarding the seizure of dogs during police encounters (Shields Decl. Ex. A, Question 7); and (2) that the City failed to adequately train its officers on dog encounters (Shields Decl. Ex. A, Question 8). These are the identical *Monell* issues presented in this case, supported by the same evidence, the same expert, the same depositions, and the same training materials. The City—the identical municipal defendant—had a full and fair opportunity to litigate these issues over a multi-week jury trial in *Dempsey* and lost on both theories. It should not be permitted a second bite at the apple.

The City of Rochester is collaterally estopped from contesting these *Monell* issues, and the City's Motion for Summary Judgment on Plaintiff's *Monell* claims should be denied.

## RELEVANT BACKGROUND

### I.  The Anniszkiewicz Claims Against the City

On June 10, 2018, Rochester Police Department ("RPD") Officer Brian Cala shot and killed Plaintiff's dog, Sampson, on Plaintiff's porch at 236 Belknap Street, Rochester, New York. After Officers Cala and Trenton entered the yard and walked onto the front porch, Sampson trotted from the back yard onto the porch and approached Officer Cala, and was not displaying any signs of aggression. (ECF 72-3, Cala Body-Worn Camera ("BWC") Video at 11:41:52–11:42:10; ECF 79-3, Expert Report of James Crosby at 5.) Cala backed off the porch and

unholstered his gun. Sampson then came to a complete stop on the porch. Cala then pointed his firearm at Sampson and yelled "back the f*** up", Sampson barked twice, and Cala shot Sampson in the head, killing him. (ECF 72-3, Cala BWC at 11:42:06–11:42:11.)

Plaintiff asserts claims under 42 U.S.C. § 1983 against the City of Rochester, alleging that the City maintained an unconstitutional policy, custom, or practice regarding the seizure of dogs during police encounters and that the City failed to adequately train its officers regarding dog encounters. The City moved for summary judgment on September 26, 2024. (ECF No. 72.) Plaintiff filed her opposition on November 7, 2024 (ECF No. 76), and the City filed its reply on November 22, 2024 (ECF No. 77). The motion remains pending before this Court.

## II.    **The Dempsey Trial and Verdict**

n the related case of *Dempsey v. City of Rochester, et al.*, No. 6:19-cv-06780-MJP (W.D.N.Y.), Plaintiffs Charles and Leona Dempsey brought § 1983 and state-law claims arising from the October 19, 2018 shooting of their dog, Tesla, by RPD Officer Javier Algarin. Officer Algarin's body-worn camera video captures what happened: Algarin jumped the fence and entered the Dempseys' yard, and approximately two seconds later, Mr. Dempsey opened the front door and Tesla ran directly at Algarin. (Algarin Body-Worn Camera Video, ECF 76-41.) Algarin never even considered pulling out his pepper spray or baton—he simply drew his firearm and shot Tesla. (*Id.*) The case was tried to a jury over a multi-week trial before Magistrate Judge Mark Pedersen, from January 13, 2026 to January 30, 2026. On January 30, 2026, the jury returned a verdict in favor of the Dempsey plaintiffs on, *inter alia*, the following claims directly relevant to the instant motion:

- **Question 6:** Officer Algarin violated the Fourth Amendment by shooting Tesla the dog (*YES*);

- **Question 7:** The City of Rochester violated the Fourth Amendment by maintaining an unconstitutional policy, custom, or practice regarding dog seizures (*YES*);

- **Question 8:** The City of Rochester violated the Fourth Amendment by failing to properly train officers regarding dog encounters (*YES*).

2

The jury also answered special interrogatories with respect to the shooting of Tesla (Question 6), finding that Tesla presented as offensive or aggressive to Officer Algarin (Interrogatory 6a — YES), but that Algarin had sufficient time to use a nonlethal method of control (Interrogatory 6b — YES), had sufficient ability to use a nonlethal method of control (Interrogatory 6c — YES), and could have observed objective indications that a dog resided at the property (Interrogatory 6d — YES). (*See* Shields Decl. Ex. A; ECF No. 229.) If the *Dempsey* jury found that Officer Algarin had sufficient time and ability to use his baton or pepper spray against Tesla—a dog that ran directly at him within seconds of emerging from the house—then certainly a jury could find that Officer Cala had the time and opportunity to use his pepper spray or baton against Sampson, who came to a complete stop on the porch before Cala shot him.

## III.    Identity of Evidence Between the Two Cases

*Monell* discovery in this case was conducted jointly with *Dempsey*. By Amended Scheduling Order dated January 25, 2023, the Court consolidated *Monell* discovery in *Dempsey*, *Anniszkiewicz*, and two other related RPD dog-shooting cases—*Gursslin v. City of Rochester*, No. 6:20-cv-06508 (W.D.N.Y.) and *Cox v. City of Rochester*, No. 6:22-cv-06207 (W.D.N.Y.)— setting unified deadlines for all *Monell* paper discovery, depositions, and post-deposition demands. (Shields Decl. Ex. F.)

The *Monell* claims in this case are supported by substantially the same evidentiary record that was presented to the *Dempsey* jury. The following key exhibits were submitted in the summary judgment record in both cases:

1.  The expert report of James Crosby (Anniszkiewicz ECF 79-3; Dempsey ECF 98-14);

2.  The deposition of James Crosby (Anniszkiewicz ECF 79-27; Dempsey ECF 98-31);

3.  The deposition of Lieutenant Michael Cuilla, the City's Rule 30(b)(6) witness and head of the RPD's Professional Development Section (Anniszkiewicz ECF 79-24; Dempsey ECF 98-22);

4.  The deposition of Reno DiDomenico, the RPD's dog-encounter trainer (Anniszkiewicz ECF 79-28; Dempsey ECF 98-32);

3

5.  The DiDomenico PowerPoint training presentation, "Dog Bite Prevention for Law Enforcement" (Anniszkiewicz ECF 79-29; Dempsey ECF 98-33);

6.  The deposition of Officer Algarin (Anniszkiewicz ECF 79-36; Dempsey ECF 98-7);

7.  The deposition of Officer Horowitz (Anniszkiewicz ECF 79-10; Dempsey ECF 98-8);

8.  The Firearm Discharge Reports documenting RPD dog shootings from 2013–2018 (Anniszkiewicz ECF 79-20; Dempsey ECF 98-27); and

9.  The U.S. Department of Justice Community Oriented Policing Services ("COPS") training videos and materials on dog encounters (Anniszkiewicz ECF 79-31 through 79-35; Dempsey ECF 98-34 through 98-39).

**IV.    Summary of the Dempsey Trial Testimony on the _Monell_ Claims**

Because the _Dempsey_ trial concluded 14 days ago, the full trial transcript has not yet been prepared. The Verdict Sheet and Special Interrogatories from the Dempsey trial are attached hereto as Exhibit A. Plaintiff's counsel ordered daily copy transcripts for the testimony of the individual defendants, Officers Javier Algarin and Adam Gorman. Officer Algarin's testimony spans two trial days and is attached as Exhibits B and C; Officer Gorman's testimony is attached as Exhibit D. Plaintiff's counsel also attaches as Exhibit E the Final Jury Instructions that Judge Pedersen provided to counsel, as the transcript of the jury charge has not yet been prepared. Additional transcripts will be provided to the Court as they become available.

The _Dempsey_ jury heard extensive testimony over a multi-week trial on the City's training, policies, and customs regarding dog encounters. The testimony and evidence presented at trial—which is substantially the same evidence submitted in support of summary judgment in this case—established pervasive failures in the RPD's training, policies, and practices.

**James Crosby**.  James Crosby, the same expert retained in _Anniszkiewicz_ (see Crosby Report, ECF 79-3), testified at length about the inadequacy of the RPD's training on dog encounters. Crosby testified that the RPD's training was "deficient" and "set [officers] up for failure" by failing to teach threat assessment, de-escalation, or non-lethal alternatives. He established that the RPD's sole training course—Reno DiDomenico's PowerPoint—amounted to

4

roughly two hours of instruction that lacked any practical, hands-on component. Crosby further testified that OC spray is "effective 100% of the time" against dogs, and that Officer Algarin—who carried both OC spray and a baton—"didn't think [OC spray] was effective," demonstrating how "grossly misinformed" RPD officers were as a result of the City's training failures. He also testified that the only simulation based training was in firearms training, where officers are trained on shooting accuracy with a simulated dog running at them; but they are not trained on any shoot/don't shoot scenarios with dogs, and there is no simulation based training on use of less lethal alternatives with dogs, like using pepper spray or a baton. Crosby testified that officers fall back on their training, and when their only simulation training involving dogs is to shoot, they will predictably shoot a dog, even when it does not pose an actual threat.

**Officers Algarin and Gorman**.  Both officers' trial testimony exposed critical deficiencies in the City's training program regarding interactions with dogs. Officer Gorman testified that the only subject on which RPD officers received annual in-service training was firearms. (Shields Decl. Ex. D, p.4, ll.19–21.) He confirmed that he received no in-service training on interactions with pet dogs between his graduation from the police academy and the October 19, 2018 incident. (*Id.* at p.5, ll.2–5.) The RPD maintained a PRISM simulator—which Gorman likened to "the old Nintendo game Duck Hunt"—that presented officers with prerecorded video scenarios requiring shoot/don't shoot decisions. (*Id.* at p.5, ll.16–22; p.6, ll.11–13.) However, Gorman testified that the simulator was used exclusively for firearms and use-of-force scenarios involving people and for de-escalation of people; he had never participated in any simulator training involving interactions with dogs, never completed a shoot/don't shoot scenario involving a dog, and never trained on a simulator for searching the curtilage of a residential property. (*Id.* at p.6, ll.1–25.) Gorman further acknowledged that the PRISM system was "already older and outdated" at the time. (*Id.* at p.7, ll.5–7.) Officer Algarin, who completed his field training only three months before the incident, testified that during field training he chased suspects through residential yards on multiple occasions, jumping fences into private curtilage without first going to the homeowner's front door to request consent—and confirmed that was

5

what RPD trained him to do. (Shields Decl. Exs. B–C, Algarin Direct, p.6, l.6–p.7, l.24.) At trial, Algarin acknowledged that he "could have went to the front door and knocked," that only approximately fifteen seconds elapsed before he shot Tesla, and that "there was no emergency." He made no attempt to use OC spray, did not attempt verbal de-escalation, and did not deploy a baton. Yet the jury specifically found, through special interrogatories, that Algarin had sufficient time to attempt nonlethal methods and sufficient ability to employ them—directly rejecting his trial testimony that he lacked time to pull his baton or pepper spray. (Shields Decl. Ex. A, Special Interrogatories (a)–(c); *cf.* Shields Decl. Exs. B–C, Algarin Cross, p.4, ll.8–23; p.5, ll.1–4.) These admissions and the training deficiencies they revealed were before the jury in evaluating both the individual excessive-force claim and the Monell claims for unconstitutional policy and failure to train.

**Officer Horowitz**. Officer Horowitz testified that the RPD Academy provided no training on entering curtilage. He confirmed that there was no training bulletin on dog encounters, no training bulletin on backtracking, and no training bulletin on curtilage entry. Horowitz also confirmed that no Rochester Police Department policy addressed how officers should handle dog encounters in the field.

**Lieutenant Michael Cuilla**. Lieutenant Cuilla testified at deposition as the City's Rule 30(b)(6) witness, and portions of his video deposition testimony were played at trial in Plaintiffs' direct case. He was also called to testify at trial by Defendants in his capacity as the head of the RPD's Professional Development Section ("PDS"), which oversees all training for the department. Cuilla's testimony was particularly damaging to the City's defense. Cuilla admitted that the RPD had "no written policy on dog encounters." He acknowledged that the DiDomenico PowerPoint training course was a "one-shot" session with no follow-up, no refresher, and no practical component. He confirmed that the department's training records showed no evidence that any officer received additional training after the initial session.

Most significantly, Cuilla's testimony revealed a direct conflict between the City's policy and New York State law. Cuilla initially could not even remember the City's policy on when an

6

officer could shoot a dog: he initially testified that the RPD's standard for when an officer may discharge a firearm against a dog required a threat of "serious physical injury"—a heightened legal standard drawn from New York Agriculture & Markets Law § 121. On cross-examination, however, Cuilla conceded that the RPD had actually adopted the lower "physical injury" standard from the Agriculture & Markets Law without realizing the discrepancy—and that RPD officers may shoot a dog any time they subjectively fear they dog may cause any injury, no matter how minor. This confusion regarding the applicable legal standard underscored the inadequacy of the City's training and policies and supported the jury's finding that the City failed to train its officers on dog encounters.

**Reno DiDomenico**.  DiDomenico, who developed and presented the RPD's sole dog-encounter training course, testified at deposition (ECF 79-28 in this case; ECF 98-32 in *Dempsey*). He was also called by the City and testified at trial in the *Dempsey* case. DiDomenico admitted that the training was "not based on any national policing standards" and confirmed that no other training or policies existed to guide officers on when and how to use force against dogs. His testimony corroborated Crosby's opinion that the City had no meaningful training infrastructure for dog encounters.

**DOJ COPS Training Materials**.  The jury viewed the DOJ Community Oriented Policing Services training videos, which are Exhibits 29 through 33 to Plaintiff's opposition in this case (ECF 79-31 through 79-35). The evidence established that these comprehensive training materials were freely available to all law enforcement agencies but that the RPD never adopted or utilized them—further demonstrating the City's deliberate indifference to the need for adequate training.

**Lieutenant Peter Nigrelli.** Lieutenant Peter Nigrelli of the Buffalo Police Department testified at deposition in support of Plaintiff's *Monell* claims (Nigrelli Dep., ECF 76-44) and at the *Dempsey* trial. Lieutenant Nigrelli testified that after the Buffalo Police Department implemented the DOJ COPS training program in 2014, the number of dog shootings by Buffalo police officers dropped dramatically. (*Id.*) He further testified that under Buffalo Police

7

Department policy, if a person is present in the yard or the room where there is a dog, the officer may not shoot the dog because of the risk that a bystander could be struck by a ricochet bullet. (*Id.*)

## ARGUMENT

### I.  Legal Standard for Offensive Collateral Estoppel

The doctrine of offensive collateral estoppel, also known as non-mutual offensive issue preclusion, permits a plaintiff "to foreclose a defendant from relitigating an issue the defendant has previously litigated unsuccessfully in another action against a different party." *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 329 (1979).

Under federal law, offensive collateral estoppel applies when: (1) the issues in both proceedings are identical; (2) the issue in the prior proceeding was actually litigated and actually decided; (3) there was a full and fair opportunity for litigation in the prior proceeding; and (4) the issue previously litigated was necessary to support a valid and final judgment on the merits. *Faulkner v. Nat'l Geographic Enters. Inc.*, 409 F.3d 26, 37 (2d Cir. 2005) (quoting *Gelb v. Royal Globe Ins. Co.*, 798 F.2d 38, 44 (2d Cir. 1986)); *accord Murdock v. Ute Indian Tribe*, 975 F.2d 683, 687 (10th Cir. 1992); *Chi. Truck Drivers v. Century Motor Freight, Inc.*, 125 F.3d 526, 530 (7th Cir. 1997). In addition, the court must ensure that application of the doctrine would not be unfair to the defendant. *Parklane*, 439 U.S. at 330–32.

The doctrine is designed to "relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication." *Allen v. McCurry*, 449 U.S. 90, 94 (1980).

### II.  Federal Courts Have Applied Offensive Collateral Estoppel to Preclude Municipalities from Relitigating *Monell* Liability After Prior Jury Verdicts

Two federal district court decisions are directly on point and compel the same result here.

#### A.  *Kluppelberg v. Burge*, 276 F. Supp. 3d 773 (N.D. Ill. 2017)

8

In *Kluppelberg*, the plaintiff was convicted in 1989 of murder and arson and sentenced to life in prison based on evidence that Chicago Police Department detectives had withheld material exculpatory and impeachment evidence—specifically, an investigative file separate from the official case file, commonly known as a "street file," that was never disclosed to the defense. *Id.* at 775. After serving nearly 23 years, Kluppelberg was granted a Certificate of Innocence and released in 2012. *Id.* He filed a § 1983 action against the City of Chicago and individual officers, asserting *Monell* claims based on the City's official policy or practice of concealing exculpatory material contained in street files. *Id.* at 775–76.

Before *Kluppelberg* went to trial, a related § 1983 case—*Fields v. City of Chicago*, No. 10 C 1168 (N.D. Ill.)—had already been tried to a jury. *Id.* at 775. In *Fields*, the plaintiff alleged that CPD detectives from a different detective area (Area 1, as opposed to Area 3 in *Kluppelberg*) had similarly withheld a street file containing exculpatory material during his murder prosecution. *Id.* The *Fields* jury was instructed that, to find the City liable under *Monell*, it had to find by a preponderance of the evidence that "it was the policy of the City of Chicago to conceal material exculpatory and/or impeachment evidence." *Id.* at 777. The jury returned a verdict against the City on the *Monell* claim. *Id.* at 775.

Kluppelberg moved to apply collateral estoppel to bar the City from relitigating whether it had such a policy or practice. *Id.* at 775–76. The court granted the motion, conducting a detailed analysis of each element.

*Identity of issues.* The court found the issues were identical even though the two cases involved different detective areas (Area 1 in *Fields*, Area 3 in *Kluppelberg*) and partially different time frames. *Id.* at 777 n.6. The court relied on the testimony of the City's own Rule 30(b)(6) witness—the same witness designated in both cases—who had conducted an audit of

9

investigative files across CPD detective areas and determined that "file production problems were present citywide." *Id.* The court also noted that there was "no suggestion in this case or in *Fields* that the City's policies or practices were different" across the relevant time periods. *Id.* The court concluded that the similarity between the policy or practice issue in *Fields* and the one raised in *Kluppelberg* was "sufficient for purposes of collateral estoppel when applying a general verdict." *Id.*

*Essential to the judgment.* The City argued that it was impossible to determine from a general jury verdict what specific policy the jury had found, because Fields presented multiple types of withheld evidence at trial. *Id.* at 776–77. The court rejected this argument, holding that although Fields presented up to ten types of withheld evidence for his *individual* due process claims, the only evidence he presented on the *Monell* claim—and the only policy he argued to the jury on that claim—related to street files. *Id.* at 777. The court pointed to Fields's closing argument, in which counsel stated: "The last claim in the case I want to talk about is the city's policy claim. This is the street file claim." *Id.* The court concluded: "As such, while Fields may have proven additional constitutional violations by the individual defendants with other exculpatory evidence, for his *Monell* claim he must have proven that the City had a policy or practice concerning street files, because that is the only evidence he presented for it." *Id.* at 778.

*Full and fair opportunity and fairness.* The City did not argue that *Fields* lacked sufficiently high stakes or that it had additional procedural opportunities unavailable in *Fields*. *Id.* at 778. The City argued that collateral estoppel was unfair because of allegedly inconsistent prior rulings. *Id.* The court rejected this argument, noting that the one prior jury verdict the City cited—an earlier verdict in *Fields* itself that found no *Monell* liability—had been vacated because the trial court found it had "rendered it impossible for Fields to attempt to show that the

10

Chicago Police Department's practice of file maintenance and disclosure affected anyone other than him." *Id.* at 778. The vacated verdict was therefore "essentially moot" for purposes of the *Parklane* inconsistency analysis. *Id.*

The court also rejected the City's argument that collateral estoppel would prejudice the individual defendants, noting that the plaintiff would still have to prove the individual defendants' knowledge and causation, and that the defendants could propose a limiting jury instruction. *Id.* at 778–79.

### B. *Cousik v. City & County of Denver*, No. 22-cv-01213-NYW-KAS, 2024 WL 4929272 (D. Colo. Dec. 2, 2024)

In *Cousik*, thirteen plaintiffs brought § 1983 claims against the City and County of Denver based on alleged violations of their First and Fourth Amendment rights during the 2020 George Floyd protests. *Id.* at *1. Among other theories, the plaintiffs sought to hold Denver liable under *Monell* for failing to adequately train its officers on crowd management and the use of less-lethal weapons. *Id.* The court had initially granted summary judgment to Denver on the failure-to-train theory, concluding that the plaintiffs had not met their burden to demonstrate deliberate indifference. *Id.*

Before the *Cousik* case went to trial, however, a related case—*Epps v. City and County of Denver*, No. 20-cv-01878-RBJ (D. Colo.)—was tried over a 15-day jury trial. *Id.* The *Epps* jury was instructed that, to recover on a failure-to-train theory, each plaintiff had to prove: (1) an officer deprived the plaintiff of a constitutional right; (2) Denver had insufficient training or supervision relating to the alleged violations, with the plaintiffs required to "identify specific deficiencies in Denver's training or supervision"; (3) the deficient training caused the constitutional deprivation; and (4) Denver adopted its policy of deficient training with deliberate

11

indifference. *Id.* at \*4. The *Epps* jury returned a verdict against Denver on the failure-to-train theory for each plaintiff. *Id.* at \*1.

Twenty-two days after the *Epps* amended final judgment was entered, the *Cousik* plaintiffs moved to preclude Denver from relitigating the failure-to-train issue. *Id.* at \*1–2. The court granted the motion, treating it as a motion for reconsideration based on new evidence (the *Epps* verdict), and conducting a thorough analysis of each collateral estoppel element plus the *Parklane* fairness factors.

*Identity of issues.* Although the *Epps* verdict form did not ask the jury to make specific findings about any particular failure-to-train theory, the court concluded the issue was identical. *Id.* at \*4–5. The court analyzed the *Epps* plaintiffs' closing arguments—which focused specifically on failures to train on crowd management and use of less-lethal weapons—and noted that Denver "does not identify any other alternative basis upon which the jury could have reached its conclusion." *Id.* at \*5. The court also found that "much of this evidence overlaps with evidence cited by Plaintiffs at summary judgment in this case." *Id.*

*Final judgment on the merits.* The court held that the *Epps* jury verdict constituted a final adjudication on the merits, citing *Frandsen v. Westinghouse Corp.*, 46 F.3d 975, 979 (10th Cir. 1995), and noting that Denver's pending appeal of *Epps* did not affect its finality for issue preclusion purposes. *Id.* at \*5. The court further found that the jury's determination of the failure-to-train issue was "necessary to the jury's verdict" because the jury "explicitly found in each plaintiff's favor on their failure-to-train theory" and was instructed that it had to find both inadequate training and deliberate indifference. *Id.*

*Full and fair opportunity.* The court noted that Denver "participated in the 15-day *Epps* trial and defended itself against the *Epps* plaintiffs' constitutional claims, including their failure-

12

to-train theory," including through cross-examination of the plaintiffs' expert and presentation of closing arguments. *Id.* at *5–6. There was "no indication that Denver lacked a fair or full opportunity to defend itself." *Id.*

*Fairness.* The court conducted a thorough *Parklane* analysis, finding: (1) Denver had an obvious incentive to defend vigorously in *Epps*; (2) Denver had not identified any inconsistent final judgments in its favor; and (3) the *Cousik* case presented no different procedural opportunities unavailable in *Epps*. *Id.* at *6. Notably, the court addressed Denver's argument that the court's own prior summary judgment ruling against the *Cousik* plaintiffs on the same issue was an inconsistent judgment. *Id.* The court rejected this argument, explaining that its earlier ruling was based on the plaintiffs' presentation of their case at summary judgment, "not necessarily a lack of supportive evidence," and that the order was interlocutory, not final, and subject to revision at any time under Fed. R. Civ. P. 54(b). *Id.*

The court concluded: "Generally speaking, it is not unfair to deny a litigant a second bite at the apple, and preclusion conserves resources and provides consistency in judicial decisions." *Id.* (quoting *In re Corey*, 583 F.3d 1249, 1251 (10th Cir. 2009)).

*Practical effect.* The court specified the precise scope of its ruling: the *Cousik* plaintiffs would not be required to prove at trial "(a) a failure to train with respect to crowd management or the use of less-lethal weapons or (b) that Denver was deliberately indifferent to this lack of training." *Id.* at *7. They would still be required to prove individual causation—that each plaintiff's constitutional rights were violated and that Denver's conduct caused the violation. *Id.*

## III.  All Four Elements of Collateral Estoppel Are Satisfied

As the foregoing discussion of *Kluppelberg* and *Cousik* demonstrates, federal courts have applied offensive collateral estoppel to preclude municipalities from relitigating *Monell* liability issues that a jury decided against them in prior proceedings. The instant case presents a stronger

13

basis for collateral estoppel than either of those cases. Each of the four required elements is satisfied, and the *Parklane* fairness factors uniformly favor preclusion.

### A. The Issues Are Identical

The *Monell* claims in this case—that the City of Rochester maintained an unconstitutional policy, custom, or practice regarding dog seizures and failed to properly train its officers regarding dog encounters—are the same claims that were tried to a jury and decided in *Dempsey*. The identity of issues here is tighter than in either *Kluppelberg* or *Cousik*.

In *Kluppelberg*, the court applied collateral estoppel even though the two cases involved different detective areas (Area 1 in *Fields*, Area 3 in *Kluppelberg*) and partially different time frames. 276 F. Supp. 3d at 777 n.6. The court relied on the City's own Rule 30(b)(6) witness— the same witness designated in both cases—who had conducted an audit of investigative files across CPD detective areas and determined that "file production problems were present citywide." *Id.* The court found the similarity sufficient "for purposes of collateral estoppel when applying a general verdict." *Id.*

In *Cousik*, the court applied collateral estoppel despite a general verdict form that did not specify which failure-to-train theory the jury adopted. 2024 WL 4929272, at *4–5. The court relied on the *Epps* plaintiffs' closing arguments—which focused on failures to train on crowd management and use of less-lethal weapons—and noted that Denver "does not identify any other alternative basis upon which the jury could have reached its conclusion." *Id.* at *5. The court also found that "much of this evidence overlaps with evidence cited by Plaintiffs at summary judgment in this case." *Id.*

Here, no such inferences are necessary. The *Dempsey* verdict sheet asked the jury two discrete questions corresponding to the two *Monell* theories—unconstitutional policy/custom/practice regarding dog seizures (Question 7) and failure to train regarding dog encounters (Question 8)—and the jury answered "Yes" to both. (Shields Decl. Ex. A.) Unlike *Kluppelberg*, where the court had to analyze closing arguments to determine the basis for a

14

general verdict, 276 F. Supp. 3d at 777, and unlike *Cousik*, where the court had to infer the specific failure-to-train theory from the evidentiary record, 2024 WL 4929272, at *4–5, the *Dempsey* verdict form provides specific, unambiguous findings on each *Monell* theory.

The *Dempsey* jury instructions further confirm the identity of issues. The trial court's charge defined with precision the legal questions submitted for decision—and those questions are the same *Monell* issues presented in this case. On the policy/custom/practice theory, the jury was instructed to determine whether "the Rochester Police Department maintained a policy, custom, or practice permitting officers to use lethal force against household dogs during police encounters, without first attempting non-lethal alternatives, and without any objectively reasonable basis for concluding that the dog posed an imminent threat of serious bodily harm." (Shields Decl. Ex. E at 49.) On the failure-to-train theory, the jury was instructed to determine whether the City's "failure to train Rochester Police Department officers on dog encounters amounted to deliberate indifference to constitutional rights"—including whether there was "a pattern of similar constitutional violations (i.e., unreasonable shootings of dogs) by Rochester Police Department officers" or whether "[t]he need for training on dog encounters was so obvious . . . that the City's failure to provide such training can fairly be said to represent deliberate indifference." (*Id.* at 51–52.) These are the identical *Monell* theories alleged in this case. In *Kluppelberg* and *Cousik*, the courts found the identity-of-issues requirement satisfied based on less direct evidence—closing arguments and evidentiary record inferences, respectively. *See* 276 F. Supp. 3d at 777; 2024 WL 4929272, at *4–5. Here, the trial court's formal jury charge goes further: it establishes definitively that the legal issues submitted to—and decided by—the *Dempsey* jury are the same *Monell* issues raised in *Anniszkiewicz*.

Moreover, the evidence supporting the *Monell* claims in *Anniszkiewicz* is not merely similar to or overlapping with the *Dempsey* evidence—it is substantially the same evidence. The same expert (Crosby), the same depositions (Cuilla [the City's Rule 30(b)(6) witness], DiDomenico [the City's trainer on dog encounters]), the same training materials (DiDomenico PowerPoint, DOJ COPS videos), and the same Firearm Discharge Reports were submitted in

15

both cases. *See supra* Section C (Identity of Evidence Between the Two Cases). Indeed, the Court consolidated *Monell* discovery across both cases by order, resulting in a unified evidentiary record. (Shields Decl. Ex. F.) This is an even stronger showing than *Kluppelberg*, where the court applied estoppel across different police areas and different time frames, 276 F. Supp. 3d at 777 n.6, and stronger than *Cousik*, where the court found it sufficient that "much of this evidence overlaps." 2024 WL 4929272, at *5. Here, the evidence does not merely overlap— it is the same evidence.

**B.  <u>The Issues Were Actually Litigated and Essential to the Judgment</u>**

The *Dempsey Monell* claims were tried over a multi-week jury trial, at which both sides presented evidence, examined and cross-examined witnesses, and argued the issues to the jury. The jury rendered a unanimous verdict finding the City liable on both *Monell* theories. A jury verdict constitutes a final adjudication on the merits for collateral estoppel purposes. *See Frandsen v. Westinghouse Corp.*, 46 F.3d 975, 979 (10th Cir. 1995) ("The prior action was tried and judgment was entered after a jury verdict, therefore, it was fully adjudicated on the merits."); *Kluppelberg*, 276 F. Supp. 3d at 776 (same).

The jury's determinations on both *Monell* theories were essential to the judgment. The Verdict Sheet (Shields Decl. Ex. A) required the jury to make specific findings on the unconstitutional policy claim (Question 7) and the failure-to-train claim (Question 8). These were not incidental findings—they were necessary components of the jury's verdict against the City. *See Cousik*, 2024 WL 4929272, at *5 (the jury "explicitly found in each plaintiff's favor on their failure-to-train theory," and these "factual determinations were necessary to the jury's verdict"). In *Cousik*, the court found that the *Epps* jury instructions required findings of both inadequate training and deliberate indifference, and that the jury's verdict necessarily established both. *Id.* The same analysis applies here: the *Dempsey* jury was instructed on the specific elements required for each *Monell* theory, including the requirement to find deliberate

16

indifference on the failure-to-train claim, and the jury's "Yes" answers necessarily establish each element.

Critically, the *Dempsey* jury also answered special interrogatories with respect to the underlying constitutional violation (Question 6), finding that Tesla presented as offensive or aggressive to Officer Algarin (Interrogatory 6a—*YES*), but that Algarin had sufficient time to use a nonlethal method of control (Interrogatory 6b—*YES*), had sufficient ability to use a nonlethal method of control (Interrogatory 6c—*YES*), and could have observed objective indications that a dog resided at the property (Interrogatory 6d—*YES*). (Shields Decl. Ex. A.) These specific factual findings provide even greater detail about the basis for the jury's verdict than was available in either *Kluppelberg*, where the court worked from a general verdict, 276 F. Supp. 3d at 776–77, or *Cousik*, where the verdict form lacked issue-specific findings, 2024 WL 4929272, at *4–5.

A jury verdict retains preclusive effect even while the case is on appeal or before final judgment is entered. *See Frandsen*, 46 F.3d at 979; *Cousik*, 2024 WL 4929272, at *5 (citing 18A Wright & Miller, Federal Practice & Procedure § 4433 (3d ed.) ("[T]he preclusive effects of a lower court judgment cannot be suspended simply by taking an appeal that remains undecided.")).

## C.  **The City Had a Full and Fair Opportunity to Litigate**

The City of Rochester—the very same municipal defendant in both cases—had a full and fair opportunity to litigate these issues in *Dempsey*. The City was represented by counsel throughout the multi-week trial, cross-examined witnesses, presented its own defense witnesses (including calling Reno DiDomenico, the RPD's dog-encounter trainer), and argued its position before the jury. There were no procedural limitations on the City's ability to litigate the *Monell* issues.

This showing is at least as strong as those in *Kluppelberg* and *Cousik*. In *Kluppelberg*, the court found the same-party and full-and-fair-opportunity requirements satisfied where the City of

17

Chicago fully litigated the *Fields* trial. 276 F. Supp. 3d at 776. In *Cousik*, the court found a full and fair opportunity where Denver "participated in the 15-day *Epps* trial and defended itself against the *Epps* plaintiffs' constitutional claims, including their failure-to-train theory," including through cross-examination of the plaintiffs' expert and presentation of closing arguments. 2024 WL 4929272, at *5–6. The court found there was "no indication that Denver lacked a fair or full opportunity to defend itself." *Id.* The same is true here.

## IV.    Application of Estoppel Is Not Unfair

Finally, there is no unfairness in applying preclusion here. Under the *Parklane* factors, the court considers whether: (1) the plaintiff could easily have joined the prior action; (2) the defendant had an incentive to defend vigorously; (3) there are inconsistent prior judgments; and (4) the defendant had different procedural opportunities in the subsequent action. *Parklane*, 439 U.S. at 330–32. Each factor favors preclusion, and the case law confirms that preclusion is appropriate in analogous circumstances.

*First*, Plaintiff could not have joined the *Dempsey* action, as the cases involve different incidents, different plaintiffs, and different individual officer defendants. The *Anniszkiewicz* shooting (June 10, 2018, Officer Cala) and the *Dempsey* shooting (October 19, 2018, Officer Algarin) are distinct events that happened to expose the same systemic municipal failures.

*Second*, the City had every incentive to defend vigorously in *Dempsey*, as it faced significant liability on both the individual and *Monell* claims in a multi-week jury trial. Neither *Kluppelberg* nor *Cousik* found any lack of incentive under analogous circumstances. *See Kluppelberg*, 276 F. Supp. 3d at 778 (City did not argue *Fields* lacked sufficiently high stakes); *Cousik*, 2024 WL 4929272, at *6 ("Defendant had an obvious incentive to defend itself in the *Epps* trial and did so.").

*Third*, there are no inconsistent prior judgments in the City's favor on these *Monell* issues. This distinguishes the instant case from both *Kluppelberg* and *Cousik*, where the defendants pointed to potentially inconsistent prior rulings. In *Kluppelberg*, the City of Chicago cited a prior jury verdict in *Fields* itself that had found no *Monell* liability—but the court rejected

18

this argument because the prior verdict had been vacated after the trial court determined its own rulings had "rendered it impossible for Fields to attempt to show that the Chicago Police Department's practice of file maintenance and disclosure affected anyone other than him." 276 F. Supp. 3d at 778. In *Cousik*, Denver argued that the court's own summary judgment ruling against the plaintiffs on the same failure-to-train issue was an inconsistent judgment. 2024 WL 4929272, at *6. The court rejected this argument, explaining that its earlier ruling "was largely based on Plaintiffs' presentation of their case at summary judgment, not necessarily a lack of supportive evidence," and that the order was interlocutory, not final. *Id.* Here, the City's motion for summary judgment in *Anniszkiewicz* remains pending; there is no prior adverse ruling to create even the appearance of inconsistency.

*Fourth*, this case presents no different procedural opportunities that were unavailable to the City in *Dempsey*. Both cases were litigated in the Western District of New York under the same Federal Rules of Civil Procedure, and the City had access to the same discovery tools, the same evidentiary rules, and the same ability to present its defense.

In sum, if the *Kluppelberg* court could apply collateral estoppel across different police detective areas and time frames, 276 F. Supp. 3d at 777 n.6, and the *Cousik* court could apply it despite a general verdict form and its own contrary summary judgment ruling, 2024 WL 4929272, at *4–6, this Court should have no difficulty applying it where the same municipal defendant lost on the identical *Monell* issues, tried on substantially the same evidence, in a case arising from the same city, the same police department, and the same time period, with a verdict form containing specific findings on each theory. As the *Cousik* court recognized, "a losing litigant deserves no rematch after a defeat fairly suffered, in adversarial proceedings, on an issue identical in substance to the one he subsequently seeks to raise." 2024 WL 4929272, at *4 (quoting *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 107 (1991)). "Generally speaking, it is not unfair to deny a litigant a second bite at the apple, and preclusion conserves resources and provides consistency in judicial decisions." *Id.* at *6 (quoting *In re Corey*, 583 F.3d 1249, 1251 (10th Cir. 2009)).

### V.    Practical Effect of Granting This Motion

As the *Cousik* court specified in granting the same relief, the practical effect of applying collateral estoppel is precisely delineated. 2024 WL 4929272, at \*7. If this Court grants Plaintiff's motion, the City would be precluded from relitigating (a) whether it maintained an unconstitutional policy, custom, or practice regarding the seizure of dogs during police encounters; and (b) whether it failed to adequately train its officers regarding dog encounters, including whether the City was deliberately indifferent to the need for such training. Plaintiff would still be required to prove (c) that Officer Cala's shooting of Sampson violated the Fourth Amendment; and (d) that the City's unconstitutional policy or failure to train was the moving force behind Officer Cala's unconstitutional conduct. *See id.* ("Plaintiffs will still be required to prove (c) that each individual Plaintiff's constitutional rights were violated by Denver officers; and (d) Denver's conduct caused the violation of each individual Plaintiff's constitutional rights.").

This is the same framework the *Kluppelberg* court applied: collateral estoppel on the *Monell* policy finding, while the plaintiff remained obligated to prove individual causation and the specific defendants' knowledge and conduct. 276 F. Supp. 3d at 778–79.

### CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court grant this motion and preclude Defendant City of Rochester from relitigating whether it maintained an unconstitutional policy, custom, or practice regarding the seizure of dogs during police encounters and whether it failed to adequately train its officers regarding dog encounters. The *Dempsey* jury's unanimous verdict on both *Monell* theories—reached after a multi-week trial at which the City had a full and fair opportunity to litigate these issues, and based on substantially the same evidence presented in this case—satisfies every element of offensive collateral estoppel. Federal courts have granted the identical relief under less compelling circumstances. *See Cousik v. City & County of Denver*, 2024 WL 4929272 (D. Colo. Dec. 2, 2024); *Kluppelberg*

20

*v. Burge*, 276 F. Supp. 3d 773 (N.D. Ill. 2017). The City of Rochester is collaterally estopped from contesting these *Monell* issues, and the City's Motion for Summary Judgment on Plaintiff's *Monell* claims should be denied.

Respectfully Submitted,

Dated: February 13, 2026          Roth & Roth, LLP
       New York, New York

_____~//s//~_____
Elliot Dolby Shields