2

**JAVIER ALGARIN**, called as a witness, being duly sworn, testifies as follows:

**MAGISTRATE JUDGE PEDERSEN:**  Thank you, Officer.

You realize you've just taken an oath to testify truthfully which I'm sure you've done and you understand that if you were to answer a question untruthfully, you can be charged, prosecuted and, if convicted, sentenced for a crime called perjury.

I instruct you to listen carefully to the questions asked and answer only those questions.  If a question calls for a yes or no answer, please answer yes or no.  And if you didn't do so, let me know and I will instruct you further. If there are objections, please don't answer the question until I've ruled upon the objection.

Do you understand?

**THE WITNESS:**  I do.

**MAGISTRATE JUDGE PEDERSEN:**  Great.

Your answer, sir.

**MR. SHIELDS:**  Thank you, your Honor.

**DIRECT EXAMINATION BY MR. SHIELDS:**

Q    Good morning, Officer Algarin.

A    Morning.

Q    You're currently employed by the Rochester Police

Algarin - Direct - Shields

Department, correct?

A    Yes.

Q    And you entered the police academy in September 2017, correct?

A    Correct.

Q    And the police academy is six months, correct?

A    Correct.

Q    In the academy you learn the laws applicable throughout the State of New York, right?

A    Correct.

Q    And that includes the Fourth Amendment to the United States Constitution, correct?

A    Yes.

Q    And that includes other laws of the State of New York, right?

A    Yes.

Q    And you completed your academy training in March 2018, correct?

A    Correct.

Q    In the academy you learned the law not just the RPD policies and procedures, correct?

A    Correct.

Q    And after completing your academy training you entered your field training, right?

A    There are the post-academy and then after

4

Algarin - Direct - Shields

post-academy, yes, to field training.

Q    And the field training was four months?

A    Yes.

Q    And in field training you're paired with experienced officers who teach you the RPD's policies on the ground, correct?

A    Correct.

Q    And there's four phases of field training, right?

A    Yes.

Q    And in each phase you rotate between different field training officers, right?

A    Except for the last -- for the fourth phase.

Q    So the first and the fourth phase you're with your primary officer, right?

A    Correct.

Q    It's the same person?

A    Yes.

Q    And those different field training officers, they evaluate your performance during that time, correct?

A    Correct.

Q    So basically in the academy you learn the law and then in field training you learn how the RPD actually operates in practice, correct?

A    I'm sorry.  Say that again.

Q    In the academy you learn the law and then in field

5

Algarin - Direct - Shields

training you learn how the RPD actually operates in practice, correct?

A   No, we also learn that during the academy time as well.

Q   But during the academy you're not on the road learning on the ground, correct?

A   Correct.

Q   And during your field training, your field training officers trained you on how the RPD operates when they're backtracking in the curtilage to a residential property, correct?

A   In general, yes, general searching, backtracking, especially when exposed to such an event.

Q   Okay.  And you completed your field training in July 2018, correct?

A   Correct.

Q   And so the academy training plus the field training plus the RPD specific period was about ten months total of training, correct?

A   Approximately, yeah.

Q   And so by July 2018, that's when you became a solo officer operating on your own, correct?

A   Correct.

Q   And you were assigned to the Clinton Section at that point?

Algarin - Direct - Shields

A    Not immediately but shortly after completing field training.

Q    Okay.  When were you -- when did you begin in the Clinton Section?

A    About just a week after, I probably had approximately a week in Lake and then they transferred me to Clinton.

Q    So the incident at issue in this lawsuit where you entered Mr. Dempsey's backyard and shot the dog Tesla, that occurred on October 19th, 2018, correct?

A    I'm sorry.  Say that one more time.

Q    The incident at issue in this lawsuit where you entered Mr. Dempsey's backyard --

A    Mm-mm.

Q    -- and shot the dog Tesla, that occurred on October 19th, 2018, correct?

A    Correct.

Q    So that was about three months after you finished your field training, correct?

A    Correct.

Q    And during your field training you'd chase suspects through residential yards more than two times, correct?

A    Correct.

Q    And did you ever have to go back and search for any potentially discarded property during either of those two

Algarin - Direct - Shields

incidents?

A    Yes.

Q    And did you have to jump fences to get into those properties?

A    I had to jump fences to go back from whence I came, yes.

Q    And before jumping those fences and going into those properties did you go to the front door and (knocking) knock and ask for consent?

A    No.

Q    Okay.  On the date of the -- oh, well, let me back up.

During your field training when you didn't go to the front door and knock and ask for consent before entering the property, at that point you were paired up with an experienced officer, your field training officer at that point, correct?

A    Correct.

Q    So that's what they trained you to do?

A    I'm sorry, say that again.

Q    That's what they trained you to do, to enter the property first without first going and knocking on the door and asking for consent.

A    For those specific incidents, yes.

Q    Okay.  So, on the date of the incident,

Algarin - Direct - Shields

October 19th, 2018, you responded to a 911 call reporting drug sales in the vicinity of 61 Kosciusko Street, correct?

A    Correct.

Q    And on October 19th, 2018, before responding to 61 Kosciusko Street, you devised a plan with Officer TKA*EUBZ, Gorman and Horowitz for how to apprehend the suspects, correct?

A    Correct.

Q    The plan was that you and TKA*EUB would drive up -- your RPD vehicles up to 61 Kosciusko Street; is that right?

A    Correct.

Q    And you anticipated that when you did that -- well, let me withdraw that.

And the plan was that Officers Gorman and Horowitz would respond to the vacant lot on 54 Sobieski Street, is that right?

A    They were just going to be south of the location, that's where we assume they may go.

Q    On the next street over?

A    South, yes.

Q    Okay.  And the next street over to the south would be Sobieski Street?

A    Correct.

Q    And so you anticipated that when you and TKA*EUB drove up to the front of 61 Kosciusko Street, the suspects

9

Algarin - Direct - Shields

would flee south through the residential backyards on Kosciusko Street south towards Sobieski Street, correct?

A    That was a possible route, yes.

Q    And that plan -- you expected that flight route because the suspected drug dealers at that location had previously escaped by running south through those same yards --

A    Yes.

Q    -- correct?  And planning to anticipate the suspect flight path and positioning of the officers to try to intercept them, that's a common police practice, right?

A    I'm sorry, say that one more time.

Q    What you did on the date of the incident, making a plan beforehand, anticipating their flight path, positioning officers to try and intercept them if they fled, that's a common thing that you do as police officers, right, make a plan beforehand?

A    Making a plan, yes.

Q    And chasing suspects through people's fenced-in backyards or curtilage to their property, that's something that also is common in police work, correct?

**MS. JONES:**  Objection.  I think we're equating two things that are not the same.

**MS. JONES:**  I think he said.

**MAGISTRATE JUDGE PEDERSEN:**  I tell you what, you can

clarify that on cross.

Overruled.

A     Can you repeat your question, please.

Q     Sure.  You chase people through -- you chase suspects through people's fenced-in yards approximately once a week or more, correct?

A     I did at that time, yes.

Q     At that time when you were working in the Clinton Section?

A     Correct.

Q     Now, when you arrived on the day of the incident at the front of 61 Kosciusko Street, the suspects, in fact, did flee as you anticipated down the driveway, correct?

A     Correct.

Q     And they ran down the driveway of 57 Kosciusko Street, correct?

A     Correct.

Q     And they ran no the backyard of 57 Kosciusko Street, correct?

A     I'm sorry, say that again.

Q     They ran down the driveway and then entered the backyard of 57 Kosciusko Street, correct?

A     I believe so.

Q     Okay.  And when you say you believe so, did you see them go down to the driveway?

Algarin - Direct - Shields

A    I saw them go down the driveway.

Q    Okay.  Did you see them enter the backyard?

A    Once we entered the backyard, there was no one there.

Q    Okay.  So you assumed that they jumped the fence from the backyard once you got there because you didn't see them?

A    No.  I heard noise from the west yard.

Q    So you heard noise from the other side of the fence?

A    Correct.

Q    And that would have been where Officer Horowitz had detained one of the suspects?

A    No.  That would have been Mr. Dempsey's yard.

Q    Okay.  So, that would have been Mr. Dempsey's yard. 53 Kosciusko Street would have been to the west of 57 Kosciusko Street?

A    Correct.

Q    So you didn't see the suspect jump the fence but you assumed he jumped the fence because he was on the other side of it?

A    Correct.

Q    So you didn't see exactly where he jumped the fence?

A    I did not.

12

Algarin - Direct - Shields

Q    So basically you went down the driveway of 57 Kosciusko Street but by the time you got to the backyard, they had already jumped the fence?

A    Correct.

Q    It was a tall, wooden, stockade fence, correct?

A    Correct.

Q    So what I want to do now is play your bodyworn camera video which we have stipulated into evidence as Exhibit 41.  And on your screen, Officer Algarin, do you see the beginning of your bodyworn camera?

A    I do.

Q    Okay.  So, before I play it, so this video, you see the time stamp.  It's 17:07:18.  And so that would be the portion where your bodyworn camera began to record, correct?

A    This is my pre-record.

Q    It's your pre-record.  It's the 30 seconds before you hit record on the camera itself, right?

A    Correct.

Q    Okay.  So basically -- up to this point you hadn't hit your bodyworn camera and exaggerated it, correct?

A    It was not activated at that time.

Q    And why didn't you activate your bodyworn camera immediately when you got out of the car and started chasing the suspects?

A    I believe I did.  Must have pressed the wrong

13

Algarin - Direct - Shields

button and then realized that later.

Q    So when did you activate the bodyworn camera?

A    It would possibly be at 1737.

Q    Thirty seconds after where we're looking at right now?

A    Correct.

Q    Okay.  So what I'm going to do is play it, pause it, ask you some questions.

A    Okay.

Q    And just before I play it, just so that the jury understands, the pre-record, that doesn't record audio, correct?

A    That's correct.

Q    So the first 30 seconds of the video doesn't contain any audio, correct?

A    That's correct.

(Video played.)

Q    So basically when you approach the fence, did you do anything, when you -- let me withdraw that.

When you got to the backyard of 57 Kosciusko, did you do anything before you approached the fence and immediately jumped over it?

A    I'm sorry, can you repeat that?

Q    When you got into the backyard of 57 Kosciusko, did you immediately approach the fence and jump over the fence?

14

Algarin - Direct - Shields

A     No.  I heard noise.  I peered over the fence, confirmed somebody was running through Mr. Dempsey's yard and then I hopped over the fence.

Q     Okay.  So, first you peered over, you climbed halfway up the fence, then you got back down, then you climbed back up and jumped over the fence?

A     It's a large fence.  I needed some momentum to get over that.

Q     You look like you're in pretty good shape.  Do you really need momentum to do that?

A     I'm 5 foot seven and that's a 6 foot fence.

Q     I'm 5 foot six.  I think I could have done it.

A     You're not me.  I'm not you.

MS. JONES:  Objection.

MAGISTRATE JUDGE PEDERSEN:  Sustained.

Q     So first you peered over the fence?

A     Correct.

Q     You confirmed that the suspect in the red sweatshirt was fleeing across Mr. Dempsey's yard?

A     Correct.

Q     You observed his flight path?

A     I observed him in the yard.  I don't know at what point he entered.

Q     You observed him in Mr. Dempsey's backyard when you peered over the fence, correct?

Algarin - Direct - Shields

A    Correct.

Q    And he was near the back of Mr. Dempsey's yard near the fence separating Mr. Dempsey's yard from the vacant lot at 54 Sobieski Street, correct?

A    No, he was -- the individual's running westbound towards the house that's west of Mr. Dempsey's yard.

Q    Okay.  So if this is Mr. Dempsey's yard and this is the back fence?

A    Yes.

Q    And this is his house?

A    Correct.

MS. JONES:  Objection.

Q    Was the suspect closer to the back fence or was he closer to the house?

MS. JONES:  Objection.  I can't see this.

MAGISTRATE JUDGE PEDERSEN:  Mr. Shields, if you have a diagram you're welcome to introduce it.  If not, could you please put that up on to the ELMO system so we can all see what the witness is seeing.

MR. SHIELDS:  That is a good idea, your Honor.

THE CLERK:  Your Honor, before this is displayed, is the jury allowed to see this as well?

MAGISTRATE JUDGE PEDERSEN:  Yes.

MS. JONES:  Can this be marked for identification while we're at it?

16

Algarin - Direct - Shields

**MAGISTRATE JUDGE PEDERSEN:**  Yes.

**MR. SHIELDS:**  I guess it would be marked for identification as Exhibit 206, your Honor.

**MAGISTRATE JUDGE PEDERSEN:**  Correct.

**Q**    Okay, so Officer Algarin, let's see if this works.

Okay.  So, let's say this is the back fence and this is Mr. Dempsey's house.  Is it true that the flight path of the suspect was closer to the back fence than it was to Mr. Dempsey's house?

A    I can't say.

**Q**    You peered over the fence, you saw him running, but you don't know where he was running?

A    I can't say if he was closer or nearer to the house or the back fence, no.  I saw an individual running through the yard.

**Q**    It's a big yard, right?

A    It's a yard.

**Q**    It's a large yard with a big tree in the middle right here, right?

**MS. JONES:**  Objection.  I think he's already answered this.

**Q**    I don't think he's answered it?

**MAGISTRATE JUDGE PEDERSEN:**  Correct.  Overruled.

**Q**    There's a big tree in the middle of the yard, right?

Algarin - Direct - Shields

A    I believe so, yes.

Q    Okay.  Was he running on the side of the tree that was closer to the back fence or the side of the tree that was closer to the house?

A    I don't know if he was closer to either side.

Q    Okay, but you said that you saw him running through the yard, right?

A    Correct.

Q    Okay.  And there's a fire pit in the yard somewhere?

A    Yes.

Q    Okay.  And when you entered the yard, did you see him go on to Mr. Dempsey's back porch which was over here somewhere near the back of the house?

A    No.

Q    Do you know if he was closer to the porch or to the tree that's in the middle of the yard?

A    I do not know.

Q    Okay.  So you're saying that you got no memory whatsoever of where the guy was in this 50 foot or so long backyard?

MS. JONES:  I think that's assuming facts that aren't in the record and also I think this has been asked and answered.

MAGISTRATE JUDGE PEDERSEN:  I'll sustain with regard to the 50 feet.

Algarin - Direct - Shields

Q    Do you know how many feet separated or can you estimate how many feet separated the back fence of Mr. Dempsey's yard from his -- let's say his back porch?

A    I cannot.

Q    When you jumped the fence -- if we go back to the beginning of the bodyworn camera video.  Okay.  So when you jumped the fence here, and you looked and so -- well, let me backup.  This location here if we hit play, it goes on and you jump the fence.  Is this also the same location where you climbed up and peered over the fence?

A    Correct.

Q    And when you peered over the fence and you looked over, was the suspect in front of you or did you have to look way over to your right?

A    No.  More towards in front of me.

Q    Okay.  So if you jumped, if we hit play here and he was in front of you -- so we're at the beginning of the video for the record -- and I'm going to hit play.

     (Video played.)

Q    Okay.  So, if we're looking straight here, this would have been the suspect's flight path approximately when you jumped over?

A    I couldn't tell you how he got to that point but I did see him going westbound through this yard around this area.

Algarin - Direct - Shields

Q     Okay.  So it was around this area that you saw him traveling westbound through the yard, correct?

A     Correct.

Q     All right.  We're paused at six seconds.  I'm going to hit play and ask a few more questions.

(Video played.)

Q     Okay.  So, after you got into Mr. Dempsey's backyard, both of the suspects had been detained, correct?

A     Two out of the four had been detained.

Q     And you were sitting here when Officer Horowitz testified just earlier, correct?

A     Correct.

Q     And you saw his arrest report which documented that there were only two suspects that fled; is that right?

A     He detailed there were two suspects that fled but doesn't mean that there was only two people that fled.

Q     Did you create any official paperwork after this incident?

A     I did not.

Q     Did you ever document anywhere that there were four suspects that allegedly fled when you drove up to the front of 61 Kosciusko Street?

A     My affidavit.

Q     Did you make any contemporaneous records on the date of the incident not an affidavit created years later for

Algarin - Direct - Shields

the purposes of litigation?

MS. JONES: Objection. This is argumentative,.

MAGISTRATE JUDGE PEDERSEN: Sustained. You can ask a question.

Q    The affidavit that you referred to is an affidavit submitted in support of the motion for summary judgment to try to dismiss this case, correct?

MS. JONES: Objection.

MAGISTRATE JUDGE PEDERSEN: Sustained. You can ask a question.

Q    When did you draft this affidavit?

A    I'll have to see the date on it.

Q    The affidavit was not drafted on the date of the incident, correct?

A    Correct.

Q    It wasn't drafted within a week of the incident, correct?

A    Again, I'll have to see the date on it.

Q    The affidavit was drafted after this litigation was filed against you, correct?

A    I don't know the timeline of things so.

Q    You sat down with the attorneys for the City and you drafted the affidavit and it was filed in court in this case, correct?

MS. JONES: Objection. This is argumentative and I

Algarin - Direct - Shields

think he's already asked and answered that he doesn't --

**MAGISTRATE JUDGE PEDERSEN:** Overruled.

A    Can you ask your question one more time, please.

Q    You sat down with the attorneys for the City, you drafted the affidavit knowing that it was going to be filed as part of this case, correct?

A    Correct.

Q    And just going back to the incident, you didn't draft any paperwork related to the incident, correct?

A    Correct.

Q    Did you take any notes in your little notepad that you guys carry around in your front pocket?

A    No, because I didn't have any paperwork with this.

Q    And after the incident you spoke with Sergeant Rudolph, right?

A    Correct.

Q    And Sergeant Rudolph's incident report, have you reviewed that?

A    I have.

Q    And Sergeant Rudolph's incident report doesn't say anything about four suspects fleeing either, correct?

A    Again, we had two detained and there was two people that left.  They have the two people that we have detained on the report.

Q    The report says nothing about four people fleeing

Algarin - Direct - Shields

from when you pulled up to the front of 61 Kosciusko Street, correct?

MS. JONES:  Objection.  Can we just clarify which we're report we're referring to.

MAGISTRATE JUDGE PEDERSEN:  Referring to the report that Sergeant Rudolph?

MR. SHIELDS:  Correct, your Honor.

MAGISTRATE JUDGE PEDERSEN:  Yes.  Overruled.

A    Can you say that one more time.

Q    The report that Sergeant Rudolph drafted after this incident does not say anything about four suspects fleeing when you drove up to the front of 61 Kosciusko street, correct?

A    Can you please pull it up.

Q    Can I please pull up the report?

A    Yes, please.

MR. SHIELDS:  Sure.  I'm sorry.  My computer is being funny so I can't see the number.  It is 32.  So Exhibit 32, will you guys stipulate that in?

MS. JONES:  What number is it again?

MAGISTRATE JUDGE PEDERSEN:  32.  Is there a stipulation that 32 is admissible?

MS. JONES:  No objection.

MAGISTRATE JUDGE PEDERSEN:  All right.  Number 32 is admitted by stipulation.

Algarin - Direct - Shields

(Exhibit 32 is received in evidence.)

**Q**    Okay.  So if we go to the first page, do you recognize this as the incident report from the date of the incident?

A    Can you just scroll down to where they have the reporting officer's name, please.

**Q**    Jason Rudolph.  So here's the narrative section. So all that it says in the narrative section is that several individuals fled and that two were detained, correct?

A    Correct.

**Q**    It doesn't say that four people fled, right?

A    It didn't have a specific number but it did say several.

**Q**    Okay.  Several just means more than one, correct?

A    It could.

**Q**    It doesn't mean four, right?

A    It could be four.

**Q**    It could be five, it could be two, it could be anything, right?

A    Correct.

**Q**    So all that we know from reading the report is that two people were detained and that more than one person fled, correct?

**MAGISTRATE JUDGE PEDERSEN:**  I didn't hear an answer. Was there an answer?

Algarin - Direct - Shields

A     Can you, can you repeat that question, please.

**Q**     From the face of reading the report all that you know is that two people were detained and that more than one person fled, correct?

A     Correct.

**Q**     And then you saw Officer Horowitz's report that said that only two people fled, correct?

**MS. JONES:**  Objection.  That's a mischaracterization.

**MR. SHIELDS:**  I'm sorry.

**MAGISTRATE JUDGE PEDERSEN:**  Basis for your objection, please?

**MS. JONES:**  That's a mischaracterization of what the report says.

**MAGISTRATE JUDGE PEDERSEN:**  I'd have to see the report to rule on that.  Do you have that available?

**MR. SHIELDS:**  Yes, your Honor, one second.

**MAGISTRATE JUDGE PEDERSEN:**  That one's been stipulated in, correct?

**MR. SHIELDS:**  Yeah, it's been entered into evidence, your Honor.

**MAGISTRATE JUDGE PEDERSEN:**  Yes, it was entered yesterday.

**MR. SHIELDS:**  It was, your Honor.

**MAGISTRATE JUDGE PEDERSEN:**  Is that Exhibit 33?

**MR. SHIELDS:**  This is 33, your Honor, yes.

Algarin - Direct - Shields

Q    So what this report says is:  On the above date and time I was responding for the report of drug activity at 61 Kosciusko Street.  I was at 54 Sobieski Street with Officer Gorman when officer TKA*EUB and officer Algarin drove up to 61 Kosciusko street.  Two black males later identified as redacted PK1 and redacted A fled on foot south toward Sobieski Street.

Do you see that?

A    I do see that.

Q    It doesn't mention anyone else that fled, correct?

A    It just mentions the two people that went toward Sobieski.

Q    Okay.  And generally when an officer drafts a report, you want to be as detailed as possible, right?

A    If you can.

Q    Add all of the important pertinent facts?

A    If you have them.

Q    Okay.  It would have been important in this arrest report, the official document of the Rochester Police Department, to know all of the facts related to the incident, like maybe there were two additional guys that fled and got away, right?

A    If he had that information.

Q    And Officer Horowitz was working with you on that day, right?

Algarin - Direct - Shields

A    Yes.

Q    You spoke with him after the incident before he wrote this report?

A    I'm sorry, say that again.

Q    You spoke with him after the incident before he wrote his report, correct?

A    I don't know.

Q    You spoke with him about the incident, correct?

A    At some point.

Q    Some point.  And if you had spoken with him after the incident, that's something you would have told him, right?

A    I, I wouldn't know what Horowitz knew at the time.

Q    Because you didn't tell him that four people fled?

A    I don't know.  Do I recall the conversation I had with him?  I do not.

Q    Okay.  And you later learned that Officer Horowitz, the suspected that he detained, he had marijuana on his person or the bag that was -- that contained marijuana; is that right?

A    Correct.

Q    You learned that after you jumped into the yard or at a later time?

A    I'm sorry, say that again.

Q    Did you learn that when you jumped into the yard or

Algarin - Direct - Shields

at a later time?

A    I don't know when I necessarily learned that information.

Q    Okay.  I want to switch back to the video and ask you some more questions.

So for the record -- well, I'm going to rewind this back to about six seconds.  So I rewound it to six seconds and then I'm going to hit play and I'll pause it and ask you some questions, okay?

A    Okay.

(Video played.)

Q    Okay.  So after entering the yard the first time here, you searched the suspect's flight path, correct?

A    No.

Q    Oh, you didn't.  Do you remember being asked this question and giving this answer at your deposition on July 15th, 2022, on Page 29?

MS. JONES:  Your Honor, can we ask that be pulled up on the screen so that the witness can follow along.

MR. SHIELDS:  No.

MAGISTRATE JUDGE PEDERSEN:  What are you asking about?

MS. JONES:  That he's about to read from the deposition and I believe the proper way is to show it on the screen so that everyone else can follow along.

MR. SHIELDS:  That's not the proper way.

Algarin - Direct - Shields

**MAGISTRATE JUDGE PEDERSEN:** That's not necessary not unless he's misreading it. You're welcome to follow along and make an objection if he misreads it.

**MS. JONES:** What page are we on?

Q We're on Page 29. I'm going to start at Line 5.

Question: "Okay. We'll ask about that in a little bit. The first time you jumped the fence from 61 Kosciusko Street in the backyard of 57 Kosciusko Street?"

Answer: "Uh-huh."

Question: That's the first time you entered the backyard of 57 Kosciusko Street, correct?"

Answer: "Correct."

Question: "And at that time you searched around the backyard for a little bit, correct?"

Answer: "In their flight path, correct."

Did I -- do you remember being asked those questions and giving that answer?

A Correct.

Q So the answer to my question before was, yes, you searched the flight path of the suspect after you jumped into the yard the first time, correct?

A I haven't gotten a flight path. It's what I believe to have been their flight path. I don't know their specific flight path just yet.

Q You searched around the backyard a little bit the

Algarin - Direct - Shields

first time you entered the yard, correct?

A    I looked around.

Q    You were in the yard long enough to search the flight path and have a conversation with Officer Horowitz and the suspect that he had detained, correct?

A    I looked around and then had a conversation with Officer Horowitz and his detainee.

Q    When you looked around you could see the ground, right, there weren't big bushes or anything that could conceal anything on the ground; is that right?

A    It was a little overgrown so I would have to, quite honestly, be on top of it to see stuff back there.

Q    Okay.  In fact, after everything was over, there was nothing in the yard, right?

A    I couldn't come to that conclusion due to the incident.

MR. SHIELDS:  I'm going to move to strike that as nonresponsive to my question?

MS. JONES:  I disagree with that.  I think he says he cannot tell you or can't confirm whether or not there wasn't anything in the yard.

MAGISTRATE JUDGE PEDERSEN:  I'll overrule the motion to strike.

You can clarify if you want to, Mr. Shields, or we can leave it to cross-examination to clarify if they feel it's

Algarin - Direct - Shields

necessary.

Q    Ultimately, it was determined that there was no contraband or any gun in Mr. Dempsey's yard, correct?

A    I can't speak to the completion of looking through the backyard due to this incident.  I don't know what was completed afterward.

Q    You never looked at the tech reports, no one ever followed up with you and told you, hey, by the way, we found a gun in the yard, you were right?

A    No.

Q    So your knowledge there was never any gun in the yard, right?

A    Not that I know of.

Q    To your knowledge there was never any drugs in the yard, right?

A    Not that I can confirm.

Q    And when you walked to the back fence and had that conversation with Officer Horowitz and the suspect he detained, you asked him if he had thrown a gun, correct?

A    Correct.

Q    And he denied having a gun, correct?

A    Correct.

Q    And in that minute and ten seconds or so that you were in the backyard the first time, you didn't see a gun, correct?

Algarin - Direct - Shields

A    I did not locate one at that time, no.

Q    Now, when you peered over the fence the first time and saw him running, you didn't see him discard anything, correct?

A    In that time that I saw him, no.

Q    Okay. Hit play. We're at one minute and ten seconds and then I'm going to do the same thing: Pause it and ask you some more questions.

(Video playing.)

Q    Okay. So, after searching the yard and speaking with Officer Horowitz, you walked towards -- Officer Gorman had jumped the fence into the backyard of 49 Kosciusko Street, that's what we see on the screen right now, is that correct?

MS. JONES:  Objection. I don't think he testified to searching the yard.

MAGISTRATE JUDGE PEDERSEN:  Sustained.

Q    After you were in the yard for a minute and ten seconds walking around searching the flight path, as you testified to, and having the brief conversation with Officer Horowitz and the suspect he detained, then what the video depicts is you walking to the fence and jumping over the fence into the backyard of 49 Kosciusko Street, correct?

A    There was a lot to that. Can we break that down a little bit.

Algarin - Direct - Shields

Q      What we just watched in the video occurred after you were in the yard for about a minute and ten seconds, right?

A      (No response.)

Q      I'll withdraw.

This portion that we just played in the video, you walked to the fence and you jumped over it into the backyard of 49 Kosciusko Street, correct?

A      Correct.

Q      And the backyard of 49 Kosciusko Street, what we can see right now, has a big cage that contains a little doghouse?

A      Correct.

Q      We're paused at 1 minute and 17 seconds.

MR. SHIELDS:  The video.  I'm going to hit play again.

(Video played.)

Q      Okay.  So when you got to the back of 49 Kosciusko, you briefly spoke with Officer Gorman first, correct?

A      Yes.

Q      And then you helped him search the suspect wearing the red sweatshirt, correct?

A      Correct.

Q      You're going through his pockets and you didn't find anything on him, right?

A      I'm sorry.

Algarin - Direct - Shields

Q    I said you searched in his pockets, that's what we see right here.  When you did that, you didn't find anything on him, right?

A    I don't know what was found in his pockets.

Q    You personally didn't find anything in his pockets, right?

A    In the brief moment I was with him, no.

Q    Okay.  We're paused at 1 minute and 32 seconds and I'm going to hit play again.

(Video played).

Q    Okay.  So I paused it at 1 minute and 35 seconds.

What we heard in the video in that portion was Officer Gorman asking you or instructing you to backtrack?

A    I --

MS. JONES:  Objection.  That's a mischaracterization of what we just heard.

MAGISTRATE JUDGE PEDERSEN:  I couldn't hear anything.  So can we replay that portion, please.  I'll sustain the objection for now.

MR. SHIELDS:  Yes, your Honor.  So I rewound to 1 minute and 31 seconds into the video and I'm going to hit play.

(Video played.)

Q    Were you able to hear that portion of the video, Officer?

A    Can you just play it one more time, the front, the

Algarin - Direct - Shields

radios in the beginning portion is hard to hear.

Q    Sure.

(Pause in proceedings.)

Q    Okay.  So I paused it at 1 minute and 32 seconds and I'll hit play again.  And I'm just going to ask you to listen for Officer Gorman's voice.

(Video played.)

Q    Were you able to hear Officer Gorman say something there?

A    Yes.

Q    And he said "do you want to backtrack"?

A    Correct.

Q    Okay.  And what he meant was backtrack the suspect's flight path through Mr. -- in Mr. Dempsey's yard, correct?

A    I'm sorry.

Q    What he meant by saying "do you want to backtrack" was to go back into Mr. Dempsey's yard a second time and search for any potentially discarded guns or contraband in that yard, correct?

MS. JONES:  Objection.  I don't think he can speak to what someone else meant.

MAGISTRATE JUDGE PEDERSEN:  Sustained.  You can ask him what he understood what Officer Gorman said to him.

Q    Did you understand what Officer Gorman said to you

when he said "do you want to backtrack" is that he meant to enter Mr. Dempsey's property at 53 Kosciusko Street to search for any potentially discarded contraband?

**MS. JONES:**  Objection.  I think that's the same.

**MAGISTRATE JUDGE PEDERSEN:**  Sustained.

**Q**    What was your understanding of what Officer Gorman meant when he said do you want to backtrack?

A    Do I want to come from where I came, go, you know, go through what the flight path was for the suspect to look for any discarded items or other personnel, the two out of the four that were still outstanding.

**Q**    What you meant was to go into Mr. Dempsey's backyard at 53 Kosciusko Street to search, correct?

**MS. JONES:**  I think this is vague.  Can we clarify the "you".

**MAGISTRATE JUDGE PEDERSEN:**  Overruled.

A    I'm sorry, can you say that one more time?

**Q**    By backtracking, your understanding was to enter Mr. Dempsey's backyard at 53 Kosciusko Street and search the flight path of the individual that Officer Gorman had detained in the backyard of 49 Kosciusko Street, correct?

**MS. JONES:**  Objection.  That's a mischaracterization of what he said.

**MAGISTRATE JUDGE PEDERSEN:**  When he was asked the question:

Algarin - Direct - Shields

"What was your understanding of what Officer Gorman meant when he said do you want to backtrack?"

Answer:  "To come from where I came, go, you know, go through what the flight path was for the suspect to look for any discarded items or other person, the two out of the four that were still outstanding."

Question:  "What you meant was to go into Mr. Dempsey's backyard at 53 Kosciusko Street to search, correct?"

"Objection."

"Overruled."

So the question now in front of this witness is what?

Q    You went -- your understanding of backtracking, what Officer Gorman meant, was to enter the backyard of 53 Kosciusko Street to search the flight path that you testified earlier you saw when you peered over the fence, correct?

A    I don't know what his exact path was.  But it was to wherever he came from, which I can assume would be through Mr. Dempsey's yard, through that yard for where that fence was and then down the driveway.

Q    So backtracking means going into Mr. Dempsey's yard to search, correct?

A    It would be entering Mr. Dempsey's yard to look for any contraband or other personnel on top of going into the -- past that fence to where I came from and I know the suspect to have come from.

Algarin - Direct - Shields

Q    Okay.  I'm going to hit the play button on the video again and we're paused at one minute and 34 seconds. Then I'll pause and ask you some more questions.

(Video played.)

Q    All right.  When you asked him -- well, let me pause.  Was that you that said "where did you see him jump"?

A    Correct.

Q    And did Officer Gorman respond to you when you asked him "where did you see him jump"?

A    He did.  You'll have to replay it so I can see if I can hear it.

Q    So I rewound to 1 minute and 34 second again and I'll hit play.

(Video played.)

A    I couldn't make it out.

Q    Do you have an independent recollection of either him responding verbally or indicating in any other way where he saw the suspect jump?

A    No.

Q    Okay.  Now, I'm going to play it a few more seconds and then ask you some questions.

(Video played.)

Q    Okay.

MAGISTRATE JUDGE PEDERSEN:  The video is paused at one minute and 43 seconds.

Algarin - Direct - Shields

**MR. SHIELDS:**  Thank you, your Honor, yes.

**Q**    From 49 Kosciusko Street you can see over the fence into the backyard of 53 Kosciusko Street, correct?

A    Not great, no.

**Q**    Maybe not right there but where there's -- if I rewind it one second to minute and 42 seconds into the video, there's a path between some of these bushes and you can see over the fence there, correct?

A    I can see over the fence, yes.

**Q**    Okay.  I'm going to hit play again and we're paused at 1 minute and 42 seconds then I'll pause and ask you some more questions.

(Video played.)

**Q**    So we're paused at 1 minute and 54 seconds into the video.  From that portion you can see over the fence from 49 Kosciusko Street into the backyard of 53 Kosciusko street, correct?

A    Not with great visibility, no.

**Q**    You're standing a few feet back from the fence right there, correct?

A    Correct.

**Q**    If you maybe walked a few feet closer to the fence and peered over it like you did the first time from the wooden stockade fence, you could have had a better view into Mr. Dempsey's yard, correct?

Algarin - Direct - Shields

A    Yes.

Q    Okay.  I'll hit play again at 1 minute and 54 seconds and pause it again.

(Video played.)

Q    So I paused it 2 minutes and 12 seconds into the video.  Okay.

Now, prior to jumping -- well, what this paused portion of the video right here shows you jumping from the backyard of 49 Kosciusko into the backyard of 53 Kosciusko, Mr. Dempsey's backyard, correct?

A    Correct.

Q    Now, prior to jumping the fence from 49 into 53, you didn't observe a gun or any contraband on the ground when you looked over the fence, correct?

A    Say that one more time.

Q    Prior to jumping the fence from 49 into 53 Kosciusko, you never observed a gun or any contraband on the ground in the backyard of 53 Kosciusko Street, correct?

A    I could not see any at that time, no.

Q    And in the first minute and ten seconds that you remember in the backyard, you never observed a gun or any contraband on the ground during that time either, correct?

A    Not in my brief look, no.

Q    The brief 1 minute and ten seconds that you're walking around the yard?

Algarin - Direct - Shields

A    A por --

**MS. JONES:**  Objection.  I think that's argumentative.

**MAGISTRATE JUDGE PEDERSEN:**  Overruled.

A    A portion of that is me speaking to Officer Horowitz and the suspect.

Q    Prior to entering from 49 into 53 you never asked the suspect that was detained in the back of 49 Kosciusko Street if he discarded anything in the yard, correct?

A    No.

**MAGISTRATE JUDGE PEDERSEN:**  Sorry.  Is that incorrect?

Q    No, you never saw the suspect discard anything or -- I'm sorry.

No, you never asked the suspect if he discarded anything in Mr. Dempsey's backyard at 53 Kosciusko Street, correct?

A    No.

Q    That's not correct?

A    I did not ask the individual Mr. Gorman had if he discarded anything, if that clarifies it.

Q    Thank you.

And you never saw the suspect discard any contraband on Mr. Dempsey's property, correct?

A    I did not, no.

Q    And Gorman didn't tell you that he saw the suspect discard any contraband in the backyard at 53 Kosciusko

Algarin - Direct - Shields

Street, correct?

A    He did not, no.

Q    Gorman simply told you to backtrack through the yard and then you immediately jumped the fence into the yard, correct?

MS. JONES:  Objection.  That's a mischaracterization.

MAGISTRATE JUDGE PEDERSEN:  Sustained.

Q    Gorman told you to backtrack in the yard and you didn't do anything else to investigate whether there might be contraband or a gun or anything else in the backyard before you jumped over the fence, correct?

MS. JONES:  Objection.  Again, a mischaracterization.

MAGISTRATE JUDGE PEDERSEN:  Sustained.

Gorman said nothing about yards.  He said simply backtrack.

Q    After Gorman asked you if you wanted to backtrack, you didn't do anything else before jumping the fence into Mr. Dempsey's backyard at 53 Kosciusko Street to determine whether there could possibly be a gun or any other contraband in the backyard at 53 Kosciusko Street, correct?

A    No.

Q    And you had no facts to support a reasonable belief that the suspect discarded a gun in that yard, correct?

A    No.

Q    And by "no" you mean correct?

Algarin - Direct - Shields

A    Your questions are confusing to me.  I'm sorry, can you repeat your question, then.

**MAGISTRATE JUDGE PEDERSEN:**  Why don't you try asking it in a direct fashion instead of a leading fashion.

**MR. SHIELDS:**  Well, if he can't answer the question, your Honor, I'm happy to play his deposition where he was able to answer the question.  Why don't we do that.

**MAGISTRATE JUDGE PEDERSEN:**  Just try it once asking the question again.

Q    When you jumped the fence from 49 to 53 Kosciusko Street, you had no facts to support a reasonable belief that the suspect discarded a gun in the yard, correct?

A    Correct.

**MAGISTRATE JUDGE PEDERSEN:**  Thank you.

Q    And you had no facts to a support a reasonable belief that the suspect discarded any drugs in the yard, correct?

A    It was a call for a group of males selling drugs and the individual that we had, no drugs were found at that time.

Q    So I'm going to move to strike your answer as nonresponsive as a yes or no question.  So you can answer yes or --

**MAGISTRATE JUDGE PEDERSEN:**  Motion to strike is granted. The jury will disregard the past answer.

Algarin - Direct - Shields

You may ask the question.

Q   So the question was at the time that you jumped the fence from 49 to 53 Kosciusko, you had no facts to support a reasonable belief that the suspect discarded any drugs in the yard, correct?

A   Incorrect.

Q   Okay.  All right.  Do you remember being asked this question and giving this answer.

And I'll pull that up for you in one second.

**MAGISTRATE JUDGE PEDERSEN:**  Are you referring to a particular exhibit, Mr. Shields?

**MR. SHIELDS:**  No, your Honor, his deposition.

**MAGISTRATE JUDGE PEDERSEN:**  Just for the record, it's a video deposition not a transcript of a deposition, correct?

**MR. SHIELDS:**  Well, it corresponds to, corresponds to Page 72, Line 25, to.

Q   It would be Page 73 starting on Page 73, Line 18 through Page 74, Line 4.

(Exhibit played.)

**MS. JONES:**  I'm sorry, can I object.  Your Honor --

(Exhibit playing throughout colloquy.)

**MS. JONES:**  -- I'm making an objection to these questions --

**MAGISTRATE JUDGE PEDERSEN:**  Stop playing for a second.

**MS. JONES:**  And I feel like we should have a ruling on

Algarin - Direct - Shields

these objections before we --

**MAGISTRATE JUDGE PEDERSEN:** What is your objection, Ms. Jones?

**MS. JONES:** So in this part of the deposition -- sorry I just pulled it up. This part of the deposition testimony has some objections from me and I was hoping that we could have a ruling on the objection before we actually played it.

**MAGISTRATE JUDGE PEDERSEN:** Side bar, Counsel.

(Held at side bar:)

**MAGISTRATE JUDGE PEDERSEN:** So I'm on Page 73, Line 18 I believe is where you started.

Question: "And you had no facts to support a reasonable belief that the suspect had discarded any drugs in the yard, correct?"

Ms. Jones: "Objection."

What was your objection?

**MS. JONES:** Again, the objection is that it was leading.

**MAGISTRATE JUDGE PEDERSEN:** Okay. Fine. He's a hostile witness by virtue of the fact that he's one of the defendants in this case so leading is not a basis to sustain your objection.

Is there another basis for your objection?

**MR. NAYLON:** Objection to the form of the question.

**MR. SHIELDS:** No, that wasn't her objection. At the time her objection at the time was leading. So you can't

Algarin - Direct - Shields

feed her objections right now.

MR. NAYLON:  You objected to the form of the question in the deposition because that is the proper objection at a deposition:  Form.

MR. SHIELDS:  She clarified just now that the form they would be objecting to is that this was leading.  If you read the deposition, she objects to every other question.  So I'm going to have this a lot if I'm using depositions.

MR. NAYLON:  That's why we needed to know beforehand and cut the objections.

MAGISTRATE JUDGE PEDERSEN:  So tell me why I should sustain the objection as to form.

MS. JONES:  Because I think it was a leading question but it also asks for a legal conclusion, I mean, his belief, I think that's --

MAGISTRATE JUDGE PEDERSEN:  Well it may be a term of art you'd not know law but it's also something that could be understood especially a a police officer.  So I don't see a basis to sustain the objection on that, either.

MS. JONES:  Is there a way to -- because I also think the next question is asked and answered.  So is there a way to kind of, I don't know, splice those.

MAGISTRATE JUDGE PEDERSEN:  So when you say asked and answered, you mean here today in the courtroom?

MS. JONES:  No, I'm sorry.  I was moving on to the next

Algarin - Direct - Shields

question that I objected to.

MR. SHIELDS:  It will end at 74, Line 4.  This clip.

MAGISTRATE JUDGE PEDERSEN:  But there's another objection here.

So the question that she objected to was:

"So the answer is no.  You had no specific facts to support a reasonable belief that the suspect had discarded guns or drugs in that yard, correct?"

Miss Jones:  "Objection."

What was the basis there?

MS. JONES:  It was leading but also that it's asked and answered.

MR. SHIELDS:  He didn't answer the prior question. That's why I asked it again.

MS. JONES:  But he does, I mean.

MR. SHIELDS:  No, he said other than -- he didn't say yes or no.  Just like he just did here.  He tried to figure out the question.

MAGISTRATE JUDGE PEDERSEN:  You can impugn an answer but it's not very clear so I don't think in a discretionary manner I would have sustained the objection to the second question either because then it clarifies that what his answer really is to the first question.

Is there any other basis?

MS. JONES:  Not for the audio.

Algarin - Direct - Shields

**MAGISTRATE JUDGE PEDERSEN:**  Okay, thank you.  Your objection is overruled.

**MS. JONES:**  Is this ending at 74, 4?

**MR. SHIELDS:**  Yes.

(Open court:)

**MAGISTRATE JUDGE PEDERSEN:**  I've made a ruling on the objection.  You may continue, Mr. Shields.

**Q**   Okay.  So going back to your deposition testimony, I'm just going to hit play again and then ask you if you remember being asked that question and giving this answer.

(Deposition played.)

**Q**   So at the time of your deposition, you said no, you had no facts to support a reasonable belief that the suspect had discarded any drugs in the yard, correct?

A    In my video statement I tried giving you a different answer but, yes, correct.

**Q**   Okay.  Now, at the moment that you jumped the fence, the only thing that you were thinking about was searching for contraband, correct?

A    No.

**Q**   No?  Okay.

Did you remember being asked this question on Page 40 of his deposition transcript at Line 18 and giving this answer?

**MS. JONES:**  Yeah, can you give --

Algarin - Direct - Shields

**Q**   Question --

**MR. SHIELDS:**  Page 40, Line 18.

**MS. JONES:**  Thank you.

**Q**   Question:  "What was going through your head at the exact moment you jumped the fence?"

Answer:  "I do not remember."

Question:  "Were you thinking about anything at the moment you jumped the fence?"

Answer:  "Just searching for contraband."

Okay.  Did you now suddenly remember something else that you were thinking about?

A   With backtracking, yes.

**Q**   What else were you thinking about?

A   Other individuals, always.

**Q**   Okay.  But you didn't say that at your deposition back on July 15th, 2022?

A   No.

**Q**   Back when your memory was better about maybe what was going through your head at the time in 2018, right?

A   I'm sorry?

**Q**   Your memory would have been better three years ago, four years ago than it would be today?

**MS. JONES:**  Objection.  Have we established when the deposition was?

**MAGISTRATE JUDGE PEDERSEN:**  Yes, he said it was in 2022,

Algarin - Direct - Shields

I believe.

MR. SHIELDS:  Correct.

A    It's about the same.

Q    Oh, you remember everything just as well today as you did about three and a half years ago?

A    That's still four years after the incident.  After reviewing paperwork, it's still almost four years till today.  And after reviewing paperwork, it's about the same.

Q    Okay.  When you jumped the fence, had you thought about the fact that you'd already been in the backyard and searched the flight path of the suspect for about a minute?

A    I briefly looked at what possibly could have been a flight path.

Q    Okay.  So the answer is, no, you didn't think about that when you jumped the fence a second time?

A    Then no.

Q    Okay.  You didn't think about the fact that the suspects were already in custody?

A    There were still two outstanding.

Q    According to you there were still two -- were they hiding in Mr. Dempsey's yard?

A    I don't know.

Q    Did you have any facts to support a reasonable belief that there were two suspects hiding in Mr. Dempsey's backyard?

A    The fact that one was detained south, one was detained west would make me, lead me to believe that if they didn't see anybody continue south or west, that those individuals could possibly still be within that yard or the previous yard that I had come from.

Q    But you had no facts to support that belief, right?

A    Other than the fact that those two officers did not see anybody pass them which would make -- allow me to believe, a reasonable person to believe, that other individuals are still either, A, in that yard or, B, in the other yard and went in a different correction.

Q    Suddenly two other mysterious, magical guys that disappeared into the backyard of Mr. Dempsey's yard where there was no hiding places, it was wide open to the public, you could see right over the fence?

**MS. JONES:**  Objection.  This is argumentative and I think he's already asked and answered this question.

**MAGISTRATE JUDGE PEDERSEN:**  On both grounds, sustained.

Q    When you looked over the fence in Mr. Dempsey's yard, did you see any hiding places?

A    There was the side of the house.

Q    Okay.  And you could have gone around to the vacant lot when -- you could have seen the side of the house, correct without entering Mr. Dempsey's yard first?

A    I would have to enter it anyways.

Algarin - Direct - Shields

Q    When you peered over the fence the first time, you didn't see anybody running to the side of the house, correct?

A    I didn't -- wasn't looking for one.  I saw one person that confirmed my suspicion that they went over that yard and then I jumped.

Q    When you peered over the fence, the only person that you saw was the suspect that Officer Gorman detained, correct?

A    Correct.

Q    And then in the one minute that you were walking around the yard the first time, you had no indication that there was anybody else hiding in the yard, right?

A    Say that one more time.

Q    When you're in the yard the first time walking around, talking to Officer Gorman, there was nothing that gave you any indication during that time period that there was another suspect allegedly hiding in the yard, correct?

A    If someone's hiding, they wouldn't indicate that.

Q    Okay.  Well, were there any reasonable hiding places that you noticed when you were looking around his yard the first time?

A    Behind the garbage can.

Q    Why didn't you go and look behind the garbage can the first time you were in the yard then?

A    Made sure to see how Officer Horowitz was doing,

Algarin - Direct - Shields

Officer Gorman was doing, make sure that their individuals are okay.

Q     If your main goal was to catch these alleged other suspects, why didn't you just walk around casually in the yard the first time, why didn't you go and continue trying to look for suspects?

A     Because at this point in time, we agree three months that I was on my own.

Q     How come you didn't mention anything about these alleged other suspects back at your deposition on July 15th, 2022, and you're just for now, first time today, coming up with this new excuse for why you entered the yard?

MS. JONES:  Objection.  I think it's argumentative and also I don't actually believe that there weren't any questions that solicited that information.

MAGISTRATE JUDGE PEDERSEN:  I'll sustain on the argumentative.

You may ask your question.

Q     How come when I asked you the question about what you were thinking about back in 2022, you didn't mention looking for other suspects, the only thing you mentioned was looking for contraband?

A     Contraband was part of it.  Eventually I was hoping to find somebody hiding back there as well.

Q     You didn't say looking for contraband and suspects,

Algarin - Direct - Shields

right, you just said looking for contraband?

A    Correct.

Q    Okay.  At the moment that you jumped the fence, you weren't thinking about any specific rules, correct?

A    Is this the -- which -- which time are we talking about?

Q    When you jump the fence the second time and reentered Mr. Dempsey's yard the second time, you weren't thinking about any specific rules, correct?

A    No.

**MAGISTRATE JUDGE PEDERSEN:**  That's not correct?

**THE WITNESS:**  I'm sorry.

A    Correct.

Q    At the exact moment that you jumped the fence the second time, you weren't thinking about -- I'm sorry, I already asked that.

Now, before you jumped the fence the second time, you knew that a warrantless search of someone's property was presumptively unreasonable, correct?

A    Without exceptions, correct.

Q    Well, that's what presumptively means, correct? Without exceptions?

A    Is it?  I don't know.  If you can define that.

Q    Okay.  So, the general rule is that to enter somebody's yard, you need a warrant, correct?

Algarin - Direct - Shields

A    Ot without exceptions.

Q    You need a warrant, you need consent or you need exigent circumstances to enter the curtilage to somebody's property to conduct a search, correct?

MS. JONES:  Objection.  That's actually conflating -- warrants are only needed for searches not entry.  You don't need a warrant to trespass.

MAGISTRATE JUDGE PEDERSEN:  Sustained.

MR. SHIELDS:  I said search --

MAGISTRATE JUDGE PEDERSEN:  -- versus search.

MR. SHIELDS:  I said search, your Honor.

MAGISTRATE JUDGE PEDERSEN:  I'm sorry?

MR. SHIELDS:  I said to enter the backyard to conduct a search.

MAGISTRATE JUDGE PEDERSEN:  The question was:

"You need a warrant, you need consent or you need exigent circumstances to enter the curtilage to somebody's property to conduct a search, correct?"

A    Generally, yes.

Q    No, not generally.  The question was --

A    You said generally.

Q    The rule is to enter someone's, the curtilage to the property, someone's fenced-in backyard, the curtilage to their property, to conduct a search, you need either a warrant, you need the homeowner's consent or you need exigent

Algarin - Direct - Shields

circumstances, correct?

A    Correct.

Q    Okay.  Now, before jumping the fence a second time you knew that if you did not have a warrant, consent -- a warrant or a consent -- then you were prohibited from searching the property unless you had exigent circumstances, correct?

A    Say that one more time.

Q    You knew before you jumped the fence the second time that if you did not have a warrant, and if you did not have consent, then you were prohibited from jumping the fence to search the property unless you had exigent circumstances, correct?

A    Correct.

Q    And if an officer does not have a warrant and no other exigent circumstances exception applies, then generally, you must obtain consent before searching the curtilage to someone's property, correct?

A    Correct.

MAGISTRATE JUDGE PEDERSEN:  Mr. Shields, let me interrupt a moment.  It's five after 12.  Can you estimate how much more time you have?

MR. SHIELDS:  I'm a little less than halfway done, your Honor.

MAGISTRATE JUDGE PEDERSEN:  Sounds like this would be a

Algarin - Direct - Shields

good time to break for lunch.

This is the jury's first time finding lunch in the bare REPB waist land outside the courthouse where you have a dish allows PAOEZ is a restaurant across the street but other places are within walking December TAPBS and today's it's snow I and in the teens temperature wise so they may WAPBLT to use a car to go some place to get lunch, did any of you bring lunch today.

A    (indicating).

**MAGISTRATE JUDGE PEDERSEN:**  But some of you are going to go out and get lunch, correct.  All right I'm suggesting that we brake for 90 minutes, in other words an hour and a half to allow them enough time to leave the courthouse, find their cars get out to lunch, order it, AOETD it, drive back and come back in here, any objection to a 90 brake.

**MS. JONES:**  No, your Honor.

**MR. SHIELDS:**  No, your Honor AOEUPLT so it's now five after # KE wet TKPWABG TKPW-T back here at about one, 35.

A    Jurors nodding yes.

**MAGISTRATE JUDGE PEDERSEN:**  We'll be in recess till about one, 35.  Let me caution you as I'm required to do I want to remind you the instruction I give you KWRERLer until

Algarin - Direct - Shields

the trial is over you are not to discuss this case with anyone including your fellow juries, member -P your family peopled involved in the trial or anyone else if anyone PROEFPDZ you and tries to talk to you about the case, do not tell your fellow jurors but advise me about it meal. TKAOPBLT read or listen to any news reports of the trial, finally remember to keep an open mind until all the evidence has been received and you have heard the views of your fellow jurors, the jury is excused everyone else remain in the courtroom.  (jury excused).

   **MAGISTRATE JUDGE PEDERSEN:**  So WAOEUL we're still on the error, I cautiontion you please TOEPBT discuss this case with anybody and KPWRUR tree to leave can come back at one, 35. Thank you.

   **MR. SHIELDS:**  Your Honor can you justs maybe a request to be clarify include you're attorneys he can't speak about his Tom.

   **MAGISTRATE JUDGE PEDERSEN:**  He can't speak about his testimony but he can certain HRE talk about HRE gigs tickets about going to lunch, about when to *R to be.

   **MR. SHIELDS:**  About THEUBGZ like that certainly.

   **MR. SHIELDS:**  Of course.

   **MAGISTRATE JUDGE PEDERSEN:**  Okay.  TPWRAEUT with regard to playing video depositions, our court reporter cannot copy the words asked SKP-PBS aced in the video depositions, so

you're TPOEG to see in the transcript it will simply SRAEU video deposition played that's it, so if you want a cleaner record, I think you're TPWOEG to need to read the questions and the answers into the record.  OEU the record will consist of video played portion he played from this time STAPL many to this STAEUPL -P time STAPL and the appellate if there ever is one involved is going to have to get the play did from this time stamp to know to know exactly what was said during the.

MR. SHIELDS:  And we have corresponding we've got, we've got WEBGDZ enter just those pages of the deposition transcripts E we've got those exact, you know, corresponding video clips with the deposition pages, so I mean they are marked as SKEUBLTSZ.

MAGISTRATE JUDGE PEDERSEN:  If there's ever a dispute between one side and the Oar at the appellate level as to whether the video deposition cord this line of this page to line or did it go further than that happen or did no not go as far as that -FPL the PEL last court to have would have HREPGS to have deposition line and go line by line to I know sure that the testimony played by the video is the same as the testimony entered into evidence and spoken up as line and page.  Just I just it's up to you as to how you want to keep the record in this case because I'm not going to be the one.

MR. SHIELDS:  Yes, your Honor.

Algarin - Direct - Shields

**MAGISTRATE JUDGE PEDERSEN:** TKPWEG to be looking at the appeal.

**MR. SHIELDS:** Well, I think I mean, we can talk, I think if there, we're not going to read it, we're going to play it and so if there was an appeal, I think that we can talk about. My preference would be to just pull those pages so that those are included.

**MR. NAYLON:** Do that now and mark them as SKEUPBLTS.

**MR. SHIELDS:** The SKEBTS the entire depositions are as exhibit.

**MR. NAYLON:** We're they're not in evidence.

**MR. SHIELDS:** But they can being marked for identification which would make it.

**MS. JONES:** I'm sorry, are you proposing to pull out pages of the deposition and enter them into evidence to match the video that you're played.).

**MR. NAYLON:** Well, I think the court has advised and the court's record S-L the court's record. I'm I'm just telling you from the per TEBGT I have of doing appeals both as an SROD indicate cat and as a SKWREUPBLG on an appeal HRAET court you want a nice clean record if you think this might go up on appeal and of course you don't know until we get to the end of the case so I'm just warning you ahead of time you're not getting a clean record right now that's going to be easy for opinion appellate court to figure out what's -P that's

Algarin - Direct - Shields

enough said we're offer the record and real we invest one, 35.

MR. NAYLON: Could I bring up a quick scheduling. Issuing.

MAGISTRATE JUDGE PEDERSEN: Off the record) lunch brake taken). Good afternoon, Judge Pedersen eye eye eye eye eye eye eye.

MAGISTRATE JUDGE PEDERSEN: Are we ready to call the jury back in.

MR. SHIELDS: Yes, your Honor. AOURBGS the only thing I would ask, your Honor, (.

MAGISTRATE JUDGE PEDERSEN: Clerk (jury present.

(WHEREUPON, luncheon recess taken.)

(Open court, jury present.)

MAGISTRATE JUDGE PEDERSEN: Back on the record. We are back on the record in the Dempsey case. Everybody who was present when we recessed is once again present.

Officer Algarin is on the stand.

And, Officer Algarin, I'll just remind you you're still under oath.

THE WITNESS: Yes, sir.

Algarin - Direct - Shields

**MAGISTRATE JUDGE PEDERSEN:**  You can come on back and have a seat.

**MAGISTRATE JUDGE PEDERSEN:**  Mr. Shields, your witness.

Q    Good afternoon, Officer.

A    Good afternoon.

Q    Okay.  So before we broke for lunch, we were discussing the reason that you entered back into the yard at 53 Kosciusko Street, correct?

A    I believe so.

Q    Okay.  And you were mentioning that there might have been suspects in the yard; is that right?  That was one of the things that you said was going through your head, we had some discussions about that?

A    Correct.

Q    And after this incident on the day of the incident you spoke with your supervisor, correct?

A    Correct.

Q    And your supervisor was Sergeant Randolph, correct?  Rudolph -- Rudolph, I'm sorry, correct?

A    Correct.

Q    And you told him the reason that you entered the yard before the dog Tesla was shot, correct?

A    I believe so.

Q    Okay.  So what I want to do is I want to -- and after the incident, as we discussed earlier, Sergeant Rudolph

he completed the incident report for the incident, correct?

A    Correct.

Q    So what I want to do is put back up Exhibit Number 32 which is the incident report.  And so do you see the highlighted portion of the incident report right there?

A    Yes.

Q    Okay.  And that highlighted portion of the incident report says:  "Two males were detained and officers began to backtrack the route of the males for contraband.  Officer J. Algarin checked the backyard of 53 Kosciusko Street."

Did I read that correctly?

A    You did.

Q    And so that says that you entered the yard while backtracking to search for contraband, correct?

A    Yes.

Q    And it does not say anything about entering the backyard to search for any potential additional suspects, correct?

A    It does not on this report.

Q    And do you think Sergeant Rudolph just forgot to include that very important detail in his report?

MS. JONES:  Objection.  He can't speak for other people.

MAGISTRATE JUDGE PEDERSEN:  Sustained.

Q    Okay.  I'm going to take that down for now.

All right, Officer Algarin, if a police officer

Algarin - Direct - Shields

doesn't have a warrant or consent, then they can only search someone's property if exigent circumstances apply, correct?

A    Correct.

Q    For exigent circumstances to apply, you must have two things:  First, probable cause and, second, an emergency, correct?

MS. JONES:  Objection.  Can -- I think the judge instructs on the law.  I think we covered this yesterday but he can speak to his understanding but not what the law is.

MAGISTRATE JUDGE PEDERSEN:  You may ask him what his training has taught him about what exigent circumstances consist of.

Sustained.

Q    Were you trained that for exigent circumstances to apply you must have two things:  Probable cause and an emergency?

A    Yes.

Q    And, so, under your training if there's no emergency, then a warrantless entry to search for weapons or contraband is not allowed pursuant to the exigent circumstances exception, correct?

A    Correct.

Q    And even if there is probable cause to believe that weapons or contraband are on the property, if there's no emergency, you're not allowed to enter the property to

Algarin - Direct - Shields

search, correct?

A    Correct.

Q    And the mere possibility that contraband is on the property does not create an urgency justifying a warrantless entry to search, correct?

A    Correct.

Q    Because suspicion is less than probable cause legally, correct?

MS. JONES:  Objection.  I think that's another legal conclusion.

MAGISTRATE JUDGE PEDERSEN:  Sustained.

You can ask him what he was trained for on that issue, if he was.  Then you can answer.

Q    You were trained that suspicion under the law is a lower legal standard than probable cause, correct?

A    Correct.

Q    And you were trained that the mere possibility that contraband could be removed or destroyed does not create an emergency justifying a warrantless entry to search, correct?

A    Correct.

Q    For exigency to apply, you must believe the contraband is in the process of being removed or destroyed or that removal or destruction is imminent, correct?

A    Correct.

Q    And that would require probable cause to actually

Algarin - Direct - Shields

believe that contraband is located on the property, correct?

A     Say that one more time, please.

Q     That would require probable cause to actually believe that contraband is on the property, correct?

**MS. JONES:**  We're talking about his understanding, correct?  Or what he was trained to do?  Just want to make sure.

**MR. SHIELDS:**  All these -- yes.  So, all these questions -- and I believe he answered yes.  Is that your answer to that question?

A     Correct.

Q     And you were trained that exigent circumstances justifying an immediate search would not be present if the police have a reasonable opportunity to first seek the homeowner's consent to enter and search the property, correct?

A     Correct.

Q     And if an officer entered a property to search without a warrant, consent or exigent circumstances, that would be wrong, correct?

A     Say that one more time.

Q     If a police officer entered a property to search without a warrant, without consent, and without exigent circumstances, that would be wrong, correct?

A     Correct.

Algarin - Direct - Shields

**Q**    If a police officer entered a property to search without a warrant, consent or exigent circumstances, that would be conduct that could place the public in danger, correct?

**MS. JONES:**  I'd object to that.  One, again I think we're still doing legal conclusions and, two, it's a hypothetical, like it's an if and speculative.

**MAGISTRATE JUDGE PEDERSEN:**  Sustained.

You may ask him what he was trained about concerning public safety and entering without a warrant.

**Q**    You were trained that if a police officer entered a property to search without a warrant, consent or exigent circumstances, that could put the public in danger, correct?

**A**    No.

**Q**    Okay.  Do you remember being asked this question and giving this answer at your deposition on July 15th, 2022, on Page 62.

**MS. JONES:**  One second.

**Q**    That would be conduct that could put the public in danger?

**MS. JONES:**  And what line?

**Q**    Ms. Jones objected --

**MR. SHIELDS:**  Starting on Line 8.

**Q**    "And that would be conduct that could put the public in danger?"

Algarin - Direct - Shields

Ms. Jones:  "Objection."

Answer:  "Yeah."

**MS. JONES:**  Um.

**Q**    So you agreed to that back at the time of your deposition, correct?

**MS. JONES:**  Well there was an objection to the question in this deposition and I think there should be a ruling on the objection before this is used in his questioning.  And it's also vague if we start with a "that".  What --

**MR. SHIELDS:**  I'll back up.

**MS. JONES:**  What is the that?

**MAGISTRATE JUDGE PEDERSEN:**  Wait, wait, wait, wait. What was the basis of the objection at the time of the deposition?

**MS. JONES:**  One, it's vague, two, it's leading, and it's, yeah, I mean....

**MAGISTRATE JUDGE PEDERSEN:**  All right.  I'm going to overrule on vague and leading.

But, Mr. Shields, I suggest you back up a little bit so that we get the context of the deposition question not just the context in this trial.

**MR. SHIELDS:**  Yes, your Honor.

**Q**    So I'll begin at Page 62, Line 3.

**MS. JONES:**  Actually, your Honor, before we read that again, do you mind if we approach briefly.

Algarin - Direct - Shields

**MAGISTRATE JUDGE PEDERSEN:**  No.  Side bar.

(Held at side bar:)

**MR. NAYLON:**  Respectfully, your Honor, I'm getting to the point where I'm getting concerned that when there's an objection instead of just sustained and overruled, the Court is instructing how the question can be asked.  My concern is at that the jury may find that the court favors one side over another.

So, that's why I wanted to bring it to the -- you know, that's going to happen.  I appreciate it if you tell me so I could correct my own questions.  But I do have a concern if it happens a lot of the --

**MAGISTRATE JUDGE PEDERSEN:**  Okay.

**MR. NAYLON:**  Sometimes it --

**MR. SHIELDS:**  Well in my -- I think if he's equal, if he's giving the similar instructions to both sides, then that concern isn't a concern at all, as long as he's fair to both of us in front of the jury.

**MR. NAYLON:**  There's no doubt the judge is fair and I know that the reason he's saying that is to be fair but I think it's appropriate for both sides.

**MAGISTRATE JUDGE PEDERSEN:**  I agree.

Now, any further objections in this deposition testimony at Page 62 starting with Line 3?

**MS. JONES:**  I did not bring it with me.

Algarin - Direct - Shields

**MR. NAYLON:** I brought it up.

**MS. JONES:** Okay. 62 are you reading from?

**MR. SHIELDS:** Correct. That was the question that I was going to impeach him with up to his answer at Line 11. And I was going to begin for the background at Line 3.

**MS. JONES:** Sure.

**MR. SHIELDS:** On Page 62.

**MS. JONES:** If we're just doing 3 to 11, then --

**MAGISTRATE JUDGE PEDERSEN:** So you're not going to get to the conduct that would be reckless?

**MR. SHIELDS:** That will be my next questioning.

**MAGISTRATE JUDGE PEDERSEN:** So you are going to get to that.

And what's your objection on Line 14, Ms. Jones?

**MS. JONES:** Yeah, so I think that questions from 8 to 11 and also 12 to 15, one -- are both leading obviously but then also that, one, I think the first one is just loaded and prejudicial but the second I feel like is a legal conclusion. recklessness is a term we use in the law.

**MR. SHIELDS:** These obviously important questions.

(court reporter interrupted for clarification.)

**MS. JONES:** Not necessarily. Maybe if we could rephrase it to like his opinion.

**MR. SHIELDS:** No.

**MS. JONES:** Yeah, I'm just concerned with how the

Algarin - Direct - Shields

questions are phrased.

MR. SHIELDS: Because if his answers are prejudicial to your case, that's just the facts in the case, that's what your concern is and there's nothing improper about the questions.

MAGISTRATE JUDGE PEDERSEN: Let's go for the first question, that would be conduct that could put the public in danger. Your objection there is what?

MS. JONES: One, that it was leading and, two, that, I mean -- so it's vague if you don't pair it with the first part but if it's paired with the first part, I also think that it's just causing him to reach a conclusion.

MAGISTRATE JUDGE PEDERSEN: Okay. And then for the --

(Court reporter interrupted for clarification.)

MR. NAYLON: Your Honor, that is very vague. It depends. An officer can -- let me read the question specifically. It says entered the property a police officer enters a property and goes on a porch.

MR. SHIELDS: Okay. And that's not what I said. I said entered and searched here.

MS. JONES: This is also a good point.

MAGISTRATE JUDGE PEDERSEN: So -- we got to go one at a time.

MS. JONES: That's fine.

MR. NAYLON: Police officers enter property without a

Algarin - Direct - Shields

warrant, without exigent circumstances, based upon that question there's not enough fact to answer.

MR. SHIELDS: This is just the impeachment. I added specific words and background.

MAGISTRATE JUDGE PEDERSEN: One at a time.

MR. NAYLON: Yep.

MR. SHIELDS: This was all done in the context of the deposition with the entry into Mr. Dempsey's yard. He knew exactly what I was talking about. He answered the questions. This followed all these questions about the specific facts of this case. He knew what he was answering at the time. There was an objection. He answered the question.

MAGISTRATE JUDGE PEDERSEN: Let's give the jury the context in which the deposition took place. So, when you say "and if a police officer entered a property without a warrant, consent or exigent circumstances that would be wrong, correct", say in the context of this case, if a police officer entered a property without a warrant, consent or exigent circumstances to search for contraband or other suspects, that would be wrong, actually search for contraband --

MR. SHIELDS: Contraband.

MAGISTRATE JUDGE PEDERSEN: -- because the suspects --

MR. SHIELDS: He wasn't searching for suspects, so.

MR. NAYLON: So you're impeaching him with a different

Algarin - Direct - Shields

question, though, than what was questioned.  If you add --

MS. JONES:  That is also -- you have to use the question that I asked.

MR. SHIELDS:  So when I asked him --

(Court reporter interrupted for clarification.)

MAGISTRATE JUDGE PEDERSEN:  One at a time.

MS. JONES:  I think the pointing out that he's asking about entry here is important.  I think that's something that we brought up in our motions in limine, right, that he needs --

MAGISTRATE JUDGE PEDERSEN:  Yeah.

MS. JONES:  The warrants applied to searching and I think Mr. Shields has done a good job actually in the trial making sure that he's talking about entering to search to kind of cure that defect but here in these questions there's none of that clarification about entering to search so I think it conflates two things under the law which is confusing to the jury.  I mean, you don't need a warrant --

MR. SHIELDS:  You --

MS. JONES:  -- just walk across somebody's property.  I mean, that was in the guesser HREUG case and it's pretty clear that this --

MR. SHIELDS:  Which is contrary to their policies but.

MS. JONES:  Which -- so, I mean, there might be a different part of the deposition where I think there are a

few times where you say "enter to search", so maybe those would be more appropriate.

MR. SHIELDS:  He understood --

MAGISTRATE JUDGE PEDERSEN:  One at a time.

MR. SHIELDS:  He understood the entire time in the deposition.

MS. JONES:  I --

MR. SHIELDS:  There was entry to search that we were talking about the entry into the Dempsey's property that happened in the context of this case so you never made specific objections in the deposition to say entry to search, I object because of that.  That never happened once.  That doesn't appear anywhere in the deposition.  So you know what, it's unfair to say now you can't use this to impeach him.

MAGISTRATE JUDGE PEDERSEN:  Okay, I've heard enough.

MR. SHIELDS:  So.

MAGISTRATE JUDGE PEDERSEN:  Stop.  I want to read.

MR. SHIELDS:  Sorry, Judge.

(Pause in proceedings.)

MAGISTRATE JUDGE PEDERSEN:  Okay.  Back on Page 58 at Line 4:

Question:  "And would you also agree that exigent circumstances justifying an immediate search may not be present if police have a reasonable opportunity to seek the owner's consent to enter and search the property."

Algarin - Direct - Shields

So the subject here appears to be entering for the purpose of searching not just for the purpose of entering. However, the testimony that's come through this officer -- and I think Officer Horowitz, as well -- is that there were more than two people involved in this incident, at least that's what they're testifying to.  And Officer Algarin has at least alleged that he was also searching for more suspects which wouldn't necessarily fall into the Fourth Amendment because it would be hot pursuit.

**MR. SHIELDS:**  Hot pursuit is still governed by the Fourth Amendment, your Honor.  It's an exigent circumstances exception.  It's not a separate exception.

**MAGISTRATE JUDGE PEDERSEN:**  All right.  Unfortunately this is not very clear and if you do start reading from Page 62, Line 3, the context is not clear to the jury.

I think if you were to set the scene with officer Algarin:  You recall being at your deposition and we talked about searching for contraband?  Yes.  And do you recall that I asked you that if the police officer entered property without considering exigent circumstances, correct?  And you answered correct.  And I asked you again in the context of what we were discussing at the deposition that would be conduct that could put the public in danger?  Objection. Yeah.

As far as recklessness, I'm going to not have you ask

Algarin - Direct - Shields

that question.  I'm going to leave that to my definition to the jury.

What would he add by saying he thinks it's reckless?  Is his mindset important to your claim?

**MR. SHIELDS:**  Yes, your Honor.

**MAGISTRATE JUDGE PEDERSEN:**  If his mindset is important to your claim and he believes it's reckless, then that would be a relevant fact to prove an issue that's in contention, would it not?

**MR. SHIELDS:**  Yes, your Honor.

**MR. NAYLON:**  Except as you indicated.  It's all very confusing and --

**MAGISTRATE JUDGE PEDERSEN:**  Okay.

**MR. NAYLON:**  And we're talking about impeachment of a witness and impeachment of a witness by a question and now we're getting all of these extraneous things.

**MAGISTRATE JUDGE PEDERSEN:**  When you conduct your cross-examination and you ask him leading questions about this stuff, you can then bring out how this is really not impeachment, okay?

**MR. NAYLON:**  Okay.

**MAGISTRATE JUDGE PEDERSEN:**  All right.

**MR. NAYLON:**  Thank you, Judge.

**MAGISTRATE JUDGE PEDERSEN:**  So you may ask the questions starting with Page 62, Line 3 but set up the context,

Algarin - Direct - Shields

first --

MR. SHIELDS:  Thank you, your Honor.

MAGISTRATE JUDGE PEDERSEN:  -- with the officer.

(Open court:)

MAGISTRATE JUDGE PEDERSEN:  Okay.  I've made my ruling.
Mr. Shields, you may continue.

MR. SHIELDS:  Thank you, your Honor.

Q    Officer Algarin, you remember at your deposition on July 15th, 2022, we asked numerous questions about the entry into Mr. Dempsey's property to search for contraband, correct?

A    Yes.

Q    And do you recall in that deposition at Page 62, Line 3, starting there, being asked these series of questions:

Question:  "And if a police officer entered a property without a warrant, consent or exigent circumstances, that would be wrong?"

Ms. Jones objected.

You answered:  "Correct."

Question:  "That would be conduct that could put the public in danger?"

Ms. Jones:  "Objected."

You answered yeah.

Do you recall being asked those questions and

Algarin - Direct - Shields

giving those answers?

A    Yes.

Q    And in fact that would be conduct that would be reckless, correct?

A    I --

MS. JONES: Objection.  I think that calls for a legal conclusion.

MAGISTRATE JUDGE PEDERSEN:  Overruled.

A    It could be.

Q    If you entered a property to search without a warrant, consent or exigent circumstances, that could be reckless, that's what you said?

A    Yes.

Q    Okay.  And if you entered a property to search a fenced-in backyard, the curtilage to the property without a warrant, consent or exigent circumstances, that could be willful misconduct, correct?

A    Yes.

Q    Okay.  Now, in this case it would have only taken you about 15 to 20 seconds to walk from the back of 49 Kosciusko Street to the front door of Mr. Dempsey's house (knocking) knock and ask for his consent, correct?

A    Yes.

Q    And the fact that it would have taken only 15 to 20 seconds to walk to the door and ask for his consent does not

Algarin - Direct - Shields

in itself create an emergency, correct?

A    Correct.

Q    And you were in the backyard of 49 Kosciusko Street for approximately one minute with Officer Gorman before you jumped the fence the second time into the backyard of 53 Kosciusko Street, correct?

A    Correct.

Q    So during that one minute you could have, instead, walked to the front door, knocked and asked for Mr. Dempsey's consent to enter and search his yard, correct?

A    It was an option.

Q    So the answer's yes, you could have done that?

A    Yes.

Q    And you chose not to?

A    Correct.

Q    And before entering Mr. Dempsey's yard to search, it would have been important to knock and tell him what was going on in his yard, correct?

A    If given time, yes.

Q    I'm sorry.  I missed your answer.

A    If given an opportunity and time, yes.

Q    And you just said you had the opportunity and time because it would have only taken 15 seconds, correct?

A    I'm sorry.  Say that again.

Q    Can you read it back.

Algarin - Direct - Shields

(Discussion between Judge Pedersen and court reporter.)

**THE REPORTER:** "And the fact that it would have taken only 15 to 20 seconds to walk to the door and ask for his consent does not in itself create an emergency, correct?

"Correct."

**MR. SHIELDS:** I'm sorry then I had another question after that that I wanted read.

**THE REPORTER:** "So the answer's yes, you could have done that?

A    Yes.

Q    And you chose not to?

A    Correct.

Q    And before entering Mr. Dempsey's yard to search, it would have been important to knock and tell him what was going on in his yard, correct?

A    If given time, yes.

**THE REPORTER:** "And you just said you had the opportunity and time because it would have only taken 15 seconds, correct?

Answer: "I'm sorry.  Say that again."

**MR. SHIELDS:** Yes, that was the question I wanted read back.  Can you read it again?

**THE REPORTER:** "And you just said you had the opportunity and time because it would have only taken 15

Algarin - Direct - Shields

seconds, correct?

A    No.

Q    You thought for pretty long there.  What were you thinking about?

A    Everything that was just read.

Q    Everything that was what?

A    That was just read.

Q    Okay.  So it would have only taken 15 seconds.  You were in the backyard at 49 Kosciusko for over a minute.

A    Yes.

Q    Just walking around.

A    (No response.)

Q    You said in that minute you could have chose instead to go to the front door and knocked and asked for consent but you chose not to do that, right?

A    It was an option.

Q    It was an option that you chose not to do?

A    Correct.

Q    And you had the time to do it because it only took ten to -- 15 to 20 seconds, correct?

A    If I had the time.

Q    If you had the time.  Why didn't you have the time?

A    Because there was still two outstanding.

Q    There's two outstanding suspects allegedly that you just made up for the first time at trial?

Algarin - Direct - Shields

**MS. JONES:** Objection. That's argumentative and inconsistent with prior testimony.

**MAGISTRATE JUDGE PEDERSEN:** Sustained.

**Q** The two suspects that you never told Sergeant Rudolph about on the date of the incident?

**MS. JONES:** Objection. I don't know if that's fact in the record.

**MAGISTRATE JUDGE PEDERSEN:** Overruled.

**A** One more time.

**Q** The two suspects that you didn't tell Sergeant Rudolph about on the date of the incident?

**A** I can't say that I didn't tell him.

**Q** Okay but it's not in his incident report, correct?

**A** Specifically that there was four, no. It doesn't say specifically there was four or two.

**Q** It says that you entered the yard to search for contraband, correct?

**A** Yes.

**Q** And Officer Horowitz's arrest report says there were only two, correct?

**MS. JONES:** Objection. That's a mischaracterization.

**MAGISTRATE JUDGE PEDERSEN:** What is Officer Horowitz's report? I'd have to go look at it again.

**MR. SHIELDS:** Officer Horowitz's arrest report I believes it's Exhibit Number 33, your Honor.

Algarin - Direct - Shields

**MAGISTRATE JUDGE PEDERSEN:** James, I'd like to see.

**MR. SHIELDS:** I can put it up, your Honor. It's in evidence.

**MAGISTRATE JUDGE PEDERSEN:** Let me look.

**MR. SHIELDS:** I'll withdraw my last question.

**Q** My new question is: And Officer Horowitz's report only documents two suspects that fled, correct?

**A** Yes, two suspects we had named.

**Q** Now, you'd agree that it would have been important for the safety of Mr. Dempsey, Mr. Dempsey's daughter and his dog to go to his front door, knock and ask for his consent before entering his yard, correct?

**A** If we had time, yes.

**Q** Now, do you recall being asked this question and giving this answer at your deposition on Page 112, Line 23.

Question: "And why would that have been important?"

Answer: "To let him know what's going on."

Question: "For his safety?"

"Yeah."

"For the safety of his daughter?"

"Yes."

"For the safety of his dog?"

"Yes."

Do you recall being asked those questions and

Algarin - Direct - Shields

giving those answers?

A    Yes.

Q    And you didn't have any extra qualifiers in there about if I had time or if there weren't these two alleged other suspects that we were looking for?

MS. JONES:  Objection.  This is argumentative.

MAGISTRATE JUDGE PEDERSEN:  Overruled.

A    During the deposition you required yes or no answers.  So I had to give you yes.

Q    I required you to -- you felt like you didn't have the opportunity to volunteer any additional information?

A    No.

Q    And you understand that your attorney had the opportunity to question you to fill in any of these gaps at your deposition also, right?

MS. JONES:  Objection.  I don't think he has personal knowledge of the legal system or at least as it comes to attorney's representations, depositions and the like.

MAGISTRATE JUDGE PEDERSEN:  I'll sustain it.

Q    At your deposition your attorney didn't ask you any clarifying questions, did she?

A    I don't remember.

Q    At your deposition you never volunteered any of those additional qualifiers about if you had time or any of the additional suspects, correct?

A     I'm sorry, one more time.

Q     At your deposition when you were asked those questions about whether it would have been important for the safety of Mr. Dempsey, his daughter and his dog to knock on their front door and let them know what was going on and you answered yes, you didn't volunteer any of those additional qualifiers, correct?

A     No.

**MAGISTRATE JUDGE PEDERSEN:**  Not correct?

A     Correct.  Sorry.

Q     Now, if you could turn back time and do it all over again, you'd go to Mr. Dempsey and seek his consent before entering his backyard to search, correct?

**MS. JONES:**  Objection.  This is a hypothetical and impossible to do.

**MAGISTRATE JUDGE PEDERSEN:**  What is the relevance of what he would have done?

**MR. SHIELDS:**  The context of the question was he entered the yard to search and he shot and killed the dog and considering that what happened and the possibility that it wasn't a lawful entry, would he do something different?

**MAGISTRATE JUDGE PEDERSEN:**  Right.  But would it --

**MR. SHIELDS:**  To avoid, to avoid having to sit here today and having shot and killed the dog?

**MS. JONES:**  I mean --

Algarin - Direct - Shields

**MAGISTRATE JUDGE PEDERSEN:**  I'll allow the question.

A    I'm sorry.  One more time then.

**Q**    If you could turn back time and do it all over again, you would go to Mr. Dempsey and seek his consent before entering his backyard to search, correct?

A    In hindsight, yes.

**Q**    And you would do that because there was no emergency requiring you to jump the fence immediately and, instead -- instead of going to the door and asking for his consent, correct?

A    I'm sorry.

**Q**    You would do that, you'd go to his door and ask for his consent because there was no emergency requiring you to jump the fence immediately instead of going to his door, knocking and asking for his consent, correct?

A    If there was no emergency, correct.

**Q**    Okay.  So, what I'm going to do is pull up your deposition.  It's going to be at Page 148, Line 21.  What I'm going to do so that it can get it in the record is first I'm going to play the video and then I'm going to read that portion, too.

**THE CLERK:**  Is this video in evidence?

**MR. SHIELDS:**  No, these are videos of his deposition.

**THE CLERK:**  Your Honor, do you want this displayed to the jury?

Algarin - Direct - Shields

**MAGISTRATE JUDGE PEDERSEN:** I think we need to mark something for identification if we're going to show it to the jury.

**MR. SHIELDS:** It's just his deposition, your Honor. It's not like evidence. It's just his deposition. I'm going to read the deposition, too, so the court reporter can get it down. But the earlier when I played the clip of his deposition, we didn't mark it -- which we can if that's what we need to do.

**MAGISTRATE JUDGE PEDERSEN:** Any problem with playing the deposition without marking the video as a piece of evidence?

**MR. SHIELDS:** Well, I'm happy to mark it for ID, your Honor. Maybe we should mark the prior deposition clip as --

**MAGISTRATE JUDGE PEDERSEN:** 207.

**MR. SHIELDS:** 207 and this could be 208.

**MAGISTRATE JUDGE PEDERSEN:** Ms. Jones?

**MS. JONES:** So the video shouldn't be shown to the jury because it hasn't been entered into evidence but if he wants to play the audio --

**MR. SHIELDS:** It's not --

**MS. JONES:** -- of the video, I think that is acceptable.

**MAGISTRATE JUDGE PEDERSEN:** If he reads deposition transcripts, we aren't necessarily marking those, how is this different?

**MS. JONES:** No. My concern is that they are seeing

Algarin - Direct - Shields

something that hasn't been entered into evidence.  Normally with depositions, they're just reading in testimony.  Like this isn't --

**MR. SHIELDS:**  That's not how depositions work.  Rule 32 --

**MAGISTRATE JUDGE PEDERSEN:**  Mr. --

**MR. SHIELDS:**  -- says you can use foam for any reason.

**MAGISTRATE JUDGE PEDERSEN:**  Mr. Shields, if you can just hold, please.  One at a time.

**MR. SHIELDS:**  Sorry, your Honor.

**MAGISTRATE JUDGE PEDERSEN:**  Ms. Jones.

**MS. JONES:**  So I was under the impression that the jury shouldn't be seeing the video because it hasn't been entered into evidence.  That's my concern.

**MAGISTRATE JUDGE PEDERSEN:**  This seems like a 21st Century problem that we didn't have back when depositions were merely typewritten transcripts.

**MS. JONES:**  Exactly, your Honor.

**MAGISTRATE JUDGE PEDERSEN:**  I suppose for the purposes of keeping a neat appellate record, we should mark the deposition video and then enter it into evidence like we did with the body cam video, like we had with the reports and that way the jury is permitted to use it during deliberations, if they see fit to do so and the appellate court, if there ever is one involved, can he's easily find

Algarin - Direct - Shields

the video that they need for review.

So we will mark as 207 the deposition of officer?

**MR. SHIELDS:** The clip earlier was a different video clip for Officer Algarin, your Honor. And --

**MS. JONES:** Oh, I'm sorry. So, what is being marked as this exhibit for identification? It's not the entire video, they're just clips?

**MR. SHIELDS:** Right now it's clips from Officer Algarin's deposition. I'm happy to put his entire video deposition into evidence.

**MAGISTRATE JUDGE PEDERSEN:** So when you say clips, it isn't a separate piece of file, it's the whole file but you're just playing part of it?

**MR. SHIELDS:** No, your Honor. We took the whole file and we pulled out --

**MAGISTRATE JUDGE PEDERSEN:** Okay.

**MR. SHIELDS:** -- small minute long clips of specific questions and answers.

**MAGISTRATE JUDGE PEDERSEN:** Great. So, the earlier one is a clip. We'll mark that later.

This one is also a clip. So this will be 208. And it's a depo clip and then we can mark either the file name or something to identify it for the record.

**MR. SHIELDS:** Yes, your Honor, and this very clip is from the deposition beginning at Page 148 Line 21.

Algarin - Direct - Shields

**MAGISTRATE JUDGE PEDERSEN:**  And is there any objection to admission of Exhibit 208 for identification?

**MS. JONES:**  Exhibit 208 for identification, yes, I do not believe that this video recording should be shown to the jury because it hasn't been entered into evidence.  And also I have some concerns with making clips that are separated from the, what is it, the authenticity of video recordings is present in the federal rules.

**MAGISTRATE JUDGE PEDERSEN:**  What was that last portion?

**MS. JONES:**  So I'm forgetting the Federal Rule of Civil Procedure but there is a rule that dictates the certification of the accuracy of videos.  And I would have -- why I'm concerned that this clip isn't being shown with that videographer's certification.

I'll just place those objections on the record, your Honor.

**MAGISTRATE JUDGE PEDERSEN:**  All right.  The objections are overruled.

The video clip is admitted.

That would be 208.

**MR. SHIELDS:**  Thank you, your Honor.

**MS. JONES:**  For clarification, 208 is the one you are about to play?

**MAGISTRATE JUDGE PEDERSEN:**  Correct.

**MS. JONES:**  And 207 was earlier.

Algarin - Direct - Shields

**MAGISTRATE JUDGE PEDERSEN:**  The earlier one.

**Q**   So this video, like I said before, that we're about to play is from your deposition beginning at Page 148, Line 21.

(Deposition played.)

**MAGISTRATE JUDGE PEDERSEN:**  Now, just so the record's clear, the court reporter did not report on anything that was said during the video and I believe those objections were ones that I ruled on at side bar; is that correct?

**MR. SHIELDS:**  Yes, your Honor.

**MAGISTRATE JUDGE PEDERSEN:**  Okay.  You agree, Ms. Jones?

**MS. JONES:**  Yes, your Honor.

**MAGISTRATE JUDGE PEDERSEN:**  Thank you.

**MR. SHIELDS:**  And just so the record is clear, your Honor, I'm going to read those questions and answers.

**MS. JONES:**  He's --

**MR. SHIELDS:**  So Line 21, Page 148.

Question:  "Okay, I appreciate that but that was not my question.  The question was if you could turn back time and do it all over again, would you do anything different?"

Ms. Jones:  "Objection."

Answer:  "Yeah, I would go to Charles Dempsey and let him know that I'm in his backyard."

Question:  "You would go and you would seek his consent prior to entering his backyard, is that what you mean?"

Algarin - Direct - Shields

Answer:  "Yes."

Question:  "You would have walked to his front door and knocked on his front door?"

Ms. Jones:  "Objection."

Answer:  "Yes."

Question:  And you would have done that because there was no emergency requiring you to jump his fence immediately into his yard instead of going to his door and knocking and asking for his consent?

Ms. Jones:  "Objection."

Question:  "Is that fair?"

Ms. Jones, objection.

Answer:  "Yes."

Do you recall being asked those questions and giving those answers?

A    Yes.

**MAGISTRATE JUDGE PEDERSEN:**  Mr. Shields, Ms. Jones, could you come side bar, please.

(Held at side bar:)

**MAGISTRATE JUDGE PEDERSEN:**  Okay.  Here's a problem I had not anticipated when we were dealing with this pretrial. We're going to play the deposition, then we're going to read the deposition to form a good record.  The jury's time is valuable.  I don't think that we're going to be able to get through this trial very well if we do both things all the

92

Algarin - Direct - Shields

time.

**MR. SHIELDS:**  I'm not, your Honor.

**MAGISTRATE JUDGE PEDERSEN:**  Okay.

**MR. SHIELDS:**  That was just for that one and now I guess that tomorrow when we play the video, I think that later we can talk with the court reporter.  I think that the quality of Officer Algarin's video is much lower than the rest of them.  I don't know if she might be able to type tomorrow or not or if that video would just be entered in as ID also in case we go out.  Then it would be part of the record.

**MAGISTRATE JUDGE PEDERSEN:**  Well it's going going to have to be admitted into evidence and I don't think asking the court reporter to redescribe what the original court reporter had at the deposition transcribed more accurately because he or SH is he is a good idea.  I'm just going to tell her to put video XXX played and then we can just.

**MR. SHIELDS:**  I mean, we could mark for ID all of the deposition transcripts that we have.

**MAGISTRATE JUDGE PEDERSEN:**  Yes.

**MR. SHIELDS:**  Okay.

**MAGISTRATE JUDGE PEDERSEN:**  You can add those to your chart.

Ms. Jones, Mr. Naylon?

**MR. NAYLON:**  With respect to tomorrow, that's one thing. With respect to today, the fact that we're doing it twice.

Algarin - Direct - Shields

MR. SHIELDS:  There was -- I'm not doing that again.

MR. NAYLON:  Okay.

MR. SHIELDS:  I think that's the last clip but no promising.

MR. NAYLON:  And you're not going to do that tomorrow, but.

MR. NAYLON:  To read twice to a jury.

MAGISTRATE JUDGE PEDERSEN:  I saw you just about ready to raise an objection to the redundancy of it so I thought hold on, we'll disuse this.

(Open court:)

Q    Officer Algarin, do you accept responsibility for entering Mr. Dempsey's backyard to search without a warrant, correct?

A    Correct.

Q    And you accept responsibility for entering Mr. Dempsey's backyard to search without his consent, correct?

A    Correct.

Q    And you accept responsibility for entering to search without probable cause, correct?

A    No.

Q    Okay.  Do you recall when you said earlier that you agreed that you had no facts to support a reasonable belief that any drugs or contraband were located in Mr. Dempsey's

Algarin - Direct - Shields

yard?

A    I do.

Q    And you had no facts to support a reasonable belief that any suspects were in his yard either, right?

A    I tried to explain it.  You wanted yes or no.

Q    You had no -- you had no facts to support a reasonable belief that any suspects were hiding in Mr. Dempsey's yard either, correct?

A    I explained that.

Q    Okay.  So, I'm not asking for an explanation.  I'm asking if you had facts to support a reasonable belief that any suspects were hiding in Mr. Dempsey's yard at the time that you jumped into his yard?

A    Yes.

Q    Oh, you did?  Okay.

And what were those facts?  After you walked around in the yard the first time for a minute, then you jumped over to 49 Kosciusko, you walked around, you didn't look like you were in any kind of rush when you were walking around there and then suddenly it becomes an emergency --

MS. JONES:  Objection.

Q    -- when you jumped back in the yard the second time.

MS. JONES:  Objection.  This is argumentative and --

MAGISTRATE JUDGE PEDERSEN:  Sustained.

Algarin - Direct - Shields

MS. JONES:  -- counsel's --

Q    You accept responsibility for entering Mr. Dempsey's yard to search without an emergency?

A    No.

Q    After you just saw yourself saying if you could do it all over again -- that's what you said three years ago that everybody just saw it (indicating) -- after you admitted that three years ago at your deposition, suddenly now you're changing your story and you did have an emergency?

A    Correct.

Q    Okay.  So three years ago there was no emergency and today there's an emergency?

A    There was always an emergency.

Q    Okay.  There was an emergency three years ago when you said if you can turn back time and do it all over again, you would have walked to his front door and knocked and asked for his consent before entering his backyard?

MS. JONES:  Objection.  I think this is asked and answered and also, again, argumentative.

MAGISTRATE JUDGE PEDERSEN:  Overruled.

A    Well that's in hindsight.

Q    In hindsight you said you would have walked to his front door knocked and asked for his consent before entering his yard, it was hindsight at the time that you answered it at your deposition three years ago, correct?

Algarin - Direct - Shields

A    In hindsight, correct.

Q    Yeah.  That's what you said three years ago and now your answer's different today?

A    Are we speaking of hindsight or in that moment?

Q    When you answered the question three years ago, you said if you could do it all over again, that's what you would have done, knowing only those facts that you knew at the time you entered the yard, that was the context of the question.

So that's the same context today if you could do it all over again and enter his yard without -- let me withdraw that.

If you could do it all over again, you just said you'd go to his front door and you'd knock, you'd ask for his consent, correct?

A    With hindsight, yes.

Q    With hindsight.  And obviously when you answered the question at the deposition, you also knew that allegedly if it was true, there were still two unapprehended suspects, correct?

A    Yes.

Q    Now, before the date of the incident, you'd previously encountered dogs when you went through people's backyards doing police work, right?

A    Yes.

Q    And you'd estimate approximately 60 to 65 percent

Algarin - Direct - Shields

of properties in the city of Rochester have dogs, correct?

A    That was my approximation.

Q    Okay.  Is it still your approximation?

A    I'd say half in my approximation.

Q    Okay.  So more than half of the residences in Rochester have dogs, right?

A    Half.

Q    So you knew when you entered Mr. Dempsey's yard that it was possible that you would encounter a dog, correct?

A    It was possible.

Q    It was possible because more than half the people in Rochester have dogs, right?

A    With my approximation, yes.

Q    Okay.  But on the date of the incident as part of the plan you made, you didn't consider what you would do if you encountered a dog in Mr. Dempsey's yard or any of the other yards that you cut through, correct?

A    Correct.

Q    Okay.  And when you were in the backyard of 49 Kosciusko Street, you noticed the large gated enclosure containing a doghouse?

A    Correct.

Q    So obviously there was a dog that resided there, correct?

MS. JONES:  Objection.  There's no personal knowledge of

Algarin - Direct - Shields

that.

**MAGISTRATE JUDGE PEDERSEN:** Sustained. You may ask the question.

Q    So obviously that indicated that a dog likely resided there, correct?

A    Correct.

Q    But before you jumped the fence the second time into Mr. Dempsey's yard, you still didn't consider what you might do if you encountered a dog in Mr. Dempsey's yard, correct?

A    Correct.

Q    Now, if you enter someone's yard, some dogs, they'll run up to a stranger on their property, correct?

A    Correct.

Q    And just because a dog runs up to a stranger on its property, that's not necessarily indicative that the dog is attacking that person, correct?

A    Correct.

Q    Okay. Now, in firearms training you got simulation training involving dogs, correct?

A    Correct.

Q    That was like a decoy that simulated a dog moving left and right and running at you, right?

A    Correct.

Q    It was training about hitting a moving target,

Algarin - Direct - Shields

correct?

    A    Correct.

    Q    And the object of that training was shooting accuracy, correct?

    A    Correct.

    Q    And the object of that training was not about avoiding shooting dogs, correct?

    A    Correct.

    Q    There were no "shoot/don't shoot" scenarios in that training, correct?

    A    Not with dogs.

    Q    I'm just talking about the firearms training with dogs.  So in the dog shooting training, there were no "shoot/don't shoot" scenarios, correct?

    A    With dogs, no.

    Q    The only thing in firearms training was about shooting accuracy, about shooting a simulated dog that's running at you, correct?

    A    Correct.

    Q    And the object of that training was not how to use any less lethal options to avoid shooting the dog, correct?

    A    Correct.

    Q    And as a police officer you often have to make quick decisions under stressful circumstances, correct?

    A    Correct.

Algarin - Direct - Shields

Q    And one situation where you have to make a quick decision under stressful circumstances is when you have to decide whether or not to shoot a dog that's running at you, correct?

A    I'm sorry.  Say that one more time.

Q    One situation where you have to make a quick decision under stressful circumstances is when you have to decide whether or not to shoot a dog that's running at you, correct?

A    Correct.

Q    And the whole point of training is so that you're prepared to handle those quick decisions under stressful circumstances, correct?

A    Correct.

Q    Because when you face those stressful circumstances where you have to make a quick decision, you fall back on your training, correct?

A    Correct.

Q    And you never received any simulation training about making quick decisions under stressful circumstances specifically related to avoiding shooting a dog, correct?

A    Correct.

Q    And that's what happened in this case, correct?

A    Can you be more specific?

Q    When Tesla ran toward you, that was one of those

101

Algarin - Direct - Shields

quick decisions you had to make under stressful

circumstances, correct?

A    Correct.

Q    And you were trained to handle that situation in

firearms training, correct?

A    Not simply firearms.

Q    You were trained to handle that situation in

firearms training, correct?

**MS. JONES:**  Objection.  That was asked and answered.

**MAGISTRATE JUDGE PEDERSEN:**  Sustained.

Q    You were trained to handle that situation in the

training simulation where the decoy dog ran at you and you

practiced shooting the dog, correct?

A    So the decoy doesn't run directly at you.

Q    The only situation that you've ever had with any

kind of simulator, any kind of simulated dog running at you

is in firearms training where the point of the training is

how to accurately shoot the dog that's simulated running at

you, correct?

**MS. JONES:**  Objection.  I think he just said it's not

running at him.

**MAGISTRATE JUDGE PEDERSEN:**  He did.  Sustained.

**MR. SHIELDS:**  I said simulated running at you.

**MS. JONES:**  No.

**MAGISTRATE JUDGE PEDERSEN:**  He said:  "So the decoy

Algarin - Direct - Shields

doesn't run directly at you."

Q   Okay.  So as I said in my earlier question, the decoy runs left and right and it's simulated running towards you, correct?

A   It's simulating an aggressive dog.

Q   So the only simulation training you've ever had about how to deal with an aggressive dog is in firearms training, correct?

A   Simulation, yes.

Q   That was my question.  Any kind of simulation training, how to handle the situation in the real world, the only time that you ever got any simulation training was in firearms training, correct?

MS. JONES:  Objection.  I think we've asked this before.

MAGISTRATE JUDGE PEDERSEN:  Overruled.

A   Simulation, yes.

Q   And you fell back on your firearms training when you unholstered your gun and you shot Tesla, correct?

A   Correct.

Q   You never considered, instead, using your pepper spray, correct?

A   I had no time to use pepper spray.

Q   Okay.  That wasn't my question.  You never considered using your pepper spray, correct?

A   I did consider I could not use my pepper spray.

Algarin - Direct - Shields

Q     That thought went through your head, you considered it?

A     No, I just -- I'm trying to format it so you would accept the answer.

Q     Okay.  And you never considered using your baton, correct?

A     I did consider it.  I could not use my baton at that time.

Q     Why couldn't you use your baton?

A     I had no time.

Q     Okay.  Now your baton and your gun are both located on your duty belt, correct?

A     Correct.

Q     And to use your baton, you got to pull it out and expand it like that (indicating), is that right?

A     You have to reach over, pull it out, expand it, bring it up, and then use.

Q     Can you demonstrate that for the jury?

A     Sure.  So in my instance --

Q     I'm sorry.  Do you have your baton with you?

A     You asked me to demonstrate it.

**MAGISTRATE JUDGE PEDERSEN:**  He's not in uniform.

Q     I don't know, maybe he's got it in his pocket.

A     How would you like me to simulate it then?

Q     Do you have your baton with you?

104

Algarin - Direct - Shields

A    I do not.

Q    Does anybody have a baton with them.

A    (No response.)

Q    I guess if you don't have your baton, go ahead and demonstrate without it.

**MAGISTRATE JUDGE PEDERSEN:**  You can simulate if you can.

**THE WITNESS:**  Thank you, your Honor.

A    Baton's on my left hip.  I'm a righty.  I would have to come across my body, bring it out -- it's pretty snug in there -- bring it out, expand it, and then bring it back up.  So:  Come here, expand it, and then end here at some point.

Q    Okay.  Now, can you simulate taking out your gun?

A    Yes.  Holster's on my right side.  Simulating taking out a gun, feeding (phonetic) the retention drawing and then bringing out your gun.

Q    So basically the retention is the little clip that holds it in so it doesn't fall out when you run?

A    Correct.

Q    So you got to --

A    May I be seated.

Q    So you got to unclip it, pull it out, that's what you got to do for your gun.  With your baton you got to pull it over here and whip it out like that and it's ready to go?

A    That's not what I did.

Algarin - Direct - Shields

**MAGISTRATE JUDGE PEDERSEN:** I'll describe for the record that the officer stood at the witness stand, reached with his right hand over to his left hip, simulated pulling a baton out. He mentioned it was snug. Then he simulated whipping it down to the ground on the right side of his body to open it. And then he simulated lifting it up to put it into a position to use it.

**MR. SHIELDS:** Thank you, your Honor.

Q   And you never considered running back and jumping over the fence, correct?

A   I did not have time.

Q   Okay. Now at the academy you also received a Humane Society class called Bite Prevention for Law Enforcement Officers, correct?

A   Correct.

Q   That was a half day training block, right?

A   Approximately, I believe.

Q   And half of that half day training block dealt with animal control so it didn't deal with the bite prevention part of the class?

A   It dealt with the Human Society. I don't remember if actually it was animal control, city animal control.

Q   So it was a four-hour block and half that was about how to contact animal control and what they do and the other half was taught by somebody named Reno and that was about the

Algarin - Direct - Shields

bite prevention --

**MS. JONES:**  Objection.

**Q**    -- correct?

**MS. JONES:**  Sorry.

I think that's a mischaracterization of what he just said.

**MR. SHIELDS:**  I'm not restating what he just said.  I'm asking

**MAGISTRATE JUDGE PEDERSEN:**  Sustained.

**Q**    The bite prevention portion of the class was only half of the four-hour training block, correct?

**A**    I don't recall the specifics of the outline of that class.

**Q**    Okay.  Now, in that class, you were trained that you can shoot a dog if it poses an imminent threat, correct?

**A**    Yes.

**Q**    Okay.  And you were trained that an imminent threat means that the dog could pose -- I'm sorry.  I withdraw that.

You were trained that an imminent threat means the dog could seriously injure or kill you, correct?

**A**    Correct.

**Q**    And you were trained that a dog merely running at an officer in and of itself does not constitute an imminent threat, correct?

**A**    Say that one more time for me, please.

Algarin - Direct - Shields

Q    You were trained that a dog merely running toward an officer in and of itself does not constitute an imminent threat, correct?

A    Correct.

Q    And you're not aware of any RPD officer ever in the history of the RPD being seriously injured or killed by a dog attack, correct?

A    Yes but this was after the fact.

Q    So before this incident --

A    Before --

Q    -- you're unaware of any officer being seriously injured or being killed by a dog?

A    Correct.

Q    You were never told in your training about any RPD officer ever being seriously injured or killed as a result of a dog attack, correct?

A    Not that I recall.

Q    And in the Humane Society training they informed you that there were various less lethal means that you could use against a dog running at you, correct?

A    I believe so.

Q    And that would include your baton or kicking the dog?

A    Yes.

Q    And as part of that class, you were never trained

Algarin - Direct - Shields

that you could use pepper spray on a dog, correct?

A     I don't recall.

Q     And is that everything that you remember about the class?

A     No.

Q     What else do you remember about the class?

A     From what we learned from the class, just making sure, you know, if we have an opportunity if there's signs of dogs, to contact the homeowner before entering to, you know, so we can safely make sure that dog's put away.  If we hear barking, obvious signs that there's a dog in the house, to communicate with the homeowner like, hey, can we please put that dog away.  If we come to face in that time and, you know, we're able to get animal patrol, that dog isn't charging us, we're able to contact them make sure that they can come, respond, able to, you know, take care of the dog, get the dog out of the equation so that we can then go ahead and do whatever it is that we're there to do.

Q     So you were taught that before entering a property like the curtilage or a fenced-in backyard, you should look for signs that a dog might reside at the property, correct?

A     Yeah.

Q     And did you do that before -- well, let me withdraw that.

        You didn't do that before you jumped the fence the

Algarin - Direct - Shields

second time and entered back into Mr. Dempsey's property, correct?

A    I don't recall seeing any signs of dogs on Mr. Dempsey's yard.

**MR. SHIELDS:**  I move to strike.  It's nonresponsive to my question.

**MAGISTRATE JUDGE PEDERSEN:**  Motion granted.

That last answer is stricken.

Q    Before entering Mr. Dempsey's property, you didn't do anything, you didn't look for any signs that a dog might reside on Mr. Dempsey's property, correct?

A    Not correct.

Q    What did you do to look for any signs that a dog might reside on Mr. Dempsey's property before you entered it?

A    Look for anything obvious like the dog kennel, cage, those sort of things.

Q    Just like you walked up to the fence and looked over it to see if there was any contraband on the ground before you entered?

A    The dog kennel is a lot larger than a small little bag of contraband.

Q    Okay.  What else did in Mr. Dempsey's yard might have indicated that a dog -- well, let me withdraw that.

Did you see the big extra foot of wiring at the back fence of Mr. Dempsey's property when you went and you

Algarin - Direct - Shields

talked to Officer Horowitz and the suspect that he had detained?

A    Yes.

Q    That's an indication that a dog might reside at the property, correct?

A    You indicated that was for stopping people from jumping the fence.

Q    That could also be an indication that maybe a dog resides there and he doesn't want it to jump over the back fence, correct?

A    It could be.

Q    Did you consider that before you entered Mr. Dempsey's property the second time?

A    No.

Q    Did you see any of the well-worn paths that his dog ran in the backyard, did you look over and try to see if there were any well-worn paths of a dog running back and forth before you jumped --

MS. JONES:  Objection.

Q    -- into the yard the second time?

MS. JONES:  Sorry.

Objection.  Those facts aren't in the record and it sounds like counsel's testifying.

MAGISTRATE JUDGE PEDERSEN:  Actually he's asking if he saw well-worn paths.  I assume that you're not trying to say

there are well-worn paths?

MR. SHIELDS:  I'm asking if he looked to see if there were well-worn paths in the property of a dog running around in a familiar pattern?

MAGISTRATE JUDGE PEDERSEN:  Overruled.

A   I did not notice any well-worn paths in the yard.

Q   Did you look over the fence to see if maybe you could see dog poop on the ground?

A   I did not -- don't recall seeing dog poop on the ground.

MR. SHIELDS:  That wasn't my question.  Move to strike.

MS. JONES:  I mean, your Honor --

MAGISTRATE JUDGE PEDERSEN:  Motion granted.  That did not respond to the question.

Q   Did you look over the fence to look on the ground to see if there was any dog poop on the ground before you jumped the fence and entered the property the second time?

A   Yes.

Q   You did that?

A   Yes.

Q   And you're saying that there was no dog poop when you looked over the fence the second time?

A   I did not see any dog poop.

Q   Okay.  All right.  And when did you -- when did you do that, when did you look?

Algarin - Direct - Shields

A    When I walked along the fence.

Q    Okay.

A    Try to see as much as I could in the areas I could but I can't see the whole yard.

Q    So you didn't see any dog poop, just like you didn't see any guns or contraband on the ground, correct?

A    From what I could see, no.

Q    And the yard was completely fenced in, correct?

A    Correct.

Q    It's also an indication that a dog resides at the property, correct?

A    Not always.

Q    That can be an indication that a dog resides at the property, correct?

A    It could be.

MAGISTRATE JUDGE PEDERSEN:  Mr. Shields, how far along are we, do you have an estimate

MR. SHIELDS:  Maybe a little less than hour, your Honor.

MAGISTRATE JUDGE PEDERSEN:  Okay.  It's quarter to 3 right now.  Does anybody need a break before we go any further or would you like to wait for a break?

(No response.)

MAGISTRATE JUDGE PEDERSEN:  Seeing no hands raised, go ahead and continue.

MR. SHIELDS:  Okay.  I want to show him the dog bite

Algarin - Direct - Shields

prevention PowerPoint.

You guys stipulate that into evidence.

**MS. JONES:**  What exhibit?

**MR. SHIELDS:**  165-1.

**MS. JONES:**  165-1?

**MR. SHIELDS:**  Correct.

**MS. JONES:**  No objection 165.1.

**MAGISTRATE JUDGE PEDERSEN:**  So, on my list I have 165 but I don't have a .1.  What do you mean?

**MR. SHIELDS:**  Okay.  There were two versions.  One was a longer version and one was a shorter version and so this is the longer version.

**MAGISTRATE JUDGE PEDERSEN:**  So we're going to mark it as 165 longer version or is it identified some other way, how is the appellate court, if there ever is one involved, going to determine what we're admitting here?

**MR. SHIELDS:**  I think that this just can be 165, your Honor.

**MAGISTRATE JUDGE PEDERSEN:**  All right.

**MS. JONES:**  I'm just looking at the Plaintiff's Exhibit sticker, that's all.  So if there's a sticker on it.

**MR. SHIELDS:**  The sticker says 165.1.

**MS. JONES:**  165.1.

**MAGISTRATE JUDGE PEDERSEN:**  So there is no plain 165. It's just a 165 decimal 1.

Algarin - Direct - Shields

MR. SHIELDS:  And there's a 165 decimal 2.

MAGISTRATE JUDGE PEDERSEN:  So we're admitting 165.1, correct?

MR. SHIELDS:  Yes, your Honor.

MAGISTRATE JUDGE PEDERSEN:  Ms. Jones?

MS. JONES:  Yes, I believe so, your Honor.  We're just trying to pull up our version to make sure they're the same.

MAGISTRATE JUDGE PEDERSEN:  Okay.

MS. JONES:  I did a quick review and I believe they are the same.

MAGISTRATE JUDGE PEDERSEN:  They are the same.

MS. JONES:  Yes, meaning we don't have any objections to using the version of 165.1 that plaintiffs seek to introduce.

MAGISTRATE JUDGE PEDERSEN:  All right.  Number 165.1 is admitted by stipulation.

(Exhibit 165.1 received in evidence.)

MR. SHIELDS:  Thank you, your Honor.

MAGISTRATE JUDGE PEDERSEN:  You may publish it to the jury if you choose.

MR. SHIELDS:  I've got it up.

THE CLERK:  Published, your Honor.

Q     Officer Algarin, can you see the Dog Bite Prevention for Law Enforcement, first page of the PowerPoint on your screen there?

A     I do.

Algarin - Direct - Shields

Q    All right.  And is this a document that you've seen before?

A    Yes, I believe it's a document from that Humane Society class.

Q    This is the, basically the training PowerPoint that was used at the academy class?

A    Correct.

Q    Okay.  And you recognize this first page here?

A    Yes.

Q    I want to fast forward to Page -- Well, let me back up.

Do you remember if your class was taught by Reno DiDomenico, the officer depicted in this picture?

A    Yes, it was.

Q    Okay.  My question here is on Page 8.  So earlier you testified that you were trained that you may shoot a dog only if it poses an imminent threat, right?

A    Correct.

Q    And so that concept is discussed here on Page 8, correct?

A    Correct.

Q    So it says that you can -- basically you can shoot a gun except an animal by gunshot is permissible for an animal that is posing an imminent threat of serious physical injury to a person or to another animal, correct?

116

Algarin - Direct - Shields

A    Correct.

Q    So, the dog has to be posing a threat of a serious physical injury in order for you to be able to permissibly shoot the dog, correct?

A    Correct.

Q    But I think you testified earlier that you aren't aware of any officer ever being seriously injured by a dog attack before this incident, correct?

A    Not an officer, no.

Q    And as part of this presentation, you're also trained to use certain less lethal methods when you encounter dogs, correct?

A    If given the ability to, yes.

Q    And some of those -- Mr. DiDomenico referred to those as bite prevention tools, is that right?

A    Correct.

Q    So he listed physical repellants, bite stick, baton, ASP, umbrellas, improvised:  Flashlight, stick, rolled up magazine, clipboard, a road flare; do you remember that portion of the training?

A    I remember specifically for the baton.

Q    Okay.  You don't remember anything else?

A    I only can recall right now specifically the baton.

Q    Then the next page.  Chemical repellants, OC spray, citronella pray.  Electronic repellants, ultrasonic stun

Algarin - Direct - Shields

guns, taser.  Improvised:  Fire extinguisher.

Do you recall a portion of the class discussing those tools?

A    From this PowerPoint, yes.

Q    Do you have an independent recollection separate from looking at this PowerPoint about what was discussed in the class?

A    No.

Q    And between the academy and the date of this incident on October 19th, 2018, you received no other training about safely interacting with dogs during police duties other than that Humane Society training and the firearms training that we've already discussed, correct?

A    No, incorrect.

Q    Incorrect?

A    Yes.

Q    What other training did you receive?

A    Training on FTO, with my FTOs in the real world when exposed to dogs.

Q    So no classroom training on interacting with dogs other than what you got at the academy?

A    Classroom training, no.

Q    Now, you were never trained on the use of force continuum against dogs, correct?

A    I don't recall the force continuum with dogs.

Algarin - Direct - Shields

Q    And you said the only dog simulation you ever received was in firearms training, correct?

A    Simulation, yes.

Q    So what I want to do is play the rest of your bodyworn camera video and I'll ask you some questions about it.

So, before when we had paused at 2 minutes and 12 seconds into the video, this was the exact moment that you jumped the fence. That's what we see here, right, you're in the midst of jumping the fence into the yard?

A    I believe so.

Q    Okay.

A    Yes.

Q    You on the bottom left here, you can see the portion of the fence that you're going over?

A    Yep.

Q    Okay. So we're at 2 minutes and 12 seconds into the video. I'm going to hit it and play through and then I'll start asking you some questions, okay?

(Video played.)

Q    For the record, I had forgot to put on the sound so I rewound it. So I'm back to 2 minutes and 12 seconds and I'm going to hit play.

(Video played.)

Q    Now when you jumped the fence, you didn't have

Algarin - Direct - Shields

anything in your hands, right?

A    Correct.

Q    So, you had the option of choosing any tool on your duty belt, right?

A    No.

Q    You could have reached for anything, so you didn't have anything in your hands at the time you jumped, right?

A    I wouldn't have time to have grabbed anything else.

Q    Okay.  You pulled out your firearm after you saw Tesla, right?

A    Immediately after, no.

Q    You pulled out your firearm, you didn't pull out your OC spray or your baton, correct?

A    I'm sorry, say that one more time.

Q    The only tool on your duty belt that you pulled out was your firearm, you didn't pull out your baton or your OC spray, correct?

A    Correct.

Q    You could have pulled out your OC spray.  You pulled out your OC spray after Chuck approached you, right?

A    I would not have had time to pull out my OC spray and spray it and have it set in and be effective, if it would have been effective.

Q    Okay.  Were you ever taught to create distance between yourself and the dog (indicating) use using a baton

Algarin - Direct - Shields

or some other object that you could hold?

A    I testified I couldn't bring my baton out in time.

Q    And did you ever learn that OC spray is effective on dogs?

A    I believe there was an additional training post this incident.

Q    In the academy training?

A    I'm sorry.  In the academy training, it could have been effective.

Q    That's not something you considered?

A    I did not have time to bring out my OC spray.

Q    Okay.  Now, you could have avoided shooting and killing Tesla by simply going to the front door and knocking and asking for Chuck's consent before entering his yard, correct?

A    In hindsight, yes.

Q    And you had time to do that, correct?

MS. JONES:  Objection.  I think these questions are asked and answered.

MAGISTRATE JUDGE PEDERSEN:  Sustained.

Q    After you shot Tesla, Gorman entered the yard, too, correct?

A    Yes.

Q    And Mr. Dempsey (indicating) told you to leave his property, correct?

Algarin - Direct - Shields

A    Correct.

Q    And you refused to do that, correct?

A    We couldn't leave that property at that time.

MR. SHIELDS:  That wasn't my question.  I move to strike.

MAGISTRATE JUDGE PEDERSEN:  Motion granted.  That last answer is stricken.

Q    After Mr. Dempsey demanded that you leave his property, you refused to leave his property, correct?

A    I did not leave, correct.

Q    And you walked around the yard and you searched the yard?

A    At that point just for my casings.

Q    When you walked around the yard and searched the yard for your casings, you never found a gun or any other contraband that you were allegedly looking for when you entered the yard the second time, correct?

A    I didn't have time to look for that.  I had to look for my casing.

MR. SHIELDS:  That wasn't my question.  Move to strike.

MAGISTRATE JUDGE PEDERSEN:  Motion granted.

That last answer is stricken.

Q    As you were looking for your shell casings from shooting and killing Tesla, while you were doing that, you didn't locate any contraband or gun that had been discarded

Algarin - Direct - Shields

by the suspect, correct?

A    Correct.

Q    And you didn't find any of the other alleged suspects that allegedly fled, correct?

A    I did not, no.

Q    As far as you know there were no other suspects hiding in Mr. Dempsey's yard, correct?

A    I don't know.

Q    As we watched the video there, did you see any other locations that would have been convenient for a suspect to hide behind?

A    Possibly underneath the porch.

Q    Did you ever go and look under the porch after you entered the property --

A    No.

Q    -- and shot the dog?  No?

A    No.

Q    He could have still been hiding there, you didn't think to go and search for him?

A    I was focused on the incident that just occurred.

Q    Okay.  But I thought they were so dangerous that these alleged additional suspects were fleeing, you never thought that maybe you should try to find them, too?

    MS. JONES:  Objection.  Argumentative.

    MAGISTRATE JUDGE PEDERSEN:  Overruled.

Algarin - Direct - Shields

A    At that point in time that incident took priority.

Q    Well, it didn't look like you were doing much other than looking for your shellss, right?

A    That was part of that incident.

Q    So you found your shells and after that you didn't continue trying to look for the suspect that could have been hiding under the porch, is that what you're saying?

A    I did not, no.

Q    Did you ever go over to the little garbage can in the corner and open that up and see if maybe he jumped in there to hide?

A    I personally did not, no.

Q    Okay.  You ever do anything else to try to find these alleged suspects after you shot and killed Tesla?

A    Me personally, I did not.

Q    Did anybody else?

A    I don't know.

Q    Did you tell anyone else, oh, hey, you know, I was looking for these suspects and then I shot the dog, you know, can someone else take a look here or there or some place they might have been hiding?

A    I did not, no.

Q    Now, everything that happened was consistent with the RPD's policies and the training that you received, correct?

124

Algarin - Direct - Shields

A    Correct.

Q    The entering of the yard was consistent with your training on backtracking, correct?

A    Correct.

Q    And you were trained to backtrack during your field training, correct?

A    Correct.

Q    And backtracking means rephrasing the flight path of a suspect to see if they discarded any contraband, correct?

MS. JONES:  Objection.  These are asked and answered.

MAGISTRATE JUDGE PEDERSEN:  Sustained.

Q    And it's common to backtrack through residential properties, correct?

A    Correct.

Q    And it's common to backtrack through residential properties without first asking for the homeowner's consent, correct?

A    Correct.

Q    And you backtracked through residential properties every time that a suspect runs from you on foot and they cross through the residential property, correct?

A    Correct.

Q    And when you do that, you never first go and ask for the homeowner's consent, correct?

Algarin - Direct - Shields

A    Unless there's obvious signs that a dog is in the backyard, yeah.

Q    Before this incident you had never done that, correct?

A    I don't recall specifically if that's something I did do or not.

Q    Okay.  I want to show you RPD General Order 415.

MR. SHIELDS:  It's Exhibit 138, and, your Honor, we stipulated that one into evidence.

Q    So this is Page 30 but let's go up to the top just to -- so you see.

Do you see on your screen, Officer Algarin, RPD General Order dated April 20th, 2015:  Search/seizure, by dynamic entries, search warrant, arrest warrant without warrant?

A    Correct.

Q    Now, at the beginning it gives some definitions here, right?

A    Yes.

Q    Okay.  And the first one under letter D here that I wanted to ask you about was probable cause.  Can you just read that to yourself real quick.

A    (Witness complies).  Letter D, correct?

Q    Yes.

A    Probable cause, reasonable cause, probable cause to

Algarin - Direct - Shields

search exists when facts and circumstances known to the officer provide the basis for a reasonable person to believe that a crime was committed at the place to be searched or that evidence of a crime exists at the location.

Probable cause to seize property exists when facts and circumstances known to the officer would lead a reasonable person to believe that the item is contraband, is stolen, or constitutes evidence of a crime.

When probable cause is based on information from an informant, there must be sufficient grounds to conclude both that, one, the informant was reliable, and, two, the information was credible under New York law.

The term reasonable cause is equivalent to the term probable cause.

Q   Okay.  Thank you.  And then can we go to E, reasonable suspicion.

A   E, reasonable suspicion is that suspicion based upon facts and any reasonable inferences that can be drawn in light of experience that lead one, as an ordinary and cautious person, to believe that some specific crimes or some specific criminal activity is being committed, was committed, or is about to be committed.

Q   Okay.  And as we discussed earlier, basically you were trained that under the law probable cause is a more stringent legal requirement than reasonable suspicion,

Algarin - Direct - Shields

correct?

A    Correct.

Q    Now can you read the definition under G, letter G, search.

A    Letter G, search.  A search is defined as any activity by a government official, including a police officer, that invades any area in which a person has a reasonable expectation of privacy.  This includes but not limited -- is not limited to a physical entry into an area, location, or item, a visual inspection or surveillance into a private area without an actual physical entry, an auditory interception or overhearing of communications on a communications device such as a telephone and viewing data on a computer or similar device.  A search deals with a person's privacy rights, and can occur regardless of whether any items are actually seized or taken by the police.

Q    So were you trained that a search is defined as basically any activity that invades someone's area where they have a reasonable expectation of privacy; is that right?

A    Yes.

Q    So like entry into the curtilage of a yard?

A    Not to curtilage specifically.

Q    That would be an area that somebody has a reasonable expectation of privacy?

A    Yes.

Algarin - Direct - Shields

Q    And so entry into the curtilage would constitute a search, that's what you were trained?

A    Yes.

Q    So basically RPD trains you that entry into -- the curtilage of a property in and of itself constitutes a search, correct?

A    Say that one more time.

Q    The RPD trains you pursuant to General Order 415 that entry into a yard or into the curtilage of a property in and of itself, constitutes a search, correct?

A    Correct.

Q    Because that would invade an area in which a person has a reasonable expectation of privacy, correct?

A    Correct.

Q    Now I want to fast forward down to Page 30 where we were before. So I'm just going to ask you some questions about the exigent circumstances exception. So you see this highlighted portion right here?

A    Mm-mm.

Q    It says simply because evidence may be lost or destroyed does not in itself justify a search under exigent circumstances, correct?

A    Correct.

Q    Okay. And then it goes on to say probable cause must exist leading one to believe: One, a crime, misdemeanor

or felony, has been or is being committed, and -- so it requires both things, right, probable cause for both things -- two -- and I highlighted the portion that's relevant here -- that if immediate action is not taken -- there's a bunch of "ors" -- or you have a reason to believe that evidence of the crime will be destroyed or otherwise lost, correct?

A    Correct.

Q    So basically that would be the exigent circumstances exception that would have applied in this case, correct?

A    Correct.

Q    Okay.  And so here you did not have any reason to believe that if you didn't immediately enter the property, the evidence of the crime would be destroyed or lost, correct?

A    Unless evidence is still on one of those outstanding individuals.

Q    Here you didn't have any reason to believe that if you didn't immediately enter, that there would be evidence on the ground that would be lost or destroyed, correct?

**MS. JONES:**  Objection.  Asked and answered.

**MAGISTRATE JUDGE PEDERSEN:**  Overruled.

A    I'm sorry.  Say that one more time.

Q    Here before you entered the property you had no

Algarin - Direct - Shields

reason to believe you had -- you testified earlier, you remember testifying earlier and you said you had no, you had no facts to support a reasonable belief that if you didn't immediately enter the property, that any guns or drugs or other contraband would be immediately lost or destroyed, correct?

A    Unless it's on a different individual.

Q    Okay, that's not what you said earlier, right.  You had no facts to support a reasonable belief that if you didn't immediately enter the property, that guns or drugs would be lost or destroyed, correct?

A    Am I still answering your first question when you asked the stuff on the ground, if there's any other drugs on the ground?

Q    That's what you said earlier.

A    So can you repeat your question, please.

Q    Here, before entering Mr. Dempsey's property, you had no facts to support a reasonable belief that any guns or drugs were located on the property and that they would be immediately lost or destroyed if you didn't immediately enter the property and search, correct?

A    Unless it was on a different individual.

Q    Okay.  So, the whole basis is this made-up fourth -- third and fourth person, right, that's the only reason that maybe there were drugs on the property?

Algarin - Direct - Shields

**MS. JONES:** Objection.

**Q** Or guns on the property?

**MS. JONES:** Objection. Argumentative and compound question.

**MAGISTRATE JUDGE PEDERSEN:** Sustained.

**Q** Forgetting about any alleged other suspects, other than any alleged other suspects, you didn't have exigent circumstances because you didn't have any reason to believe that if you didn't immediately enter, the evidence would be lost or destroyed, correct?

**MS. JONES:** Objection. It's improper to remove facts of the incident in question. It's purely hypothetical and not grounded in this incident. I don't see how it's relevant to answer a question that is divorced from the facts here.

**MAGISTRATE JUDGE PEDERSEN:** Overruled.

**A** Without anyone else in play.

**Q** Okay. Just like you told Sergeant Rudolph on the day of the incident, right?

**A** Excuse me?

**Q** Just like you told Sergeant Rudolph on the day of the incident, right?

**A** Can you specify what I said to Sergeant Rudolph?

**Q** That you entered the yard to search for contraband.

**A** Yes.

**Q** So, that's what you did on the day of the incident,

Algarin - Direct - Shields

you entered the yard to search for contraband, correct?

A    And other individuals.

Q    But that's not what his incident report says.

A    (No response.)

Q    You think it would have been important to tell Sergeant Rudolph that you entered the yard to search or other individuals and not just contraband?

A    I don't know specifically what I told him and why he would have put that in his report.

Q    It's important when police officers write reports, that they're as detailed as possible, right?

A    Yeah.

Q    They're often used in court years later after the incident to refresh your recollection, right?

A    Correct.

Q    So it's important to have every single important detail contained in the report, correct?

A    Correct.

Q    And that detail isn't in this report or any other report, right?

A    These details are third-party.

Q    Because you had decided not to tell him or you decided not to write your own report, right?

MS. JONES:  I --

A    I did not --

Algarin - Direct - Shields

**MS. JONES:** I --

A    I'm sorry.

Q    Oh, you didn't.  Actually let's go back to Exhibit 138.

A    I'm sorry.

**MS. JONES:** Oh.  Before --

**MR. SHIELDS:** And we're going to go to Page 21.

**MS. JONES:** I make for the record that the highlighting was not done by the city of Rochester and was added to the exhibit by the plaintiff.

**MAGISTRATE JUDGE PEDERSEN:** Is that correct, Mr. Shields?

Q    I highlighted the portion to direct his attention for the part that I wanted to read, that's correct?

**MAGISTRATE JUDGE PEDERSEN:** So I will note that in Exhibit 138, the General Order, the highlighting on the page was put in by the plaintiff and was not put in by the city of Rochester.

**MR. SHIELDS:** And that is not the copy that, you know, we'd plan on entering into evidence with the exhibit sticker.

Q    Now on your screen right now, Officer Algarin, do you see subsection 10 procedures during and following warrantless searches?

A    Yes.

Q    You see that?  And then you see how subsection A

Algarin - Direct - Shields

says:  Following any search, members will document their actions, do you see that?

A    Can you point to it, please.

Q    The very first part:  Following any search, members will document their actions, do you see that?

A    The incident was documented by Officer Horowitz.

Q    Following any search, members will -- you didn't document it though, correct?

A    That would have been duplicative documentation on that.

Q    The incident report doesn't document anything about the search, that's an incident report about a dog shooting incident, right?

A    Officer Horowitz?

Q    Did I say Officer Horowitz?

A    I said Officer Horowitz.

Q    The incident report drafted by Officer -- Sergeant Rudolph, that's the incident report for the incident, right?

A    For the dog shooting.

Q    For the dog shooting.  Where's the incident report about your search, your two searches of Mr. Dempsey's property?

A    Everything would have been in Officer Horowitz's report.

Q    Okay.  So Officer Horowitz had the arrest report?

Algarin - Direct - Shields

A    Correct.

Q    Okay.  And so where in Officer Horowitz's arrest report does it document anything about your two searches of Mr. Dempsey's property.  I do not see it in his report.

Q    Okay.  And you don't see it in Sergeant Rudolph's incident report either, right?

A    About searching --

Q    About your two searches of Mr. Dempsey's property.

A    It states my backtracking through the property.

Q    Okay.  You're backtracking the property to search for contraband, right?

A    And other individuals.

Q    It doesn't say anything about searching for other individuals?

A    The report, no.

Q    And, so, nowhere did you comply with General Order 415 which requires you to document all of your actions, correct?

A    Those actions were contained in those reports.

Q    Okay.  And this says, it goes on to say, this is especially important because the reasonableness of the search and seizure cannot be based on what was found as a result of of the search.  Instead, it must be measured by the facts and circumstances known to the member prior to the search and seizure.

Algarin - Direct - Shields

So if you knew that you were looking for these alleged additional suspects prior to the search, entering his yard to search, General Order 415 requires that you would have documented it somewhere, correct?

A    I wasn't able to finish anything.

Q    You entered to search, you searched the flight path the first time you entered and yet it was never documented as required by General Order 415, correct?

A    I looked around.  I wasn't able to really look.

Q    General Order 415 says any time you invade the reasonable expectation of privacy, you agreed earlier, any time that you enter into the curtilage of someone's property, that constitutes a search, correct?

A    I'm sorry, say that again.

Q    General Order 415, the definition of a search, states any time you enter the curtilage to a property, that constitutes a search, correct?

A    Correct.

Q    And yet you didn't document your search as required by subsection 10 of General Order 415, correct?

A    I did not document anything.  It was covered by those two documents.

Q    You could have.  It wasn't covered by those two documents because it doesn't exist anywhere, right?  What you're claiming about entering the property to look for these

137

Algarin - Direct - Shields

two other alleged suspects that got away, right, that's not documented anywhere?

A    From, from me, no, I did not document anything.

Q    Okay.  And General Order 415 requires that any search be documented.

A    Members will document.

Q    Okay.  You're a member, right?

A    So is Jason Horowitz.

Q    And he didn't document it in his report?

A    So is Sergeant Rudolph.

Q    And he didn't document it in his report?

A    Which part?

Q    So you have an independent duty pursuant to General Order 415 to document it in your own independent report, correct?

A    Why?

Q    Because that's what it says.

A    It was reported.

Q    What was reported?

A    The incident.

Q    The incident where you shot the dog was reported, I agree with that.  The incident documenting that you entered the yard to search for contraband to backtrack into the yard, to track the route of the males for contraband but nowhere does it say you backtracked the route to search for

Algarin - Direct - Shields

additional suspects that allegedly got away, correct?

A    No.

**MAGISTRATE JUDGE PEDERSEN:**  That's not correct?

A    That is correct.  I'm sorry.

**MAGISTRATE JUDGE PEDERSEN:**  Mr. Shields, estimate?

**MR. SHIELDS:**  Getting close your Honor.

Q    Now, after this incident you were never disciplined in any way as a result of this incident, correct?

A    Correct.

Q    And you testified earlier your direct supervisor was Sergeant Rudolph; is that right?

A    Correct.

Q    And he reviewed your actions and he determined that they were all consistent with RPD policy and training, correct?

A    According to his incident report, correct.

Q    Did he ever have a discussion with you about the incident?

A    A verbal discussion?

Q    Yes.

A    I don't recall.

Q    You don't remember ever talking with Sergeant Rudolph about what happened?

A    Do I have a private recollection of a verbal conversation?  I do not.

Case 6:20-cv-06629-GWC-CDH    Document 80-4    Filed 02/13/26    Page 138 of 153

139
Algarin - Direct - Shields

Q    Okay.  Do you recall ever telling Sergeant Rudolph any of the reasons that you entered Mr. Dempsey's property the first time or the second time?

A    Do I recall exactly what was said?

Q    Do you recall having a conversation where you informed him of that?

A    Yes.

Q    Okay.  And do you remember what you told him?

A    I don't recall the specific details, no.

Q    Okay.  So you don't recall if you told him that you entered to search for contraband?

A    I don't recall the specifics of the details of that conversation, I'm sorry.

Q    You don't recall if you told him you entered to search for these alleged other suspects?

A    I don't recall the specifics of that conversation.

Q    Okay.  Now, do you know if Sergeant Rudolph ever reviewed your bodyworn camera footage?

A    According to his incident report, yes.

Q    After he reviewed your bodyworn camera footage, did he ever come and have a conversation with you about the incident?

A    I don't recall.

Q    Did you ever review your bodyworn camera footage with Sergeant Rudolph?

Algarin - Direct - Shields

A    I don't, I don't recall.

Q    And the incident report says that a Lieutenant Pearson was notified about the incident as well, correct?

A    According to the incident report, yes.

Q    And who's Lieutenant Pearson?

A    Former Lieutenant Pearson.  He would have been the 410 car that night.

Q    He would have been basically the highest ranking RPD officer working at that time?

A    Correct.

Q    And did Lieutenant Pearson ever come and speak with you about the incident?

A    I don't believe so.

Q    And you never spoke with anyone from internal affairs or what they call the Professional Standards Section, correct?

A    I don't believe so.

Q    And as far as you know, PSS reviewed the incident and the video and determined that all your actions were consistent with RPD policy and procedures, correct?

A    Correct.

Q    Now, do you take personal responsibility for shooting and killing Tesla?

A    No.

Q    And do you remember being asked this question and

Algarin - Direct - Shields

giving this answer at 111, Page 4 (sic).

You said:

Question:  "Do you take personal responsibility for shooting and killing Tesla?"

Answer:  "I pulled the trigger so yes."

Do you recall being asked that question and giving that answer?

A    I do.

Q    Okay.  And then you went on to say that you described the incident as bad circumstances; is that right?

A    Correct.

Q    You went on to say you were in a bad place at a bad time, right?

A    Correct.

Q    And you agreed that you didn't have to be in that place at that time, correct?

A    Say that one more time.

Q    You agreed that you didn't have to be in that place at that time, correct?

A    In hindsight.

Q    You agreed that it was your choice to be in that place at that time, correct?

A    Correct.

Q    And you agreed that you could have, instead, chosen to walk to the front door and asked for Mr. Dempsey's consent

Algarin - Direct - Shields

or to warn him what was going on in his backyard before you entered, correct?

MS. JONES:  Objection.  I think we've asked and answer answered all of these questions.

MAGISTRATE JUDGE PEDERSEN:  I'll sustain the objection.

Q    And you agreed that slowing down and thinking before jumping into the yard is something that you could have done to avoid this situation, correct?

A    In hindsight.

MR. SHIELDS:  Thank you.  Nothing further, your Honor.

MAGISTRATE JUDGE PEDERSEN:  Thank you.

Members of the jury, let's take a, oh, let's say five-minute recess while I talk with the lawyers about the next steps.

(WHEREUPON, recess taken.)

(Open court:)

MAGISTRATE JUDGE PEDERSEN:  We're back on the record. Everybody that was present before the recess is once again present.

I intend to stop at about 4, a little after 4.  I've been looking at cameras, the roads look black.  I can't tell if they're wet or dry but it doesn't look like it's snowstorming anywhere.  You guys have access to the windows. Is it snowing out?

(Jurors say no.)

Algarin - Cross - Jones

**MAGISTRATE JUDGE PEDERSEN:** Ms. Jones is going to begin her cross-examination and then when there's kind of a natural break around 4 or 4:10, I'll cut us off and recess for the day.

Any problems with coming back tomorrow at 9 o'clock?

(Jurors nodding no.)

**MAGISTRATE JUDGE PEDERSEN:** So start at 9 o'clock tomorrow.

Okay, Ms. Jones, your witness.

**CROSS-EXAMINATION BY MS. JONES:**

Q    Okay, good afternoon.

A    Good afternoon.

Q    Would you like to introduce yourself to the jury?

A    Sure.  Officer Javier Algarin with the RPD.  Been there about eight years now.

Q    So I would like to start with actually asking you some questions about BWC.  So what does BWC stand for?

A    Bodyworn camera.

Q    How does a body camera actually work?

A    The camera is activated via button.  That button will capture not only the events after the button is activated but the 30 seconds prior to that.  It continues recording until it is turned off and then -- I'm sorry, deactivated and then it's saved on to the camera.

Q    So when you turn the bodyworn camera on to have it

Algarin - Cross - Jones

start recording, is that the first time you like turn it on or activate it in your shift?

MR. SHIELDS:  Objection.

MR. SHIELDS:  It's an irrelevant question.

MAGISTRATE JUDGE PEDERSEN:  Overruled.

A    I don't recall.

Q    I'm sorry, I'm talking generally.  So do you -- oh, so, I'm talking generally.  So do you have to turn on your bodyworn camera before you start actually recording an incident in order for it to prerecord those 30 seconds?

A    Sorry.  Yes.  So the camera has to be on.  And then once it's on, when you activate it, the 30 seconds will be included.

Q    And you said you turn it off by also touching it, touching a button, as well?

A    Yes.  So -- are we talking about off or deactivating?

Q    Both.

A    Okay.  Deactivating would be the recording button, you would have to hold that for a certain amount of seconds and then turning it off would be the off button which you would have to hold for a certain amount of seconds before it turned off, and this is for the old system.

Q    Yes, the bodyworn camera that you had at the time of this incident?

Algarin - Cross - Jones

A    Correct.

Q    So earlier you said that you thought you had activated it but realized that you -- that it wasn't on and recording.  How is it -- how is that possible to believe you had activated it but it not actually be recording?

A    There are several buttons on that thing, at least three on the side, two on the top, and then several on the back.  The recording button at the time was on the side next to other buttons.  And then it would alert you during, if you are recording, during like intervals, it would vibrate or beep just to let you know, hey, I'm on and I'm recording.

Q    So is that how you realized that it wasn't actually recording?

A    Correct.

Q    One more thing about bodyworn cameras.  Where do they actually sit on your person?

A    At that time I would have had it on my chest.  It would be chest height.

Q    Does your bodyworn camera always see what you see?

A    No.

Q    And why is that?

A    Because it's stationary to wherever my chest is.  Obviously my neck can swivel or it is not as high as my head is.  So maybe I am able to see a little differently or vice versa.  It's a little lower so it might see stuff lower than

Algarin - Cross - Jones

I could see.

Q    So we talked about this incident for a few hours now.  I wanted to actually play the entire thing in its entirety because, as I understand it, you experienced this situation in one continuous stretch of time, right?

A    I'm sorry, this incident?

Q    Yes, what we're talking about here today.  You experienced it in one continuous amount of time?

A    Yes.

Q    There wasn't any stopping and starting?

A    No.

Q    So I'm going to pull up Exhibit 41 which I believe is your bodyworn camera.  It's already been introduced.  We're going to play it from the beginning through till the end, and then I'll ask you questions about it.

**MAGISTRATE JUDGE PEDERSEN:**  Now, at plaintiffs' table, you don't have a view of this, is that correct?

**MR. SHIELDS:**  Correct, your Honor, our monitors are not working.

**MAGISTRATE JUDGE PEDERSEN:**  For the moment then, can you use the monitor that's pointing towards the gallery.

Mr. Bock, since nobody's in the gallery, can we just move it over so they can see it better.

**MR. SHIELDS:**  I can watch it here, your Honor.

**MAGISTRATE JUDGE PEDERSEN:**  Yeah, that would be great.

Algarin - Cross - Jones

You can watch it there, if you'd like.  Thank you.

**MR. SHIELDS:**  As long as the jury can see, your Honor.

**MAGISTRATE JUDGE PEDERSEN:**  So we have one in the gallery pointed this way that you can see if you turn around from the plaintiffs' table and then Mr. Shields is going to watch the monitor that's up here on the podium.

**MAGISTRATE JUDGE PEDERSEN:**  Thank you James.

Go ahead, Ms. Jones.

**MS. JONES:**  Thank you.

Ms. Zollers, do you mind just pushing play and we're going to watch it from beginning to end.

(Video played.)

Q    Less than six minutes?

A    Yes.

Q    Less time actually than it took me to figure out the technology this morning.

A    (No response.)

Q    Was that a yes, actually?

A    What's that?

Q    Was that a yes, less time than it took me to figure out the technology this morning?

A    Yes.

Q    So we can take that down.  Thank you, ***Sandra.

So I actually wanted to start at the beginning now, a few minutes before where that video picked up.

Algarin - Cross - Jones

Why did you respond to that area of Kosciusko Street on that day?

A    For the 911 vice call about males, a group of males selling drugs at a -- in front of that location.

Q    Was that the first time you'd been to that location?

A    No.

Q    What -- or why had you responded to that location previously?

A    For the same 911 call for individuals selling drugs at that location.

Q    You mean that people were reporting drug selling on previous occasions?

A    Correct.

Q    Not necessarily that it was the same caller?

A    Correct.

Q    What else did you know about that area from the previous times that you had responded to that location?

A    Open air drug market there.  The surrounding area is high volume of gun violence.  There was just for 61 specifically there was a lot of people selling drugs there, yeah.

Q    You had only been in the Clinton Section for a few months at this point, right?

A    Correct.

Algarin - Cross - Jones

**Q**   And yet it was already clear to you after a few months that this area was a high drug and gun violence area?

A   Correct.

**Q**   Did you ever make any gun arrests in this area of Kosciusko Street?

A   Yes.

**Q**   When was that?

A   A few days after this incident.

**MR. SHIELDS:** Objection. This has nothing to do with what happened here because it was after the incident.

**MAGISTRATE JUDGE PEDERSEN:** Overruled.

**MS. JONES:** I think it goes --

**Q**   So who responded to this location with you on this day?

A   For the gun arrest.

**Q**   No, actually back to the incident in this case.

A   Okay.

**Q**   Who responded with you to the location for this incident?

A   Officer Gorman, Officer TKA*EUB and Officer Horowitz.

**Q**   And what did you all plan to do, if anything?

A   We planned to have two people, two officers south of the location in case anyone tried to go towards Sobieski and then the other two will go up front and see if anybody

Algarin - Cross - Jones

were to stay there, they'd be detained or if they ran, we would give chase.

Q    Why did ya'll decide to do it that way?

A    Due to previous encounters there.  It seemed that they would, they would run from us before we even get up to that location.  So it would make sense for them to want to run south to Sobieski Street.

Q    So what actually happened when you arrived on this particular day?

A    We arrived, pulled up.  The group of males outside saw us and the cars pulling up.  They then began running towards -- down the driveway of 57 Kosciusko Street, to which I gave chase.  When I got back to the backyard of the same driveway, I saw them run down.  Nobody was back there that I could see briefly but I did hear noise to the west of me.  So I peered over the fence.  I looked to see and I saw somebody running westbound.  I then jumped over that fence and by the time I got over that fence, I saw that there were two out of the four detained at that point.

Q    When you say you saw a person running westbound, was that in the Dempsey yard that that man was running?

A    Correct.

Q    And then what happened after you saw the two individuals had been detained?

A    I checked to see if Horowitz's male would mention

Algarin - Cross - Jones

anything about a gun and then after that, I went to go check to see if Officer Gorman was okay with his individual and see if he had anything on him.

Q    Why did you check with Officer Horowitz's detainee about a gun?

A    To insure and see what he had.  It could be clear maybe he gave it up and said, yeah, I dropped a gun back there.  That occurs.  It could be that he said -- will give me some sort of reaction to believe that he did have a gun and is trying to evade that or -- but it was just to see what response he would give me.

Q    And then what did you do after that?

A    After that I went to check on Officer Gorman and his suspect.

Q    Okay.  And then how did -- tell me the next step after that when you went to go help Mr. -- excuse me, Officer Gorman.

A    I checked with Officer Gorman to see if he had anything when Officer Gorman suggested that I go and backtrack.

Q    So when you were in the Dempsey's yard, did you actually see any indicia of a dog residing there?

A    No.

Q    And did you look while you were in the Dempsey's yard?

Algarin - Cross - Jones

A    I looked briefly as I was walking but not extensively.

Q    So, I believe you said that you went into the yard with Officer Gorman and he suggested that you backtrack.  So then what happened after that?

A    I looked -- I checked the fence line to see if anything was dropped there, to see if there was anything obvious from what I could see -- from what I could see over the yard.  I traced back and forth to see if there was anything I could see and then I noticed a picnic table which would make it much easier for me to jump the fence.

Q    You had gotten over once before on your own.  Why didn't you just hop back over in the same place you had cleared it the first time?

A    That would be the second fence that I jumped after running down the driveway.  I'm trying to save a little bit of energy here.  I saw a fence -- or I'm sorry, a picnic table.  It gave me a good enough height to just jump over the fence.

Q    So just to be clear, when Officer Gorman suggested backtracking, what's your understanding of what backtracking is?

A    Backtracking would be to search for any contrabands that were or -- I'm sorry, look for any contrabands that were discarded during that time.  I checked to see if there was

153

Algarin - Cross - Jones

any outstanding individuals, where they could have gone.

MR. SHIELDS: Objection. That's not what he testified to earlier.

MAGISTRATE JUDGE PEDERSEN: The objection is overruled. You can make that point during argument.

Q    Go ahead. Start over at the beginning if you need to.

A    And just trying to go down the path that they came. And see from that path if anything was discarded or within throwable reach to see if there's anything discarded there.

Q    Did you understand Officer Gorman's statement about backtracking to be an order or a directive?

A    No.

Q    Could Officer Gorman give you a directive?

A    No.

Q    And why is that?

A    We're both officers. We're equal playing field.

Q    So how often do individuals that you are chasing discard things that they are carrying like guns and contraband in your experience?

A    Quite -- quite often.

Q    Can you approximate how quite often is?

A    Probably 70, 80 percent.

Q    I would actually like to stop here before we get into what happened with the dog. Can we stop at this point?

Algarin - Cross - Jones

**MAGISTRATE JUDGE PEDERSEN:** Certainly.

Any objection?

**MR. SHIELDS:** Yes.

**MAGISTRATE JUDGE PEDERSEN:** Why?

**MR. SHIELDS:** Because we're short on time and I'd like to not waste the jury's time.

**MAGISTRATE JUDGE PEDERSEN:** Well I said we were going to quit about 4 and it's a little bit after 4 right now. We will recommence tomorrow morning at 9 a.m.