2

Algarin - Cross - Jones

**MAGISTRATE JUDGE PEDERSEN:** Morning, ladies and gentlemen. We are going to continue the trial today. We recessed yesterday during the cross-examination of Officer Algarin and so we're going to continue with Ms. Jones's cross-examination of Officer Algarin.

Ms. Jones, your witness.

Officer Algarin, I remind you you're still under oath.

**THE WITNESS:** Yes, your Honor.

**CONTINUED CROSS-EXAMINATION BY MS. JONES:**

Q    Okay. Yesterday -- good morning.

A    Good morning.

Q    Yesterday we left off talking about Officer Gorman when he was in the adjacent yard with his detainee and that's where I'm going to pick up today.

So when you were in the yard adjacent to the Dempseys with Officer Gorman and his detainee, could you see in the Dempsey yard from the adjacent yard?

A    Just a little bit.

Q    Was anything -- or why do you describe it as a little bit?

A    It was overgrown. So even if I have a clear view from the fence, I couldn't see what was on the ground especially towards that fence where I jumped into, on top of the fact that the fence was hard to see through to begin

Algarin - Cross - Jones

with.

Q    So from your position in the adjacent yard, were you able -- or did you see any indicia of a dog in the Dempseys' yard?

A    No, I did not.

Q    But there was indicia of a dog in the adjacent yard, right?

A    Correct.

Q    So what happened after you entered the Dempseys' yard?

A    So I jumped into Mr. Dempsey's yard.  I started walking towards the other end of the yard when I noticed the door open.

Q    And then what happened after that?

A    The door opened, I saw Mr. Dempsey exiting and then from the stairs I saw a large black dog.

Q    Can you describe the dog that you saw?

A    From what I saw at the moment, it was a very large black dog.

Q    And then what happened after that?

A    The dog ran down the stairs and then ran -- more like charged at me at that point and then as it charged, it began barking and ran what I can -- at a very fast pace.

Q    And what did you do in response to seeing this dog running very fast at you?

4

Algarin - Cross - Jones

A    I tried alerting everyone and trying to walk back at the same time.  I tried saying whoa, whoa, whoa, making my presence known.  I tried stepping back to create a little bit of space between me and the dog.

Q    And then what did you do?

A    When the dog got close, I had to at that point I had -- drew my firearm and shot the dog.

Q    So why didn't you pull out your baton?

A    I did not have time to pull my baton.

Q    And why do you describe it as not having enough time?

A    As I showed earlier, I would have had to reach across my body, bring it out, flip it open which is not a simple flick of the wrist.  I have to actually extend my arm back this way and then come back up to actually use that and then go back down to swing at the dog.

Q    So this is an expandable baton that you're using?

A    Correct.

Q    So the force you're using is to expand it to its full length?

A    Correct.

Q    So why didn't you use your pepper spray?

A    I wouldn't have time to pull out my pepper spray.

Q    Any other reasons you chose not to use the pepper spray on the dog that was running fast at you?

5

Algarin - Cross - Jones

A    I wouldn't believe that that pepper spray would have been effective or I wouldn't have a chance for it to be effective.  It would take a second on a person anyways to become effective which is more time than I had.

Q    So when I think about spray bottles, there's like the stream mode --

MR. SHIELDS:  Objection.

Q    -- and there's --

MAGISTRATE JUDGE PEDERSEN:  What's your objection?

MR. SHIELDS:  She's leading him.

MAGISTRATE JUDGE PEDERSEN:  This is cross-examination.

MR. SHIELDS:  It's her witness, your Honor.  It's a defense witness.

MAGISTRATE JUDGE PEDERSEN:  It's cross-examination.

MR. SHIELDS:  It's effectively her direct examination, your Honor.

MAGISTRATE JUDGE PEDERSEN:  Let's take a side bar.

(Held at side bar:)

MAGISTRATE JUDGE PEDERSEN:  Is there a rule I'm not familiar with that says when you're cross-examining your own party whose been called as a witness by the defense, you cannot use direct -- I mean leading questions.

MR. SHIELDS:  Your Honor, when she -- first of all, she's conducting her entire direct examination.  She's not limiting her questions to only the questions that I asked.

Algarin - Cross - Jones

**MAGISTRATE JUDGE PEDERSEN:**  She should be and you should object if she goes outside your direct.

**MR. SHIELDS:**  And that's another reason I objected here because she's giving him a leading question about something that I didn't ask about.

**MAGISTRATE JUDGE PEDERSEN:**  Then your objection is outside the scope.

**MR. SHIELDS:**  Outside the scope.

**MAGISTRATE JUDGE PEDERSEN:**  And then she can call him as her own witness to establish things that are outside your scope.  But is there a rule that I'm not aware of that says when you're cross-examining your own party who's been called as a witness by the defense, you cannot use leading questions.  Just because the witness is called by the opposing party doesn't mean you can't ask leading questions.

**MR. SHIELDS:**  I don't know if there's a rule but that's my experience when the defense calls a witness that's a defendant in the case, that effectively the cross-examination is treated as their direct examination.

**MAGISTRATE JUDGE PEDERSEN:**  When the defense calls the witness, yes, you called the witness so right now the witness is on cross from you.

**MR. SHIELDS:**  Yes, your Honor, but that's what I'm saying is that this will effectively serve as the direct examination also so, it's --

Algarin - Cross - Jones

**MAGISTRATE JUDGE PEDERSEN:**  To the extent that --

**MR. SHIELDS:**  It's to the extent it's taken out of order and it's her witness.

**MS. JONES:**  Not --

**MAGISTRATE JUDGE PEDERSEN:**  If she calls a witness, she's on direct, no leading questions unless it's a hostile witness, et cetera.  But you called this witness.  I let you lead him because it was a hostile witness associated with a party, actually and now he's on cross.  So to the extent that her examination is within the confines of your examination, your direct, I think she can lead.

**MR. SHIELDS:**  Okay.

**MAGISTRATE JUDGE PEDERSEN:**  Unless you have some authority that says I'm wrong.

**MR. SHIELDS:**  I'll withdraw my objection based on leading but her question about what type of pepper spray is outside of the scope of what I asked him on direct.

**MAGISTRATE JUDGE PEDERSEN:**  Ms. Jones.

**MS. JONES:**  I'm pretty sure he discussed why he didn't use his pepper spray on the dog.

**MAGISTRATE JUDGE PEDERSEN:**  Right, he did.

**MS. JONES:**  So we're just adding additional context to that.

**MR. SHIELDS:**  And he didn't say anything about the type of pepper spray.

8

Algarin - Cross - Jones

**MAGISTRATE JUDGE PEDERSEN:**  He did say something about its effectiveness, as I recall.

**MR. SHIELDS:**  But he didn't say that was because it's the type of spray that sprays a cloud of spray instead of a stream of spray and that's what she's trying to elicit.

**MAGISTRATE JUDGE PEDERSEN:**  I think the door is open to more examination on the pepper spray at this point so I'm going to overrule the objection and then we'll go forward but if it's outside the scope of your direct, go ahead and object.

**MR. SHIELDS:**  Yes, your Honor.  Thank you, your Honor.

**MS. JONES:**  Thank you, your Honor.

(Open court:)

**MAGISTRATE JUDGE PEDERSEN:**  The objection's overruled. You may continue.

**MS. JONES:**  Thank you, your Honor.

**Q**    So, spray bottles that most of us are familiar with have kind of these two settings like a spray versus a stream. Is pepper spray disbursed similarly in a spray versus a stream or is it something else?

**A**    For RPD pepper spray it is considered a cone, a cone mist.

**Q**    How would -- I'll withdraw that.

Do you know how long it would take for pepper spray to be effective on an animal?

Algarin - Cross - Jones

A    I do not.

Q    Okay.  Did you have a taser on you at the time of this incident?

A    No.

Q    Okay.  So I want to -- actually before I go there.

Yesterday we were talking about the reasons that you went into the Dempseys' yard and I believe one of those reasons was to look for contraband, right?

A    Correct.

Q    Okay.  Were either of the plaintiffs one of the individuals that were selling drugs outside of 61 Kosciusko Street?

A    No.

Q    So were you looking for plaintiff -- either of plaintiffs' guns or drugs in that yard?

A    No.

Q    You were looking for guns or drugs that were discarded by the individuals that had fled from the police, right?

A    Correct.

Q    So I want to play the video again.

***Ms. Zollers is going to pull that up for us.  I want to start right after he's jumped into the yard with Officer Gorman, that is DiSabatino.  Can you pull up Exhibit 41, Officer Algarin.

Algarin - Cross - Jones

MR. SHIELDS: Your Honor, can we just note that the jury it was published -- oh, did the jury not see that or was that up?

MS. JONES: I do not know, Mr. Bock.

MAGISTRATE JUDGE PEDERSEN: The screen was pulled up. They may have seen a portion of the clip that was --

MR. SHIELDS: The jury just saw a clip from a different body camera from another officer, Ryan DiSabatino.

MAGISTRATE JUDGE PEDERSEN: It's not admitted into evidence yet.

MR. SHIELDS: It's not admitted into evidence yet but I'm happy to admit it into evidence.

MAGISTRATE JUDGE PEDERSEN: What I saw was it was somebody driving a car.

MS. JONES: It was.

MR. SHIELDS: And then walking in the backyard of 57 Kosciusko.

MAGISTRATE JUDGE PEDERSEN: I just saw someone driving a car.

MR. SHIELDS: I saw him walk into the yard, also, your Honor, so that's why I was objecting.

MAGISTRATE JUDGE PEDERSEN: The jury will disregard that. Perhaps it will be admitted later into evidence but for now it's not.

Mr. Bock, you can shut off the jury for now.

Algarin - Cross - Jones

THE CLERK:  Yes, your Honor.

MS. JONES:  Can you go to the point in the video where he hops into the yard with Officer Gorman it's around the 1:25 mark.

Q    Okay, we're going to play from --

MAGISTRATE JUDGE PEDERSEN:  You're all set now?

MS. JONES:  Yes.

MAGISTRATE JUDGE PEDERSEN:  The right video?

MS. JONES:  Yes.

MAGISTRATE JUDGE PEDERSEN:  You can open it up to the rest of us.

THE CLERK:  Displaying for the jury.

Q    We're at the 1 minute 12 second mark of Exhibit 41 which is your bodyworn recording, Officer Algarin, and we're going to play until the 2 minute 21 mark which is after you have shot the dog.  I'm going to ask you a question about some things that are towards the end of that video just so you know.

A    Okay.

Q    Can you go ahead and push play, Ms. Zollers.

(Video played.)

MS. JONES:  I wanted to stop at 1:21 mark.

MAGISTRATE JUDGE PEDERSEN:  You're well over that. You're at 2:32.

MS. JONES:  Yes, thank you.

Algarin - Cross - Jones

Q    Right after you shot the dog it seems like your hand came up in the area of your bodyworn camera.  Do you know what you were doing there?

A    Yes.  I was insuring that my BWC was for sure activated for that moment.

Q    And why did you want to insure that your body worn camera was activated?

A    To insure that this incident was recorded on BWC to make sure that it was captured.

Q    So you knew that it would be important for your supervisor to be able at least to see what had happened?

A    Yes.

Q    So even if it hadn't been activated, they would have that 30 seconds of visual in the very least?

A    Yes.

Q    Okay.  So I want to talk about what happened after you discharged your firearm.  What happened after you shot the dog?

A    I shot the dog.  I started walking back creating space between myself and the dog and then I noticed Mr. Dempsey charging towards me and then my attention was drawn to Mr. Dempsey.

Q    And then what happened?

A    I looked at Mr. Dempsey and then I put my gun away and then I continued walking back as to not, to not -- to

Algarin - Cross - Jones

insure nothing physical occurred with Mr. Dempsey, I made sure that I kept walking back and then I put my firearm away and then eventually I brought out my pepper spray.

Q    Okay.  I want to take it a few steps back.  Did you ever point your gun or direct your gun at Mr. Dempsey?

A    Yes.

Q    So can you explain how that happened?

A    Yes.  I just used my firearm, my firearm is out and it's just been used.  At that point in time I'm very focused on what I just used that firearm on.  When I noticed Mr. Dempsey charging me, my gaze went towards Mr. Dempsey. With that, my gun follows.  So if I were to look somewhere else, my gun will follow wherever my eyes are looking.  I just used my gun.  My arm is going to follow, my firearm is going to follow my eyes.  My eyes went to Mr. Dempsey and so my firearm followed it.

Q    And then you put your firearm away once you realized it was Mr. Dempsey and not a threat?

A    Correct.

Q    So why were you -- why did you want to create distance between you and Mr. Dempsey after the firearm discharged?

A    I did not want there to be a physical confrontation between myself and Mr. Dempsey.  I realized his emotions were high.  I just wanted to make sure that I tried to deescalate

Algarin - Cross - Jones

the situation as much as I can.

**Q**   Do you have a dog?

A    I do.

**Q**   So you can sympathize with --

**MR. SHIELDS:**  Objection.

**MAGISTRATE JUDGE PEDERSEN:**  Sustained.

Outside the scope.

**Q**   Do you have anything against dogs?

**MR. SHIELDS:**  Objection.

**MAGISTRATE JUDGE PEDERSEN:**  Sustained.

Outside the scope.

**Q**   Are you sorry that you shot the dog?

**MR. SHIELDS:**  Objection.

**MAGISTRATE JUDGE PEDERSEN:**  Overruled.

A    Yes.

**Q**   So after you had retreated or walking back a little bit, can you tell us more about what happened?

A    I'm sorry, can you say that one more time.

**Q**   Yes.  So you mentioned you remember walking back to avoid a physical confrontation with Mr. Dempsey.  What happened after that?

A    I continued walking back to try and create distance.  Mr. Dempsey kept following me as I walked back. Realizing I can't go back forever, I brought out my pepper spray in hopes that this will de-escalate the situation and

Algarin - Cross - Jones

will stop Mr. Dempsey from continuing forward.

Q   Were you speaking anything while you were walking backwards?

A   Yes.

Q   What did you say to Mr. Dempsey?

A   Get back.  Get back.  And then eventually go check on his dog.

Q   Did Mr. Dempsey say anything to you while you were walking back and then eventually when you stopped?

A   He was yelling at me to get out of his yard.  There were other things but from what I can remember right now is "get out, get out of the my yard".

Q   So why didn't you leave his yard?

A   At that point in time, especially with this incident, we couldn't leave the yard.  Now that was a scene that had to be secured.

Q   Okay.  I want to play the video again.  This time I want to start at 2 minutes and 18 seconds and go to 2 minutes and 56 seconds.  So this clip is largely of your interaction with Mr. Dempsey and I'll ask you some questions after that. So start at 2:18 and end at 2:56.  Go ahead.

(Video played.)

Q   Okay.  So in that video you can see your left hand is extended?

A   Yes.

Algarin - Cross - Jones

Q    So your right hand is hidden in the video, right, you can't see it?

A    Correct.

Q    But you explained that it was holding pepper spray through some of this interaction?

A    Correct.

Q    Did you ever see a girl throughout this incident with Mr. Dempsey?

A    No.

Q    So Leona Dempsey is older now so we are looking for more like a 10-year-old.  Do you see --

MR. SHIELDS:  Objection.  It's outside of the scope.  I didn't ask him if he saw Leona.

MAGISTRATE JUDGE PEDERSEN:  Sustained.

Q    What happened with the dog after the firearm discharged?

A    As I was stepping back, the dog went to the porch.

MR. SHIELDS:  Objection.  Outside the scope.  I didn't ask about this either.

MAGISTRATE JUDGE PEDERSEN:  Just a moment.

Overruled.

A    The dog went to the porch, to the door, waited there for a little bit and then I believe it went down to the side of the house and went towards the front of the house.

Q    Okay.  I'd like to play that video again, the same

Algarin - Cross - Jones

section, the 2:18 to 2:56 but can you turn off the audio so we can just focus on the visual, so it's kind of easier to see the dog in the background.

(Video played.)

Q    Thank you.  So in that video you were able to see the dog up on the porch?

A    Yes.

Q    Okay.  Yesterday Mr. Shields asked you if you took responsibility for shooting and killing the Dempsey's dog, he asked you that?

A    Correct.

Q    Yes.  And I believe your answer was no, correct?

A    Correct.

Q    But I believe previously in your deposition you said you were willing to take responsibility for shooting and killing the dog, right?

A    Correct.

Q    So why did your answer change?

A    That was before I realized that the dog was taken to a vet, not given surgery, and then was later euthanized.

MR. SHIELDS:  Objection.  I didn't ask about that.

Q    You --

MAGISTRATE JUDGE PEDERSEN:  Sustained.

MS. JONES:  But he did ask if --

MR. SHIELDS:  No.

18

Algarin - Cross - Jones

**MS. JONES:**  If he had taken responsibility for shooting and killing the dog --

**MAGISTRATE JUDGE PEDERSEN:**  He did.

**MS. JONES:**  -- and it's just explaining the difference between his answers.  He can't explain why?

**MAGISTRATE JUDGE PEDERSEN:**  I'll allow him to explain the difference between his answers, Mr. Shields, and you can follow up on redirect, re-cross/direct.

**MS. JONES:**  So should I reask that question.

**Q**    So why did your answer change from the time of your deposition to trial with respect to taking responsibility for shooting and killing the dog?

**A**    That was before I realized that the dog was taken to a vet, not given surgery and euthanized.

**Q**    So you still take responsibility for shooting the dog?

**A**    Yes.

**Q**    But not necessarily killing the dog?

**A**    Correct.

**Q**    How did you learn that the dog had died?

**A**    Speaking with counsel later on.

**Q**    Were you disciplined for the --

**A**    I'm sorry.  Are we speaking of the first time I just knew that the dog died?

**Q**    Yes.

Algarin - Cross - Jones

A    Yes.

Q    The first time.

A    I had just learned that the dog had died per my supervisor, Sergeant Rudolph.

Q    And he didn't provide any other additional details other than the dog had died?

A    Correct.

Q    So you just made an assumption?

A    Correct.

Q    Were you disciplined for the firearm discharge?

A    No.

Q    I think yesterday you said that prior to this incident you had never -- you did not know of any police officers that had been seriously injured by a dog, right?

A    Correct.

Q    But then after this incident you did learn --

MR. SHIELDS:  Objection.

Q    -- of someone?

MS. JONES:  He did say that yesterday.

MR. SHIELDS:  And I moved to strike, I believe, because it was irrelevant.

MAGISTRATE JUDGE PEDERSEN:  The question --

MR. SHIELDS:  I just --

MAGISTRATE JUDGE PEDERSEN:  -- I heard yesterday was prior to this incident but it was after this incident that he

Algarin - Cross - Jones

had heard a dog had injured a police officer.

**MS. JONES:** Yes.

**MAGISTRATE JUDGE PEDERSEN:** Is that correct?

And the basis of your objection is what?

**MR. SHIELDS:** I believe I moved to strike his answer as irrelevant to the testimony because my question was about before the incident.

**MS. JONES:** From what I remember he just asked a follow-up question to clarify that it was not before this incident and that it wasn't actually stricken from the record?

**MAGISTRATE JUDGE PEDERSEN:** Correct.

What I recall yesterday -- and the jury's recollection will rule in this case or we can go back to the transcript -- is you asked him if he had ever heard of the dog injuring a police officer. He answered yes and then you clarified before this incident and he answered no.

Was that your recollection --

**MS. JONES:** Correct.

**MAGISTRATE JUDGE PEDERSEN:** -- as well?

**MR. SHIELDS:** I don't recall the exact sequence, your Honor. I just --

**MAGISTRATE JUDGE PEDERSEN:** We can go back and get the transcript if you like.

**MR. SHIELDS:** That's okay, your Honor.

Algarin - Cross - Jones

**MAGISTRATE JUDGE PEDERSEN:**  Okay.  I'll overrule the objection.

A    Yes.

Q    Yes, that you knew of officers being severely injured by a dog that you recalled after this incident?

A    Correct.

Q    Are you aware of any other people that aren't police officers that have been severely injured --

**MR. SHIELDS:**  Objection.

Q    -- by a dog?

**MAGISTRATE JUDGE PEDERSEN:**  Sustained.

Outside the scope.

Q    So at the end of the bodyworn camera video that we watched yesterday, I believe Mr. Dempsey said something about wanting assistance or help, do you remember that?

A    Yes.

Q    Why didn't you go over to Mr. Dempsey at that point?

A    There were two.  One, I stood by with the casings to insure that we collected that for evidence.  That was my assigned role for that.  And then, more importantly, I don't believe that would have deescalated the situation.  I think that would have had the reverse effect.  I think it would have escalated it more if I were to be the one to approach him again.

22

Algarin - Cross - Jones

Q    So now you know that you weren't ever disciplined for this situation, right, but at that time you didn't know whether or not there, that -- sorry.

But at that time you could have been the subject of an investigation, correct?

A    Yes.

Q    So you wanted to keep your distance from another involved individual?

MR. SHIELDS:  Objection.

MAGISTRATE JUDGE PEDERSEN:  Basis?

MR. SHIELDS:  It's outside of the scope.  I didn't ask him anything about that.

MS. JONES:  I mean, he showed the whole video.

MAGISTRATE JUDGE PEDERSEN:  Yeah, I'm going to overrule the objection.

A    I'm sorry.  Can you repeat your question?

Q    So, knowing that an investigation could happen, you also tried to keep your distance from somebody who was involved in the situation?

A    Correct.

Q    Yesterday Mr. Shields asked you about making a plan before you respond to situations.  And I believe you said that was common, right?

A    Yeah.

Q    So when you respond to a call, do you plan for

Algarin - Cross - Jones

everything that could possibly happen?

A    No.

Q    And when you receive simulation training at the city, have you received simulation training for every type of situation that you encounter as a police officer?

A    No.

Q    So, what was your purpose in jumping over the fence into the Dempseys' yard?

A    To look for evidence, any discarded weapons, drugs, contraband and any other of the outstanding individuals.

Q    So yesterday you said that it was your understanding that a person generally needed a warrant, consent or exigent circumstances to search a property, right?

A    Correct.

Q    Would a person need a warrant, exigent circumstances or consent to search a public baseball field in a public park?

MR. SHIELDS:  Objection.  I didn't ask about open fields.

MAGISTRATE JUDGE PEDERSEN:  No but you did ask about the subject of what his understanding was of the warrant requirement.  So I'll overrule.

A    No.

Q    Would you need a warrant or exigent circumstances or consent to search a vacant lot?

24

Algarin - Cross - Jones

A    No.

Q    So when you said that you needed a warrant, exigent circumstances or consent to search a property, you were only referring to properties where the Fourth Amendment in your understanding actually applies or limits searches in those areas, right?

A    Correct.

Q    Because you understand that the Fourth Amendment or at least one of its purposes is to protect individual's privacy?

A    Correct.

Q    So if there's -- so as you understand it, if there's, if a person doesn't have an expectation to privacy in a certain area, a person wouldn't be required to get a warrant, exigent circumstances or consent generally to search that area where there's no privacy interest at stake?

A    Correct.

Q    So -- yesterday you also said that it could be reckless to enter a property to search without a warrant, consent and exigent circumstances.  That's --

A    Correct.

Q    -- what you said?

A    Correct.

Q    What is your understanding of the word "reckless"?

A    With complete disregard of the safety of anyone

Algarin - Cross - Jones

involved.

Q    So do you believe that exigent circumstances existed in this situation?

A    Correct.

Q    So if the jury disagreed with you and thought there wasn't exigent circumstances, do you think it was reckless for you to enter Mr. Dempsey's yard even though you didn't have a warrant, consent --

MR. SHIELDS:  Objection, your Honor.

Q    -- or --

MAGISTRATE JUDGE PEDERSEN:  What is the relevance of his understanding of what is reckless?

MS. JONES:  Well these are questions that he was asked yesterday and I'm trying to apply it to this particular situation and not just in general.

MAGISTRATE JUDGE PEDERSEN:  Why don't you come up to side bar.

(Held at side bar:)

MAGISTRATE JUDGE PEDERSEN:  Yes, you did ask him yesterday about recklessness.  Would it be reckless to go in -- his understanding of what is or is not reckless relevant to the claims in this case.

MR. SHIELDS:  No, your Honor.  It's an objective standard, so.

MS. JONES:  Yeah, but if he's going to talk about

Algarin - Cross - Jones

recklessness, it kind of implies that this situation is also reckless. So I'm allowing him the opportunity to clarify and provide context. I mean, why would he ask that unless he was implying that there's recklessness involved here.

**MAGISTRATE JUDGE PEDERSEN:** That's true, you did ask what he thought, if he thought it was reckless.

**MR. SHIELDS:** I --

**MAGISTRATE JUDGE PEDERSEN:** Which I guess should have been objected to as irrelevant at the time it was asked. So, should I allow her now to delve into that since it was part of the direct?

**MR. SHIELDS:** What I asked was if an officer entered a property -- I didn't ask him if his actions in this particular circumstance were reckless. I asked a general question and I didn't ask anything specific to the facts of this case.

**MS. JONES:** But that is the implication because there's really no other purpose for asking that question. As he said, it would have been irrelevant.

**MR. SHIELDS:** It was a question about it was related to the training, not related to the specific facts of this case because obviously he's not the one. That's something that goes to the supervisor review what he's supposed to think about before he takes certain actions, whether that be in this case or any other case. And the line of questions at

Algarin - Cross - Jones

the deposition were all the same and that's what I impeached him on on the other other question and your Honor would not let me go on to the next question was that would be action that could constitute willful misconduct.

**MAGISTRATE JUDGE PEDERSEN:**  I'll sustain the objection.

If you want to ask him about what he was trained with regard to recklessness, I don't know if there's any training with regard to recklessness.  But as far as commenting on whether he thought his actions were reckless, I don't think that that's relevant.  It's an objective standard.

**MS. JONES:**  I'll accept the ruling, your Honor.

**MR. NAYLON:**  So I guess the question that would be -- can she ask when you jumped that fence, did you believe you were whatever he just said without putting anybody in danger or endangering the situation what would be wrong with that if he asked what his understanding was of reckless on direct.  So now, okay, when you went over that fence, I mean, he's described what he thinks is reckless, when you went over that fence did you think you were in danger, was there anybody out there?

**MAGISTRATE JUDGE PEDERSEN:**  Let's say he says, no, I didn't think I was endangering anybody, how does the jury take that information and use it?

**MR. NAYLON:**  Same way they use what he was asked on direct.  It's up to them.  He's asking generally what's your

Algarin - Cross - Jones

understanding of this, that and the other thing.  This case is about what happened that day and.

**MAGISTRATE JUDGE PEDERSEN:**  So what if she were to ask when a police officer enters a property without warrant, exigent circumstances, consent, do you believe that it opens up the possibility of danger, would that work?

**MR. SHIELDS:**  Yes, your Honor, because it shouldn't be, it shouldn't be.

**MAGISTRATE JUDGE PEDERSEN:**  But all these questions about danger and so forth, I guess they're going to have to determine recklessness.  I'm going to give them a definition. They're going to have to have some facts to say.  But what his opinion of what is reckless or not reckless really isn't what they should be considering.

**MR. SHIELDS:**  It goes more to the Monell claim, your Honor, and punitive damages but that's the facts that get applied to the law that you'll instruct them on.  And so if his understanding based on general training that he received about what constitutes reckless conduct, which he testified to at his deposition, you know, if you enter without a warrant, consent or exigent circumstances, they didn't follow up and ask him, okay, were your actions reckless in this case based on that question I just asked you.  I didn't make that and that's because that's a decision that, one, gets made by the supervisors and that's why it's relevant to the Monell

Algarin - Cross - Jones

claim, what type of review happened after the incident.

Did they make that determination, I mean, he's already testified they didn't, right.  So that's facts that the jury has to make this determination with respect to the Monell claim.  Then they have the rest of the facts after you instruct them on the law to determine were the facts of the case, did they constitute recklessness.  So --

**MAGISTRATE JUDGE PEDERSEN:**  Well in the context of his examination right now --

**MR. SHIELDS:**  Yes.

**MAGISTRATE JUDGE PEDERSEN:**  -- the question of were you ever trained about why you wouldn't enter a property without a warrant, exigent circumstances or consent, could it be reckless, is that something that's relevant?

**MS. JONES:**  Well, I think if this is going to the issue of punitive damages, then it is because you have to establish some sort of, like, willful misconduct on behalf of the individual so he needs to be able to speak to what was his opinion of his actions and whether or not they met this recklessness standard that was introduced yesterday.

**MAGISTRATE JUDGE PEDERSEN:**  Right but if you were to say, okay, you got trained at entering without this, this, and this, is reckless or is willful misconduct it wouldn't be whether he thought it was or not, it would be what his training was.  Now if he was not trained that entering this

Algarin - Cross - Jones

property was reckless or willful misconduct --

**MS. JONES:**  So I --

**MAGISTRATE JUDGE PEDERSEN:**  -- that would be on the Monell claim.

**MR. NAYLON:**  How about this, this gets into --

(Court reporter interrupted for clarification.)

**MR. NAYLON:**  When you jumped the fence, did you think there was any situation just by jumping the fence that was putting anybody in danger, to go and ask, it's up to you to go on and say okay you fired your gun in that backyard, isn't that dangerous, he can respond.  I guess she'd have to say why did you fire the gun, what did you do to make sure it's all about the conduct itself as opposed to asking his state of mind, what did you do, why did you do it, did that put, you know, however you want to ask it but go through each thing hopping over that fence didn't put anybody in danger, did it, walking in the yard, nobody's there, that didn't put anybody in danger, okay did it, okay but you did shoot your gun in that backyard, did you do anything to prevent danger.

**MR. SHIELDS:**  No objection to asking about his conduct.

**MAGISTRATE JUDGE PEDERSEN:**  So state of mind is what the problem is.

**MR. SHIELDS:**  I mean, the state of mind does go to punitive damages but it's the application of that conduct, did he know that what he was doing at the time possibly

Algarin - Cross - Jones

violated the law, that's just facts.  If he knew what the law was and if the jury determines that the facts as applied did not meet the legal standard for entering the property, then the jury can find objectively that that constitutes reckless conduct, willful misconduct if he knew he didn't have exigent circumstances and he entered anyways, then if they find he did know what the law was and he entered the property, they can find that that was reckless conduct.

**MAGISTRATE JUDGE PEDERSEN:**  So that raises the question, then, if he thinks it was an exigent circumstance, is his state of mind is I'm still looking for suspects and contraband.

**MR. SHIELDS:**  No, it's an objective standard, your Honor.  So he's already testified that he believed that that's what he was looking for but the question is did he have probable cause and was there an emergency?

**MAGISTRATE JUDGE PEDERSEN:**  Yeah, those are something the jury has to determine.  What about his conduct that Pat mentioned about when you jump the fence, did you think that was reckless when you jumped.

**MR. NAYLON:**  I wouldn't ask his state of mind.

**MAGISTRATE JUDGE PEDERSEN:**  Okay.  When you jump the fence, was anybody in danger?

**MR. NAYLON:**  What did you do or what did you do to make sure nobody was in danger, something along those lines just

Algarin - Cross - Jones

asking about the conduct not what he's thinking.

MR. SHIELDS:  If he says yeah when I fired my gun I didn't think it was dangerous to anybody.

MR. NAYLON:  Well it's not his answer.  It's the question I'm talking about.

MAGISTRATE JUDGE PEDERSEN:  All right.  So you can ask about his conduct.  But you won't get into his state of mind because that's not necessarily relevant.  Okay.

MR. NAYLON:  Thank you.

MAGISTRATE JUDGE PEDERSEN:  I have to go back and look at the transcript.  What was the objection to the question?

MS. JONES:  I think I asked did he believe that his actions in this circumstances were reckless.

MAGISTRATE JUDGE PEDERSEN:  So I'll --

MR. NAYLON:  Withdraw the question and start over.

MAGISTRATE JUDGE PEDERSEN:  That's a good idea.

MS. JONES:  Great.

MAGISTRATE JUDGE PEDERSEN:  Thanks.

(Open court:)

MAGISTRATE JUDGE PEDERSEN:  An objection's been made to the question.

MS. JONES:  Yes, there was an objection.  I'm withdrawing that question.  I'm going to ask you a different one.

Q    You said that recklessness is a complete disregard

Algarin - Cross - Jones

for the safety of other people, I believe that's what you said?

A    Yes, of everyone else.

Q    Okay.  So when you jumped the fence into the Dempseys' yard, did you place anyone in danger by doing that?

A    No.

Q    When you took a few steps into the Dempseys' yard, did you place anyone in danger by doing that?

A    No.

Q    When you discharged your firearm, was anyone placed in danger when you did that?

A    Person?

Q    Dogs or people?

A    No person, no.

Q    So how is that, how is it possible that a firearm discharged and doesn't place any other people in danger?

**MR. SHIELDS:**  Objection.

**MAGISTRATE JUDGE PEDERSEN:**  Basis?

**MR. SHIELDS:**  I don't think she's laid a foundation for how it's not.  She didn't ask him are there other people in the yard, you know, why would it not be dangerous in this situation.

**MAGISTRATE JUDGE PEDERSEN:**  Overruled.  I think she's coming to that.

A    Can you repeat your question, please.

Algarin - Cross - Jones

Q    Yeah.  So, why was this particular firearm discharge not dangerous to other people who were possibly present?

A    Because it was directly down to the ground.

Q    Grate.  Any other reasons that the firearm discharge isn't dangerous to other people?

A    There was no one in front nor directly behind the dog at the time.

Q    Yesterday I believe Mr. Shields asked you or -- I'll withdraw that.

So yesterday you said that it would take you approximately 15 seconds to walk from the adjacent yard to the front of Mr. Dempsey's house?

A    Yes.

Q    But you didn't do that, did you?

A    No.

Q    So, one of the reasons or you said that one of the reasons that you went into the Dempsey's yard was also to pursue the outstanding two individuals, right?

A    Correct.

Q    Did you have any doubt in your mind at that point that there were four individuals involved in this situation?

A    No.

Q    And that there were two that were detained by Officer Gorman, Officer Horowitz and that two were

Algarin - Cross - Jones

outstanding?

A    Correct.

Q    Yesterday plaintiffs played some of the video recording of your deposition from July of 2022.  Do you remember that?

A    Yes.

Q    And in that video it looked like you were in your police uniform, were you?

A    Yes.

Q    Had you come from work to your deposition --

MR. SHIELDS:  Objection.

Q    -- that day?

MR. SHIELDS:  Objection.

MS. JONES:  I was --

MR. SHIELDS:  I wasn't asking him anything about his uniform or if he came from work to his deposition.

Q    Your Honor, it's --

MAGISTRATE JUDGE PEDERSEN:  Sustained.

Q    Were you working in Clinton section in July of 2022?

MR. SHIELDS:  Objection.

Q    This incident happened in Clinton Section?

MR. SHIELDS:  I you just asked about July 2022.  I didn't ask him anything about that.

MAGISTRATE JUDGE PEDERSEN:  Sustained.

Algarin - Cross - Jones

Q    Yesterday Mr. Shields asked you some questions about a firearms training, do you remember that?

A    Yes.

Q    And you said something about the firearms training or one of the firearms training included a simulation with dogs?

A    Correct.

Q    Yeah.  What is the purpose of firearms training?

A    To insure that a police officer can utilize a firearm, utilize it when needed, utilize it and shoot the intended target.

Q    You have to become recertified every year to insure that you can properly use your firearm, right?

A    Yes.

Q    And the State of New York requires that you be recertified every year?

A    Correct.

Q    So this firearms training is part of insuring that you can being recertified every year, right?

A    Correct.

Q    So it would be a little boring if the city did the same firearms training every year, right?

A    Correct.

Q    So sometimes you have different firearms training with different situations to keep things fresh from year to

Algarin - Cross - Jones

year to year, right?

A    Correct.

Q    You also talked a little bit about the Humane Society training yesterday.  Can you tell the jury some of the things that you learned from that Humane Society training on encountering dogs in your law enforcement duties?

A    Yes.  It was about trying to minimize situations of encounters with dogs and trying to do your best with it when given time.  If there's, again, you hear a dog inside and you are supposed to talk to people inside, you can ask that person, hey, can you put away your dog, please.  If there's obvious signs of a dog outside or beware of the dog signs or doghouses or there's an actual dog outside, you can talk to the owner and say, hey, can we put this dog away just to make sure it's out of the equation, we don't have to worry about the dog.  If we, if need be, there's something, there's a dog and we'd have to proceed, we can contact animal control and to assist with coming there and removing the dog from the situation so we can go and continue what we, what we need to do.  Yeah.

Q    If I were to show you the PowerPoint of the Humane Society training, would you be able to tell me the specific slides that were up when you learned that content that you just shared with us?

A    Yeah.

Algarin - Cross - Jones

Q    Why -- oh, one second.  Okay, I think I do want to publish the Humane Society training to the jury just so they can see every slide.  It wasn't shown in its entirety yesterday.

Yes, Mr. Bock?

THE CLERK:  What exhibit?

MS. JONES:  It was 165.1.

THE CLERK:  Publishing to the jury, your Honor?

MAGISTRATE JUDGE PEDERSEN:  Yes.

Q    So, this is the Humane Society training or it's the PowerPoint of the Humane Society training a few slides were shown yesterday.  So we're just going to publish it to the jury so you can just see the slides.  We're going to click through them at a reasonable pace so they can see it.  Can you make the settings so it's full screen.

All right.  So we passed the first page.  This is moving on to the trainer.  You can just click through every few seconds, ***Sandra.

MAGISTRATE JUDGE PEDERSEN:  Did you want the witness to stop.

MS. JONES:  No, so I really actually just wanted to publish the whole training to the jury.

MAGISTRATE JUDGE PEDERSEN:  Okay.

MR. SHIELDS:  Objection, your Honor.

Q    Can you --

Algarin - Cross - Jones

**MAGISTRATE JUDGE PEDERSEN:**  Hold on a moment.  There's an objection.

**MS. JONES:**  Sorry?

**MAGISTRATE JUDGE PEDERSEN:**  What's the basis?

**MR. SHIELDS:**  She's just going to scroll through the entire thing without asking any questions.  She said before she put it up, that she wanted to direct his attention to a certain slide and ask him questions about it.

**MAGISTRATE JUDGE PEDERSEN:**  Overruled.

**Q**   So can you make it a full screen because I think the bottom part of the slide is not showing up.  Or maybe you can't.  Maybe shrink it so that more of it shows on the screen.  Sorry, zoom in, that's what I meant.  Zoom in at the top next to the page number.  That works, too.  Can you just go down so the jury can see all of the pages in the PowerPoint training.  A little slower.  Okay.

(Publishing exhibit.)

**Q**   Great, thanks.  I'll let you pull that down.  So there was a fair amount in that training.

**MAGISTRATE JUDGE PEDERSEN:**  Mr. Bock, can you shut that off, please.

**THE CLERK:**  Yes, your Honor.

**Q**   There was a fair amount in that training about animal behavior and recognizing the signs of, I guess, dog behavior, right?

Algarin - Cross - Jones

A    Correct.

Q    Great.  Did you -- I'm assuming you relied on that training in assisting you in interpreting the dog's behavior in this particular incident?

A    Correct.

Q    And that's how you recognized it to be aggressive and a threat to you?

A    Correct.

Q    I have a few other questions about some things we talked about so far this morning.  One when the dog was approaching you while you were in the Dempsey's yard, did you hear Mr. Dempsey say anything?

MR. SHIELDS:  Objection.  I didn't ask about that.

MS. JONES:  I mean, I think it's part --

MAGISTRATE JUDGE PEDERSEN:  The entire situation was reviewed on direct so I'm going to overrule.

A    No.

Q    And later after you discharged your firearm, did you ever tell Mr. Dempsey to stay put or stay there?

A    No.

Q    After, again after the firearm discharge, did you ever prevent him from leaving?

A    No.

Q    You told plaintiff to get back repeatedly --

A    Correct.

Algarin - Cross - Jones

**Q**    -- right?  So I did want to play the 911 call that led to this incident.  Defendant's Exhibit 501.

**MR. SHIELDS:**  Objection.

**MS. JONES:**  I don't think that's been admitted.  Will you stipulate to that admissibility?

**MR. SHIELDS:**  No.

**MS. JONES:**  I'd still like to enter it as a business record.  The business record certification is in Plaintiff's Exhibit 132 on Page two.  Can you pull up Plaintiff's Exhibit 132.  Unfortunately the business certification was included with the documents that were produced but the video is present but the audio is produced as a separate exhibit.

**MR. SHIELDS:**  I still object, your Honor.

**MAGISTRATE JUDGE PEDERSEN:**  I understand.  I have to look at 132 before I can rule.

**MS. JONES:**  Plaintiff's Exhibit 132.  It's on Page 2.

So the first page is the business certification for the CAD report that's also in this document but the second page is the business certification for the audio file which is what I want to introduce.  I think yesterday we talked about pulling out particular pages if the Court would prefer.  But it is there.

**MAGISTRATE JUDGE PEDERSEN:**  Having seen the certification, do you still have an objection?

**MR. SHIELDS:**  Yes, your Honor.  He never heard the 911

call.

MAGISTRATE JUDGE PEDERSEN:  Now you're saying out of scope.

MR. SHIELDS:  Correct, it's out of scope.

MS. JONES:  I don't think that was his objection.  I thought he said that he just didn't hear the 911 call.

MAGISTRATE JUDGE PEDERSEN:  He changed the basis of his objection to out of scope of the direct.

So I'm going to sustain.

If you want to take the witness as your own or call the witness as your own, you may do so.

MS. JONES:  Thank you, your Honor.

MS. JONES:  Okay, I think I just want to ask my cocounsel about one thing and then I might be done, your Honor.

MAGISTRATE JUDGE PEDERSEN:  All right.

(WHEREUPON, a discussion was held off the record.)

MS. JONES:  No further questions, your Honor.

MAGISTRATE JUDGE PEDERSEN:  Thank you very much.

Before we get to any redirect, I just want to point out that Ms. Leona Dempsey was unable to attend today and I instruct you not to draw any inferences from her absence.

Mr. Shields, any redirect?

MR. SHIELDS:  Yes.

**REDIRECT EXAMINATION BY MR. SHIELDS:**

Algarin - Redirect - Shields

**Q**    Good morning, Officer.

A    Good morning.

**Q**    All right.  So yesterday you spoke about when you showed up to the incident you made you made a mistake or you tried to turn on your bodyworn camera at first but it didn't activate, correct?

A    Correct.

**Q**    Okay, so I want to go to your bodyworn camera video and ask you a question about that.

So, you spoke yesterday about how when you do activate your camera then there's the 30 seconds of prerecord, correct?

A    Correct.

**Q**    So I'm going to fast forward to --

**THE CLERK:**  I'm sorry, which exhibit?

**MR. SHIELDS:**  I'm sorry, this is...

**MAGISTRATE JUDGE PEDERSEN:**  41.

**MR. SHIELDS:**  41.

**THE CLERK:**  Okay.  Publishing, your Honor.

**Q**    Okay.  So what I'm going to do is go to 28 seconds first.  I'm going to hit play and then I'm going to ask you a question, okay?

A    Okay.

(Vide played.)

**Q**    Did you hear the beeping sound?

Algarin - Redirect - Shields

A    I did.

Q    So when you turn on your body camera, it beeps really loud, right?

A    It beeps, yes.

Q    So you know whether or not your bodyworn camera is activated?

A    It will indicate that it's acticve, yes.

Q    So if you tried to activate it as you were going down the driveway and you didn't hear that sound, you would have known that it wasn't activated, correct?

A    Correct.

Q    So I want to ask a few more questions here about the body camera.  So you said one of the reasons that you entered the yard allegedly was to look for the two undetained alleged suspects, correct?

A    Correct.

Q    And you said they might have been hiding in the yard somewhere, right?

A    It was possible, yes.

Q    Okay.  So let's back up to the moment that you entered the yard.  So we're at three seconds into the video.  You see the ground at this point, right?

A    Yes.

Q    Okay.  I'm going to hit play.  Is this the moment that you're jumping over the fence?

Algarin - Redirect - Shields

A     I, I believe so.

Q     Okay.  So let's hit play here.

A     Okay, yes.

(Video played.)

Q     In that portion of the video what are you doing to try to find these two undetained suspects?

MS. JONES:  Objection, your Honor.  I think this is beyond the scope of cross.

MAGISTRATE JUDGE PEDERSEN:  Sustained.

MR. SHIELDS:  Your Honor, she asked him multiple questions about the reason that he entered the yard was to look for the two undetained suspects.

MS. JONES:  No, I think I just -- no.

MAGISTRATE JUDGE PEDERSEN:  Hold on a moment.

MS. JONES:  And I certainly didn't ask him to --

MAGISTRATE JUDGE PEDERSEN:  Hold on a moment.

MS. JONES:  Sorry.

MAGISTRATE JUDGE PEDERSEN:  So there was a question asked on Page 44.

"So you said one of the reasons that you entered the yard allegedly was to look for the two undetained alleged suspects, correct?"

"Correct."

Is that your question?

MR. SHIELDS:  That sounds like that was probably my

question, your Honor. Ms. Jones may have used different language than I used.

**MS. JONES:** I know I used the word doubt once when I was talking about the four people who were in the yard.

**MR. SHIELDS:** Or four, your Honor.

**MS. JONES:** That might be a unique term to search.

**MR. SHIELDS:** Your Honor, I mean there were multiple questions about the legal justifications of entering the yard.

(Court reporter interrupted for clarification.)

**MAGISTRATE JUDGE PEDERSEN:** I cannot talk with her about what's in the transcript and talk on the record with you and other counsel so you need to wait.

**MR. SHIELDS:** I apologize.

**MAGISTRATE JUDGE PEDERSEN:** Back on the record.

On Page 34, while cross was continuing, the question was asked: "Did you have any doubt in your mind at that point that there were four individuals involved in this situation?"

Answer: "No."

Question: "And that there were two that were detained by Officer Gorman, Officer Horowitz and that two were outstanding?"

Answer: "Correct."

**MAGISTRATE JUDGE PEDERSEN:** So I'll overrule the objection or have you withdrawn it?

Algarin - Redirect - Shields

**MS. JONES:** I just said that I was willing to so we can move things along but this is fine, too.

**MAGISTRATE JUDGE PEDERSEN:** Overruled.

**MR. SHIELDS:** Thank you, your Honor, okay.

**Q** And here we're paused at 34 seconds into the video. Did you ever walk over and search behind these trash can -- the blue recycling bin and green trash can for the undetained suspects?

**A** Not, not at that point, no.

**Q** But you could see over into the side of the house at this point, correct?

**A** Yes.

**Q** And it would create a officer safety issue if there were two undetained suspects possibly armed with a gun, correct?

**A** So would leaving one officer in the yard by himself with an alleged person with possibly a gun.

**Q** And you reentered the yard later by yourself with a possible undetained suspect with a gun, correct?

**A** After --

**MS. JONES:** Objection. I don't think there's facts in the record to suggest that that detainee had a gun.

**MR. SHIELDS:** No, what I'm -- that wasn't my question.

**MS. JONES:** I'll withdraw it.

**MAGISTRATE JUDGE PEDERSEN:** I'll overrule the objection

Algarin - Redirect - Shields

just to make the record clear.

But when there are objections, I need to have silence because sometimes I'm not paying attention to every word spoken and I need to look at the transcript.  When you continue to talk, the transcript moves away from me.  Then I have to sit down and figure out where you said the question, where the objection was.  It makes it more difficult for me to rule.  So you could say objection and hold off, everybody, and then once I've got what the question is, I can rule.  And maybe I'll ask you then for the basis.

Thank you.

**MR. SHIELDS:**  I apologize, your Honor.

**Q**    And you never walked over and looked under the porch, correct?

A    I wasn't able to, no.

**Q**    At this point in the 34 seconds into the video when you first got into the yard, you could see over on the side of the house, you could see the porch but you never walked over there and looked for any of these alleged undetained suspects, correct?

A    I wasn't able to, no.

**Q**    At this point in the video you're saying that you couldn't have just walked over there?  You weren't able to at this moment when you were in the yard?

A    No, I stated that I had to make sure that Officer

Algarin - Redirect - Shields

Gorman was okay with his detainee.

Q    Okay, but you didn't immediately walk over and make sure that Officer Gorman was okay with his detainee, first you stopped and had a conversation with Officer Horowitz, correct?

A    Correct.

Q    So let's back up to where your video starts at 30 seconds, okay.  So, yesterday in response to Ms. Jones's questions, you said when you entered the yard the second time, you used a small children's picnic table to jump because you were tired from chasing the suspects down the yard, right?

A    I was definitely saving my energy --

Q    You were winded --

A    -- after jumping two fences.

Q    -- you were tired, you just allegedly chased some suspects into the yard, correct?

A    If a second pursuit started I was going to need energy for that one as well.

Q    But you said that you were tired from chasing the suspects originally, correct?

A    I stated that I had to save my energy.

Q    No, you said that you were tired from running after the guys in the front of the house down the driveway, right, and then jumping the fence into Mr. Dempsey's yard the first

Algarin - Redirect - Shields

time?

A    I --

**MS. JONES:**  Objection.  I think this is asked and answered.

**MAGISTRATE JUDGE PEDERSEN:**  Sustained.  It's direct.

Q    So the audio in your video begins around 30 seconds, correct?

A    Correct.

Q    So I'm going to go ahead and hit play.  Then I'll ask you some questions.

(Video played.)

Q    In that conversation and before that conversation, do you hear yourself breathing heavily?

A    I could hear my heart beat at a high rate.

Q    Are you out of breath?

A    I'm trying my best to speak but I could definitely hear my heart rate.

Q    You're able to speak clearly, you're not winded when you're speaking with Officer Horowitz and his detained suspect?

A    No, I was able to say what I needed to say.

Q    And before that when you were walking around the around the yard, you were looking for contraband on the ground, correct?

A    I'm sorry, say that again.

Algarin - Redirect - Shields

Q    When you were walking around in Mr. Dempsey's backyard before the moment we paused, your gaze was on the ground looking for potentially discarded contraband or a weapon, correct?

A    I looked briefly to see if there was anything obvious.

Q    So the answer is yes?

A    I looked briefly as I was looking around, as I was -- I'm sorry, walking around.

Q    And if you truly believed that there was an undetained suspect with a gun, possibly armed, your focus would have been on the places that that person could hide, correct?

A    That's if Mr. Gorman and Mr. Horowitz would have told me anything else.

Q    If they had told you anything else like, hey, we saw these other guys run, they're hiding over there, you need to go check, they never told you that, right?

A    They also didn't state that anyone --

Q    Excuse me --

A    -- ran by them.

Q    -- it was a yes or no question.  They never told you that, correct?

MS. JONES:  Objection.  I think this is beyond the scope of cross.

Algarin - Redirect - Shields

**MR. SHIELDS:**  She played the entire video for him and asked him what the purpose of entering the yard was, your Honor.

**MAGISTRATE JUDGE PEDERSEN:**  Overruled.

A    Can you repeat your question, please.

Q    They never told you that they saw one of these alleged undetained suspects at any time, correct?

A    Correct.

Q    And if you truly were looking for one of these undetained suspects -- well, let me withdraw that.

If there was an undetained suspect that you were looking for, potentially in Mr. Dempsey's backyard, that would pose a serious risk of officer safety, correct?

A    Say that one more time for me, please.

Q    If there was an undetained suspect --

A    Mm-mm.

Q    -- possibly armed with a gun in Mr. Dempsey's backyard, that would pose a serious threat to officer safety, correct?

A    Correct.

Q    It would be a threat that they could possibly ambush you with a gun, correct?

A    Correct.

Q    And so you would need to immediately try to find that person to make sure that you yourself and your fellow

                    Algarin - Redirect - Shields

officers are safe, correct?

     A    Correct.

     Q    Your focus wouldn't be on walking around looking at the ground for possibly discarded contraband, correct?

     A    I'm also looking for people, too.

     Q    And as we saw at 34 seconds, you could see over to the side of the house but you didn't walk over there to look for any potential people that were hiding, right?

     A    I haven't spoken to Officer Gorman yet.

     Q    And you hadn't spoken to Officer Horowitz either, right?

     A    Is that before I speak to Officer Horowitz?  At this point in the video.

     Q    34 seconds into the video is before you speak with Officer Horowitz so.

     A    Yes.

     Q    We can go to that point.

     (Video played.)

     Q    So you asked that suspect whether he threw a gun, right?

     A    Correct.

     Q    At that point fair to say you're looking for a gun, right?

     A    Yes.

     Q    You told him, you said to him "it's either his or

Algarin - Redirect - Shields

yours", correct?

A    Correct.

Q    Talking about the one other suspect that was detained or the suspect that Officer Horowitz had detained, correct?

A    Of the two that we had detained, correct.

Q    There were only two guys that you spoke about in this conversation, right?

A    Of the two detained, correct.

Q    Now, you didn't ask Officer Horowitz if he saw any other suspect, correct?

A    I think Officer Horowitz would let me know if he saw any other suspects.

MR. SHIELDS:  That wasn't my question.  Move to strike.

MAGISTRATE JUDGE PEDERSEN:  Motion is granted.

The answer will be stricken.

Q    You didn't ask Officer Horowitz if he saw any other suspects flee, correct?

A    No.

Q    You didn't --

MAGISTRATE JUDGE PEDERSEN:  Wait.  Not correct?

THE WITNESS:  Correct, I apologize.

Q    You didn't ask the suspect that Officer Horowitz had detained where any of his other friends that allegedly ran from you, where they went, correct?

Algarin - Redirect - Shields

A    Correct.

Q    You only asked about a gun, correct?

A    Correct.

Q    And, again, if you truly believed that there was one or more other undetained suspects with a possible gun, your first question would be where is he, correct?

A    No, not correct.

Q    Okay.  Now knowing where this other alleged suspect was located, possibly armed with a gun, that's important not only for officer safety but for the safety of the community, right?

A    Correct.

Q    You got somebody hiding in Mr. Dempsey's yard possibly with a gun, that could be dangerous for Mr. Dempsey, right?

A    Correct.

Q    But you didn't go and try to find that person hiding in Mr. Dempsey's yard, correct?

A    I didn't have a chance to complete my -- to look around.

Q    You didn't have a chance to look around.  You're moseying around in the yard looking at the ground, having a conversation with Officer Horowitz.  In that time, you could have gone over and looked behind the garbage cans or under the porch, right?

Algarin - Redirect - Shields

**MS. JONES:**  Objection.  I think this is argumentative and also asked and witnessed.

**MAGISTRATE JUDGE PEDERSEN:**  Overruled.

A    One more time, please.

Q    The entire time that you're walking slowly around the yard looking at the ground, having a conversation with Officer Horowitz and the suspect, during that time, instead, if you were actually looking for a suspect you had the time to walk, look behind the garbage cans, look under the porch see if they were hiding in those places, correct?

A    No, not till I spoke with Officer Gorman.

Q    Okay.  Now, let's go forward in the video a little bit and then I'll pause again and ask you some more questions.

(Video played.)

Q    Okay.  So you approach Officer Gorman, like you said, made sure that he's good with his suspect, like you said, correct?

A    Correct.

Q    Now you didn't ask Officer Gorman if he saw any other undetained suspects, correct?

A    Correct.

Q    And you didn't ask the suspect that Officer Gorman detained where any of the other guys that he was allegedly fleeing with where they went, did you?

Algarin - Redirect - Shields

A    This one will be, no, right, you want?

Q    There you go.

A    Paying attention.

Q    You only asked Officer Gorman, as we heard at the end of the video, where the suspect that he had detained jumped the fence, correct?

A    Correct.

Q    And you did that so that you could retrace his flight path, correct?

A    Correct.

Q    To look for any contraband that he might have discarded?

A    Correct.

Q    Because when you and Officer Gorman search the suspect in the red sweatshirt, he didn't have anything on his person, right?

A    Correct.

Q    And if you truly believed that there was another suspect still out there possibly armed with a gun, that's something that you would have brought up with Officer Gorman, right?

A    I'm sorry.

Q    If you truly believed that there was another suspect that wasn't detained possibly armed with a gun, that's something that you would have alerted Officer Gorman

Algarin - Redirect - Shields

to immediately, correct?

A    Officer Gorman was there with me.  If he knew there was two there, then we were on the same page.

MR. SHIELDS:  I'm going to move to strike.  It wasn't responsive to my question.

MAGISTRATE JUDGE PEDERSEN:  Motion is granted.  That answer is stricken.

Q    If you truly believed that there was another suspect that fled from you when you drove up to the front of 61 Kosciusko Street that Officer Gorman couldn't see -- he didn't know there were four guys because he drove up to Sobieski Street, right.  So if you had this knowledge in your head that there's another suspect possibly armed with a gun that wasn't detained and you were out there looking for him and Officer Gorman didn't know about it, that's really important information for Officer Gorman to have, right?

A    If Officer Gorman didn't know about four, then, yes, that would be important information.

Q    It would be really important to say, hey, you know, there's this other guy that we're looking for with a gun, we got to be careful, he could jump out, he could ambush us, but you didn't have that conversation, did you?

A    Your last one was hypothetical.  Are we hypothetical again?

Q    This isn't hypothetical.

Algarin - Redirect - Shields

A    Your last one was hypothetical.

Q    You didn't have that conversation with Officer Gorman, correct?

A    I did not have that conversation with Officer Gorman, that is correct.

Q    And it would be important to have that conversation because that might affect how he positions himself and what he's looking out for as he's searching the suspect that he's detained, right?

A    In your hypothetical scenario, yes.

Q    It's not a hypothetical scenario, it's your words. You're saying there's this other guy out there, he might have a gun, I got to go look for him, that's what you're saying here, right?

MS. JONES:  Objection.  I think we're beyond the scope of cross.  Well beyond actually.

MAGISTRATE JUDGE PEDERSEN:  I'm going to allow it.

A    One more time, please.

Q    Your justification for entering the yard the second time was that (indicating) you were looking for this possible undetained suspect who might be armed with a gun.  Now if you're looking for a possible armed suspect who might be detained with a gun, that creates a serious officer safety issue, correct?

A    Correct.

Algarin - Redirect - Shields

**Q**    And so if there's a serious officer safety issue, that's something that you would discuss with Officer Horowitz and Officer Gorman, correct?

A    They were with us for the entire situation.

**Q**    And they never saw any other suspects flee over the fence or at any other time, correct?

**MS. JONES:**  Objection.  I don't know if -- he can't speak to what other people saw.

**MAGISTRATE JUDGE PEDERSEN:**  Sustained.

**Q**    If there was this serious officer safety issue present at the time, that's something that you would have brought up with both Officer Horowitz and Officer Gorman, correct?

A    They were part of the entire job.

**Q**    They weren't part of the entire job, right?  They responded to Sobieski Street so they didn't see the suspects flee from 61 Kosciusko Street down the driveway, correct?

**MS. JONES:**  Objection.  That's assuming facts not in the record.

**MR. SHIELDS:**  It's what Officer Horowitz testified to, that's what he testified to was their plan on that day when they arrived at the scene.

**MS. JONES:**  Yeah, I'm more concerned with what the officers saw.

**MAGISTRATE JUDGE PEDERSEN:**  Can we come up to side bar,

Algarin - Redirect - Shields

please.

(Held at side bar:)

**MAGISTRATE JUDGE PEDERSEN:**  I think the horse is dead.

**MR. SHIELDS:**  Okay.

**MAGISTRATE JUDGE PEDERSEN:**  And you're bloodying my carpet.

**MR. SHIELDS:**  All right, Judge.

**MAGISTRATE JUDGE PEDERSEN:**  So please move on.

**MR. SHIELDS:**  Yes.

**MAGISTRATE JUDGE PEDERSEN:**  Thank you.

(Open court:)

**MAGISTRATE JUDGE PEDERSEN:**  I'm going to sustain the objection.

**Q**    All right.  I want to move on and ask you some questions about that.

**MR. SHIELDS:**  Well, you guys have any objection to his affidavit going into evidence, Exhibit 39?

**MS. JONES:**  Well that's beyond the scope of cross.  I didn't bring that up in his cross.

**MR. SHIELDS:**  Well it's relevant to my questions.  It's not beyond the scope.

**MS. JONES:**  Well you can ask your questions but we're not going to stipulate to the affidavit at this time maybe. If there's more foundation, you can ask again later.

**Q**    So you submitted an affidavit in this case where

62

Algarin - Redirect - Shields

you said -- where you described the justification for your reentry into Mr. Dempsey's yard, correct?

**MS. JONES:**  Objection.  This is beyond the scope of cross.

**MAGISTRATE JUDGE PEDERSEN:**  Side bar.

(Held at side bar:)

**MAGISTRATE JUDGE PEDERSEN:**  My recollection is that both on direct and cross we went over and over the entry into the yard the second time.

**MR. SHIELDS:**  I've got on cross we did and so I'm going to impeach him with his affidavit.

**MAGISTRATE JUDGE PEDERSEN:**  What's the -- I don't see how it's outside the scope because we're still dealing with this one.

**MR. NAYLON:**  He wasn't asked about his affidavit.

**MAGISTRATE JUDGE PEDERSEN:**  No, he wasn't asked about his affidavit but isn't that fair impeachment?

**MS. JONES:**  If he's just going to use it for impeachment.

**MR. SHIELDS:**  Yes, in his prior sworn testimony.  It's got the same rules as his deposition.

**MAGISTRATE JUDGE PEDERSEN:**  Right.  So I don't see any basis for granting your objection to having him use the affidavit in questioning the witness.

I'm going to take a 10-minute break.  I need one.  And I

Algarin - Redirect - Shields

presume the jury could use one.  So why don't you discuss whether you want to stipulate to the admission of the affidavit.  Thanks.

(Open court:)

**MAGISTRATE JUDGE PEDERSEN:**  Objection is overruled. Let's take a 10-minute recess.

Remember the warnings that I've given you about not discussing the case, please.

Back in ten minutes.  That's at about 10:40.

(WHEREUPON, recess taken.)

(Open court:)

**MAGISTRATE JUDGE PEDERSEN:**  Can we go over to side bar for a memo back on the record.  (held at side bar.).  So I realize the issue of whether the jury believes he was in pursuit of just contraband or a gun versus in pursuit of suspects goes to the hot pursuit issue.  This is hotly contested.

So what else are you going to be bringing out that might raise lots of objections that we can take care of now instead of bothering the jury with them?  You're going to raise that you're going to impeach him with his affidavit.

Have you decided whether you want to stipulate that?

**MS. JONES:**  We will stipulate it.

**MAGISTRATE JUDGE PEDERSEN:**  Okay.  And then is there more to come or is that going to be close to the end?

64

Algarin - Redirect - Shields

MR. SHIELDS:  Then I'm going to go through just notes that I made about her and ask specific questions about the notes I made from her cross yesterday and today.

MAGISTRATE JUDGE PEDERSEN:  Okay.  Okay.

MS. JONES:  Yes, I thought you were asking specifically about his questions about hot pursuit.  To see if we had any objections.  So are you saying that after we get past the affidavit.

MAGISTRATE JUDGE PEDERSEN:  There are --

(Court reporter interrupted for clarification.)

MS. JONES:  After we get past the affidavit, you won't have any other questions about the hot pursuit?

MR. SHIELDS:  I didn't say that.  What I said was that I was going to go through my notes that I was making as you asked Officer Algarin questions and I plan to ask specific questions about specific questions and answers.  So, I might have additional questions, I might not.  I'm not sure at --

MS. JONES:  Okay.

MR. SHIELDS:  -- this point.

MS. JONES:  So he's not sure, got it.

MAGISTRATE JUDGE PEDERSEN:  And then it appears that Officer Algarin frequently either has trouble either not understanding your questions.

MR. NAYLON:  It's the double negative.

MAGISTRATE JUDGE PEDERSEN:  The double negative.

Algarin - Redirect - Shields

MR. NAYLON:  I do it all the time.

MR. SHIELDS:  I thought he was doing all right, actually.

MR. NAYLON:  I do that in depositions.  It's like.

MAGISTRATE JUDGE PEDERSEN:  Maybe you could try:  Is it true that blah blah blah yes, it's true.  Because when you say you did not talk to him, correct, no.  No, you didn't talk to him or yes, that's correct.

MR. NAYLON:  I have some messed up depositions from doing that.

MAGISTRATE JUDGE PEDERSEN:  Yeah.

MR. NAYLON:  You didn't do that, did you?  Which answer were we --

MAGISTRATE JUDGE PEDERSEN:  Is that correct.  All right. Thank you very much.  We'll start.

MS. JONES:  Thank you, your Honor.

MR. SHIELDS:  Thank you, your Honor.

MAGISTRATE JUDGE PEDERSEN:  Okay.  Back on the record again.

We are continuing with the redirect examination of Officer Algarin by Mr. Shields.

MR. SHIELDS:  I believe there's a stipulation that we need to address, first.

MR. SHIELDS:  Yes, your Honor.  The defendants and I conferred and we are stipulating Exhibit 39 into evidence

Algarin - Redirect - Shields

which is Officer Algarin's affidavit that was submitted in June 2020 in support of the City's motion for summary judgment.

**MAGISTRATE JUDGE PEDERSEN:** Any objection, Ms. Jones?

**MS. JONES:** Well I think that initial description about why it was filed on the record is incorrect but, yes, we're stipulating to the admission of the exhibit.

**MAGISTRATE JUDGE PEDERSEN:** Okay. So number 39 is admitted by stipulation.

(Exhibit 39 is received in evidence.)

**Q** So I'm going to ask some questions about this affidavit.

**MR. SHIELDS:** Can we publish it to the jury?

**THE CLERK:** Yes.

**Q** Officer Algarin, on your computer do you see an affidavit that says affidavit of Javier Algarin and then little blue numbers at the top. It says filed 6/16/20.

**A** Correct.

**Q** Okay. And so 6/16/20, that's about a little less than two years after after this incident, correct?

**A** Correct.

**Q** And so is this the first writing that you ever made documenting what happened in the incident?

**A** Yes.

**Q** Okay. So if we go down to Paragraph 3 says on

67

Algarin - Redirect - Shields

October 19th, 2018, at approximately 4:33 p.m., RPD received a 911 call, right, it says a call reporting a group of black males. So, did I read -- I guess I will paraphrase instead of reading directly at points, but generally that was about the time of day, 4:33 p.m. as stated in Paragraph 3?

A    Correct.

Q    So then if we go down to Paragraph 9, this is where you say "as Officer DiSabatino and I arrived at Kosciusko Street, I saw a group of four black males in front of 61 Kosciusko Street", correct?

A    Correct.

Q    And before that time you never put in writing anywhere that you'd seen the four black males, correct?

A    No.

**MAGISTRATE JUDGE PEDERSEN:**  Wait.

A    Correct, I'm sorry.

**MAGISTRATE JUDGE PEDERSEN:**  Okay.

A    Sorry.

Q    And then Paragraph 9 goes on to say that they fled down the driveway between 61 Kosciusko and 57 Kosciusko street, correct?

A    Correct.

Q    And then it says that in Paragraph 10, which I've highlighted, that you wrote that you, quote, pursued the suspects down the driveway of 57 Kosciusko Street, correct?

Algarin - Redirect - Shields


A    Correct.

Q    It didn't say that you chased them, correct?

A    I think pursuit in this case could be synonomous with chasing.

Q    Okay, it doesn't say that you ran, correct?

A    I don't think anybody chases while walking.

Q    Okay.  And then if you go to Paragraph 13 which I highlighted said:  After I jumped the fence and landed in the backyard of 53 Kosciusko Street, I saw that Officer Gorman had detained the suspect that I had seen fleeing west in the backyard of 49 Kosciusko Street, the property immediately west of the property that I was in, correct?

A    Correct.

Q    So that person was detained at that point, right?

A    Correct.

Q    And Paragraph 15 says:  Once I was in the 53 Kosciusko Street yard, I could see Officer Horowitz had detained one of the perpetrators in the vacant lot at 54 Sobieski Street to the south of where I was, correct?

A    (No response.)

Q    So that person was also detained --

(Court reporter interrupted for clarification.)

A    Are you asking that what you read was correct, right?

Q    Yes.

Algarin - Redirect - Shields

A    Correct.

Q    So Paragraphs 13 and 15 explained that you could see Officer Horowitz had detained one of the perpetrators and Officer Gorman had detained the other one and the one that Officer Gorman detained is the one that you had seen fleeing, correct?

A    Correct.

Q    And now before I ask more questions about these other paragraphs, down here at the bottom, that's your signature, right, you signed this affidavit under oath?

A    Correct.

Q    So everything that you said in here is true, you signed it under the penalty of perjury?

A    Correct.

Q    Okay.  Now it goes on in Paragraph 16 to talk about the reason that you -- 16 and 17 go on to talk about the reasons that you spoke with Officer Horowitz about a gun, correct?

A    Correct.

Q    So I want to go down to Paragraphs 24 through 27. So this just basically recounts, before we get down there in these additional paragraphs, what you testified to throughout the case, right, that the individual -- in Paragraph 19 -- the individual Officer Horowitz detained denied being in possession of a gun, and then you began to look around the

Algarin - Redirect - Shields

yard of 53 Kosciusko Street to see if there were any weapons, guns, or other contraband that had been discarded by the perpetrators as they fled in the police, correct?

A    Correct.

Q    So that's what you're looking for, guns, weapons, contraband, correct?

A    Correct.

Q    Doesn't say anything about a person in that paragraph, right?

A    I'm still searching for a person but I was looking for contraband at the same time, correct.

Q    But in that paragraph it doesn't say anything about "I was also looking for a person", correct?

A    Correct.

Q    And 21 just describes the ground and why you couldn't see that stuff.

22 says I went to see if Officer Gorman needed any assistance with the individual that he had apprehended. Climbing the chain link fence from 53 to 49 Kosciusko Street.

And then can you just read the highlighted paragraphs for me and tell me when you need me to scroll down.

A    Starting?

Q    Starting at Paragraph 23 through 27 and then I'll scroll down and you can read the rest of it.

Algarin - Redirect - Shields

A    Okay.  After speaking briefly with Officer Gorman, he suggested that I backtrack over the path of the flight of the individual he had stopped who I understand to have run from 57 Kosciusko Street through 57 Kosciusko and then to 49 Kosciusko Street.

**MAGISTRATE JUDGE PEDERSEN:**  Hold on just a moment.  Are you going to have him read all those photographs?

**MR. SHIELDS:**  I meant to have him read them in his head but he can read them out loud.

**MAGISTRATE JUDGE PEDERSEN:**  Why don't you read them to yourself.

A    (Witness complies.)  Okay.

Q    Hen if you could just read through 29 there.

A    (Witness complies.)  Okay.

Q    So those paragraphs where the affidavit explains what backtracking means and why it's done generally --

A    Generally --

Q    -- right?

A    Generally, yes.

Q    And Paragraph 24 says basically perpetrators, especially suspected drug dealers, commonly discard drugs and other contraband during flight, including weapons, correct?

A    Correct.

Q    Paragraph 25 says backtracking is important to ensure no dangerous items, illegal drugs or weapons are left

Algarin - Redirect - Shields

behind, correct?

A    Correct.

Q    And Paragraph 26 says you understood the backtracking you engaged in to be part of the hot pursuit and directly related to the crime of drug deal, correct?

A    Correct.

Q    And when you were talking about the hot pursuit, you meant the hot pursuit of the detained suspects, correct?

MS. JONES:  Your Honor, I think this exhibit is already in evidence and if we want to publish it to the jury, they can read it all but I think it's inefficient to go line by line, paragraph by paragraph.

MAGISTRATE JUDGE PEDERSEN:  Right.  So, first of all, the jury has had this published to them since we started talking about it and if this is how he wants to conduct, he may do so.  So overruled.

Q    Now when you backtracked in this case, it was immediately after you had the conversation with Officer Gorman and then you asked him after he asked you if you wanted to backtrack and you asked Officer Gorman where did he jump, correct?

A    Correct.

Q    And Paragraph 27 says you wanted to make sure no contraband was left in the backyards of innocent people, correct?

Algarin - Redirect - Shields

A    That is true, correct.

Q    No contraband by the detained suspects, correct?

A    From anyone that was involved in that investigation.

Q    But you were looking for discarded contraband, correct?

A    That was part of it, correct.

Q    That's what your affidavit says, that's what you were looking for:  Discarded contraband, correct?

A    Can you scroll up, please.

I speak about backtracking in general but not specific to this incident.

Q    And in general, backtracking is a practice that you engage in to look for discarded contraband, correct?

A    Correct.

Q    Not potential other undetained suspects that might be armed with a gun, correct?

A    It could be if there's outstanding people.

Q    That's not what your definition of backtracking in Paragraphs 24 through 27 say, is it?

A    No.

Q    Okay.  So after you describe in Paragraphs 24 through 27 what backtracking means generally, looking for contraband, then in Paragraph 28 you say "I began my backtracking in the backyard of 49 Kosciusko Street, walking

74

Algarin - Redirect - Shields

visually scanning the lawn as Officer Gorman continued to search the man he had detained", correct?

A    Correct.

Q    So you're describing what you're doing to backtrack at that moment, scanning the lawn for potentially discarded contraband on the ground, correct?

A    Or individuals.

Q    Potentially discarded individual laying on the ground hiding from you in the backyard of 49 Kosciusko Street?

A    Yes.

Q    Did you write this language in paragraphs 24 -- or 23 through 27, was that your words that you wrote?

MS. JONES:  Your Honor, I think we're well beyond the scope of cross here.

MAGISTRATE JUDGE PEDERSEN:  Mr. Shields, you want to get to the point of your purpose for bringing this affidavit in as we discussed.

MR. SHIELDS:  One of the purposes, your Honor, is to ask if he drafted the words there or if they were drafted for them.

MAGISTRATE JUDGE PEDERSEN:  Fine.

MS. JONES:  I think that --

MAGISTRATE JUDGE PEDERSEN:  I'll overrule the objection and let him ask that question.

Algarin - Redirect - Shields

A    I don't quite remember if it was drafted and reviewed or if I wrote it.

Q    So someone else might have drafted it and then you reviewed it and either way you agreed with it and you signed it under oath, right?

A    Correct.

Q    Could have been drafted by your attorneys?

A    Correct.

Q    Now, if we go down to the remainder, it goes on to talk about the incident that occurred in the yard after you jumped the fence into Mr. Dempsey's yard, correct, generally?

A    Correct.

Q    Did you review this affidavit before you came in to testify at court for the trial?

A    Yes.

Q    So, nowhere in this affidavit does it say anything about the other alleged undetained suspects being the reason that you reentered Mr. Dempsey's yard, correct?

A    I'm sorry.  Say it one more time, please.

Q    Nowhere in the affidavit, not once, does it say anything about the alleged other undetained suspects being the reason that you backtracked into Mr. Dempsey's yard the second time when you jumped over the small picnic table, correct?

A    Not specifically, no.

Algarin - Redirect - Shields

**Q** Not specifically or generally, correct?

A There's backtracking but specifically, no.

**Q** It says that you were backtracking to search for discarded contraband, correct?

A That was the general statement of backtracking for me.

**Q** And, in fact, what the affidavit says is that the reason you entered the yard was to backtrack to look for discarded contraband, nothing about any potentially undetained suspects, correct?

A I stated I started my backtrack.

**Q** Right after you described backtracking as specifically only meaning going back to look for potentially discarded contraband, correct?

A That was backtracking in general.

**Q** You know what, let's go to your deposition. So, hold on one second.

**MS. JONES:** Is this being published to the jury?

**MAGISTRATE JUDGE PEDERSEN:** The affidavit has been published to the jury the entire time it's been being discussed.

**MS. JONES:** No, it's just showing deposition testimony right now.

**MR. NAYLON:** Yeah, it's not --

**MAGISTRATE JUDGE PEDERSEN:** That's been shut off.

**MS. JONES:** Thank you.

Oh, can I note one other thing regarding the affidavit. There was a lot of highlighting. I just want to make sure that the record shows that the City didn't put on that highlighting and we're not stipulating to that. And I understand that the version that will be in the record will not have that highlighting.

**MAGISTRATE JUDGE PEDERSEN:** Correct. The version that will be in the record won't have any highlighting at all and I agree that your representation is that the City did not put the highlighting there. In fact, Mr. Shields testified that he put it there.

**MS. JONES:** Thank you, your Honor.

**Q** At Page 115 of your deposition, Line 22, do you remember being asked this question and giving this answer.

"Okay. And can you describe generally what backtracking means?"

You said, answer: "Taking the flight path of a suspect to see if he had discarded any contraband."

Do you remember being asked that question and giving that answer?

**A** Yes.

**Q** Okay. Thank you.

I've just got some questions about some other things that Ms. Jones asked you about.

Algarin - Redirect - Shields

Now you admitted that after you shot the dog, you pointed your gun at Chuck, right?

A    Correct.

Q    And that wouldn't have happened if you were never in the yard in the first place, right?

A    Correct.

Q    And you said Tesla was a very large black dog, that's how you described Tesla in questioning from Ms. Jones?

A    Correct.

Q    You've owned a bunch of dogs in your life, right?

A    (Gesturing affirmatively.)

Q    Can you estimate how much Tesla weighed?

A    No.  Heavier than 50, 60.

Q    Now you said Chuck was charging at you, is that what you said?

A    Correct.

**MAGISTRATE JUDGE PEDERSEN:**  Excuse me.

Q    He said that Chuck was charging at him in his testimony?

**MAGISTRATE JUDGE PEDERSEN:**  Who was charging?

**MR. SHIELDS:**  Chuck -- I'm sorry, Mr. Dempsey.

**MAGISTRATE JUDGE PEDERSEN:**  Okay, thank you.

Q    Now, you explained the difference a little bit between your deposition testimony and your testimony yesterday on -- I'm sorry, earlier today you explained why

Algarin - Redirect - Shields

you no longer said that you took responsibility for shooting and killing Tesla, correct?

A    Correct.

Q    And did you ever learn from Sergeant Rudolph or anyone else that when Tesla was brought to the vet, they told Mr. Dempsey that --

MS. JONES:  Objection.

Q    -- there was --

MS. JONES:  Objection.

MAGISTRATE JUDGE PEDERSEN:  I'm going to overrule the objection.  That was addressed on cross.

Q    Did you ever learn that the reason that Mr. Dempsey had to euthanize Tesla was because the veterinarians told him that even if they performed this emergency surgery --

MS. JONES:  Your Honor --

Q    -- to take out part of her lung and it cost --

MS. JONES:  Your Honor --

Q    -- $10,000 --

MS. JONES:  Your Honor --

MS. JONES:  Your Honor.

Q    -- that there was a very low likelihood of success.

MAGISTRATE JUDGE PEDERSEN:  Mr. Shields, there is apparently an objection.

MR. SHIELDS:  In the middle of my question.  She's got to wait until I --

Algarin - Redirect - Shields

(Court reporter interrupted for clarification.)

**MAGISTRATE JUDGE PEDERSEN:**  All right, wait a minute. Side bar, please.

(Held at side bar:)

**MAGISTRATE JUDGE PEDERSEN:**  Okay.  Let's set some ground rules.  Let's have a question and if there's an objection, let's have a loud, clear objection and then let's have some silence until I ask for something further.

**MR. SHIELDS:**  Consider that's --

**MS. JONES:**  He's just introducing facts that are not in the record.

**MR. NAYLON:**  Just running on.

**MAGISTRATE JUDGE PEDERSEN:**  They're in -- part of it is in the record from Officer Horowitz, no.

**MR. NAYLON:**  Not in the record.  He's testifying and that becomes --

**MR. SHIELDS:**  He said that Sergeant Rudolph informed him later.  This is the whole reason he changed his testimony that Sergeant Rudolph informed him later that Tesla was brought to the vet --

**MR. NAYLON:**  No.

**MR. SHIELDS:**  -- and had to be euthanized.

**MS. JONES:**  No.

**MAGISTRATE JUDGE PEDERSEN:**  He setted the words euthanized.

Algarin - Redirect - Shields

**MR. NAYLON:** What he said Rudolph told him the dog was dead.

**MR. SHIELDS:** No.

(Court reporter interrupted for clarification.)

**MR. NAYLON:** The testimony with respect to Rudolph was Rudolph told him the dog was dead and that he changed later because he later learned from counsel that the dog had been euthanized.

**MR. SHIELDS:** He said --

(Court reporter interrupted for clarification.)

**MR. NAYLON:** He said euthanized and that's why he changed his answer and it's fair for me to ask what he actually learned about why the dog was euthanized and why he takes back his answer.

**MAGISTRATE JUDGE PEDERSEN:** Fine.

**MS. JONES:** No.

**MAGISTRATE JUDGE PEDERSEN:** Let's ask it in a nonleading question so you don't introduce evidence that's not in the record yet. So you can ask him what did you learn was the reason that the dog was euthanized or how did you learn that the dog was euthanized and what were you told?

**MR. NAYLON:** Or did you learn anything more than that he was euthanized.

**MAGISTRATE JUDGE PEDERSEN:** And then if you want to introduce that evidence, you can do so through your own

Algarin - Redirect - Shields

witness.

**MR. SHIELDS:**  He is my witness, yes, your Honor, yes.

**MAGISTRATE JUDGE PEDERSEN:**  But I don't want you going around using my ruling that you could lead him to introduce evidence that's not yet in the record.

**MR. SHIELDS:**  Respectfully, your Honor, yes, I'll comply with what you just said.  But also respectfully, it's what the law says that I'm allowed to lead a witness.  So, I'm not trying to -- yes, it was your ruling and, yes, that's also what the rules say, so.

**MAGISTRATE JUDGE PEDERSEN:**  Okay.  Anything further?

What are we going to do when there's a basis for an objection?

**MS. JONES:**  Just object.

**MAGISTRATE JUDGE PEDERSEN:**  We're going to wait for the question.

**MR. NAYLON:**  Loud and clear.

**MAGISTRATE JUDGE PEDERSEN:**  Loud and clear.

(Open court:)

**MAGISTRATE JUDGE PEDERSEN:**  All right.  The objection is sustained.

Please reask the question.

**Q**   Earlier you testified that you changed your answer about taking responsibility for shooting and killing Tesla, correct?

Algarin - Redirect - Shields

A    Correct.

Q    From the time that you gave your deposition to today, correct?

A    Correct.

Q    And the reason that you changed your answer was because you later learned that Tesla had to be euthanized when she was taken to the veterinary hospital, correct?

A    Correct.

Q    Now, where did you learn that?

A    Later on through counsel.

Q    Through counsel?

A    Correct.

Q    What other information did counsel give you about the reasons that Tesla was euthanized?

A    That surgery was available but not given.

Q    What else did you learn about the surgery that was potentially available?

A    That it would have approximately cost $10,000.

Q    And did you learn anything about the likelihood of success with the surgery?

A    From counsel, no.

Q    Did you ever review the veterinary records?

A    No.

Q    Did counsel ever tell you anything else about the likelihood of success of the surgery?

Algarin - Redirect - Shields

A    No.

Q    She ever tell you that it was a very high risk surgery?

**MS. JONES:**  Objection.

**MAGISTRATE JUDGE PEDERSEN:**  Sustained.

Q    Did you ever learn anything about whether it was a high risk surgery?

**MS. JONES:**  Objection.  Asked and answered.

**MAGISTRATE JUDGE PEDERSEN:**  Sustained.

Well, it wasn't answered actually.  You can ask that question.

**MR. SHIELDS:**  And it wasn't answered.

**MAGISTRATE JUDGE PEDERSEN:**  You can ask --

Q    Did you learn anything else about the surgery or the reasons that -- did you -- well, let me withdraw that.

Did you ever learn what Tesla's injuries were?

A    Through -- not through the veterinary records, no.

Q    Did you learn them in some other way?

A    The general where there was a shot to the ear and then shot to a chest cavity.

Q    Did you ever learn where the shot through the ear actually punctured Tesla in the body?

A    No.

Q    Did you ever learn how many bullets were located by the veterinarians inside of Tesla's body?

Algarin - Redirect - Shields

A    No.

Q    So you have no idea whether Tesla could have made it after the surgery that was available, correct?

A    One more time.

Q    You have no idea if the surgery could have possibly been successful, correct?

A    No.  As in correct.

Q    Assuming that the surgery had a very low likelihood of success and would have cost Mr. Dempsey more money than he could have ever paid, would that change your answer about whether you take responsibility for shooting and killing Tesla?

MS. JONES:  Objection.

MAGISTRATE JUDGE PEDERSEN:  Overruled.

A    One more time, please.

Q    Assuming that there was a very low likelihood of success even if Tesla had the surgery and that the surgery would have cost Mr. Dempsey over $10,000, money that he didn't have, and so he was forced to make the decision to humanely euthanize her, would that change your answer about whether or not you take responsibility for shooting and killing Tesla?

MS. JONES:  Objection.

MAGISTRATE JUDGE PEDERSEN:  Sustained.

Q    If you learned that even if Mr. Dempsey had come up

Algarin - Redirect - Shields

with the $10,000 and got Tesla the surgery, that it would have been very likely that Tesla still would have died, and if she had made it, she would have had injuries for the rest of her life that would affect her, would that change your --

well, let me withdraw that question.

I'll move on.

Q    Now you said earlier in response to a question from Ms. Jones about planning police actions, that you can't plan for everything, right?

A    Correct.

Q    And that's the whole point of training, right, that you can't plan for everything so you fall back on your training for things that you can't plan for, correct?

A    There's adaptability, as well.  There's not going to be specific training for specific items with every specific detail.

MR. SHIELDS:  I move to strike as nonresponsive.

MAGISTRATE JUDGE PEDERSEN:  Overruled.

I'll let it stand.

Q    But you agree that one of the reasons that you received training is for situations that you can't plan for, correct -- so that you can be prepared to handle situations that you can't plan for, correct?

A    Correct.

Q    Incorrect?

Algarin - Redirect - Shields

A    I said correct.

Q    Oh, okay, thank you.

Now, you said on cross that discharging a firearm isn't dangerous, correct, or you said in this instance discharging a firearm was not dangerous, correct?

A    That's not what I said.

Q    You said that Mr. Dempsey wasn't directly behind you and so that was one of the reasons that discharging the firearm in this instance wasn't dangerous, correct?

A    That's incorrect.

Q    Okay.  What did you say about why the discharge of the firearm in this case wasn't dangerous?

A    There was nothing in front of me and between the dog and there was nothing behind the dog in my line of fire.

Q    Okay.  Now discharging a firearm is considered the use of deadly force, correct?

A    Correct.

Q    And there's always a possibility that a gun, that a bullet can ricochet off of hard objects, correct?

A    Correct.

Q    Hard objects like rocks in the ground or pieces of metal on the ground, correct?

A    Correct.

Q    Concrete, other hard objects, correct?

A    Possibility, correct.

Algarin - Redirect - Shields

**Q**    And are you aware that, in fact, in the past when an RPD officer shot a bullet at a dog, that another person had been hit and seriously injured?

**MS. JONES:**  Objection.  Beyond the scope.

**MAGISTRATE JUDGE PEDERSEN:**  Sustained.

**MR. SHIELDS:**  Your Honor, he said he wasn't dangerous. This goes to whether or not he would be aware of it possibly being dangerous?

**MS. JONES:**  That's beyond the scope of cross.

**MAGISTRATE JUDGE PEDERSEN:**  At one point in his questioning on cross he was asked:  "So why was this particular firearm discharged not dangerous to other people who were possibly present?"

Answer:  "Because it was directly down to the ground."

Is the situation in which you're questioning him the same?

**MR. SHIELDS:**  It's similar.  There's a dog in the yard and officer shot at it and a person got hit.

**MAGISTRATE JUDGE PEDERSEN:**  All right.  You may ask him if he's aware of it.

Overruled.

**A**    I'm not aware of it, no.

**Q**    So the RPD never made its officers aware that there was an incident where a person got shot after officers discharged their firearms at a dog?

Algarin - Redirect - Shields

**MS. JONES:**  Objection.

**MAGISTRATE JUDGE PEDERSEN:**  Sustained.

Q    Were you ever trained that when you discharge your firearm at a dog, there's always a possibility that people in the vicinity could also get shot, either by a ricochet bullet or if you missed, is that something that you were taught in your training?

A    Yes.

Q    Is that something you considered in this instance?

A    Yes.

Q    And Mr. Dempsey was on the back porch descending the stairs somewhere back behind you generally when you discharged the firearm?

A    I'm sorry, say that one more time.

Q    When you discharged your firearm at Tesla, Mr. Dempsey was not inside his house, correct?

A    Correct.

Q    He was either on the back porch or descending the stairs at that point?

A    Correct.

Q    And as far as you're aware, the RPD does not have a policy that prohibits you from discharging your firearm at a dog if there's a person present in the yard or in the vicinity of the dog, correct?

A    Not to my knowledge, correct.

Case 6:20-cv-06629-CWC-CDH    Document 80-5    Filed 02/13/26    Page 89 of 100

90

Algarin - Redirect - Shields

Q    You testified that firearms training is annual, correct?

A    Correct.

Q    Annual training that you have to get recertified on your firearm every year?

A    Correct.

Q    And it's important.  We want our police officers to be certified with their firearms, right?

A    Correct.

Q    Are there any other required trainings that happen every single year other than firearms training?

A    I'm sure there are.  I just can't -- the specifics of the training, I don't know what the yearly requirements are.  I don't set the roll calls.

Q    So you don't recall as we sit here today any other subject that you're trained on every single year?

A    Well, there's bean bag gun, there are shotgun.  But that's all that I can recall at the moment.

Q    Were you ever taught that a bean bag gun could be effective against a dog?

MS. JONES:  Objection.

MAGISTRATE JUDGE PEDERSEN:  Sustained.

MS. JONES:  Beyond --

A    Not that I remember, no.

Q    Can you explain to the jury what a bean bag gun is?

Algarin - Redirect - Shields

**MS. JONES:** Objection. Beyond the scope.

**MAGISTRATE JUDGE PEDERSEN:** Mr. Shields, I don't recall bean bag guns coming up. I recall batons and pepper spray but not bean bag guns.

**MR. SHIELDS:** He just volunteered it, your Honor, so I was just following up on his answer.

**MAGISTRATE JUDGE PEDERSEN:** Well nonetheless, I'm going to sustain the objection and let's move on to something more relevant.

Q    Now, counsel asked you and put up the Humane Society training, correct?

A    Correct.

Q    And that's a training that you received at the academy, right?

A    Correct.

Q    That would have been in -- can you remind me when you went to the academy, 2017?

A    Yes. My begin date was September of 2017.

Q    Okay. And then after that training, did you ever get that roll call or did you ever get that -- ever see that PowerPoint, was it ever shown to you again?

A    I don't recall.

Q    Did you get that PowerPoint training again at a roll call training at any point --

A    I don't recall.

Algarin - Redirect - Shields

**Q**    Do you recall a roll call training in 2019 shortly after this incident where that PowerPoint presentation was ed presented to all officers?

A    I can't recall if it's the same PowerPoint.

**Q**    Okay.  Do you recall a roll call training about the bite prevention program with dogs being given shortly after this incident?

A    Yes.

**Q**    Was that roll call training given because of this incident?

**MS. JONES:**  Objection.  Lacking personal knowledge and we're beyond the scope of cross.

**MAGISTRATE JUDGE PEDERSEN:**  If you know the answer to the question, you answer it.

A    I do not know.

**Q**    No supervisors or anybody from the City ever said to you, hey, because of this incident we're going to follow up and give this additional training at roll call about what happened, that never happened?

A    No.

**Q**    And counsel had gone over that humane training society training with you and it was about 50 pages, right?

A    I believe so.

**Q**    There was a lot of material?

A    Yes.

Algarin - Redirect - Shields

**Q**    It's a lot of material to cover in about an hour and a half long class, right?

A    I don't remember specifically the time allotted to that class.

A    I believe I approximated half a day.

**Q**    And half that half day training was also about animal control not specifically about the bite prevention training, correct?

A    That I don't recall.

**Q**    Okay.  Just a few more questions.

I'm going to pull back up the video and ask you a couple questions about it.

**MR. SHIELDS:**  Mr. Bock, could we publish Exhibit 41 to the jury.

**MAGISTRATE JUDGE PEDERSEN:**  It's admitted.  You may.

**Q**    So, you said that when you were in the backyard you saw no indication of a dog?

A    Correct.

**Q**    Did you ever walk up next to the fence, the tall, wooden stockade fence and notice that there was a well-worn path where maybe a dog was running back and forth?

A    No.

**Q**    You got dogs yourself you testified to, right?

A    Yes.

**Q**    And those dogs ever run in your backyard?

Algarin - Redirect - Shields

**MS. JONES:** Objection.

**MAGISTRATE JUDGE PEDERSEN:** Basis?

**MS. JONES:** This is beyond the scope of cross-examination. I seem to recall a question about whether he had dogs was objected to and I sustained the objection by Mr. Shields when Ms. Jones was questioning him about it.

**MR. SHIELDS:** There was --

**MAGISTRATE JUDGE PEDERSEN:** Was your recollection different?

**MR. SHIELDS:** There was -- he testified that he owns a dog. That wasn't a sustained objection, and I don't remember what was sustained. But this question is about what he knows about things to look for in a yard that might indicate that a dog resided at that property.

**MAGISTRATE JUDGE PEDERSEN:** Overruled.

You may answer it.

A    So one more time, please.

Q    What are the specific things that you were looking for in the backyard to determine whether or not a dog potentially lived there?

A    Dog toys, leash, kennel, dog bowls, dog... Things along those sorts.

Q    A lot of people might not keep those things in their backyard, right, maybe they keep their dog bowls and the little house inside their house, right?

Algarin - Redirect - Shields

A    Possibly.

Q    So were you ever trained that you need to look for other things in the yard that might indicate that a dog lives there?

A    The things that I mentioned.  I'm sure there's other things as well.

Q    Dog poop or maybe paths in the yard that might indicate a dog has a route that it runs every day.

A    There are routes made by people, too.

Q    Were you trained or do you know from your own personal experience that if you have a dog, that they might go up to the back door and scratch (indicating) to try to get into the house or let you know they want to come back in?

A    From my personal knowledge?  Yeah.

Q    Did you ever think to look at Mr. Dempsey's back door or glance towards it to see if maybe there was any indication on his door that maybe there was a dog that resided at the property?

A    Say that question one more time.

Q    When you were in the yard and you said that you looked around and didn't see any indication of a dog --

A    Mm-mm.

Q    -- did you look towards his back door and see how it's all worn out from where his dog scratches to try to get back in the house?

Algarin - Redirect - Shields

A    This scene is post the shooting but, no, I did not see any indications on the door.

Q    That door didn't change before the shooting to after, right?

A    My view would have.

Q    So your testimony is that you didn't look at the door and you didn't see it before you reentered his yard the second time, correct?

A    I did not see any clear indications, no.

MR. SHIELDS:  Thank you, your Honor.  I'm all set.

MAGISTRATE JUDGE PEDERSEN:  Thank you, Mr. Shields.

Ms. Jones, is there any recross?

MS. JONES:  Yes, your Honor.

MAGISTRATE JUDGE PEDERSEN:  You estimate about how much time?

MS. JONES:  15 minutes, your Honor.

MAGISTRATE JUDGE PEDERSEN:  Very well.

RECROSS-EXAMINATION BY MS. JONES:

Q    Afternoon again.  So I actually want to start with your affidavit.  Plaintiff's Exhibit -- or, excuse me, Exhibit 39 because it's been entered into evidence.  We're going to pull it up on the screen again.

Okay, so, your Honor, I'd like to publish the affidavit to the jury and just give them the opportunity to read it in its entirety.

Algarin - Recross - Jones

**MR. SHIELDS:** Objection.

**Q** So --

**MAGISTRATE JUDGE PEDERSEN:** Basis?

**MR. SHIELDS:** Just wasting time, you want to have them read the entire affidavit as we sit here?

**MAGISTRATE JUDGE PEDERSEN:** If she wants to, that's fine.

**MR. SHIELDS:** Okay.

**MAGISTRATE JUDGE PEDERSEN:** Overruled.

So are you going to have them read it to themselves?

**Q** Yes, sorry, read it to themselves. I was going to start at the top and kind of scroll down and I was kind of going to wait for people to look up and scroll down some more.

(Exhibit published to the jury.)

**Q** Okay, thank you. We can pull that down.

Okay, a few more questions for you.

It's the State of New York that requires that police officers undergo firearm training every year, right?

**A** Correct.

**Q** If a dog was attacking another person, a person would be nearby, right?

**MR. SHIELDS:** Objection.

**MAGISTRATE JUDGE PEDERSEN:** I don't understand the question, Ms. Jones, would you like to reask.

Algarin - Recross - Jones

**MS. JONES:**  I can rephrase it, sure.

**Q**    If a dog was attacking a person, a person would be close to the dog --

**MR. SHIELDS:**  Objection.

**Q**    -- right?

**MAGISTRATE JUDGE PEDERSEN:**  Basis?

**MR. SHIELDS:**  She's talking about a dog attacking people.  I didn't ask about dogs attacking people.  It's outside of the scope.

**MS. JONES:**  I think he talked about proximity and, you know, being close to a dog.

**MAGISTRATE JUDGE PEDERSEN:**  You can talk about the zone of danger, if you will, so I'll allow the question.

A    One more time.

**Q**    Sure.  So if a dog is attacking a person, a person would be close to that dog, right?

A    Correct.

**Q**    You didn't know the breed of the dog at the time you were in the Dempsey's yard, right?

A    No.

**Q**    And then does the -- does bodyworn camera necessarily show what you are seeing in a given instant?

A    No.

**Q**    Why didn't you ask Officer Gorman about whether he saw another detainee?

Algarin - Recross - Jones

A    I think if he saw another detainee run past him, that he would express that to me.

Q    He would just volunteer that information, you're saying?

A    Yes.

Q    Lastly, I'd like to introduce the audio of the 911 call since we reviewed it in the affidavit, it's Defendant's Exhibit 501.  If you can pull that up, ***Sandra.

MR. SHIELDS:  Objection.

Q    And then the business records certification in Plaintiff's Exhibit 132, Page 2?

MS. JONES:  And we can separate that out if you'd like, your Honor.

MAGISTRATE JUDGE PEDERSEN:  The 911 call was mentioned in the affidavit so I'm going to allow it to be here.

Q    I'd like to enter either by stipulation, Mr. Shields or as a business record given the certification that we can provide.

MR. SHIELDS:  Stipulate.

MAGISTRATE JUDGE PEDERSEN:  Exhibit 501 and Exhibit -- what was the exhibit number for the certification?

MS. JONES:  So it's contained in the other documents that were submitted.  So only Page 2 of Plaintiff's Exhibit 132 is the actual certification.  So if you'd like us to call the certification exhibit 132A, we can do that.

Algarin - Recross - Jones

**MR. SHIELDS:**  I mean, if the, if the call is coming in, I mean, I don't think the certification necessarily needs to come in, like, I stipulated to the call coming in, so.

**MAGISTRATE JUDGE PEDERSEN:**  So you're stipulating without the certificate?

**MR. SHIELDS:**  Yes, that's fine, your Honor.

**MAGISTRATE JUDGE PEDERSEN:**  So I'll just admit the recording of the call which is Exhibit 501.

**MS. JONES:**  Thank you, your Honor.

***Sandra, do you mind playing that for us again it's just audio so there's no visual but if you push play and then make sure the speaker.

(Audio played.)

Q    Officer Algarin, you just heard the 911 call.  Is the information provided by that caller consistent with your experience of Kosciusko Street?

A    Yes.

Q    And in which specific ways?

A    The frustration about the constant sales that are happening there, the blatant sales, the sales that are stopping school children getting from on the bus or off the bus, just not being discreet about it, being bold and just selling.  It's constantly, that there's multiple times that he's called about it and it just continues to happen.

Q    In your experience with Kosciusko Street before

101

Algarin - Recross - Jones

this particular incident, were you ever aware of a lookout on that street?

MR. SHIELDS:  Objection.

MAGISTRATE JUDGE PEDERSEN:  I think now we're approaching beyond the scope.

MS. JONES:  Okay.  Give me one second to confer but I think I might be done.

(WHEREUPON, a discussion was held off the record.)

MS. JONES:  No further questions, your Honor.

MAGISTRATE JUDGE PEDERSEN:  You're welcome to recall him as your own witness and bring in other evidence but that is beyond the scope.  So I'll sustain that objection.

MS. JONES:  Thank you, your Honor.

MAGISTRATE JUDGE PEDERSEN:  Anything further, Mr. Shields?

MR. SHIELDS:  No, your Honor.

MAGISTRATE JUDGE PEDERSEN:  Thank you.

Officer, you may step down.  Thank you.

(WHEREUPON, witness excused.