**ADAM GORMAN,** called as a witness, being duly sworn, testifies as follows:

**DIRECT EXAMINATION BY MR. SHIELDS:**

**Q**      Good afternoon, Officer.

A      Good afternoon, sir.

**Q**      And, Officer Gorman, you're currently a Rochester police department officer?

A      Yes, I am.

**Q**      And you were hired by the RPD in about September 2016; is that right?

A      Yes, sir.

**Q**      And first was six months of academy training, correct?

A      Correct.

**Q**      And then the academy is full time 40 hours a week; is that right?

A      That is correct.

**Q**      After the academy you got got the two week post-academy training period; is that right?

A      Yes.

**Q**      Where you learn like RPD policies and procedures?

A      Correct.

**Q**      And then after that it's four months of field training, correct?

A    Yes.

Q    And basically that's just your on-the-job training, right?

A    Correct.

Q    And you did your field training in the Clinton Section; is that right?

A    I did.

Q    And you did your from the time of your field training through October 19th, 2018, the incident in this case, you worked in the Clinton Section that whole time; is that right?

A    Yes, yes, I did.

Q    And generally how would you describe the Clinton Section, high crime neighborhood, something else?

A    Extremely violent.

Q    Extremely violent.  So, public safety that something that your -- part of your job enhancing public safety, correct?

A    The primary focus of my job, yes, sir.

Q    And your number one priority as an officer is making it home safe to your family, correct?

A    I would say my number one priority is insuring the safety of the public secondary or -- or, firstly to my own safety.

Q    Officer safety's number one, correct?

A    It is a considering a factor in decision making.

Q    And in decision making, you're always taught to maintain a tactical advantage and be aware, correct?

A    That is fair to say, yes, sir.

Q    So after officer safety, the next most important thing is safety to the public, correct?

A    I would put public safety before my own and that is speaking personally, sir.

Q    So those are the two top priorities, safety for the public, officer safety, correct?

A    Yes, sir.

Q    And after the academy, after you're done with the academy and field training, the RPD provides additional training to officers, correct?

A    Could you elaborate.

Q    Every year you get, for example, firearms training, correct?

A    Yes, sir, yes, sir.

Q    And the only topic that you receive annual training on is firearms training, correct?

A    To my knowledge, yes.

Q    And between the academy and October 19th, 2018, the incident in this case, you never had an inservice training about searching the curtilage to a residential property, correct?

A    I do not recall if I did or did not.

Q    Okay.  And between the academy and the October 19th, 2018, incident, you never had an inservice training about interactions with pet dogs, correct?

A    Not to my knowledge.

Q    You don't recall ever going to one of those trainings, right?

A    Honestly I do not.

Q    And the RPD, they have they have a training simulator, correct?

A    If you're referring to prism, yes, they did at the time.  I cannot speak to now if they do.

Q    Okay.  You havent used the prism simulator recently?

A    No, sir, it's been many years.

Q    And the prism simulator, that's like a screen with a prerecorded video that you interact with; is that right?

A    Yes, that's a good interpretation of it.

Q    And it would have like different scenarios that you would have to interact with the screen, make decisions and then and it would go on from there, depending on the decision that you make?

A    Yes, correct.

Q    And you've done simulator training for use of force incidents, correct?

6

A    In terms of firearms situations, use of forces, yes, I have.

Q    Okay.  And you've done simulator training for deescalation of people, correct?

A    Yes, yes, we have.

Q    You've done simulator training for you said firearms but that would be like a shoot/don't shoot scenario involving people, correct?

A    Yes, from what I recall that -- those were the scenarios.

Q    It's sort of like the old Nintendo game Duck Hunt (indicating), correct?

A    Very similar, yes.

Q    And you did that simulation training in the police academy?

A    Yes, yes, we did.

Q    But you've never had a simulator training like that about interactions with dogs, correct?

A    Not that I can recall, no.

Q    You've never done any shoot/don't shoot scenarios involving dogs, correct?

A    I don't believe so.

Q    And you've never done a simulator training on searching the curtilage to a residential property, correct?

A    No.

**Q**    And the training simulator you said that the RPD had it's called the PRISM simulator?

**A**    Yes, I'm not sure what the acronym is for but it's PRISM is the spelling of it.

**Q**    And at the time that you used the simulator it was already older and outdated, right?

**A**    Yes, it was.

**MR. NAYLON:**  Objection.

**MAGISTRATE JUDGE PEDERSEN:**  Basis?

**MR. NAYLON:**  Foundation.

**MAGISTRATE JUDGE PEDERSEN:**  Sustained.

**Q**    You think it would be a good idea for the city to get a more modern simulator that involved additional scenarios?

**MR. NAYLON:**  Objection, relevance.

**MAGISTRATE JUDGE PEDERSEN:**  Mr. Shields.

**MR. SHIELDS:**  The relevance will be clear in my next couple questions, your Honor.

**MAGISTRATE JUDGE PEDERSEN:**  I'll allow it then.

**A**    I would love to see more updated systems throughout our training.  Obvious problem is money, as with everything in this world.

**Q**    The more training the better, right?

**A**    That is fair.

**Q**    If the RPD could get a new modern simulator that

8

involved shoot/don't shoot scenarios with dogs, you think that would be a good thing for the city to do?

MR. NAYLON:  Objection.

MAGISTRATE JUDGE PEDERSEN:  What's the relevance?

Q    Better training, one of our claims in this case is that the City's --

MR. NAYLON:  It's assuming facts not in evidence as well, your Honor, that such things are even available.

MAGISTRATE JUDGE PEDERSEN:  Oh.  Are they available?

MR. SHIELDS:  100 percent, your Honor.

MAGISTRATE JUDGE PEDERSEN:  Well then why don't you put some evidence on about that.

I'll sustain the objection for now.

MR. SHIELDS:  I'm sorry your Honor, I didn't hear what you said before you sustained the objection.

MAGISTRATE JUDGE PEDERSEN:  I said if you have evidence that there are better trainers out that can do what you're suggesting, fine but until that time, I'll sustain the objection.

Q    Are you aware that there's simulation training that involves shoot/don't shoot scenarios with dogs?

A    I cannot say specifically for dogs.  I am familiar with a few involving people or situational scenarios.

Q    Have you ever heard of a company called VirTra that makes training simulators for police departments?

A    I am not familiar with them, no.

Q    Okay, let's switch topics.

Now, curtilage means the immediate area surrounding a person's home, correct?

A    From my understanding of curtilage, that is the generally accepted understanding of it.  I think there are situations as to where that may not be the case.

Q    In this case, do you contest the fact that Mr. Dempsey's backyard was the curtilage to his home?

A    I do not.

Q    And were you trained that the fenced-in backyard of a home is generally considered part of the curtilage to the home?

A    I will not say that I've been trained to understand that but that is my general understanding that is typically the case, yes.

Q    And a residential backyard or the curtilage to the home, that's protected by the fourth amendment, correct?

A    Compared to a house, there are differences but in the general sense, yes, it is protected by the Fourth Amendment.

Q    Were you ever trained by the RPD that the curtilage to the property enjoys the same Fourth Amendment protections as the home itself?

A    If there was specific training, I'm not going to

testify that I received it.  I do not recall.

**Q** That's not your general understanding that the curtilage to the property enjoys the same Fourth Amendment protections as the home itself?

**MR. NAYLON:** Objection, your Honor.  He's testified already that there are differences.

**MAGISTRATE JUDGE PEDERSEN:** Okay.

**MR. SHIELDS:** I just asked him that, yeah.

**MAGISTRATE JUDGE PEDERSEN:** It's been asked.  It's been answered.  You may move on.

Sustained.

**Q** And as a police officer, you can't enter the curtilage to search for evidence unless a recognized exception to the warrant requirement applies or you have a warrant, correct?

**A** That is correct.

**Q** And when the United States Supreme Court issues a decision, as a police officer you're required to comply with that decision, correct?

**A** Yes.

**Q** Okay.  So I want to show you first Exhibit 139 which is already in evidence.

Okay, can you just read for us the highlighted portion there?

**A** To give full practical effect to that right, the

Court considers curtilage, quote, "the area immediately surrounding and associated with the home", end quote, to be, quote, "part of the home itself for Fourth Amendment purposes", end quote.

Q    Thank you.  So if we go back up to the top so that's training bulletin L-65-19, correct?

A    Yes.

Q    So it discusses a United States Supreme Court case calls *Collins v. Virginia*, right?

A    Yes, it does.

Q    And it says that that case was decided on May 29, 2018?

A    It does say that.

Q    Okay.  And so that was about four months before this incident on October 19th, 2018, correct?

A    Correct.

Q    So at the time of the incident in this case you and Officer Algarin would have had to comply with the decision that was issued in this case, correct?

A    I don't think I can say that yes or no directly. Can I give an explanation?

Q    Sure.

A    Yes, we would have had to comply with it.  That being said, it is fair to say things move slow throughout the court system and getting its way to government agencies.  So

it would have taken time for us to receive this, as you can see, May 30th, 2019 on the top left for the issue date.

Q    So the RPD did not inform officers about the *Collins* decision before the date of the incident in this case on October 19th, 2018, correct?

**MR. NAYLON:**  Objection.

**MAGISTRATE JUDGE PEDERSEN:**  Sustained.

A    Can you repeat your question, I'm sorry?

**MAGISTRATE JUDGE PEDERSEN:**  You do not need to answer the question.

Next question.

Q    So your answer was that you would have to comply with it but government moves slowly.  So is what you meant that prior to the incident October 19th, 2018, you had not been made aware of this decision by the United States Supreme Court in the *Collins* case?

A    That is correct.

Q    And RPD didn't provide any training about this *Collins* case before the October 19th, 2018, incident, is that correct?

A    Not to my knowledge.

Q    Okay.  And this training bulletin which came down on May 30th, 2019, so that's after the date of the incident in this case, correct?

A    Yes.

Q    And this training bulletin says, if you look here, so it's quoting from the case:  "Like the automobile exception, the Fourth Amendment's protection of curtilage has long been Black Letter law", correct?

A    It says that, yes.

Q    And do you understand Black Letter law to mean well-established?

A    To be honest, it's a new term to me.

Q    Okay.  Where it says "has long been", so does that mean that it's long been understood?

A    That's how I interpret that, yes.

Q    And the bulletin states that when an officer physically intrudes on curtilage to gather evidence, that intrusion is considered a search under the Fourth Amendment, correct?

A    You're saying it says that on this document?

Q    (Indicating.)

A    Okay, I see it now, thank you.  Yes, it does say that.

Q    Then it goes on to explain that:  "Such conduct thus is presumptively unreasonable absent a warrant", correct?

A    Yes, sir.

Q    And your understanding as an officer is that if you don't have a warrant, sometimes some other exception to the

warrant requirement might permit you to enter the curtilage to a property to conduct a search, correct?

A    Yes.

Q    And one of those exceptions is exigent circumstances, correct?

A    Yes.

Q    And exigent circumstances requires both probable cause and an emergency, correct?

A    It does.

Q    Exigency basically means emergency, right?

A    Yes, I think that's fair.

Q    So if there's no emergency then you can't search the curtilage to a property, correct?

MR. NAYLON:  Objection.  Insufficient information concerning that question.

MAGISTRATE JUDGE PEDERSEN:  Yes.  You have to -- clarify the question in a better tighter way.  Thank you.

Q    If there's no emergency ongoing on the property that requires immediate entry, then you're not allowed to enter the property to search the curtilage to the property, correct?

A    I'm sorry.  Did you say enter the property?  I just want to clarify.

Q    Enter to conduct a search on the property.

A    That would be my understanding of it, yes.

**Q**    And hot pursuit is a subcategory of the exigent circumstances exception to the warrant requirement, correct?

A    Correct.

**Q**    But hot pursuit doesn't last forever, right?

A    No, it does not.

**Q**    The hot pursuit ends once the suspect is caught, correct?

A    That is typically the end of a hot pursuit whenever all suspects are in custody.

**Q**    So after the hot pursuit is concluded and all the suspects are detained, an officer needs some other lawful basis to enter a residential curtilage to search for evidence, correct?

A    Yes, another exception to the warrant.

**Q**    So the hot pursuit would no longer justify the entry, you need a different exigent circumstance exception to the warrant requirement or consent to enter, correct?

A    Yes, correct.

**Q**    Okay.  So I want to show you what has been marked as Exhibit 143 -- which we stipulated into evidence and so I'd move to enter it now.

**MAGISTRATE JUDGE PEDERSEN:**  Exhibit 143, the training bulletin.  Is that stipulated in?

**MR. NAYLON:**  Yes, your Honor.

**MAGISTRATE JUDGE PEDERSEN:**  Thank you.

143 will be admitted as stipulated.

(Exhibit 143 received in evidence.)

Q    Okay, Officer Gorman, this training bulletin, it's number L-15-97 dated January 1997, correct?

A    Yes.

Q    And the subject of this bulletin is warrantless entries with or without exigent circumstances, correct?

A    Yes.

Q    And in your time with the RPD before this incident, you never received training on this training bulletin, correct?

A    It looks vaguely familiar but I'm not going to say I received specific training on this bulletin.

Q    When training bulletins are issued, that's something that's generally distributed at a roll call; is that right?

A    Not always roll call.  They are, from my experience, distributed through email.  That's one of the primary ways or if it is a hot button issue, they will talk about it in roll call so there are different methods.

Q    Okay.  Do you recall ever getting this training bulletin in like an email?

A    I'm sorry, I wish I could say yes, but I can't remember.

Q    Okay.  And this training bulletin discusses a case

called *Welsh v. Wisconsin*, another United States Supreme Court case, right?

A    Yes, sir.

Q    And basically it discusses how in *Welsh*, the Supreme Court disallowed a warrantless entry to make an arrest for a nonjailable traffic offense, is that fair?

A    Yes.

Q    Then it goes on and says:  "It is clear, under the *Welsh* case, that once the violation is abated, there is no justification for entry into the house unless you have a warrant or consent".  Correct?

A    Yes.

Q    And in plain terms, "abated" means the violation is no longer ongoing, correct?

A    I honestly have no idea.

Q    If I told you that "abated" means it's no longer ongoing?

A    I would believe you.

Q    Okay.  So under this bulletin's explanation of *Welsh*, once the violation is no longer ongoing, then entry's no longer justified unless the officer has a warrant or consent, correct?

A    Correct.

Q    And then if we scroll down to the second page, under the underlined portion, it says:  Probable cause must

exist for warrantless entries, leading one to believe:  One, a crime, misdemeanor or felony, has been or is being committed and, two, if immediate action is not taken -- it says a few things but if you go to the end -- or you have reason to believe that evidence of the crime, a misdemeanor or felony, will be destroyed or otherwise lost, did I read that right?

A    Yes, sir, you did.

Q    Okay.  So, basically the bulletin expressly ties warrantless entry to the need for immediate action, right?

A    Yes.

Q    It requires both probable cause and an immediate reason why immediate entry is necessary, right?

A    Correct.

Q    And then it goes on to specify, it says:  Assume you cannot use this exception in other than extremely unusual circumstances, right?

A    It does say that.

Q    Okay.  So if we apply those rules after a hot pursuit, once a suspect is caught and the violation is no longer ongoing, then the violation is abated, correct?

A    Can you reword that for me.

Q    Once a suspect is caught or detained?

A    Mm-mm.

Q    So the violation -- the pursuit of them running

from you, right, is no longer ongoing and so that violation is abated, correct?

A    Yeah.

Q    And so the bulletin states that once that violation is abated, there's no justification for the entry unless the officer has a warrant or consent or some other exigent circumstances, correct?

A    That is correct.

Q    So basically after the hot pursuit is concluded and the suspect's detained, an officer can't rely on hot pursuit alone to reenter and search the curtilage to a residential property, correct?

MR. NAYLON:  Objection, your Honor.

MAGISTRATE JUDGE PEDERSEN:  Asked and answered. Sustained.

MR. NAYLON:  It's also additionally, your Honor -- are you referring to this particular exhibit in that question?

MR. SHIELDS:  You want me to take it down.

MR. NAYLON:  No.  I just want to know because I would have a further objection but if you're not using it for that question, then I'm fine.

MR. SHIELDS:  I was just asking the question.  I wasn't referring to the exhibit.

MR. NAYLON:  Okay, thank you.

Q    And this bulletin -- now I am.  This bulletin

doesn't say anything about securing potential evidence after an arrest automatically authorizing a warrantless entry, correct?

A    I don't believe it does.

Q    Okay.  Instead, it requires probable cause that a misdemeanor or felony has been or is being committed, correct?

A    Correct.

Q    And it requires a reason to believe that without immediate entry, evidence will be lost or destroyed, if that's the reason that you were going to enter the curtilage to the property, correct, to --

MR. NAYLON:  Objection.

Q    -- conduct the search?

MR. NAYLON:  If he's referring to this, this exhibit refers to entry to the home.

MAGISTRATE JUDGE PEDERSEN:  Mr. Shields, are we talking about entry to the home as this exhibit talks about or are you talking about entry to the curtilage?

MR. SHIELDS:  Well that's why we discussed Exhibit 139 first which explains that for the purposes of the Fourth Amendment, the home and the curtilage enjoy the same Fourth Amendment protections.

MR. NAYLON:  And I objected to that and you sustained it, your Honor.

**MAGISTRATE JUDGE PEDERSEN:**  Side bar.

(Held at side bar:)

**MAGISTRATE JUDGE PEDERSEN:**  So what I'm seeing is that he's using this earlier bulletin that came out before the case involving a motorcycle to say the home is protected but the later bulletin extends as to the Supreme Court to the curtilage, in this case the fenced-in area outside the home, and I lost track of where we are with your question here that he objected to.

**MR. SHIELDS:**  The question was and it requires a reason to believe that without immediate entry evidence would be lost or destroyed.

**MR. NAYLON:**  Correct.  And he was referring to the exhibit, the later exhibit.

**MAGISTRATE JUDGE PEDERSEN:**  The earlier exhibit?

**MR. NAYLON:**  The current exhibit which is the earlier exhibit, I guess.

**MR. SHIELDS:**  I could say read together.

**MR. NAYLON:**  You can't read them together.

**MAGISTRATE JUDGE PEDERSEN:**  All right.

**MR. NAYLON:**  They're two different things.

**MAGISTRATE JUDGE PEDERSEN:**  So simply refer to the exhibit which that information is contained versus this one here.

**MR. SHIELDS:**  Well, that's what I did.

**MAGISTRATE JUDGE PEDERSEN:**  This one here.

**MR. SHIELDS:**  The *Welsh* case, I pulled up.

**MAGISTRATE JUDGE PEDERSEN:**  Right, they have to be read together.  You read them together.  One talks about the home, one seas curtilage is part of the home.

**MR. NAYLON:**  And if I may.

**MAGISTRATE JUDGE PEDERSEN:**  Mm-mm.

**MR. NAYLON:**  Are you done?  If the officer is already, as the officer has already explained that there is -- they're not necessarily the same, the home and the curtilage.  You specifically asked about the curtilage and he said they're not necessarily exactly the same.  He said it depends and it does depend.

**MAGISTRATE JUDGE PEDERSEN:**  And so you're trying to get the point, however, that what?

**MR. SHIELDS:**  I'm trying to get the point that they can't enter the curtilage immediately without some factual basis to believe that if they don't immediately enter, evidence will be lost or destroyed pursuant to the reading of the training bulletins, that's what they should have been trained on and if that's not his understanding, you know, that's what the RPD policies say.

**MR. NAYLON:**  And enter to search not just entry.

**MAGISTRATE JUDGE PEDERSEN:**  Yeah.

**MR. SHIELDS:**  I do keep attempting to catch myself.

**MR. NAYLON:**  No, that's all right.  I just wanted to say it now.

**MAGISTRATE JUDGE PEDERSEN:**  We have a question that's going to be unobjectionable.

**MR. SHIELDS:**  I mean, I don't think my question is objectionable and it requires a reason to believe that without immediate entry, evidence will be destroyed or lost.

**MAGISTRATE JUDGE PEDERSEN:**  That is what the problem, I think, might be.

**MR. SHIELDS:**  And these two bulletins read together require a reason to believe that without immediate entry, evidence would be lost or destroyed, correct.

(Open court:)

**MAGISTRATE JUDGE PEDERSEN:**  Objection is sustained.  You may reask the question in a different way.

**Q**    So, Officer Gorman, these two training bulletins that we just reviewed together, Exhibit 139, discussing the *Collins* case, and 143, discussing the *Welsh* case, so those two training bulletins read together stand for the proposition that police officers are not permitted to enter the curtilage to a property to conduct a search unless they have probable cause to believe that without immediate entry, evidence will be lost or destroyed, correct?

**A**    Yes, correct.

**Q**    And if those requirements are not met and the

violation has already been abated, then the bulletin requires a warrant or consent before entry or some other exigent circumstance, correct?

A    Correct.

Q    And probable cause, the definition of probable cause, that means more than like a mere hunch, correct?

A    Yes.

Q    Okay.  I want to show you one other training bulletin.

MR. SHIELDS:  It's going to be Plaintiff's Exhibit 142 which we also stipulated into evidence and I'd move in now, your Honor.

MR. NAYLON:  I'm not positive.  142?

(WHEREUPON, a discussion was held off the record between counsel.)

MR. SHIELDS:  Mr. Naylon just wants to look at the Order really quick, your Honor, first.

MAGISTRATE JUDGE PEDERSEN:  Okay.

(WHEREUPON, a discussion was held off the record.)

MR. NAYLON:  No objection, your Honor.

MAGISTRATE JUDGE PEDERSEN:  Very well.

Exhibit 142 is admitted by stipulation.

(WHEREUPON, Exhibit 142 is received in evidence.)

Q    Thank you.

So, Officer Gorman, I'm showing you what's been

marked as Exhibit 142.  Again, this is a Rochester police department training bulletin, correct?

A    Yes, it is.

Q    Dated April 25th, 2019?

A    That is correct.

Q    And it says that it rescinds a prior training bulletin dated April 2000, right?

A    Yes.

Q    Okay.  So the bulletin explains several rules must be satisfied before the consent search is deemed valid, is that fair?

A    Yes.

MR. NAYLON:  Respectfully it says "applied", not "satisfied".

Q    Applied.  One of those rules is that before an officer even seeks consent, the officer must have reasonable suspicion that criminal activity is occurring, correct?

A    Correct.

Q    And then the bulletin expressly says that asking for consent without reasonable suspicion based only on a request for information, that could result in suppression of evidence, right?

A    Yes, that is correct.

Q    So, again, under this bulletin, similar to my other question, an officer has to have more than like a mere hunch

before requesting consent to search, right?

A   Yeah, for generally speaking, yes.

Q   And generally speaking, reasonable suspicion is a lower standard than probable cause, right?

A   Yes.

Q   And probable cause is the standard required for exigent circumstances or a warrantless search without consent, correct?

A   That is correct.

Q   But under the consent training bulletin, consent search bulletin, probable cause isn't required if you're just seeking consent to search, correct, reasonable suspicion is sufficient?

A   Yes, it would be.

Q   And that's because the consent, not an exigency, not an emergency is what would authorize the search in that situation, right?

A   Correct.

Q   So when an officer doesn't have probable cause to search the curtilage to a property but has more than a mere hunch, the officer's required to seek consent before conducting the search, correct?

A   Yes, that would be correct.

Q   That's what these three training bulletins basically read together, that's what they teach, right?

A    Yes, sir.

Q    And that rule applies to searches of the curtilage to the home, correct?

A    They would apply, yes, sir.

Q    I'll switch topics, talk about foot pursuits.  Foot pursuits are typical in Rochester for suspect -- it's typical for suspects in Rochester to run through residential yards during foot chases, is that fair?

A    Yes, it is.

Q    And you personally engage in foot pursuits through residential yards how often in your time working in the Clinton Section?

A    Back in my younger days, it was weekly, multiple times a week.

Q    And after most foot pursuits through residential yards, you would routinely backtrack to search for a discarded or potentially discarded contraband, correct?

A    It was a common practice.

Q    Okay.  You'd say the majority of the time you'd do it?

A    I, I would not necessarily say majority of the time.  I would -- I'm trying to think.  Sorry about that.  If I had to put a number on it, a third to half we would end up backtracking.

Q    Okay.  Do you remember being asked these questions

at your deposition on June 3rd, 2022, and giving these answers.  Starting at Line 4 on Page 220.

"How often during those foot chases would you end up backtracking and going through the route that you chased the person to look for any discarded contraband?"

Answer:  "On my personal foot chases are you asking?"

Question:  "Yes.  I'm just asking about your experience, you know, what you have done."

Answer:  "I would say the majority of the time."

Do you remember being asked those questions and giving that answer?

A    In all honesty, I don't remember any of the questions from that deposition.  It was quite a few years ago, so I just want to put that out there.

Q    Okay.  But you'd agree that at that time you testified it was the majority of the time after foot chases, right?

A    That sounds like a fair statement.  I mean, if you're reading it, I do believe that is what I said.

Q    And you testified that the majority of the time your backtrackin search requires you to jump fences, correct?

A    I can't say I said majority, maybe I did.  I would say about half of the time would be a fair estimate.

Q    Okay.  Do you remember being asked this question

and giving this answer?  Page 220 of your deposition, Line 15.

"Would it be fair to say that the majority of the time" --

MR. NAYLON:  Could you give me a second to get to the page and line before reading it, please?

MAGISTRATE JUDGE PEDERSEN:  Certainly.

Hold on there, Mr. Shields.

MR. NAYLON:  Thank you.

MAGISTRATE JUDGE PEDERSEN:  Okay.

Q    Question:  "Would it be fair to say that a majority of the time some of those times at least would require you to jump over a fence similar to what happened in this instance?"

Answer:  "Yes."

Remember being asked that question and giving that answer?

A    Like I said, I don't necessarily recall these exact questions but if that's what I said, that's what I said.

Q    Okay.  And before the incident in this case on October 19th, 2019, you'd never gone to the homeowner's front door to request consent before entering the fenced curtilage during backtracking searches, correct?

A    It was many years ago.  I'm trying to think prior to this incident.  I know I have since then.  I know I have prior.  I'm trying to think if it was after a foot chase or

not but I know I have asked for consent.

Q    Okay.  Would you trust me without reading your deposition --

A    Yes, I would.

Q    -- that that's what you said there?  And you just explained that after this incident you have gone to the homeowner's front door and (knocking) knocked to ask consent prior to entering the curtilage to conduct a search after the conclusion of a hot pursuit, correct?

MR. NAYLON:  Objection.  Mischaracterization.

MR. SHIELDS:  I can just withdraw it and ask another question.

MAGISTRATE JUDGE PEDERSEN:  Go ahead.

Q    After this incident on October 19th, 2018, you have, in fact, gone to the homeowner's front door following the conclusion of a hot pursuit to request their consent to enter and search the curtilage to their property, correct?

A    Yes, it has happened on a few -- quite a few occasions.

Q    One of the reasons that you started doing that on quite a few occasions after this incident is because of this incident, correct?

A    I would definitely say this was a hard experience and a learned experience.

Q    It was a good learning experience, right?

31

A    Yes.

Q    And -- okay.  So let's switch and talk about the incident a little bit.

So the day before the incident, October 18th, 2018, you had responded to the same general area, right, for a call involving suspected open air drug sales; is that right?

A    Yes, correct.

Q    And that call similarly involved drug sales on Kosciusko Street, correct?

A    Yes, correct.

Q    Specifically 61 Kosciusko Street?

A    I'm not going to speak to the prior calls but in that general vicinity, yes.

Q    Okay.  The day before you responded to the same general vicinity, correct?

A    Yes, sir.

Q    And during the incident the day before, the suspects fled on foot, correct?

A    They did.

Q    They fled down the driveway to the backyard area?

A    Yes, I believe they fled south towards Sobieski.

Q    And they escaped during that incident on the prior day, correct?

A    They did.

Q    And what happened the day before informed the

strategy that you and other officers used on October 19th, correct?

A    Yes, sir.

Q    You expected on October 19th that, just like the day before, if they ran, they'd use the same escape route, through the driveways and backyards from Kosciusko to Sobieski?

A    I did assume they would.

Q    And so that's why you and Officer Horowitz positioned yourselves on Sobieski Street; is that right?

A    Yes.

Q    Okay.  So let's -- what I want to do is go through your body camera with you from the date of the incident.

**MR. NAYLON:**  No objection.

**MR. SHIELDS:**  It's Exhibit 50.

**MR. NAYLON:**  Stipulated in.

**MAGISTRATE JUDGE PEDERSEN:**  What exhibit number is that?

**MR. SHIELDS:**  50, your Honor.

**MAGISTRATE JUDGE PEDERSEN:**  Exhibit 50 is admitted by stipulation.

(Exhibit 50 received in evidence.)

**MAGISTRATE JUDGE PEDERSEN:**  You may publish it, Mr. Bock.

**THE CLERK:**  It is published, your Honor.

**MAGISTRATE JUDGE PEDERSEN:**  Thank you.

Q    Officer Gorman, you see on your screen what you otherwise -- do you recognize this as your bodyworn camera from the date of the incident?

A    Yes, sir, I do.

Q    Okay.  So I'm going to hit play and then I'm going to pause it and ask you some questions similar to what you saw me do with Officer Algarin.

(Video played.)

Q    Now I got a question for you.  So, Officer Algarin explained that when the bodyworn camera turns on, the first 30 seconds are prerecorded and doesn't capture any audio. But in your camera, the audio turned on immediately.

Do you know why that is?

A    I am unsure why there's no prerecord 30 seconds to that.  I'll be honest.  I have no idea.  It's obviously activated but I can't speak to -- maybe he had a different model at the time, I don't recall.

Q    Okay.  So sometimes it will record immediately and sometimes it will do the prerecord?

A    It's pretty consistent on the 30 second prerecord. Again, I don't know why mine does not have that visual.

Q    Okay.  I actually wanted to back up and ask you a question that's really hard to see because you're running. Give me one second.

So we're paused at 7 seconds into the video.  And

34

my question is as you're running, you were running from where your car parked on Sobieski Street over the vacant lot at 54 Sobieski street, correct?

A    Yes, I believe it was in a westward direction, northwest direction.

Q    And as you ran, you saw the individual that Officer Horowitz ended up detaining in that vacant lot; is that correct?

A    If this is that person, then yes.

Q    Okay.  That's what I was going to ask here.  Is this what you see that this portion of the paused video here at that 7 seconds, that other individual?

A    My screen is extremely blurry.  Yes.

Q    It's right there on the ground.

A    Yes.

THE CLERK:  One second, Mr. Shields.

Your Honor, for some reason the witness monitor is extremely dim.

MAGISTRATE JUDGE PEDERSEN:  Can you see it better on the large monitors on either side of the courtroom.

THE WITNESS:  I can see well enough.  I don't have my glasses.

(WHEREUPON, a discussion was held off the record regarding the monitors.)

Q    As you were running from your car over to this

location where you see the individual, the individual Officer Horowitz ended up detaining, did you see at this point any other fleeing suspects?

A    At this exact second I don't recall what I did or didn't see.

Q    Eventually you saw the one other suspect that you detained in the back of 49 Kosciusko Street, correct?

A    Yes, sir.

Q    So let's fast forward to that point.  Other than that suspect in 49 Kosciusko Street that you ended up detaining, did you see any other fleeing suspects?

A    I did not, sir.

Q    I'm going to hit play and pause again around 15 seconds.

(Video played.)

Q    And so at that point I paused it 16 seconds into the video.

My question is the first time that you saw the suspect who you ended up detaining here in the backyard of 49 Kosciusko street, the first time you saw him, he was physically present in the backyard of 49 Kosciusko Street, correct?

A    That would be incorrect, sir.

Q    When is the first time that you saw him?

A    As long as I have my numerics right, I believe it

would have been 53 in Mr. Dempsey's, the western side of Mr. Dempsey's yard.

**Q**   Do you recall an affidavit that you signed in this case on June 16th, 2020?

**A**   I don't recall it but I'm sure it's mine.

**MR. SHIELDS:**  Okay.  Can we take this down for a second.

**THE CLERK:**  Yes.

**Q**   Paragraph 10 of this affidavit.  You said I ran west down Sobieski Street toward a vacant lot at 54 Sobieski Street.  When I arrived there, I saw a black male in a red sweatshirt running west in what I later learned was the backyard of 49 Kosciusko Street.

In Paragraph 11 you said based upon the 911 calls, the radio call received from officers Algarin and DiSabatino and the speed and direction of that individual's flight away from 61 Kosciusko Street, I suspected this individual was one of those reported to have been selling drugs at 61 Kosciusko Street.

Do you remember giving that affidavit?

**A**   I'll be honest, I don't.  But it is definitely an accurate representation of what occurred.

**Q**   And nowhere in the affidavit do you say that you saw him running through the yard at 53 Kosciusko Street.  If I told you that, does that refresh your recollection of what you said in your affidavit?

A    I'm sorry, did you say Sobieski?

Q    I'm sorry, 53 Kosciusko Street.

A    Okay.  It is not in the affidavit, you're saying?

Q    Correct.

A    Okay.  It's not normal.  Can I explain anything?

Q    What's not normal?

A    It's not normal to typically list every single -- because foot chases can last, you know, 10 feet or a couple miles.  It wouldn't be normal to list every numerical property.  So I could see why it wouldn't be listed in there but.

Q    Okay.  So Paragraph 10 says I ran west down Sobieski Street toward a vacant lot at 54 Sobieski Street. When I arrived there, I saw a black male in a red sweatshirt running west in what I later learned was the backyard of 49 Kosciusko Street.

So, it says when you arrived you saw him in the backyard of 49 Kosciusko, it doesn't say when you arrived you saw him in the backyard of 53 Kosciusko, correct?

A    That is I assume what it says, correct.

Q    Sitting here, are you saying that you did see him running in the backyard of 53 Kosciusko?

A    Yes, sir.

Q    Okay.

A    Going over the, the chain link fence.

**MR. SHIELDS:** Can we publish this to the jury. I want to put it this in evidence.

**MAGISTRATE JUDGE PEDERSEN:** Is it admitted?

**THE CLERK:** What exhibit?

**MR. NAYLON:** You want to put the whole thing in evidence?

**MR. SHIELDS:** It's Exhibit 40.

**MR. NAYLON:** Let me look at the entire exhibit, please.

**MAGISTRATE JUDGE PEDERSEN:** Okay, Exhibit 40.

**MR. NAYLON:** No objection, your Honor.

**MAGISTRATE JUDGE PEDERSEN:** All right. Exhibit 40 is admitted by stipulation.

(WHEREUPON, Exhibit 40 received in evidence.)

Q    Okay. So now we had just read Paragraph 10.

If we go down to the highlighted Paragraph 16, it says based on the direction of the flight of the man that I had stopped, I believed that he, like Officer Algarin, had fled from 57 Kosciusko Street through 53 Kosciusko Street and then to 49 Kosciusko Street where I stopped him.

Correct?

A    That is what it says.

Q    So that indicates that, in fact, you did not see him running through 53 Kosciusko Street, you had to make that inference, correct?

**MR. NAYLON:** Objection. He asked him what it did not

mean.  The question began with what it does not mean.  My objection is to what he meant.

**MAGISTRATE JUDGE PEDERSEN:**  I'll sustain.  You can ask.

Q     Paragraph 16 says, if you read Paragraph 16, that would say that you didn't actually see him running through 53 Kosciusko Street, correct?

A     If I was to read this as a third-party, I would infer it in that manner.

Q     Did you draft this affidavit?

A     I did not.  The grammar is way too good.

Q     Who drafted the affidavit for you?

A     I am going to assume it was my counsel.

Q     So they drafted it for you.  And do you remember reading it over and signing it before you filed it in court?

A     Very vaguely do I recall that, that interaction with counsel and reviewing it.

Q     But at the end here, that's your signature, correct?

A     Yes, sir.

Q     Okay.  Even if you don't recall doing it, you must have sat down, swore out the truth of all the allegations in the affidavit?

A     Yes.

Q     So at least back in June of 2020 your allegations were that you hadn't seen him actually run through the

backyard of 53 Kosciusko Street, you believed that he ran through the backyard of 53 Kosciusko Street and then made it to 49 Kosciusko Street where you stopped him, correct?

A    Is that a yes or no question?

Q    Yes.

A    That is what it says, correct.

Q    And then can you just read Paragraphs -- well you, you already said that counsel drafted this for you, correct?

A    Yes, sir.

Q    My question was going to be Paragraphs 21 through 25, they say the same exact thing as they said in Officer Algarin's affidavit.  And so my question was going to be if you and Algarin sat down and wrote those together or if those were written by counsel for you but you already said counsel wrote it for you, correct?

A    I believe they did, yes.

Q    And Paragraphs 21 through 23 basically describe the importance of backtracking and the reason that you asked Officer Algarin to backtrack, correct?

A    I'm sorry, say it again, sir.

Q    I said those paragraphs that are highlighted there, Paragraphs 21 through 23, basically describe the importance of backtracking in police work and the reason that you asked Officer Algarin to backtrack in this case, correct?

A    That is correct?

A    That is correct.

Q    And the reason you asked Officer Algarin to backtrack in this case is because you either saw or assumed that the individual you had detained ran through the backyard of 53 Kosciusko Street.  When you patted him down, you didn't find any drugs, guns or contraband on him and you believed he may have discarded contraband in the backyard of 53 Kosciusko Street, correct?

A    That would be one of the reasons, sir, yes.

Q    Okay.  And what were the other reasons?

A    Well, as stated prior, there were four individuals and it is noted in the ECD report.

MR. SHIELDS:  Objection.  There's no ECD report in evidence and I move to strike his answer.

MAGISTRATE JUDGE PEDERSEN:  No, I think you asked him what the other reasons were and he's giving that answer, so, overruled.

A    That being said, I recall that radio transmission being broadcasted over my portable radio that two men were still outstanding.  So I would expect Officer Algarin to continue his search for those men while I dealt with my suspect and got him into my patrol car.

Q    Okay.  So nowhere in your affidavit does it say anything about Officer Algarin or you -- what were the words you used, the reason I asked Officer Algarin to backtrack --

nowhere in your affidavit does it say anything about these other undetained, possibly armed suspects as one of the reasons that you asked Officer Algarin to backtrack, correct?

A    It does not say that, sir.

Q    Okay.  And you never said that anywhere in writing ever, correct?

A    I do not believe so, sir.

Q    And you spoke with Sergeant Rudolph after the incident?

A    I have no idea.

Q    You don't recall speaking with your supervisor after the incident in this case?

A    I would assume I did but I will not say that I -- I will not testify to the fact that I did.

Q    Now, you never observed any other alleged suspects, correct?

A    No, no, I did not.

Q    And no other officers ever observed any other alleged undetained suspects, correct?

MR. NAYLON:  Objection.

MAGISTRATE JUDGE PEDERSEN:  Sustained.

Q    You're unaware of any other officer ever observing any other undetained suspect, correct?

MR. NAYLON:  I'll object to the form of the question.  The way the question is asked suggests he's unaware of any

anyone else. I would be okay did anybody else report to you, I mean --

**MAGISTRATE JUDGE PEDERSEN:** Overruled.

**Q** Thank you.

**MAGISTRATE JUDGE PEDERSEN:** You're unaware of any other officer ever observing any other undetained suspect.

**MR. NAYLON:** I'm just looking for a timeframe. That's what I meant.

**MAGISTRATE JUDGE PEDERSEN:** So you want to tell us about the timeframe. Presumably you're talking about this one incident, is that right?

**MR. SHIELDS:** All these questions are about this one incident.

**MAGISTRATE JUDGE PEDERSEN:** And then we have --

**MR. SHIELDS:** Related to --

**MAGISTRATE JUDGE PEDERSEN:** -- the issue of before the detention of the suspect that he's got in custody.

**MR. SHIELDS:** I said at any time. I said at no time before the detention of this suspect or after did any other officer ever observe any other undetained suspect?

**MAGISTRATE JUDGE PEDERSEN:** Well, that's objectionable. He wouldn't know any other officer observed.

**Q** You're unaware of any other officer from the time that you got out of your car and began to run -- well, okay, let me withdraw it.

You're unaware, other than the radio call that you received, after that, after the suspects fled, you're unaware of any officer seeing any of the alleged suspects, other than the two that were detained by you and Officer Horowitz, correct?

A    Can I give a little bit of an explanation to that? It's not a yes or no.

Q    Sure.

A    I would reasonably infer that based on Officer Algarin and Officer DiSabatino, whom was the one to call out over the radio, that they would have seen the other suspects but do I have personal knowledge of them seeing?  No, I do not.

Q    Other than the radio call, other than that one piece of information that you say what you heard was four suspects, my question is after you saw -- so let's start with the period in time when you saw the first suspect that was detained by Officer Horowitz, from that point forward, you're unaware -- you personally didn't see any other suspects and you're unaware of any other officer seeing any suspects from that point forward, correct?

A    I believe that is correct.

Q    You never saw any other suspects in Mr. Dempsey's backyard at 53 Kosciusko Street?

A    I did not observe any other suspect in his yard.

Q    And you're unaware of any other officer ever seeing any suspects in Mr. Dempsey's backyard at 53 Kosciusko Street, correct?

A    I am unaware of that.

Q    And you never saw the suspect that you detained discard any guns or contraband or anything in Mr. Dempsey's backyard at 53 Kosciusko Street, correct?

A    I did not see him discard anything.

Q    And you didn't see the other suspect that Officer Horowitz detained discard anything in Mr. Dempsey's yard, correct?

A    No, I did not.

Q    And you didn't see that other suspect that Officer Horowitz detained ever enter Mr. Dempsey's yard, correct?

A    No, I did not.

Q    He jumped the fence from 57 Kosciusko into the vacant lot at 54 Sobieski, right?

A    I believe that is his path.

Q    So the only suspect, by the time that you detained him in the back 49 Kosciusko Street, that's the only person that you had any reason to believe that ever entered Mr. Dempsey's yard of 53 Kosciusko Street, right?

A    Are you saying that exact moment?

Q    You never had any facts to support any kind of reasonable belief that any other suspect at any time had ever

entered Mr. Dempsey's backyard at 53 Kosciusko Street, correct?

A    In that moment, or --

Q    Throughout --

A    -- at any --

Q    -- the entire incident.

A    I would disagree with that, sir.

Q    You never saw anybody, correct, enter Mr. Dempsey's yard at 53 Kosciusko Street?

A    (No response.)

Q    Correct?

A    Correct.

Q    You ran right up from your car.  As you were running through the vacant lot at 54 Sobieski Street, you could see over the chain link fence in Mr. Dempsey's yard at 53 Kosciusko Street, correct?

A    That is correct.

Q    Throughout that whole period of time you never saw anybody in the yard other than maybe what you're saying different from your affidavit, the guy in the red sweatshirt, correct?

A    That is correct.

Q    So at no point in time you never saw anybody else, right, but you saw the two guys that were detained that had ran?

47

A    Yes.

Q    But you never saw anybody else?

A    That is correct.

Q    So what facts would you have to support a reasonable belief that anybody else at any time ever entered Mr. Dempsey's yard?

A    Well I can reasonably assume that they did not run towards the officers as they approached 61 Kosciusko.  I can reasonably assume that they went southwest.  So unless they doublebacked in an eastbound direction, I can assume that they continued from a western -- from east to west and would have either beaten me to Mr. Dempsey's yard and continued on or doubled back north back to Sobieski as my partners were entering the backyard.  There's a lot of ways this could go but it's reasonable to assume that they ran in a southwestern direction initially.

Q    So, that's just your assumption, right?

A    Yes, from my personal experience, yes, that is...

Q    This is just a hunch, right?

A    I would call it a little more than a hunch, sir.

Q    Little more than a hunch, so maybe -- maybe a suspicion?

A    Yes.

Q    But not probable cause?

A    Not for the two unknown.

**MR. NAYLON:** Objection. Probable cause is not required to see someone.

**MR. SHIELDS:** I'm not asking about seeing somebody. That wasn't my question the whole line of questioning was did he have any facts to support a reasonable belief?

**MAGISTRATE JUDGE PEDERSEN:** And he answered that question.

**MR. SHIELDS:** And then we're following up with these follow-up questions about what level of information he had.

**MAGISTRATE JUDGE PEDERSEN:** And he answered that, too, did he not?

**MR. SHIELDS:** We're in the middle of these questions, your Honor.

**MAGISTRATE JUDGE PEDERSEN:** Well, I can reasonably assume that they did not run towards the officers as they approached and he went on from there explaining his rationale. Is there anything else other than that?

**MR. SHIELDS:** I'm sorry, your Honor?

**MAGISTRATE JUDGE PEDERSEN:** Are you seeking to see if there's anything further beyond what he already explained?

**MR. SHIELDS:** I'm asking him what level of belief he had. So I said is it a hunch, sounds like maybe just a suspicion but not probable cause. That was the series of questions.

**MAGISTRATE JUDGE PEDERSEN:** I'll allow it.

Q    So the last question was -- the first question was I asked you it sounds like just a hunch.  You said more than a hunch.  I said it sounds like suspicion.  I don't remember what your answer to that was.  You said --

A    I said yeah, reasonable suspicion, yeah.

Q    You'd agree --

A    I, I --

Q    -- that maybe you had a, maybe you had a suspicion, a reasonable suspicion that somebody else maybe at some point had entered the yard, right?

A    If you're trying to define -- use as to define probable cause and reasonable suspicion, I think it's on the border but it could go either way and I would allow the Court to decide that.

Q    It's not going to be up to the Court.  I mean, you're the one that had to make the decision in the moment about whether there was probable cause to ask Officer Algarin to enter the yard, correct?

A    I am, I am not the one.

MR. NAYLON:  Objection.  He did not have to make any decision with respect to what Officer Algarin did.

Q    You asked him to backtrack, correct?

MAGISTRATE JUDGE PEDERSEN:  Let's have a side bar.

(Held at side bar:)

MAGISTRATE JUDGE PEDERSEN:  Okay.  I know this is an

important point for the plaintiff.  Would his determination as to whether it was probable cause or not be relevant in this case?

**MR. SHIELDS:**  Yes, your Honor because part of the claim -- one claim is failure to intervene but part of the claim, and if you read Judge Wolford's decision, it specifically says that he asked him to backtrack.  It's like the initiation of Officer Algarin's decision to go and backtrack.  Instead of he could have said to him, hey, man, you know, I didn't see any of these guys in the yard and there's no emergency, I think you got to walk up and knock on his front door, so, yes, it is important to the plaintiffs' claims.

**MR. NAYLON:**  The question that was asked of him was do you want to backtrack and Algarin left without a foundation that he knew what Officer Algarin was going to do.  What he is thinking is irrelevant.  Hey, you want to backtrack.  Other than that --

**MR. SHIELDS:**  He mentioned backtracking.  He didn't say he walked up to his --

(Court reporter interrupted for clarification.)

**MAGISTRATE JUDGE PEDERSEN:**  One at a time, please.

**MR. SHIELDS:**  And he put in his affidavit.

**MR. NAYLON:**  Not -- I don't want the jurors seeing you pointing.  It's not a good look.

**MAGISTRATE JUDGE PEDERSEN:**  No.

**MR. NAYLON:**  For either of us.

Do you want to backtrack, we have nothing more than that in the record than do you want to backtrack.

**MR. SHIELDS:**  Except his affidavit which says he asked him to backtrack.

**MR. NAYLON:**  Do you want to backtrack, same thing, he asked him do you want to backtrack, it's the same thing.

**MR. SHIELDS:**  That's up for interpretation.

**MR. NAYLON:**  You can hear what he said on the BWC.

**MR. SHIELDS:**  No but what I'm saying is, yeah, words can be open for interpretation and that is our claim and that's why it's important the failure to intervene claim isn't limited to running up and stopping him.  When he begins to walk towards the fence, it's he was an active participant in that.  And that's what Judge Wolford's decision says, that's why the failure to intervene claim wasn't denied on this claim.  It was only, he had the opportunity to prevent him from entering the yard by instead of asking him to backtrack, he's saying he could have said go knock on the front door, man, we don't have probable cause here.

**MR. NAYLON:**  And that assumes he knew what Algarin was going to do.

**MR. SHIELDS:**  He played -- the whole claim is that he had an active role in what Algarin did by saying document to

backtrack, yeah, that's the claim.

MR. NAYLON: That's fine. Do you want to backtrack. There's no foundation as to anything past that question.

MR. SHIELDS: I don't, I don't understand what the objection is. It's clear that he --

MR. NAYLON: You're trying to ask him if Algarin had probable cause.

MR. SHIELDS: I'm not. I'm trying to ask him if he had probable cause to believe that there was a lawful basis for Algarin to backtrack.

MR. NAYLON: Okay. So now you're asking him essentially to be an expert on what Algarin is doing.

MR. SHIELDS: No, no.

MR. NAYLON: And he doesn't even know --

MR. SHIELDS: This is about his actions. It's not about Algarin. It's about his actions, about him. He has to have probable cause. Probable cause to believe that there was a lawful basis for Algarin to backtrack. He has to meet those same elements.

(Court reporter interrupted for clarification.)

MAGISTRATE JUDGE PEDERSEN: I'll allow you to ask the question and you can clarify on cross.

MR. SHIELDS: Okay.

MR. NAYLON: Thank you, your Honor.

(Open court:)

**MAGISTRATE JUDGE PEDERSEN:** The objection's overruled.

**MR. SHIELDS:** Diane, can I ask you to read back the last question.

**THE REPORTER:** "It's not going to be up to the Court. I mean, you're the one that had to make the decision in the moment about whether there was probable cause to ask Officer Algarin to enter the yard, correct?"

**Q** So before that we were talking about the different amounts of facts that you would have to support different legal conclusions, right? We went through a hunch, you said I think I had more than a hunch, right?

**A** Correct.

**Q** And you agreed, yeah, you know, more than a hunch. Maybe reasonable suspicion, right?

**A** In the technical term of reasonable suspicion -- let me put it this way. I believe we had probable cause to enter his backyard. I believe there were two outstanding males. I know for a fact that people hide in garbage cans and that's why I believed he went into the backyard. That's what I would do as an officer. And that's it. I, I don't think that trying to slip me up on reasonable suspicion or probable cause changes the fact of what we had.

**Q** I'm not trying to slip you up, Officer. All I'm trying to do is ask what facts you have to support any reasonable belief that a person had ever entered a yard that

you didn't see, that you have no facts to believe that any other person, any other officer you were working with ever saw, that were never captured on your body camera, you know, so, that's, that's all.  No one's trying to slip you up.

A    Totally, totally understandable.  So --

Q    You never saw anybody, right?

A    Correct.

Q    Algarin never saw anyone other than the suspect that you detained, correct?

A    I would assume based on his testimony no.

Q    Officer Horowitz never saw anyone?  You were sitting in the courtroom for his testimony, correct?

A    From my understanding, no, he did not.

Q    And the only other officer was Officer DiSabatino, right?

A    That is correct.

Q    Okay.  So I'd like to play Officer DiSabatino's bodyworn camera which is Exhibit.  Actually there's --

MR. NAYLON:  There's two of them.

Q    -- two of them.

MR. NAYLON:  48 and 49.

MR. SHIELDS:  We'll go with 48 for now.

MR. SHIELDS:  We'll stipulate 48 and 49 in, your Honor.

MR. NAYLON:  No objection.

MAGISTRATE JUDGE PEDERSEN:  Exhibits 48 and 49 are

admitted by stipulation.

(WHEREUPON, Exhibits 48 and 49 received in evidence.)

Q   So this is Exhibit 48 that we're going to watch so I'm just going to go ahead and hit play and I'll ask you some questions at some point.

So, according to your affidavit and everything, officer -- and the plan that you guys made was DiSabatino drove to the front of 61 Kosciusko with Officer Algarin, correct?

A   Correct.

(Video played.)

Q   Those numbering he called out, those were like your car numbers, is that right?

A   Yes, our assigned car numbers for the day.

Q   That was identifying all the four officers?

A   That is correct.

MR. SHIELDS:  And for the record, I paused at 1 minute and 19 seconds in the video.

Q   And I'm going to hit play again.

(Video playing.)

Q   All right.  So -- well hold on.

So, if you know, that is Officer Horowitz and the suspect that he detained?

A   Yes.

Q   So what the video showed right before that -- we're

paused at one minute and 53 seconds into the video.  So if we rewind, there's a bunch of other properties to the left, correct?

A    That is correct.

Q    So, these two other suspects, they could have escaped that way, also, correct?

A    They could have doubled back to head eastbound, that is a possibility.

Q    And you never saw them and Officer Horowitz never saw them after they ran down the driveway into the backyard of 57 Kosciusko, right?

A    I only saw the two people who we took into custody.

Q    And Officer Algarin never saw any of the other guys after they ran down, he never saw them jump the fence.  By the time he jumped the fence, the only people he saw were the suspect that you detained in 49 and the suspect that Horowitz detained in 45 Sobieski Street, correct?

A    Based on --

MR. NAYLON:  I'm just going to object, your Honor.  We already heard this testimony.  We already know it.  It's just repetitive.

MAGISTRATE JUDGE PEDERSEN:  I'll let him answer this one question and then let's move on.

A    Based on my partner's testimony I would say he did not see anybody.

Q     So it seems likely that the guys probably went somewhere else, right?

A     Are you implying that they went eastbound which is the direction that Officer DiSabatino's facing currently?

Q     That they jumped the fence into one of these other properties that we can see in the video, that they jumped the fence?

A     So --

Q     -- that that fence or some --

A     Just to be clear, 49 Kosciusko is west of 53 Kosciusko and we -- you are implying that the suspects went east of 49 Kosciusko, correct?

Q     I'm implying that when they're in this backyard, which is 57 Kosciusko, that they went the other direction away from 49 Kosciusko so not --

MR. NAYLON:  Objection.

MAGISTRATE JUDGE PEDERSEN:  Sustained.

Q     What I'm saying is that since you never saw them, Algarin never saw them, Horowitz never saw them, instead of jumping into the vacant lot of 54 Sobieski or Mr. Dempsey's yard at 53 Kosciusko, more likely they went in the other direction?

A     From the location where Officer DiSabatino is right now, you're saying they would have gone east directly from the lot that he is in, correct?  That's what you're saying --

Q    Correct.

A    -- right?

Q    They would have gone somewhere else since none the officers never saw him?

A    Correct.  And that could include northbound doubling back towards Kosciusko Street towards the front of the houses.

Q    The point is that nobody ever saw them in Mr. Dempsey's yard, right?

A    Correct.

Q    And nobody ever searched for them in Mr. Dempsey's yard, right?

A    Correct.

Q    And at the time that Officer Algarin entered Mr. Dempsey's yard the second time, he was entering to search for contraband not entering to search for the suspects?

**MR. NAYLON:**  Objection, your Honor.

**MAGISTRATE JUDGE PEDERSEN:**  Sustained.

Q    Let's go back to your body camera video.

Well, actually while we have this up, let's just finish DiSabatino.  So we're paused at 1 minute and 45 seconds so let's just play it through.

(Video played.)

Q    So, generally from the last time that we paused at 1 minute and 45 seconds to where we're at at 2 minutes and 37

seconds, it looks like Officer DiSabatino walked back and he's retracing the flight path of the suspects, correct?

A    Correct.

Q    So he would be backtracking?

A    Or just walking back to his car.

Q    You heard him ask Officer Horowitz where he jumped from?

A    Yes.

Q    So, it would be reasonable to assume that after that -- or the reason for that question was so that he could retrace the path and see if they dropped anything?

A    That is not an unreasonable assumption.

Q    Doesn't look like he's walking around very fast, right?

A    Nope.

Q    He's not like running and looking for a possibly armed suspect, right?

A    Maybe he's a bit lazy.

Q    It looks more like he's looking for possibly discarded guns or contraband on the ground?

MR. NAYLON:  Objection.  It's his BWC.  We don't know what Officer DiSabatino's eyes are doing.

MAGISTRATE JUDGE PEDERSEN:  I'll sustain.  You can ask.

Q    You can infer based on what you see in the body camera video and your years of experience as a police

officer, that he's more likely looking for discarded contraband on the ground than looking for an undetained possibly armed suspect?

A    I would assume that that is what he is doing.

Q    Okay.  We're paused at 2 minutes and 37 seconds. I'm going going to hit play.

(Video played.)

Q    Now he said we still have two in custody but he didn't call out anything about the undetained guys, right?

A    He did not call out anything about the two missing people.

(Video played.)

Q    I'm now going to switch back to your video.  Okay.

So we had paused your video at about 16 seconds into the video.  I got to put it back on the screen here.

And so where we had paused before was right to the point where you had run through the yard and paused at the back fence of 49 Kosciusko Street, correct?

A    I believe that is correct.

Q    And up to that point you hadn't seen any other suspects other than the one that you detained and the one that Officer Horowitz detained, right?

A    No, I did not.

(Video played.)

Q    All right.  Now, before you asked Officer Algarin

to backtrack, do you know how many officers had responded to the scene at that point?

A    I can only assume it was the four who had initially responded.

Q    Okay.  So why didn't you ever consider asking Officer Algarin to walk to the front door and ask for Mr. Dempsey's consent to enter his yard?

A    Because it is not my job to instruct him on how to be a police officer.

Q    You asked him to backtrack?

A    Correct, I asked him to backtrack.

Q    Okay.

A    In any manner that he sees fit.

Q    Now you could have asked over the radio for Officer DiSabatino to go to the front door and (knocking) knock, could have done that, right?

A    I could have done a lot of things.

Q    So you could have asked Algarin to go to the front door and ask for permission, you could have asked Officer DiSabatino over the radio to do the same thing but you chose not to do either one of those things, right?

A    I also could have avoided this job in its totality and not done proactive policing but that doesn't benefit anyone.

Q    Well, this wasn't proactive policing, you're

responding to a 911 call, right?  There's a difference.

A     There is a minor difference there, sure.

Q     It's important that police officers comply with the law, right?

A     I would say so, yes.

Q     It's also important to insure the safety of the community, right?

A     Exactly what we were attempting to do.

Q     And, unfortunately, instead of doing that, you ended up ruining my client's life, right?

**MR. NAYLON:**  Objection, your Honor.

**MAGISTRATE JUDGE PEDERSEN:**  Sustained.

We are at 3:00.  Do you have an estimate of the amount of time left?

**MR. SHIELDS:**  Maybe half an hour, your Honor.

**MAGISTRATE JUDGE PEDERSEN:**  Let's take a 10-minute recess at this point and so everybody can have some relief and we'll come back at say 3:15.

You can step down.

**THE WITNESS:**  Thank you, your Honor.

**MAGISTRATE JUDGE PEDERSEN:**  Remember my admonishments to not speak about the case to anybody or amongst yourselves.

(WHEREUPON, jury excused and recess taken.)

(Open court:)

**MAGISTRATE JUDGE PEDERSEN:**  Do we need to discuss

anything before I bring the jury?

**MR. NAYLON:** No, your Honor.

**MAGISTRATE JUDGE PEDERSEN:** Mr. Shields was finishing up his direct of Officer Gorman.

Mr. Shields.

**MR. SHIELDS:** Thank you, your Honor.

Q   Before we took our break I had asked you why you didn't ask Officer Algarin to walk to the front door and ask for his permission before entering the yard, correct?

A   Yes.

Q   And I forget what you said your answer was?

A   I believe it was something along the lines of I am not in a position to dictate how he does his job.

Q   Okay. Do you remember being asked this question at your deposition on Page 217, Line 16?

**MAGISTRATE JUDGE PEDERSEN:** Okay. Hold on a moment.

**MR. NAYLON:** Thank you, your Honor.

**MAGISTRATE JUDGE PEDERSEN:** Go ahead.

Q   Question: "Why didn't you just ask Officer Algarin to walk to the front door to ask for permission and knock on the door, did you ever think about that?"

Answer: At the time it did not cross my mind."

A   Sounds like something I would say.

Q   Okay. Now, assuming that there weren't these two undetained suspects and all the rest of the facts are the

same, assuming that you had no -- let's just assume that you had no reason to believe at all that anybody ever entered Mr. Dempsey's yard.  We can agree that there would have been no lawful basis for Officer Algarin to enter the yard under those circumstances, correct?

**MR. NAYLON:**  Objection.

It's a hypothetical, your Honor.

**MAGISTRATE JUDGE PEDERSEN:**  And?

**MR. NAYLON:**  Your Honor, if we're going to be into hypotheticalss, I think we could be here for quite a long time.

**MAGISTRATE JUDGE PEDERSEN:**  Agreed.

**MR. SHIELDS:**  I'm not planning to ask him a hundred hypotheticals, your Honor, it's one hypothetical?

**MAGISTRATE JUDGE PEDERSEN:**  You can ask this one.

**MR. SHIELDS:**  Thank you.

A    I just want to clarify you said that assuming that I had no indication that anyone had been --

Q    Well --

A    -- in the --

Q    You know what, I'll withdraw and I'll ask a better question.  It was a lot of words.

Let's just assume that there is no lawful basis to enter the yard based on the suspects, okay.  So take the suspects out of the equation.  Everything else else is the

same.  The only reason to enter the yard would be the hypothetical possibility that the suspect you detained had discarded a gun or contraband in the yard.  You didn't have facts to support a reasonable belief that any contraband had been discarded in the yard, correct?

A    I'm going to be honest.  I'm all over the place with this hypothetical.  You said that he hypothetically discarded a gun but I have no belief that he discarded a gun.

Q    I'm sorry, I'll withdraw that question.

So, assuming that the undetained suspects don't provide a lawful basis to enter the yard, taking that out of the equation, then Officer Algarin had no lawful basis to enter the yard, correct?

A    In this hypothetical it does not sound like he would have.

Q    So what you're saying is the only -- in the real world situation that we have, the only hypothetical reason, the only lawful basis for Officer Algarin to enter the yard would have been these alleged undetained suspects possibly being in the yard, correct?

A    In the real world there are about, I'd say about 50 percent of people carrying guns in that neighborhood and in the real world we have to secure those scenes.

Q    And in the real world in this case, no one ever saw any of those people in my client's yard ever (indicating)

correct?

A    If you're referring to the two undetained suspects, correct.

Q    And I want to put the video back up.  What you see in the video is Officer Algarin casually walking around looking at the ground, correct?

MAGISTRATE JUDGE PEDERSEN:  With regard to his camera, you mean?

Q    What you see in the video, which is from his camera, what you can see on your camera --

A    Mm-mm.

Q    -- when you're looking at Officer Algarin, is he's walking around looking at the ground, correct?

MR. NAYLON:  Object to the form.

(Video playing.)

Q    You see him looking at the ground, right?

A    His head appears to be down.

Q    His head appears to be down.  He's looking at the ground, right?

A    That is what it appears.

MAGISTRATE JUDGE PEDERSEN:  Overruled.

MR. NAYLON:  Yes, I'm sorry, Judge.  I thought he was asking what Officer Gorman was seeing but if he's asking what the BWC shows, that's fine.  I apologize.

Q    Okay.  So what your bodyworn camera shows is

Officer Algarin walking around slowly looking at the ground for any potentially discarded contraband, correct?

A    That is what it appears to be.

(Video played.)

Q    And you told him that he came from that fence after he asked you where he had jumped, correct?

A    Yes, that eastern fence at 49 Kosciusko.

Q    And he never asked you whether you saw any additional undetained suspects, correct?

A    He did not ask me that question.

Q    And when he's walking around slowly looking at the ground, he doesn't have his gun out, correct?

A    He does not.

Q    And when you ran up and approached the suspect that you detained, you did have your gun out, right?

A    I did.

Q    Because when you're looking for a potentially armed suspect, you got to protect yourself and so you have your gun out, right?

A    In my vast experience, yes, that is the best option to...

Q    And when Officer Algarin jumped the fence, his hands were clear, he didn't have his gun out, correct?

A    He did not have his gun out but just to clarify, that is a safety -- reasonable safety measure to holster your

weapon prior to jumping a fence.

Q    After he jumped the fence he didn't immediately unholster his gun like he was searching for a potentially armed suspect, correct?

A    He did not.

Q    So I want to play through the rest of your video.

(Video played.)

Q    Did you know his cousins?

A    By name?

Q    Did you, why did you -- did you know his cousins? You said "whether it's you or your cousins".

A    So, for the jury, "cousins" is a common term associated with acquaintance, pal, friend or even literal cousins.  It does not necessarily mean blood relatives.

Q    So you're just being friendly?

A    Say that again.

Q    You were just being friendly?

A    Yes.

Q    Okay.  We were paused at 2 minutes and 16 seconds and I'm going to keep playing.

(Video played.)

Q    Now at this point when you're walking around the yard and there's these allegedly undetained possibly armed suspects in his yard, you don't look for them at all, right?

A    Say the last part again.

Q    You don't look for them at all, right?

A    I'm keeping my awareness up but it is not my primary focus.

Q    Did you go and look in these trash cans over here?

A    I am going to assume no.  I haven't seen the body cam but.

Q    You didn't watch your own body cam before you came to court to testify?

A    Well life happens between then and now, so no.

Q    And earlier when we watched Officer DiSabatino's body camera when he was in the backyard of 57 Kosciusko Street, he also walked by a bunch of garbage cans, right?

A    It would appear so.

Q    And he didn't look inside the garbage cans even though you testified that it's common tactic for suspects to hide in garbage cans, right?

A    I don't believe my word was "common".

Q    Okay.  It's a possible place where they might hide?

A    Very much so.

Q    But nobody ever checked in any of the garbage cans, right?

A    It would appear not.

Q    I paused at 4 minutes and 44 seconds.  I'm going to go ahead and hit play.

(Video played.)

Q    Now one question I got here paused at 8:02 in the video is can you see along the fence how it's all worn down?

A    It appears more beaten up than the rest of the yard.

Q    Almost like a path, right?

A    I would describe it in that manner, yes.

Q    Have you owned dogs in your life?

A    I have.

Q    Do your dogs ever run the same path along in your backyard?

A    Sure.

Q    Does it ever get worn down in that one spot?

A    It has.

Q    So this path here in Mr. Dempsey's yard would be an indication that perhaps he had a dog that resided at that property?

A    It is definitely an indicator.

Q    Okay.  All right.  We were paused at 8 minutes and 2 seconds.  I'm going to go ahead and hit play.

(Video played.)

Q    Okay.  Now, if you could do it all over again, would you call Officer DiSabatino over the radio and ask him to knock on the door before having asked Officer Algarin to backtrack and enter Mr. Dempsey's yard?

A    To avoid having Mr. Dempsey's dog shot, yes.

Gorman - Cross - Naylon

Q    Considering all the facts and circumstances, even the undetained suspects, if you could do it all over again, that's what you'd do, right?

A    Yes, I don't think anyone wants the outcome that occurred, including myself.

Q    Because there was no emergency requiring Officer Algarin to immediately enter the yard, correct?

A    Incorrect.

Q    What was the emergency?

A    I think we've discussed it at length.

Q    Okay.  So if you'd do it all over again, you'd call and have Officer DiSabatino knock even though there was an emergency requiring immediate entry?

A    Yes.

MR. SHIELDS:  Okay.  All right.  No further questions.

MAGISTRATE JUDGE PEDERSEN:  Thank you, Mr. Shields.

Mr. Naylon.

MR. NAYLON:  Thank you, your Honor.

CROSS-EXAMINATION BY MR. NAYLON:

Q    Probably going to call you Adam.

A    That works for me, sir.

Q    Well we've had some time together.

The best indicator of what happened from your perspective is your BWC?

A    I would say yes, that's correct.

Gorman - Cross - Naylon


**Q**    That is what happened that day?

A    Yes, there is no disputing it.

**Q**    Did not have the luxury, you didn't see DiSabatino's bodyworn camera when you were in that yard, did you?

A    I did not, sir.

**Q**    You had no idea where these other two people might be?

A    No, I did not.

**Q**    You, sir, have a tough job?

**MR. SHIELDS:**  Objection.

**MAGISTRATE JUDGE PEDERSEN:**  Overruled.

**Q**    You were Clinton Section and you testified it's a violent section?

A    Yes, I did.

**Q**    You testified that you're chasing people through yards and they have guns?

A    Yes, sir.

**Q**    And they have contraband?

A    Yes, sir.

**Q**    And they take off?

A    Very frequently.

**Q**    And occasionally -- in this case a gun went off, you didn't know what it was, did you?

A    I did not, not at the time.

Gorman - Cross - Naylon

Q    And you DiSabatino ran towards that gun, didn't you?

A    Yes, sir.

Q    When you entered that yard, the plaintiff's yard, why did you enter?

A    Well at the time the gunshots went off, I had no idea who was shooting, whether it be a suspect that we had just chased, the homeowner, at that point I had no idea. Or even be my partner, I still went to assist.

MR. NAYLON:  Could I have DiSabatino's video, please.

THE CLERK:  Is this admitted?

MR. NAYLON:  Yes.

MAGISTRATE JUDGE PEDERSEN:  48 and 49.

Which one do you want to display?

MR. NAYLON:  48

Q    If you can play it from there, please.

(Video played.)

MR. NAYLON:  If you could stop it there, please.  Thank you.

Q    Did you hear him say there's two males outstanding?

A    I did, sir.

Q    And he's going to a backyard?

A    Yes, he is.

Q    Do you think he's looking for two males outstanding?

Gorman - Cross - Naylon

A    I believe that is what he was doing, yes, sir.

Q    If you could continue, please.

(Video played.)

Q    Did you hear what he said there?

A    Yes, that was --

Q    What did he say?

A    -- Sergeant Gonzalez.

Q    Pardon me?

A    That was Sergeant Gonzalez.

Q    And he said I saw more than two, did you hear that?

A    I'm sorry, I didn't hear what you said.

Q    Did you hear him say "I saw more than two"?

A    Oh, yes.

Q    Thank you.

A    I thought you were referring to the radio transmission.  My apologies.

Q    No, probably me.

(Video played.)

Q    You could see, if I'm not mistaken, you can correct me on the directions, the officer is looking into the other yards on the other side of the yard he went in; is that correct?

A    Yes, he is looking in an eastern direction.

Q    So he knows at least Officer Horowitz has someone in custody, yet he's looking in these other yards?

Gorman - Cross - Naylon

A    Yes, I would presume he's searching those yards based on the body cam.

Q    Looking for two outstanding suspects?

A    That is my assumption, yes.

Q    Would you continue, please.

(Video played.)

Q    Could you stop it there, please, and please rewind.

Okay, if you could play it again, please.

Pay attention as he rounds the corner.

(Video played.)

Q    Stop, please.  Did you see the officer with something in his hand?

A    Flashlight.

Q    Okay.  Thank you.

What would he be using a flashlight for?

A    So I didn't notice this the first time I watched this when Mr. Shields played it.  But he illuminated under the staircase of the porch that he's walking by, not an uncommon spot for people to hide when they're attempting to flee from us.

Q    So he's continuing to look for fleeing suspects?

A    Yes, it would appear so.

MR. NAYLON:  Thank you.  You can take that down.

If you could put up Officer Gorman's BWC, please.

MAGISTRATE JUDGE PEDERSEN:  That's Exhibit 50.  It's

Gorman - Cross - Naylon

been entered into evidence.

Q    And you can fast forward to when he is in the yard at 49, please.  That's good.  Thank you.  And just play it and I want you to listen to the audio.

(Video played.)

Q    Pause there, please.  Did you hear yourself say he came off this fence?

A    Yes, I did.

Q    If you didn't see him come off the fence, you couldn't have told him he came off the fence when he asked you where did come from?

A    That is correct.

Q    So you saw him come off the fence into the yard you were in?

A    I did.

MR. SHIELDS:  Objection.

MAGISTRATE JUDGE PEDERSEN:  Basis?

MR. SHIELDS:  It doesn't necessarily mean that he saw him come off the fence just because he said it in the video.  He made the assumption as laid out in his affidavit.

MAGISTRATE JUDGE PEDERSEN:  Let's leave the argument for closings.  Thank you.

Objection is overruled.

Q    I can play it for you again but did you see black bags, a black bag near the feet of the individual you had

Gorman - Cross - Naylon

detained?

A    I would honestly have to ask you play it back.

Q    Okay.  Unfortunately I'm not sure exactly where it is.  Let's go back to where he handcuffs the suspect, please, and when he starts to get up.  Pay attention to the area of the ground.

(Video played.)

Q    Pause there.

Did you see the two black objects?

A    I did, yes.

Q    Is that something that you're familiar with and that dealers use them to store marijuana to sell out of?

A    Yes, they're disposable, one-time use bags that you typically get from a corner store.

Q    So among the facts that you had were that there's two undetained.  You have an individual who ran from the suspected area where drug dealing is going on.  You have bags that are empty.  You didn't find any marijuana on them, did you?

A    No, I did not.

Q    So you thought the possibility was that he tossed drugs -- at the time you didn't know it was marijuana that you were pursuing, did you?

A    Correct.  I had a general assumption due to the odor of marijuana coming from his person which at the time

Gorman - Cross - Naylon

was illegal.

Q    Was?

A    At the time possessing marijuana was illegal.

Q    And still illegal in some quantities to sell?

A    Yes, that is correct.

Q    And when you asked Officer Algarin, you said "you want to backtrack"?

A    Yes, that is what I asked him.

Q    You didn't know exactly what he was going to do?

A    No, I did not.

Q    Could you put up 139, please.  Thank you.

Training bulletin is a written document the department pulls out, correct, and makes available to you?

A    Yes, sir.

Q    Doesn't mean that they have never provided training on anything on that prior, this just means there wasn't a prior bulletin, correct?

A    That is correct.

Q    And when you were in the academy you learned about search and seizure?

A    Yes, we did.

Q    I have to ask you briefly, PRISM, you used that in the academy, correct?

A    Yes.

Q    And that's academy is a not RPD's academy, that's

Gorman - Cross - Naylon

run by the state, correct?

A    I don't think it's run by the state but the contents of it are dictated by the state.

Q    Okay.  It's run by the MCC?

A    Yes, yes.

Q    Okay.  And that was their PRISM?

A    That is a good question.  I don't know the answer to that.

Q    Okay.  Could you put up 143, please.

You see that in front of you?

A    Yes, sir.

Q    The issue date is 1997?

A    Yes, it is, sir.

Q    About how old were you then?

A    I was about 3.

Q    Nevertheless, that is available to you in your car to review, correct?

A    Yes, sir.

Q    With respect to your bodyworn camera, when you pull that out of a charger, just let the jury know how they work, you show up at work, you have one camera, it's assigned to you, is that correct?

A    Yes, bodyworn cameras are assigned to an individual.

Q    And you pick it out of the camera -- or you pick it

Gorman - Cross - Naylon

out of the charger and it's in the off position?

A    At the time --

MR. SHIELDS:  Objection.  I didn't ask anything about -- oh, actually I withdraw it.  Never mind.

A    At the time I believe they had an on and off button.  We've gone through I believe it's been three different body cameras since then.

Q    With respect to the prerecord, if your camera's not on and then you hit to activate it on, would that be a reason there's no prerecord?

A    That is definitely a possibility if I had just transitioned it from off to on.

Q    Okay.  Adam, when the gunshots were fired, at that time the concern with the two had got away was over, is that correct?

A    Yes, it definitely fell on my priority list, yes.

Q    They got away just like the day before?

A    That is correct.

MR. SHIELDS:  I'm just having a really hard time hearing Mr. Naylon, if I could walk up here.

MR. NAYLON:  I'll pull it closer.  I apologize.

MAGISTRATE JUDGE PEDERSEN:  We've also asked maintenance to address the noise.

(WHEREUPON, a discussion was held off the record regarding extraneous noise.)

Gorman - Cross - Naylon

Q    So, again, I'm not going to go through your BWC again but did you hear -- and the jury has the BWC they can listen to it -- but did you hear the individual that you had detained use the term that he was out there with his "cousins" before you used it?

A    I did on the second or third time that it's been played.  I could hear him slightly say "cous".

Q    Okay.  If you're in hot pursuit and you're not far behind and you know you're not far behind because you and Officer Horowitz caught them, would you think they had time to get in garbage cans?

A    If I was not far behind, no, and I maintain visual, no.

Q    You have no idea what would have happened had you caught -- asked Officer Algarin to knock on the front door, do you?

A    Correct.  I mean, I can assume but I don't know factually what would have happened.

Q    You have no idea whether he would have ever even make it to the front door, correct?

A    Yeah, that's correct.

Q    You don't know what would have happened when he got to the front door?

A    True.

Q    Don't know whether somebody would have answered?

Gorman - Cross - Naylon

A    That is correct.

Q    Don't know whether the dog would have come out the front door?

A    That's also correct.

MR. SHIELDS:  That's -- objection.

Q    That's speculation as to what would have happened?

MR. SHIELDS:  Objection.

MAGISTRATE JUDGE PEDERSEN:  Overruled.

Q    I think we've had enough.  I'm just going to go over what I think the facts were that you had that day.

MR. SHIELDS:  Objection.

MAGISTRATE JUDGE PEDERSEN:  Basis?

MR. SHIELDS:  He's just going to go over all the facts that he thought head.

MAGISTRATE JUDGE PEDERSEN:  He's on cross.

MR. SHIELDS:  It's asked and answered.

MAGISTRATE JUDGE PEDERSEN:  No, he's on cross.

Q    You're working a rough section, you've been to this location before, the individuals selling run, you know they drop stuff, whatever it might be?

MR. SHIELDS:  Objection.

Q    You got a 911 call for this area.  You make your plan.  The individuals run.  They run towards you.  You've got a guy who you said you saw him there the day before and he ran and escaped.

Gorman - Cross - Naylon

A    Yes.

MR. SHIELDS:  Your Honor, objection.  He's just testifying.

MAGISTRATE JUDGE PEDERSEN:  Side bar.

(Held at side bar:)

MAGISTRATE JUDGE PEDERSEN:  And what were you doing when you were asking leading questions through the entire exam?

MR. SHIELDS:  He's talking for two minutes.  He's summarizing his entire testimony.  I didn't do that.  He's making his summation arguments to the jury.  That's different than what I was doing.

MAGISTRATE JUDGE PEDERSEN:  No, he's summarizing the facts that he's heard this gentleman testify to.  If he starts making argument, reengage your objection.

MR. SHIELDS:  I don't think that it's appropriate to summarize all the facts that his client's already testified to because all of these questions have been asked and answered.

MR. NAYLON:  Not by me.

MAGISTRATE JUDGE PEDERSEN:  But we're on cross.

MR. SHIELDS:  They've been asked by you and answered by him already.

MAGISTRATE JUDGE PEDERSEN:  But we're on cross.

MR. SHIELDS:  Yeah, exactly, your Honor.  He's already asked the question and the question's already been answered.

Gorman - Cross - Naylon

**MAGISTRATE JUDGE PEDERSEN:** So you can ask the question six times, eventually I'll say that's enough. But this is cross-examination. This is his chance to undermine the witness or in this case he happens to be a witness that's favorable to the Rochester City police department.

**MR. SHIELDS:** Okay, I hear your ruling, your Honor. I'm not going to argue any further.

**MAGISTRATE JUDGE PEDERSEN:** Okay.

**MR. SHIELDS:** My objection is stated.

**MAGISTRATE JUDGE PEDERSEN:** Just so you know, when we speak up loudly, except for you, Ms. Jones, they can hear in the jury box.

**MR. NAYLON:** And this is going to be my last question. I want to make sure we get us out of here.

**MR. SHIELDS:** I've got a short redirect.

(Open court:)

Q    Do you remember the part of the question that I had already started to ask you?

A    Yes.

Q    In addition to that, so you have these individuals that run, you have an individual detained, the plastic bags are there that marijuana is contained in or other drugs, and he doesn't have any?

A    Yes.

Q    Two outstanding and you say to Officer Algarin "you

Gorman - Cross - Naylon

want to backtrack"?

A    Correct.

MR. NAYLON:  That's all the questions I have, your Honor.

MAGISTRATE JUDGE PEDERSEN:  Thank you, Mr. Naylon.

Mr. Shields, any redirect?

MR. SHIELDS:  Just a few questions, your Honor.

MAGISTRATE JUDGE PEDERSEN:  Thank you.

REDIRECT EXAMINATION BY MR. SHIELDS:

Q    Earlier when you were shown Officer DiSabatino's video, you heard some radio chatter, Mr. Naylon asked you a question about I believe it was Sergeant Gonzalez; is that right?

A    Yes, I heard his voice come over the radio.

Q    Officer Gonzalez was not present at the scene, correct?

A    Sergeant Gonzalez.

Q    Sergeant?

A    Correct, he was not present at the scene.

Q    And you said he saw more than two, is that what he said or something?

A    Not Sergeant Gonzalez.  Officer DiSabatino.  I thought that counsel was referring to what Sergeant Gonzalez had said.

Q    What did Sergeant Gonzalez say?

Gorman - Cross - Naylon

A    He was checking on the status of the officers to see if we were still in a foot pursuit.

Q    Okay.  So Sergeant Gonzalez didn't see anything, correct?

A    Correct, he was completely uninvolved.

Q    Now the only foot pursuit that happened of the four suspects at the beginning was the foot pursuit that isn't captured on any bodyworn cameras, correct?

A    It's not captured, correct.

Q    So --

A    Let me clarify.  The initial chase by Officer Algarin and DiSabatino was not captured that I saw.  But in mine and in Officer Horowitz, you can see us pursuing.  It's a little shaky but nonetheless.

Q    Officer DiSabatino, we see him on his body camera getting out of his car and entering the backyard of 57 Kosciusko Street, correct?

A    Yes.

Q    So, on his body camera when he gets out of car and goes into the yard, you don't see any of the suspects, correct?

A    Correct.

Q    And Officer Algarin had a little slipup with his body camera so that didn't capture what happened from the time he got out of his car until he entered the backyard,

Gorman - Cross - Naylon

correct?

A    It would appear so.

Q    So, wherever these guys went or how close these other officers were pursuing, nobody knows, correct?

MR. NAYLON:  Object to the --

Q    The officers --

MR. NAYLON:  -- form of the question.

A    -- I would assume know.

Q    It's not captured for us to see here today in court on any body camera video, though, right?

A    That is correct.

Q    You testified earlier that a hot pursuit doesn't go on forever, right?

A    Right.

Q    And for it to be a hot pursuit, you got to be chasing the suspects, right?

A    You are in pursuit of the suspects, yes.  That is generally the understanding of it.

Q    So if Officer Algarin actually never chased the suspects, then there would have been no hot pursuit of the all original suspects by Officer Algarin, correct?

MR. NAYLON:  Objection, beyond the scope.

MAGISTRATE JUDGE PEDERSEN:  Sustained.

Q    Now you testified earlier the hot pursuit doesn't go on forever, correct?

Gorman - Cross - Naylon

A    That is correct.

Q    It is when the suspects are detained?

A    No.

MR. NAYLON:  Objection, your Honor.  We're getting --

MAGISTRATE JUDGE PEDERSEN:  Sustained.

Q    It ends when the suspects are lost, too, right?

MR. NAYLON:  Same objection, your Honor.  I mean, we've been through this.

MR. SHIELDS:  He had testimony on his cross, your Honor, about the pursuit.

MAGISTRATE JUDGE PEDERSEN:  I'll allow it.

A    Repeat your question.

Q    You testified earlier that a hot pursuit ends --

A    Yes.

Q    -- when the suspects are detained, correct?  And the hot pursuit also ends when the suspects are lost, correct?

A    I would disagree.

Q    You testified earlier that after the suspects are detained or lost, that you no longer have that hot pursuit exception to enter the curtilage to a property, correct?

A    I think that is being taken out of context.

Q    Here, no one ever pursued any suspect other than the individual that you detained, there was no facts to support any reasonable basis that any suspect other than the

Gorman - Cross - Naylon

suspect that you had detained ever crossed through Mr. Dempsey's property, correct?

A    Process of elimination indicates that he would be within that region so I would disagree with that.

Q    He was the only one that anybody ever had any facts to support a reasonable belief that any suspect had crossed Mr. Dempsey's property, correct?

A    Who is he?

Q    The suspect that you detained.

A    You're saying that he would be the only one with firsthand knowledge?

Q    The suspect that you detained is the only suspect that you or any other officer ever had any facts to support any kind of reasonable belief that suspects had passed through Mr. Dempsey's property, correct?

A    If you're implying that facts only visual observation can be concluded as fact, then, sure.

Q    You went over earlier, you got hunches, you got suspicions, and then you got probable cause. And probably cause is what you need to enter a property, correct?

A    Yes.

Q    And that requires more facts than a suspicion, correct?

A    If you say so.

Q    And that requires more facts than a hunch, right?

Gorman - Cross - Naylon

A    If you say so.

Q    And here all you had was a hunch, right?

A    No.

Q    Okay.  That will be up for the jury to decide, so thank you.

A    Thank you.

MR. NAYLON:  Nothing, your Honor, thank you.

MAGISTRATE JUDGE PEDERSEN:  Officer, you may step down.

THE WITNESS:  Thank you, your Honor.

(WHEREUPON, witness excused.)