UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

------------------------------------------------X

CHARLES DEMPSEY, individually, and L.D. by her father and natural guardian, CHARLES DEMPSEY,

        Plaintiffs,

                          Docket No.

    - against -                 20-CV-6780
                           (EAW)(MWP)

THE CITY OF ROCHESTER, a municipal entity, JAVIER ALGARIN, ADAM GORMAN, "JOHN DOE" RPD OFFICER RESPONSIBLE FOR TRAINING JAVIER ALGARIN,

        Defendants.

------------------------------------------------X

        Zoom Conference
        Long Island, New York

        August 22, 2023
        9:10 a.m.

      VIDEOTAPED DEPOSITION of LIEUTENANT MICHAEL CUILLA, Witness, taken by Plaintiff, pursuant to Federal Rules of Civil Procedure, and Notice, held at the above-noted time and place, before Emma Badger-DeRienzis, a Stenotype Reporter and Notary Public within and for the State of New York.

**A P P E A R A N C E S:**

ROTH & ROTH LLP
        Attorneys for Plaintiffs
        192 Lexington Avenue, Suite 802
        New York, New York 10016

BY:  ELLIOT DOLBY SHIELDS, ESQ.


MUNICIPAL ATTORNEY
CITY OF ROCHESTER LAW DEPARTMENT
        Attorneys for Defendants
        30 Church Street, Room 400A
        Rochester, New York 14614

BY:  PEACHIE JONES, ESQ.


ALSO PRESENT:

KEVIN GONZALEZ - Videographer
NELLIE KLUZ - Videographer intern

F E D E R A L   S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and between (among) counsel for the respective parties herein, that filing and sealing being the same are hereby waived.

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, shall be reserved to the time of trial.

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be sworn to and signed before any officer authorized to administer an oath, with the same force and effect as if signed and sworn to before the Court.

VIDEO STIPULATIONS

IT IS HEREBY STIPULATED AND AGREED by and between counsel for all parties present that Pursuant to CPLR Section 3113(d) this deposition is being conduced by Videoconference, that the Court Reporter, all counsel, and the witness are all in separate remote locations and participating via Videoconference, (LegalView/Zoom/WebEx) meeting under the control of Lexitas Court Reporting Service, that the officer administrating the oath to the witness need witness shall be sworn in remotely by the Court Reporter after confirming the witness's identity, that this Videoconference will not be recorded in any manner, and that any recording without the express written consent of all parties shall be considered unauthorized, in violation of law, and shall not be used for any purpose in this litigation or otherwise.

IT IS FURTHER STIPULATED that exhibits may be marked by the attorney presenting the exhibit to the witness, and that a copy of any exhibit presented to a witness shall be e-mailed to or

otherwise in possession of all counsel prior to any questioning of a witness regarding the exhibit in question.  All Parties shall bear their own costs in the conduct of this deposition by Videoconference.

(Both attorneys acknowledged and agreed.)

MS. REPORTER:  Please state your full name for the record.

THE WITNESS:  Lieutenant Michael Cuilla.

MS. REPORTER:  What is your current business address for the record?

THE WITNESS:  185 Exchange Boulevard, Rochester, New York 14614.

THE VIDEOGRAPHER:  We are on the record and the time is approximately 9:10 a.m.  Today's date is August 22, 2023 and this is Media Number One of the video deposition of Lieutenant Michael Cuilla in the matter of Charles Dempsey, et al versus The City of Rochester, et al.  The case number is 20-CV-6780 in the United States District Court, Western District of New York.

My name is Kevin Gonzales, legal videographer with Shereck Video in association with Lexitas.

Will counsels please voice identify yourselves and state whom you represent, beginning with the noticing attorney?

MR. SHIELDS: Elliot Shields representing the plaintiffs, Roth & Roth, LLP.

MS. JONES: Peachie Jones with the City of Rochester representing all of the defendants.

THE VIDEOGRAPHER: Thank you, Counsels.

The court reporter is Emma DeRienzis with Lexitas, who may now swear in the witness.

(Witness sworn in by court reporter.)

**L I E U T E N A N T   M I C H A E L   C U I L L A,** Witness, having first been duly sworn by the Notary Public, was examined and testified as follows:

**EXAMINATION BY**

**MR. SHIELDS:**

Q    Good morning. My name is Elliot Shields. I represent several people whose dogs were shot by PD officers. I'm going to ask you some questions today, okay, Lieutenant?

A    Yes.

Q    If there's anything I ask of you that you

Lieutenant Michael Cuilla

don't understand, please say so and I'll gladly rephrase my question for you. Otherwise, if you answer the question, we're going to assume that you understood it. Do you understood everything I've said so far?

A    Yes.

Q    And you understand that everything we say is being written down in a little book for use of trial?

A    Yes.

Q    You understand that everything we say is being video recorded for use of trial?

A    Yes.

Q    You understand that if we take any breaks during the deposition, you're not permitted to speak with your attorney about your testimony?

A    Yes.

MS. JONES:  No.

A    No.

MS. JONES:  Elliot, that's not correct.

MR. SHIELDS:  Well, you know what, if you want to go ahead and waive privilege and cause an issue for motion practice, go

Lieutenant Michael Cuilla

ahead and talk to the lieutenant about his testimony during breaks. Otherwise, I'm telling you, the case law that I provided to you yesterday and the order issued by Judge Peterson make it very clear that you're not permitted to talk about the testimony in the middle of a break and if you do so, it's not privileged. So I'm just telling you right now, that's our position and you're risking a motion if that happens.

MS. JONES: Thank you for advising me of that. We disagree with your understanding of case law. So if we're off the record and taking a break, we can do whatever we want.

MR. SHIELDS: Thank you for clarifying your position.

Q    Officer, you agree to the terms other than the objection just phrased by your attorney?

A    Yes.

Q    Lieutenant, you understand that you're here to testify on behalf of the City of Rochester today, correct?

Lieutenant Michael Cuilla

A     Yes.

Q     You understand that you are designated to testify on behalf of the City of Rochester on the topics listed in the Notice that the parties in the court agreed to?

A     Yes.

Q     So I just want to put up as Exhibit 1 the Notice of Deposition.  So I'm going to share my screen.  And, Lieutenant, on my screen, do you see the document with the caption "Charles Dempsey" and under here on the titled "Notice of Deposition pursuant to Federal Rules of Civil Procedure 30(b)(6)"?

A     Yes.

Q     Have you seen that document before?

A     I don't recall.

Q     If I scroll down -- you don't recall if you were ever shown this document before?  Let me scroll down to the matters for deposition and see if that refreshes your recollection.

A     I don't recall specifically seeing this document.

Q     Let me go up to this paragraph right here.  Can you see the highlights in blue that I just made

Lieutenant Michael Cuilla

on the document?

A    Yes.

Q    Can you just read that paragraph for me and tell me when you've completed reading it?

A    Yes (complying).

Q    Do you see where it says, "or other persons who consent to testify on its behalf about information known or reasonably available to the city concerning the matters for deposition set forth below"?

A    Yes.

Q    Did you consent to testify on behalf of the City of Rochester about the topics listed in the matters for deposition?

A    Yes.

Q    Can you tell me everything that was done to prepare you to testify on behalf of the City of Rochester on today's deposition?

A    I reviewed the documentation given to me by counsel and had many meetings with counsel.

Q    Tell me all of the documents that you reviewed.

A    I do not have memorized the list of documents that I reviewed.

Lieutenant Michael Cuilla

MR. SHIELDS:  We would just call for production of all of the documents that the 30(b)(6) witness reviewed in order to prepare for today's deposition.

MS. JONES:  Can you follow up in writing, please?

Q    Lieutenant, you said that those documents were like provided to you in an e-mail or a packet or something?

A    Yes.

Q    Was it e-mailed to you or given to you in hard copies?

A    E-mail.

Q    Multiple e-mails or just one e-mail?

A    Multiple.

Q    How many meetings did you have with Ms. Jones to prepare for today's deposition?

A    Several.

Q    When you say "several," do you mean three, do you mean eight, how many?

A    Less than ten, more than two.

Q    More than five?

A    Around there.

Q    How long were each meeting?

Lieutenant Michael Cuilla

A     On average, probably around an hour.

Q     So you met with Ms. Jones for a total of about five hours to prepare for today's deposition; is that fair?

A     That's a fair assessment.

Q     When was that last meeting?

A     We spoke yesterday.

Q     For about an hour?

A     I can't recall how long it was yesterday.

Q     To prepare for today's deposition, did you speak with any other attorneys from the City of Rochester?

A     No.

Q     Did you speak with anybody from the Rochester Police Department?

A     No.

Q     In reviewing the documents or gathering any information to come and testify today, did you speak with anybody else from the City or from the Rochester Police Department?

A     I asked my subordinates for some documentation that was requested of me.

Q     What documentation was that?

A     Taser training materials, as well as the

Lieutenant Michael Cuilla

**roster of current Taser operators.**

**MR. SHIELDS:  We're just going to call for production of the roster of current Taser operators because I don't believe that document has been produced in discovery in the new cases yet.**

**MS. JONES:  Please follow up in writing.**

Q    Lieutenant, was there any documentation or information that you were asked to affirmatively gather and produce?

**A    The training materials regarding the aggressive dog inservice as well as the subsequent roll call training and the sign-up sheet for that inservice.**

Q    Now, were you asked to gather those documents a long time ago or recently?

**A    What I would consider a while ago.**

Q    Like more than a year ago?

**A    No, probably less than a year ago.**

Q    When you say the 2014 and 2019 aggressive dog training, is that the training that was put on by the Humane Society and Reno DiDomenico?

**A    Yes.**

**Lieutenant Michael Cuilla**

Q    And then the sign-up sheet that you referred to, that's the Excel sheet, the typed-up Excel sheet?

**A    I believe it's an Excel, yes.**

Q    Were you also asked to look for the handwritten sign-in sheet where officers would sign their names when they attended that training?

**A    Yes.**

Q    What was the conclusion of your search for that handwritten sign-in sheet?

**A    That we do not possess it.**

Q    Do you know why you don't possess it?

**A    I do not.**

Q    Is it something that should have been created at that training?

**A    Yes.**

Q    Can you tell me where you looked for that handwritten sign-in sheet?

**MS. JONES:  Objection, but go ahead.**

**A    I requested it from my subordinates, and they searched for it, and they weren't able to find it.**

Q    Do you know if they looked for it, for example, in hard copy and, for example, if it was

Lieutenant Michael Cuilla

scanned in somewhere electronically?

A    **Yes, they did look.**

Q    Where would those documents be stored normally?

A    **There is a file cabinet in the PDS office where those documents should have been located and they were not.**

Q    So the PDS file cabinet would be where the hard copy would normally be stored, correct?

A    **Yes.**

Q    Is that the type of document that would also be scanned and saved electronically?

A    **That is the procedure as of more recently. I do not know the procedure prior to my tenure in the Professional Development Section.**

Q    When did you move to the Professional Development Section?

A    **Last year.**

Q    So sometime in 2022?

A    **Yes.**

Q    Can you give me an overview of your assignments between when you began with the RPD up to the time when you joined the Professional Development Section?

Lieutenant Michael Cuilla

MS. JONES: Objection. So I thought Lieutenant Cuilla was speaking on behalf of the City. So some of these questions have been a little bit confusing to me. I think that he's still talking as if he's himself, Lieutenant Cuilla. Are you going to continue with questions about him or speaking on behalf of the City?

MR. SHIELDS: I was just looking for some general background information before we get into the topics. I mean, look, he volunteered that he was with the PDS and so, you know, that's why I asked when he went to PDS. And so the questions are to lay the foundation that he's a proper witness to testify on behalf of the City.

MS. JONES: Can we come back to these questions? I need to think about it a little bit more. I don't know if that's necessarily relevant. I mean, if we prepared the witness to testify, it seems like he's prepared irrespective of --

MR. SHIELDS: I'm not going to argue about this and waste my time. So I'll

Lieutenant Michael Cuilla

just ask questions that I think are relevant and you let me know if you think they're objectionable.

Q    Lieutenant Cuilla, in your time with the RPD, were you a Taser training coordinator?

MS. JONES:  Speak as if you're the City.

A    City is not a person so the City can't be a Taser coordinator.  I, as the City, have Taser coordinators.

MR. SHIELDS:  I can ask him if personally he was a Taser coordinator.  You're going to object and not let him answer that question?

MS. JONES:  This is a deposition representing the City.  So you're asking the City whether or not Lieutenant Cuilla is a Taser coordinator.

MR. SHIELDS:  And you produced a witness who is fully prepared to answer on behalf of the City based on his time with the City and based on his preparation.  The use of a Taser in this case and these cases is relevant, as you acknowledged by

Lieutenant Michael Cuilla producing the Taser document. So, know what you specifically sat down and prepared him to testify about on behalf of the City, you produced a witness to testify on behalf of the City. His background as a Taser coordinator is relevant to the testimony on behalf of the City. That's why you chose somebody from PDS, that's why you chose somebody who is previously a Taser coordinator.

MS. JONES: You can testify as if you're the City.

(Court reporter asking for clarification.)

MS. JONES: Sorry, I said to the witness please testify as if you're the City.

A Lieutenant Cuilla is both a Taser instructor and a Taser subject resistance report reviewer.

Q So the City has designated Taser subject resistance report reviewers?

A Yes.

Q I'm going to come back to that a little

Lieutenant Michael Cuilla

later on in the deposition, but thank you for that.

A    Yes.

Q    So, Lieutenant Cuilla, I just want to put up the -- Exhibit 1 one more time.  I'll be referencing this document throughout the deposition. So if we look at the matters for deposition, Topic 1-A says, "All rules, regulations, methods, policies, procedures and practices in effect or customarily followed between January 1, 2013 and present" regarding, A, "entering fenced in curtilage of residential properties without a warrant."

So my question is, can you tell me everything that was done to prepare you to testify about Topic 1-A?

MS. JONES:  Objection.  This is asked and answered, but go ahead.

A    I was provided documentation by counsel. We had meetings subsequent to that that as well was done to prepare me specifically for that.

Q    What documents were you provided that were relevant to Topic 1-A?

A    A copy of our general orders.

Q    Which general orders?

A    The order pertaining to searches.

Lieutenant Michael Cuilla

Q    Do you know the number?

A    I do not recall the number.

Q    Were there any other documents that were provided to you to prepare you to testify about Topic 1-A, other than that one general order about searches?

A    Not that I recall.

Q    Now in 2019, after the Dempsey and Gerslin incidents, the RPD issued a new policy entitled "Warrantless Searches on Curtilage," correct?

MS. JONES:  Objection.

You can answer.

A    I'm afraid I don't understand what you mean by "new policy."

Q    I'm going to put up what we'll mark as Exhibit 2 for this deposition.  This is a document -- can you see this document on your screen entitled "Rochester Police Department Training Bulletin"?  It's dated 5/30/2019.  The training bulletin numbers L-65-19 and it says the subject is "Warrantless Searches on Curtilage."  Can you see that document on your screen, Lieutenant?

A    Yes.

MS. JONES:  Can you zoom in a little

Lieutenant Michael Cuilla

for me, please?

MR. SHIELDS: Sure. One second.

MS. JONES: Thank you.

Q    Lieutenant, this training bulletin says "new," correct?

A    Yes.

Q    And so if there was a training bulletin that had existed on the subject prior to the issuance of this specific training bulletin, it would specify that it was rescinding that prior training bulletin; is that correct?

A    Yes.

Q    So my question is, this was issued in May of 2019, correct?

A    Yes.

Q    And the two of the cases that we're here to speak about today, the Charles Dempsey case and the Erin Gerslin case, those both occurred in September and October of 2018, correct?

MS. JONES: Objection.

You can answer. Answer unless I tell you not to.

A    Yes.

Q    My original question was, in 2019, after

Lieutenant Michael Cuilla

the Dempsey and Gerslin incidents, the RPD issued a new policy entitled "Warrantless Searches on Curtilage," correct?

MS. JONES: Objection.

**A    A training bulletin is not always new policy.  It can simply be a clarification of current policy.  It is considered training.**

Q    Now, prior to the issuance of this training bulletin, the RPD did not have a written policy specifically concerning warrantless searches on curtilage, true?

MS. JONES: Objection.

**A    Warrantless searches are covered under state law.**

Q    Please just listen to my specific question and answer it.  If you can't, tell me that you can't answer it, okay?

Prior to the issuance of this training bulletin, the RPD didn't have a specific written policy concerning warrantless searches on curtilage, true?

MS. JONES: Objection.

**A    Not one that I'm aware of.**

Q    This new training bulletin or policy was

Lieutenant Michael Cuilla

disseminated to officers at a roll call training, true?

**MS. JONES:  Objection.**

A    Yes.

Q    Roll call training was provided in 2019, true?

A    Yes.

Q    And can you just tell me what the definition of curtilage is according to RPD policy?

**A    Curtilage is the area around a building or home that is considered to be within the property's lines.**

Q    That's codified in General Order 415; is that correct?

**A    I apologize.  I'm not great with the numbering of the general orders, just their content. If that is the general order on searches, then that would be correct.**

Q    Does the RPD teach its officers the definition of curtilage?

**A    Yes.**

Q    Now, before 2019, did the RPD teach its officers that people have a reasonable expectation of privacy in the curtilage to their property?

Lieutenant Michael Cuilla

A    Yes.

Q    When was that training provided?

A    It's provided in the academy.

Q    What did that academy training consist of?

A    There is an overview on searches including warrantless searches.

Q    How long is that training?

A    I do not recall.

Q    Is there any testing provided to ensure that officers understand the definition of curtilage and -- well, I'll leave it there.  Is there any testing provided to ensure that officers understand the definition of curtilage?

A    There is testing at the end of the training.  I can't recall specifically if a question about curtilage is on the testing, but the testing is for the training in its totality.

Q    What exactly do they teach at the academy about the definition of curtilage?

A    What the definition of curtilage is and people's rights regarding it.

Q    What do they teach officers about what people's rights are regarding curtilage, the curtilage to their property?

Lieutenant Michael Cuilla

A    They have an expectation of privacy and when they would or would not need a search warrant to search the area.

Q    After officers graduate from the academy and join the RPD, what training does the RPD provide officers about the curtilage to somebody's property?

A    There are subsequent inservice and roll call trainings provided by the City, us; however, you know, the topics vary.  So I'm not -- I do not recall how many times curtilage has come up since any individual has graduated the academy.

Q    When is the last time that the RPD provided a training to its officers specifically regarding the legal requirements to enter the curtilage to an individual's property?

A    So as curtilage is considered a part of someone's property, training regarding searches and seizures generally or warrantless searches would all touch upon curtilage.  However, I would not recall whether or not curtilage was a specific point made in the training, but curtilage and a person's personal property have been interlinked in previous trainings including this training bulletin.

Q    So my question is, what has the RPD done

Lieutenant Michael Cuilla

in terms of training between 2013 and today that isn't at the academy?  So after officers graduate from the academy between 2013 and today, what specific training has been provided by the RPD to its officers to ensure that they understand the legal requirements to enter the curtilage to somebody's property?

A     So we offer inservice trainings yearly. We offer roll call trainings, but a great majority of training specific to things taught in the academy that may have been forgotten would be addressed at the supervisory level and at the section level.  So, for example, if an officer was to violate the policy, a supervisor would then offer them training.

Q     When is the last time that a supervisor offered someone training for violating the policy on unlawfully entering the curtilage to somebody's property?

A     Not all training is documented.  There is a lowest level of training, which is just verbal counseling that would happen between a supervisor and an officer and that takes place on a daily basis.

Q     So when is the last time that you know of

Lieutenant Michael Cuilla

that somebody was provided training by a supervisor because they unlawfully entered the curtilage to somebody's property?

A    The only time I would be made aware of it is if it were documented.  If it's not documented, if it's only a verbal counseling given by a supervisor to their subordinate, I wouldn't be aware of the last time.  However, if the question is the last time I am personally aware or I'm aware as the City of Rochester of the training, I do not recall.

Q    When you say you do not recall, you're unaware is your answer, you're unaware of any time in the past that somebody has been given specific training because they were found to have unlawfully entered the curtilage to somebody's property?

MS. JONES:  Objection.

A    No.  I would be aware, as some training is documented in additional training forms, and training is done remedially by Professional Development Section as well as that section level.  So there are some trainings that are documented.  I have not gone through all of that documentation.

Q    In preparation for your testimony today, did you review any additional training forms

Lieutenant Michael Cuilla

specifically concerning additional training provided regarding entering the curtilage to somebody's property?

A     No.

MR. SHIELDS:  And, Ms. Jones, just to the extent that -- I don't believe they've been provided.  We call for production of any additional training forms that specifically concern an officer entering or violating somebody's rights by unlawfully entering the curtilage to their property.

MS. JONES:  Please follow up in writing so we make sure we understand your request.

Q     Lieutenant, before this training bulletin in 2019, are you aware of the RPD ever holding a specific training where it instructed its officers that the fenced-in backyard to someone's property is considered the curtilage to their property?

MS. JONES:  Objection.

You can answer.

A     I am unaware of that specific training other than what is taught in the academy.

Lieutenant Michael Cuilla

Q    After the academy -- so let me back up. So at the academy, are you aware of whether or not the recruits are specifically trained that somebody's fenced-in backyard is considered the curtilage to their property?

**A    I am aware they are specifically trained.**

Q    What has the RPD done between 2013 and today to ensure that recruits that graduate from the academy and become officers remain aware that the fenced-in backyard to somebody's property is considered curtilage to their property and entitled to Fourth Amendment protection?

**MS. JONES:  Objection.**

**A    The Rochester Police Department, we remediate any issues that arise from officers on the section and platoon level unless the issue arose to a higher degree in which case it would be handled by the Professional Development Section or, if discipline were required, by the chief's office.**

Q    When you say remediate at the section and platoon level, what does that mean?

**A    That means that the supervisors are charged with monitoring their officers' performance and evaluating their ability to conduct themselves**

Lieutenant Michael Cuilla

**as police officers and if they see that there are any violations of policy that do not arise to the level that they feel needs to be addressed by the Professional Development Section or the chief's office, they are charged with addressing in remediating the issue at the section level.**

Q    And what -- those options for remediating at the section level would be issuing one of these additional training reports, true?

**MS. JONES:  Objection.**

**A    True.**

Q    Are there any other reports other than an additional training report that would be completed if there was remedial training given at the section or platoon level?

**A    The great majority of remedial training conducted at that level is not documented.  It is considered verbal counseling.  Above that would be the additional training forms or an IDC or interdepartmental correspondence that would be submitted up the chain.**

Q    Two follow-up questions to what you just said.  One, verbal counseling provided to an officer does not require to be documented in any way,

Lieutenant Michael Cuilla

correct?

**MS. JONES: Objection.**

**A** **That is correct. There are many instances where a supervisor would assist an officer. That does not need to be documented.**

Q But you would agree the best practices would be to document if verbal counseling was provided to an officer, true?

**MS. JONES: Objection.**

**A** **I do not.**

Q And if verbal counseling is provided to an officer numerous times and they don't correct their actions, how does the RPD know whether or not additional training or discipline needs to be imposed?

**A** **Supervisors in the Rochester Police Department supervise officers for certainly a length of time that they would be aware of some of the officers' issues that perhaps were not documented, as well as supervisors have access to each other to represent a verbal counseling that has occurred. However, if the issue is to the level that the supervisor felt it would be a problem beyond their tenure as the supervisor, they would document it.**

Lieutenant Michael Cuilla

Q    How are supervisors in the Rochester Police Department evaluated?

**A    Supervisors -- well, ultimately an officer supervisor is a sergeant.  That sergeant is evaluated by a lieutenant.  The lieutenant is evaluated by a captain.  Captains are evaluated by the commanders.  The commanders are evaluated by the deputy chief.  The deputy chief is evaluated by the chief who is evaluated by the mayor who answers to the people of Rochester.**

Q    So the first line of supervisors are sergeants.  If they don't document verbal counseling provided to their officers, there's no way for their supervisor, the lieutenant, to see whether or not they're doing an adequate job in supervising their officers, true?

**MS. JONES:  Objection.**

**A    No.  The lieutenant should be observing the sergeant while conducting their responsibilities and duties.**

Q    If the verbal counseling provided to officers was documented, that would be additional documentation, objective evidence available to the lieutenant to use in their evaluation of the

Lieutenant Michael Cuilla

sergeant, correct?

MS. JONES: Objection.

A     Yes, that is correct.  Certainly if the conversations were documented, the lieutenant would have access to them.

Q     There's no access to those documents for lieutenants to review their supervisors -- I'm sorry -- to review the sergeants who they are supervising, correct, in terms of verbal counseling?

MS. JONES: Objection.

A     I apologize.  Can you clarify the question, sir?

Q     Yes.  It was a bad question.  So just to make sure I understand the City's position on this, right now as we -- as the City -- the way that the City's review process of sergeants works, lieutenants don't have any access to any documentation regarding verbal counseling that sergeants provide to their officers, correct?

MS. JONES: Objection.

A     I apologize.  The question is lieutenants do not have access to documentation that does not exist?

Q     Correct.

Lieutenant Michael Cuilla

A    **It sounds logical that lieutenants do not have access to nonexistent documentation.  However, if a documentation did exist, the lieutenants would have access to it.**

Q    Well, let me ask you this, do some sergeants document instances when they provide verbal counseling to their officers voluntarily?

A    **Yes.**

Q    So if they voluntarily did it, then they would have access to it, correct?

**MS. JONES:  Objection.**

A    **They would have to be made aware by the sergeant that the sergeant was keeping personal notes.**

Q    Could it be made in, like, a yearly evaluation or something like that or a probationary evaluation that verbal counseling was provided to an officer about a specific subject?

A    **Yes.  It is documented in an evaluation if the sergeant believes it has not been remediated or has risen to a level that it needs to be documented.**

Q    Now, let's say that a sergeant did want to document verbal counseling that was provided in a form other than a probationary or yearly evaluation

Lieutenant Michael Cuilla

form, what form would they use to document that verbal counseling?

A    There's no official form.  What's referred to as an orange card is simply a note for the supervisor that verbal counseling has occurred and a reminder to perhaps add it to the annual evaluation if they believe it is necessary.

Q    Now, would an orange card be something placed in the officer's personnel file?

A    The officer has official personnel files kept on the sixth floor as well as in the Professional Development Section with their training file.  This would be something that would be kept at the section or referenced by the supervisors.

Q    What else are orange cards used for?

A    Other than to document information that supervisors would like to remember for evaluations, I don't believe that they are used for anything else.

Q    So just that I make sure I understand, orange cards are a document used to note things that supervisors want to remember to include in an evaluation?

MS. JONES:  Objection.

Lieutenant Michael Cuilla

A     That is correct.

Q     In preparation for your testimony today, did you review any orange cards specifically dealing with a supervisor's verbal counseling to an officer about entry into the curtilage of a property?

A     I did not.

Q     Now, another document that you referenced was the interdepartmental communication; is that correct?

A     Yes.

Q     In preparation for today, did you review any interdepartmental communications specifically dealing with an officer's entry into the curtilage of a property?

A     I did not.

Q     And then I believe that you said the next level of review would potentially be at the Professional Development Section level; is that correct?

A     That's correct.

Q     Can you explain to me what the process at the Professional Development Section level is for reviewing an incident?

MS. JONES:   Objection.

Lieutenant Michael Cuilla

A     The Professional Development Section would be made aware of an incident from the section level, the additional training form or interdepartmental correspondence.  Professional Development Section would then reach out to those supervisors to conduct the appropriate remedial training.

Q     So basically, PDS becomes involved after they get a communication and they are -- the department -- within the Rochester Police Department that would conduct that additional training for the officer?

A     If that was deemed appropriate, the training might be done at the section level in consultation with the Professional Development Section if they felt that was more appropriate.

Q     And then above that, you said it would be the chief's office and -- well, let me just finish there.  Above that, you said it was the chief's office, correct?

MS. JONES:  Objection.

A     Correct.

Q     And if the chief's office becomes involved, would that mean that there would be a consideration of whether or not discipline would be

Lieutenant Michael Cuilla

imposed?

        A    The chief's office does make those considerations.

        Q    So my question, I guess, is, is the chief's office sometimes notified if discipline is not being considered?

        A    Yes.

        Q    Would that be, for example, if there was additional training that was going to be considered, but either PDS or the section level wanted to consult with the chief before that additional training was provided?

                MS. JONES:    Objection.

        A    Yes.

        Q    Are there any other instances where the chief's office would be notified about an incident other than what we just spoke about, where either training or discipline was being considered?

        A    I apologize.  Could you ask that one more time?

        Q    Sure.  I guess that, you know, my general understanding is that the chief's office is the reason that -- you know, the chief is the final decisionmaker in terms of implementing any

Lieutenant Michael Cuilla

discipline, right?  So when I hear the chief's office is notified, to me, that usually -- my understanding is that there might be discipline imposed.  But my question is, why else would the chief's office be potentially notified of an incident?

MS. JONES:  Objection.

A     When an interdepartmental correspondence is generated and submitted up the chain, if the chain of command goes to the operations bureau of the department, that would go up to the chief's office and then would be assigned by the chief's office back to the administrative bureau and come back down to PDS.  So it is possible that if someone would submit an IDC, that would go up into the chief's office and then come back down to PDS, although PDS does take the records of submission.

Q     And Professional Development Section operations bureau would oversee like patrol officers?

A     That is correct.

Q     If there is an instant where somebody trespassed on the curtilage to a property and an IDC was generated by the section level, that would go up

Lieutenant Michael Cuilla

the chain and eventually make it to the chief's office?

**MS. JONES:  Objection.**

A    That is correct.

Q    Are you aware of any instances where an IDC has ever been generated regarding an officer allegedly trespassing on the curtilage to a property?

**MS. JONES:  Objection.**

**A    I do not have the documentation for that particular -- I'm not aware of the documentation, but it may exist.**

**MR. SHIELDS:  To the extent that there are any IDCs that exist regarding officers allegedly trespassing on the curtilage to a property, we call for production of those documents.**

**MS. JONES:  Please follow up in writing.**

Q    Now, Lieutenant, under the Fourth Amendment, officers are prohibited from walking across someone's fenced-in backyard to get to a neighboring property unless they have a warrant, consent or exigent circumstances, true?

Lieutenant Michael Cuilla

**MS. JONES: Objection.**

**A   Warrant, consent, exigent circumstances, yes.**

Q   And under the Fourth Amendment, there's no difference between going into someone's fenced-in backyard and searching for evidence versus simply walking across their backyard to get to a neighboring property, true?

**MS. JONES: Objection.**

**A   As far as the governmental intrusion when it comes to the suppression of evidence?**

Q   So my question is, under the Fourth Amendment, a search occurs simply by an officer entering someone's property, correct?

**MS. JONES: Objection.**

**A   That is correct.**

Q   So there would be no difference between an officer's reason for entering a fenced-in backyard, whether it be entering the yard to traverse the yard to get to the neighboring property or if they entered the yard with a specific intent of searching for contraband on that property, correct?

**MS. JONES: Objection.**

**A   The question is if an officer enters a**

**Lieutenant Michael Cuilla**

**yard regardless of the reason, does it constitute a**

**search?**

Q    Correct.

**A    That's correct.**

Q    The general order -- here, let's just do this.  Let me put up as Exhibit 3, General Order 415.  And so let me go up to the top here.  So on your screen, Lieutenant, do you see Rochester Police Department General Order No. 415 entitled "Search Seizures:  By Dynamic Entries, Search Warrant, Arrest Warrant, Without a Warrant"?

**A    Yes.**

**MS. JONES:  Can you zoom in again, please, Elliot?**

Q    Is this the document that you were referencing earlier, Lieutenant?

**A    Yes.**

Q    So as I go through this, I'll reference this document when I ask you some questions on these topics, okay?  And so if we go down to the definition of search, the RPD's policy on the definition of search says, "A search is defined as any activity by a government official, including a police officer that invades any area in which a

Lieutenant Michael Cuilla

person has a reasonable expectation of privacy. This includes but is not limited to a physical entry into an area, location or item." And then it goes on. And then the last sentence says, "A search deals with person's privacy rights and can occur regardless of whether any items are actually seized or taken by the police." Did I read that correctly?

A    Yes.

Q    And so that's what I was referencing before when I was asking of a search occurs regardless of whether the specific intent of the officers entering onto the property was to look for a specific item on that property. So my question is now, what has the RPD done to train its officers on the definition of search as articulated in General Order No. 415?

A    **This topic is covered in the police academy.**

Q    Other than the police academy, between 2013 and today, what trainings have been provided by the RPD to its officers about the definition of a search?

A    **The Rochester Police Department conducts yearly inservice trainings as well as roll call**

**Lieutenant Michael Cuilla**

**trainings, in addition to all of the remedial trainings that I referred to previously, that may be documented or may not be documented if it's done as verbal counseling at the section level. When we talk about a topic like search, it's a large topic and may be touched upon in other trainings that are related.**

Q   When is the last time that the RPD held an inservice training specifically regarding the definition of a search?

**A   An eight-hour inservice training in regards solely to the definition of the word search, I cannot recall. Most of our training covers a variety of topics and touches upon many of these issues.**

Q   When is the last time that the RPD held an inservice training that specifically included a discussion of the definition of a search?

**A   I cannot recall.**

Q   In preparation for your testimony today, did you review any training documents either provided to officers at a roll call or an inservice training that specifically discussed the definition of a search?

Lieutenant Michael Cuilla

**A      I did not review that documentation.**

Q      In preparation for your testimony today, did you review any remedial documentation where an officer was found to have conducted an unlawful search on the curtilage to somebody's property?

**A      No.**

Q      Are you aware of any time between 2013 and present where an officer was required to undergo any remedial training because they were found to have conducted an unlawful search on the curtilage to someone's property?

**A      I am not aware specifically.  The trainings that you are referring to as well as the remedial training are not categorized by keyword and so I would need to review all the trainings and all the remedial documentation for whatever length of time in order to read and sit through them and find keywords myself, which I did not do in preparation for this.**

Q      So in preparation for the testimony today, you didn't do anything to try to find any of those documents on that specific topic of whether or not anybody was ever required to undergo any remedial training specifically regarding an unlawful search

Lieutenant Michael Cuilla

on a curtilage to a property, true?

                    **MS. JONES:  Objection.**

     **A    I would have needed a significantly longer period of time to do that.**

     Q    So the answer to my question is no, correct?

                    **MS. JONES:  Objection.**

     **A    Correct.**

     Q    You weren't provided by the city attorneys or anyone else any of those documents about anybody ever having been required to undergo any remedial training because they were found to have committed an unlawful search on the curtilage to someone's property, true?

                    **MS. JONES:  Objection.**

     **A    I, City of Rochester, would not need to be provided as I would have the documentation.**

     Q    Since 2013 -- let me withdraw that question for now.

          Since 2013 to present, has the RPD ever provided specific training to officers that the Fourth Amendment prohibits them from walking across someone's fenced-in property to get to the neighboring property?

Lieutenant Michael Cuilla

A     Yes.

Q     When was that training provided?

A     **That training is provided in the academy.**

Q     The RPD doesn't conduct the academy, correct?

A     **That is correct.**

Q     The academy is provided by the DCJS, correct?

A     **The standards and the content of the academy is provided by DCJS.  The academy itself is run by Monroe Community College.**

Q     And so aside from the training provided by Monroe Community College, after recruits graduate from the academy, has the RPD ever provided any specific training to officers that the Fourth Amendment prohibits them from walking across someone's fenced-in yard to get to a neighboring property?

A     **In addition to that topic being touched on in trainings that were related, either through inservice or roll call trainings, a topic can be addressed at the section level through verbal counseling through the use of additional training form or an IDC.  It may be documented or it may not**

Lieutenant Michael Cuilla

be documented.

Q    Are you aware of any documents from inservice or roll call trainings or section level remedial trainings that specifically discussed the prohibition under the Fourth Amendment from walking across someone's fenced-in backyard to get to the neighboring property?

A    I feel like my answer to all of these questions is very similar if it assists, but training itself touches on many topics.  I would have to review it piece by piece, page by page to see if it had any of the keywords that you're referring.

Q    And you didn't do that in preparation for today's deposition, correct?

A    I did not.

Q    And so as we sit here today, you're unaware of those documents existing, correct?

A    That is correct.

Q    Now, before 2019, it was the practice of RPD officers to walk across fenced-in yards without a warrant, consent or exigent circumstances to get to a neighboring property, true?

MS. JONES:  Objection.

Lieutenant Michael Cuilla

A    Sorry.  Consent or exigent circumstances, you had said, so just walking across people's fenced-in backyards?

Q    Correct.  The question was, before 2019, it was the practice of RPD officers to walk across fenced-in backyards without a warrant, consent or exigent circumstances to get to a neighboring property, true?

MS. JONES:  Objection.

A    Prior to 2019, as in today, the practice of the Rochester police officers is to follow the United States Constitution as dictated by the U.S. Supreme Court as the New York State Constitution as dictated by New York State Supreme Court, as well as all of the New York State laws regardless of what is or is not dictated in the general orders.  So if it was in the New York State law prior to 2019, then all officers would have followed it.

Q    Do you understand the difference between the words policy and the word practice?

A    Yes.  I assume it is similar to the difference between de facto and de jure.

Q    So you understand that the word policy means that is the rules of the Rochester Police

Lieutenant Michael Cuilla

Department, correct?

A    Yes.

Q    Those rules that are written down in the general orders and the other policy documents issued by the RPD?

A    Yes.

Q    What is your understanding of the definition of the word practice?

A    **It is what is done.**

Q    If I told you that defendant Aaron Springer testified that before 2019, it was the practice of RPD officers to walk across the fenced-in backyards of people's properties without a warrant, consent or exigent circumstances, if I told you that he testified to that in his deposition, would Lieutenant Springer have been mistaken?

**MS. JONES:   Objection.**

**A    I'm sorry.  He said it was the policy?  To do -- I'm sorry.  The practice to do that?**

Q    Correct.

**MS. JONES:   Objection.**

**A    I would say that he could testify to his personal practice.  However, that was not the practice of the Rochester Police Department as a**

**Lieutenant Michael Cuilla**

**whole, as it is our practice to follow all relevant laws dictated by New York State and U.S. government.**

Q     What did you do in preparation for today's deposition to understand what the practice of the Rochester Police Department was prior to 2019 in terms of whether officers walked across fenced-in backyards without a warrant, consent or exigent circumstances to get to a neighboring property?

**A     I referenced the experience of Lieutenant Michael Cuilla.  That's my answer.**

Q     So you didn't review any documents to help you testify on behalf of the City regarding what the practice of RPD officers on the whole is, true?

**MS. JONES:  Objection.**

**A     Not specifically to that practice.**

Q     So as we sit here today, you didn't do anything to prepare to testify on behalf of the City about the practice of officers traversing across fenced-in backyards without a warrant, consent or exigent circumstances to get to a neighboring property, true?

**MS. JONES:  Objection.**

**A     That specific practice, no, but practices of following laws and regulations in general, I did.**

**Lieutenant Michael Cuilla**

Q   So you reviewed policies issued by the Rochester Police Department that prohibited people from violating the Fourth Amendment by unlawfully entering and searching the curtilage to a property, correct?

**MS. JONES:   Objection.**

**A     I also reviewed the Fourth Amendment as well as relevant New York State law.**

Q   But you didn't review any documents about what specific RPD officers have gone over a period of time between January 2013 and present, true?

**A     Those practices may have been documented or they may have only been taken care of in verbal counseling at the section level, in which case there would be no documentation.**

Q   So, no, you didn't review any documentation about that practice, true?

**MS. JONES:   Objection.**

**A     That is correct.**

Q   In the Gerslin case, when Officers Nellis and Kelly traversed across Erin Gerslin's backyard on September 6, 2018, they didn't have a warrant, consent or exigent circumstances, true?

**MS. JONES:   Objection.**

**Lieutenant Michael Cuilla**

**A    I would need to refresh my recollection of the specifics of that case.**

Q    Before we came here today for this deposition, did you review the facts of that case?

**A    Yes.**

Q    So briefly, the Erin Gerslin incident was the incident involving a SWAT team operation on St. Paul and Nellis and Kelly were the SWAT team officers who planned beforehand with Lieutenant Aaron Springer and Fabian Rivera, Lieutenant Springer's supervisor, to go through her backyard to reach their final operating position on a neighboring property.  Does that refresh your recollection of that incident?

**A    It does.**

Q    So when Nellis and Kelly traversed Erin Gerslin's backyard on September 6, 2018, their actions were consistent with the RPD's practice; is that true?

**MS. JONES:  Objection.**

**A    Yes.**

Q    And when Nellis and Kelly traversed Erin Gerslin's backyard on September 6, 2018, that was a violation of General Order 415, true?

Lieutenant Michael Cuilla

**MS. JONES: Objection.**

**A     I believe the warrant was an unarmed individual; is that correct?**

Q     I don't have any facts about the warrant for the person.

**A     That would be a relevant factor.  Would you like me to stipulate?**

Q     My question is simply, you know, when they traversed her backyard on September 6, 2018, that was a violation of General Order 415, true?

**MS. JONES: Objection.  I mean, Elliot, if we can agree that it was for a high-risk search warrant, I mean, we talked about that at length in the Gerslin deposition.**

**MR. SHIELDS:  It was -- sure.  The operation three properties down was for a high-risk search warrant, that's true.**

**A     These officers were providing cover -- deadly force coverage for those officers that were entering into the home for the high-risk search warrant?**

Q     I don't -- they were -- they traversed my client's property to reach their final operating

Lieutenant Michael Cuilla

position.

A    Which their point was to provide coverage. These are members of the sniper team of the SWAT team?

Q    That's correct.

A    The high-risk search warrant creates exigency, whether that exigency is created by someone screaming from inside of a house or the execution of a high-risk search warrant, at which time all citizens as well as officers are in danger and those officers traversed to get to a location where they can provide the coverage so that those officers would be safe while executing the high-risk warrant.

Q    Both Fabian Rivera and Aaron Springer testified that when Nellis and Kelly traversed Erin Gerslin's backyard on September 6, 2018, the exigent circumstances exception to the Fourth Amendment did not apply.  Were both Lieutenant Rivera and Lieutenant Springer mistaken?

MS. JONES:  Objection.

A    Both Lieutenant Springer and Lieutenant -- I'm sorry, it was Commander Rivera?

Q    Commander Fabian Rivera.

Lieutenant Michael Cuilla

**A     Yes.  Were not or not at this time legal experts and they were not in my estimation, correct, about the exigent created by high-risk search warrant.**

Q     Does the City of Rochester disagree with the opinion offered by both former commander now chief of police Fabian Rivera and former lieutenant now deputy chief Aaron Springer that looking back on the incident now today that they realized after having the opportunity to review the law, that exigent circumstances exception to the Fourth Amendment did not apply when Nellis and Kelly traversed Ms. Erin Gerslin's backyard on September 6, 2018 to infiltrate to and ex-filtrate from their final operating position?

**MS. JONES:  Objection.**

**A     It is the opinion of the City of Rochester that exigency did exist.**

Q     So the City of Rochester disagrees with the opinion that was expressed by two other defendants in the same case, Fabian Rivera and Aaron Springer, true?

**MS. JONES:  Objection.**

**A     Only on this specific legal matter that's**

**Lieutenant Michael Cuilla**

**being brought to me at this time.**

Q   Now, before 2019, the RPD had never provided any training to its officers to explain the legal requirements for entering the curtilage to a residential property was the same as legal requirements for entering the home itself, true?

**MS. JONES:  Objection.**

**A   That's covered in the academy and any training touching upon that and -- again, you may have heard this before -- may be touched upon an inservice training or roll calls informally done at the section level as well as training that had been documented at the section level and additional training forms and interdepartmental correspondence.**

**MR. SHIELDS:  Just to the extent that it hasn't been provided, because I know it hasn't, we call for production of all of the training provided on searches of the curtilage and any searches more generally provided to officers at the police academy.**

**MS. JONES:  Again, follow up in writing that would help us know exactly what you're requesting.  Elliot, did you**

Lieutenant Michael Cuilla

request that before?

MR. SHIELDS: I'm sure that I did.

Q    After the academy, has the RPD in any specific trainings explain to its officers that in order to enter the curtilage to someone's property, you have to have the same exact legal basis as you would to enter the front door to their home?

A    Again, Counsel, what I'm going to probably say was very similar here. The trainings has labeled -- are labeled generally. They do not address every topic or keyword that may be covered under that training. So I would have to go through the training word by word to see if those things were referenced in the training, same thing with the additional training forms, same thing with every evaluation conducted by the Rochester Police Department between 2013 and today, you know, whether or not those words have been referenced. These things are not keyworded and cataloged as we're used to with things like Google. It would just be myself reading by hand.

Q    So Officer Jason Horowitz has testified that before 2019 he never received any training about the legal requirements to enter the curtilage

Lieutenant Michael Cuilla

to a residential property.  Was he mistaken?

A    Yes.

Q    When did Officer Jason Horowitz receive training about the legal requirements to enter the curtilage to a residential property?

MS. JONES:  Jason Horowitz is not a named defendant so we didn't specifically look up the training offered to Jason Horowitz.  We only focused on the named defendants.  So if you're going to ask him about the named defendants, he can speak to that.

Q    When did Officer Javier Algarin receive any training about the legal requirements to enter the curtilage to a residential property?

A    In late 2017 and early 2018 when he attended the police academy.

Q    What did they teach him specifically?

A    The rights to privacy for a person under the Fourth Amendment, what is and is not in a legal search and seizure as well as exceptions to the search warrant, the requirements of a search warrant including what is and is not personal property and curtilage.

Lieutenant Michael Cuilla

Q    Did you review those documents that he was provided in the police academy in preparation for your deposition today?

A    No.

Q    So how do you know sitting here today that those are the things that he received in his training at the police academy?

A    In consultation with Lieutenant Michael Cuilla, who has attended the police academy and taught at the police academy for several years as well as currently overseeing the police academy for the Rochester Police Department.  That is why I, as the City, am aware of the topics covered in the Fourth Amendment search and seizure portion of the academy.

Q    Do you teach the Fourth Amendment search and seizure portion of the academy?

A    No.  I am the City of Rochester.

MR. SHIELDS:  Peachie, you got to be kidding me.  Like, this is ridiculous. You obviously produced somebody who has a specific knowledge background to testify on behalf of the City.  I have to ask him background questions.  We could have just

Lieutenant Michael Cuilla skipped over a whole bunch of silly questions if you just let me figure out from the beginning that he's the person who teaches at the police academy. Are you going to let me ask these background questions?

MS. JONES: He's a witness on behalf of the City so --

MR. SHIELDS: I don't think you have any idea how a 30(b)(6) deposition works because, you know what, you produced somebody who has all of the relevant knowledge and background to testify on behalf of the City. You designate someone and then you fully prepare them. You fully prepare them by picking somebody that has the relevant knowledge and/or giving them the information, so it's both things. If he has relevant information because he's the person who trains people, then I need to be able to ask him about that.

MS. JONES: You can ask the City of Rochester about Lieutenant Cuilla's

**Lieutenant Michael Cuilla**

**training and oversight of the police**

**academy.  Our witness should know that.**

Q    What training is provided at the police academy regarding search and seizure and entry onto -- let me withdraw that.

At the police academy, what specific training is provided to recruits about the legal requirements to enter the curtilage to somebody's property?

**MS. JONES:  Objection.**

**A    That is laid out by the DCJS and provided by Monroe Community College in a course entitled "Fourth Amendment Search and Seizure."**

Q    How long is that course?

**A    I don't recall the specific hours off the top of my head.**

Q    Is it a one-hour course?

**MS. JONES:  Objection.**

**A    No, it is a longer course.**

Q    Is it a two-hour course?

**MS. JONES:  Objection.**

**A    Generally courses will range from, at minimum, four hours to, for most topics, 40 hours. So I can't recall specifically where this particular**

Lieutenant Michael Cuilla

course follows in that spectrum.  I will say that these issues are touched upon throughout the training, whether that's a training on arrest procedures or training on evidentiary rules or how to gather evidence.  These topics are built upon and layered upon one another.  So for the most part, training generally is done in a fashion where many topics are covered within one specific training that may touch on many of these topics again and again and again, and it may not be labeled as such.  It would be difficult, again, without searching through each of the training documents word by word to find all of the times that these things may be mentioned.

Q   After recruits graduate from the academy, once they become members of the RPD, what does the RPD do to ensure that they understand the definition of curtilage?

MS. JONES:  Objection.

A   In the course of general operations, the Rochester Police Department will monitor their officers through the use of supervisors.  Those supervisors are called upon to monitor their officers' activity, as well as the reports they generate and then they are to verbally counsel them

Lieutenant Michael Cuilla

when required as well as document deficiencies and remediate deficiencies. Those officers also are subject to an annual -- allow me to correct that. They are first subject to monthly probationary evaluations and then to annual evaluations -- I apologize. Let me correct that as well. Prior to that, they are subject to field training. In field training, they are subject to daily evaluations by the field training officer. Each of those daily observation reports are generated and may or may not mention the specific topic that you are referring to. That is a 16-week, which is now a 10- to 16-week program that officers go through upon graduation from the academy where all topics regarding being a police officer including the definition of Fourth Amendment and curtilage are covered and may or may not be documented in any of the DORs created by every officer that has been hired by the Rochester Police Department since 2013.

Q But you haven't reviewed any documents created by the Rochester Police Department since 2013 that specifically dealt with the training or oversight of any specific officers regarding the definition of curtilage, true?

Lieutenant Michael Cuilla

**MS. JONES:  Objection.**

**A    To do that, I would need to look through every DOR for every officer --**

Q    Sorry, I have to cut you off.

**A    It's okay.**

Q    It's a yes or no question.  The answer is no, correct?

**A    The answer is no.**

Q    I want to move on to the next topic.  So I'm just going to put up Exhibit 1 one more time.

Okay, Lieutenant, I'm going to move on to topics 1-B and C.  So all rules, regulations, methods, policies, procedures and practices in effect or customarily followed between January 1, 2013 and present regarding, B, foot pursuits of suspects who flee from officers; and C, backtracking through the curtilage of residential properties after a foot chase has concluded.  Can you tell me everything that you did to prepare to testify about topics 1-B and 1-C?

**A    I reviewed training bulletins regarding New York v. De Bour, as well as training that occurs in the academy as well as general orders.**

Q    What general orders did you review?

Lieutenant Michael Cuilla

A    The general order regarding searches as well as general orders regarding arrest.

Q    And so the searches is Exhibit 3 that we had looked at previously?

A    Yes.

THE WITNESS:  Counsel, I apologize, you don't mind while I take drinks, do you?  I don't need to be...

MR. SHIELDS:  Not at all.

THE WITNESS:  Thank you.

Q    When an officer chases somebody on foot, that's also known as a hot pursuit, true?

A    Yes.

Q    Sometimes a hot pursuit could provide justification for an officer to chase somebody through the curtilage to a residential property, correct?

A    Yes.  Legally, that's under the definition of exigent circumstances, but it has been specifically outlined in the policy.

Q    According to General Order 415, an officer must have probable cause to believe that a crime is being committed and then immediate action must be taken, correct?

Lieutenant Michael Cuilla

**A      Correct.**

Q      What circumstances may be considered exigent such that police can run through the curtilage without a warrant or consent?

**A      As outlined by you, hot pursuit would be one of those.  There are other exigent circumstances, some that are put forward in the general orders, and some that are dictated by New York State case law.**

Q      I scrolled down on Exhibit 3 to page 30, which is the exigent circumstances exception.  If we look at this part where it says "Probable cause must exist leading one to believe, one, a crime (misdemeanor or felony) has been or is being committed; and two, that if immediate action is not taken, the crime will be completed or you will have reasonable suspicion that you or others will suffer physical injury or death or you have reason to believe the evidence of the crime will be destroyed or otherwise lost" and then it says "If a minor offense is occurred and the sole purpose of the warrantless entry is to make an arrest or serve an appearance ticket for that offense, the exigent circumstances exception would not be applicable."

Lieutenant Michael Cuilla

I guess when I had asked my prior question, what I was trying to reference was number two here and ask if there were any other types of circumstances other than what's listed in this paragraph that would be considered an exigency that would justify a warrantless entry?

A     Yes.

Q     What else might justify a warrantless entry?

A     There is an exception for a medical emergency if there were, for example, a small child in medical duress, an officer would be allowed to enter into a premises to save that child's life or any person's life.  That is not dictated, I believe, here in this general order, but it is part of New York State case law.

Q     In addition to that exigency outlined in the second paragraph, as articulated in paragraph 1, you also have to have probable cause to believe that a crime is being or has been committed on that property, correct?

A     Again, this is one of the several circumstances in which exigency applies that has been defined here in the general order.  There are

**Lieutenant Michael Cuilla**

**other circumstances for exigency that may not be defined in the general order that are covered under case law, which we are also under.**

Q    And then down here, it says, "Assume you cannot use this exception in other than extremely unusual circumstances," correct?

**A    Yes.**

Q    Is that the practice of the RPD to only enter the curtilage to a property in extremely unusual circumstances?

**MS. JONES:  Objection.**

**A    In what is characterized as the general order as extremely unusual, yes.**

Q    One entering a home or curtilage in pursuit of a fleeing felon, correct?

**A    Yes, an armed fleeing felon.**

Q    You would have to have probable cause to believe that that fleeing felon is armed, correct?

**MS. JONES:  Objection.**

**A    The first paragraph or section seems to be separate than the second, which is referencing a second set of circumstances.**

Q    As the City of Rochester here testifying today, Lieutenant, is it your understanding that you

Lieutenant Michael Cuilla

have to have probable cause to believe that the fleeing felon, in fact, is armed in order to enter the curtilage to their property during a hot pursuit?

A    Reading the general order right here, and this is my understanding, that you would need probable cause for a crime, misdemeanor or felony is being committed.  You would also need probable cause that if the immediate action is not taken -- I will not read the full paragraph but it is two, and then secondarily and mapped under the probable cause section, "Assume you cannot use this exception in other than extremely unusual circumstances, for example," and then listing some of the extremely unusual circumstances, two examples given, one is "entering a home in pursuit of an armed fleeing felon," doesn't reference probable cause and it's not my understanding that you would need probable cause if you were in pursuit of an armed fleeing felon.  Reasonable suspicion under New York State law would suffice.

Q    I want to put up what we'll mark as Exhibit 4, which is a training bulletin entitled "Warrantless Entries With or Without Exigent

Lieutenant Michael Cuilla

Circumstances," and that number is L-1597 and it said it was issued in January 1997.

So, Lieutenant, my first question is, is this a document that you reviewed in preparation for today's deposition?

**MS. JONES: Sorry, Elliot, can you zoom in again?**

A    I do not recall.

Q    My next question is, when there's a training bulletin that was issued decades ago, like in 1997 as this one appears to have been, does the department hold additional trainings or updated trainings about these older training bulletins?

**A    Trainings are updated when the training bulletin occurs.  The training bulletins are given out and conducted in roll call trainings.  If you're asking if this training is referenced in any roll call trainings or any conversations or verbal counseling or any of that, I am unaware that that is the case, but it may be.**

Q    I guess my question is, like, would the RPD hold an updated roll call training on this topic and issue, this training bulletin, to its officers?

**A    When this training bulletin is issued, the**

**Lieutenant Michael Cuilla**

**RPD would train the officers in this new information.**

Q    When is the last time that this training bulletin that we marked as Exhibit 4 was provided to its officers?

**A    This training bulletin is provided to its officers on a continuous basis on the Rochester Police Department web.**

Q    If an officer from the department wanted to look at this training bulletin, they would affirmatively have to go and search for it on the RPD web themselves?

**A    Their sergeant may direct them to do so -- I apologize.  Any supervisor may direct them to do so.**

Q    So when is the last time that the RPD held either a roll call training or some other training where this specific training bulletin was provided to all of the officers who attended the training?

**A    On a department-wide basis, when was the last time that this was provided?  The only time that I would know it would have been provided was when it was issued and then henceforth, it would be provided on an individual basis for officers that**

Lieutenant Michael Cuilla

needed it as a reminder for -- through remedial training.

Q   Do you know if Officer Algarin ever got this training?

A   This particular bulletin would be covered in the academy training that he receives on the Fourth Amendment search and seizure laws.  All relevant case law is covered.  Now, when I say that, I don't mean that they go through every relevant case law that has ever existed, but they do cover what is current for Fourth Amendment search and seizure.  And if it were updated, it would come out in a training bulletin that would be disseminated to the department.

MR. SHIELDS:  I'm going to move to strike that portion of the answer as nonresponsive to my question.

Q   So just answer -- just listen to my specific question --

A   Yes, sir.

Q   -- because it'll help us get out of here more quickly.

So the specific question was, when was the last time that this training bulletin, if ever, was

Lieutenant Michael Cuilla provided to Officer Javier Algarin?

MS. JONES: Objection, asked and answered.

A    It was provided to him on a near constant basis on the RPD web, which he has full access to.

Q    So there was never any specific training where Officer Javier Algarin was provided this specific document by one of his supervisors where this document was sat down and discussed with Javier Algarin about warrantless entries with or without exigent circumstances, this document; is that true?

MS. JONES: Objection.

A    No training that I'm aware of.

Q    Did Officer Adam Gorman ever get this specific training bulletin as part of any training that he attended after he graduated from the academy with the Rochester Police Department?

A    Not that I am aware of.

Q    We discussed earlier that hot pursuit is one of the reasons an officer may be permitted to enter the curtilage to a residential property, correct?

A    Yes.

Q    We agreed that hot pursuit falls under the

Lieutenant Michael Cuilla

emergency exceptions to the warrant requirement, correct?

A     **Exigency, yes.**

Q     And the hot pursuit ends after the officers catch or apprehend the person that they were chasing, true?

                    **MS. JONES:  Objection.**

A     **Hot pursuit ends once the person is caught, yes.**

Q     After the person is caught, the hot pursuit is concluded, true?

A     **Yes.  The hot pursuit can also be ended if the person is lost.  It doesn't go on forever if we lose sight of him.**

Q     After the hot pursuit is concluded, there's no longer exigent circumstances that would permit entry into the curtilage of a residential property that the police chase somebody across, correct?

                    **MS. JONES:  Objection.**

A     **No.**

Q     Why would exigent circumstances still apply after the hot pursuit has concluded?

A     **If the suspect were to discard something**

**Lieutenant Michael Cuilla**

**that could be deemed a danger to the public, the officers would have a duty to retrieve it prior to it causing harm to a member of the public and that would create an exigency.**

Q    So if the suspect did not discard anything, there would not be an exigency to enter the curtilage to that property, correct?

**MS. JONES:  Objection.**

**A    If the officer can articulate and reasonably suspect that the suspect may have discarded something that was a danger to the public, then there would be exigency until the officer was certain that that particular danger was not discarded.**

Q    If the officer did not see the suspect discard anything on that property, then the officer would not have a reasonable basis to articulate any specific facts that would support probable cause to believe that something was discarded on that property, correct?

**A    No.**

Q    What's the police department's policy about being able to backtrack through residential properties that a felon, a fleeing person was chased

Lieutenant Michael Cuilla

through?

A    If an officer can articulate that there is reason to believe that the suspect may have discarded something that is a danger to the public, then the officer has a duty to retrieve that weapon, specifically referring to a gun.  Your question previously was would he have had to have -- I'm sorry -- he or she have had to have seen a gun be discarded, if the officers caught up with the individual -- and I'm only giving an example here for clarification purposes -- an individual had an empty holster, that would be a reasonable suspicion that that person may have been carrying a firearm during the chase, then the officer would have a duty to check to make sure that that firearm was not left on someone's property.

Q    Let's take your example and say the officer caught up with the person.  The officer did not see anything discarded and the person did not have a holster on their body.  Under those circumstances, would an officer have a reason to backtrack through a fenced-in curtilage to someone's property to check for any hypothetically potentially discarded weapon?

Lieutenant Michael Cuilla

**MS. JONES: Objection.**

**A So there's a lot of other circumstances that I would need to know to answer that question correctly. In addition would be the officer's knowledge of the individual, the individual's history of carrying weapons, what the individual was doing prior to having fled. If the call was for shots being fired and this person matched the description and is found with no gun, oftentimes, suspects do not have holsters in the city of Rochester. They keep their firearms in their pockets of their pants. So that would be another articulable reason. The number of articulable reasons is substantial as to why an officer may believe reasonably that a person was armed with a firearm and may have left it in the backyard. In addition, a knife or other dangerous instrument, syringes are all things that create a danger to the public. If the officer believes that this person has discarded something that could be dangerous to the public, they have a duty to retrieve it as opposed to it being retrieved by, let's say, a small child or an unsuspecting homeowner.**

Q Let's say the hot pursuit concluded, the

Lieutenant Michael Cuilla

officers did not see any guns or other contraband potentially discarded. The person stops -- was being chased because they were suspected of selling marijuana and they don't have anything on their person after they're stopped. Does the officer, first, before entering the curtilage to the property, have a duty to seek the consent of the homeowner before entering their property?

**MS. JONES: Objection.**

**A Again, not knowing the knowledge of the officer, the knowledge of the suspect, what I can say is that the officer would have exigent belief that a dangerous instrument, syringe, knife, gun were left, were discarded during the chase, the officer would have a duty to obtain that property and would have the right to do so under exigency.**

Q If the officer can see over the fence and can't see anything on the ground, right, and the officer has time to walk to the front door of the person's property, knock on the front door and ask their consent to enter their property, under those circumstances, there would not be an immediate need to enter the property prior to seeking their consent, true?

Lieutenant Michael Cuilla

**MS. JONES:  Objection.**

**A     Again, I agree again there may be some factors that would allow the officer to enter the property without consent and certainly legally under exigency.  I don't know enough about the property to say if the officer left it for long enough, that someone couldn't get to the discarded contraband in that time.  I do not know about who is or is not outside, the time of day, whether or not this a cut that people use that perhaps don't utilize the property, you know, along a path, you know, maybe children jump the fence pretty often.  I don't know enough about the neighborhood to say that this is a well traveled area or a backyard that people have a lot of access to or if there's some difficultly in getting to the front of the home that the officer would be better served by immediately trying to locate the contraband prior to it being picked up by an uninvolved third party.**

Q     If the officer has the time and the opportunity to seek the homeowner's consent prior to entering their property, they're required to first ask the homeowner for consent to enter their property, true?

Lieutenant Michael Cuilla

MS. JONES: Objection.

A    If the officer believes that there is no immediate danger, then they would need consent or an exigent circumstance to enter that property.

Q    When you say if the officer believes, that's not the correct standard, right?  The correct standard is under the totality of the circumstances if the officer has objective facts to believe?

A    If they reasonably --

MS. JONES: Objection.

Q    It's objective standard, not a subjective standard, correct?

MS. JONES: Objection.

A    They reasonably suspect, it's what a reasonable officer would do.

Q    Considering the totality of the circumstances, correct?

A    Yes, correct.

Q    If there is no emergency and the officers don't have consent, then the warrantless entry is not allowed, correct?

MS. JONES: Objection.

A    Without exigent circumstances, consent or a warrant, there are very few other search

**Lieutenant Michael Cuilla**

**exceptions and certainly none that I think can apply**

**here.**

Q    Even if there's probable cause to believe that there's incriminating evidence on the property, if there is not an emergency and there is not consent, without a warrant, they're not allowed to enter onto the property, true?

**MS. JONES:   Objection.**

**A    Again, as I previously stated, it depends on the nature of the evidence and whether or not that poses a danger to the public or the homeowner.**

Q    And so that would be the officer's reasonable belief based on the totality of the circumstances that there's potentially some sort of evidence that may have been discarded on the property, correct?

**A    It would not suffice for it to be evidence.  It would need to be dangerous for the public for them to have the exigency exception.**

Q    Any time that a police officer can articulate facts that they believe a gun may have been discarded on a property during a hot pursuit, is it the RPD's policy that they have exigent circumstances to immediately enter the property

Lieutenant Michael Cuilla

prior to seeking the homeowner's consent to search for any potentially discarded gun?

**A      It is our policy and practice to immediately secure any firearms that have been discarded during a pursuit or during a struggle or simply discarded by a suspect.**

**MR. SHIELDS:  That's not my question. I'm going to move to strike that as non-responsive.**

Q      My question is, you don't know that there's a gun that was discarded, okay?  We're going to start with that premise.  Any time that an RPD officer engages in a hot pursuit, traverses across a property, then detains a suspect, doesn't see a gun was discarded, but can say that they think there might have been a gun that was discarded on a property, is it the RPD's policy -- without having any articulable facts supporting a reasonable suspicion that a gun, in fact, was discarded other than the fact that there was a hot pursuit across the property, is it the RPD's policy that under those circumstances, the exigent circumstances exception applies and they're allowed to backtrack through the property to search for any potentially

Lieutenant Michael Cuilla

discarded gun?

MS. JONES:  Objection.

A    They would need to have at least some reasonable suspicion based on articulable facts.

Q    In order to have reasonable suspicion based on articulable facts, there have to be more than simply the fact that there was a hot pursuit that the person ran from them when they attempted to apprehend them, true?

A    That is true.

MS. REPORTER:  Elliot, when it's a good time to take a quick bathroom break, please.

MR. SHIELDS:  Sure.  Do you want to take -- now is a good time.

MS. REPORTER:  Great, thank you.

MR. SHIELDS:  Sure.

THE VIDEOGRAPHER:  Off the record, Counsel?

MR. SHIELDS:  Yes.

THE VIDEOGRAPHER:  Going off the record.  The time is 10:56 a.m.  Please standby while I stop recording.

(A brief recess was taken from

Lieutenant Michael Cuilla

10:54 a.m. to 11:05 a.m.)

THE VIDEOGRAPHER: The time is now 11:07 a.m. We are back on the record.

Q    Lieutenant -- it's lieutenant, right?

A    Yes.

Q    We just had an opportunity to take a break for about 10 minutes. During that break, did you have an opportunity to speak with your attorney?

A    Yes.

Q    Did you speak about your testimony?

A    Somewhat, yes.

Q    Tell me everything you spoke about.

MS. JONES: Sorry, I'm directing him not to answer that.

MR. SHIELDS: What's the basis of you directing him not to answer that?

MS. JONES: That was covered by attorney/client privilege.

MR. SHIELDS: And our position is that you're not permitted to speak with your deponent in the middle of the deposition about the subject of his testimony and that by doing so, you waived the attorney/client privilege and anything

Lieutenant Michael Cuilla

you discuss is not protected.  I'm not going to waste our time calling the court right now about that so we'll preserve that objection to bring up in the future.

Q     Let me ask you this, Lieutenant, after having the opportunity to speak with your attorney, are there any questions that you gave answers to that you'd either like to clarify or change your answer to?

A     I'd like to clarify that the training that's given on these particular topics -- I know I've listed that we do several inservice trainings.  To be more specific, we currently do two full-day in-services and four two-hour off the road in-services as well as 12 roll call trainings.  And any training given that touches on arrests or searches would touch on the topics that you listed.  So it is most likely that this training is given two to three times per year to be more specific about these particular topics.

Q     Did you review any of those trainings in preparation for your testimony today?

A     No.

Q     Did you review any materials that might

Lieutenant Michael Cuilla

have been used as those trainings in preparation for your testimony today?

A    No.

MR. SHIELDS:  Just to the extent that they haven't been provided, we call for production of any of those materials given to officers at any of the trainings that Lieutenant Chula just referenced and I'll follow up in writing.

A    I'd like to further clarify that many of the requests made for training from the Professional Development Section or from lieutenants is conducted via e-mail as well.  So a lot of communications throughout the department is either done through face-to-face contact or e-mail.  A formal request via additional training form or interdepartmental correspondence is not required in order to get assistance for an officer that may need remedial training.  They can simply reach out to the section commander of the Professional Development Section directly and ask for some advice on the types of remedial training that might be needed.

THE VIDEOGRAPHER:  Counsel, this is the videographer.  I apologize for the

Lieutenant Michael Cuilla

interruption just briefly.

Lieutenant Cuilla, it looks like when you speak, the camera is shaking a lot. Maybe someone there is moving the desk, but the video recording is very shaky at the moment when you speak.

MS. JONES: I'm sorry, that's probably me. I'll try to be more still.

THE VIDEOGRAPHER: Thank you so much, Counsel. I apologize.

MS. JONES: I'll also add that we, as the city, are still expecting the videographer to add other information pursuant to Federal Rules 30 once when we come from break in between these segments and --

MR. SHIELDS: Okay. We hired the videographer, we checked with the videographer. We went over the federal rules with the videographer. The videographer is compliant with the federal rules, just as he always complies with federal rules in his practice for his entire career and he's never put on any

**Lieutenant Michael Cuilla**

**statements that the City is requesting**

**because they're not required by Federal**

**Rules Civil Procedure 30 so...**

MS. JONES: I just wanted to finish and say that the City objects to the propriety of these video recording since you're not going to comply with Federal Rules 30. Thank you.

Q    Lieutenant, you said that there were, I believe you said two full-day inservices and then can you just remind me, you said four other some sort of training, then 12 some other training?

**A    Four two-hour off the road inservices.  I say off the road because the officers aren't taken away from their shift to sit in two hours of training.  And then the roll call trainings are -- they are monthly roll call training and that's in addition to any training bulletins that come out or updates to the general orders that are also administered in roll calls.**

Q    Are you aware of any training bulletins that have come out since 2019 that specifically discussed curtilage to a person's property?

**A    I am not.**

Lieutenant Michael Cuilla

Q    Are you aware of any of these two full-day inservice for off the road trainings or 12 roll call trainings that have specifically discussed curtilage to an individual's property?

**A    Insofar as the officers know that curtilage is part of a person's property, property is discussed.  The word curtilage may or may not be discussed.**

Q    As we sit here today, you're not sure if the word curtilage or entry onto the curtilage to somebody's property is a topic specifically discussed in any of those trainings, true?

**MS. JONES:  Objection.**

**A    Again, the officers are taught in the academy that curtilage is part of someone's property and it may henceforth be referred to as property, as officers are aware that curtilage is part of the property.**

Q    I've taken about 20 depositions between these cases and almost every officer has testified that they believe, based on their training and experience, that there's a difference in the legal requirements for entering the curtilage to somebody's property versus entering their home

Lieutenant Michael Cuilla

itself.  Those officers are confused about the legal requirements if that was their testimony, true?

**MS. JONES:  Objection.**

**A    I can't testify as to their state of mind, but what you have stated is they are incorrect.**

Q    They would be incorrect about that, correct?

**MS. JONES:  Objection.**

Q    After any of the testimony provided by any of these officers in these cases about their incorrect understanding about the legal requirements to enter the curtilage to somebody's property, did they receive any additional training after their depositions in these civil cases?

**A    As this civil case is ongoing, I am unaware of what will occur at the end of this civil case once we had debriefed from this, but during the civil case, no, we have not discussed each other's testimony.**

Q    As far as my question, my question is, if an officer were to testify about an incorrect legal understanding during a deposition of civil case, the Professional Development Section of the RPD would not be made aware of that fact that they were

Lieutenant Michael Cuilla

incorrect about their legal understanding?

**MS. JONES:  Objection.**

**A      PDS would need to be notified either by the city attorney or at the end of the civil case whatever the findings were.  The city attorney could then advise the police department and we would then remediate any issues that occurred.**

Q    So you'd have to be notified first.  And as far as you're aware, you weren't notified after any of these depositions, correct?

**MS. JONES:  Objection.**

**A      As this is an ongoing civil case, I'm not entirely sure I could be notified but, no, I was not notified at this time.  I, the City of Rochester, we.**

Q    No one from PDS was notified, correct?

**MS. JONES:  Objection.**

**A      That's correct.**

Q    Does the RPD teach its officers that the mere possibility that there's contraband on a property that could be removed or destroyed does not create an emergency under the exigent circumstances exception that would justify entry onto the property?

Lieutenant Michael Cuilla

**A      Yes, that is correct.**

Q      That's what General Order 415 says, correct?

**A      Yes.**

Q      And if officers have a reasonable opportunity to obtain the homeowner's consent prior to entering the curtilage to their property, then there's no emergency that would justify a warrantless entry onto the property, correct?

**A      That is not correct.**

Q      How is that not correct?

**A      Your question was, if the officers had time to obtain a homeowner's consent, there is no emergency that would cause them to have exigency to enter the property?**

Q      My question was, if officers have a reasonable opportunity to obtain the homeowner's consent prior to entering the curtilage to their property, then there's not an emergency that would justify the warrantless entry onto their property without the homeowner's consent, true?

**A      That's correct.**

Q      If officers don't have a warrant and there's no emergency, then they're not permitted to

Lieutenant Michael Cuilla

enter the property unless they have consent from the homeowner, correct?

A    I apologize, Counsel.  You used the word emergency to refer to exigent circumstances?

Q    Well, emergency is part of the exigent circumstances -- let me withdraw that.

Yes, for the purposes of your question.

A    Then, yes, barring any exigent circumstances, they would need consent or a warrant or another exception to the search warrant that I'm unaware of at this time.

Q    And I just wanted to put back up Exhibit 3, General Order 415, and ask just a couple more questions about that.  So if we're looking at the exigent circumstances exception again, there is this highlighted portion right here, and it says, "Simply because the evidence may be lost or destroyed does not in itself justify a search under the exigent circumstances."  That's the policy of the RPD, correct?

A    Correct.

Q    Let me just take that down for now.  Now, does the RPD teach its officers that the flight of a misdemeanor suspect alone does not necessarily

Lieutenant Michael Cuilla

justify the warrantless entry into a home or its curtilage?

A    Yes.

Q    Prior to 2019, did the RPD provide any training to its officers about backtracking a person's flight path through the curtilage to residential property?

A    **That training would be covered under the Fourth Amendment training searches and seizures.**

Q    Is there any specific training about, quote, unquote, backtracking?

A    **I can't recall if that particular word is used in the training that discusses what is and is not an illegal search or warrantless search procedure.**

Q    Is backtracking a common practice in the RPD?

A    **Yes.**

Q    And it's RPD's policy and practice to backtrack through the curtilage to residential properties after a hot pursuit has concluded, true?

          **MS. JONES:  Objection.**

A    **If they have reasonable suspicion that something was discarded that could be a danger to**

**Lieutenant Michael Cuilla**

**the public.**

Q    We had just gone over the definition in -- well, hold on.  Let me put it back up.  So General Order 415 as we just had looked at, right, it says, "Simply because the evidence may be lost or destroyed does not in itself justify a search under exigent circumstances," right?  So where in the general orders does it say that officers are permitted to enter a property if they believe that there might be something that could endanger the public?

**A    That's part of New York state case law. The general orders do not articulate every policy that the Rochester Police Department is adherent to. That starts with the U.S. Constitution as interpreted by the U.S. Supreme Court, New York State Constitution as interpreted by the New York State Court as well as all relevant New York State laws.  Those are all, for the most part, not articulated in the general orders.**

Q    What specific case law permits an officer to enter the curtilage to somebody's property if officers believe that there might be a dangerous object that was discarded on the property?

Lieutenant Michael Cuilla

**A      I would probably have to look that up.**

Q      Is that something that's taught at the academy, specific case law?

**A      For the most part, we don't teach the officers the names of all specific case laws.  There are a few that stick out, but for the most part, we just teach what the case laws dictate to the police department.**

Q      Are officers specifically told that if they believe some dangerous object was discarded onto a residential property during a hot pursuit that they're required to backtrack to collect that potentially dangerous thing that was discard?

**A      Officers are specifically trained to retrieve any dangerous objects that might fall into the hands of the unsuspected public whether that's during a hot pursuit or during an altercation or simply discarded by a suspect while standing on a street corner.  The officers are trained not to just leave a gun or knife or syringes there on the street corner for anyone to find.**

Q      We're talking about a backyard and the officers do not, in fact, know that there was a gun or syringe or a knife that was discarded and they

Lieutenant Michael Cuilla

have the time and opportunity to obtain a warrant before entering the property. Are they required to obtain a warrant before entering the property?

**A But first, I just want to make sure we're clear that they didn't have to, in fact, know that something has been discarded. It is reasonable suspicion, not knowledge. Number two, they're not required to obtain a warrant if they have consent; they are not required to obtain consent if they have exigency. So as long as an exception of the search warrant applies, they can use that exception to the search warrant.**

Q So simply because the evidence may be lost or destroyed, right, so simply because somebody might come along and find the gun that they have reasonable suspicion may have been discarded, that alone doesn't provide exigency to enter the yard to search for the potentially discarded gun according to General Order 415, true?

**MS. JONES: Objection.**

**A It's not that the gun will be lost. It will harm the public. So that would be -- it's a different exception to the search warrant under RPD dictated by New York State case law.**

Lieutenant Michael Cuilla

Q    You're saying that there is this whole other exception to the search warrant requirement that isn't articulated specifically in the RPD's written general orders, true?

**A    I am saying, yes, that there are exceptions to the search warrant that are not articulated in the RPD general orders, specifically those to public safety as well as medical emergencies by the public, which is also not dictated in the general orders but is part of New York State case law.**

Q    Officer Horowitz testified that prior to the Dempsey incident, the RPD hadn't provided any training about backtracking along the flight path after the conclusion of a hot pursuit.  Was he mistaken about that?

**MS. JONES:  Objection.**

**A    Backtracking is a term used to indicate searching, so the training is under searching.  What word that Officer Horowitz used, it may or may not be specifically in the training, but a backtrack would be a search and the search training has been articulated previously.**

Q    So, yes, Officer Horowitz was mistaken is

Lieutenant Michael Cuilla

the City's position because specific training about searches was provided; is that your testimony?

**MS. JONES:  Objection.**

**A     That is correct, although he was correct in the fact that the word backtracking may not have been covered in the training specifically as there are many, many words used for searches that may not be covered in the training.**

Q     Officer Algarin testified that every time a suspect is chased through a fenced-in backyard to a residential property, officers backtrack through the property to check for potentially discarded contraband or weapons.  Is that consistent with RPD policy?

**A     There would have to be articulable reason to conduct that backtracking or search.**

Q     My question is specifically was -- assuming that that is what Officer Algarin testified to, his testimony would not be consistent with RPD policy, true?

**MS. JONES:  Objection.**

**A     It might be difficult for Officer Algarin to split that particular hair.  Maybe having other circumstances in his mind as to officer's knowledge,**

**Lieutenant Michael Cuilla**

**what caused the flight, the area that it's in, that would count for a reasonable suspicion.  I can't testify to his exact knowledge when it comes to what he was referring to.  So I would like not to say that he's incorrect.  He could be correct under particular circumstances.**

Q    It would be a violation of the RPD's policy to backtrack through the property to check for potentially discarded contrabands or weapons unless an officer can articulate reasonable suspicion to believe that a potentially dangerous weapon or something that could endanger the public was discarded by the person, correct?

**A    That is correct.**

Q    It would be a violation of RPD policy to not make that determination and instead to simply backtrack every time that a suspect is chased through the fenced-in backyard to residential property, correct?

**MS. JONES:  Objection.**

**A    That is correct.**

Q    And Officer Algarin was never disciplined as a result of entering Mr. Dempsey's backyard to backtrack, correct?

Lieutenant Michael Cuilla

A     That's correct.

Q     And Officer Algarin was never required to undergo any retraining on backtracking after this incident, correct?

A     That is correct.

Q     And Officer Algarin's backtracking through Mr. Dempsey's backyard at 53 Kosciusko Street, that was consistent with RPD practice, true?

A     That is correct.

Q     And Algarin backtracking through Mr. Dempsey's backyard at 53 Kosciusko Street, that was consistent with -- or that was inconsistent with General Order 415, correct?

MS. JONES:  Objection.

A     I do not know that to be true based on the circumstances.  A supervisor on the scene may have -- a supervisor on the scene believed that it was consistent with our policies, training and New York State law.

Q     Where did Officer Algarin ever justify the backtrack by articulating a reasonable suspicion that the suspect had discarded something on the property that created an exigency?

A     I would have to refresh my recollection of

Lieutenant Michael Cuilla

his report, as well as I do not know what he did or did not articulate to a supervisor or any court testimony after that.

Q    Did you review any of those documents prior to coming here to testify today?

A    Yes.  In addition to the nearly five hours of meeting with counsel, I reviewed all of the documents over the course of many, many, many, many hours.  That's my need for caffeine today.

Q    As we sit here today, you don't remember exactly what his justification was, but you remember that Sergeant Rudolph, his supervisor, determined that his actions were consistent with RPD policy?

A    Yes.

Q    I want to move on to the next topic on the 30(b)(6) Notice.  I'm just going to put that up so we can review it together.  So we're at 1-D.  So "All rules regulations, methods, policies, procedures and practices in effect or customarily followed between January 1, 2013 and present regarding:  The training, supervision and discipline of officers who enter residential properties unlawfully."  So we've covered this a little bit already, but some additional questions.  Other than

Lieutenant Michael Cuilla

what we've discussed already, what training do officers receive to ensure that they don't unlawfully enter the curtilage to a residential property?

A    So as I previously stated, all the types of trainings that officers receive that are multi-faceted, these are very broad topics that we're referring to that touch upon these particular trainings.  Any training that's going to be related to the Fourth Amendment searches is going to touch upon these topics.  The officers make the link to curtilage and property after they've had that defined for them in the academy.  So whether or not we reiterate the definition of what is or is not property, we do touch upon the training regarding searches and unlawful searches and gathering of evidence.  One of the many sources of this information would be the court system, you know, as officers continuously gather evidence and use those evidences in court cases.  Judges make determinations, those determinations are then reported back to the Rochester Police Department and that too informs our training as to what the officers need.  So if, for example, we started

Lieutenant Michael Cuilla

seeing a rash of evidence being kicked back or suppressed in court, then that would be dictated from the district attorney's office to Rochester Police Department. Then Rochester Police Department would then remediate in training.

Q    Like an across-the-board training?

A    That is correct, if it appeared to be an across-the-board problem.

Q    Other than getting that information from the district attorney's office, what does the RPD do to look at issues like unlawful entry onto the curtilage of people's properties to determine an across-the-board retraining is necessary?

MS. JONES:  Objection.

A    So in addition to -- so how we determine training would be the documentation, if we get additional training reports all indicating the same issue, a bunch of interdepartmental correspondences all indicating the same issue.  We get reports from the sections via e-mail or simple phone calls regarding training that they had to give the officers or requesting some advice about particular trainings.  If it seems as it's getting to be a larger issue, then we would do a departmental

Lieutenant Michael Cuilla

training.

Q   So basically, it would need to be documented and put up the chain?

MS. JONES:   Objection.

A   There are times where it's not documented or put up the chain.  For example, we just did a training on crime scene management that was kicked out to the entire department.  That was at the request of one section, which is the Major Crimes Unit, that saw that there was an issue department-wide.  I do not know that they documented that.  What they did was they reached out to the Professional Development Section and said, "We recognize that there's a problem, can you please kick this training out," and we did.  We, as the City of Rochester, not as the Professional Development Section as I do represent the City.

Q   So if, for example, supervisors in one section saw an ongoing problem, realized that their officers were repeatedly entering the curtilage to a property unlawfully, they could reach out to the Professional Development Section and request a department-wide training on that issue?

A   Yes.

Lieutenant Michael Cuilla

Q    Has that ever been done specifically with regard to the unlawful entry on the curtilage to residential property?

**A    Not that I'm aware of.**

Q    Has that ever been done with respect to the legal requirements for backtracking to collect evidence?

**A    The difficulty is that it has been done in cases of De Bour or, you know, what is reasonable suspicion, what is probable cause and that may touch upon backtracking and searches and the Fourth Amendment.  But for that specific purpose, not that I can recall.**

Q    What were the trainings that you just referenced with respect to De Bour?

**A    We've done several roll call trainings as updates and just refreshers as to what De Bour is.**

Q    What the legal requirements would be to engage in a foot chase in the first place if somebody were to run away from an officer, for example?

**MS. JONES:  Objection.**

**A    That is correct.  De Bour articulates when we can or cannot chase a suspect.**

Lieutenant Michael Cuilla

Q    What you were discussing previously, how that would intersect with the requirements and the training that might be covered to enter the curtilage to residential property, if you chase somebody, that would begin with an assessment under De Bour whether or not you had the legal requirements met to engage in a foot chase in the first place?

**A    That is correct.**

Q    Taking a step back, for example, with General Order 415, how does the RPD develop these general orders, where they come from?

**A    We have a research and evaluation section. That section is in contact with the city law department.  They are in contact with the county ADA.  They are in contact with the New York State DCJS.  They are in contact with law enforcement agencies in our area and outside of our area and develop these general orders reviewed by the relevant parties and then they are disseminated to the department.**

Q    Do you know -- give me one second.  Do you know if the RPD or the City subscribes to any policy risk management services such as Lexipol?

Lieutenant Michael Cuilla

MS. JONES:  Elliot, I don't see -- which topics are you asking questions under?  I don't think there's an order --

MR. SHIELDS:  The general training and policies about everything there since 2013 to present.

MS. JONES:  Counsel, we interpreted this topic as what policies we had enforced, not how we created policies generally.  I think this is little off topic.

MR. SHIELDS:  Well, General Order 415 that we're looking at was created January 20, 2018.  So, you know, where did this come from and its contents, I think are certainly relevant to the testimony today.

MS. JONES:  No.  It says -- no.

MR. SHIELDS:  All regulations, methods, policies, a general order is a policy, procedures and practices in effect or customarily followed.

MS. JONES:  I disagree with that.

MR. SHIELDS:  Put the objection on

Lieutenant Michael Cuilla

the record and let him answer if he knows the answer.

MS. JONES: No. It's not that (inaudible) --

MR. SHIELDS: You're wasting everyone's time by making speaking objections on the record. I'm going to ask you to stop and just state your objection and let him answer whether or not he knows.

MS. JONES: So, I'm directing him not to answer because this is outside of the scope of this deposition and the judge --

MR. SHIELDS: It is not outside of the scope of the deposition, Counsel.

MS. JONES: (Inaudible.)

MS. REPORTER: Ms. Jones, you're cutting in an out.

MS. JONES: I'm sorry. Since you did not notify the City that you wanted to speak about the creation of these policies, I'm directing him not to answer, but we're happy to speak to the substance of what our policies are in addition to

Lieutenant Michael Cuilla

our methods.

MR. SHIELDS: I don't see how you can reasonably say that this isn't covered under the matters of the deposition, but you know what, I can tell that you're just trying to waste my time so I'm going to move on for now and we can raise this in a motion later.

MS. JONES: Just for the record, we're not trying to waste your time. We're trying to follow the judge's recommendations and guidance on --

MR. SHIELDS: You're objecting to something that's specifically articulated in number one to testify about "all rules, regulations, methods, policies, procedures and practices in effect or customarily followed between January 1, 2013 and present." Where did this policy come from that we've been talking about for two hours, I think is 100 percent relevant to his testimony today.

MS. JONES: I understand that and we just disagree.

**Lieutenant Michael Cuilla**

Q    Lieutenant Cuilla, you testified that these policies will be drafted by the research and evaluation section, correct?

**MS. JONES:  Elliot --**

Q    You can't -- first of all, you can't look at your attorney and wait for her to say something before you answer.  You got to let her jump in and object and you can't wait for -- looking to her for some kind of clue about whether you should answer my question, okay?  So let's just get that clear for the deposition, all right?

**MS. JONES:  Elliot, it's important for the stenographer that people aren't talking at the same time and so I think when he sees I'm about to speak, he gives me pause so I can jump in.  I think that's perfectly fine.  So I'm objecting to this additional line of questioning because the creation and background and reasons that we're creating this policy was not noticed in the 30(b)(6).  So can we please move forward?**

**MR. SHIELDS:  No.**

Q    Who approved the training that you just

Lieutenant Michael Cuilla

testified?  After it's developed by the research and evaluation section, does that training, before it's implemented into a general order, have to be approved by, for example, the chief of police?

    **A    It's signed off on by the chief of police or their designee.**

    Q    How about training bulletins, does the chief of police also sign off on training bulletins?

    **A    Or they designate.**

    Q    My question about that is -- and I'm not trying to trick you, so I'm going to put up the training bulletin that we marked as Exhibit 4, is just on that training bulletin.  I don't see there -- so if we compare Exhibit 4 with Exhibit 3, so I see what you're saying on Exhibit 3, the chief's signature.  At the time, it was Michael Ciminelli, correct?

    **A    Correct.**

    Q    And then if we compare that with Exhibit 4, I just don't see any signature on that document.

    **A    The training bulletin as previously, it helps articulate the policy.  It does not in itself become a general order.**

Lieutenant Michael Cuilla

Q     Who would develop these training bulletins?

MS. JONES:  Elliot, I'm sorry, again I --

MR. SHIELDS:  We're calling the court, we're calling the court.  I'm going to go off the record.

MS. JONES:  You're going to have to because if you want him to speak as to how --

MR. SHIELDS:  I'm calling the court. This is ridiculous.

MS. JONES:  You need me --

MR. SHIELDS:  Stop talking.  And I'm going to go off the record and preserve my time and we're going to call the court.

MS. JONES:  Okay, thank you.  Are we off the record?  Do we need the videographer to say something?

MR. SHIELDS:  Yes.

THE VIDEOGRAPHER:  Standby everyone. The time is 11:46 a.m.  We are off the record.

(Discussion held off the record.)

Lieutenant Michael Cuilla

THE VIDEOGRAPHER:  The time is 12:40 p.m.  We are now back on the record.

MR. SHIELDS:  Thank you.  Before we get back into questions about the testimony, I think Ms. Jones and I will just put on quick statement about the conference that we had with Judge Peterson.  First, Judge Peterson informed us that Judge Payson was unavailable.  Judge Peterson held a conference, which was recorded.  There were two issues discussed.  The first issue was whether or not Lieutenant Cuilla was required to answer questions regarding the training bulletin that I had asked him about and the developments and how it was -- how it came to be into existence, who wrote it and where it came from. Judge Peterson agreed with Ms. Jones that Lieutenant Cuilla did not have to answer those questions.

The second issue that was raised was conferences during breaks between Ms. Jones and Lieutenant Cuilla and

Lieutenant Michael Cuilla

whether -- whether the city attorney was permitted to discuss the substance of the testimony with the deponent and Judge Peterson said that no substance of the deponent's testimony could not be discussed during any breaks and if we took a break and came back, that the plaintiff's attorney would be permitted to question the deponent regarding the substance of those conversations.

So, Ms. Jones, I'll obviously let you --

MS. JONES: Yes. Judge Peterson prohibited coaching. He said it was perfectly fine for me to give feedback on how he's testifying, right, speak up, answer questions directly, examples that he offered, but just that I'm not supposed to coach the witness in his testimony. So I agreed to not coach.

MR. SHIELDS: And just so we're all on the same page, Judge Peterson said that coaching constituted discussions about the substance of the testimony that had been

Lieutenant Michael Cuilla

provided already or that would be provided, but that, of course, she's allowed to instruct the deponent, hey, you can speak up a little louder or things of that nature that don't have to do with the substance of the testimony.

MS. JONES: That's not what I wrote down about his definition of coaching, but we can talk about that later.

MR. SHIELDS: The substance -- we agree that you can't talk about the substance of the testimony.

MS. JONES: We don't agree about that. Now, we agree that I'm not allowed to sway the content of his testimony, but not that I can't talk about the substance.

MR. SHIELDS: Okay. I believe that what I heard Judge Peterson say was that you're not permitted to talk about the substance of the testimony that had been given, so that is what my understanding was.

MS. JONES: Understood.

Q So, Lieutenant, we're back on the record.

Lieutenant Michael Cuilla

We just had a break for a while.  Did you have an opportunity to speak with your attorney during the break?

     A     Yes, I had an opportunity, but didn't really speak with the attorney.

     Q     You didn't discuss the testimony that has been given so far?

                    MS. JONES:  Objection.

     A     No, I did not.  Other than the length of time, you know, exhaustion, I ate a snack.

     Q     Lieutenant, we're still talking about 1-D now from the Notice of Deposition and so that included the training supervision and discipline of officers who enter residential properties unlawfully.  We discussed training a little bit. I'm going to move on to supervision.  My question is, has the department ever found that an officer unlawfully entered the curtilage to a residential property?

     A     Ever in the history of the Rochester Police Department?

     Q     Well, we can limit it to what the Notice of Deposition said, which is between January 1, 2013 and present.  Has the Rochester Police Department

Lieutenant Michael Cuilla

ever found that an officer unlawfully entered the curtilage to a residential property?

A   From the specific name of defendants?

MS. JONES:  Elliot, I don't -- yeah, I think we just disagree on the scope, but we're talking about rules, methods, policies and procedures in effect about the training and discipline of officers. Like, that's about the substance of how we supervise and discipline, not whether or not we've ever found an officer to do that, to have unlawfully entered residential property.  I think we just understand these differently.

Q   The training, supervision and discipline of officers who enter residential properties unlawfully, so in your preparation for your deposition today, did you ever find an instance where the Rochester Police Department has imposed discipline on an officer because they entered a residential property including the curtilage to a residential unlawfully?

MS. JONES:  I'm going to object to that and instruct him not to answer

Lieutenant Michael Cuilla

because this is outside of the scope. We're talking about --

MR. SHIELDS: I just literally read what the Notice of Deposition says.

MS. JONES: (Inaudible.)

MS. REPORTER: I can't hear, Ms. Jones.

MS. JONES: You read the subtopics of the deposition. You didn't read the title, like, all of these subtopics go under the rules, regulations, procedures and practices in effect, like, the substance of those policies, not whether or not we discipline any officer pursuant to these topics.

MR. SHIELDS: It says, "the training, supervision and discipline of officers who enter residential properties unlawfully." How are you going to talk about any of that unless you know if somebody was found to have entered a residential property unlawfully?

MS. JONES: This is part of number one. Each of these subtopics has

Lieutenant Michael Cuilla

to be read in conjunction with what's at the top, right?  All rules, regulations, policies, procedures and practices in effect regarding the training, supervision and discipline of officers who enter residential property.  Like, you're asking about our policies, the substance of those procedures regarding these things, not if any officer has been found in violation of them.

Q    Lieutenant, what was the procedure that was followed if and when any officers was ever found to have unlawfully entered a residential property unlawfully between January 1, 2013, and present?

MS. JONES:  Objection.

A    If an officer was found to have entered an property unlawfully, that would be documented by their supervisor, which would then be submitted up the chain of command.  Depending on the seriousness of the incident, the chief would make the ultimate distinction whether or not discipline or training would be justified.

Q    Has any officer between January 1, 2013, and present ever been found to have entered the

Lieutenant Michael Cuilla

curtilage to a residential property unlawfully?

MS. JONES: Objection. I'm directing you not to answer. That's outside of the scope.

MR. SHIELDS: Alright, we gotta call the court back so let's go back off the record.

MS. JONES: I'm objecting until we break. This is ridiculous. Why are you continuing to ask questions outside of the scope? We talked about --

MR. SHIELDS: Stop, stop talking and wasting our time.

(Both attorneys speaking at the same time and reporter asking for clarification.)

MR. SHIELDS: Let's go off the record because we're going to call the court back.

THE VIDEOGRAPHER: Going off the record. The time is 12:49 p.m.

(A brief recess was taken from 12:49 p.m. to 1:09 p.m.)

THE VIDEOGRAPHER: The time is now

Lieutenant Michael Cuilla

1:09 p.m. We are back on the record.

MR. SHIELDS: Thank you. We just had another conference with Judge Peterson about the scope of the Notice Section 1, Subsection D. And in short, after discussing that topic with Judge Peterson, his ruling was that the plaintiff is permitted to ask, in practice, how has this been applied. So in practice, how has the training, supervision, discipline of officers who enter residential properties unlawfully, how has that been applied by the Rochester Police Department. Is that an accurate recitation, Ms. Jones?

MS. JONES: Yes, that's my understanding.

Q So, Lieutenant, in practice, how has the department disciplined officers who enter residential properties unlawfully?

A Based on the severity of the violation of the policy, the sergeant who's supervising the officer would have several options, one of which is the verbal counseling, going up through additional

**Lieutenant Michael Cuilla**

**training through an interdepartmental correspondence generated and submitted up the chain to request either additional training through Professional Development Section or for discipline.**

Q    So the question wasn't hypothetical.  The question was, in practice, how has the department disciplined officers who enter residential properties unlawfully?  Can you tell me how it has actually happened?

**MS. JONES:  Objection.**

**A    Sergeants have verbally counselled their officers.  Sergeants have submitted documentation for review up the chain of command or to the Professional Development Section for additional training.  And ultimately, the chief's office has made the designation whether or not discipline was required or additional training was required.**

**MS. SHIELDS:  So I'm going to move to strike the nonresponsive portion of that answer.**

Q    And can you say any specific examples of an instance where, in practice, the department has disciplined an officer who has been found to enter residential property unlawfully?

Lieutenant Michael Cuilla

MS. JONES: Objection. I think this goes back to the same, I guess, dispute that we talked about the scope over the deposition. You're not permitted to ask us about specific examples unless it's one of the named defendants, which we're happy to do so because you have done that with your history, but he is -- the witness has testified what happens in practice and that's what Judge Peterson stated.

MR. SHIELDS: He said that I can ask him in practice how has the department disciplined officers who enter residential properties unlawfully. So I'm asking how has the department disciplined an officer who has been found to enter a residential property unlawfully?

MS. JONES: Yes. He already said that.

MR. SHIELDS: He didn't -- he didn't give any specific examples of any discipline has ever been imposed. He gave a hypothetical answer. He said, "We follow our policy," which is exactly what

Lieutenant Michael Cuilla

Judge Peterson said you're not supposed to do. You're supposed to talk about the practice, which is separate from the policy.

MS. JONES: I think you're not listening to his answers. So maybe you should ask the question again and he can answer it again.

MR. SHIELDS: I think I listened to his answer and I moved to strike the answer for being nonresponsive to my question.

Q So, Lieutenant Cuilla, my question is, in practice, how has the department disciplined officers who have been found to have entered a residential property unlawfully?

A So in practice, the department finds, in this scenario that you're laying out for me, that an officer has entered into a property unlawfully and then the supervisor has found or desires for that officer to receive some discipline and submits up the chain of command an IDC to the chief's office. And you're asking how, in practice, the chief's office can discipline the officer?

Lieutenant Michael Cuilla

Q    I'm asking, in practice, what has happened?

A    **As far as discipline regarding this exact topic?**

Q    So for example -- let's just back it up. In practice, has a supervisor ever written an IDC and submitted up to the chain of command because he found that an officer entered a residential -- the curtilage to a residential property unlawfully?

**MS. JONES:  I think that's a different question than how the City, in practice, does its discipline.**

A    **Counsel, if you're asking the specific -- about the time a specific person was disciplined and what their discipline was --**

**MS. JONES:  Then we're objecting to that.**

A    **-- it's obviously a different question. If you would like to know how, in practice, if someone were to do this, what could happen and what would happen in practice as opposed to what would happen strictly within the policy, I'm happy to testify.**

**MR. SHIELDS:  Look, I'm calling for**

Lieutenant Michael Cuilla

production of all interdepartmental communications regarding any instance where an individual was found to have unlawfully entered the curtilage to a residential property.

MS. JONES:  Please follow up in writing.  And for the record, I don't understand how that request connects to this line of questioning.

MR. SHIELDS:  That's great.  I don't care what you understand or not.  You're directing your witness not to answer specific questions about specific instances where somebody was found to have been disciplined for entering a residential property unlawfully, in practice.  So if you're not going to let him answer these in-practice questions, then I need documentation to show what the City's practice is.  That's the answer to your question.

MS. JONES:  Lieutenant Cuilla just said that he's happy to testify on what would happen in practice if an individual

Lieutenant Michael Cuilla

were found to have entered a residential property unlawfully.

MR. SHIELDS: And I'm calling for production of any documentation about what the lieutenant is testifying about.

Q So, Lieutenant, first, you said one could be training memorandum, correct?

MS. JONES: Objection.

A Correct. There can be verbal counseling, additional training and then submitting of an IDC up the chain of command and then that IDC would be reviewed by the chief's office and he would then either assign that investigation to DSS or make a different determination. He has several options, he or she. In this case, it's he.

MR. SHIELDS: So we're calling for production of all documentation regarding any verbal counseling, any additional training or any IDCs that were issued as a result of any findings or allegations regarding an officer unlawfully entering the curtilage to a residential property.

MS. JONES: Please follow up in writing.

Lieutenant Michael Cuilla

Q    Now, Lieutenant Cuilla, after an instance where officers backtracked through someone's fenced-in yard, are supervisors instructed to review the incident to ensure that the officer did not violate General Order 415?

A    Yes.

Q    Where is that instruction to the supervisors or the sergeants laid out or documented in the RPD's policies?

A    It's a general instruction for supervisors to observe and maintain their officers' performance as well as their abilities to operate as a police officer.  So it's part of a more general broad instruction towards the sergeants to make sure that the officers are not violating policies.

Q    Where is that general instruction to supervisors documented in the RPD's policy?

A    The instruction to supervisors that they have to observe and -- that would be under our general order, I'm sure, to -- again, it's a very general topic, but to supervise an officer, I guess that would be in the chain of command and directing if the word supervise is defined in the general orders, I don't believe it is.  I don't think

Lieutenant Michael Cuilla

there's a definition section.  However, there is a supervisor school training, which is a one-week course given to all sergeants.  It's required by DCJS.  It covers many of these topics.  Also, our sergeants are subject to field training for sergeants where these topics are touched on again by their field training sergeant.

Q     In any of those things, the general order, the supervisor training school, sergeant field training, is there any specific written policy that says after an incident, you're required to review the officer's actions to ensure that they complied with the RPD's general orders?

A     Again, you know, I would have to say that that's the definition of supervision.  Just the general common knowledge or definition of how to supervise a person.  I am not sure that we define it so specifically, but I am unsure as to how someone would supervise without observing the officer's behavior and remediating it.  So under the duties of our sergeants, there is probably some listing of supervision.  I'd have to have my recollection refreshed, but that is my answer to that.

Q     So as we sit here today, you're unsure

Lieutenant Michael Cuilla

what specific general order or other policy document specifies exactly the method by which supervisors must review the actions of their subordinates to ensure that they complied with the RPD's general orders and other written policies, true?

MS. JONES: Objection.

A     That is true if such a document exists.

Q     So such a document may not exist, true?

MS. JONES: Objection.

A     Yes.  How to supervise may just be done through training and best practices.  I'm sure it is articulated that an officer reports to a sergeant and what a sergeant's duties are in the general orders.  That, I am certain of.  Whether or not that specifies what the word supervise means or observe or how to observe or how to supervise, I am unaware whether it goes into that specificity.  It's more of a general concept of supervising, observing, evaluating.  And those other subtopics may be considered to be just parts of the larger comments.

Q     Has a supervisor ever found any of the named defendants violated General Order 415 when they backtracked through someone's fenced-in backyard?

Lieutenant Michael Cuilla

A    Not to my knowledge.  I have to have my recollection refreshed perhaps.  I don't believe so.

MS. JONES:  So, Elliot, I think that's outside of his scope.

MR. SHIELDS:  It's named defendants covered in the topics that we agreed to so I'm not asking about Mitchell Leach.  I'm asking about Javier Algarin, Adam Gorman, the officers that are defendants that have those claims and defenses asserted in these cases.

Q    So to your knowledge, Lieutenant, has --

MS. JONES:  (Inaudible.)

MS. REPORTER:  Hold on a second, you're cutting out.

MS. JONES:  We agreed to speak to the discipline (inaudible).  So any other discipline or corrective action, the witness was not prepared to speak to today.

MR. SHIELDS:  That's something that we disagree about because it's says the discipline so -- but anyways...

MS. JONES:  What?  Which topic are

Lieutenant Michael Cuilla

you talking about?  Are you still on 1-D?
Are you talking about 1-D or 3?  Because
now we're talking about --

MR. SHIELDS:  I don't want to have
conversations with you on the record,
okay?  You're wasting my time.

Q    Now, Lieutenant Cuilla, within the --

MS. JONES:  For the record --

(Both attorneys speaking at the same
time.)

MS. JONES:  For the record, I just
wanted to understand your position so we
can attempt to resolve it.

Q    Lieutenant, the only person within the
department that has the authority to impose
discipline is the chief, correct?

A    That is correct.

Q    And if there's any lesser amount of
remedial action that needs to be taken, that could
be done at the supervisory level, correct?

A    That is correct.

Q    Other than that remedial action being
addressed at the supervisory level by the sergeant,
could there be any other remedial actions taken that

Lieutenant Michael Cuilla

were not initiated by the sergeant if it's less than formal discipline imposed by the chief?

A     If PDS becomes aware of a widespread problem, they may require all of the officers to do what is ultimately remedial training as a refresher, but I wouldn't consider that discipline in any way, shape or form but just a refresher training.

Q     And in order for PDS to take those actions, we spoke earlier, usually, that's either the result of one of two things, either documentation being submitted to PDS and then recognizing a pattern or a specific request from a supervisor?

A     Yes.  That specific request does not need to come specifically from a supervisor.  It can come from the head of a unit that's noticing a trend, like the technician's unit, if they noticed that officers were, I mean, for example, touching places where fingerprints might be, they might ask us to do a refresher training on surfaces that are usually fingerprintable.  The DA's office can also reach out to the department and request additional training. If the DA's office has found in court cases, certain types of evidence is being suppressed due to the way

**Lieutenant Michael Cuilla**

**we are doing our searches, the DA's office could reach out to the Rochester Police Department and let them know that this is happening and we would conduct training.**

Q    What specific training did Officer Javier Algarin receive regarding the prohibition against entering a residential property unlawfully?

A    Other than the training that he received in the academy, the training that he received in field training, that's the 16 weeks after the academy where they're assigned a field training officer and cover a range of topics, he may have received -- I can't speak to whether he received training on a verbal counseling level from his supervisor, but as far as formal training requested from the Professional Development Section, I'm unaware of any training.

Q    Did you do anything to reach out to Officer Algarin or any of his supervisors to find out whether he had received any additional training other than what he received at the academy?

A    In response to this deposition?

Q    In preparation for this deposition, did you prepare to answer the question about what

Lieutenant Michael Cuilla

training Officer Algarin had received about whether he'd ever been -- you know, ever received any verbal counseling or whether he had received any other remedial training of any kind about entering into residential properties unlawfully?

**A     I did not reach out to his former or current supervisors regarding any verbal counseling.**

Q     Did you reach out to Officer Algarin about that topic?

**A     No.  I did not reach out to any of the named defendants to discuss their previous training.**

Q     Did you reach out to any of the named defendants' supervisors to ask them about any training or disciplinary issues or remedial issues about any of the topics for today's deposition?

**A     No, I did not.**

Q     I want to put up the Notice of Deposition again, which has been marked as Exhibit 1 for this deposition.  So, Lieutenant, I want to move on to topics 1-E, F and G.  So "All rules, regulations, methods, policies, procedures and practices in effect or customarily followed between January 1, 2013 and present regarding:  Encounters with dogs on residential properties, use of deadly force against

Lieutenant Michael Cuilla

dogs and using less lethal force against dogs."  I'm going to take that down for now.

My first question is, Lieutenant, can you tell me everything that you did or everything that was done to prepare you to testify about those three topics at today's deposition?

MS. JONES:  Objection.

A    I reviewed the training that was done in 2014 and 2019 regarding dogs, aggressive dogs, and I also reviewed a training bulletin that had the same diagram as the training in 2014.  I also reviewed our Taser training regarding Axon's claims of using the Taser on dogs.

Q    In the training, RPD officers are taught that they'll inevitably encounter dogs on residential properties, true?

MS. JONES:  Objection.

A    Yes.  We let officers know that they will encounter dogs.

Q    Are these trainings that you listed earlier, the 2014 and 2019 aggressive dog trainings, the training bulletin that you said that you reviewed and then the Taser training, is that the complete universe of training materials provided by

Lieutenant Michael Cuilla

the RPD to its officers between 2013 and present about encounters with dogs on residential properties?

A     That's the universe of training solely devoted to the encounters of dogs, but like much about training, it is touched on in other topics.

Q     What other topics is that training about encounters with dogs touched on?

A     Defensive tactics, firearms.

Q     What is discussed in defensive tactics about encounters with dogs?

A     Well, when encountering a suspect, if there are dogs at the scene, it may change the way that the officer encounters that suspect, that suspect needs to be arrested, are there other serviced that can be called, what type of use of force may be necessary to take someone into custody quicker, if they are struggling with an individual and a dog jumps into the fight.  That's as far as I can think of in defensive tactics.  Insofar as the dog will modify the totality of circumstances when taking someone into custody or when dealing with a noncomplying subject.

Q     Do you know if there's any specific DT

Lieutenant Michael Cuilla

manuals or written policies about defensive tactics that specifically reference encounters with dogs?

A    So they are, again, just to be taken into account in the totality of circumstances when it comes to the decisions by uses of force.

Q    I want to put up what we'll mark as Exhibit 5 for this deposition and that's going to be the 2014 training.  Lieutenant, on your screen, do you see the document entitled "Dog Bite Prevention for Law Enforcement" from the Humane Society of Greater Rochester and then down at the bottom, it says "Humane Society of Greater Rochester 2014"?

A    Yes.

Q    This is -- is this the training document that you referenced earlier?

A    Yes.

Q    Was 2014 the first time that the Rochester Police Department provided this training to its officers?

A    This particular PowerPoint, yeah.

Q    Since 2014, has this PowerPoint been provided to its officers again?

A    It was provided again as a roll call training.

**Lieutenant Michael Cuilla**

Q    I'm going to put up what's going to be marked as Exhibit 6 for this deposition.  So that's going to be the roll call training document and it's dated December 2019 and it says "Roll Call Training December 2019 LE Dog Bite Prevention Humane Society of Greater Rochester."  Do you see that document on your screen, Lieutenant?

A    I do.

Q    If we go to -- go back to Exhibit 5, I just want to do some comparison between Exhibit 5 and Exhibit 6.  Do you see the page count here on the right?  Can you see my cursor on your screen?

A    One second, I'm sorry.  I can, yes.

Q    This looks like it's a 51-page document; is that right?

A    Yes, that's correct.

Q    Then if we go to Exhibit 6 and we go down to the page count, that's a 24-page document; is that right?

A    That's correct.

Q    If we go back to Exhibit 5 -- well, before I scroll through it and stuff, let me just ask you, other than the difference in the number of slides or pages between these two documents, are there any

Lieutenant Michael Cuilla

other substantive differences in these two trainings?

A    Other than some information has been removed as the roll call training is considered a refresher and not a full training, no, I don't believe so.

Q    Do you know what information was removed from the roll call training that was present in the 2014 training?

A    I would have to take a look at the slides. I didn't memorize which ones were.

Q    Did you review both of these training documents in preparation for your deposition today?

A    I did.

Q    Through your review of those two documents in preparation for the deposition, is there anything that stands out to you that was removed from the 2019 training?

A    Nothing stands out, no.

Q    The 2019 training that was put together by Mr. Reno DiDomenico, who's here on the second page of that document; is that right?

MS. JONES:    Objection.

A    That's correct.

Lieutenant Michael Cuilla

Q    Do you know who put together the 2019 roll call training?

A    It's the same training created by Reno, but who edited it would be a member of the Professional Development Section.

Q    But as we sit here today, you don't know which member of the Professional Development Section did that editing?

A    No, I do not.

Q    And that's because you didn't reach out to PDS to figure out, in preparation for the deposition, who did the editing or why they removed certain pages?

MS. JONES:  Objection.

A    I understand generally the policy and practice why we make roll call trainings shorter, but I did not ask as to why they edited it in the manner that they did, no.

Q    Would it be fair to say that the edits were made to keep the slides that whoever in PDS felt were most important to refresh officers on in the roll call training?

MS. JONES:  Objection.

A    That sounds fair.

Lieutenant Michael Cuilla

Q    Mr. DiDomenico testified at his deposition that the 2014 training was a two-hour awareness course to give some tools to officers for how to interact with dogs that they might encounter during their police duties.  Is that an accurate recitation of Mr. DiDomenico's training that he put together?

MS. JONES:  Objection.

A    Yes, that seems accurate.

Q    This two-hour training that was given to officers in 2014, was that a training that was required department-wide?

A    Yes.  It's part of our -- one of our inservice.

Q    You testified earlier that you had gathered the -- I guess it would be more accurate to call it a list, that was an Excel spreadsheet of the officers who were assigned to go to that specific training on specific days?

A    Yes.

Q    And then when officers attend the training, they would be a written sign-in sheet where they would sign their name?

MS. JONES:  Objection.

A    Yes.  That is the common practice.

Lieutenant Michael Cuilla

Q    What happens if an officer has an emergency and can't attend the training on their assigned day?  For emergency or whatever reason, they don't make the training on that assigned day, are they required to make up the training on another day?

A    Yes.  They should be rescheduled by their supervisor.

Q    Let's say an officer misses a specific training about a specific topic, so here, the dog bite prevention training, do they have to make up that specific training about dog bite prevention or do they just have to simply make up like hours of training that they missed?  Could they make it up by attending a different training?

MS. JONES:  Objection.

A    No.  They have to make up the exact training.

Q    Now, this Humane Society training, it was an awareness course, so does that mean that it did not train RPD officers about the policies of the Rochester Police Department?

A    The course is provided by the Humane Society regarding specifically dog behavior and

Lieutenant Michael Cuilla

some, you know, extra tools, exactly what Reno said. No, I don't believe that our policies were part of that PowerPoint.

Q So, for example, if Mr. DiDomenico taught specific tactics that could be used to avoid using lethal force against a dog, those were just basically suggestions, they're not something that would be required by the policies of the Rochester Police Department, true?

MS. JONES: Objection.

A Yes, that is correct.

Q The DiDomenico training is not something that the RPD officers are required to comply with, correct?

MS. JONES: Objection.

A So officers are required to comply with the training, as I understand it. I'm unsure of the question, Counsel. I'm sorry.

Q We had just talked about how the specific tactics that Mr. DiDomenico taught officers to avoid, for example, having to use deadly force against the dogs. Those tactics that Mr. DiDomenico taught were not tactics that are required by policy to be used by Rochester Police Department officers,

Lieutenant Michael Cuilla

correct?

A    Those tactics fall within the policy of the Rochester Police Department, but the policy does not require for those tactics to be utilized, no.

Q    For example -- and I'm not trying to trick you, so let's put this back up.  So putting back up Exhibit 5, if we fast forward to some less lethal options.  So, for example, if we fast forward to page 45 and it says "bite prevention tools" and one of them displayed on this page is chemical repellants such as OC spray, the question is, in an interaction with a dog, officers are not required to use OC spray prior to resorting to their firearm, correct?

A    That is correct.

Q    Other than the Humane Society training from 2014 and the roll call training in 2019, does the RPD provide any other training to its officers about how to safely deal with dogs they might encounter on residential properties?

A    Yes.  It's discussed in the defensive tactics training, as I previously mentioned, as well as firearms training.

Q    How in firearms training does the RPD --

Lieutenant Michael Cuilla

well, let me withdraw that question.

Just tell me everything about firearms training about how officers are taught to deal with dogs, other than shooting them.

A    So officers -- in firearms training, officers are trained to deal with aggressive dogs. Dogs that either are an imminent threat to themselves, others or attacking, are destructive, injured or threatened.  If dogs meet that threshold, the officers are trained on how to use their firearm to stop them.

Q    Okay, so I guess I was confused.  So let me just ask you this, in firearms training, are officers taught how to deal with dogs in any other way than using their firearm against the dog?

A    Firearms training specifically, they are taught to try to create distance prior to an attack. They are taught to put objects between themselves and the animal if possible.  The training in firearms regarding dogs equates dogs closer to a person with a knife, as that is the level of threat to the officer.  A large dog with sharp teeth is similar to what the damage that can be done by a person with a knife.  They're just much faster.  So

Lieutenant Michael Cuilla

that's a lot of the training regarding dogs that are attacking or an imminent threat or destructive, injured or threatening is regarding -- is similar to how an officer would react being charged by a person with a knife.

Q    Does the RPD teach its officers that in the history of the RPD, there has never been an officer that was seriously injured as a result of a dog attack?

A    No.   That does not come up in the training.

Q    Has the RPD ever taught any of its officers in the training that since 1932, no officer in the entire United States has ever been killed as a result of a dog attack?

MS. JONES:   Objection.

A    No.   That has not come up in the training.

Q    Can you tell me -- going back to less lethal options, what are officers trained with regard to the use of OC spray against a dog?

A    Officers are not trained to utilize OC spray against a dog specifically.   They are made aware that it could be an option if the dog has not yet become an imminent threat.

Lieutenant Michael Cuilla

Q   We'll talk about imminent threat in a minute here, but I want to just follow up on what you just said a little bit.  Are officers taught at the dog bite prevention course by Mr. DiDomenico that OC spray is a viable option to use against a dog that either appears like it might begin attacking or is attacking?

**A   So possibly, DiDomenico gives officers options to deal with animals that may be at different levels of aggression.  However, once officers determine that the animal was attacking or an imminent threat to a person or destructive, injured or threatening, then the officers are trained to utilize their firearm.**

Q   Are officers taught about the use of a beanbag gun against dogs?

**A   No.**

Q   Have you ever been trained or taught -- or has the RPD ever trained or taught it officers, you included, that a beanbag gun is a potential less lethal option that could be used against a dog?

**A   A beanbag gun is, for the most part, not readily available to officers when encountering dogs.  If a plan were to be made and enough time was**

Lieutenant Michael Cuilla

present, then the beanbag gun would then be suboptimal. In a situation where an officer has a beanbag gun and is being charged by an animal, I guess we would rely on the officer to use their best judgment. But training an officer to utilize a beanbag gun versus a dangerous dog is not trained.

Q For example, officers sometimes have to respond to scenes where there's a call about a loose dog, true?

A Yes.

Q Does the RPD have any kind of policy that when responding to a scene of a loose dog, that an officer who has a beanbag gun in their car is required to respond to that scene?

A No.

Q Have you ever -- let me withdraw that.

One thing that you had mentioned a few minutes ago was that in firearms training, officers are taught to place an object between themselves and the dog; is that right?

A Officers are taught in the firearms that when being -- when someone has a knife, that distance and having objects between them, objects meaning things like a fire hydrant or a car or

Lieutenant Michael Cuilla

something that would impede the person from reaching them, would be beneficial and give them more time, but not to use their hands which may be needed to reach the tools on their belt to grab an object, no, the officers are not trained to do that.

Q    Are officers trained to use objects such as a backpack to hold between themselves and a dog that might be charging at them to put off or block the dog if it's charging at them?

A    Officers are not trained to have their hands occupied when they may need to utilize the tools on their belt.  So they are trained to keep their hands unoccupied so that they can utilize the tools that they've been given, as opposed to using makeshift barriers or weapons.  Again, although that is the training, you know, if an officer is under a threat by a suspect and they want to grab a table lamp to strike them with, that's the most readily available tool that would keep the officer from getting harmed or a third party from being harmed, I would expect the officer to grab whatever is at hand.  That is the training.

Q    When dealing with dogs specifically, not people, are officers ever taught that if there is



Lieutenant Michael Cuilla

more than one officer, that one officer should have their firearm ready and the other officer should have a less lethal option ready to deal with the aggressive dog?

     A    When there is time to make a plan, when we talk about things like executing a search warrant and officers are making a plan to go to a place where they know there to be aggressive dogs, the practice would be to have animal control come to the call.  Obviously, that is not feasible for every loose dog call.  It's not feasible for every just general run-of-the-mill domestic call.  So most of the time, officers encounter dogs they are not planning to do so.  So if officers have time to plan, then they are encouraged to utilize the resources that are available to them like animal control.  There are no less lethal options that we have that we train specifically for canines.

     Q    So my -- the short answer to my question sounds like if there is two officers at a scene, let's say it's a response to a loose dog call, they show up, one of them is Taser certified, there's no requirement that the Taser certified officer attempt to use their Taser, and that the other officer have

Lieutenant Michael Cuilla

their firearm ready if necessary?

**MS. JONES:** Objection.

**A    We train officers not to utilize a Taser for use with dogs.**

Q    I'm going to ask you some follow-up questions on that in a second. Before we talk about Tasers, officers are not trained on the use of catchpoles, correct?

**A    I'm sorry, catchpoles?**

Q    Correct.

**A    No. Officers are not trained on the use of catchpoles.**

Q    Why aren't officers equipped or trained on the use of catchpoles?

**A    They don't have access to catchpoles.**

Q    Why don't officers have access to catchpoles?

**A    Because I, the City of Rochester, did not purchase them catchpoles.**

Q    Why did the City of Rochester not purchase catchpoles and train its officers to use catchpoles?

**A    I would imagine that is -- I, as the City of Rochester, would say that it has to do with budgeting both the time of the officers and what**

Lieutenant Michael Cuilla

they can and cannot be trained in as well as the feasibility of where they would carry that equipment and cost versus benefit.

Q    Is the City aware that other municipalities have implemented policies that every officer in their department is required to carry a catchpole in their car, that some other police departments require all officers to have the training and have catchpoles in their vehicles?

MS. JONES:  I'm objecting.  That's outside the scope of this deposition.

MR. SHIELDS:  Whatever.  I'm done fighting with you so...

MS. JONES:  I'll also say that the decision as to why we do not -- do or do not have catchpoles in every officer's car is also outside of the scope of this deposition.  So for you to supplement that is also belated.

MR. SHIELDS:  Your belated deposition -- your objection is late.  And so, you know, I object to you raising it after the officer already answered the question.

Q    Lieutenant, I'm sorry.  Now, Lieutenant,

Lieutenant Michael Cuilla

some officers in the Rochester Police Department are equipped with Tasers, true?

A    Yes.

Q    Let's just put up what we'll mark for this deposition as Exhibit 7.  This is a document that was exchanged by the City of Rochester a couple of weeks ago.  And so my first question, Lieutenant, is this a document that you recognize?

A    Yes.  That's part of Axon's training materials.

Q    As we go through this, it's a six-page document.  And on the third of the six pages, basically, this Axon training material explains that Tasers are effective on dogs, true?

MS. JONES:   Objection.

A    It does explain that, yes.

Q    You said that this document came from or it's a portion of a larger training that's provided by Axon, which is the company that bought Taser, correct?

MS. JONES:   Objection.

A    Yes.

Q    Is that training that -- just the overall training that this document -- that this portion was

Lieutenant Michael Cuilla

taken from, is that larger training something that is provided to officers in the RPD who are equipped and Taser certified?

A    Yes.

Q    Is this portion of the training about how Tasers can be effectively used against animals, is that portion of the training provided to RPD officers who are Taser certified and equipped to carry a Taser?

A    Insofar as we make them aware of Axon's findings, but it is not Rochester policy.  We advise our officers not to use a Taser with a dog.

Q    Why do you advise officers not to use a Taser with a dog?

A    One, it is -- the Taser is a weapon designed for use against humans.  As we stand upright, we provide a large target area, and both probes need to hit for the weapon to be effective.  And dogs are horizontal, so oftentimes that can lead to missed probes.  I see the mention in the training as to sometimes when animals -- it is not effective against animals.  That's number one.  Number two, not mentioned in this training is that the Taser may also be lethal to animals.  Certainly, it's not a

Lieutenant Michael Cuilla

nonlethal weapon.  So it is both not completely nonlethal towards the animal and less effective at stopping the behavior that the officers looking to stop.

Q    When you say it's not completely nonlethal, what you mean is that in some circumstances shooting an animal with a Taser could kill them, correct?

A    That's correct.  So we receive extensive training for where to target the person, the human, to not raise the risk of cardiac arrest.  But that is certainly not provided here in this training.  If we were even to utilize it, which again it is not as effective.  That is two of the reasons why we would not need a Taser against a dog.

Q    So a Taser, in some instances, could kill the dog, true?

A    That's true.

Q    And a firearm, in some instances, could also kill the dog, true?

A    True.

Q    A firearm, in more instances than a Taser, is likely to kill the dog, true?

MS. JONES:  Objection.

Lieutenant Michael Cuilla

A    I wouldn't have the statistics on it.    I don't know what it would be.    I don't know how many dogs that have been tased versus shot.    However, what I can say is that a firearm has been shown to be far more effective at stopping dangerous dogs.

Q    I just want to put up what we'll mark as Exhibit 8 for this deposition.    And looking at this document, Lieutenant, it's a Taser International document dated August 8, 2003.    And so my first question is, is this a document that you've ever seen before?

A    I don't recall.

MS. JONES:    Can you zoom in, Elliot, please?

Q    This highlighted portion says, "Over the past several years, we have completed additional animal training and have received 37 field reports of the advanced Taser M26 being used in field applications on animals.    Of these 37 incidents, the M26's use was reported to have been successful in 34 cases and 92 percent success rate."    Do you see it says that?

A    Yes.

Q    Is that a statistic that the City was ever

Lieutenant Michael Cuilla

aware of?

MS. JONES:  Objection.  He's not answering that.

(Reporter asking for clarification.)

MS. JONES:  I'm directing the witness not to answer that question.

MR. SHIELDS:  Come on.  Like, seriously?  I don't know what you're doing here because he's supposed to be here to testify about all less lethal options against dogs and all trainings and policies of the city about using less lethal force against dogs.

MS. JONES:  Yes, that's correct.  So you can ask him what our policy and training is regarding Tasers and other less lethal options.

Q    Were RPD officers ever trained that Taser International has published statistics that the use of a Taser against the dog is successful in at least 90 percent of instance where the Taser is used against the dog?

A    This number is so small to be statistically relevant.  34 out of 37 incidents in a

**Lieutenant Michael Cuilla**

**country of 350 million people with however many Tasers have been deployed may not be statistically relevant to train to the officers. If we are going to give our officers statistics, we're going to want more than 37 examples of something.**

Q    Give me one second. I'm going to put up what will be marked as Exhibit 9 for the purposes of this deposition. And this is a document that was exchanged by the plaintiff with the City in discovery. Lieutenant, on your screen, do you see the Taser document, on the top right corner, it says, "U2 User Course Version 20," and then in the middle, it says, "Taser protect life X2 conducted electrical weapon, end-user course Version 20, effective January 1, 2016," do you see that?

**A    I do see it. There's an X2 at the top. You did say U2. I don't know if you're testing me.**

Q    X2, thank you. Now, is this a document that you've ever seen before?

**A    I can't recall.**

Q    Is this a document that the City is in possession of?

**MS. JONES:  Objection.  It's not part of the scope.  In fact, I was going to ask**

                    Lieutenant Michael Cuilla

          you, this isn't Bates stamped.  Is this

          part of the production you sent a few

          weeks ago?

               THE WITNESS:  Yes, it is.

               MR. SHIELDS:  And it is Bate stamped

          at the top because I didn't put them here.

          This is bate stamped.

               MS. JONES:  Oh.

               MR. SHIELDS:  This is 7016 to 7237.

     Q    If we go to this page -- so it's a
222-page PowerPoint document.  If we go to page 209,
it says animals just like Exhibit 7 did.  So if we
go to the next page, "Effects on animals, if animals
are stunned, consider having animal control standby
to apply a restraint during the cycle."  And then
down here, in the instructor notes, it says, "CEWs
have been shown to be an effective option for
dealing with aggressive animals and have generally
been successful.  Most animals have been
incapacitated or stunned but usually recover
instantly once the CEW cycle is over.  The majority
of them quickly left the scene and broke the wires.
Some dogs, however, do not run away and can become
aggressive.  Deployments were unsuccessful on

Lieutenant Michael Cuilla

animals are typically the result of a single probe impact. Officers must remember they cant -- to cant their CEW to line up the bottom probe with the animal's body. If animals are stunned, consider having animal control standing by to apply a restraint during the cycle."

Lieutenant, is this something that the RPD ever trained its officers on, that slide?

A    That's the same information as the other PowerPoint. We train our officers not to utilize a Taser or conduct an energy weapon against dogs.

Q    Here on the next slide there appears to be a video, which I'll give you a little preview. We'll play it when I put up the next exhibit because we didn't embed it in this one. But just from looking at the slide that's depicted here with the freeze frame of the video, is that video something that the RPD has ever shown its officers?

A    Yes. This training, we have utilized. I have seen this video before.

Q    That's the training that has been utilized by the RPD?

MS. JONES:  Objection.

A    The officers have seen this video, yes.

**Lieutenant Michael Cuilla**

It's not part of the newer training, so it was an older training for Taser.

Q    I want to put up what we'll mark as Exhibit 10 for this deposition.  So this is going to be -- so this is -- Lieutenant, can you see the document on your screen?

A    Yes.

Q    And it says Taser X26P.  Now this is Axon, and it says Version 21 effective January 14, 2019, correct?

A    That is correct.

Q    Is this a document that the RPD has ever used in training its officers?

A    The X26P, I'm uncertain that we've utilized that model, although the training is similar between models.

Q    My question -- if we fast forward to page 135 of the 157-page document -- here, if we go to the next page, 136 of 157, effects on animals. If you quickly glance at that page, does it appear that it contain the same information as the page from the prior PowerPoint, Exhibit 9, that we had just reviewed about effects on animals?

A    Yes.

**Lieutenant Michael Cuilla**

Q    And you testified before that that's the same basic information that's contained in Exhibit 7, which was produced by the City in this case, correct?

**MS. JONES:  Objection.**

**A    Yes, it's the same general information.**

Q    If we go to the next page, page 137 of 157, and there's a video that I'm going to play for you and then I'll have some questions, okay?  And down below the video, for the record, it says, "Recorded on Taser Axon body, officers deployed a single five-second cycle against the aggressive dog. The dog recovered approximately 10 minutes later and was put back in the residence without further incident."  Did I read that accurately, Lieutenant?

**A    Yes.**

Q    I'm going to go ahead and hit play on the video.

(Video playback.)

Q    So the video is over.  It was about 29 seconds long.

**MS. JONES:  Was there sound to that video, Elliot?**

**MR. SHIELDS:  There was sound to that**

Lieutenant Michael Cuilla

video.  It wasn't really pertinent to the video.  But could you hear the sound of the video?

MS. JONES:  I don't know about the first few seconds.  So just be aware that whatever sound, he can't really testify to.

MR. SHIELDS:  Okay, we can play the video again.  Here, let me try it one other way to see if it works better.

A    I feel I got the gist of the video, if that helps.

Q    Well, let me just ask you this, Lieutenant, you said that this is a video that you've seen before in trainings for the Rochester Police Department?

A    Yes.

Q    And this is a video that's been provided to officers within the Rochester Police Department as part of a training dealing with Taser use?

A    Yes.  Insofar -- as I've said, they are advised at that time when viewing the video or going through that training that is Rochester Police Department's policy not to utilize Taser against

**Lieutenant Michael Cuilla**

**dogs.**

Q    If you're showing officers a video during a Taser training but advising them not to do what they see in the video, why are you showing them the video?

**A    We're making them aware of what Axon claims to be effective against animals if that was the case, but we wanted to address the fact that the Rochester Police Department does not utilize Tasers against dogs.**

Q    Are you aware that some Rochester Police Department officers have successfully utilized Tasers against dogs?

**MS. JONES:  Objection.**

**A    I am unaware of that fact.**

Q    If I told you that in discovery in these cases there have been incident reports that have been exchanged that show at least one officer has effectively utilized the Taser against the dog, that officer that utilized the Taser against the dog would have violated Rochester Police Department policy by using the Taser against the dog?

MS. JONES:  Don't answer that.

MR. SHIELDS:  Come on.  You gotta let

Lieutenant Michael Cuilla

him answer.  This is about the policies of the department and the discipline of officers, whether they used less lethal force against the dog or not.  So I'm asking him, he just testified that it's not the policy of the department to utilize Tasers against dogs.

MS. JONES:  I'm sorry.  Maybe I misunderstood your question.

MR. SHIELDS:  Let me withdraw that and ask a new question.

Q    If an officer utilized the Taser against the dog, would that be in violation of Rochester Police Department policy?

A    Yes.

Q    If an officer utilized a Taser against the dog, would that officer be subjected potentially to discipline?

A    Allow me to clarify.  When I say it's a violation of policy, it's a violation of their training.  Certainly, all methods of defending oneself, once under a deadly physical threat, become viable.  It certainly would be suboptimal to a level that I would expect that a verbal counseling would

Lieutenant Michael Cuilla

be required.  The Taser is not an appropriate weapon to use, but in a pinch, can be utilized.  That being said, a sock full of nickels isn't an appropriate weapon to use, but if that's all the officer had on hand, then it could be utilized if in a deadly force situation.

Q    You just mentioned a deadly physical threat.  Does the RPD consider any time that a dog appears to be attacking for that dog to be a deadly physical threat to the officer?

A    The Rochester Police Department considers, under a totality of the circumstances, whether or not something is or is not a deadly physical threat.  Just having a dog is not enough for there to be -- constitute a deadly physical threat.  Just like having a person with a knife does not constitute a deadly physical threat in and of itself.

Q    My question --

MR. SHIELDS:  I'm going to move to strike the answer as nonresponsive to my question.

Q    My question was, any time that a dog is perceived by the officer to be attacking them, is that dog considered by the Rochester Police

Lieutenant Michael Cuilla

Department pursuant to its policies and training, to be a deadly physical threat to the officer?

A     Again, you're not giving me enough information to make that distinction, Counsel.

Q     Just across the board, is it the policy of the department that if a dog is attacking, that dog constitutes a deadly physical threat?

A     Maybe if I could make myself a little more clear.  If a person with a knife was attacking a police officer, you would think that that would constitutes a deadly physical threat, right, given what I had laid out, under common sense rules. However, if that person were a 6-year-old child or a 99-year-old man and moving slow as the grass grows, then that would not constitute a deadly physical threat for which I would want an officer to pump rounds into their body.  However, if someone is attacked by a Chihuahua that's as big as my shoe, then, no, I don't perceive it as a deadly physical threat, no matter how angry it is.  I hope that explains it.  It's the totality of circumstances in these cases that does or does not constitute a deadly physical threat.  But certainly, are there dogs, when attacking, that constitute deadly

Lieutenant Michael Cuilla

physical threat to the officers, the answer is yes.

Q    I think when you referenced like the size differences and DT training, what's that called, it's called like subject --

A    Officer/subject factors.

Q    Officer/subject factors.  Those would apply also to interactions between an officer and a dog?

A    All of the same totality of circumstances apply when utilizing deadly physical force.

Q    Are officers taught about different types of calls that they might respond to or different scenarios where they might encounter dogs during their police duties?

A    Yes.

Q    For example, officers are taught obviously that they'll encounter a dog if they're responding to a call for a loose dog, correct?

A    They may not encounter a dog, but they certainly are trained if they may encounter.

Q    And officers are trained that they might encounter a dog on other types of calls, for example, like a domestic violence call, correct?

A    That is correct.

Lieutenant Michael Cuilla

Q    Are officers taught to prepare differently when responding to a call for a loose dog versus a call for domestic violence situation for how to interact with the dog once they arrive at the scene?

MS. JONES:  Objection.

A    The officers are trained to interact with the dog based upon the dog, but certainly there are other factors that may come into play when it comes to how the officers respond at the dog.  It's going to depend on a multitude of factors that could have nothing to do with the dog's behavior.

Q    My question, I think, was confusing.  Let me ask another way.  Are officers -- when they get the call, are they taught to prepare differently when they're responding to the scene for how to interact with the dog, whether they're responding to a scene for a call for a loose dog versus a call for a domestic violence situation, where they're maybe not sure whether or not there will be a dog when they arrive?

A    How they interact with the dog is not going to be dependent upon the type of call that they are responding to.  How they interact with the dog is going to be dependent upon the dog's behavior

Lieutenant Michael Cuilla

as well as the totality of the circumstances.  Other subject's behavior on the scene, the scene itself, the weather.  There's all sorts of factors that may come into play that may change the officer's behavior towards the dog.

MR. SHIELDS:  Again, I'm just going to move to strike that as nonresponsive to my question.

Q    If you just listen to the beginning of my question, it specifically deals with the preparation.  So are officers taught to prepare -- let me break it down into different questions, okay?  So the question, the first question is, are officers taught to prepare in any way doing something specific when they get a call to respond to a scene involving a loose dog, whether they're taught to prepare to do before they go to the scene?

A    Same as they would prepare for any scene, just taking the context of the call into account, certainly looking out for danger, perhaps parking in a more tactical manner, staying in the car, trying to observe where the dog is prior to getting out of the vehicle, and then -- and only then getting out of the vehicle to try to talk to people at the

**Lieutenant Michael Cuilla**

scene.

Q   Are they taught anything else that they're required to do to prepare for encountering a dog before they go to a call for a loose dog?

A   Other than in-field training, taking some time to observe the scene, but they should be doing that at a every call.  They should -- they are taught to prepare to go to any scene by making observations prior to just exiting the vehicle.  No, there's nothing specific about a call for a loose dog versus a domestic.

Q   Are officers taught that based on the circumstances of the call, they might be more likely to encounter an aggressive dog?

MS. JONES:   Objection.

A   Officers are taught that there -- I mean, there are aggressive dogs in the city.  I -- nothing specific as to the propensity for certain calls that more aggressive dogs or less, no.

Q   What are all of the City's written policies about encounters with dogs?

A   The policy of deadly physical force that we read, the use of force policy, having to do with animals.  There is something about dogs when it

Lieutenant Michael Cuilla

comes to search warrants as well and preparation for warrants. Other than that, there's training that's been given and then the training in best practices is passed down by officers through field training.

Q But the training in best practices down through field training, that's not written policies of the City, correct?

A That's correct. That's not codified.

Q It sounded like you listed three written policies, deadly physical force, response to animal scenes and you said the search warrant policy?

A Yes.

Q So I want to put up first the response to animal scenes and just ask you some questions about that document, which will be marked as Exhibit 11 for this deposition. Lieutenant, on your screen, do you see the document entitled "Police Response to Animal Scenes"?

A Yes.

Q And this is training bulletin that looks like it was issued on May 16, 2017?

A Yes.

Q Do you know if it has been updated in any way since 2017, if there's a more recent version of

Lieutenant Michael Cuilla

this policy or training bulletin?

A     I do not believe there is a more recent version.

MS. JONES:  Can you zoom in for me, Elliot, please?  Thank you.

Q     If we first scroll down to the bottom of the first page of this six-page document, it says that the first thing officers are required to do -- well, let me back up.  If we go to the beginning, under the heading, "Patrol Officers' Duties When Responding to Animal Scenes," the preliminary paragraph says, "Police officers must assess the situation upon arriving on any scene at which an animal is present.  The first priority is the safety of citizens and of the responding officers," correct?

A     That is correct.

Q     It doesn't say anything about the sanctity of life of the dog or any animals, correct?

A     That is correct.

Q     This is the document that you reviewed in preparation for the deposition today, correct?

A     Correct.

Q     If we go down to the bottom of the first

Lieutenant Michael Cuilla

page, "Response as a first responder remember the following," and the highlighted portion here, it says, "Determine if companion animal is secured, confined or restrained," correct?

A    **That is what it says, yes.**

Q    How are officers trained to make that determination?

A    **Just an observation they're basically making when they are responding to the scene that if companion animal is secured, confined or restrained.**

Q    Let's say officers are responding to a call for a loose dog and they had a 911 caller.  Is one way that they could make that determination picking up the phone and calling the 911 caller to make a determination if the animal has been secured, confined or restrained?

A    **Yes.  They can also have at the admin channel call the caller back and request additional information.**

Q    Or, like you said, they can exit their vehicle and they could walk around the area to make visual observation?

A    **They should be making visual observations from their vehicle and then, yes, upon exiting.**

Lieutenant Michael Cuilla

Q    It would be a violation of policy, basically, if they exited their vehicle and they failed to make any kind of reasonable visual observation under the circumstances, correct?

MS. JONES:  Objection.

**A    It would be a violation of their training if they failed to make any reasonable observations prior to exiting their vehicle at any time.**

Q    So, for example, if they exited their vehicle and then entered the yard to a fenced-in property without, first, making a reasonable visual observation, that would be a violation of their training, correct?

MS. JONES:  Objection.

**A    Again, unless there's some exigent circumstance I'm unaware of or, again, barring any sort of other totality of circumstances of how it's played out, yes, they should look into the yard prior to going into the yard.  Yes, we train our officers to look prior to entering anything.**

Q    And the totality of the circumstances would determine the extent to which officers would be required to make that visual observation prior to entering the property, true?

Lieutenant Michael Cuilla

A    Yes.  The more time that they would have, the more time they would be -- they had been trained to take.

Q    So if there's not an emergency and they have time to, for example, walk around the side of the property if there is a fence -- let's say it's a corner property and they have time to walk around to the side of the property to observe over the fence if there are dogs in the yard, their training would require them to take that additional time to walk around to the side of the property to see if there's any dogs present in the yard, correct?

MS. JONES:  Objection.

A    That could depend on the nature of the call.  So, for example, if it's a domestic call, as previously stated, and the officers could reasonable assume that the people are in the house, they would not need to case the entire property prior to knocking on the door seeing if the people needed assistance.

Q    So in a different circumstance where it's not an emergency call, maybe it's a call for a loose dog, if there's time and opportunity to walk around to the side of the house to see if there's any dogs

Lieutenant Michael Cuilla

present on the property, the officers would be trained to do that, to walk around to the side of the property and make a visual -- reasonable visual inspection under the circumstances, correct?

**A    If the officers are on a loose dog call and they are searching for a loose dog and they are not violating anyone's rights, property rights, by doing so, then the officers are expected to make reasonable observations.**

Q    I want to go back to the exhibit and go down to page -- let's see here.  Page 3 of 6, under subheading C, "Animal Bites/Scratches."  And if we go down to the second paragraph here, it says, "Destruction of the animal should be a last resort," true?

**A    That is what that sentence says.**

Q    And is that the policy of the Rochester Police Department, that destruction of the animal should be the last resort?

**A    So if the animal has bitten someone and is secured, then destruction of the animal should be the last resort and testing needs to occur for any sort of diseases that the animal may have had.**

Q    Are you saying that the policy of the

Lieutenant Michael Cuilla

Rochester Police Department is not to have destruction of the animal in all circumstances be the last resort?

A    That is correct.

Q    So, for example, this policy does not require officers to first use or attempt to use less lethal force against the dog.  They're permitted to use lethal force against the dog without first trying to avoid using lethal force?

A    So this is a training bulletin which helps clarify the policy, the policy on when officers can use lethal force against an animal is laid out here on deadly physical force and there are two subs and five circumstances under which an officer is allowed to use deadly force.  This particular subdivision of this particular training bulletin is referring specifically to animals who have bitten or scratched, not animals who are attacking or animals who are threatening or destructive or injured. Simply that if they come upon an animal that has bitten or scratched someone, that if they can possibly maintain the integrity of the animal in order to test it, that they should.

Q    Does this policy also indicate that just

Lieutenant Michael Cuilla

because an animal has bitten somebody, for example, a dog, just because a dog has bitten somebody, that's not a reason to use deadly physical force against the dog in and of itself?

MS. JONES: Objection.

A    **We keep referencing the policy. The policy is that, you know, an animal would have to be -- a dog would have to be attacking or an imminent threat to a person or it can be destructive, threatening or injured. This is not referring to any of those situations. This is referring to a situation in which an animal has bitten someone and if the animal is not any of the situations I've mentioned in which deadly force is authorized, destruction of the animal should be the last resort. We should try to maintain the animal for testing purposes.**

Q    So my specific question is, just because the dog has bitten somebody, that fact alone is not reason alone to shoot and kill the animal, correct?

MS. JONES: Objection.

A    **It would be part of the totality of the circumstances, as I mentioned.**

Q    Thank you. You mentioned deadly physical

Lieutenant Michael Cuilla

force.  Let's put that one up as Exhibit 12. Lieutenant, on your screen, do you see the document entitled "Use of Deadly Physical Force General Order 340"?

A     Yes.

Q     And this is the one that's dated August 29, 2017.  Do you know if this policy has been updated since 2017?

A     I do not believe so.

Q     If we scroll to page 3 of the 16-page document, is this highlighted portion of the policy what you were referencing earlier in terms of the department's policy about when it's appropriate or when it's allowed for an officer to use a firearm against the dog?

A     Yes.

Q     It says, "Members may use firearms against animals when they are, one, attacking or presenting an imminent danger to any person," correct?

A     Yes.

        MS. JONES:  Elliot, can you zoom in again, please?

Q     So my first question is, pursuant to this policy, what is the definition of imminent danger?

Lieutenant Michael Cuilla

A    Danger that will occur whether -- if the officer does not act to stop it.

Q    What kind of danger?

A    Of injury.

Q    Does it require a serious injury or something else?

MS. JONES:   Objection.

A    It requires the threat of injury.  It could be serious injury but, no, it does not require the threat of specifically a serious physical injury.

Q    So it could be a minor injury?

A    If that could somehow be determined, it could be a minor injury.  Let's say imminent danger does not say serious physical injury.

Q    For example, if we scroll up to right above this, where it says "firearm guidelines, Section 3-A," and it says, "Members are justified in removing their firearms from holsters and/or gun mounts and pointing the firearm if the member reasonable believes," and 1-A, it says, "the person or a situation poses or may pose an immediate threat of death or serious physical injury to either themselves or another person."  Did I read that

Lieutenant Michael Cuilla

right?

A    Yes, sir.

Q    And it says, 2, "There is justification to use a firearm against an animal pursuant to Section 3-B below," correct?

A    Correct.

Q    I guess my question is, are these two sections, A-1 and B-1, the injury that it's referencing or the danger that it's referencing, are those different definitions or the same?

A    They're different.  They're two separate sections.

Q    So Rochester Police Department officers are not taught that they cannot discharge the firearm against an animal unless it's posing a threat of serious physical injury, correct?

MS. JONES:  Objection.

A    That is correct.  It does not have to be a serious physical injury, but they are also not taught to differentiate between a dog that can cause physical injury versus serious physical injury. That's a very fine distinction.

Q    If an officer, according to this policy, does not believe that the dog may pose a threat or

Lieutenant Michael Cuilla

causing a serious physical injury, they think that the dog may only pose a threat of causing a danger, and if they interpret dangerous, meaning a minor physical injury, they'd be permitted under this policy to shoot the dog?

A     Either sub 1 or sub 2.  Sub 2 is less restrictive than the first subdivision, B-2.

Q     B-2 requires supervisory approval when there's time to obtain it, correct?

A     Yes, when there's time to obtain it.

Q     My understanding was that sub 2 generally was only applicable to situations where, for example, there was an injured deer on the side of the road and an officer was going to put it out of its misery.  Are you saying that sub 2 also applies to situations with dogs?

A     Yes.  I actually do not know of a deer injured on the side of the road that I have found threatening or destructive, so I don't think that's a good definition.

Q     Destructive, injured or threatening --

A     Yes.  Two different situations.

Q     Is it the practice of the department to get supervisory approval before shooting a dog?

Lieutenant Michael Cuilla

A      When there is time to obtain it.

Q      And if there is no time to obtain it, but if an officer perceives the dog to be attacking or presenting an imminent danger of any kind, then they're permitted to shoot the dog?

A      Or destructive, injured or threatening. There are five situations listed under B in which an officer would be authorized to use a firearm against the dog.  Attacking and presenting an imminent danger is -- or two of them, the other is destructive, the other is injured and the last is threatening.

Q      Two would be, for example, like an officer gets a call to a scene where two dogs are fighting and the dogs are just fighting like in someone's basement, but they're not attacking a person, but they're being destructive.  In that situation, the officer would be required to call a supervisor and say, hey, dog one is about to kill dog two, can I shoot dog one; is that fair?

A      If the officer had time.  If dog one were to kill or attacking -- in most instances, it's a very -- it's a larger dog attacking a much smaller dog and to the officer making the distinction that

Lieutenant Michael Cuilla

that dog will kill the smaller dog, as dogs are deemed property under the Fourth Amendment, that would be destruction of property.  So that would be destructive behavior and, of course, the officer would be authorized to utilize their firearm against the dog that is the aggressor.  If they had time to obtain supervisor approval, they should obtain it, but if they do not have time because they want to preserve the property being destroyed, that being the smaller dog, then they would be authorized to utilize their firearm.

Q    Has the RPD ever taught its officers that dogs are considered more than just property but to be members of people's families?

A    No.  The Rochester Police Department does not view dogs as persons.

Q    I want to put up what will be marked as Exhibit 13 for the purposes of this deposition and this is the Buffalo Police Department's policy about responses to animal scenes, instances involving animals.  So my first question is, has the Rochester -- is this a document that you reviewed in preparation for the deposition today?

MS. JONES:  Zoom in, please.

Lieutenant Michael Cuilla

A     I don't recall.

Q     Has the Rochester Police Department ever consulted with Buffalo Police Department about the Buffalo Police Department's policies and practices regarding the shooting of dogs?

MS. JONES:  I'm directing him not to answer.  This goes to the creation and the background of our policies.  This is not what the substance of our policy is.

MR. SHIELDS:  This isn't about the creation of policies.  This is a question about, hey, what's your policy, is it influenced by what your sister city did over in Buffalo?

MS. JONES:  Yeah.  Like, how we create or determine what our policy is, that's exactly what you're asking and it's outside the scope of this deposition.

MR. SHIELDS:  Absolutely not.  So I'm going to go ahead and ask all my questions and you can direct him not to answer and we can raise it with the court later.

Q     Lieutenant, are you aware that in 2014 the City of Buffalo implemented new training and

Lieutenant Michael Cuilla

policies in response to several high-profile dog shootings that received widespread media attention?

                    **MS. JONES:  Objection.  You don't have to answer because that's outside the 30(b)(6).**

                    **MR. SHIELDS:  No, it's not.**

     Q     But, Lieutenant, are you aware that -- whether the RPD ever considered implementing any new policies of its own in training officers like they did in the Buffalo Police Department?

                    **MS. JONES:  I'm not -- I'm objecting to that too because I think it still goes to how we determine what our policy is as opposed to the substance of the actual policy.**

     Q     In correcting the substance of any of the Rochester Police Department's policies, did it ever look to any other jurisdictions such as the city of Buffalo to consider whether they were going to make any changes or updates to the Rochester Police Department policies?

                    **MS. JONES:  Yeah, I'm directing him not to answer that either for the same reasons I've stated.**

Lieutenant Michael Cuilla

MR. SHIELDS:  Sure, we can do that right now.

THE VIDEOGRAPHER:  Going off the record.  The time is 2:46 p.m.

(A brief recess was taken from 2:46 p.m. to 3:01 p.m.)

THE VIDEOGRAPHER:  The time is now 3:01 p.m.  We are back on the record.

Q    Lieutenant Cuilla, we just took a short break.  During that break, did you have an opportunity to speak with your attorney?

A    I did.

Q    Did you speak with your attorney about any of your testimony?

A    No.

Q    I can't really hear you.  I don't know if you --

A    I apologize.  No.

Q    So we're discussing some training materials.  Has the City of Rochester ever provided -- well, let me withdraw that question.

Is the City of Rochester aware that there's free training provided by the Department of

Lieutenant Michael Cuilla

Justice Community Oriented Policing Services about how to safely interact with dogs?

MS. JONES: Objection. Elliot, if you just rephrase your question, that might make it permissible under the scope.

Q    Has the City of Rochester ever provided training to its officers that was developed by the Department of Justice Community Oriented Policing Services?

MS. JONES: Objection.

A    Not that I'm aware of.

Q    Has the City ever amended its training materials for encounters with dogs based upon any interactions that officers had with dogs?

MS. JONES: Objection. Elliot, now we're back to the creation and development. Just ask --

MR. SHIELDS: Absolutely, no, it doesn't. And first of all, it goes to the body-worn camera policy that we agreed upon for number 5.

MS. JONES: Maybe you can rephrase it. By now you're just asking generally if they've changed our training based on

Lieutenant Michael Cuilla

prior situations.  That goes to how we develop our training.  So maybe if you rephrase it --

MR. SHIELDS:  It actually falls under what we agreed to for number 5, "make recommendations for changes in policies and procedures, make recommendations for changes in training."

MS. JONES:  Maybe you can restate your question because that's not what I thought you asked.  I thought you said has the City ever changed its training based on prior incidents with officers.

Q    After reviewing the body-worn camera videos of any interactions that an officer had with a dog, has the City made any recommendations for changes in training?

MS. JONES:  Hold on.

MR. SHIELDS:  If I don't hear an objection, I'm going to ask Lieutenant Cuilla to answer the question.

A    Not that I'm aware of.

Q    To follow up on that topic number 5 that we agreed to, 5-C, it says "make any recommendations

Lieutenant Michael Cuilla

for changes in training" and then in parentheses, "including any specific changes that have been made." So my follow-up question is, after reviewing any body-worn camera videos of incidents involving officers discharging their firearms at a dog, has the City of Rochester made any specific changes to its training?

A    Not that I'm aware of.

Q    Has the City of Rochester utilized body-worn camera recordings of incidents where officers discharged their firearms at dogs to review the incidents to determine whether the officer's actions were objectively reasonable under the circumstances?

A    Yes.

Q    Can you explain to me what the policy is for the Rochester Police Department in terms of reviewing the body-worn camera recordings of the incidents where officers have shot dogs to determine whether or not the officer's actions were objectively reasonable under the circumstances?

A    The policy on the body-worn camera review is to review the body-worn camera as well as the subject resistance report or incident report

Lieutenant Michael Cuilla

depending on if it's a firearm incident against a dog.  That's all to be reviewed by the supervisor to determine if there's any need for remedial training or if that there were any violations of policy.

Q    So other than the supervisor, is anyone else required to review the body-worn camera video?

A    When it is submitted to PSS, PSS may choose to review the body-worn camera footage as well.

Q    Is there a requirement when an officer discharges their firearm at a dog that PSS review the body-worn camera video?

A    Not that I'm aware of.

Q    Is there a requirement that the supervisor must review the body-worn camera video within a certain period of time?

A    Not that I'm aware of.  They have to review the incident within a certain period of time and body-worn camera review would be part of that.

Q    What periods of time do they have to review the incident?

A    For just the general use of force, department policy is 10 days.

Q    When you say just a general use of force,

Lieutenant Michael Cuilla

you mean like against the person where a subject resistance report would have to be completed?

A    Yes, a subject resistance report.

Q    Is an incident report in a case where an officer discharges their firearm at a dog, is there any different or a specific period of time that that incident report is required to be completed?

MS. JONES:   Objection.

A    There may be in the general orders that specific guidelines as to how long an incident report should take to review, but I'm unaware if it articulates an exact amount of time.

Q    When a supervisor reviews a body-worn camera recording of an incident where an officer had shot a dog, are they required to document that review on any specific form?

A    No.  The review of the body-worn camera footage is documented in the system.

Q    When you say it's documented in the system, what do you mean?

A    There's a log of who used body-worn camera footage.

Q    Other than the log that shows who viewed the footage, is the officer required to, for

Lieutenant Michael Cuilla

example, make a note somewhere that the officer's actions complied with their training and the RPD's policies?

A    Once your supervisor signed off on the report, if there is any violation of policies that the supervisor believes needs to be documented, they document it on the form, as I've mentioned previously.

Q    The method for basically reviewing whether an officer's actions complied with training and policies, if it were to go up the chain of command, would be just the documentation in the report itself, correct?

MS. JONES:  Objection.

A    If the supervisor adds any additional training forms or an IDC, that could be passed along the chain as well.

Q    Does the RPD track the effectiveness of its policies and training?

A    Generally, yes.

Q    How does it track the effectiveness of its policies and training?

MS. JONES:  Objection.

Q    You can answer.

Lieutenant Michael Cuilla

MS. JONES:  I'm sorry, which topic are you on?

MR. SHIELDS:  Tracking the number of dogs shot by officers.

MS. JONES:  Hold on.

MR. SHIELDS:  1-J.

MS. JONES:  Do you want to break your question as more specific to that or are you just talking about -- it sounds like you're talking generally.

MR. SHIELDS:  Sure.  I was going to ask a general question, then specific questions.

Q    So how does the department track generally the effectiveness of its policies and training?

MS. JONES:  Elliot, I think you need to ask a specific question about tracking the number of dogs shot by officers.

MR. SHIELDS:  First, I'm asking him generally how it works.

MS. JONES:  I'm directing him not to answer because it's outside the scope of the 30(b)(6).

Q    Lieutenant Cuilla, how does the RPD track

Lieutenant Michael Cuilla

the effectiveness of any policies and training regarding -- how does the RPD track the effectiveness of any policies and training regarding using force against dogs?

MS. JONES:  (Inaudible.)

MS. REPORTER:  I can't hear you, Ms. Jones.

MS. JONES:  Yeah, I'm sorry, I'm trying to think to myself.  Can you repeat your question?

Q    Lieutenant Cuilla, how does the RPD track the number of dogs shot by officers?

A    PSS keeps track of it in a system called LERMS, L-E-R-M-S.

Q    Who tracks the number of dogs shot by officers at PSS?

A    Who within the section of the Professional Development Section, it's under the supervision of the commanding officer of the Professional Development Section, whoever he designates to track.

Q    How do they track the number of dogs that are shot by police?

A    It's inputted into the system as a firearm discharge and the incident can be searched as a

Lieutenant Michael Cuilla

firearm discharge and looked up to see which incidents have to do with dogs and which incidents have to do with deer or other animals.

Q    Why does the RPD track the number of instances where dogs are shot by officers?

A    The RPD tracks all --

MS. JONES:  Objection.  No, I think that's outside the scope still.

MR. SHIELDS:  I can absolutely ask him why they track the number of dogs shot by police.

MS. JONES:  I don't think so.

MR. SHIELDS:  What's the point of tracking --

Q    Lieutenant Cuilla, what is the point of tracking the number of dogs that have been shot by police?

MS. JONES:  I still think that's outside the scope.

MR. SHIELDS:  I'm calling the court again and let's go off the record.

THE VIDEOGRAPHER:  Going off the record.  The time is 3:14 p.m.

(A brief recess was taken from

Lieutenant Michael Cuilla

3:14 p.m. to 3:29 p.m.)

THE VIDEOGRAPHER: The time is now 3:29 p.m. We are back on the record.

MR. SHIELDS: Thank you. We just had a conference with Judge Peterson about the question regarding why the RPD tracks the number of dogs shot by officers and Judge Peterson ruled that he believed that was outside of the scope of the deposition notice. So we're going to move on from that question.

Q    So, Lieutenant Cuilla, my next question is, going back to the body-worn camera recordings, under what circumstances would the City consider making recommendations for changes in policies and procedures if it reviewed a body-worn camera recording of an officer shooting a dog?

A    Changes in policies and procedures are submitted to the chief and the chief makes that ultimate determination.

Q    The question is, under what circumstances might some change in policy be submitted to the chief? You know, for example, if an officer shot five dogs in a month, is that a -- and the RPD

Lieutenant Michael Cuilla

sergeant reviewed those instances, determined that maybe the officer shouldn't be disciplined, but he was complying with RPD policy, but maybe they determined, oh, that's too many dogs that were shot in a month period, maybe we should change our policy.  Is that an instance where that proposed policy change might be made to the chief?

MS. JONES:  Objection.

A    If a sergeant felt that there needs to be a policy change regardless of what inspires that sergeant, they would codify that on an interdepartmental correspondence submitted to their supervisor up to the chain of command to the chief of police.

MR. SHIELDS:  We just call for production of any interdepartmental correspondence regarding any proposed policy changes regarding how officers interact with dogs that were prompted by review of any body-worn camera recordings.

MS. JONES:  Just follow up in writing.

Q    Between 2013 and present, how has the RPD tracked the number of dogs shot by officers?

Lieutenant Michael Cuilla

**MS. JONES: Objection.**

**A     When a dog is shot by an officer, an incident report is generated and that report gets submitted to PSS.  They input it into a system called LERMS.  That's L-E-R-M-S.**

Q     Does LERMS create any kind of statistical analysis of the number of dogs that are shot by police?

**A     No.**

Q     Does LERMS create any kind of report about the number of dogs shot by police?

**A     You can put out a listing of all the firearm discharges and then sift through those to see which ones were dogs that were shot by police. Again, you'd have to obviously sift out treating incidents to the animals simply being injured versus animals that were aggressive.**

Q     Do you know when the RPD began tracking the number of dogs shot by police?

**A     As far back as 30 years ago, it's been a policy of the Rochester Police Department to generate an incident report when an animal is shot by police, any firearm discharged at an animal.  So that's prior to -- far enough back that I would not**

Lieutenant Michael Cuilla

know where that began.

Q    Are there any reporting requirements regarding tracking the number of dogs shot by the police?

A    Reporting by the officer to the City or reporting by the City to another agency?

Q    Reporting by the City to another agency.

A    There are not.

Q    Reno DiDomenico testified that for a number of years the City would provide him with statistics about the number of dogs shot by police. Does the City still provide Mr. DiDomenico with reports about the number of dogs that are shot by police?

A    We would only do so upon his request.

Q    Do you know why the City was providing Mr. DiDomenico with this tracking of the number of dogs shot by police?

MS. JONES:  Objection.

A    If we know as per the statistics, you know, as a law enforcement officer, we would provide them with statistics, but that would have to be cleared through the chief's office.

Q    Do you know if Reno has made any changes

Lieutenant Michael Cuilla

to the training that he provides to the RPD between 2013 and the present?

MS. JONES: Objection.

A I am unaware of any changes Reno has made to his training.

Q Reno provides his training currently at the police academy, correct?

A That is correct.

Q Do you know if Reno has updated his training at all based on any review, either by Reno or by the City, of body-worn camera recordings of incidents where officers have shot dogs?

MS. JONES: Objection.

A I am unaware of him modifying his training in any way due to any situation.

Q Other than the training provided by Reno, has there been any training changes as a result of officer's -- or a supervisor's review of an officer shooting a dog, so an officer's review of body-worn camera incident where an officer shot a dog?

MS. JONES: Objection.

A No. Not in my estimation have we changed our policy due to body-worn camera review of a shooting incident from a dog shooting.

Lieutenant Michael Cuilla

Q   And maybe it was a bad question, but my question I meant to ask was, has the RPD made any, not policy changes, but changes in any training after reviewing a body-worn camera incident involving a dog shooting?

**A   No, not that I'm aware of.**

Q   I'm going to ask about topic 1-K, which is the requirement to fill out an incident report and/or a firearm discharge report any time an officer discharges their firearm.  So my first question is -- I guess I -- I called it a firearm discharge report.  Is that a -- is that a separate form from an incident report?

**A   No.  The incident report is used to report incidents, that includes crime reports, missing persons reports.  That is all the same form.  The general form is called an incident report.**

Q   So, for example, if I requested firearm discharge reports from the City, that would really just be incident reports that reported incidents where a firearm was discharged?

**A   That's correct.**

Q   And when a firearm is discharged, is the incident report always completed by the supervisor?

Lieutenant Michael Cuilla

A     You mean if it's ever completed by the person who discharged the firearm?

Q     Correct.

A     No.  It would be completed by a supervisor.  I am not certain it is always completed by their supervisor, but a supervisor would complete that.

Q     Do you know why the requirement to fill out an incident report is -- that it's filled out by the supervisor and not the officer that discharged the firearm?

            MS. JONES:  Objection.  I'm
            instructing him not to answer.

Q     What are the policies of the RPD regarding the requirement to fill out an incident report for a firearm discharge report any time that an officer discharges their firearm?

A     I could --

            MS. JONES:  Objection.

A     I could reference the GO.  I can't recite it from memory, but in general, it is that a supervisor will complete the report for an officer that has discharged their firearm at an animal.

Q     This topic isn't limited to when an

Lieutenant Michael Cuilla

officer discharges their firearm at an animal.  So the question is, is there a difference in the reporting requirements when a firearm is discharged at a person versus when a firearm is discharged at an animal?

A    Is there a difference -- I'm sorry.  Maybe I -- is there a difference in the reporting requirements when a firearm is discharged at a person versus when a firearm is discharged at an animal?

Q    Correct.

A    Yes, there is a difference in the reporting requirement.

Q    What is that difference?

A    There are several differences that occur at the scene, as well as the differences of severity.  Do you mean just the differences in how the report is written?

Q    Or if an officer discharges their firearm at a person, are they required to fill out some other report other than an incident report?  Are they required to put -- fill out some other report about their firearm discharge?

A    So the officer, when -- of course, if it's

Lieutenant Michael Cuilla

used against a person, an officer is required to fill out a subject resistance report. And they're not required to fill out a subject resistance report if the firearm -- if force is used against an animal. An animal is not recognized as a subject. It is a piece of property.

Q Just to make sure I'm clear, so when an officer discharges a firearm against a dog, the officer does not fill out any paperwork documenting their own actions, true?

A That is correct.

Q But when an officer discharges a firearm in other circumstances, like at a person -- well, let me withdraw that.

As opposed to the situation where an officer discharges their firearm at a person, the officer would be required to fill out what happened from their own perspective in a subject resistance report, correct?

A I have to refresh my recollection of the GO when an officer shoots a person. I'm unsure just because of my recollection of whether or not they have to fill out a subject resistance report as there may be a criminal investigation and there may

**Lieutenant Michael Cuilla**

**be different requirements.**

Q Yesterday, Officer Leach testified that there was some kind of follow-up report that's required to be completed by officers if they discharged their firearm at a person. He didn't say subject resistance report, but he said that there was some writing that had to be created. Does that sound accurate?

**MS. JONES: Objection.**

**A It does sound accurate, but I think it'd be best to reference the GO about this particular incident as the laws have been updated that all shootings against people are not handled by the -- first, by the district attorney's office, so there may be different reporting requirements. The GO would have the most recent information.**

Q Do you know which general order that would be?

**A That would be the general order dictating use of deadly force.**

Q So that's 340, does that sound right?

**A That sounds correct.**

Q Let me just put that out. So that is Exhibit 12 that we had already marked. Let me ask

Lieutenant Michael Cuilla

you, Lieutenant, here under procedures -- subheading 8, procedures, if we go down here, it says, "if firearm discharges accidental or unintentional and did not injure anyone" -- so that's not what we're looking at, right, because --

A    No.

Q    Let's see.  So it would be B, "if a discharge" -- "the supervisor will respond, call for medical assistance, secure the scene, manage the scene."  It says, "Immediately prepares and submits an incident report, subject resistance report and any of the reports as so directed by the RPD."  So, I, is that where it would be?

A    So, I, that would be the member's supervisor.  That would be the member's supervisor would fill out the report.

Q    And then if we go down to D, "If a firearm discharges directly to an animal, the member's supervisor will submit an incident report," correct?

A    Yes.

Q    And then it also requires D-2, "the member's section, platoon commanding officer will respond to the scene of the incident and direct a thorough investigation and notify PSS."  And then

Lieutenant Michael Cuilla

"the commanding officer of PSS will make a determination based on the circumstances of the situation as to whether or not to respond to the scene and/or make further notifications and document any nonresponse to the scene by PSS and make it part of the incident file," correct?

A    Correct.

Q    Can you just explain what 3-B means?

A    If PSS does not respond to the scene, they have to document why they did not respond to the scene.

Q    How would they go about documenting that they did not respond to the scene?

A    They would submit an attachment to their incident report.

Q    So if there was a dog shooting incident and the supervisor created an incident report and PSS did not respond to the scene, then an addendum would be attached to that incident report explaining why PSS didn't respond to the scene?

A    Showing the PSS did not respond to the scene, yes.

Q    If that addendum was not created, that'd be a violation of the policy?

Lieutenant Michael Cuilla

A    Yes.  Their nonresponse has to be documented.  I'm unsure if it would suffice in practice for the supervisor to add that nonresponse to their report.  PSS may feel that that meets that requirement to document their nonresponse if it is documented by the supervisor filling out the incident report.

Q    So you're saying maybe it's not a separate --

A    It may not need to be a separate incident report -- I'm sorry.  A separate addendum in practice.  It may be documented by that supervisor on the report as requested by PSS.

Q    So it says, "the commanding officer of PSS will make a determination if they're going to respond or not and then document any nonresponse."  So you're saying that that could be read to mean maybe the commanding officer of PSS is notified and say, yeah, we're not going to come to the scene and then the supervisor could put that in the report by himself or herself?

A    Yes, if requested to do so by the commanding officer of PSS.

Q    Let's go back to Exhibit 1, the Notice.

Lieutenant Michael Cuilla

The next topic is "training received by each of individually named defendant police officers relevant to the claims and defenses in this action." Were you prepared, before coming to testify to this deposition today, to testify about that topic?

A    I was.

Q    Let's go up through each case, defendant by defendant.  In the Marianne Anniszkiewicz case, the two named defendant officers are Jennifer Trenton and Brian Cala.  And so can you tell me, in terms of the claim for unreasonable search of the curtilage, what is the training that both of those officers received about that topic?

A    They received the search and seizure training as dictated in the academy by DCJS.  They would receive refreshers throughout their field training as well as any relevant inservice training that has touched upon that topic, a roll call training that touched upon that topic since their hire date.

Q    What are the dates of all of the inservice trainings that they received on those topics?

A    I am unaware of the exact dates of all of the inservice trainings that Brian Cala has received

Lieutenant Michael Cuilla

since 1997 or Jennifer Trenton has received since 2004. They are biyearly.

Q When is the last time that Brian Cala received any training about the search of the curtilage to a property?

A If it's the last time that Brian Cala received training regarding searches -- I'm sorry. Specifically, the training -- does the training have to solely be about that topic or just touched on the topic of searches, illegal searches, warrantless searches?

Q The claim in the case is unreasonable search of the curtilage to the property. So the training would have to concern search of the curtilage of a property.

A Then I would have to just refer to their previous training bulletin.

Q The last time that the City is aware that Officer Cala received any training about the search to a curtilage would be the training from 2019?

A Yes.

Q That was just like a five-minute roll call training?

MS. JONES: Objection.

Lieutenant Michael Cuilla

A     It was a roll call training.

Q     On average, how long do roll call trainings last for?

MS. JONES:  Objection.

You can answer now.

A     Eight to ten minutes.

Q     Is that something that's like a policy about roll call training, the length of time that they're supposed to last?

MS. JONES:  I'm sorry, can you repeat that?

Q     Is there a policy about how long a roll call training is supposed to last for?

A     Roll call itself lasts for 15 minutes. The training has to fit within that timeframe. However, multiple days can be utilized for that training.  So you might run a training with several compartments to it.  The last time we did the De Bour training was split up into several parts and part one, which was eight to ten minutes, was delivered in -- within the first week.  We try to catch every officer that applied to that roll call. Part two was delivered the next week and part three delivered the third week and so on and so forth.  So

Lieutenant Michael Cuilla

the training can actually be rather lengthy over time.

Q    The training bulletin that we marked as Exhibit 2 from 2019 that was entitled "Warrantless Searches on Curtilage."  It was a two-page document. Is that the type of roll call that would have been more like eight minutes or more like a series of days like you just testified to about the De Bour training?

A    That would be up to the supervisors.  If they believe that the officers understood the training within the eight to ten minutes, then they wouldn't bring it up in roll call again other than to reiterate it.  However, really, any roll call training officers are going to get at least more than once, however many times the supervisors do the roll calls, however many times it takes to hit all of the officers as well as make sure the officers have an understanding.

Q    Officer Cala, before the 2019 roll call training, when is the last time before that that he had received any training regarding the search of a curtilage?

A    For a specific search to curtilage, again,

Lieutenant Michael Cuilla

I would have to check every training that has occurred to see if any -- make any mention of that particular search because, again, the training wouldn't be titled "searches to curtilage," although it may touch upon that fact.  However, the last time that I am fully aware that Officer Cala had received that training would be the prior training bulletin.

Q    When is the last time that Officer Cala received any training about the search of a curtilage prior to the incident at issue in the Marianne Anniszkiewicz case in which he's named as a defendant?

A    The 2018 incident?

Q    Give me one second and I'll confirm the date for you.  Correct, that incident occurred on June 10, 2018.

A    Again, that training would be -- so if that predates the latest training bulletin that you have on warrantless searches and seizures, there could be any update to the general order that occurred in that time.  Prior to that, he would have received it again in the academy in field training.

Q    As we sit here today, you're unsure of when the last time that Officer Cala received any

Lieutenant Michael Cuilla

training prior to the June 10, 2018 incident on searching a curtilage to a property, correct?

MS. JONES:  Objection.

A    I am certain that Officer Cala was trained.  I am certain on the first time he was trained and then he was trained fully.  However, I am uncertain as to the last time his training was refreshed on that particular topic.

Q    As we sit here today, you can't say whether or not between Officer Cala's academy training and the training he received in 2019, whether he received any training at all about the search of a curtilage, true?

MS. JONES:  Objection.

A    That is correct.  I cannot confirm whether he received any training on that particular topic.

Q    Before June 10, 2018, when is the last time that Officer Cala received any training about the legal claim is unlawful seizure of personal property, which in regular language means discharging his firearm at a dog?

A    If it comes to unlawful seizure of personal property, again, I was not -- I did not look through all of the training that occurred since

**Lieutenant Michael Cuilla**

**1997 on that topic.  I'm sure I could do so.  It would require a significant amount of time on my part, more time that I was given to prepare for this deposition.**

Q    As you sit here today, you don't know when the last time Officer Cala received training on discharging his firearm at a dog, correct?

**MS. JONES:  Objection.**

**A    I can say that he did receive that training in the documents that were provided and their dates.  Other than the documents that were provided, I did not pick through all of the training issued by the Rochester Police Department from 1997 to this date to see if there were any references to the issues at hand, nor have I spoken to every supervisor that Brian Cala had since 1997 to today to see if they engaged in any remedial training about these issues.**

Q    And you didn't speak with Officer Cala himself to see when the last time that he was trained on either of the issues at issue in the Anniszkiewicz case, correct?

**A    Yes.  As to Officer Cala, I did not speak to Officer Cala directly about this deposition.**

**Lieutenant Michael Cuilla**

Q    How about Officer or Sergeant Jennifer Trenton, do you know when the last time that she received any training about the search of a curtilage?

A    So the answers for all of the officers are going to be my reference to the training that was -- documents that were provided.  That was what I was tasked with retrieving.  I did not speak with any of these officers directly regarding their training.  I did not speak with their supervisors regarding any remedial training that they might have done that may not have been documented.  I did not dig through all of the trainings that have been conducted by the Rochester Police Department for these particular keywords that may have been mentioned or touched upon in other trainings.

Q    As we sit here today, you're not prepared to testify about any of the trainings specifically received by any of the individually named defendants in any of these seven cases, true?

MS. JONES:  Objection.

A    No.  I am prepared to talk about the training that was documented and presented.  I'm prepared to talk about their academy training where

Lieutenant Michael Cuilla

they are fully trained in all of these topics. I'm prepared to talk about the field training. I am not prepared to talk about every conversation that they had with their supervisors regarding these topics, nor would I be prepared to talk about every training conducted by the Rochester Police Department from their date of hire to today's date. I simply did not go through every single document for those trainings.

Q    Officer Cala, do you know if he was equipped with a Taser on June 10, 2018 when he shot Ms. Anniszkiewicz's dog? And her dog's name was Sampson.

A    I would need to have my recollection refreshed about any of these particular officer's equipment during these incidents.

Q    Do you know if Officer Cala ever watched the video that we watched as part of the Taser training in Exhibit 10 and whether he was ever made aware that the Taser is a viable nonlethal option against the dog?

A    I can say that -- again, I would have to refresh my recollection if Officer Cala is a Taser operator. If he is a Taser operator, regardless of

Lieutenant Michael Cuilla

whether he watched that video, at no time would he be advised that he should be using a Taser to tase a dog in a situation where a firearm was a more appropriate tool.

Q   What if under the circumstances Officer Cala had determined that a Taser was a more appropriate tool than a firearm?

MS. JONES:  Objection.  I think that that's outside the scope.

Q   If Officer Cala was, in fact, carrying his Taser, did he ever receive any training that a Taser could be an effective less lethal option to use against the dog?

MS. JONES:  Elliot, I don't think Officer Cala is a certified Taser operator.

MR. SHIELDS:  I believe that he is.

MS. JONES:  I don't think so.

MR. SHIELDS:  I believe that he testified in his deposition that he had a Taser on him or in his interrogatory responses.  Okay, maybe you're right.

A   My answer can be for any officer trained in Taser, general.

Lieutenant Michael Cuilla

Q    Officer Whitney Celentano had a Taser on her at the time that she shot and killed Alexandria Barnes's dog or shot Alexandria Barnes's dog.  Do you know if Officer Celentano ever received the training that we reviewed as Exhibit 10, the video in that training PowerPoint of the officer effectively using a Taser against the dog?

A    If Officer Celentano was shown that video as part of her Taser training, which appears that it would be the case, it would only be in the context of it should not be used to -- in a situation where a firearm is a more appropriate tool, that the Taser is not to be used against dogs.

Q    So is the Rochester Police Department's policy that under no circumstances is a Taser ever appropriate to use against dogs?

A    There are very, very few Rochester Police policies that are under no circumstances.  There are circumstances that would dictate officer use almost any level of force.  So I certainly can't sit here today and say that is the case.  We would say that a firearm is the most appropriate tool to use when a dog presents with the five determinations that are listed under the deadly force GO.

## Lieutenant Michael Cuilla

Q    So the specific question was whether Officer Celentano was provided and viewed that video as part of her training, part of her Taser training. For the record, specifically the video that's embedded in the PowerPoint presentation that was marked as Exhibit 10 for the purposes of this deposition on page 137 of the 157-page exhibit.

A    **Prior to this most recent Taser training and the removal of the video, it was part of the Taser training video. If she had received her Taser previously, then yes, she has viewed that video.**

Q    When did that video get removed from the Taser training?

A    **That's the most recent PowerPoint that you were provided with.**

Q    It was just removed in the 2023 version?

A    **I believe it's from 2022 but yes.**

Q    So from whatever the prior version before that was, the video was included in that version, correct?

A    **It was embedded in Taser previous versions of trainings.**

Q    If we go to Cheryl Cox case, the defendant is Dakota VanBrederode and the claims are unlawful

Lieutenant Michael Cuilla

seizure of personal property and trespass to channels or conversion. So it's just the state law claim for shooting the dog. Can you tell me all of the training that Dakota VanBrederode received on those topics?

A He received the training -- all the training that you've been provided with since his hire date, 2015. Most importantly, the largest amount of training on that particular topic would have been conducted in the academy and through his field training program. The subsequent training would be considered to be refresher training as opposed to training about a topic that he was not trained on. These topics are trained in the academy.

Q Do you know when the Humane Society training, when that began being taught at the academy?

A I don't have the specific date.

Q Do you remember the dates that Dakota VanBrederode attended the academy?

A Yes. Right after his hire date at 9/22/2015, he would have attended the academy for six months after that.

Lieutenant Michael Cuilla

Q    Do you have a document that you just referenced to refresh your recollection of the date that he attended the academy?

A    I do.  I have a document that lists all hire dates of the officers.

Q    Do you have any other documents that you reviewed during the deposition with you that you've referenced to help you answer any questions?

A    No.  I have the document that lists just the topics that you have been referencing just to kind of keep track of where we are.

Q    And then the other document that you just referenced was just a document with the hire dates of all the various officers?

A    Correct, just the officers involved in the case.

Q    Can you just hold that up for us?

A    Sure (complying).

Q    What other information is on that other than their hire dates?

A    Case name, case date, officer's name, hire date and whether or not they are still employed.

Q    When is the last time that Dakota VanBrederode, before the incident in the Cheryl Cox

Lieutenant Michael Cuilla

case, received any training about how to safely interact with dogs at a residential property?

A    I'm just referencing the document to see when the incident occurred.  So the last time -- since 2021 would be the -- again, that I am aware of as has been documented is the 2019 roll call training.

Q    We'll move on to the Charles Dempsey incident.  Claims there are unlawful seizure of personal property, unlawful seizure of the plaintiffs, Charles Dempsey and his daughter and assault for Javier Algarin and then unreasonable search of the curtilage and trespass for both Javier Algarin and Adam Gorman and then failure to intervene for Adam Gorman.  So just starting with Officer Algarin, when's the last time that Officer Algarin, before the October 2018 incident, had received any training about how to lawfully interact with any dogs that he might encounter on a residential property?

A    The most relevant training he would have received would have been in 2014, if that was a 2018 incident.

Q    What was Officer Algarin's hire date?

Lieutenant Michael Cuilla

A    I'm going to have to reference the sheet for the hire date.  I do not have them memorized.

Q    That is more than fine.

A    2017.

Q    If he was hired in 2017 --

A    Then he received the training in 2017 or early 2018 when he received it in the academy and it was touched upon in the field training.

Q    I forget what your answer was to my question earlier if you know when Officer DiDomenico began doing the Humane Society training at the academy.  Do you remember what year that happened in?

MS. JONES:  Objection.

A    I would have to check with the academy as to when that started.

Q    Is there a possibility that there might have been a gap there and then Officer Algarin maybe didn't receive that training at the academy?

A    As of 2017, no.  The training definitely had started prior to 2014.

Q    Prior to the incident in October of 2018, when is the last time that Officer Algarin received any training about a search of the curtilage to a

Lieutenant Michael Cuilla

property?

A    As he had just finished with the academy, it would have been in the academy and then the field training.  He had just finished with his field training that summer.

Q    How about Officer Gorman, when is the last time that Officer Gorman received any training about the search to the curtilage of a property prior to the incident?

A    Again, I would have to refresh my recollection with the dates of the training bulletins that we talked about and if any of them fell between 2016 and 2018 to get the exact last time he had received the training.  He had certainly received it in 2016 when he was hired and 2017 during his field training.

Q    The warrantless searches on curtilage, Exhibit 2, that we had reviewed earlier in the deposition that was dated May 30, 2019, so does that refresh your recollection of when the last time it might have been?

A    Yes.  It would be during his field training, which occurred in 2017.

Q    So he would have been taught by his field

Lieutenant Michael Cuilla

training officer, you know, what the legal requirements were when he was basically learning on the ground after the academy, correct?

A    **He was taught in the academy.  It is touched upon and refreshed during field training.**

Q    We'll move on to the Gerslin incident, which was September 2018.  The claims there are unlawful seizure of personal property and unreasonable search of the curtilage by Jeremy Nellis and Josh Kelly, Fabian Rivera and Aaron Springer and unlawful seizure of plaintiff, Erin Gerslin, by Jeremy Nellis and Josh Kelly.

What I want to ask is, because Officer Algarin also had the same claim against him, when are officers permitted to point their guns at a person?

A    **That's directly referenced in the GO and it is when there is a situation when a person is presenting a threat of a deadly -- serious physical injury or deadly physical force.**

Q    So if an officer pointed their gun at a person and they weren't presenting a threat of serious physical injury or deadly physical force, then that would be a violation of the general order

Lieutenant Michael Cuilla

to point their gun at that person, correct?

A    A person or a situation.

Q    If the situation did not present the officer with deadly physical force or serious physical injury, then they would not be permitted to point their gun at the person, correct?

A    Yes.  If the situation or person does not dictate the use -- the threat of serious physical injury and deadly physical force, then the officer should not have their gun unholstered and pointed at a person.

Q    When is the last time before the September 2018 incident that Jeremy Nellis, Josh Kelly, Fabian Rivera and/or Aaron Springer had received any training about the search of a curtilage?

A    That would be from the training bulletins provided.  And if it is after that date -- well, actually, that date was in 2021.  I think the 2019 training bulletin would apply.

Q    So Gerslin was in September 2018. Before --

A    I have a different date.  Maybe mine is wrong.

Q    Erin Gerslin's dog was shot in September

Lieutenant Michael Cuilla

of 2018.  So prior to September of 2018 --

A     That is my mistake.

Q     I'm sorry?

A     That is my mistake.  I thought it was 2021.  If it's prior to 2018, it would be the last relevant legal update or their academy training, whichever came later.

Q     As we discussed earlier, in their depositions both Fabian Rivera and Aaron Springer testified that they had no understanding that the curtilage to a property was entitled to Fourth Amendment protection prior to the incident in the Erin Gerslin case.  So I guess my question regarding the training is, do you think that that was training deficiency on the part of the RPD?

MS. JONES:  Objection.

A     It appears that it might be a training deficiency on the part of the officer involved because certainly we train to the standards that are set forth by New York State law, New York State case law when it comes to our search and seizure training provided to us by the DCJS.

Q     Do you know when the last time that Fabian Rivera received any training about the definition or

Lieutenant Michael Cuilla

the legal requirements to enter and search the curtilage to a property prior to September 2018?

A    If it is not in the -- if that window does not include any of the legal updates provided -- or training bulletins provided, then it would have been in his academy and field training.

Q    Do you know what Fabian Rivera's hire date was?

A    I do.  It is 7/31/2000.

Q    So it would have been about 18 years prior to the incident at issue?

A    His academy, yes, approximately.

Q    What was Defendant Aaron Springer's hire date?

A    10/7 of 1996.

Q    Would it be the same answer for Defendant Aaron Springer, that the last time he had received that training would have been during his academy and field training in 1996, 1997?

A    That I am aware of.  As we get training bulletins, some are rescinded.  So it might have been other training that they could testify to that I would not be aware of if it's been rescinded and it wasn't held too.

[Page 236]
August 22, 2023

**Lieutenant Michael Cuilla**

Q I'm confused by your answer. So you said that Rivera's last training on entering and searching the curtilage would have been at his academy and/or field training in or around the year 2000, correct?

**A Yes.**

Q So Defendant Springer would have been the same, correct?

**A I believe you showed me a training bulletin that was dated 1997 and Springer was hired in 1996.**

Q Okay, I'm sorry. That's why I was confused. It would have been --

**A The only --**

Q -- warrantless entries. So you're right, Exhibit 4, warrantless entries with or without exigent circumstances, dated January 1997. So his last time that he would have been training -- trained on anything having to do with searching potentially the curtilage to a property would have been when he received that training bulletin, which we marked as Exhibit 4?

**A That is potentially the last time that he received that training.**

Lexitas Court Reporting
800-678-0166

Lieutenant Michael Cuilla

Q    So it looks like that training only discusses exigent circumstances generally and not anything specifically about entering the curtilage to a property.  So if that's the case and that doesn't discuss entering the curtilage to a property, would the last time that Defendant Springer have received any training about the legal requirements to enter the curtilage to a property and conduct a search, that would have been at the academy in 1996?

A    It would have been until 1997.  It would have been around the same time and field training.  Again, that's the time -- you know, as I stated, that is the time that they are trained that that is what those words mean.  Those words and that operation is used throughout their career.  So, again, it's not the last time that they heard the word curtilage.  Well, maybe they like used the word property, but it was described to them that a person's property contains the curtilage.  They were trained that, yes.

Q    When were they trained that?

A    In the academy.

Q    After the academy, are you aware of any

Lieutenant Michael Cuilla

training that either of them received to specifically discuss the legal requirements to enter and search the curtilage to a property?

A    I'm not aware of any specific training.

Q    And then how about Josh Kelly and Jeremy Nellis, what were their hire dates?

A    Josh Kelly was hired tin 2007.  Jeremy Nellis was hired in 2008.

Q    Same questions for them.

A    Same answers, Counsel.

Q    Just for the record, the same answers would be their last time that they received any training about entering and searching the curtilage to a property would have been during their academy and field training in 2007 and 2008?

A    Yes.

Q    How about before the September 2018 incident, when is the last time that either Josh Kelly or Jeremy Nellis received any training about how to lawfully interact with dogs on residential properties?

A    It could be the 2014 training.

Q    We move on to the McGill incident.  The defendant is Trevor Jones.  What was Defendant

Lieutenant Michael Cuilla

Jones's hire date?

A    2017, 9/25/2017.

Q    Claims there are only unlawful seizure of personal property.  The question would be, when is the last time that Defendant Jones received any training about the legal requirements or how to lawfully interact with a dog on residential property?

A    2019.

Q    Would he receive the roll call training update?

A    Yes.

Q    And how about before that?

A    That would be his academy training, field training.

Q    Other than his academy training and the roll call training, would Officer Jones have received any other training about how to lawfully interact with dogs?

A    Again, I -- I guess I -- I have to get some clarification here.  When you say training, you simply are referring to formal training, formal documented training or are you referring to any incident that would solidify their training?  So in

Lieutenant Michael Cuilla

other words, officers interact with dogs many times over the course of their career and those interactions may be documented, may not be documented, may be observed by a supervisor, may not be observed by a supervisor, who would then discuss with the officer if the officer had interacted poorly or had, you know, done an unlawful search, when that officer would receive confirmation that their training was correct through all of the searches that they had done that led to successful prosecutions. I mean, that would reaffirm the training. I mean, in the same way that you're only formally trained in addition in second grade, but you don't need to be trained as an officer on how to add because our officers have to utilize that skill. And if their addition is poor, they cannot add or cannot spell, then they would receive remedial training. So it would be confirmed through the operation of their career, their successful operation, that what they are doing is correct, that they are following the policies and procedures because they are supervised and observed and evaluated. So the last time they were formally trained would be these dates that we're referring

Lieutenant Michael Cuilla

to, however, that training is reaffirmed each and every time they utilize that training in their career and are then observed and evaluated by their supervisor.

Q    So the answer to your question is, I'm asking about formal trainings.

A    Formal trainings, then, yes, these are the dates of the formal trainings.  Just by listing their hire dates and listing the documentation that you've been provided, those are going to be the answers.  And the answer is, all of them, they went to the police academy, got the basic certification of a police officer and successfully completed the field training program.

Q    So for Officer Jones, that would have been academy and field training, correct?

A    That's correct.

Q    And then the last case is Victoria Preston and the defendant is Mitchell Leach and the claim is unlawful seizure of personal property.  So what was the hire date for Officer Leach?

A    9/24/2018.

Q    The last time he would have received any training about interactions with dogs would have

Lieutenant Michael Cuilla

been the roll call training in 2019?

A     That's correct.

Q     And then before that, it would have been his academy training and his field training?

A     Yes.

MR. SHIELDS:  Let's take a short break.  I just want to review some notes real quick.  We come back in like 10 minutes?

THE VIDEOGRAPHER:  Going off the record.  The time is 4:30 p.m.

(A brief recess was taken from 4:30 p.m. to 4:44 p.m.)

THE VIDEOGRAPHER:  The time is now 4:44 p.m.  We are back on the record.

Q     Lieutenant Cuilla, welcome back.  After taking our break for about 14 minutes there, same questions as before, did you have an opportunity to discuss your testimony at all with your attorney?

A     I had an opportunity.

Q     Did you do so?

A     No.

Q     The other same question as before, are there any answers that you gave that you'd like to

Lieutenant Michael Cuilla

either clarify or change your answers here?

A    Not at this time.

Q    So I just want to put up one more exhibit, then ask you some questions about it.  So the exhibit is going to be the file history activity for the body-worn cameras of the defendants in these cases.  So this will be Exhibit 14 for this deposition.  Lieutenant, is this a document that you've seen before, the file activity history?

A    Yes.

MS. JONES:  Can you zoom in again, please, Elliot?

Q    This first page of the 14-page document, this one just has to do with -- it looks like the Dempsey incident here because the upload was done by Javier Algarin on October 19, 2018.  Can you just generally take me through the names of the people who had some sort of activity, their viewing or exporting the file, and what their role would have been in terms of reviewing and exporting the files?

A    Sure.  So first is Officer Algarin.  He uploaded the file.  Jason Rudolph is his sergeant.  He reviewed it.  Javier viewed his own file.  Ralph Montinarelli is lieutenant, reviewed it.  Javier

Lieutenant Michael Cuilla

viewed his own file. And then it gets into who are the BWC or at the time were the body-worn camera workers. You know, Lieutenant Perkowski was part of the body-worn camera program as well as Matthew Ehlers. And then there are a few more views, Javier Algarin, Lieutenant Perkowski. Steve Kennedy is a sergeant. And then there's not any new names until Abigail Minchella, who I am unsure who Abigail Minchella is at this time.

Q  Do you know what Steve Kennedy's role might have been in reviewing the video?

A  I need to refresh my recollection of the particulars of this case as to why Sergeant Kennedy would be involved.

Q  This is the case where -- it happened on Kosciusko Street. My client's address was 53 Kosciusko Street and Officer Algarin and another officer pull up to the front on Kosciusko Street and the individuals ran through the backyards. I believe it was 61 Kosciusko Street, 53 Kosciusko Street and then one of them was apprehended in 49 Kosciusko Street. And the other individual was apprehended on, I believe it was 54 Sobieski Street. Does that refresh your recollection?

Lieutenant Michael Cuilla

A    Yeah, it does.  I'm unsure of Sergeant Kennedy's exact assignment at the time, but a sergeant may review that body-worn camera footage for a multitude of reasons, perhaps having to do with the address.  I mean, either uninvolved, perhaps an investigative purpose for the individuals involved and went to view the footage.  Sergeant Kennedy is an investigative -- a sergeant at this time.  He may have had an investigative purpose to view the footage.

Q    So if we go down to these first few views, it sounds like from your answers that it would have been Sergeant Rudolph and Lieutenant Montinarelli who would have been directly involved in any supervisory review of what happened in the incident?

A    Yes, sir.

Q    Was Montinarelli Rudolph's supervisor?

A    I'd have to check the rosters from the time.  That is the most likely explanation of why that lieutenant reviewed this particular footage.  Yes.

Q    If we go down to the next incident, this is the Marianne Anniszkiewicz case.  Same questions, it looks like it was Brian Cala first who uploaded

Lieutenant Michael Cuilla

it and then Corey Clark would have been his --

A    Sergeant.

Q    -- supervisor, correct?

A    Yes, sir.

MS. JONES:  Let him finish his question before you answer.

THE WITNESS:  I apologize.

Q    And then Cala again, then Brian Marone. Who's Brian Marone?

A    He's a captain now.  He was a lieutenant at the time.

Q    Just looking at that, if he was the lieutenant at the time, would he have -- if he had viewed it on the same day of the incident, 6/10/2018, that would have been most likely a view that was done directly involved in a review of the incident itself and to determine whether Officer Cala had complied with his training and policies?

MS. JONES:  Objection.

A    Yes.  That would be my estimation from the view history.

Q    And then if we go up after Corey Clark, a couple of more views.  It's Lieutenant Perkowski

Lieutenant Michael Cuilla

and -- I'm sorry. Did you say earlier that he was a lieutenant or that he was somebody who was in the body-worn camera program?

A He's a lieutenant and was in charge of the body-worn camera program.

Q So that was a few days after the incident. So if he's viewing the video as part of the body-worn camera program, would that be part of like a supervisory review of the incident or something else?

A That would most likely be something else nothing to do with the body-worn camera program and not having to do with the content of the incident.

Q And then above that is Jeffrey Pursel. Who is Jeffrey Pursel?

A He's a sergeant at the same platoon.

Q The same platoon that Brian Cala was assigned to?

A Yes.

Q So that would most likely be like a supervisor review of some sort?

A Yes. There are times where supervisors will ask other supervisors to review footage if they want their opinion.

Lieutenant Michael Cuilla

Q    Then how about David Williams?

A    Same, supervisor on that platoon.

Q    When you say supervisor, do you mean sergeant?

A    He's a sergeant, yes.

Q    And then how about Jeremy Anzalone?

A    Also a lieutenant.

Q    On the same platoon?

A    He is the lieutenant on the day shift.  So that would have been Corey Clark's -- as of 2018, it would have been Corey Clark's direct supervisor.  Brian Marone may have been there on an overtime shift and he's on the initial review.  And then Jeremy Anzalone would do the another review as it is his platoon.

Q    And then above that, it's a bunch of entries by Matthew Ehlers, who you said was part of the body-worn camera program, correct?

A    Yes.  So that's why most of his entries are exports.  Not a lot of the officer's supervisor are trained in exporting files.

Q    Exporting file would be like for a response to a discovery request or a FOIL request?

A    Yes.

Lieutenant Michael Cuilla

Q     And then after that, we've got Adam Devincentis.  Did I say that right?

A     Yes.

Q     And who's Adam Devincentis?

A     He is a union representative.

Q     Sometime in September, it was sent to the union -- or viewed by the union representative.  Do you know if they have the ability to view the video like from the Locust Club offices or does it have to be sent to them?

A     I don't believe the Locust Club office computer has access to these particular programs or review the city --

Q     If Adam was a union representative, he'd still be also an RPD officer, correct?

A     Yes, he is.  He's a sergeant.

Q     And then Michael Perkowski, again, so he's from the body-worn camera unit, right?

A     Yes.

Q     And then Matthew Ehlers, again, from the body camera, Perkowski body camera, Ehlers.  Saladeen Mian?

A     Mian is also in the body-worn camera unit.

Q     So moving on to the next one, this would

Lieutenant Michael Cuilla

be the Alexandria Barnes case. So we've got, first, the officer who shot the dog, Whitney Celentano, uploading it and then it looks like the first person who viewed it is Sam Lucyshyn. And Sam Lucyshyn, what was his rank?

A    At that time, I believe he was a captain's deputy officer.

Q    Do you know why he would have been the first person to view the file after it was uploaded?

A    It looks like he was his deputy officer that evening and probably reviewed it immediately.

Q    It looks like it was viewed a couple of days later. Do you know, like, at the time if he would have been Officer Celentano's like direct supervisor?

A    I do not believe so. I believe that Darren Maxwell was her direct supervisor, Sergeant Maxwell, and Brochu was her lieutenant.

Q    For some reason, Sam Lucyshyn viewed it a couple of times before her lieutenant, Daniel Brochu. Does that all look like it would have been views that were done in a supervisory capacity to review the incident?

A    Yes.

Lieutenant Michael Cuilla

Q    And then how about Agustin Gonzalez, what was his role?

A    He is also a lieutenant on that platoon.

Q    That would have also most likely been a supervisory review of the incident?

A    Yes.

Q    How about above that, Joseph Graham?

A    He is a lieutenant on a day platoon.

Q    That was viewed a few months later.  Any idea why that might have happened?

A    It looks like it was viewed a year and a few months later.

Q    There we go.  You're right, a year and a few months later.

A    Again, maybe for an investigative purpose, maybe due to the people involved, maybe due to the location involved.  That is oftentimes -- if there is some other investigation occurring, he may review body-worn camera footage from that location.

Q    Within the program, obviously, you can tag the location of where the incident happened?

A    That is correct.

Q    How about above that, Anthony DelVecchio?

A    He is a sergeant now -- in 2022, he was in

Lieutenant Michael Cuilla

PSS, and most likely, it looks like he retrieved this footage for counsel.

Q     That's why it says "profile update"?

A     Yes.

Q     That's what it indicates that to you?

A     That's what it indicates that to me.  That is not just a view.

Q     This incident -- if you look at the incident involving Brandon Contreras, just from looking at this document, are you familiar with what incident this was?

A     I'd have to have my recollection refreshed.

Q     This was an incident that happened in July 2021 when officers responded to, I believe it was a domestic call, and the suspect jumped out the window and the dog jumped out the window with the suspect and Officer Contreras fired his weapon multiple times at the dog as it was standing in the vicinity of where the officers were apprehending the suspect on the ground.  Are you familiar with the incident that I'm talking about?

A     I probably need more documentation to refresh my recollection to this particular incident.

**Lieutenant Michael Cuilla**

Q   I don't need to ask details of the incident.  The real question is the same as before, just about the supervisory process after this body-worn camera was uploaded and who the people are -- who are listed on this document.  Are you able to do that without knowing the details of the incident?

**A   That, I can do, yes.**

Q   So the first person is Jason Barton.  Who is that?

**A   Sergeant.**

Q   Sergeant?

**A   Yes, he is a sergeant.**

Q   Would he have been Officer Contreras's supervisor?

**A   Yes, in '22.**

Q   And then after that, it's Sarah Zanni, and --

**A   Yes.  It appears to be someone in the body-worn camera or IT department.**

Q   Is that indicated to you just by the fact that it -- the file was exported or something else?

**A   Her employee number is different than ours.**

Lieutenant Michael Cuilla

Q    So that would indicate, for example, that maybe she's like a civilian?

**A    Yes, that's correct.**

Q    What about the numbers indicates that to you?

**A    So --**

**MS. JONES:  Objection.**

**A    Officers --**

**MS. JONES:  Yeah, I don't think you need to answer that.  No.**

**MR. SHIELDS:  Whatever.**

Q    After that, Timothy Pancoe?

**A    Pancoe, he is a lieutenant.**

Q    Timothy Pancoe, so that would have been most likely part of the supervisory review of the incident?

**A    That's correct.**

Q    And then above that, a bunch of entries by David Williams.

**A    He is in the Professional Standard Section.**

Q    And if it said "update profile," would that mean that he collected the video or something, is that what you said before?

Lieutenant Michael Cuilla

A    He just updated --

MS. JONES:  Objection.

A    He updated something about the -- just how the footage was tagged and what system it was in.  I mean, ultimately, I'm not entirely sure exactly what he updated on the profile of this particular footage.

Q    After that, it's Mian, who you said is just from the body camera unit, right?

A    Yes.

Q    And then Ms. Jones.  Let's go to the next one, which is the Victoria Preston incident.  First, we've got Officer Leach, then we've got Agustin Gonzalez, who's the sergeant?

A    Yes.

Q    Then Officer Leach.  Then Robert Osipovitch, was he the lieutenant?

A    No.  Also a sergeant.

Q    Also a sergeant.  So just a different sergeant?

A    Yes.

Q    Same platoon?

A    Yes.

Q    And then a few views by Agustin Gonzalez,

Lieutenant Michael Cuilla

and then Jeffrey Koehn.  Who is Jeffrey Koehn?

A    He was the captain of that section.

Q    Leach, Leach, Gonzalez, Gonzalez, and then we've got Bing Reaves.  And was he another sergeant?

A    I believe Bing Reaves was a sergeant at that time, yes.

Q    And if you know, would that have been part of some sort of supervisory review?

A    Yes.

Q    And then Thomas Wild, who is Thomas Wild?

A    Thomas Wild is an officer.

Q    He's just an officer?

A    That's correct.

Q    I guess my question then is, officers can review body-worn cameras from other officers?

A    No, not generally.  So he would have had to have been given permission for some reason, investigative purpose -- I mean, they can't -- the footage was viewed over a month later during the daytime hours.  So there must be some investigative purpose as to why he was viewing the footage.

Q    It looks like the rest of these folks are people that we've discussed before, so we'll go down to the next one, which looks like it's the -- do you

Lieutenant Michael Cuilla

remember which incident Alexander Pierce was?

**MS. JONES:  Sorry?**

Q    Oh, I know, that was Reginald McGill so -- okay.  So if you -- well, the details of the incident are, I guess, pertinent to the video itself.  So first, we have Officer Pierce and then --

**A    Tamburello-Conway is a lieutenant.**

Q    She's a lieutenant?

**A    Yes.**

Q    And then Jennifer Trenton would have been the supervisor, correct?

**A    Yes, the sergeant.**

Q    Sergeant?  Then Officer Pierce.  Then Jason Terrigino.  How do I say that, Terrigino?

**A    He works in the IT department.**

Q    He exported the file.  And then we've got Timothy Pancoe.

**A    He was the lieutenant on the day shift.**

Q    Pancoe and then we've got Alexander Pierce again, Pierce and then just David Williams and Mian.  Let's go down here.  So this is the Cheryl Cox incident, on page 7.  So first, we've got Dakota VanBrederode uploading and viewing it.  And then

Lieutenant Michael Cuilla

Benjamin Caruso.  That would have been his sergeant, correct?

A     Yes.

Q     And then Danielle DiGaspari, what was her role?

A     She was an investigative coordinator.

Q     I'm sorry, did you say investigative coordinator?

A     That's correct.

Q     Can you explain to me what that means?

A     That is an officer assigned to assist with the coordination of investigations that are ongoing in the department, follow-up investigations.

Q     So just from looking at this document, can you tell what her role in reviewing the body-worn camera might have been?

A     There may have been some investigative angle to it because the next person is Captain Zenelovic, who was assigned to the investigative unit at the time.

Q     But just from looking at this, you don't know what the investigation would have obviously entailed, correct?

A     No, not at this time.

Lieutenant Michael Cuilla

Q    And then we've got Officer VanBrederode, and then above that Robert Wetzel.  What would -- it says he exported the file?

A    He's a sergeant in the investigative unit.

Q    And then Mian, above that, a few months later, also exported it.  Just from their roles within the department, do you know if you can tell if their exporting of the file would have been for different purposes?

A    No, not from their roles.  I -- they are in different units.  Sergeant Wetzel is in an investigative unit.  Mian is in the body-worn camera unit.  From their roles, I guess I could reasonable assume that there were different purposes for any exported file.

Q    And then above that, everybody else is in the body-worn camera unit, right?

A    Correct.

MR. SHIELDS:  We'll mark as Exhibit 14 just those first seven pages.  I don't need to ask you questions about the rest of the document.  Lieutenant, I think that I have completed all of my questions for you for today.  I appreciate

Lieutenant Michael Cuilla

your time.

MS. JONES:  Can you give me a few minutes?  I'd have to look at my notes in case I have any questions.

MR. SHIELDS:  Yeah.  I'm not exactly sure that you're entitled to ask questions of your 30(b)(6) witness.

MS. JONES:  I don't see why not.  Can we go off the record or do you want to wait for a few minutes while I look at my notes?

MR. SHIELDS:  Sure, we can go off the record.

THE VIDEOGRAPHER:  Going off the record.  The time is 5:09 p.m.

(A brief recess was taken from 5:09 p.m. to 5:16 p.m.)

THE VIDEOGRAPHER:  The time is now 5:16 p.m.  We are back on the record.

MS. JONES:  Thank you.  So I did want to repeat today's objection to have a video recording here happening.  We do think that the federal rules require that you show information in each segment, but

Lieutenant Michael Cuilla

aside from that, we don't have any further questions for the witness, so I think we're finally done for the day.

MR. SHIELDS: Just for the record, we disagree with the City's objection, but thank you.

MS. JONES: I will also say that the City only wants an electronic copy of the record for the transcript, excuse me, Madam Court Reporter.

MS. REPORTER: So you'd be ordering a copy of this transcript then, Ms. Jones?

MS. JONES: Yes.

MS. REPORTER: Thank you.

MR. SHIELDS: As to the federal rules, yeah. And same for the plaintiff, please, just an electronic copy.

MS. REPORTER: Sure.

THE VIDEOGRAPHER: Off the record, Counsel?

MR. SHIELDS: Yes.

MS. JONES: Yes.

THE VIDEOGRAPHER: This concludes the video-recorded deposition of Lieutenant

Lieutenant Michael Cuilla

Michael Cuilla, 30(b)(6) of the City of Rochester on August 22, 2023.  We are off the record at 5:17 p.m.

(Several documents were marked as Plaintiff's Exhibit 1 through 14, for identification, as of this date.)

(TIME NOTED:  5:17 p.m.)

_____
LIEUTENANT MICHAEL CUILLA

Subscribed and sworn to before me this____day of_____, 2023.

_____
NOTARY PUBLIC

INDEX

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| Lieutenant Michael Cuilla | Mr. Shields | 7 |


EXHIBITS

| PLAINTIFF'S | DESCRIPTION | PAGE |
|---|---|---|
| 1 through 14 | Several documents | 259 |


REQUESTS

| DESCRIPTION | PAGE |
|---|---|
| All of the documents that the 30(b)(6) witness reviewed in order to prepare for today's deposition | 12 |
| Roster of current Taser operators | 14 |
| Additional training forms that specifically concern an officer entering or violating somebody's rights by unlawfully entering the curtilage to their property | 29 |

REQUESTS

DESCRIPTION                                    PAGE

Any IDCs that exist regarding officers    41
allegedly trespassing on the curtilage
to a property

Training provided on searches of the      58
curtilage and any searches more
generally provided to officers at the
police academy

Production of any of those materials      88
given to officers at any of the
trainings referenced

All interdepartmental communications     128
regarding any instance where an
individual was found to have unlawfully
entered the curtilage to a residential
property

All documentation regarding any verbal   130
counseling, any additional training or
any IDCs that were issued as a result
of any findings or allegations regarding
an officer unlawfully entering the
curtilage to a residential property

REQUESTS

| DESCRIPTION | PAGE |
|---|---|
| Any interdepartmental correspondence regarding any proposed policy changes regarding how officers interact with dogs that were prompted by review of any body-worn camera recordings | 203 |

CERTIFICATION

STATE OF NEW YORK       )

                        ) ss

COUNTY OF SUFFOLK       )


          I, EMMA BADGER-DeRIENZIS, a stenotype reporter and Notary Public within and for the State of New York, do hereby certify:

          THAT the witness(es) whose testimony is hereinbefore set forth, was duly sworn by me;

          THAT the within transcript is a true and accurate record of the testimony given by said witness(es).

          I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

          IN WITNESS WHEREOF, I have hereunto set my hand this 22nd day of August, 2023.

_____
EMMA BADGER-DeRIENZIS

**ERRATA SHEET FOR: LT. MICHAEL CUILLA**

LT. MICHAEL CUILLA, being duly sworn, deposes and says: I have reviewed the transcript of my proceeding taken on 08/22/2023. The following changes are necessary to correct my testimony.

_____

PAGE LINE   CHANGE      REASON

----|----|--------------------|--------------

----|----|--------------------|--------------

----|----|--------------------|--------------

----|----|--------------------|--------------

----|----|--------------------|--------------

----|----|--------------------|--------------

----|----|--------------------|--------------

----|----|--------------------|--------------

----|----|--------------------|--------------

----|----|--------------------|--------------

----|----|--------------------|--------------

----|----|--------------------|--------------

----|----|--------------------|--------------

----|----|--------------------|--------------

----|----|--------------------|--------------

----|----|--------------------|--------------

----|----|--------------------|--------------

Witness Signature:_____

Subscribed and sworn to, before me

this ___ day of _____, 20 ___.

_____  _____

(NOTARY PUBLIC)    MY COMMISSION EXPIRES

**A**

**A-1 (1)**
186:9
**a.m (7)**
1:14 6:12
85:23 86:2,2
86:4 115:23
**Aaron (10)**
51:11 54:11
56:16 57:9,22
232:11
233:15
234:10
235:14,18
**Abigail (2)**
244:9,9
**abilities (1)**
131:13
**ability (2)**
30:25 249:9
**able (4)**
15:22 62:22
77:24 253:7
**above-noted ...**
1:19
**absolutely (3)**
190:20 193:19
201:10
**academy (80)**
25:4,5,19 26:5
26:12 27:3,4
27:11 29:25
30:2,3,10
44:19,20 48:4
48:5,8,11,11
48:15 58:9,22
59:4 60:18
61:3,8,10,11
61:12,16,18
62:5 63:3,5,7
64:15 65:15
66:24 74:7
75:17 91:16
98:4 105:14

137:10,12,22
206:8 215:16
219:23
220:11
222:25
227:11,16,19
227:22,24
228:4 230:8
230:13,16,20
231:3,4 232:4
232:5 234:7
235:7,13,19
236:5 237:11
237:24,25
238:15
239:15,17
241:13,17
242:5 264:10
**access (13)**
32:21 34:6,7
34:18,23 35:3
35:5,11 75:6
81:16 155:16
155:17
249:13
**accidental (1)**
212:4
**account (2)**
141:5 174:20
**accurate (7)**
124:15 145:6,9
145:16 211:9
211:11
266:14
**accurately (1)**
166:16
**acknowledge...**
5:6 18:25
**across-the-b...**
106:7,9,14
**act (1)**
185:3
**action (8)**
67:24 68:16

71:10 134:19
135:20,23
215:4 266:17
**actions (12)**
32:14 54:19
104:14
132:13 133:4
135:25
136:10
195:14,21
198:3,11
210:11
**activity (5)**
43:24 64:24
243:6,10,19
**actual (1)**
191:15
**ADA (1)**
109:17
**Adam (8)**
1:8 75:15
134:9 229:15
229:16 249:2
249:5,15
**add (6)**
36:7 89:12,14
214:4 240:16
240:17
**addendum (3)**
213:19,24
214:12
**addition (11)**
45:2 48:20
69:18 79:5,18
90:19 104:7
106:16
111:25
240:14,17
**additional (36)**
28:19,25 29:2
29:9 31:10,14
31:20 32:15
33:23 38:4,11
39:10,12

48:24 58:14
59:16 72:13
88:17 92:14
104:25
106:18
113:19
124:25 125:4
125:15,18
130:11,19
136:23
137:21
160:17
178:19
180:11
198:16
263:20
264:20
**address (5)**
6:7 59:12
168:9 244:17
245:6
**addressed (4)**
27:12 31:4
48:23 135:24
**addressing (1)**
31:6
**adds (1)**
198:16
**adequate (1)**
33:16
**adherent (1)**
97:15
**admin (1)**
178:18
**administer (1)**
3:13
**administered...**
90:21
**administrati...**
4:13
**administrati...**
40:14
**advanced (1)**
160:19

**advice (2)**
88:22 106:23
**advise (3)**
93:7 158:12,14
**advised (2)**
167:23 224:3
**advising (2)**
9:13 168:4
**affirmatively...**
14:11 73:12
**afraid (1)**
21:14
**agencies (1)**
109:19
**agency (2)**
205:7,8
**aggression (1)**
151:11
**aggressive (14)**
14:14,22
139:10,22
149:7 154:5,9
163:19,25
166:13
175:15,18,20
204:18
**aggressor (1)**
189:7
**ago (9)**
14:18,19,20,21
72:11 152:19
157:8 163:4
204:21
**agree (7)**
9:20 32:7
55:13 81:3
118:12,14,15
**agreed (14)**
3:4,8,11 4:5
5:6 10:6
75:25 116:20
117:21 134:7
134:17
193:21 194:6

194:25
**Agustin (3)**
251:2 255:14
255:25
**ahead (6)**
8:24 9:2 15:20
20:17 166:18
190:21
**al (2)**
6:15,16
**Alexander (2)**
257:2,21
**Alexandria (3)**
225:3,4 250:2
**Algarin (30)**
1:8,9 60:14
74:4 75:2,8
75:11 101:10
101:19,23
102:23 103:3
103:11,21
134:9 137:7
137:20 138:2
138:9 229:13
229:15,17,18
230:19,24
232:15
243:17,22
244:7,18
**Algarin's (2)**
103:7 229:25
**allegations (2)**
130:21 264:22
**allegedly (3)**
41:8,16 264:5
**allow (3)**
65:4 81:4
169:20
**allowed (8)**
69:13 82:22
83:7 84:24
118:4,15
182:15
184:15

**Alright (1)**
123:6
**altercation (1)**
98:18
**amended (1)**
193:13
**Amendment ...**
30:13 41:22
42:5,14 47:23
48:17 49:6
53:4,8 56:19
57:13 60:21
61:15,17
63:14 65:17
74:8,12 96:10
105:11
108:13 189:3
234:13
**amount (4)**
135:19 197:13
221:3 227:10
**analysis (1)**
204:8
**and/or (6)**
62:18 185:20
207:10 213:5
233:15 236:5
**angle (1)**
258:19
**angry (1)**
171:21
**animal (47)**
149:20 151:12
152:4 154:10
154:17 159:3
159:8 160:18
163:15 164:6
176:11,15,19
177:12,15
178:4,11,16
181:13,15,19
181:21,22,24
182:3,13,21
182:23 183:2

183:8,13,14
183:16,17,21
186:5,16
189:21
204:23,24
208:24 209:2
209:6,11
210:6,6
212:19
**animal's (1)**
164:5
**animals (26)**
151:10 158:7
158:22,23,25
160:20
163:13,14,14
163:19,20
164:2,5
165:20,24
168:8 175:25
177:20
182:18,19,19
184:19
189:22 201:4
204:17,18
**Anniszkiewi...**
215:9 219:12
221:23
245:24
**Anniszkiewi...**
223:13
**annual (3)**
36:7 65:4,6
**answer (67)**
8:4 18:15,21
21:13 22:22
22:22 23:17
23:18 28:13
29:23 47:6
49:9 52:11
66:7,9 74:17
74:19 79:4
86:15,17
87:10 111:2,3

111:10,13,23
113:8,10
116:15,21
117:18
120:25 123:4
125:21
126:24 127:9
127:11,12
129:13,19,21
132:24
137:25
154:20 161:7
168:24 169:2
170:21 172:2
190:8,22
191:5,24
194:22
198:25
199:23
208:14 217:6
224:24 228:9
230:10
235:17 236:2
241:6,12
246:7 254:11
**answered (3)**
20:17 75:4
156:24
**answering (1)**
161:4
**answers (10)**
33:10 87:8
127:7 222:6
238:11,12
241:12
242:25 243:2
245:13
**Anthony (1)**
251:24
**anybody (4)**
13:15,20 46:24
47:11
**anyone's (1)**
181:8

**anyways (1)**
134:24
**Anzalone (2)**
248:7,15
**apologize (12)**
24:16 34:12,22
39:20 65:7
67:7 73:15
88:25 89:11
95:4 192:19
246:8
**appear (1)**
165:21
**appearance (1)**
68:24
**appeared (1)**
106:8
**appears (7)**
72:12 151:7
164:13
170:10
225:10
234:18
253:20
**applicable (2)**
68:25 187:13
**applications ...**
160:20
**applied (3)**
124:10,14
217:23
**applies (4)**
69:24 84:24
99:12 187:16
**apply (9)**
56:20 57:13
76:24 83:2
163:16 164:6
172:8,11
233:20
**appreciate (1)**
259:25
**apprehend (2)**
76:6 85:10

apprehended... 244:22,24
apprehendin... 252:21
appropriate ... 38:7,13,16 170:2,4 184:14 224:5 224:8 225:13 225:17,23
approval (3) 187:9,25 189:8
approved (2) 113:25 114:5
approximate... 6:11 166:14 235:13
area (10) 24:11 26:4 43:25 44:4 81:15 102:2 109:19,19 158:18 178:22
argue (1) 17:24
armed (6) 70:17,19 71:3 71:17,20 79:16
arose (1) 30:17
arrest (5) 43:12 64:4 67:3 68:23 159:12
arrested (1) 140:16
arrests (1) 87:17
arrive (2) 173:5,21
arriving (1) 177:14

articulable (6) 79:14,14 84:19 85:5,7 101:16
articulate (8) 77:10,18 78:3 83:22 97:14 102:11 104:3 114:24
articulated (8) 44:16 69:19 97:21 100:4,8 100:24 112:15 133:13
articulates (2) 108:24 197:13
articulating (... 103:22
aside (2) 48:13 261:2
asked (10) 13:22 14:11,17 15:6 17:14 20:16 69:2 75:3 116:16 194:12
asking (19) 18:17 19:14 44:11 72:18 110:3 122:7 123:16 126:15 127:24 128:2 128:14 134:8 134:9 161:5 169:6 190:18 193:24 199:20 241:7
assault (1) 229:13
asserted (1) 134:11
assess (1) 177:13

assessment (2) 13:6 109:6
assign (1) 130:14
assigned (8) 40:13 137:12 145:18 146:4 146:5 247:19 258:12,20
assignment (1) 245:3
assignments ... 16:23
assist (2) 32:5 258:12
assistance (3) 88:19 180:21 212:10
assists (1) 49:10
association (1) 6:22
assume (6) 8:4 50:22 70:5 71:13 180:18 259:15
assuming (1) 101:19
ate (1) 119:11
attached (1) 213:20
attachment (1) 213:15
attack (3) 149:18 150:10 150:16
attacked (1) 171:19
attacking (18) 149:9 150:3 151:8,8,12 170:10,24 171:7,10,25

182:19 183:9 184:19 188:4 188:10,17,23 188:24
attempt (3) 135:14 154:24 182:7
attempted (1) 85:9
attend (2) 145:21 146:3
attended (8) 15:8 60:18 61:10 73:20 75:17 227:22 227:24 228:4
attending (1) 146:16
attention (1) 191:3
attorney (17) 2:8 4:23 6:25 8:17 9:21 86:9 87:7 93:5,6 113:7 117:2,9 119:3 119:6 192:12 192:14 242:20
attorney's (3) 106:4,11 211:15
attorney/clie... 86:19,25
attorneys (7) 2:4,9 5:6 13:12 47:10 123:15 135:10
August (6) 1:13 6:12 160:10 184:8 262:3 266:21
authority (1) 135:16

authorized (5) 3:13 183:16 188:9 189:6 189:11
available (5) 11:9 33:24 151:24 153:20 154:17
Avenue (1) 2:5
average (2) 13:2 217:3
avoid (3) 147:6,22 182:10
aware (52) 23:24 28:5,8 28:10,10,18 29:18 30:3,7 30:10 32:19 35:13 38:3 41:6,12 46:8 46:13 49:3 61:14 75:14 75:19 90:22 91:2,18 92:25 93:10 108:5 136:4 150:24 156:5 158:11 161:2 167:6 168:7,12 190:24 191:8 192:24 193:12 194:23 195:9 196:14,18 207:7 216:19 219:7 223:21 229:6 235:21 235:24 237:25 238:5
awareness (2) 145:3 146:21

**Axon (5)**
157:14,20
165:9 166:12
168:7
**Axon's (3)**
139:13 157:10
158:11

---

**B**

**B (3)**
66:16 188:8
212:8
**B-1 (1)**
186:9
**B-2 (2)**
187:8,9
**back (43)**
17:18 19:25
30:2 40:14,15
40:17 57:9
86:4 95:13
97:4 105:23
106:2 109:11
116:3,5 117:8
118:25 123:7
123:7,20
124:2 126:3
128:6 142:10
142:22 148:7
148:7 150:19
166:15
177:10
178:19
181:11 192:9
193:17 202:4
202:14
204:21,25
214:25 242:9
242:16,17
260:20
**background ...**
17:11 19:7
61:23,25 62:6
62:14 113:20

190:9
**backpack (1)**
153:8
**backtrack (11)**
77:24 78:23
84:24 96:21
98:13 100:22
101:12 102:9
102:18,25
103:22
**backtracked ...**
131:3 133:24
**backtrackin...**
66:17 96:6,12
96:17 100:15
100:19 101:6
101:17 103:4
103:7,11
108:7,12
**backyard (24)**
29:20 30:5,11
41:23 42:7,8
42:19 49:7
53:22 54:13
54:18,24
55:10 56:18
57:14 79:17
81:15 98:23
101:11
102:19,24
103:8,12
133:25
**backyards (6)**
50:4,7 51:14
52:8,20
244:20
**bad (2)**
34:14 207:2
**Badger-DeRi...**
1:20 266:8,23
**Barnes (1)**
250:2
**Barnes's (2)**
225:4,4

**barriers (1)**
153:16
**barring (2)**
95:9 179:17
**Barton (1)**
253:10
**based (15)**
18:22,23 83:14
85:5,7 91:22
103:16
124:22 173:8
175:13
193:14,25
194:13
206:11 213:3
**basement (1)**
188:17
**basic (2)**
166:3 241:13
**basically (8)**
38:8 107:3
147:8 157:14
178:9 179:3
198:10 232:3
**basis (8)**
27:24 59:7
73:8,21,25
75:6 77:18
86:16
**bate (2)**
163:6,8
**Bates (1)**
163:2
**bathroom (1)**
85:13
**beanbag (7)**
151:17,21,23
152:2,4,7,14
**bear (1)**
5:4
**began (5)**
16:23 204:19
205:2 227:18
230:12

**beginning (4)**
6:25 62:4
174:10
177:10
**behalf (17)**
9:24 10:4 11:8
11:13,18 17:3
17:9,17 18:22
19:4,6,8
52:13,18
61:24 62:8,15
**behavior (8)**
132:21 146:25
159:4 173:12
173:25 174:3
174:6 189:5
**belated (2)**
156:20,21
**belief (2)**
80:13 83:14
**believe (47)**
14:6 15:5 29:7
36:8,19 37:17
55:3 67:23
68:14,20
69:15,20
70:19 71:2
77:20 78:4
79:16 82:9
83:4,22 90:11
91:22 97:10
97:24 98:11
102:12
118:18
131:25 134:3
143:7 147:3
177:3 184:10
186:25
218:12
224:18,20
226:18
236:10
244:21,24
249:12 250:7

250:17,17
252:16 256:6
**believed (2)**
103:18 202:9
**believes (6)**
35:21 79:20
82:3,6 185:22
198:7
**belt (2)**
153:5,13
**beneficial (1)**
153:3
**benefit (1)**
156:4
**Benjamin (1)**
258:2
**best (6)**
32:7 133:12
152:5 176:4,6
211:12
**better (2)**
81:18 167:11
**beyond (1)**
32:24
**big (1)**
171:19
**Bing (2)**
256:5,6
**bit (5)**
17:5,20 104:24
119:16 151:4
**bite (6)**
141:10 142:6
146:12,13
148:10 151:5
**Bites/Scratc...**
181:13
**bitten (7)**
181:21 182:18
182:22 183:2
183:3,14,20
**biyearly (1)**
216:3
**block (1)**

153:9
**blood (1)**
266:17
**blue (1)**
10:25
**board (1)**
171:6
**body (7)**
78:21 164:5
166:12
171:18
249:22,22
255:10
**body-worn (...**
193:21 194:15
195:5,11,19
195:23,24
196:7,9,13,16
196:20
197:14,18,22
202:14,17
203:21
206:12,20,24
207:5 243:7
244:3,5 245:4
247:4,6,9,13
248:19
249:19,24
251:20 253:5
253:21
256:16
258:16
259:13,18
265:8
**book (1)**
8:9
**bottom (4)**
141:12 164:4
177:7,25
**bought (1)**
157:20
**Boulevard (1)**
6:8
**Bour (8)**

66:23 108:10
108:16,18,24
109:7 217:20
218:9
**Brandon (1)**
252:10
**break (16)**
9:8,16 85:13
86:7,8 89:16
117:8 119:2,4
123:10
174:13
192:11,11
199:8 242:8
242:18
**breaks (4)**
8:15 9:3
116:24 117:7
**Brian (10)**
215:11,25
216:4,7
221:17
245:25 246:9
246:10
247:18
248:13
**brief (6)**
85:25 123:23
192:6 201:25
242:13
260:17
**briefly (2)**
54:7 89:2
**bring (2)**
87:5 218:14
**broad (2)**
105:8 131:14
**Brochu (2)**
250:19,22
**broke (1)**
163:23
**brought (1)**
58:2
**budgeting (1)**

155:25
**Buffalo (7)**
189:20 190:4,5
190:15,25
191:11,20
**building (1)**
24:11
**built (1)**
64:6
**bulletin (42)**
21:20,21 22:5
22:8,10,12
23:6,10,20,25
26:24 29:17
71:24 72:11
72:16,24,25
73:5,7,11,19
74:6,14,25
75:16 114:13
114:14,23
116:16
139:11,23
176:21 177:2
182:11,17
216:18 218:4
219:8,19
233:20
236:11,22
**bulletins (12)**
66:22 72:14,16
90:19,22
114:8,9 115:3
231:13
233:17 235:6
235:22
**bunch (4)**
62:2 106:19
248:17
254:19
**bureau (3)**
40:11,14,20
**business (1)**
6:7
**BWC (1)**

244:3

———————————
**C**
———————————
**C (6)**
2:2 7:14,14
66:13,17
181:13
**cabinet (2)**
16:6,9
**caffeine (1)**
104:10
**Cala (26)**
215:11,25
216:4,7,20
218:21 219:7
219:9,25
220:5,19
221:7,17,20
221:24,25
223:11,18,24
224:7,11,16
245:25 246:9
246:19
247:18
**Cala's (1)**
220:11
**call (85)**
12:2 14:4,15
24:2,6 26:9
27:10 29:8
41:17 44:25
45:23 48:22
49:4 58:18
72:17,19,23
73:18 79:8
87:16 88:6
90:17,18 91:3
108:17
115:17 123:6
123:19
141:24 142:4
142:5 143:5,9
144:3,17,23
145:17

148:18 152:9
154:11,12,13
154:22
172:19,24
173:3,4,15,18
173:18,23
174:16,20
175:5,8,11,14
178:13,19
180:16,16,23
180:23 181:6
188:15,19
203:16 212:9
215:19
216:23 217:2
217:3,9,14,15
217:23 218:7
218:14,15,21
229:7 239:11
239:18 242:2
252:17
**called (8)**
64:23 140:17
172:4,5
200:14 204:6
207:12,18
**caller (3)**
178:13,15,19
**calling (9)**
87:3 115:6,7
115:12
128:25 130:4
130:17
178:15
201:21
**calls (7)**
58:12 90:21
106:21
172:13,23
175:19
218:18
**camera (43)**
89:4 193:21
194:15 195:5

195:11,19,23
195:24 196:7
196:9,13,16
196:20
197:15,18,22
202:14,17
203:21
206:12,21,24
207:5 244:3,5
245:4 247:4,6
247:9,13
248:19
249:19,22,22
249:24
251:20 253:5
253:21
255:10
258:17
259:13,18
265:8

**cameras (2)**
243:7 256:16

**canines (1)**
154:19

**cant (2)**
164:3,3

**capacity (1)**
250:23

**captain (4)**
33:7 246:11
256:3 258:19

**captain's (1)**
250:7

**Captains (1)**
33:7

**caption (1)**
10:11

**car (5)**
152:14,25
156:8,17
174:22

**card (2)**
36:5,9

**cardiac (1)**

159:12

**cards (3)**
36:16,22 37:4

**care (2)**
53:14 129:12

**career (5)**
89:25 237:17
240:3,20
241:4

**carry (3)**
156:3,7 158:10

**carrying (3)**
78:14 79:7
224:11

**Caruso (1)**
258:2

**case (57)**
6:17 9:4,15
18:24 22:18
22:19 30:18
53:15,21 54:3
54:5 57:22
68:10 69:17
70:4 72:21
74:9,11 92:16
92:18,19,23
93:5,13 97:13
97:22 98:4,6
98:8 99:25
100:12
130:16 166:5
168:9 180:19
197:5 215:8,9
216:13
219:12
221:23
225:11,22
226:24
228:17,22,22
229:2 234:14
234:21 237:5
241:19
244:14,16
245:24 250:2

260:5

**cases (15)**
14:7 18:25
22:17 91:21
92:11,15
105:21
108:10
134:12
136:24
160:22
168:18
171:23
222:21 243:8

**cataloged (1)**
59:20

**catch (2)**
76:6 217:23

**catchpole (1)**
156:8

**catchpoles (11)**
155:9,10,13,15
155:16,18,20
155:22,22
156:10,17

**categorized (1)**
46:15

**caught (4)**
76:10,11 78:10
78:19

**cause (16)**
8:25 67:23
68:13 69:20
70:18 71:2,8
71:9,12,18,20
77:19 83:4
94:15 108:11
186:21

**caused (1)**
102:2

**causing (3)**
77:4 187:2,3

**Celentano (5)**
225:2,5,9
226:3 250:3

**Celentano's (...**
250:15

**certain (10)**
77:14 133:15
136:24
144:14
175:19
196:17,19
208:6 220:5,6

**certainly (16)**
32:18 34:4
81:5 83:2
110:17
158:25
159:13
169:22,24
171:24
172:21 173:8
174:21
225:21
231:15
234:20

**certification ...**
241:13 266:2

**certified (5)**
154:23,24
158:4,9
224:16

**certify (2)**
266:10,16

**CEW (2)**
163:22 164:4

**CEWs (1)**
163:17

**chain (16)**
31:22 40:10,11
41:2 107:4,7
122:20 125:3
125:14
127:23 128:8
130:12
131:23
198:12,18
203:14

**change (9)**
87:9 140:14
174:5 202:23
203:6,8,11
243:2 267:5

**changed (3)**
193:25 194:13
206:23

**changes (17)**
191:21 194:7,9
194:18 195:2
195:3,7
202:16,19
203:19
205:25 206:5
206:18 207:4
207:4 265:5
267:3

**channel (1)**
178:19

**channels (1)**
227:3

**characterize...**
70:13

**charge (1)**
247:5

**charged (4)**
30:24 31:6
150:5 152:4

**charging (2)**
153:9,10

**Charles (7)**
1:4,4 6:15
10:11 22:18
229:9,12

**chase (9)**
66:19 67:16
76:19 78:15
80:15 108:20
108:25 109:5
109:8

**chased (4)**
77:25 80:4
101:11

102:18
**chases (1)**
67:12
**chasing (1)**
76:7
**check (7)**
78:16,24
101:13 102:9
219:2 230:16
245:19
**checked (1)**
89:19
**chemical (1)**
148:11
**Cheryl (3)**
226:24 228:25
257:23
**chief (18)**
33:9,9,10
39:12,24 57:8
57:9 114:5,6
114:9 122:21
135:17 136:3
202:20,20,24
203:8,14
**chief's (21)**
30:20 31:5
38:18,19,23
39:3,6,17,23
40:2,6,12,13
40:17 41:2
114:16
125:16
127:23,24
130:13
205:24
**Chihuahua (1)**
171:19
**child (3)**
69:12 79:24
171:14
**child's (1)**
69:14
**children (1)**

81:13
**choose (1)**
196:9
**chose (2)**
19:9,10
**Chula (1)**
88:9
**Church (1)**
2:10
**Ciminelli (1)**
114:17
**circumstanc...**
82:5 179:17
180:22
**circumstanc...**
41:25 42:3
49:23 50:2,8
51:15 52:9,21
53:24 56:19
57:12 67:20
68:3,8,12,25
69:5,24 70:2
70:7,11,23
71:14,16 72:2
75:12 76:17
76:23 78:22
79:3 80:23
82:8,18,24
83:15,25
84:23,23
93:23 95:5,7
95:10,16,20
97:8 101:25
102:7 103:17
140:22 141:5
159:8 170:13
171:22
172:10 174:2
175:14 179:5
179:18,22
181:5 182:3
182:15
183:24
195:15,22

202:15,22
210:14 213:3
224:6 225:16
225:19,20
236:18 237:3
**citizens (2)**
56:11 177:16
**city (95)**
1:8 2:9 6:16
7:6 9:24 10:4
11:10,14,18
13:12,20 17:4
17:9,17 18:8
18:9,9,10,17
18:18,22,23
19:5,6,9,13
19:18,22 26:9
28:11 34:16
47:10,17
52:13,18 57:6
57:18,20
61:14,19,24
62:9,15,24
70:24 79:11
89:13 90:2,6
93:5,6,15
107:17,18
109:15,24
111:21 117:2
128:12
155:19,21,23
156:5 157:7
160:25
161:13
162:10,22
166:4 175:18
176:8 190:14
190:25
191:19
192:21,24
193:7,13
194:13,17
195:7,10
202:15 205:6

205:7,8,11,13
205:17
206:12
207:20
216:19
249:14 261:9
262:2
**City's (6)**
34:15,17 101:2
129:21
175:21 261:6
**civil (10)**
1:18 10:13
90:4 92:15,16
92:17,19,23
93:5,13
**civilian (1)**
254:3
**claim (6)**
215:12 216:13
220:20 227:4
232:15
241:20
**claims (8)**
134:11 139:13
168:8 215:4
226:25
229:10 232:8
239:4
**clarification ...**
19:15 23:7
78:12 123:17
161:5 239:22
**clarify (7)**
34:12 87:9,11
88:11 169:20
182:12 243:2
**clarifying (1)**
9:19
**Clark (2)**
246:2,24
**Clark's (2)**
248:11,12
**clear (5)**

9:6 99:6
113:11
171:10 210:8
**cleared (1)**
205:24
**client's (2)**
55:25 244:17
**closer (1)**
149:21
**Club (2)**
249:10,12
**clue (1)**
113:10
**coach (2)**
117:20,21
**coaching (3)**
117:15,24
118:9
**codified (2)**
24:14 176:9
**codify (1)**
203:12
**collect (2)**
98:13 108:7
**collected (1)**
254:24
**College (3)**
48:12,14 63:13
**come (26)**
13:19 17:18
19:25 26:11
40:14,17
74:13 89:16
90:19,23
99:16 109:13
110:16
112:20
136:16,16
150:11,18
154:10 161:8
168:25 173:9
174:5 182:21
214:20 242:9
**comes (7)**

42:12 102:4
141:6 173:9
176:2 220:23
234:22

**coming (2)**
104:6 215:5

**command (9)**
40:11 122:20
125:14
127:23 128:8
130:12
131:23
198:12
203:14

**commander ...**
56:24,25 57:7
88:21

**commanders...**
33:8,8

**commanding...**
200:20 212:23
213:2 214:15
214:19,24

**comments (1)**
133:21

**COMMISSI...**
267:25

**committed (5)**
47:13 67:24
68:16 69:21
71:9

**common (4)**
96:17 132:17
145:25
171:13

**communicati...**
37:9 38:9

**communicati...**
37:13 88:14
129:3 264:14

**Community ...**
48:12,14 63:13
193:2,9

**companion (2)**

178:4,11

**company (1)**
157:20

**compare (2)**
114:15,20

**comparison (...**
142:11

**compartmen...**
217:19

**complete (3)**
139:25 208:7
208:23

**completed (13)**
11:5 31:14
68:17 160:17
197:3,8
207:25 208:2
208:5,6 211:5
241:14
259:24

**completely (2)**
159:2,6

**compliant (1)**
89:22

**complied (5)**
132:13 133:5
198:3,11
246:19

**complies (1)**
89:23

**comply (3)**
90:8 147:14,17

**complying (3)**
11:6 203:4
228:19

**computer (1)**
249:13

**concept (1)**
133:19

**concern (3)**
29:10 216:15
263:21

**concerning (4)**
11:10 23:11,21

29:2

**concluded (6)**
66:19 76:12,16
76:24 79:25
96:22

**concludes (1)**
261:24

**conclusion (2)**
15:10 100:16

**conduced (1)**
4:8

**conduct (9)**
5:5 30:25 38:6
38:11 48:5
101:17 137:5
164:12
237:10

**conducted (10)**
31:18 46:5,11
59:17 72:17
88:13 162:14
222:14 223:7
227:11

**conducting (1)**
33:20

**conducts (1)**
44:24

**conference (5)**
1:12 116:8,12
124:4 202:6

**conferences (...**
116:24

**confined (3)**
178:5,11,17

**confirm (2)**
219:15 220:16

**confirmation...**
240:9

**confirmed (1)**
240:19

**confirming (1)**
4:15

**confused (4)**
92:2 149:13

236:2,14

**confusing (2)**
17:5 173:13

**conjunction ...**
122:2

**connects (1)**
129:9

**consent (32)**
4:18 11:8,13
41:25 42:3
49:23 50:2,7
51:15 52:8,20
53:24 68:5
80:8,22,25
81:5,22,24
82:4,21,24
83:7 84:2
94:7,14,19,22
95:2,10 99:9
99:10

**consider (7)**
14:19 136:7
163:15 164:5
170:9 191:20
202:15

**consideratio...**
38:25

**consideratio...**
39:4

**considered (...**
4:19 23:8
24:12 26:17
29:21 30:5,12
31:19 39:7,10
39:19 68:3
69:6 133:21
143:5 170:25
189:14 191:9
227:13

**Considering ...**
82:17

**considers (1)**
170:12

**consist (1)**

25:5

**consistent (7)**
54:19 101:14
101:20 103:9
103:13,19
104:14

**constant (1)**
75:5

**constitute (6)**
43:2 170:16,17
171:16,23,25

**constituted (1)**
117:24

**constitutes (2)**
171:8,12

**Constitution ...**
50:13,14 97:16
97:18

**consult (1)**
39:12

**consultation ...**
38:15 61:9

**consulted (1)**
190:4

**contact (5)**
88:16 109:15
109:16,17,18

**contain (1)**
165:22

**contained (1)**
166:3

**contains (1)**
237:21

**content (4)**
24:17 48:10
118:16
247:14

**contents (1)**
110:16

**context (2)**
174:20 225:11

**continue (1)**
17:8

**continuing (1)**

123:11
**continuous (1)**
73:8
**continuously...**
105:20
**contraband (6)**
42:23 80:2
81:8,19 93:21
101:14
**contrabands ...**
102:10
**Contreras (2)**
252:10,19
**Contreras's (...**
253:15
**control (5)**
4:12 154:10,18
163:15 164:6
**conversation...**
223:4
**conversation...**
34:5 72:19
117:11 135:6
**conversion (1)**
227:3
**coordination...**
258:13
**coordinator ...**
18:6,10,13,19
19:7,11 258:7
258:9
**coordinators...**
18:11
**copies (1)**
12:13
**copy (7)**
4:24 15:25
16:10 20:23
261:9,13,18
**Corey (4)**
246:2,24
248:11,12
**corner (4)**
98:20,22

162:12 180:8
**correct (192)**
8:22 9:25
16:10 21:11
22:6,12,15,20
23:4 24:15,19
32:2,4,13
34:2,4,10,20
34:25 35:11
37:2,10,20,21
38:20,22
40:22 41:5
42:15,17,23
43:4,5 47:7,9
48:6,7,9
49:16,19,20
50:5 51:2,21
53:6,20 55:4
56:6 57:3
65:4,7 66:8
67:18,25 68:2
69:22 70:7,16
70:19 75:23
76:3,20 77:8
77:21 82:7,7
82:13,18,19
82:22 83:17
92:8 93:11,17
93:19 94:2,4
94:10,11,12
94:23 95:3,21
95:22 101:5,5
102:6,14,15
102:20,22,25
103:2,5,6,10
103:14 106:8
108:24
109:10 113:4
114:18,19
130:8,10
135:17,18,21
135:22
142:17,21
143:25

147:12,15
148:2,15,16
155:9,11
157:21 159:9
159:10
161:15
165:11,12
166:5 172:19
172:24,25
176:8,9
177:17,18,20
177:21,23,24
178:5 179:5
179:14
180:13 181:5
182:5 183:21
184:20 186:6
186:7,17,19
187:10
198:14 206:8
206:9 207:23
208:4 209:12
210:12,20
211:23
212:20 213:7
213:8 219:16
220:3,16
221:8,23
226:21
228:16 232:4
233:2,7 236:6
236:9 240:10
240:21
241:17,18
242:3 246:4
248:19
249:16
251:23 254:4
254:18
256:14
257:13 258:3
258:10,24
259:19 267:3
**correcting (1)**

191:17
**corrective (1)**
134:19
**correctly (2)**
44:8 79:5
**corresponde...**
31:21 38:5
40:9 58:15
88:18 125:2
203:13,18
265:4
**corresponde...**
106:19
**cost (1)**
156:4
**costs (1)**
5:4
**counsel (23)**
3:5 4:6,9 5:2
11:21,21
20:18 59:9
64:25 67:7
85:20 88:24
89:11 95:4
104:8 110:8
111:16
128:14
147:19 171:5
238:11 252:3
261:21
**counseling (2...**
27:22 28:7
31:19,24 32:8
32:12,22
33:13,22
34:10,19 35:8
35:18,24 36:3
36:6 37:5
45:5 48:24
53:15 72:20
124:25
130:10,19
137:15 138:4
138:8 169:25

264:20
**counselled (1)**
125:12
**counsels (2)**
6:23 7:9
**count (3)**
102:3 142:12
142:19
**country (1)**
162:2
**county (2)**
109:16 266:6
**couple (5)**
95:14 157:7
246:25
250:13,21
**course (19)**
63:13,15,18,20
63:21 64:2,20
104:9 118:3
132:4 145:4
146:21,24
151:5 162:13
162:15 189:5
209:25 240:3
**courses (1)**
63:23
**court (29)**
1:2 3:15 4:8,12
4:15 6:18
7:10,13 10:6
19:14 50:14
50:15 87:3
97:17,19
104:3 105:19
105:21 106:3
115:7,7,12,17
123:7,19
136:24
190:23
201:21
261:11
**cover (3)**
55:20 74:11

| | | | | |
|---|---|---|---|---|
| 137:13 | **Crimes (1)** | 84:1 85:1 | 168:1 169:1 | 249:1 250:1 |
| **coverage (3)** | 107:10 | 86:1 87:1 | 170:1 171:1 | 251:1 252:1 |
| 55:21 56:3,13 | **criminal (1)** | 88:1 89:1,3 | 172:1 173:1 | 253:1 254:1 |
| **covered (18)** | 210:25 | 90:1 91:1 | 174:1 175:1 | 255:1 256:1 |
| 23:14 44:18 | **Cuilla (287)** | 92:1 93:1 | 176:1 177:1 | 257:1 258:1 |
| 58:9 59:12 | 1:17 6:5,14 8:1 | 94:1 95:1 | 178:1 179:1 | 259:1 260:1 |
| 61:14 64:9 | 9:1 10:1 11:1 | 96:1 97:1 | 180:1 181:1 | 261:1 262:1,2 |
| 65:18 70:3 | 12:1 13:1 | 98:1 99:1 | 182:1 183:1 | 262:11 263:6 |
| 74:6,9 86:18 | 14:1 15:1 | 100:1 101:1 | 184:1 185:1 | 267:1,1 |
| 96:9 101:7,9 | 16:1 17:1,3,7 | 102:1 103:1 | 186:1 187:1 | **Cuilla's (1)** |
| 104:24 109:4 | 18:1,5,18 | 104:1 105:1 | 188:1 189:1 | 62:25 |
| 112:4 134:7 | 19:1,19 20:1 | 106:1 107:1 | 190:1 191:1 | **current (7)** |
| **covers (2)** | 20:4 21:1 | 108:1 109:1 | 192:1,10 | 6:6 14:2,5 23:7 |
| 45:14 132:5 | 22:1 23:1 | 110:1 111:1 | 193:1 194:1 | 74:12 138:8 |
| **Cox (3)** | 24:1 25:1 | 112:1 113:1,2 | 194:22 195:1 | 263:19 |
| 226:24 228:25 | 26:1 27:1 | 114:1 115:1 | 196:1 197:1 | **currently (3)** |
| 257:23 | 28:1 29:1 | 116:1,14,21 | 198:1 199:1 | 61:12 87:14 |
| **CPLR (1)** | 30:1 31:1 | 116:25 117:1 | 199:25 200:1 | 206:7 |
| 4:7 | 32:1 33:1 | 118:1 119:1 | 200:12 201:1 | **cursor (1)** |
| **create (7)** | 34:1 35:1 | 120:1 121:1 | 201:16 202:1 | 142:13 |
| 77:5 79:19 | 36:1 37:1 | 122:1 123:1 | 202:13 203:1 | **curtilage (129)** |
| 93:23 149:18 | 38:1 39:1 | 124:1 125:1 | 204:1 205:1 | 20:11 21:11,22 |
| 190:17 204:7 | 40:1 41:1 | 126:1 127:1 | 206:1 207:1 | 23:4,12,21 |
| 204:11 | 42:1 43:1 | 127:14 128:1 | 208:1 209:1 | 24:10,11,21 |
| **created (12)** | 44:1 45:1 | 129:1,23 | 210:1 211:1 | 24:25 25:11 |
| 15:16 56:8 | 46:1 47:1 | 130:1 131:1,2 | 212:1 213:1 | 25:14,17,20 |
| 57:4 65:19,22 | 48:1 49:1 | 132:1 133:1 | 214:1 215:1 | 25:21,24,25 |
| 103:24 | 50:1 51:1 | 134:1 135:1,8 | 216:1 217:1 | 26:7,11,16,17 |
| 110:10,14 | 52:1,11 53:1 | 136:1 137:1 | 218:1 219:1 | 26:20,21,22 |
| 144:4 211:8 | 54:1 55:1 | 138:1 139:1 | 220:1 221:1 | 27:7,18 28:3 |
| 213:18,24 | 56:1 57:1 | 140:1 141:1 | 222:1 223:1 | 28:16 29:3,12 |
| **creates (1)** | 58:1 59:1 | 142:1 143:1 | 224:1 225:1 | 29:21 30:6,12 |
| 56:7 | 60:1 61:1,10 | 144:1 145:1 | 226:1 227:1 | 37:6,14 40:24 |
| **creating (1)** | 62:1 63:1 | 146:1 147:1 | 228:1 229:1 | 41:8,17 46:6 |
| 113:21 | 64:1 65:1 | 148:1 149:1 | 230:1 231:1 | 46:11 47:2,14 |
| **creation (5)** | 66:1 67:1 | 150:1 151:1 | 232:1 233:1 | 53:5 58:5,20 |
| 111:22 113:20 | 68:1 69:1 | 152:1 153:1 | 234:1 235:1 | 59:6,25 60:6 |
| 190:8,12 | 70:1 71:1 | 154:1 155:1 | 236:1 237:1 | 60:16,25 63:9 |
| 193:17 | 72:1 73:1 | 156:1 157:1 | 238:1 239:1 | 64:18 65:17 |
| **crime (8)** | 74:1 75:1 | 158:1 159:1 | 240:1 241:1 | 65:25 66:18 |
| 67:23 68:14,17 | 76:1 77:1 | 160:1 161:1 | 242:1,17 | 67:17 68:5 |
| 68:20 69:21 | 78:1 79:1 | 162:1 163:1 | 243:1 244:1 | 70:10,15 71:4 |
| 71:8 107:8 | 80:1 81:1 | 164:1 165:1 | 245:1 246:1 | 75:22 76:18 |
| 207:16 | 82:1 83:1 | 166:1 167:1 | 247:1 248:1 | 77:8 78:23 |

80:7 90:24
91:4,7,8,11
91:11,16,18
91:24 92:13
94:8,19 96:3
96:7,21 97:23
105:4,13
106:13
107:21 108:3
109:5 119:19
120:3,22
123:2 128:10
129:5 130:23
215:13 216:6
216:14,16,21
218:6,24,25
219:5,11
220:3,14
222:5 229:14
230:25 231:9
231:18
232:10
233:16
234:12 235:3
236:4,21
237:4,6,9,19
237:21 238:4
238:14
263:23 264:5
264:8,17,24
**custody (2)**
140:18,23
**customarily ...**
20:10 66:15
104:20
110:23
112:18
138:23
**cut (2)**
66:5 81:10
**cutting (2)**
111:19 134:16
**cycle (4)**
163:16,22

164:7 166:13

——————
**D**
——————

**D (3)**
3:2 124:6
212:18
**D-2 (1)**
212:22
**DA's (3)**
136:22,24
137:2
**daily (3)**
27:23 65:9,10
**Dakota (5)**
226:25 227:5
227:21
228:24
257:24
**damage (1)**
149:24
**danger (19)**
56:11 77:2,12
77:14 78:5
79:19 82:4
83:12 96:25
174:21
184:20,25
185:2,4,15
186:10 187:3
188:5,11
**dangerous (12)**
79:18,21 80:14
83:19 97:24
98:11,14,16
102:12 152:7
160:6 187:4
**Daniel (1)**
250:21
**Danielle (1)**
258:5
**Darren (1)**
250:18
**date (22)**
6:12 215:21

219:16
221:15 223:8
223:8 227:9
227:20,23
228:3,22,23
229:25 230:3
233:18,19,23
235:8,15
239:2 241:22
262:7
**dated (7)**
21:20 142:5
160:10 184:7
231:20
236:11,18
**dates (12)**
215:22,24
221:12
227:21 228:6
228:14,21
231:12 238:7
240:25 241:9
241:10
**daughter (1)**
229:12
**David (3)**
248:2 254:20
257:22
**day (12)**
81:10 146:4,5
146:7 246:15
248:10 251:9
257:20 261:4
262:13
266:21
267:24
**days (6)**
145:19 196:24
217:17 218:9
247:7 250:14
**daytime (1)**
256:21
**DCJS (7)**
48:8,11 63:12

109:18 132:5
215:16
234:23
**de (10)**
50:23,23 66:23
108:10,16,18
108:24 109:7
217:19 218:9
**deadly (33)**
55:21 138:25
147:22
169:23 170:6
170:8,10,14
170:16,18
171:3,8,12,16
171:20,24,25
172:11
175:23
176:11
182:14,16
183:4,15,25
184:4 211:21
225:25
232:20,21,24
233:5,10
**deal (6)**
148:20 149:4,7
149:15
151:10 154:4
**dealing (6)**
37:4,14 140:23
153:24
163:19
167:21
**deals (2)**
44:6 174:11
**dealt (1)**
65:23
**death (2)**
68:19 185:24
**debriefed (1)**
92:18
**decades (1)**
72:11

**December (2)**
142:5,6
**decision (1)**
156:16
**decisionmak...**
39:25
**decisions (1)**
141:6
**deemed (3)**
38:13 77:2
189:3
**deer (3)**
187:14,18
201:4
**defendant (16)**
51:11 60:8
215:3,8,9,10
219:13
226:24
235:14,17
236:8 237:7
238:25,25
239:6 241:20
**defendants (...**
1:10 2:9 7:7
57:22 60:11
60:12 120:4
126:7 133:23
134:6,10
138:12
222:20 243:7
**defendants' (1)**
138:14
**defending (1)**
169:22
**defenses (2)**
134:11 215:4
**defensive (5)**
140:10,11,21
141:2 148:22
**deficiencies (2)**
65:2,3
**deficiency (2)**
234:16,19

define (1)
132:18
defined (5)
43:23 69:25
70:3 105:14
131:24
definitely (1)
230:21
definition (28)
24:10,21 25:11
25:14,20,21
43:22,23
44:16,22
45:11,13,19
45:24 51:9
64:17 65:17
65:25 67:19
97:3 105:15
118:9 132:2
132:16,17
184:25
187:21
234:25
definitions (1)
186:11
degree (1)
30:18
delivered (3)
217:22,24,25
DelVecchio (1)
251:24
Dempsey (11)
1:4,4 6:15
10:11 21:9
22:18 23:2
100:14 229:9
229:12
243:16
Dempsey's (3)
102:24 103:8
103:12
department (...
2:9 13:16,21
21:19 30:15

32:18 33:3
38:10,10
40:12 43:10
44:24 51:2,25
52:6 53:3
59:18 61:13
64:21 65:20
65:22 72:13
73:9,10 74:15
75:18 88:15
93:7 97:15
98:9 105:23
106:5,5 107:9
109:16,22
119:18,22,25
120:20
124:15,20
125:7,23
126:13,16
127:15,18
135:16
136:23 137:3
141:19
146:23
147:10,25
148:4 156:7
157:2 167:17
167:20
168:10,13,22
169:3,7,15
170:12 171:2
171:7 181:19
182:2 186:14
187:24
189:16 190:3
190:4 191:11
191:22
192:25 193:9
195:18
196:24
199:15
204:22
221:14
222:15 223:7

253:21
257:17
258:14 259:8
department'...
77:23 167:25
184:14
189:20 190:5
191:18
225:15
department-...
73:21 107:12
107:24
145:12
departmenta...
106:25
departments...
156:9
depend (2)
173:11 180:15
dependent (2)
173:23,25
depending (2)
122:20 196:2
depends (1)
83:10
depicted (1)
164:17
deployed (2)
162:3 166:12
Deployments...
163:25
deponent (4)
86:22 117:4,10
118:4
deponent's (1)
117:6
deposes (1)
267:1
deposition (76)
1:16 3:12 4:7
5:5 6:14 8:16
10:9,12,20
11:10,15,19
12:5,18 13:4

13:11 18:16
20:2,6,7
21:17 49:16
51:16 52:5
54:5 55:16
61:4 62:11
72:6 86:23
92:23 111:14
111:16 112:5
113:12
119:13,24
120:19 121:5
121:10 126:5
137:23,24
138:16,18,20
139:7 141:8
142:3 143:14
143:17
144:13 145:2
156:12,19,21
157:6 160:8
162:9 165:5
176:17
177:23
189:19,24
190:19
202:10 215:6
221:5,25
224:21 226:8
228:8 231:20
243:9 261:25
263:18
depositions (4)
91:20 92:15
93:11 234:10
deputy (5)
33:9,9 57:9
250:8,11
DeRienzis (1)
7:10
described (1)
237:20
description (5)
79:10 263:10

263:15 264:3
265:3
designate (2)
62:15 114:10
designated (2)
10:3 19:22
designates (1)
200:21
designation (1)
125:17
designed (1)
158:17
designee (1)
114:7
desires (1)
127:21
desk (1)
89:5
destroyed (6)
68:20 93:22
95:19 97:7
99:15 189:10
destruction (6)
181:15,19,22
182:3 183:16
189:4
destructive (...
149:9 150:3
151:13
182:20
183:11
187:20,22
188:7,12,18
189:5
details (3)
253:2,7 257:5
detains (1)
84:15
determinatio...
102:17 130:15
178:8,14,16
202:21 213:3
214:16
determinatio...

105:22,22 225:24

**determine (11)** 106:13,16 151:12 178:4 179:23 190:17 191:14 195:13,20 196:4 246:18

**determined (5)** 104:13 185:14 203:2,5 224:7

**develop (4)** 109:12,20 115:2 194:3

**developed (2)** 114:2 193:8

**development...** 16:16,18,25 28:21 30:19 31:5 36:13 37:19,23 38:2 38:5,15 40:19 88:13,21 92:24 107:14 107:18,23 125:5,15 137:17 144:6 144:8 193:18 200:19,21

**development...** 116:17

**Devincentis (2)** 249:3,5

**devoted (1)** 140:6

**diagram (1)** 139:12

**dictate (3)** 98:8 225:20 233:9

**dictated (10)** 50:13,15,17

52:3 68:9 69:15 99:25 100:11 106:3 215:16

**dictating (1)** 211:20

**DiDomenico ...** 14:24 143:22 145:2 147:5 147:13,21,23 151:5,9 205:10,13,18 230:11

**DiDomenico'...** 145:7

**difference (11)** 42:6,18 50:20 50:23 91:23 142:24 209:3 209:7,8,13,15

**differences (5)** 143:2 172:4 209:16,17,18

**different (22)** 99:24 128:12 128:19 130:15 146:16 151:11 172:12,13 174:13 180:22 186:11,12 187:23 197:7 211:2,16 233:23 253:24 255:20 259:10,12,15

**differentiate ...** 186:21

**differently (3)** 120:15 173:2 173:15

**difficult (2)** 64:12 101:23

**difficultly (1)** 81:16

**difficulty (1)** 108:9

**dig (1)** 222:13

**DiGaspari (1)** 258:5

**direct (7)** 73:14,15 190:22 212:24 248:12 250:15,18

**directed (1)** 212:13

**directing (11)** 86:14,17 111:12,23 123:3 129:13 131:23 161:6 190:7 191:23 199:22

**directly (8)** 88:22 117:18 212:19 221:25 222:10 232:18 245:15 246:17

**disagree (7)** 9:14 57:6 110:24 112:25 120:6 134:23 261:6

**disagrees (1)** 57:20

**discard (4)** 76:25 77:6,17 98:14

**discarded (33)**

77:12,15,20 78:5,10,20,25 79:21 80:3,15 81:8 83:16,23 84:3,6,7,12 84:16,17,20 85:2 96:25 97:25 98:11 98:19,25 99:7 99:17,19 101:13 102:10,14 103:23

**discharge (9)** 186:15 200:25 201:2 207:10 207:13,20 208:17 209:24 212:9

**discharged (...** 195:12 204:24 207:22,24 208:3,11,24 209:4,5,9,10 211:6

**discharges (1...** 196:12 197:6 204:14 207:11 208:18 209:2 209:20 210:9 210:13,17 212:4,19

**discharging (...** 195:6 220:22 221:8

**disciplinary ...** 138:15

**discipline (34)** 30:20 32:15 38:25 39:6,19 40:2,4 104:22 119:14 120:9 120:11,16,21

121:15,18 122:6,22 124:11 125:5 125:17 126:23 127:22,25 128:4,13,16 134:18,19,24 135:17 136:3 136:7 169:3 169:19

**disciplined (...** 102:23 124:20 125:8,24 126:14,16 127:15 128:15 129:16 203:3

**discovery (4)** 14:7 162:11 168:17 248:24

**discuss (8)** 87:2 117:3 119:7 138:12 237:6 238:3 240:6 242:20

**discussed (18)** 45:24 49:5 75:10,20 90:24 91:4,8 91:9,13 92:19 105:2 116:13 117:7 119:16 140:11 148:22 234:9 256:24

**discusses (2)** 96:14 237:3

**discussing (3)** 109:2 124:7 192:20

**discussion (2)** 45:19 115:25

| | | | | |
|---|---|---|---|---|
| **discussions (1)** 117:24 **diseases (1)** 181:24 **displayed (1)** 148:11 **dispute (1)** 126:3 **disseminated...** 24:2 74:14 109:21 **distance (2)** 149:18 152:24 **distinction (4)** 122:22 171:5 186:23 188:25 **district (7)** 1:2,2 6:18,18 106:4,11 211:15 **Docket (1)** 1:6 **document (82)** 10:11,16,19,23 11:2 14:6 16:12 19:2 20:6 21:18,18 21:23 32:8,25 33:13 35:7,24 36:2,17,22 37:8 43:16,20 65:2 72:5 75:9,10,12 114:22 133:2 133:8,9 141:10,15 142:4,7,15,19 143:23 157:6 157:9,13,18 157:25 160:9 160:10,11 162:9,12,19 162:22 | 163:12 165:7 165:13,19 176:16,18 177:8,22 184:3,12 189:23 197:16 198:8 213:5,11 214:6,17 218:6 223:9 228:2,5,10,13 228:14 229:4 243:9,14 252:11 253:6 258:15 259:23 **documentati...** 11:20 13:23,24 14:10 20:18 28:23 33:24 34:19,23 35:3 35:4 41:11,12 46:2,4,17 47:18 53:16 53:18 106:17 125:13 129:20 130:5 130:18 136:12 198:13 241:10 252:24 264:19 **documented ...** 27:20 28:6,6 28:19,22 31:18,25 32:6 32:20 33:23 34:5 35:20,22 45:4,4 48:25 49:2 53:13 58:14 65:18 107:4,6,12 122:18 131:9 | 131:18 197:19,20 198:7 214:3,7 214:13 222:13,24 229:7 239:24 240:4,5 **documenting...** 210:10 213:13 **documents (...** 11:22,25 12:3 12:8 13:18 14:18 16:4,7 20:21 21:4 34:7 41:18 45:22 46:23 47:11 49:3,19 51:5 52:12 53:10 61:2 64:13 65:21 104:5,9 142:25 143:14,16 221:11,12 222:8 228:7 262:5 263:11 263:16 **DOE (1)** 1:8 **dog (138)** 14:14,23 139:22 140:20,22 141:10 142:6 146:11,13,25 147:7 148:13 149:16,23 150:10,16,21 150:23,24 151:5,7,22 152:7,10,13 152:21 153:8 153:10 154:5 154:12,22 | 158:13,15 159:16,18,21 159:24 161:21,23 166:13,14 168:20,21,23 169:5,14,18 170:9,10,15 170:23,25 171:7,7 172:9 172:18,19,20 172:23 173:3 173:5,8,8,10 173:17,18,20 173:22,25 174:6,17,23 175:4,5,12,15 177:20 178:13 180:24 181:6 181:7 182:8,9 183:3,3,5,9 183:20 184:16 186:21,25 187:3,6,25 188:4,6,10,20 188:20,21,22 188:24,25 189:2,2,7,11 191:2 194:17 195:6 196:3 196:12 197:6 197:16 202:18 204:3 206:20,21,25 207:6 210:9 213:17 220:22 221:8 223:13,22 224:4,14 225:4,4,8,24 227:4 233:25 239:8 250:3 | 252:18,20 **dog's (3)** 173:12,25 223:13 **dogs (98)** 7:21 138:24 139:2,2,10,10 139:14,16,20 140:3,6,9,12 140:14 141:3 145:5 147:23 148:20 149:5 149:7,8,10,15 149:21,21 150:2 151:17 151:25 153:24 154:9 154:14 155:5 157:15 158:20 160:4 160:6 161:12 161:14 163:24 164:12 168:2 168:11,14 169:8 171:25 172:14 175:18,20,22 175:25 180:10,13,25 187:17 188:15,16 189:2,14,17 190:6 193:3 193:14,15 195:12,20 199:5,19 200:5,13,16 200:22 201:3 201:6,11,17 202:8,25 203:5,20,25 204:8,12,15 204:20 205:4 |

205:12,14,19
206:13
225:14,17
229:3,20
238:21
239:20 240:2
241:25 265:7
**doing (10)**
33:16 79:8
86:24 137:2
161:9 174:15
175:7 181:9
230:12
240:21
**DOLBY (1)**
2:6
**domestic (7)**
154:13 172:24
173:4,19
175:12
180:16
252:17
**door (4)**
59:8 80:20,21
180:20
**DOR (1)**
66:4
**DORs (1)**
65:19
**drafted (1)**
113:3
**drinks (1)**
67:8
**DSS (1)**
130:14
**DT (2)**
140:25 172:4
**due (5)**
136:25 206:16
206:24
251:17,17
**duly (3)**
7:15 266:12
267:1

**duress (1)**
69:13
**duties (6)**
33:21 132:21
133:14 145:6
172:15
177:11
**duty (6)**
77:3 78:6,15
79:22 80:8,16
**Dynamic (1)**
43:11

───── E ─────

**E (7)**
2:2,2 3:2,2
7:14,14,14
**e-mail (6)**
12:9,14,15
88:14,16
106:21
**e-mailed (2)**
4:25 12:12
**e-mails (1)**
12:15
**earlier (11)**
43:17 75:20
136:10
139:22
141:16
145:15
184:13
230:11
231:19 234:9
247:2
**early (2)**
60:17 230:8
**EAW (1)**
1:7
**edited (2)**
144:5,18
**editing (2)**
144:9,13
**edits (1)**

144:20
**effect (10)**
3:14 20:9
66:15 104:20
110:22
112:18 120:8
121:13 122:5
138:23
**effective (11)**
157:15 158:19
158:22 159:3
159:15 160:6
162:16
163:18
165:10 168:8
224:13
**effectively (3)**
158:7 168:20
225:8
**effectiveness ...**
198:19,22
199:16 200:2
200:4
**effects (3)**
163:14 165:20
165:24
**Ehlers (4)**
244:6 248:18
249:21,22
**eight (5)**
12:21 217:7,21
218:8,13
**eight-hour (1)**
45:12
**either (23)**
39:11,18 45:22
48:21 73:18
87:9 88:15
93:4 125:4
130:14
136:10,11
149:8 151:7
185:24 187:7
191:24

206:11
221:22 238:2
238:19 243:2
245:6
**electrical (1)**
162:15
**electronic (2)**
261:9,18
**electronicall...**
16:2,13
**Elliot (24)**
2:6 7:2,20 8:21
43:15 55:13
58:25 72:7
85:12 110:2
113:5,13
115:4 120:5
134:4 160:14
166:24 177:6
184:22 193:4
193:16
199:17
224:15
243:13
**embed (1)**
164:16
**embedded (2)**
226:6,22
**emergencies ...**
100:10
**emergency (...**
69:12 76:2
82:20 83:6
93:23 94:9,15
94:20,25 95:5
95:6 146:3,4
180:5,23
**Emma (4)**
1:20 7:10
266:8,23
**employed (1)**
228:23
**employee (1)**
253:24

**empty (1)**
78:13
**encounter (12)**
139:16,20
145:5 148:21
154:14
172:14,18,20
172:21,23
175:15
229:20
**encountering...**
140:13 151:24
175:4
**encounters (9)**
138:24 140:3,6
140:9,12,15
141:3 175:22
193:14
**encouraged (1)**
154:16
**end-user (1)**
162:15
**endanger (2)**
97:11 102:13
**ended (1)**
76:13
**ends (2)**
76:5,9
**energy (1)**
164:12
**enforced (1)**
110:10
**enforcement ...**
109:18 141:11
205:22
**engage (2)**
108:20 109:8
**engaged (1)**
221:18
**engages (1)**
84:14
**ensure (9)**
25:10,13 27:6
30:9 64:17

105:3 131:5
132:13 133:5
**entailed (1)**
258:24
**enter (42)**
26:15 27:7
59:6,8,25
60:5,15 63:9
69:14 70:10
71:3 75:22
77:7 80:22,24
81:4,24 82:5
83:8,25 92:13
94:16 95:2
97:10,23
99:18 104:23
105:4 109:4
119:15
120:17
121:19 122:6
124:12,20
125:8,24
126:14,17
235:2 237:9
238:3
**entered (18)**
28:3,16 42:22
119:19 120:2
120:13,21
121:22
122:14,17,25
127:16,20
128:9 129:5
130:2 179:11
264:17
**entering (39)**
20:11 27:18
29:3,10,12
42:15,19,20
44:13 53:5
55:22 58:5,7
70:15 71:17
80:7,9 81:23
91:24,25 94:8

94:19 99:3,4
102:24
107:21
129:16
130:22 137:8
138:5 179:21
179:25 236:3
237:4,6
238:14
263:21,23
264:23
**enters (1)**
42:25
**entire (4)**
89:25 107:9
150:15
180:19
**entirely (2)**
93:14 255:6
**entitled (13)**
21:10,19 23:3
30:12 43:10
63:13 71:24
141:10
176:18 184:4
218:5 234:12
260:7
**entity (1)**
1:8
**entries (8)**
43:11 71:25
75:11 236:16
236:17
248:18,20
254:19
**entry (16)**
37:6,14 44:3
63:5 68:23
69:7,10 76:18
82:21 91:11
93:24 94:10
94:21 96:2
106:12 108:3
**equates (1)**

149:21
**equipment (2)**
156:3 223:17
**equipped (5)**
155:14 157:3
158:3,9
223:12
**Erin (10)**
22:19 53:22
54:7,17,23
56:17 57:14
232:12
233:25
234:14
**ERRATA (1)**
267:1
**ESQ (2)**
2:6,11
**estimation (3)**
57:3 206:23
246:22
**et (2)**
6:15,16
**evaluated (9)**
33:3,6,7,7,8,9
33:10 240:24
241:4
**evaluating (2)**
30:25 133:20
**evaluation (11)**
33:25 35:17,18
35:20,25 36:7
36:24 59:17
109:14 113:4
114:3
**evaluations (4)**
36:18 65:6,6,9
**evening (1)**
250:12
**eventually (1)**
41:2
**everybody (1)**
259:17
**everyone's (1)**

111:7
**evidence (17)**
33:24 42:7,12
64:6 68:20
83:5,11,16,19
95:18 97:6
99:14 105:18
105:20 106:2
108:8 136:25
**evidences (1)**
105:21
**evidentiary (1)**
64:5
**ex-filtrate (1)**
57:15
**exact (8)**
59:7 102:4
128:4 146:18
197:13
215:24
231:14 245:3
**exactly (9)**
25:19 58:24
104:12
126:25 133:3
147:2 190:18
255:6 260:6
**EXAMINAT...**
7:18 263:4
**examined (1)**
7:16
**example (35)**
15:25,25 27:14
39:9 69:12
71:15 78:11
78:18 105:25
107:7,19
108:22
109:11 114:5
128:6 136:19
147:5,22
148:6,9 152:8
172:17,24
179:10 180:6

180:16 182:6
183:2 185:17
187:14
188:14 198:2
202:24
207:19 254:2
**examples (6)**
71:16 117:18
125:22 126:6
126:22 162:6
**Excel (4)**
15:3,4,5
145:17
**exception (16)**
56:19 57:12
68:12,25
69:11 70:6
71:13 83:20
84:24 93:24
95:11,16
99:11,12,24
100:3
**exceptions (4)**
60:22 76:2
83:2 100:7
**Exchange (1)**
6:8
**exchanged (3)**
157:7 162:10
168:19
**excuse (1)**
261:10
**executing (2)**
56:14 154:7
**execution (1)**
56:10
**exhaustion (1)**
119:11
**exhibit (54)**
4:23,24 5:3
10:8 20:5
21:17 43:7
66:11 67:4
68:11 71:24

73:5 95:14 114:13,15,15 114:16,21 138:19 141:8 142:3,10,11 142:12,18,22 148:8 157:6 160:8 162:8 163:13 164:15 165:5 165:23 166:4 176:16 181:11 184:2 189:19 211:25 214:25 218:5 223:20 225:6 226:7,8 231:19 236:17,23 243:4,6,8 259:21 262:6

**exhibits (2)** 4:22 263:9

**exigency (18)** 56:8,8 57:19 69:6,18,24 70:2 76:4 77:5,7,13 80:17 81:6 83:20 94:15 99:11,18 103:24

**exigent (36)** 41:25 42:3 49:23 50:2,8 51:15 52:8,21 53:24 56:18 57:4,12 67:20 68:4,7,12,24 71:25 75:12 76:17,23 80:13 82:5,24 83:24 84:23

93:23 95:5,6 95:9,16,20 97:8 179:16 236:18 237:3

**exist (8)** 34:24 35:4 41:13,15 57:19 68:14 133:9 264:4

**existed (2)** 22:9 74:11

**existence (1)** 116:18

**existing (1)** 49:19

**exists (1)** 133:8

**exit (1)** 178:21

**exited (2)** 179:3,10

**exiting (3)** 175:10 178:25 179:9

**expect (2)** 153:22 169:25

**expectation (3)** 24:24 26:2 44:2

**expected (1)** 181:9

**expecting (1)** 89:13

**experience (2)** 52:10 91:23

**experts (1)** 57:3

**EXPIRES (1)** 267:25

**explain (7)** 37:22 58:4 59:5 157:17 195:17 213:9 258:11

**explaining (1)** 213:20

**explains (2)** 157:14 171:22

**explanation (...** 245:20

**exported (5)** 253:23 257:18 259:4,7,16

**exporting (5)** 243:20,21 248:22,23 259:9

**exports (1)** 248:21

**express (1)** 4:18

**expressed (1)** 57:21

**extensive (1)** 159:10

**extent (5)** 29:7 41:14 58:16 88:5 179:23

**extra (1)** 147:2

**extremely (5)** 70:6,10,14 71:14,15

_____

**F**
_____

**F (2)** 3:2 138:21

**Fabian (10)** 54:11 56:16,25 57:8,22 232:11 233:14 234:10,24 235:8

**face-to-face (...** 88:16

**fact (15)**

71:3 84:20,21 85:8 92:25 98:24 99:6 101:6 162:25 168:9,16 183:20 219:6 224:11 253:22

**facto (1)** 50:23

**factor (1)** 55:7

**factors (6)** 81:4 172:6,7 173:9,11 174:4

**facts (8)** 54:5 55:5 77:19 82:9 83:22 84:19 85:5,7

**failed (2)** 179:4,8

**failure (1)** 229:15

**fair (5)** 13:5,6 144:20 144:25 188:21

**fall (2)** 98:16 148:3

**falls (2)** 75:25 194:5

**familiar (2)** 252:11,22

**families (1)** 189:15

**far (11)** 8:6 42:11 92:21 93:10 119:8 128:4 137:16 140:20 160:6 204:21,25

**fashion (1)** 64:8

**fast (3)** 148:8,9 165:18

**faster (1)** 149:25

**father (1)** 1:4

**feasibility (1)** 156:3

**feasible (2)** 154:11,12

**federal (10)** 1:18 10:13 89:15,20,22 89:24 90:3,8 260:24 261:16

**feedback (1)** 117:16

**feel (4)** 31:4 49:9 167:12 214:5

**fell (1)** 231:14

**felon (7)** 70:16,17,19 71:3,18,21 77:25

**felony (2)** 68:15 71:8

**felt (4)** 32:24 38:16 144:22 203:10

**fence (4)** 80:18 81:13 180:7,9

**fenced (1)** 20:11

**fenced-in (21)** 29:20 30:5,11 41:23 42:6,19 47:24 48:18

49:7,22 50:4 50:7 51:14 52:7,20 78:23 101:11 102:19 131:4 133:24 179:11

**field (32)** 65:8,8,10 132:6,8,10 137:11,12 160:18,19 176:5,7 215:17 219:23 223:3 227:12 230:9 231:4,5,17,23 231:25 232:6 235:7,20 236:5 237:13 238:16 239:15 241:15,17 242:5

**fight (1)** 140:20

**fighting (3)** 156:14 188:15 188:16

**figure (2)** 62:3 144:12

**file (18)** 16:6,9 36:10 36:14 213:7 243:6,10,20 243:23,24 244:2 248:23 250:10 253:23 257:18 259:4 259:9,16

**files (3)** 36:11 243:21 248:22

**filing (1)** 3:6

**fill (11)** 207:9 208:9,16 209:21,23 210:3,4,10,18 210:24 212:17

**filled (1)** 208:10

**filling (1)** 214:7

**final (4)** 39:24 54:13 55:25 57:16

**finally (1)** 261:4

**find (8)** 15:22 46:18,22 64:13 98:22 99:16 120:19 137:20

**findings (4)** 93:6 130:21 158:12 264:22

**finds (1)** 127:18

**fine (4)** 113:18 117:16 186:23 230:4

**fingerprinta...** 136:22

**fingerprints ...** 136:20

**finish (3)** 38:18 90:5 246:6

**finished (2)** 231:3,5

**fire (1)** 152:25

**firearm (58)** 78:14,16 79:17

148:14 149:11,16 151:15 154:3 155:2 159:20 159:23 160:5 184:15 185:18,21 186:5,16 188:9 189:6 189:12 196:2 196:12 197:6 200:24 201:2 204:14,24 207:10,11,12 207:19,22,24 208:3,12,17 208:18,24 209:2,4,5,9 209:10,20,24 210:5,9,13,17 211:6 212:4 212:18 220:22 221:8 224:4,8 225:13,23

**firearms (16)** 79:12 84:5 140:10 148:24,25 149:3,6,14,17 149:21 152:19,22 184:18 185:20 195:6 195:12

**fired (2)** 79:9 252:19

**first (52)** 7:15 33:12 65:5 70:21 72:4 80:7 81:23 93:9 99:5 108:20 109:9 113:6

116:9,13 130:7 139:4 141:18 157:8 160:10 167:6 174:14 176:14 177:7 177:8,9,15,25 178:2 179:12 182:7,9 184:24 187:8 189:22 193:20 199:20 207:11 211:15 217:22 220:6 243:14,22 245:12,25 250:2,4,10 253:10 255:13 257:7 257:24 259:21

**fit (1)** 217:16

**five (7)** 12:23 13:4 104:7 182:15 188:8 202:25 225:24

**five-minute (1)** 216:23

**five-second (1)** 166:13

**fled (1)** 79:8

**flee (1)** 66:17

**fleeing (7)** 70:16,17,19 71:3,17,20 77:25

**flight (4)** 95:24 96:7

100:15 102:2

**floor (1)** 36:12

**focused (1)** 60:10

**FOIL (1)** 248:24

**folks (1)** 256:23

**follow (15)** 12:6 14:8 29:14 41:19 50:12 52:2 58:23 88:10 112:12 126:25 129:7 130:24 151:3 194:24 203:22

**follow-up (5)** 31:23 155:6 195:4 211:4 258:14

**followed (8)** 20:10 50:19 66:15 104:21 110:23 112:19 122:13 138:23

**following (4)** 52:25 178:3 240:22 267:2

**follows (2)** 7:17 64:2

**foot (5)** 66:16,19 67:12 108:20 109:8

**footage (15)** 196:9 197:19 197:23,25 245:4,8,11,21 247:25 251:20 252:3

255:5,8
256:20,22
**force (36)**
3:14 55:21
138:25 139:2
140:18 141:6
147:7,22
161:14 169:5
170:6 172:11
175:23,24
176:11 182:8
182:9,10,13
182:14,16
183:4,15
184:2,4
196:23,25
200:5 210:5
211:21
225:21,25
232:21,24
233:5,10
**forever (1)**
76:14
**forget (1)**
230:10
**forgotten (1)**
27:12
**form (14)**
3:9 35:25 36:2
36:2,4 38:4
48:25 88:17
136:8 197:17
198:8 207:14
207:17,18
**formal (8)**
88:16 136:3
137:16
239:23,23
241:7,8,9
**formally (2)**
240:14,24
**former (3)**
57:7,8 138:7
**forms (8)**

28:19,25 29:9
31:20 58:15
59:16 198:17
263:20
**forth (4)**
11:10 217:25
234:21
266:12
**forward (5)**
68:8 113:23
148:8,9
165:18
**found (25)**
28:15 46:5,10
47:13 79:10
119:18 120:2
120:12
121:21
122:10,13,17
122:25
125:24
126:17
127:16,21
128:9 129:4
129:15 130:2
133:22
136:24
187:19
264:16
**foundation (1)**
17:16
**four (4)**
63:24 87:15
90:12,14
**Fourth (23)**
30:13 41:21
42:5,13 47:23
48:16 49:6
53:4,8 56:19
57:12 60:21
61:15,17
63:14 65:17
74:8,12 96:10
105:11

108:12 189:3
234:12
**frame (1)**
164:18
**free (1)**
192:25
**freeze (1)**
164:18
**front (5)**
59:8 80:20,21
81:17 244:19
**full (5)**
6:2 71:11 75:6
143:6 170:4
**full-day (3)**
87:14 90:11
91:2
**fully (6)**
18:21 62:16,17
219:7 220:7
223:2
**further (8)**
3:8,11 4:22
88:11 166:15
213:5 261:2
266:16
**future (1)**
87:5

———— G ————

**G (1)**
138:21
**gap (1)**
230:19
**gather (4)**
14:12,17 64:6
105:20
**gathered (1)**
145:16
**gathering (2)**
13:18 105:17
**general (78)**
17:11 20:23,24
21:6 24:14,17

24:18 39:22
43:6,7,10
44:16 50:17
51:5 52:25
54:25 55:11
64:20 66:24
66:25 67:2,3
67:22 68:9
69:16,25 70:3
70:13 71:6
90:20 94:3
95:14 97:4,9
97:14,21
99:20 100:5,8
100:11
103:14
109:12,13,20
110:5,13,21
114:4,25
131:6,11,14
131:17,21,22
131:24 132:9
132:14,17
133:2,5,14,19
133:23
154:13 166:7
184:4 196:23
196:25
197:10
199:13
207:18
208:22
211:18,20
219:21
224:25
232:25
**generally (18)**
26:19 58:20
59:11 63:23
64:8 110:11
144:16
163:19
187:12
193:24

198:21
199:11,15,21
237:3 243:18
256:17 264:9
**generate (2)**
64:25 204:23
**generated (6)**
40:10,25 41:7
65:11 125:3
204:4
**Gerslin (10)**
21:9 22:19
23:2 53:21
54:7 55:15
232:7,13
233:21
234:14
**Gerslin's (6)**
53:22 54:18,24
56:18 57:14
233:25
**getting (6)**
81:17 106:10
106:24
153:21
174:23,24
**gist (1)**
167:12
**give (12)**
16:22 106:22
109:23
117:16
126:22 145:4
153:3 162:5,7
164:14
219:15 260:3
**given (22)**
11:20 12:12
28:7,14 31:15
71:16 72:16
87:12,17,19
88:7 118:22
119:8 132:4
145:10

153:15
171:12 176:4
221:4 256:18
264:12
266:14
**gives (2)**
113:16 151:9
**giving (3)**
62:19 78:11
171:4
**gladly (1)**
8:2
**glance (1)**
165:21
**go (69)**
8:24,25 10:24
15:20 20:17
40:12,16,25
43:8,19,21
54:12 59:13
65:14 73:12
74:10 76:14
115:8,16
121:11 123:7
123:18
142:10,10,18
142:18,22
145:18 154:8
157:12
163:11,12,14
165:19 166:8
166:18
174:18 175:5
175:9 177:10
177:25
181:11,11,14
190:21
198:12
201:22
208:21
210:22
211:12,16
212:3,18
213:13

214:25 215:8
223:9 225:25
226:24
232:18
245:12,23
246:24
251:14
255:12
256:24
257:23
260:10,13
**goes (8)**
40:11 44:4
126:3 133:18
190:8 191:13
193:20 194:2
**going (80)**
7:22 8:4 10:9
14:3 17:7,24
18:14 19:25
21:16 39:10
42:6 59:9
60:11 62:6
66:11,12
74:16 84:9,12
85:22 87:3
90:8 104:17
105:10,11
111:8 112:7
114:12 115:7
115:9,16,17
119:17
120:24
121:20
123:19,21
124:25
125:19
129:18 139:3
141:8 142:2,2
142:4 150:19
155:6 162:4,5
162:7,25
165:5 166:9
166:18

167:23
170:20
173:10,23,25
174:7 179:20
187:15
190:21
191:20 192:4
194:21
199:12
201:23
202:11,14
207:8 214:16
214:20
218:16 222:7
230:2 241:11
242:11 243:6
260:15
**Gonzales (1)**
6:20
**Gonzalez (6)**
2:14 251:2
255:15,25
256:4,4
**good (4)**
7:20 85:13,16
187:21
**Google (1)**
59:21
**Gorman (7)**
1:8 75:15
134:9 229:15
229:16 231:7
231:8
**gotta (2)**
123:6 168:25
**government ...**
43:24 52:3
**governmenta...**
42:11
**grab (3)**
153:5,18,22
**grade (1)**
240:14
**graduate (5)**

26:5 27:3 30:9
48:14 64:15
**graduated (2)**
26:12 75:17
**graduation (1)**
65:15
**Graham (1)**
251:8
**grass (1)**
171:15
**great (5)**
24:16 27:10
31:17 85:17
129:11
**Greater (3)**
141:12,13
142:7
**ground (3)**
80:19 232:4
252:22
**grows (1)**
171:15
**guardian (1)**
1:4
**guess (16)**
39:5,22 69:2
72:22 126:3
131:22
145:16
149:13 152:5
186:8 207:12
234:14
239:21
256:15 257:6
259:14
**guidance (1)**
112:13
**guidelines (2)**
185:18 197:11
**gun (28)**
78:7,9 79:10
80:14 83:22
84:3,12,15,17
84:20 85:2

98:21,24
99:16,19,22
151:17,21,23
152:2,4,7,14
185:20
232:22 233:2
233:7,11
**guns (2)**
80:2 232:16

_____

**H**

**H (1)**
7:14
**hair (1)**
101:24
**hand (5)**
59:22 153:23
170:6 221:16
266:21
**handled (2)**
30:18 211:14
**hands (4)**
98:17 153:4,12
153:14
**handwritten ...**
15:7,11,19
**happen (5)**
27:22 128:21
128:22,23
129:25
**happened (9)**
125:10 128:3
210:18
230:13
244:16
245:16
251:11,22
252:15
**happening (2)**
137:4 260:23
**happens (3)**
9:12 126:10
146:2
**happy (4)**

111:24 126:7
128:23
129:24
**hard (3)**
12:13 15:25
16:10
**harm (2)**
77:4 99:23
**harmed (2)**
153:21,21
**head (2)**
63:17 136:17
**heading (1)**
177:11
**hear (6)**
40:2 121:7
167:3 192:17
194:20 200:7
**heard (3)**
58:11 118:19
237:18
**held (7)**
1:19 45:9,17
73:17 115:25
116:11
235:25
**help (4)**
52:12 58:24
74:22 228:9
**helps (3)**
114:24 167:13
182:11
**henceforth (2)**
73:24 91:17
**hereinbefore...**
266:12
**hereunto (1)**
266:20
**hey (3)**
118:4 188:20
190:13
**high-profile ...**
191:2
**high-risk (7)**

55:14,19,22
56:7,10,14
57:4
**higher (1)**
30:18
**highlighted (4)**
95:17 160:16
178:3 184:12
**highlights (1)**
10:25
**hire (16)**
215:21 223:8
227:9,23
228:6,14,21
228:22
229:25 230:3
235:8,14
238:7 239:2
241:10,22
**hired (7)**
65:20 89:18
230:6 231:16
236:11 238:8
238:9
**history (7)**
79:7 119:21
126:9 150:8
243:6,10
246:23
**hit (3)**
158:19 166:18
218:18
**hold (8)**
72:13,23 97:4
134:15 153:8
194:19 199:6
228:18
**holding (1)**
29:18
**holster (2)**
78:13,21
**holsters (2)**
79:11 185:20
**home (9)**

24:12 55:22
58:7 59:8
70:15 71:17
81:17 91:25
96:2
**homeowner (...**
79:24 80:9
81:24 83:12
95:3
**homeowner'...**
81:22 84:2
94:7,14,18,22
**hope (1)**
171:21
**horizontal (1)**
158:20
**Horowitz (7)**
59:23 60:4,7
60:10 100:13
100:21,25
**hot (21)**
67:13,15 68:6
71:4 75:20,25
76:5,9,11,13
76:16,24
79:25 83:23
84:14,21 85:8
96:22 98:12
98:18 100:16
**hour (2)**
13:2,9
**hours (10)**
13:4 63:16,24
63:24 90:16
104:7,10
112:22
146:14
256:21
**house (3)**
56:9 180:18,25
**human (1)**
159:11
**Humane (9)**
14:24 141:11

141:13 142:6
146:20,24
148:17
227:17
230:12
**humans (1)**
158:17
**hydrant (1)**
152:25
**hypothetical ...**
125:6 126:24
**hypotheticall...**
78:24

_____
I
_____

**IDC (10)**
31:20 40:16,24
41:7 48:25
127:23 128:7
130:11,12
198:17
**IDCs (4)**
41:15 130:20
264:4,21
**idea (2)**
62:11 251:11
**identificatio...**
262:7
**identify (1)**
6:23
**identity (1)**
4:16
**illegal (2)**
96:15 216:11
**imagine (1)**
155:23
**immediate (6)**
67:24 68:16
71:10 80:23
82:4 185:23
**immediately ...**
81:18 83:25
84:5 212:11
250:12

**imminent (11)**
149:8 150:3,25
151:2,13
183:10
184:20,25
185:15 188:5
188:10
**impact (1)**
164:3
**impede (1)**
153:2
**implemented...**
114:4 156:6
190:25
**implementin...**
39:25 191:9
**important (2)**
113:13 144:22
**importantly ...**
227:9
**impose (1)**
135:16
**imposed (6)**
32:16 39:2
40:5 120:20
126:23 136:3
**in-field (1)**
175:6
**in-practice (1)**
129:19
**in-services (2)**
87:15,16
**inaudible (6)**
111:5,17 121:6
134:14,18
200:6
**incapacitate...**
163:21
**incident (91)**
37:24 38:3
39:17 40:7
54:7,8,15
57:10 100:14
103:5 122:21

131:5 132:12
166:16
168:18
195:25 196:2
196:19,22
197:5,8,11,15
200:25 204:4
204:23
206:21,25
207:5,9,14,15
207:18,21,25
208:10,16
209:22
211:13
212:12,20,24
213:7,16,17
213:18,20
214:8,11
219:11,14,16
220:2 228:25
229:5,10,18
229:24
230:23
231:10 232:7
233:14
234:13
235:12
238:19,24
239:25
243:16
245:16,23
246:15,18
247:7,10,14
250:24 251:6
251:22 252:9
252:10,12,15
252:22,25
253:3,8
254:17
255:13 257:2
257:6,24
**incidents (16)**
21:10 23:2
160:20

161:25
194:14 195:5
195:11,13,20
201:3,3
204:17
206:13
207:16,21
223:17
**include (2)**
36:23 235:5
**included (4)**
45:18 119:14
151:21
226:20
**includes (2)**
44:3 207:16
**including (7)**
25:6 26:24
43:24 60:24
65:16 120:22
195:3
**inconsistent ...**
103:13
**incorrect (6)**
92:6,7,12,22
93:2 102:6
**incriminatin...**
83:5
**INDEX (1)**
263:2
**indicate (3)**
100:19 182:25
254:2
**indicated (1)**
253:22
**indicates (3)**
252:6,7 254:5
**indicating (2)**
106:18,20
**individual (12)**
26:12 55:4
73:25 78:11
78:12 79:6,7
129:4,25

140:19
244:23
264:16
**individual's (...**
26:16 79:6
91:5
**individually ...**
1:4 215:3
222:20
**individuals (2)**
244:20 245:7
**inevitably (1)**
139:16
**infiltrate (1)**
57:15
**influenced (1)**
190:14
**informally (1)**
58:12
**information ...**
11:9 13:19
14:11 17:11
36:17 62:19
62:20 73:3
89:14 105:19
106:10 143:4
143:8 164:10
165:22 166:3
166:7 171:5
178:20
211:17
228:20
260:25
**informed (1)**
116:10
**informs (1)**
105:24
**initial (1)**
248:14
**initiated (1)**
136:2
**injure (1)**
212:5
**injured (12)**

149:10 150:4,9
151:14
182:20
183:11
187:14,19,22
188:7,12
204:17
**injury (21)**
68:19 185:5,6
185:9,10,12
185:13,15,16
185:24 186:9
186:17,20,22
186:22 187:2
187:5 232:21
232:24 233:6
233:10
**input (1)**
204:5
**inputted (1)**
200:24
**inservice (18)**
14:14,16 26:8
27:9 44:25
45:10,12,18
45:23 48:22
49:4 58:12
87:13 91:3
145:14
215:18,22,25
**inservices (2)**
90:11,14
**inside (1)**
56:9
**Insofar (4)**
91:6 140:21
158:11
167:22
**inspection (1)**
181:5
**inspires (1)**
203:11
**instance (7)**
120:19 125:23

129:3 131:2
161:22 203:7
264:15
**instances (12)**
32:4 35:7
39:16 41:6
129:15
159:17,20,23
188:23
189:21 201:6
203:2
**instant (1)**
40:23
**instantly (1)**
163:22
**instruct (2)**
118:4 120:25
**instructed (2)**
29:19 131:4
**instructing (1)**
208:14
**instruction (5)**
131:8,11,15,17
131:19
**instructor (2)**
19:20 163:17
**instrument (2)**
79:18 80:14
**integrity (1)**
182:23
**intent (2)**
42:22 44:12
**interact (15)**
145:5 173:5,7
173:17,22,24
193:3 203:20
229:3,20
238:21 239:8
239:20 240:2
265:6
**interacted (1)**
240:7
**interaction (1)**
148:13

interactions ... 172:8 193:15 194:16 240:4 241:25
interdepart... 31:21 37:9,13 38:4 40:9 58:15 88:17 106:19 125:2 129:2 203:13 203:17 264:14 265:4
interested (1) 266:18
interlinked (1) 26:23
intern (1) 2:15
Internationa... 160:9 161:20
interpret (1) 187:4
interpreted (3) 97:17,18 110:8
interrogator... 224:22
interruption ... 89:2
intersect (1) 109:3
intervene (1) 229:16
intrusion (1) 42:11
invades (1) 43:25
investigation... 130:14 210:25 212:25 251:19 258:23
investigation... 258:13,14
investigative ...

245:7,9,10 251:16 256:19,21 258:7,8,18,20 259:5,13
involved (10) 38:8,24 228:16 234:19 244:15 245:8 245:15 246:17 251:17,18
involving (6) 54:8 174:17 189:21 195:5 207:6 252:10
irrespective (... 17:23
Island (1) 1:12
issuance (3) 22:10 23:9,19
issue (15) 8:25 30:17 31:7 32:23 72:24 106:19 106:20,25 107:11,24 116:14,23 219:11 221:22 235:12
issued (14) 9:5 21:10 22:14 23:2 51:5 53:2 72:3,11,25 73:24 130:20 176:22 221:14 264:21
issues (12) 30:16 32:20 45:16 64:3

93:8 106:12 116:13 138:15,15 221:16,19,22
issuing (1) 31:9
it'd (1) 211:11
it'll (1) 74:22
item (2) 44:4,14
items (1) 44:7

_____

**J**
January (14) 20:10 53:12 66:15 72:3 104:21 110:15 112:19 119:24 122:15,24 138:23 162:16 165:10 236:18
Jason (7) 59:23 60:4,7,9 243:23 253:10 257:16
Javier (14) 1:8,9 60:14 75:2,8,10 134:9 137:6 229:13,14 243:17,24,25 244:6
Jeffrey (4) 247:15,16 256:2,2
Jennifer (4)

215:10 216:2 222:2 257:12
Jeremy (8) 232:10,13 233:14 238:6 238:8,20 248:7,15
job (1) 33:16
JOHN (1) 1:8
join (1) 26:6
joined (1) 16:24
Jones (281) 2:11 7:5,5 8:19 8:21 9:13 12:6,18 13:3 14:8 15:20 17:2,18 18:7 18:16 19:12 19:16 20:16 21:12,25 22:4 22:21 23:5,13 23:23 24:4 28:17 29:6,14 29:22 30:14 31:11 32:3,10 33:18 34:3,11 34:21 35:12 36:25 37:25 38:21 39:14 40:8 41:4,10 41:19 42:2,10 42:16,24 43:14 47:3,8 47:16 49:25 50:10 51:18 51:22 52:15 52:23 53:7,19 53:25 54:21 55:2,12 56:22 57:17,24 58:8

58:23 60:7 62:8,24 63:11 63:19,22 64:19 66:2 70:12,20 72:7 75:3,13 76:8 76:21 77:9 79:2 80:10 81:2 82:2,11 82:14,23 83:9 85:3 86:14,18 89:8,12 90:5 91:14 92:4,9 93:3,12,18 96:23 99:21 100:18 101:4 101:22 102:21 103:15 106:15 107:5 108:23 110:2 110:8,19,24 111:4,12,17 111:18,20 112:10,24 113:5,13 115:4,9,14,18 116:6,20,25 117:12,14 118:8,14,24 119:9 120:5 120:24 121:6 121:8,9,24 122:16 123:3 123:9 124:16 124:17 125:11 126:2 126:19 127:6 128:11,17 129:7,23 130:9,24 133:7,10 134:4,14,17 134:25 135:9

135:12 139:8
139:18
143:24
144:15,24
145:8,24
146:17
147:11,16
150:17 155:3
156:11,15
157:16,22
159:25
160:14 161:3
161:6,15
162:24 163:9
164:24 166:6
166:23 167:5
168:15,24
169:9 173:6
175:16 177:5
179:6,15
180:14 183:6
183:22
184:22 185:8
186:18
189:25 190:7
190:16 191:4
191:12,23
193:4,11,16
193:23
194:10,19
197:9 198:15
198:24 199:2
199:6,8,17,22
200:6,8,9
201:8,13,19
203:9,22
204:2 205:20
206:4,14,22
208:13,20
211:10
216:25 217:5
217:11 220:4
220:15 221:9
222:22 224:9

224:15,19
230:15
234:17
238:25 239:6
239:18
241:16
243:12 246:6
246:21 254:8
254:10 255:3
255:12 257:3
260:3,9,21
261:8,13,14
261:23
**Jones's (1)**
239:2
**Joseph (1)**
251:8
**Josh (6)**
232:11,13
233:14 238:6
238:8,19
**judge (17)**
9:6 111:14
116:9,9,10,11
116:20 117:5
117:14,23
118:19 124:4
124:7 126:11
127:2 202:6,9
**judge's (1)**
112:12
**Judges (1)**
105:21
**judgment (1)**
152:6
**July (1)**
252:15
**jump (3)**
81:13 113:8,17
**jumped (2)**
252:17,18
**jumps (1)**
140:20
**June (4)**

219:17 220:2
220:18
223:12
**jure (1)**
50:23
**jurisdictions ...**
191:19
**Justice (2)**
193:2,9
**justification ...**
67:16 104:12
186:4
**justified (2)**
122:23 185:19
**justify (9)**
69:7,9 93:24
94:9,21 95:19
96:2 97:7
103:21

———————
**K**
**keep (6)**
79:12 144:21
153:13,20
183:7 228:12
**keeping (1)**
35:14
**keeps (1)**
200:14
**Kelly (12)**
53:22 54:9,17
54:23 56:17
57:13 232:11
232:13
233:14 238:6
238:8,20
**Kennedy (3)**
244:7,14 245:9
**Kennedy's (2)**
244:11 245:3
**kept (2)**
36:12,14
**Kevin (2)**
2:14 6:20

**keyword (2)**
46:15 59:12
**keyworded (1)**
59:20
**keywords (3)**
46:19 49:13
222:16
**kick (1)**
107:16
**kicked (2)**
106:2 107:8
**kidding (1)**
61:21
**kill (8)**
159:9,17,21,24
183:21
188:20,23
189:2
**killed (2)**
150:15 225:3
**kind (10)**
113:10 138:5
152:12 179:4
185:4 188:5
204:7,11
211:4 228:12
**KLUZ (1)**
2:15
**knife (10)**
79:18 80:14
98:21,25
149:22,25
150:6 152:23
170:17
171:10
**knock (1)**
80:21
**knocking (1)**
180:20
**know (99)**
8:23 15:13,24
16:15 17:14
17:20 18:3
19:2 21:2

26:10 27:25
32:14 39:22
39:24 55:9
58:17,24
59:18 61:6
62:12 63:3
73:23 74:4
79:4 81:6,9
81:12,12,13
84:11 87:12
91:6 98:24
99:6 103:16
104:2 105:19
107:12
108:10
109:23,24
110:15 112:6
119:11
121:21
128:20
132:15 137:4
138:3 139:19
140:25 143:8
144:2,7 147:2
153:17 154:9
156:23 160:3
160:3 161:9
162:18 167:5
176:24 183:8
184:8 187:18
192:17
202:24
204:19 205:2
205:17,21,22
205:25
206:10 208:9
211:18 221:6
222:3 223:11
223:18 225:5
227:17
230:11 232:2
234:24 235:8
237:14 240:8
244:4,11

249:9 250:9 250:14 256:8 257:4 258:23 259:8

**knowing (2)** 80:11 253:7

**knowledge (...** 61:23 62:14,18 79:6 80:11,12 99:8 101:25 102:4 132:17 134:2,13

**known (2)** 11:9 67:13

**knows (2)** 111:2,11

**Koehn (2)** 256:2,2

**Kosciusko (8)** 103:8,12 244:17,18,19 244:21,21,23

———————
**L**
———————

**L (6)** 3:2,2 7:14,14 7:14,14

**L-1597 (1)** 72:2

**L-65-19 (1)** 21:21

**L-E-R-M-S (2)** 200:15 204:6

**L.D (1)** 1:4

**labeled (3)** 59:11,11 64:11

**laid (4)** 63:12 131:9 171:13 182:13

**lamp (1)** 153:19

**language (1)**

220:21

**large (3)** 45:6 149:23 158:18

**larger (5)** 106:25 133:21 157:19 158:2 188:24

**largest (1)** 227:9

**lasts (1)** 217:15

**late (2)** 60:17 156:22

**latest (1)** 219:19

**law (27)** 2:9 4:20 9:4,15 23:15 50:18 53:9 57:11 68:10 69:17 70:4 71:22 74:9,11 97:13 97:22 98:4 99:25 100:12 103:20 109:15,18 141:11 205:22 227:3 234:21,22

**lawfully (4)** 229:19 238:21 239:8,19

**laws (8)** 50:16 52:3,25 74:8 97:20 98:6,8 211:13

**lay (1)** 17:16

**layered (1)** 64:7

**laying (1)** 127:19

**LE (1)**

142:6

**Leach (8)** 134:8 211:3 241:20,22 255:14,17 256:4,4

**lead (1)** 158:20

**leading (1)** 68:14

**learning (1)** 232:3

**leave (2)** 25:12 98:21

**led (1)** 240:11

**left (5)** 78:16 79:17 80:15 81:7 163:23

**legal (29)** 6:20 26:15 27:7 57:2,25 58:5,6 59:7 59:25 60:5,15 60:21 63:8 91:23 92:2,12 92:22 93:2 108:7,19 109:7 220:20 232:2 234:7 235:2,5 237:8 238:3 239:7

**legally (2)** 67:19 81:5

**LegalView/Z...** 4:11

**length (5)** 32:18 46:17 55:15 119:10 217:9

**lengthy (1)** 218:2

**LERMS (4)**

200:15 204:6,7 204:11

**lesser (1)** 135:19

**let's (25)** 35:23 43:6 78:18 79:23 79:25 113:11 123:7,18 128:6 146:10 148:7 154:22 157:5 178:12 180:7 181:12 184:2 185:15 201:22 212:8 214:25 215:8 242:7 255:12 257:23

**lethal (17)** 139:2 147:7 148:8 150:20 151:22 154:4 154:18 158:25 161:11,14,18 169:4 182:8,9 182:10,13 224:13

**level (32)** 27:13,13,21 28:21 30:17 30:22 31:4,7 31:9,16,18 32:23 35:22 37:18,19,23 38:3,14 39:11 40:25 45:5 48:23 49:4 53:15 58:13 58:14 135:21 135:24 137:15 149:22 169:24

225:21

**levels (1)** 151:11

**Lexington (1)** 2:5

**Lexipol (1)** 109:25

**Lexitas (3)** 4:12 6:22 7:11

**lieutenant (3...** 1:16 6:4,14 7:23 8:1 9:1,2 9:23 10:1,10 11:1 12:1,8 13:1 14:1,10 15:1 16:1 17:1,3,7 18:1 18:5,18 19:1 19:19 20:1,4 21:1,23 22:1 22:5 23:1 24:1 25:1 26:1 27:1 28:1 29:1,17 30:1 31:1 32:1 33:1,6,6 33:15,19,25 34:1,5 35:1 36:1 37:1 38:1 39:1 40:1 41:1,21 42:1 43:1,9 43:17 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1,17 52:1 52:10 53:1 54:1,11,12 55:1 56:1,20 56:21,23,23 57:1,8 58:1 59:1 60:1 61:1,9 62:1

62:25 63:1
64:1 65:1
66:1,12 67:1
68:1 69:1
70:1,25 71:1
72:1,4 73:1
74:1 75:1
76:1 77:1
78:1 79:1
80:1 81:1
82:1 83:1
84:1 85:1
86:1,5,5 87:1
87:6 88:1,9
89:1,3 90:1
90:10 91:1
92:1 93:1
94:1 95:1
96:1 97:1
98:1 99:1
100:1 101:1
102:1 103:1
104:1 105:1
106:1 107:1
108:1 109:1
110:1 111:1
112:1 113:1,2
114:1 115:1
116:1,14,21
116:25 117:1
118:1,25
119:1,12
120:1 121:1
122:1,12
123:1 124:1
124:19 125:1
126:1 127:1
127:14 128:1
129:1,23
130:1,6,7
131:1,2 132:1
133:1 134:1
134:13 135:1
135:8,15

136:1 137:1
138:1,20
139:1,4 140:1
141:1,9 142:1
142:8 143:1
144:1 145:1
146:1 147:1
148:1 149:1
150:1 151:1
152:1 153:1
154:1 155:1
156:1,25,25
157:1,8 158:1
159:1 160:1,9
161:1 162:1
162:11 163:1
164:1,8 165:1
165:6 166:1
166:16 167:1
167:15 168:1
169:1 170:1
171:1 172:1
173:1 174:1
175:1 176:1
176:17 177:1
178:1 179:1
180:1 181:1
182:1 183:1
184:1,3 185:1
186:1 187:1
188:1 189:1
190:1,24
191:1,8 192:1
192:10 193:1
194:1,22
195:1 196:1
197:1 198:1
199:1,25
200:1,12
201:1,16
202:1,13
203:1 204:1
205:1 206:1
207:1 208:1

209:1 210:1
211:1 212:1,2
213:1 214:1
215:1 216:1
217:1 218:1
219:1 220:1
221:1 222:1
223:1 224:1
225:1 226:1
227:1 228:1
229:1 230:1
231:1 232:1
233:1 234:1
235:1 236:1
237:1 238:1
239:1 240:1
241:1 242:1
242:17 243:1
243:9,25
244:1,4,7
245:1,14,21
246:1,11,14
246:25 247:1
247:3,5 248:1
248:8,10
249:1 250:1
250:19,21
251:1,4,9
252:1 253:1
254:1,14
255:1,18
256:1 257:1,9
257:10,20
258:1 259:1
259:23 260:1
261:1,25
262:1,11
263:5
**lieutenants (6)**
34:8,18,22
35:2,4 88:13
**life (4)**
69:14,15
162:14

177:20
**limit (1)**
119:23
**limited (2)**
44:3 208:25
**line (5)**
33:12 113:19
129:10 164:4
267:5
**lines (1)**
24:13
**link (1)**
105:12
**list (2)**
11:24 145:17
**listed (10)**
10:5 11:14
69:5 87:13,18
139:21
176:10 188:8
225:25 253:6
**listen (3)**
23:16 74:19
174:10
**listened (1)**
127:10
**listening (1)**
127:7
**listing (5)**
71:15 132:22
204:13 241:9
241:10
**lists (2)**
228:5,10
**literally (1)**
121:4
**litigation (1)**
4:21
**little (12)**
8:9 17:5,20
19:25 21:25
104:24
110:11 118:5
119:16 151:4

164:14 171:9
**LLP (2)**
2:4 7:4
**locate (1)**
81:19
**located (1)**
16:7
**location (5)**
44:4 56:12
251:18,20,22
**locations (1)**
4:10
**Locust (2)**
249:10,12
**log (2)**
197:22,24
**logical (1)**
35:2
**long (12)**
1:12 12:25
13:10 14:18
25:8 63:15
81:7 99:11
166:22
197:11 217:3
217:13
**longer (3)**
47:4 63:20
76:17
**look (22)**
15:6 16:3
17:12 20:7
44:13 60:9
66:3 68:13
73:11 98:2
106:12 113:6
128:25
143:11
179:19,21
191:19
220:25
250:22 252:9
260:4,11
**looked (5)**

15:18,24 67:5 97:5 201:2
**looking (14)** 17:10 57:9 95:15 110:14 113:9 159:4 160:8 164:17 174:21 212:6 246:13 252:11 258:15,22
**looks (13)** 89:3 142:15 176:21 237:2 243:15 245:25 250:4 250:11,13 251:12 252:2 256:23,25
**loose (14)** 152:9,13 154:12,22 172:19 173:3 173:18 174:17 175:5 175:11 178:13 180:23 181:6 181:7
**lose (1)** 76:15
**lost (6)** 68:21 76:14 95:18 97:6 99:14,22
**lot (6)** 79:3 81:16 88:14 89:4 150:2 248:21
**louder (1)** 118:5
**lowest (1)** 27:21
**LT (2)**

267:1,1
**Lucyshyn (3)** 250:5,5,20

**M**

**M (1)** 7:14
**M26 (1)** 160:19
**M26's (1)** 160:21
**Madam (1)** 261:11
**maintain (3)** 131:12 182:23 183:17
**Major (1)** 107:10
**majority (3)** 27:10 31:17 163:22
**makeshift (1)** 153:16
**making (9)** 111:7 154:8 168:7 175:9 178:10,24 179:12 188:25 202:16
**man (1)** 171:15
**manage (1)** 212:10
**management...** 107:8 109:25
**manner (3)** 4:17 144:19 174:22
**manuals (1)** 141:2
**mapped (1)** 71:12
**Marianne (3)**

215:9 219:12 245:24
**marijuana (1)** 80:5
**mark (7)** 21:16 71:23 141:7 157:5 160:7 165:4 259:20
**marked (13)** 4:23 73:5 114:13 138:19 142:3 162:8 176:16 189:18 211:25 218:4 226:7 236:23 262:5
**Marone (3)** 246:9,10 248:13
**marriage (1)** 266:18
**matched (1)** 79:9
**material (1)** 157:14
**materials (9)** 13:25 14:13 87:25 88:7 139:25 157:11 192:21 193:14 264:11
**matter (4)** 6:15 57:25 171:21 266:19
**matters (5)** 10:20 11:10,15 20:7 112:5
**Matthew (3)** 244:5 248:18

249:21
**Maxwell (2)** 250:18,19
**mayor (1)** 33:10
**McGill (2)** 238:24 257:4
**mean (27)** 12:20,21 17:12 17:21 21:15 30:22 38:24 55:12,14 74:10 136:19 146:21 159:7 175:17 197:2 197:21 208:2 209:18 214:18 237:16 240:12,13 245:6 248:4 254:24 255:6 256:19
**meaning (2)** 152:25 187:4
**means (6)** 30:23 50:25 133:16 213:9 220:21 258:11
**meant (1)** 207:3
**media (2)** 6:13 191:3
**medical (4)** 69:11,13 100:9 212:10
**meet (1)** 149:10
**meeting (4)** 4:11 12:25 13:7 104:8
**meetings (3)** 11:21 12:17

20:19
**meets (1)** 214:5
**member (4)** 77:4 144:5,8 185:21
**member's (4)** 212:15,16,19 212:23
**members (5)** 56:4 64:16 184:18 185:19 189:15
**memorandu...** 130:8
**memorize (1)** 143:12
**memorized (2)** 11:24 230:3
**memory (1)** 208:22
**mention (3)** 65:12 158:21 219:3
**mentioned (1...** 64:14 148:23 152:18 158:24 170:8 183:15,24,25 198:8 222:16
**mere (1)** 93:21
**met (2)** 13:3 109:8
**method (2)** 133:3 198:10
**methods (9)** 20:8 66:14 104:19 110:21 112:2 112:17 120:7 138:22 169:22

| | | | | |
|---|---|---|---|---|
| **Mian (6)** | 86:1 87:1 | 173:1 174:1 | 260:1 261:1 | 60:2 100:17 |
| 249:23,24 | 88:1 89:1 | 175:1 176:1 | 262:1,2,11 | 100:25 |
| 255:9 257:22 | 90:1 91:1 | 177:1 178:1 | 263:5 267:1,1 | **misundersto...** |
| 259:6,13 | 92:1 93:1 | 179:1 180:1 | **middle (3)** | 169:10 |
| **Michael (267)** | 94:1 95:1 | 181:1 182:1 | 9:8 86:22 | **Mitchell (2)** |
| 1:17 6:4,14 8:1 | 96:1 97:1 | 183:1 184:1 | 162:14 | 134:8 241:20 |
| 9:1 10:1 11:1 | 98:1 99:1 | 185:1 186:1 | **million (1)** | **model (1)** |
| 12:1 13:1 | 100:1 101:1 | 187:1 188:1 | 162:2 | 165:16 |
| 14:1 15:1 | 102:1 103:1 | 189:1 190:1 | **Minchella (2)** | **models (1)** |
| 16:1 17:1 | 104:1 105:1 | 191:1 192:1 | 244:9,10 | 165:17 |
| 18:1 19:1 | 106:1 107:1 | 193:1 194:1 | **mind (3)** | **modify (1)** |
| 20:1 21:1 | 108:1 109:1 | 195:1 196:1 | 67:8 92:5 | 140:22 |
| 22:1 23:1 | 110:1 111:1 | 197:1 198:1 | 101:25 | **modifying (1)** |
| 24:1 25:1 | 112:1 113:1 | 199:1 200:1 | **mine (1)** | 206:15 |
| 26:1 27:1 | 114:1,17 | 201:1 202:1 | 233:23 | **moment (1)** |
| 28:1 29:1 | 115:1 116:1 | 203:1 204:1 | **minimum (1)** | 89:7 |
| 30:1 31:1 | 117:1 118:1 | 205:1 206:1 | 63:24 | **monitor (2)** |
| 32:1 33:1 | 119:1 120:1 | 207:1 208:1 | **minor (4)** | 64:21,23 |
| 34:1 35:1 | 121:1 122:1 | 209:1 210:1 | 68:21 185:13 | **monitoring (1)** |
| 36:1 37:1 | 123:1 124:1 | 211:1 212:1 | 185:15 187:4 | 30:24 |
| 38:1 39:1 | 125:1 126:1 | 213:1 214:1 | **minute (1)** | **Monroe (3)** |
| 40:1 41:1 | 127:1 128:1 | 215:1 216:1 | 151:3 | 48:12,14 63:13 |
| 42:1 43:1 | 129:1 130:1 | 217:1 218:1 | **minutes (12)** | **month (3)** |
| 44:1 45:1 | 131:1 132:1 | 219:1 220:1 | 86:8 152:19 | 202:25 203:6 |
| 46:1 47:1 | 133:1 134:1 | 221:1 222:1 | 166:14 217:7 | 256:20 |
| 48:1 49:1 | 135:1 136:1 | 223:1 224:1 | 217:15,21 | **monthly (2)** |
| 50:1 51:1 | 137:1 138:1 | 225:1 226:1 | 218:8,13 | 65:5 90:18 |
| 52:1,11 53:1 | 139:1 140:1 | 227:1 228:1 | 242:10,18 | **months (5)** |
| 54:1 55:1 | 141:1 142:1 | 229:1 230:1 | 260:4,11 | 227:25 251:10 |
| 56:1 57:1 | 143:1 144:1 | 231:1 232:1 | **misdemeano...** | 251:13,15 |
| 58:1 59:1 | 145:1 146:1 | 233:1 234:1 | 68:15 71:8 | 259:6 |
| 60:1 61:1,9 | 147:1 148:1 | 235:1 236:1 | 95:25 | **Montinarelli...** |
| 62:1 63:1 | 149:1 150:1 | 237:1 238:1 | **misery (1)** | 243:25 245:14 |
| 64:1 65:1 | 151:1 152:1 | 239:1 240:1 | 187:16 | 245:18 |
| 66:1 67:1 | 153:1 154:1 | 241:1 242:1 | **missed (2)** | **morning (1)** |
| 68:1 69:1 | 155:1 156:1 | 243:1 244:1 | 146:15 158:21 | 7:20 |
| 70:1 71:1 | 157:1 158:1 | 245:1 246:1 | **misses (1)** | **motion (3)** |
| 72:1 73:1 | 159:1 160:1 | 247:1 248:1 | 146:10 | 8:25 9:11 |
| 74:1 75:1 | 161:1 162:1 | 249:1,18 | **missing (1)** | 112:9 |
| 76:1 77:1 | 163:1 164:1 | 250:1 251:1 | 207:16 | **mounts (1)** |
| 78:1 79:1 | 165:1 166:1 | 252:1 253:1 | **mistake (2)** | 185:21 |
| 80:1 81:1 | 167:1 168:1 | 254:1 255:1 | 234:3,5 | **move (17)** |
| 82:1 83:1 | 169:1 170:1 | 256:1 257:1 | **mistaken (5)** | 16:17 66:10,12 |
| 84:1 85:1 | 171:1 172:1 | 258:1 259:1 | 51:17 56:21 | 74:16 84:9 |

104:16 112:8
113:22
119:17
125:19
138:20
170:20 174:8
202:11 229:9
232:7 238:24

**moved (1)**
127:11

**moving (3)**
89:5 171:15
249:25

**multi-facete...**
105:8

**multiple (4)**
12:15,16
217:17
252:19

**multitude (2)**
173:11 245:5

**municipal (2)**
1:8 2:8

**municipaliti...**
156:6

**MWP (1)**
1:7

_____
N
_____

**N (4)**
2:2 3:2 7:14,14

**name (8)**
6:3,20 7:20
120:4 145:23
223:13
228:22,22

**named (12)**
60:8,10,12
126:7 133:23
134:6 138:12
138:13 215:3
215:10
219:12
222:20

**names (4)**
15:8 98:6
243:18 244:8

**natural (1)**
1:4

**nature (3)**
83:11 118:6
180:15

**near (1)**
75:5

**nearly (1)**
104:7

**necessarily (2)**
17:21 95:25

**necessary (5)**
36:8 106:14
140:18 155:2
267:3

**need (42)**
4:14 17:19
26:3 32:6
46:16 47:17
54:2 62:22
66:3 67:9
71:7,9,19
79:4 80:23
82:4 83:19
85:4 88:19
93:4 95:10
104:10
105:25 107:3
115:14,19
129:20
136:15
153:12
158:19
159:16
180:19 196:4
199:17
214:11
223:15
240:15
244:13
252:24 253:2

254:11
259:22

**needed (5)**
47:4 74:2
88:23 153:4
180:20

**needs (8)**
31:4 32:15
35:22 135:20
140:16
181:23 198:7
203:10

**neighborhoo...**
81:14

**neighboring ...**
41:24 42:9,21
47:25 48:18
49:8,24 50:8
52:9,21 54:14

**NELLIE (1)**
2:15

**Nellis (12)**
53:21 54:9,17
54:23 56:17
57:13 232:11
232:13
233:14 238:7
238:9,20

**never (7)**
58:3 59:24
75:7 89:25
102:23 103:3
150:8

**new (42)**
1:2,12,21 2:5,5
2:10 6:9,19
14:7 21:10,15
22:6 23:3,6
23:25 50:14
50:15,16,18
52:3 53:9
66:23 68:10
69:17 71:21
73:2 97:13,17

97:18,19
99:25 100:11
103:19
109:17
169:12
190:25 191:9
234:21,21
244:8 266:4
266:10

**newer (1)**
165:2

**nickels (1)**
170:4

**non-responsi...**
84:10

**noncomplyin...**
140:24

**nonexistent (1)**
35:3

**nonlethal (4)**
159:2,3,7
223:21

**nonresponse ...**
213:6 214:2,4
214:6,17

**nonresponsi...**
74:18 125:20
127:12
170:21 174:8

**normally (2)**
16:5,10

**Notary (5)**
1:21 7:16
262:15 266:9
267:25

**note (3)**
36:5,22 198:2

**NOTED (1)**
262:8

**notes (5)**
35:15 163:17
242:8 260:4
260:12

**notice (12)**

1:19 10:5,9,12
104:17
119:13,23
121:5 124:5
138:18
202:11
214:25

**noticed (2)**
113:21 136:18

**noticing (2)**
6:25 136:17

**notifications ...**
213:5

**notified (11)**
39:6,17 40:3,6
93:4,9,10,14
93:15,17
214:19

**notify (2)**
111:21 212:25

**number (36)**
6:13,17 21:2,3
69:3 72:2
79:14 99:8
112:16
121:25
142:24
158:23,23
161:24
193:22 194:6
194:24 199:4
199:19
200:13,16,22
201:5,11,17
202:8 203:25
204:8,12,20
205:4,11,12
205:14,18
253:24

**numbering (1)**
24:17

**numbers (2)**
21:21 254:5

**numerous (1)**

32:13

**O**

**O (1)**
3:2
**oath (2)**
3:13 4:13
**object (8)**
18:14 97:25
98:11 113:9
120:24
152:20 153:5
156:23
**objecting (6)**
112:14 113:18
123:9 128:17
156:11
191:12
**objection (161)**
9:21 15:20
17:2 20:16
21:12 22:21
23:5,13,23
24:4 28:17
29:22 30:14
31:11 32:3,10
33:18 34:3,11
34:21 35:12
36:25 37:25
38:21 39:14
40:8 41:4,10
42:2,10,16,24
47:3,8,16
49:25 50:10
51:18,22
52:15,23 53:7
53:19,25
54:21 55:2,12
56:22 57:17
57:24 58:8
63:11,19,22
64:19 66:2
70:12,20 75:3
75:13 76:8,21

77:9 79:2
80:10 81:2
82:2,11,14,23
83:9 85:3
87:5 91:14
92:4,9 93:3
93:12,18
96:23 99:21
100:18 101:4
101:22
102:21
103:15
106:15 107:5
108:23
110:25
111:10 119:9
122:16 123:3
125:11 126:2
130:9 133:7
133:10 139:8
139:18
143:24
144:15,24
145:8,24
146:17
147:11,16
150:17 155:3
156:22
157:16,22
159:25 161:3
162:24
164:24 166:6
168:15 173:6
175:16 179:6
179:15
180:14 183:6
183:22 185:8
186:18 191:4
193:4,11,16
194:21 197:9
198:15,24
201:8 203:9
204:2 205:20
206:4,14,22

208:13,20
211:10
216:25 217:5
220:4,15
221:9 222:22
224:9 230:15
234:17
246:21 254:8
255:3 260:22
261:6
**objectionabl...**
18:4
**objections (2)**
3:9 111:8
**objective (3)**
33:24 82:9,12
**objectively (2)**
195:14,22
**objects (6)**
90:6 98:16
149:19
152:24,24
153:7
**observation (...**
65:11 178:9,23
179:5,13,24
**observations...**
175:10 178:24
179:8 181:10
**observe (7)**
131:12,20
133:16,17
174:23 175:7
180:9
**observed (4)**
240:5,6,23
241:4
**observing (3)**
33:19 132:20
133:19
**obtain (14)**
80:16 94:7,14
94:18 99:2,4
99:9,10

187:10,11
188:2,3 189:8
189:8
**obviously (8)**
61:22 117:12
128:19
154:11
172:17
204:16
251:21
258:23
**OC (5)**
148:12,14
150:21,22
151:6
**occupied (1)**
153:12
**occur (5)**
44:6 92:17
181:23 185:2
209:16
**occurred (11)**
22:19 32:22
36:6 68:22
93:8 219:3,16
219:22
220:25 229:5
231:24
**occurring (1)**
251:19
**occurs (4)**
42:14 44:11
66:23 72:16
**October (4)**
22:20 229:18
230:23
243:17
**offense (2)**
68:22,24
**offer (3)**
27:9,10,15
**offered (4)**
27:17 57:7
60:9 117:19

**office (28)**
16:6 30:20
31:6 38:18,20
38:23 39:3,6
39:17,23 40:3
40:6,13,14,17
41:3 106:4,11
125:16
127:23,25
130:13
136:22,24
137:2 205:24
211:15
249:12
**officer (257)**
1:8 3:13 4:13
9:20 27:14,23
29:10 31:24
32:5,9,13
33:4 35:19
36:11 37:5
38:12 41:7
42:14,25
43:25 46:5,9
59:23 60:4,14
65:10,16,19
66:4 67:12,16
67:22 69:13
73:10 74:4
75:2,8,15,21
77:10,13,16
77:17 78:3,6
78:15,19,19
78:22 79:15
79:20 80:6,12
80:13,16,18
80:20 81:4,7
81:17,21 82:3
82:6,9,16
83:21 84:14
88:19 91:21
92:22 97:22
100:13,21,25
101:10,19,23

102:11,23
103:3,7,21
108:21
119:18 120:2
120:12,21
121:15
122:10,17,24
124:24
125:24
126:16
127:20,22,25
128:9 130:22
131:5,14,22
133:13 137:6
137:13,20
138:2,9
140:15 146:2
146:10
149:23 150:5
150:9,14
152:3,5,6,14
153:17,20,22
154:2,2,3,24
154:25 156:7
156:24
168:19,21
169:13,17,18
170:5,11,24
171:3,11,17
172:8 182:15
184:15 185:3
186:24
187:15 188:4
188:9,14,19
188:22,25
189:5 194:16
196:11 197:6
197:15,25
200:20
202:18,24
203:3 204:3
205:6,22
206:19,21
207:11

208:11,17,23
209:2,20,25
210:2,9,10,13
210:17,18,22
211:3 212:23
213:2 214:15
214:19,24
216:20
217:23
218:21 219:7
219:9,25
220:5,11,19
221:7,20,24
221:25 222:2
223:11,18,24
224:7,11,16
224:24 225:2
225:5,7,9,20
226:3 229:17
229:18,25
230:11,19,24
231:7,8 232:2
232:15,22
233:5,10
234:19
239:18 240:7
240:7,9,15
241:14,16,22
243:22
244:18,19
246:19
249:16 250:3
250:8,11,15
252:19
253:15
255:14,17
256:12,13
257:7,15
258:12 259:2
263:21
264:23

**officer's (19)**
36:10 37:14
42:19 79:5

83:13 101:25
132:13,20
156:17 174:5
195:13,21
198:2,11
206:19,20
223:16
228:22
248:21

**Officer/subj...**
172:6,7

**officers (255)**
7:22 15:7 24:2
24:20,24
25:11,13,23
26:5,7,14
27:3,6 29:19
30:10,16 31:2
32:18 33:14
33:17,23
34:20 35:8
40:21 41:16
41:22 44:13
44:15,22
45:23 47:22
48:16 49:22
50:6,12,19
51:13 52:7,14
52:19 53:11
53:21 54:10
55:20,21
56:11,12,14
58:4,21 59:5
64:22 65:3,14
65:24 66:17
72:24 73:2,6
73:8,20,25
76:6 77:3
78:10 80:2
82:20 88:8
90:15 91:6,15
91:18 92:2,11
93:20 94:6,13
94:17,24

95:24 96:6
97:9,24 98:6
98:10,15,20
98:24 101:12
104:23 105:3
105:7,12,20
105:25
106:23
107:21
119:15 120:9
120:17
121:18 122:6
122:13
124:12,20
125:8,13
126:14
127:16 131:3
131:16
134:10 136:5
136:19
139:15,19
140:2 141:20
141:23
144:22 145:4
145:11,18,21
146:22
147:14,17,21
147:25
148:13,19
149:4,6,7,11
149:15 150:7
150:14,20,22
151:4,9,12,14
151:16,20,24
152:8,19,22
153:6,7,11,25
154:8,14,15
154:21 155:4
155:8,12,14
155:17,22,25
156:9 157:2
158:3,9,13,14
159:4 161:19
162:4,5 164:3

164:9,11,19
164:25
165:14
166:12
167:20 168:3
168:13 169:4
172:2,12,17
172:22 173:2
173:7,10,14
174:12,14
175:13,17
176:5 177:9
177:13,16
178:7,12
179:21,23
180:17 181:2
181:6,9 182:7
182:12
186:14
189:13
191:10 193:8
193:15
194:14 195:6
195:12,20
199:5,19
200:13,17
201:6 202:8
203:19,25
206:13 211:5
215:3,10,14
218:12,16,19
218:19 222:6
222:10 228:6
228:15,16
232:16 240:2
240:16
252:16,21
254:9 256:15
256:16 264:4
264:9,12
265:6

**officers' (5)**
30:24 32:20
64:24 131:12

177:11
offices (1)
249:10
official (3)
36:4,11 43:24
oftentimes (3)
79:10 158:20
251:18
oh (3)
163:9 203:5
257:4
okay (18)
7:23 23:18
43:21 66:6,12
84:12 89:18
113:11
115:18
118:18 135:7
149:13
166:10 167:9
174:13
224:23
236:13 257:5
older (2)
72:14 165:3
once (10)
64:16 76:9
89:15 92:18
151:11
163:22
169:23 173:5
198:5 218:17
one-hour (1)
63:18
one-week (1)
132:3
ones (2)
143:12 204:15
oneself (1)
169:23
ongoing (4)
92:16 93:13
107:20
258:13

operate (1)
131:13
operating (3)
54:13 55:25
57:16
operation (5)
54:8 55:18
237:17
240:20,21
operations (3)
40:11,20 64:20
operator (3)
223:25,25
224:17
operators (3)
14:2,5 263:19
opinion (4)
57:7,18,21
247:25
opportunity ...
57:11 81:22
86:7,9 87:7
94:7,18 99:2
119:3,5
180:24
192:12
242:19,21
opposed (6)
79:23 128:22
153:15
191:15
210:16
227:14
option (7)
150:24 151:6
151:22 154:4
163:18
223:21
224:13
options (9)
31:8 124:24
130:15 148:9
150:20
151:10

154:18
161:11,18
orange (5)
36:5,9,16,22
37:4
order (48)
9:5 12:4 20:25
21:6 24:14,18
43:6,8,10
44:17 46:18
54:25 55:11
59:6 67:2,22
69:16,25 70:3
70:14 71:3,6
85:6 88:18
94:3 95:14
97:5 99:20
103:14
109:12 110:4
110:13,21
114:4,25
131:6,21
132:9 133:2
133:23 136:9
182:24 184:5
211:18,20
219:21
232:25
263:17
ordering (1)
261:12
orders (23)
20:23,24 24:17
50:17 51:5
66:24,25 67:3
68:9 90:20
97:9,14,21
100:5,8,11
109:13,20
131:25
132:14 133:6
133:15
197:10
Oriented (2)

193:2,9
original (1)
22:25
Osipovitch (1)
255:18
other's (1)
92:19
outcome (1)
266:19
outlined (3)
67:21 68:6
69:18
outside (17)
81:10 109:19
111:13,15
121:2 123:4
123:11 134:5
156:12,18
190:19 191:5
199:23 201:9
201:20
202:10
224:10
overall (1)
157:24
oversee (1)
40:20
overseeing (1)
61:12
oversight (2)
63:2 65:24
overtime (1)
248:13
overview (2)
16:22 25:6

_____
        P
_____
P (3)
2:2,2 3:2
p.m (23)
116:3 123:22
123:24,24
124:2 192:5,7
192:7,9

201:24 202:2
202:2,4
242:12,14,14
242:16
260:16,18,18
260:20 262:4
262:8
packet (1)
12:9
page (32)
49:12,12 68:11
117:23
142:12,19
143:22
148:10,11
163:11,12,14
165:19,20,21
165:22 166:8
166:8 177:8
178:2 181:12
181:12
184:11 226:8
243:14
257:24 263:4
263:10,15
264:3 265:3
267:5
pages (4)
142:25 144:14
157:13
259:21
Pancoe (5)
254:13,14,15
257:19,21
pants (1)
79:13
paperwork (1)
210:10
paragraph (9)
10:24 11:4
69:6,19,19
70:21 71:11
177:13
181:14

parentheses ... 195:2
parking (1) 174:21
part (44) 26:17 64:7 68:13 69:16 75:16 91:7,16 91:18 95:6 97:13,20 98:5 98:7 100:11 121:24 131:14 145:13 147:3 151:23 157:10 162:24 163:3 165:2 167:21 183:23 196:20 213:6 217:21,24,24 221:4 223:19 225:10 226:4 226:4,10 234:16,19 244:4 247:8,9 248:18 254:16 256:8
participating... 4:10
particular (25) 41:12 63:25 74:6 77:14 87:12,21 96:13 101:24 102:7 105:9 106:23 141:21 182:16,17 211:12 219:4 220:9,17 222:15 223:16 227:10

245:21 249:13 252:25 255:7
particulars (1) 244:14
parties (7) 3:5 4:6,18 5:4 10:5 109:21 266:17
parts (2) 133:21 217:20
party (2) 81:20 153:21
passed (2) 176:5 198:17
path (3) 81:12 96:7 100:15
patrol (2) 40:20 177:11
pattern (1) 136:13
Paul (1) 54:9
pause (1) 113:17
Payson (1) 116:10
PD (1) 7:22
PDS (17) 16:6,9 17:13 17:15 19:10 38:8 39:11 40:15,17,18 93:4,17 136:4 136:9,12 144:12,21
Peachie (3) 2:11 7:5 61:20
people (18) 7:21 24:24 33:11 53:3 62:21 81:11

81:15 113:14 153:25 162:2 174:25 180:18,20 211:14 243:18 251:17 253:5 256:24
people's (6) 25:22,24 50:3 51:14 106:13 189:15
perceive (1) 171:20
perceived (1) 170:24
perceives (1) 188:4
percent (3) 112:22 160:22 161:22
perfectly (2) 113:18 117:16
performance... 30:24 131:12
period (6) 47:5 53:11 196:17,19 197:7 203:6
periods (1) 196:21
Perkowski (5) 244:4,7 246:25 249:18,22
permissible (1) 193:6
permission (1) 256:18
permit (1) 76:18
permits (1) 97:22
permitted (16) 8:16 9:7 75:21

86:21 94:25 97:10 117:3,9 118:20 124:9 126:5 182:8 187:5 188:6 232:16 233:6
person (60) 18:9 44:2 55:6 60:20 62:4,21 76:6,9,11,14 77:25 78:14 78:19,20 79:9 79:16,20 80:3 80:6 85:9 102:14 128:15 132:18 135:15 149:22,25 150:5 151:13 153:2 159:11 170:17 171:10,14 183:10 184:20 185:22,25 188:17 197:2 208:3 209:5 209:10,21 210:2,14,17 210:22 211:6 232:17,19,23 233:2,3,7,8 233:12 250:4 250:10 253:10 258:19
person's (8) 26:22 44:6 69:15 80:21 90:24 91:7 96:7 237:21
personal (11) 26:23 35:14

51:24 60:24 220:20,24 227:2 229:11 232:9 239:5 241:21
personally (2) 18:13 28:10
personnel (2) 36:10,11
persons (3) 11:8 189:17 207:17
perspective (1) 210:19
pertaining (1) 20:25
pertinent (2) 167:2 257:6
Peterson (15) 9:6 116:9,9,11 116:20 117:5 117:14,23 118:19 124:4 124:7 126:11 127:2 202:6,9
phone (2) 106:21 178:15
phrased (1) 9:21
physical (39) 44:3 68:19 169:23 170:8 170:11,14,16 170:18 171:3 171:8,12,16 171:20,24 172:2,11 175:23 176:11 182:14 183:4 183:25 184:4 185:11,16,24 186:17,20,22 186:22 187:2

187:5 232:20
232:21,24,24
233:5,6,9,10
**pick (1)**
221:13
**picked (1)**
81:19
**picking (2)**
62:17 178:15
**piece (3)**
49:12,12 210:7
**Pierce (5)**
257:2,7,15,21
257:22
**pinch (1)**
170:3
**place (6)**
1:19 27:23
108:20 109:9
152:20 154:8
**placed (1)**
36:10
**places (1)**
136:19
**plaintiff (5)**
1:17 124:8
162:10
232:12
261:17
**plaintiff's (3)**
117:9 262:6
263:10
**plaintiffs (4)**
1:5 2:4 7:3
229:12
**plan (4)**
151:25 154:6,8
154:16
**planned (1)**
54:10
**planning (1)**
154:15
**platoon (12)**
30:17,22 31:16

212:23
247:17,18
248:3,9,16
251:4,9
255:23
**play (6)**
164:15 166:9
166:18 167:9
173:9 174:5
**playback (1)**
166:20
**played (1)**
179:19
**please (23)**
6:2,23 8:2 12:7
14:8 19:17
22:2 23:16
29:14 41:19
43:15 85:14
85:23 107:15
113:22 129:7
130:24
160:15 177:6
184:23
189:25
243:13
261:18
**pockets (1)**
79:13
**point (7)**
26:21 56:3
201:14,16
232:16 233:2
233:7
**pointed (2)**
232:22 233:11
**pointing (1)**
185:21
**police (115)**
13:16,21 21:19
30:15 31:2
32:17 33:3
38:10 43:10
43:25 44:8,18

44:20,24
50:12,25
51:25 52:6
53:3 57:8
58:21 59:17
60:18 61:3,8
61:10,11,12
61:13 62:5
63:2,4,7
64:21 65:16
65:20,22 68:4
73:9 75:18
76:19 77:23
83:21 93:7
97:15 98:8
105:23 106:5
106:5 114:5,6
114:9 119:22
119:25
120:20
124:14
131:13 137:3
141:19 145:6
146:23
147:10,25
148:4 156:8
157:2 167:17
167:20,24
168:10,12,22
169:15
170:12,25
171:11
172:15
176:18
177:13
181:19 182:2
186:14
189:16,20
190:3,4,5
191:11,18,21
195:18
200:23
201:12,18
203:15 204:9

204:12,15,20
204:22,24
205:5,12,15
205:19 206:8
215:3 221:14
222:15 223:7
225:15,18
241:13,14
264:10
**policies (54)**
20:9 53:2
66:14 103:19
104:19 110:6
110:9,10,21
111:23,25
112:17 113:3
120:8 121:14
122:4,8
131:10,16
133:6 138:22
141:2 146:22
147:3,9 156:6
161:13 169:2
171:2 175:22
176:7,11
190:5,9,12
191:2,10,18
191:22 194:7
198:4,6,12,20
198:23
199:16 200:2
200:4 202:16
202:19
208:15
225:19
240:22
246:20
**Policing (2)**
193:2,9
**policy (100)**
21:10,15 23:3
23:7,8,11,21
23:25 24:10
27:15,17 31:3

43:22 50:21
50:24 51:5,19
67:21 77:23
83:24 84:4,18
84:22 95:20
96:20 97:14
101:15,21
102:9,16
104:14
109:24
110:22
112:20
113:21
114:24
124:23
126:25 127:5
128:23
131:18
132:11 133:2
144:16
147:24 148:3
148:4 152:12
158:12
161:16
167:25
168:23 169:7
169:15,21
171:6 175:23
175:24
176:12 177:2
179:2 181:18
181:25 182:6
182:12,12,25
183:7,8 184:8
184:12,14,25
186:24 187:6
189:20
190:10,13,17
191:14,16
193:21
195:17,23
196:5,24
202:23 203:4
203:7,8,11,19

204:22
206:24 207:4
213:25 217:8
217:13
225:16 265:5
**poor (1)**
240:17
**poorly (1)**
240:8
**portion (12)**
61:15,18 74:17
95:17 125:20
157:19,25
158:6,8
160:16 178:3
184:12
**pose (3)**
185:23 186:25
187:3
**poses (2)**
83:12 185:23
**posing (1)**
186:16
**position (9)**
9:11,19 34:15
54:13 56:2
57:16 86:20
101:2 135:13
**possess (2)**
15:12,13
**possession (2)**
5:2 162:23
**possibility (2)**
93:21 230:18
**possible (2)**
40:15 149:20
**possibly (2)**
151:9 182:23
**potential (1)**
151:21
**potentially (...**
37:18 40:6
78:24 80:3
83:15 84:3,25

98:14 99:19
101:13
102:10,12
169:18
236:21,24
**PowerPoint (...**
141:21,22
147:4 163:12
164:11
165:23 225:7
226:6,15
**practice (49)**
8:25 49:21
50:6,11,21
51:9,13,20,24
51:25 52:2,5
52:14,16,19
52:24 53:18
54:19 70:9
84:4 89:24
96:17,20
103:9 124:9
124:10,19
125:7,23
126:10,13
127:4,15,18
127:24 128:2
128:7,13,20
128:22
129:18,21,25
144:17
145:25
154:10
187:24 214:4
214:13
**practices (15)**
20:9 32:7
52:24 53:13
66:14 104:20
110:22
112:18
121:13 122:4
133:12
138:22 176:4

176:6 190:5
**predates (1)**
219:19
**preliminary ...**
177:12
**premise (1)**
84:13
**premises (1)**
69:14
**preparation ...**
18:23 28:24
37:3,12 45:21
46:3,19,21
49:15 52:4
61:3 72:5
87:23 88:2
120:18
137:24
143:14,17
144:12
174:12 176:2
177:23
189:24
**prepare (24)**
11:18 12:5,18
13:4,11 20:14
20:20 21:5
52:18 62:16
62:17 66:20
137:25 139:6
173:2,15
174:12,15,18
174:19 175:4
175:9 221:4
263:17
**prepared (12)**
17:22,23 18:21
19:4 134:20
215:5 222:18
222:23,25
223:3,4,6
**prepares (1)**
212:11
**present (23)**

2:13 4:6 20:11
46:9 47:21
53:12 66:16
104:21 110:7
112:20
119:25
122:15,25
138:24 140:2
143:9 152:2
177:15
180:13 181:2
203:24 206:3
233:4
**presentation ...**
226:6
**presented (2)**
4:25 222:24
**presenting (6)**
4:23 184:19
188:5,10
232:20,23
**presents (1)**
225:24
**preserve (3)**
87:4 115:16
189:10
**Preston (2)**
241:19 255:13
**pretty (1)**
81:13
**prevention (6)**
141:10 142:6
146:12,13
148:10 151:5
**preview (1)**
164:14
**previous (4)**
26:23 138:12
216:18
226:22
**previously (13)**
19:11 45:3
67:5 78:8
83:10 100:24

105:6 109:2
114:23
148:23
180:17 198:9
226:12
**prior (49)**
5:2 16:15 22:9
22:11 23:9,19
50:11,18 52:6
65:7 69:2
77:3 79:8
80:24 81:19
81:22 84:2
94:7,19 96:5
100:13 104:6
148:14
149:18
165:23
174:23
175:10 179:9
179:20,21,24
180:19 194:2
194:14
204:25 219:8
219:11,22
220:2 226:9
226:19
230:22,23
231:9 234:2,6
234:13 235:3
235:11
**priority (1)**
177:15
**privacy (5)**
24:25 26:2
44:2,6 60:20
**privilege (3)**
8:24 86:19,25
**privileged (1)**
9:9
**probable (13)**
67:23 68:13
69:20 70:18
71:2,8,9,12

71:18,19
77:19 83:4
108:11
**probably (8)**
13:2 14:21
59:9 89:9
98:2 132:22
250:12
252:24
**probationar...**
35:17,25 65:5
**probe (2)**
164:2,4
**probes (2)**
158:19,21
**problem (5)**
32:24 106:9
107:15,20
136:5
**procedure (7)**
1:18 10:13
16:14,15 90:4
96:16 122:12
**procedures (...**
20:9 64:5
66:14 104:20
110:22
112:17 120:8
121:12 122:4
122:9 138:22
194:8 202:17
202:19 212:2
212:3 240:22
**proceeding (1)**
267:2
**process (3)**
34:17 37:22
253:4
**produce (1)**
14:12
**produced (6)**
14:6 18:20
19:5 61:22
62:12 166:4

**producing (1)**
19:2
**production (...**
12:3 14:4 29:8
41:18 58:18
88:7 129:2
130:5,18
163:3 203:17
264:11
**Professional ...**
16:16,17,24
28:20 30:19
31:5 36:13
37:19,23 38:2
38:5,15 40:19
88:12,21
92:24 107:14
107:17,23
125:4,15
137:17 144:6
144:8 200:18
200:20
254:21
**profile (3)**
252:4 254:23
255:7
**program (10)**
65:14 227:12
241:15 244:5
247:4,6,9,13
248:19
251:21
**programs (1)**
249:13
**prohibited (3)**
41:22 53:3
117:15
**prohibition (2)**
49:6 137:7
**prohibits (2)**
47:23 48:17
**prompted (2)**
203:20 265:7
**propensity (1)**

175:19
**proper (1)**
17:16
**properties (21)**
20:12 51:14
55:18 66:18
77:25 96:22
104:23
106:13
119:15
120:17
121:19
124:13,21
125:9 126:15
138:6,25
139:17 140:4
148:21
238:22
**property (183)**
24:25 25:25
26:7,16,18,23
27:8,19 28:4
28:16 29:4,13
29:20,21 30:6
30:11,12 37:6
37:15 40:24
41:9,17,24
42:9,15,21,23
44:13,14 46:6
46:12 47:2,15
47:24,25
48:19 49:8,24
50:9 52:9,22
53:5 54:14
55:25 58:6
59:6 60:2,6
60:16,24
63:10 67:17
69:22 70:10
71:4 75:22
76:19 77:8,17
77:21 78:17
78:24 80:8,9
80:16,21,22

80:24 81:5,6
81:12,23,25
82:5 83:5,8
83:17,23,25
84:15,18,22
84:25 90:24
91:5,7,7,12
91:16,17,19
91:25 92:13
93:22,25 94:8
94:10,16,20
94:21 95:2
96:8 97:10,23
97:25 98:12
99:3,4 101:12
101:13 102:9
102:20
103:24 105:5
105:13,16
107:22 108:4
109:5 119:20
120:3,14,22
121:22 122:7
122:14,18
123:2 125:25
126:18
127:17,20
128:10 129:6
129:17 130:3
130:23 137:8
179:12,25
180:7,8,9,12
180:19 181:2
181:4,8 189:3
189:4,10,14
210:7 216:6
216:14,16
220:3,21,24
227:2 229:3
229:11,21
231:2,9 232:9
234:12 235:3
236:21 237:5
237:7,9,20,21

238:4,15
239:5,9
241:21
263:24 264:6
264:18,24
**property's (1)**
24:12
**proposed (3)**
203:7,18 265:5
**propriety (1)**
90:7
**prosecutions...**
240:12
**protect (1)**
162:14
**protected (1)**
87:2
**protection (2)**
30:13 234:13
**provide (13)**
26:6 34:20
35:7 56:3,13
67:15 96:5
99:18 148:19
158:18
205:11,13,22
**provided (85)**
9:4 12:9 20:18
20:21 21:5
24:6 25:3,4
25:10,13 26:9
26:14 27:5
28:2 29:2,8
31:24 32:9,12
33:14,22
35:18,24
39:13 44:21
45:23 47:10
47:18,22 48:3
48:4,8,11,13
48:15 58:4,17
58:19,21 61:3
63:4,8,12
73:5,7,19,22

73:23,25 75:2
75:5,8 88:6
92:10 100:14
101:3 118:2,3
139:25
141:19,23,24
146:24
157:19 158:3
158:8 159:13
167:19
192:22,25
193:7 206:17
221:11,13
222:8 226:3
226:16 227:8
233:18
234:23 235:5
235:6 241:11
264:7,9
**provides (2)**
206:2,7
**providing (2)**
55:20 205:17
**PSS (19)**
196:8,8,12
200:14,17
204:5 212:25
213:2,6,10,19
213:21,22
214:5,14,15
214:19,24
252:2
**public (20)**
1:21 7:16 77:2
77:4,12 78:5
79:20,22
83:12,20 97:2
97:12 98:17
99:23 100:9
100:10
102:13
262:15 266:9
267:25
**published (1)**

161:20
**pull (1)**
244:19
**pump (1)**
171:17
**purchase (2)**
155:20,21
**purpose (8)**
4:20 68:22
108:13 245:7
245:10
251:16
256:19,22
**purposes (8)**
78:12 95:8
162:8 183:18
189:19 226:7
259:10,15
**Pursel (2)**
247:15,16
**pursuant (8)**
1:18 4:7 10:13
89:15 121:15
171:2 184:24
186:5
**pursuit (25)**
67:13,15 68:6
70:16 71:5,17
71:20 75:20
75:25 76:5,9
76:12,13,16
76:24 79:25
83:23 84:6,14
84:21 85:8
96:22 98:12
98:18 100:16
**pursuits (1)**
66:16
**put (42)**
10:8 14:23
20:4 21:16
43:7 66:11
68:8 71:23
89:25 95:13

97:4 104:17
107:4,7
110:25
114:12 116:7
138:18 141:7
142:2 143:21
144:2 145:7
148:7 149:19
153:9 157:5
160:7 162:7
163:7 164:15
165:4 166:15
176:14 184:2
187:15
189:18
204:13
209:23
211:24
214:21 243:4
**putting (1)**
148:7

_____

**Q**

**question (106)**
3:9 5:4 8:3,4
18:15 20:13
22:14,25
23:16 25:16
26:25 28:9
34:13,14,22
39:5 40:5
42:13,25
44:14 47:6,20
50:5 55:9
66:7 69:3
72:4,10,22
74:18,20,24
78:7 79:4
84:8,11 92:21
92:21 94:13
94:17 95:8
101:18
113:11
114:11

117:10
119:17 125:6
125:7 127:8
127:13,14
128:12,19
129:22
137:25 139:4
147:19
148:12 149:2
154:20
156:24 157:8
160:11 161:7
165:18
169:10,12
170:19,22,23
173:13 174:9
174:11,14,14
183:19
184:24 186:8
189:22
190:12
192:23 193:5
194:11,22
195:4 199:9
199:13,18
200:11 202:7
202:12,13,22
207:2,3,12
209:3 226:2
230:11
234:14 239:5
241:6 242:24
246:7 253:3
256:15
**questioning (3)**
5:3 113:19
129:10
**questions (39)**
7:22 17:4,8,15
17:19 18:2
31:23 43:20
49:10 61:25
62:3,7 87:8
95:15 104:25

110:3 116:5
116:15,22
117:18
123:11
129:14,19
155:7 166:10
174:13
176:15
190:21
199:14 228:9
238:10
242:19 243:5
245:24
259:22,25
260:5,7 261:3
**quick (3)**
85:13 116:7
242:9
**quicker (1)**
140:19
**quickly (3)**
74:23 163:23
165:21
**quote (1)**
96:12

_____

**R**

**R (2)**
2:2 3:2
**raise (3)**
112:8 159:12
190:23
**raised (1)**
116:23
**raising (1)**
156:23
**Ralph (1)**
243:24
**ran (2)**
85:9 244:20
**range (2)**
63:23 137:13
**rank (1)**
250:6

rash (1)
106:2
rate (1)
160:22
reach (14)
38:6 54:13
  55:25 88:20
  107:22
  136:22 137:3
  137:19 138:7
  138:9,11,13
  144:11 153:5
reached (1)
107:13
reaching (1)
153:2
react (1)
150:5
read (12)
11:4 44:8
  46:18 71:11
  121:4,9,10
  122:2 166:16
  175:24
  185:25
  214:18
readily (2)
151:24 153:19
reading (3)
11:5 59:22
  71:6
ready (3)
154:3,4 155:2
reaffirm (1)
240:12
reaffirmed (1)
241:2
real (2)
242:9 253:3
realized (2)
57:10 107:20
really (6)
119:6 167:2,7
  192:17

207:20
218:15
reason (14)
39:24 42:19
  43:2 68:19
  78:4,22 79:14
  101:16 146:4
  183:4,21
  250:20
  256:18 267:5
reasonable (...
24:24 44:2
  68:18 71:21
  77:18 78:13
  82:16 83:14
  84:19 85:5,6
  94:6,18 96:24
  99:7,17 102:3
  102:11
  103:22
  108:10 179:4
  179:8,12
  180:17 181:4
  181:10
  185:22
  195:14,22
  259:14
reasonably (6)
11:9 77:11
  79:16 82:10
  82:15 112:4
reasons (6)
75:21 79:15
  113:20
  159:15
  191:25 245:5
Reaves (2)
256:5,6
recall (22)
10:17,18,22
  13:10 21:3,8
  25:9,16 26:11
  26:20 28:11
  28:12 45:14

45:20 63:16
63:25 72:9
96:13 108:14
160:13
162:21 190:2
receive (15)
60:4,14 92:14
  105:3,7
  127:22 137:7
  159:10
  215:17
  221:10
  224:12
  230:20
  239:11 240:9
  240:18
received (59)
59:24 61:7
  137:9,10,14
  137:14,21,22
  138:2,3,4
  160:18 191:3
  215:2,14,15
  215:23,25
  216:2,5,8,20
  218:23 219:7
  219:10,23,25
  220:12,13,17
  220:19 221:7
  222:4,20
  225:5 226:11
  227:5,7 229:2
  229:19,23
  230:7,8,24
  231:8,15,16
  233:15
  234:25
  235:18
  236:22,25
  237:8 238:2
  238:13,20
  239:6,19
  241:24
receives (1)

74:7
recess (6)
85:25 123:23
  192:6 201:25
  242:13
  260:17
recitation (2)
124:16 145:6
recite (1)
208:21
recognize (2)
107:15 157:9
recognized (1)
210:6
recognizing (1)
136:13
recollection (...
10:21 54:2,15
  103:25
  132:23 134:3
  210:21,23
  223:15,24
  228:3 231:12
  231:21
  244:13,25
  252:13,25
recommenda...
112:13 194:7,8
  194:17,25
  202:16
record (44)
6:3,7,11 9:16
  85:19,23 86:4
  111:2,8
  112:10 115:8
  115:16,19,24
  115:25 116:3
  118:25 123:8
  123:18,22
  124:2 129:8
  135:6,9,12
  166:11 192:5
  192:9 201:22
  201:24 202:4

226:5 238:12
242:12,16
260:10,14,16
260:20 261:5
261:10,20
262:4 266:14
recorded (4)
4:17 8:13
  116:12
  166:12
recording (7)
4:17 85:24
  89:6 90:7
  197:15
  202:18
  260:23
recordings (6)
195:11,19
  202:14
  203:21
  206:12 265:8
records (1)
40:18
recover (1)
163:21
recovered (1)
166:14
recruits (5)
30:4,9 48:14
  63:8 64:15
refer (2)
95:5 216:17
reference (8)
43:19 69:3
  71:18 141:3
  208:21
  211:12 222:7
  230:2
referenced (...
36:15 37:8
  52:10 59:15
  59:19 72:18
  88:9 108:16
  141:16 172:3

228:3,9,14
232:18
264:13
**references (1)**
221:15
**referencing (...**
20:6 43:17
44:10 70:22
183:7 184:13
186:10,10
228:11 229:4
**referred (4)**
15:3 36:4 45:3
91:17
**referring (12)**
46:14 49:14
65:12 78:7
102:5 105:9
182:17
183:12,13
239:23,24
240:25
**refresh (12)**
54:2,14 103:25
144:22
210:21
223:24 228:3
231:11,21
244:13,25
252:25
**refreshed (6)**
132:24 134:3
220:9 223:16
232:6 252:14
**refresher (5)**
136:6,8,21
143:6 227:13
**refreshers (2)**
108:18 215:17
**refreshes (1)**
10:21
**regard (2)**
108:3 150:21
**regarding (62)**

5:3 14:13
20:11 25:22
25:24 26:15
26:18 29:3
34:19 41:7,15
45:10 46:25
52:13 63:5
65:16,24
66:16,22 67:2
67:3 104:22
105:16
106:22
116:15
117:10 122:5
122:9 128:4
129:3 130:18
130:22 137:7
138:8,24
139:10,13
146:25
149:21 150:2
150:4 161:17
190:6 200:3,4
202:7 203:18
203:19 205:4
208:15 216:8
218:23
222:10,11
223:5 234:14
264:4,15,19
264:22 265:5
265:6
**regardless (6)**
43:2 44:7,12
50:16 203:11
223:25
**regards (1)**
45:13
**Reginald (1)**
257:4
**regular (1)**
220:21
**regulations (9)**
20:8 52:25

66:13 104:19
110:20
112:17
121:12 122:3
138:21
**reiterate (2)**
105:15 218:15
**related (4)**
45:8 48:21
105:10
266:16
**relevant (23)**
17:21 18:3,25
19:8 20:22
52:2 53:9
55:7 62:13,18
62:20 74:9,10
97:19 109:21
110:17
112:22
161:25 162:4
215:4,18
229:22 234:7
**rely (1)**
152:5
**remain (1)**
30:10
**remedial (24)**
31:15,17 38:7
45:2 46:4,10
46:15,17,24
47:12 49:5
74:2 88:19,23
135:20,23,25
136:6 138:5
138:15 196:4
221:18
222:12
240:18
**remedially (1)**
28:20
**remediate (5)**
30:16,21 65:3
93:8 106:6

**remediated (1)**
35:21
**remediating ...**
31:7,8 132:21
**remember (9)**
36:18,23
104:11,12
164:3 178:2
227:21
230:13 257:2
**remind (1)**
90:12
**reminder (2)**
36:7 74:2
**remote (1)**
4:10
**remotely (1)**
4:14
**removal (1)**
226:10
**removed (7)**
93:22 143:5,8
143:18
144:13
226:13,17
**removing (1)**
185:20
**Reno (11)**
14:24 143:22
144:4 147:2
205:10,25
206:5,7,10,11
206:17
**repeat (3)**
200:10 217:11
260:22
**repeatedly (1)**
107:21
**repellants (1)**
148:12
**rephrase (4)**
8:3 193:5,23
194:4
**report (51)**

19:20,23 31:14
104:2 195:25
195:25 197:3
197:4,5,8,12
198:6,13
204:4,4,11,23
207:9,10,13
207:14,15,15
207:18,25
208:10,16,17
208:23
209:19,22,22
209:23 210:3
210:4,20,24
211:4,7
212:12,12,17
212:20
213:16,18,20
214:5,8,12,14
214:21
**reported (3)**
105:23 160:21
207:21
**reporter (21)**
1:20 4:9,15 6:2
6:6 7:10,13
19:14 85:12
85:17 111:18
121:7 123:16
134:15 161:5
200:7 261:11
261:12,15,19
266:9
**reporting (9)**
4:12 205:3,6,7
205:8 209:4,8
209:14
211:16
**reports (15)**
31:10,13 64:24
65:11 106:18
106:20
133:13
160:18

168:18
205:14
207:16,17,20
207:21
212:13
**represent (4)**
6:24 7:21
32:22 107:18
**representati...**
249:6,8,15
**representing...**
7:3,6 18:17
**request (14)**
29:16 59:2
88:16 107:10
107:23 125:3
129:9 136:13
136:15,23
178:19
205:16
248:24,24
**requested (6)**
13:23 15:21
137:16
207:19
214:14,23
**requesting (3)**
58:25 90:2
106:23
**requests (4)**
88:12 263:14
264:2 265:2
**require (10)**
31:25 136:5
148:5 156:9
180:11 182:7
185:6,10
221:3 260:24
**required (42)**
30:20 46:9,24
47:12 65:2
81:23 88:18
90:3 98:13
99:3,9,10

103:3 116:15
125:18,18
132:4,12
145:12 146:6
147:9,14,17
147:24
148:13
152:15 156:7
170:2 175:4
177:9 179:24
188:19 196:7
197:8,16,25
209:21,23
210:2,4,18
211:5
**requirement ...**
76:2 100:3
154:24
196:11,15
207:9 208:9
208:16
209:14 214:6
**requirement...**
26:15 27:7
58:5,7 59:25
60:5,15,23
63:9 91:24
92:3,12 108:7
108:19 109:3
109:8 205:3
209:4,9 211:2
211:16 232:3
235:2 237:9
238:3 239:7
**requires (3)**
185:9 187:9
212:22
**rescheduled ...**
146:8
**rescinded (2)**
235:22,24
**rescinding (1)**
22:11
**research (3)**

109:14 113:3
114:2
**reserved (1)**
3:10
**residence (1)**
166:15
**residential (5...**
20:12 58:6
60:2,6,16
66:18 67:17
75:22 76:18
77:24 96:8,21
98:12 101:12
102:19
104:23 105:4
108:4 109:5
119:15,19
120:3,14,17
120:22,23
121:19,22
122:7,14
123:2 124:12
124:21 125:8
125:25
126:14,17
127:17 128:9
128:10 129:6
129:17 130:2
130:23 137:8
138:6,25
139:17 140:3
148:21 229:3
229:21
238:21 239:8
264:17,24
**resistance (11)**
19:20,23
195:25 197:3
197:4 210:3,4
210:19,24
211:7 212:12
**resolve (1)**
135:14
**resort (5)**

181:15,20,23
182:4 183:17
**resorting (1)**
148:14
**resources (1)**
154:17
**respect (2)**
108:6,16
**respective (1)**
3:5
**respond (15)**
152:9,15
172:13
173:10
174:16 212:9
212:24 213:4
213:10,11,14
213:19,21,22
214:17
**responded (1)**
252:16
**responder (1)**
178:2
**responding (...**
152:13 172:18
173:3,16,17
173:24
177:12,16
178:10,12
**response (8)**
137:23 154:22
176:11,14,18
178:2 191:2
248:24
**responses (2)**
189:21 224:23
**responsibiliti...**
33:20
**RESPONSI...**
1:9
**rest (2)**
256:23 259:23
**restate (1)**
194:10

**restrained (3)**
178:5,11,17
**restraint (2)**
163:16 164:7
**restrictive (1)**
187:8
**result (8)**
102:24 130:21
136:11 150:9
150:16 164:2
206:18
264:21
**retraining (2)**
103:4 106:14
**retrieve (4)**
77:3 78:6
79:22 98:16
**retrieved (2)**
79:23 252:2
**retrieving (1)**
222:9
**review (64)**
28:25 34:8,9
34:17 37:4,12
37:18 45:22
46:2,4,16
49:12 52:12
53:10,17 54:5
57:11 61:2
66:25 87:22
87:25 104:5
104:18
125:14 131:4
132:12 133:4
143:13,16
195:12,23,24
196:7,9,12,16
196:19,20,22
197:12,17,18
203:21
206:11,19,20
206:24 242:8
245:4,16
246:17

247:10,22,24
248:14,15
249:14
250:24 251:6
251:19
254:16 256:9
256:16 265:7
**reviewed (31)**
11:20,23,25
12:4 53:2,8
65:21 66:22
72:5 104:8
109:20
130:13 139:9
139:11,12,24
165:24
177:22
189:23 196:3
202:17 203:2
225:6 228:8
231:19
243:24,25
245:21
250:12
263:17 267:2
**reviewer (1)**
19:21
**reviewers (1)**
19:23
**reviewing (10)**
13:18 37:24
194:15 195:4
195:19
198:10 207:5
243:21
244:12
258:16
**reviews (1)**
197:14
**ridiculous (3)**
61:21 115:13
123:10
**right (37)**
9:10 10:24

34:16 40:2
71:6 80:17,19
82:7 86:5
87:4 95:17
97:5,8 99:15
113:12
117:17 122:3
142:13,16,20
143:23
152:21
162:12
171:12
185:17 186:2
192:3 211:22
212:6 224:23
227:23
236:16 249:3
249:19
251:14
255:10
259:18
**rights (8)**
25:22,24 29:11
44:6 60:20
181:8,8
263:22
**risen (1)**
35:22
**risk (2)**
109:25 159:12
**risking (1)**
9:11
**Rivera (11)**
54:11 56:16,20
56:24,25 57:8
57:22 232:11
233:15
234:10,25
**Rivera's (2)**
235:8 236:3
**road (6)**
87:15 90:14,15
91:3 187:15
187:19

**Robert (2)**
255:17 259:3
**Rochester (97)**
1:8 2:9,10 6:9
6:16 7:6 9:24
10:4 11:14,19
13:13,16,21
21:19 28:11
30:15 32:17
33:2,11 38:10
43:9 44:24
47:17 50:12
50:25 51:25
52:6 53:3
57:6,18,20
59:17 61:13
61:19 62:25
64:21 65:20
65:22 70:24
73:8 75:18
79:12 93:15
97:15 105:23
106:4,5
107:17
119:21,25
120:20
124:14 137:3
141:12,13,18
142:7 146:23
147:9,25
148:4 155:19
155:21,24
157:2,7
158:12
167:16,20,24
168:10,12,22
169:14
170:12,25
181:18 182:2
186:14
189:16,23
190:3 191:18
191:21
192:21,24

193:7 195:7
195:10,18
204:22
221:14
222:15 223:7
225:15,18
262:3
**role (5)**
243:20 244:11
251:3 258:6
258:16
**roles (3)**
259:7,11,14
**roll (46)**
14:15 24:2,6
26:8 27:10
44:25 45:23
48:22 49:4
58:12 72:17
72:18,23
73:18 87:16
90:17,18,21
91:3 108:17
141:24 142:4
142:5 143:5,9
144:2,17,23
148:18
215:19
216:23 217:2
217:3,9,13,15
217:23 218:7
218:14,15,18
218:21 229:7
239:11,18
242:2
**Room (1)**
2:10
**roster (3)**
14:2,4 263:19
**rosters (1)**
245:19
**Roth (4)**
2:4,4 7:3,3
**rounds (1)**

171:18
**RPD (97)**
1:8 16:23 18:6
21:10 23:2,10
23:20 24:10
24:20,23 26:6
26:6,13,25
27:5 29:18
30:8 32:14
44:15,22 45:9
45:17 47:21
48:5,15 49:22
50:6 51:6,13
52:14 53:11
58:3 59:4
64:16,17 70:9
72:23 73:2,13
73:17 75:6
84:13 92:24
93:20 95:21
95:24 96:5,18
99:24 100:8
100:14
101:14,20
102:16 103:9
104:14
106:11
109:12,24
139:15 140:2
146:22
147:14
148:19,25
150:7,8,13
151:20
152:12 158:3
158:8 161:19
164:8,19,23
165:13 170:9
189:13 191:9
198:19
199:25 200:3
200:12 201:5
201:7 202:7
202:25 203:4

203:24
204:19 206:2
207:3 208:15
212:13
234:16
249:16
**RPD's (13)**
43:22 54:19
83:24 84:18
84:22 96:20
100:4 102:8
131:10,18
132:14 133:5
198:3
**Rudolph (3)**
104:13 243:23
245:14
**Rudolph's (1)**
245:18
**ruled (1)**
202:9
**rules (22)**
1:18 10:13
20:8 50:25
51:4 64:5
66:13 89:15
89:21,23,24
90:4,9 104:19
112:16 120:7
121:12 122:3
138:21
171:13
260:24
261:17
**ruling (1)**
124:8
**run (5)**
48:12 68:4
108:21
163:24
217:18
**run-of-the-m...**
154:13

**—— S ——**
**S (3)**
2:2 3:2,2
**safe (1)**
56:14
**safely (3)**
148:20 193:3
229:2
**safety (2)**
100:9 177:15
**Saladeen (1)**
249:23
**Sam (3)**
250:5,5,20
**Sampson (1)**
223:14
**sanctity (1)**
177:19
**Sarah (1)**
253:18
**sat (2)**
19:3 75:10
**save (1)**
69:14
**saved (1)**
16:13
**saw (2)**
107:11,20
**saying (7)**
100:2,6 114:16
181:25
187:16 214:9
214:18
**says (47)**
11:7 20:8
21:21 22:5
43:23 44:5
68:13,21 70:5
94:3 95:17
97:5 110:19
121:5,17
132:12
134:23
141:13 142:5

148:10
160:16,23
162:13,14
163:13,17
165:9,10
166:11 177:8
177:13 178:4
178:6 181:14
181:17
184:18
185:18,19,22
186:4 194:25
212:3,11
214:15 252:4
259:4 267:2
**scanned (2)**
16:2,13
**scenario (1)**
127:19
**scenarios (1)**
172:14
**scene (35)**
103:17,18
107:8 140:14
152:13,15
154:21
163:23 173:5
173:16,18
174:3,3,16,18
174:19 175:2
175:7,9
177:14
178:10
188:15
209:17
212:10,11,24
213:5,6,10,12
213:14,19,21
213:23
214:20
**scenes (6)**
152:9 176:12
176:15,19
177:12

189:21
**school (2)**
132:3,10
**scope (19)**
111:14,16
120:6 121:2
123:5,12
124:5 126:4
134:5 156:12
156:18
162:25
190:19 193:6
199:23 201:9
201:20
202:10
224:10
**scratched (2)**
182:19,22
**screaming (1)**
56:9
**screen (12)**
10:10,10 21:18
21:23 43:9
141:9 142:8
142:13
162:11 165:7
176:17 184:3
**scroll (6)**
10:18,20
142:23 177:7
184:11
185:17
**scrolled (1)**
68:11
**sealing (1)**
3:6
**search (81)**
15:10 26:3,4
42:14 43:3,11
43:11,22,23
43:23 44:5,11
44:16,23 45:6
45:11,13,19
45:25 46:6,11

46:25 47:14
55:14,19,22
56:7,10 57:4
60:22,23,23
61:15,17 63:5
63:14 73:12
74:8,12 82:25
84:2,25 95:11
95:19 96:15
96:15 97:7
99:11,13,19
99:24 100:3,7
100:23,23
101:17 154:7
176:2,12
215:12,15
216:5,14,15
216:20
218:23,25
219:4,10
220:14 222:4
229:14
230:25 231:9
232:10
233:16
234:22 235:2
237:10 238:4
240:8
**searched (2)**
15:22 200:25
**searches (37)**
20:25 21:7,11
21:22 23:3,11
23:14,21
24:18 25:6,7
26:18,19
58:19,20 67:2
67:4 87:18
96:10 101:3,8
105:11,17,17
108:12 137:2
216:8,11,11
216:12 218:6
219:5,20

231:18
240:11 264:7
264:8
**searching (11)**
42:7,22 53:5
64:12 100:20
100:20 181:7
220:3 236:4
236:20
238:14
**second (14)**
22:3 69:19
70:22,23
109:23
116:23
134:15
142:14
143:22 155:7
162:7 181:14
219:15
240:14
**secondarily (1)**
71:12
**seconds (2)**
166:22 167:6
**section (62)**
4:7 16:16,18
16:25 27:13
28:21,21
30:17,19,21
31:5,7,9,15
36:13,15
37:19,23 38:2
38:3,5,14,16
39:11 40:19
40:25 45:5
48:23 49:4
53:15 58:13
58:14 70:21
71:13 88:13
88:20,21
92:24 107:10
107:14,18,20
107:23

109:14,15
113:4 114:3
124:5 125:5
125:15 132:2
137:17 144:6
144:8 185:19
186:6 200:18
200:19,21
212:23
254:22 256:3
**sections (3)**
106:21 186:9
186:13
**secure (2)**
84:5 212:10
**secured (4)**
178:4,11,16
181:22
**see (48)**
10:10,20,25
11:7 21:18,22
31:2 33:15
43:9 49:13
59:14 77:16
78:20 80:2,18
80:19 84:15
110:2 112:3
114:14,16,21
141:10 142:7
142:12,13
158:21
160:22
162:11,16,17
165:6 167:11
168:5 176:18
180:12,25
181:12 184:3
201:2 204:15
212:8 219:3
221:15,18,21
229:4 260:9
**seeing (3)**
10:22 106:2
180:20

**seek (2)**
80:8 81:22
**seeking (2)**
80:24 84:2
**seen (8)**
10:16 78:9
160:12
162:20
164:21,25
167:16
243:10
**sees (1)**
113:16
**segment (1)**
260:25
**segments (1)**
89:16
**seized (1)**
44:7
**seizure (18)**
60:22 61:15,18
63:5,14 74:8
74:13 215:15
220:20,23
227:2 229:10
229:11 232:9
232:12
234:22 239:4
241:21
**seizures (4)**
26:19 43:11
96:10 219:20
**selling (1)**
80:4
**sense (1)**
171:13
**sent (3)**
163:3 249:7,11
**sentence (2)**
44:5 181:17
**separate (8)**
4:10 70:22
127:4 186:12
207:13

214:10,11,12
**September (...**
22:20 53:23
54:18,24
55:10 56:18
57:15 232:8
233:13,21,25
234:2 235:3
238:18 249:7
**sergeant (49)**
33:5,5,20 34:2
35:14,14,21
35:23 73:14
104:13
124:23 132:8
132:10
133:13
135:24 136:2
203:2,10,12
222:2 243:23
244:8,14
245:2,4,8,9
245:14 246:3
247:17 248:5
248:6 249:17
250:18
251:25
253:12,13,14
255:15,19,20
255:21 256:5
256:6 257:14
257:15 258:2
259:5,12
**sergeant's (1)**
133:14
**sergeants (13)**
33:13 34:9,17
34:20 35:7
125:12,13
131:9,15
132:4,6,7,22
**series (1)**
218:8
**serious (13)**

185:6,10,11,16
185:24
186:17,20,22
187:2 232:20
232:24 233:5
233:9
**seriously (2)**
150:9 161:9
**seriousness (1)**
122:20
**serve (1)**
68:23
**served (1)**
81:18
**Service (1)**
4:13
**serviced (1)**
140:17
**services (3)**
109:25 193:2
193:10
**set (5)**
11:10 70:23
234:21
266:12,20
**seven (2)**
222:21 259:21
**severity (2)**
124:22 209:18
**shaking (1)**
89:4
**shaky (1)**
89:6
**shape (1)**
136:8
**share (1)**
10:9
**sharp (1)**
149:23
**sheet (10)**
14:15 15:2,3,4
15:7,11,19
145:22 230:2
267:1

**Shereck (1)**
6:21
**Shields (103)**
2:6 7:2,2,19,20
8:23 9:18
12:2 14:3
17:10,24
18:12,20 22:3
29:6 41:14
55:17 58:16
59:3 61:20
62:10 67:10
74:16 84:8
85:15,18,21
86:16,20 88:5
89:18 110:5
110:13,20,25
111:6,15
112:3,14
113:24 115:6
115:12,15,21
116:4 117:22
118:11,18
121:4,17
123:6,13,18
124:3 125:19
126:12,21
127:10
128:25
129:11 130:4
130:17 134:6
134:22 135:5
156:13,21
161:8 163:6
163:10
166:25 167:9
168:25
169:11
170:20 174:7
190:11,20
191:7 192:2
193:19 194:5
194:20 199:4
199:7,12,20

201:10,14,21
202:5 203:16
224:18,20
242:7 254:12
259:20 260:6
260:13 261:5
261:16,22
263:5
**shift (4)**
90:16 248:10
248:14
257:20
**shoe (1)**
171:19
**shoot (4)**
183:21 187:6
188:6,21
**shooting (11)**
149:5 159:8
187:25 190:6
202:18
206:20,25,25
207:6 213:17
227:4
**shootings (2)**
191:3 211:14
**shoots (1)**
210:22
**short (4)**
124:6 154:20
192:10 242:7
**shorter (1)**
144:17
**shot (33)**
7:21 160:4
195:20
197:16 199:5
199:19
200:13,16,23
201:6,11,17
202:8,24
203:5,25
204:3,8,12,15
204:20,23

205:4,12,14
205:19
206:13,21
223:12 225:3
225:4 233:25
250:3
**shots (1)**
79:9
**show (4)**
129:20 154:23
168:19
260:25
**showed (1)**
236:10
**showing (3)**
168:3,5 213:22
**shown (5)**
10:19 160:5
163:18
164:19 225:9
**shows (1)**
197:24
**side (7)**
180:6,9,12,25
181:3 187:14
187:19
**sift (2)**
204:14,16
**sight (1)**
76:15
**sign (3)**
15:7 114:9
145:23
**sign-in (4)**
15:7,11,19
145:22
**sign-up (2)**
14:15 15:2
**signature (3)**
114:17,21
267:23
**signed (4)**
3:12,14 114:6
198:5

**significant (1)**
221:3
**significantly ...**
47:4
**silly (1)**
62:2
**similar (6)**
49:10 50:22
59:10 149:24
150:4 165:17
**simple (1)**
106:21
**simply (19)**
23:7 36:5 42:7
42:14 55:9
84:7 85:8
88:20 95:18
97:6 98:19
99:14,15
102:17
146:14
182:21
204:17 223:8
239:23
**single (3)**
164:2 166:13
223:9
**sir (5)**
34:13 74:21
186:3 245:17
246:5
**sister (1)**
190:14
**sit (13)**
46:18 49:18
52:17 90:16
91:10 104:11
132:25 144:7
219:24
220:10 221:6
222:18
225:21
**sitting (1)**
61:6

**situation (17)**
152:3 170:7
173:4,19
177:14
183:13
185:23
188:18
206:16
210:16 213:4
224:4 225:12
232:19 233:3
233:4,8
**situations (7)**
183:12,15
187:13,17,23
188:8 194:2
**six (2)**
157:13 227:25
**six-page (2)**
157:12 177:8
**sixth (1)**
36:12
**size (1)**
172:3
**skill (1)**
240:16
**skipped (1)**
62:2
**slide (3)**
164:9,13,17
**slides (3)**
142:24 143:11
144:21
**slow (1)**
171:15
**small (3)**
69:12 79:23
161:24
**smaller (3)**
188:24 189:2
189:11
**snack (1)**
119:11
**sniper (1)**

56:4
**Sobieski (1)**
244:24
**Society (9)**
14:24 141:11
141:13 142:6
146:20,25
148:17
227:17
230:12
**sock (1)**
170:4
**sole (1)**
68:22
**solely (3)**
45:13 140:5
216:10
**solidify (1)**
239:25
**somebody (20)**
19:9,10 28:2
28:14 40:23
61:22 62:13
62:17 67:12
67:16 76:19
99:15 108:21
109:6 121:21
129:15 183:2
183:3,20
247:3
**somebody's (...**
26:7 27:8,18
28:4,16 29:3
29:11 30:5,11
46:6 63:9
91:12,25
92:13 97:23
263:22
**someone's (17)**
26:18 29:20
41:23 42:6,15
46:12 47:14
47:24 48:18
49:7 59:6

78:17,23
91:16 131:3
133:24
188:16
**Somewhat (1)**
86:12
**sorry (29)**
19:16 34:9
50:2 51:19,20
56:24 66:5
72:7 78:9
86:14 89:8
111:20 115:4
142:14
147:19
155:10
156:25 169:9
199:2 200:9
209:7 214:12
216:8 217:11
234:4 236:13
247:2 257:3
258:8
**sort (7)**
83:15 90:13
179:18
181:24
243:19
247:22 256:9
**sorts (1)**
174:4
**sound (7)**
166:23,25
167:3,7 211:9
211:11,22
**sounded (1)**
176:10
**sounds (6)**
35:2 144:25
154:21
199:10
211:23
245:13
**sources (1)**

105:18
**speak (30)**
8:16 13:12,15
13:20 18:7
22:18 60:12
86:9,11,21
87:7 89:4,7
111:22,24
113:16
115:10
117:17 118:5
119:3,6
134:17,20
137:14
192:12,14
221:20,24
222:9,11
**speaking (5)**
17:3,9 111:7
123:15
135:10
**specific (78)**
22:10 23:16,20
26:21 27:5,11
28:14 29:19
29:24 35:19
42:22 44:12
44:14 46:23
47:22 48:16
52:24 53:11
57:25 59:5
61:23 63:7,16
64:9 65:12,24
73:19 74:20
74:24 75:7,9
75:16 77:19
87:14,20
96:11 97:22
98:4,6 101:2
108:13 120:4
125:22 126:6
126:22
128:14,15
129:14,14

132:11 133:2
136:13,15
137:6 140:25
145:18,19
146:10,11,13
147:6,20
174:16
175:11,19
183:19 195:3
195:7 197:7
197:11,17
199:9,13,18
218:25 226:2
227:20 238:5
**specifically (...**
10:22 19:3
20:20 23:11
25:16 26:14
29:2,10 30:4
30:7 37:4,13
45:10,18,24
46:13,25 49:5
52:16 60:8,19
63:25 65:23
67:21 78:7
90:23 91:4,12
98:10,15
100:4,8,22
101:7,18
108:2 112:15
132:19
136:16 141:3
146:25
149:17
150:23
153:24
154:19
174:11
182:18
185:11 216:9
222:19 226:5
237:4 238:3
263:21
**specificity (1)**

133:18
**specifics (1)**
54:3
**specifies (2)**
133:3,16
**specify (1)**
22:11
**spectrum (1)**
64:2
**spell (1)**
240:18
**split (2)**
101:24 217:20
**spoke (4)**
13:8 39:18
86:13 136:10
**spoken (1)**
221:16
**spray (5)**
148:12,14
150:21,23
151:6
**spreadsheet ...**
145:17
**Springer (15)**
51:12,17 54:11
56:16,21,23
57:9,23
232:12
233:15
234:10
235:18 236:8
236:11 237:8
**Springer's (2)**
54:12 235:14
**ss (1)**
266:5
**St (1)**
54:8
**stamped (3)**
163:2,6,8
**stand (1)**
158:17
**standard (5)**

82:7,8,12,13
254:21
**standards (2)**
48:10 234:20
**standby (3)**
85:24 115:22
163:15
**standing (3)**
98:19 164:6
252:20
**stands (2)**
143:18,20
**start (1)**
84:13
**started (3)**
105:25 230:17
230:22
**starting (1)**
229:16
**starts (1)**
97:16
**state (28)**
1:21 6:2,24
23:15 50:14
50:15,16,18
52:3 53:9
68:10 69:17
71:21 92:5
97:13,18,19
97:19 99:25
100:12
103:20
109:17 111:9
227:3 234:21
234:21 266:4
266:9
**stated (7)**
83:10 92:6
105:6 126:11
180:17
191:25
237:14
**statement (1)**
116:7

**statements (1)**
90:2
**States (4)**
1:2 6:18 50:13
150:15
**statistic (1)**
160:25
**statistical (1)**
204:7
**statistically (2)**
161:25 162:3
**statistics (6)**
160:2 161:20
162:5 205:12
205:21,23
**staying (1)**
174:22
**stenographe...**
113:14
**stenotype (2)**
1:20 266:8
**step (1)**
109:11
**Steve (2)**
244:7,11
**stick (1)**
98:7
**stipulate (1)**
55:8
**STIPULAT...**
3:4,8,11 4:5,22
**STIPULATI...**
4:2
**stop (8)**
85:24 111:9
115:15
123:13,13
149:12 159:5
185:3
**stopped (1)**
80:6
**stopping (2)**
159:4 160:6
**stops (1)**

80:3
**stored (2)**
16:4,10
**street (12)**
2:10 98:20,21
103:8,12
244:17,18,19
244:21,22,23
244:24
**strictly (1)**
128:23
**strike (7)**
74:17 84:9
125:20
127:11
153:19
170:21 174:8
**struggle (1)**
84:6
**struggling (1)**
140:19
**stuff (1)**
142:23
**stunned (3)**
163:15,21
164:5
**sub (5)**
187:7,7,7,12
187:16
**subdivision (2)**
182:16 187:8
**subheading (2)**
181:13 212:2
**subject (23)**
19:20,22 21:21
22:9 35:19
65:4,5,8,9
86:23 132:6
140:24 172:5
195:25 197:2
197:4 210:3,4
210:6,19,24
211:7 212:12
**subject's (1)**

174:3
**subjected (1)**
169:18
**subjective (1)**
82:12
**submission (1)**
40:18
**submit (3)**
40:16 212:20
213:15
**submits (2)**
127:22 212:11
**submitted (12)**
31:22 40:10
122:19 125:3
125:13 128:8
136:12 196:8
202:20,23
203:13 204:5
**submitting (1)**
130:11
**suboptimal (2)**
152:3 169:24
**subordinate ...**
28:8
**subordinates...**
13:22 15:21
133:4
**subs (1)**
182:14
**Subscribed (2)**
262:13 267:23
**subscribes (1)**
109:24
**Subsection (1)**
124:6
**subsequent (4)**
14:14 20:19
26:8 227:12
**substance (16)**
111:24 117:3,5
117:11,25
118:7,11,13
118:17,21

120:10
121:14 122:8
190:10
191:15,17
**substantial (1)**
79:15
**substantive (1)**
143:2
**subtopics (4)**
121:9,11,25
133:20
**success (1)**
160:22
**successful (5)**
160:21 161:21
163:20
240:11,20
**successfully (...**
168:13 241:14
**suffer (1)**
68:18
**suffice (3)**
71:22 83:18
214:3
**SUFFOLK (1)**
266:6
**suggestions (1)**
147:8
**Suite (1)**
2:5
**summer (1)**
231:6
**supervise (9)**
32:18 120:11
131:22,24
132:18,20
133:11,16,17
**supervised (1)**
240:23
**supervising (4)**
33:16 34:10
124:23
133:19
**supervision (...**

104:22
119:14,17
120:16
121:18 122:5
124:11
132:16,23
200:19
**supervisor (6...**
27:15,16,22
28:2,8 32:5
32:24,25 33:5
33:15 36:6
54:12 73:15
103:17,18
104:3,13
122:19
127:21 128:7
132:3,10
133:22
136:14,16
137:16 146:9
188:19 189:8
196:3,6,15
197:14 198:5
198:7,16
203:14
207:25 208:6
208:7,7,11,23
212:9,16,16
212:20
213:18 214:4
214:7,13,21
221:17 240:5
240:6 241:5
245:18 246:4
247:22 248:3
248:4,12,21
250:16,18
253:16
257:13
**supervisor's ...**
37:5 206:19
**supervisors (...**
30:23 32:17,21

33:2,4,12
34:8 36:15,18
36:23 38:6
64:22,23 75:9
107:19 131:4
131:9,11,18
131:19 133:3
137:20 138:8
138:14
218:11,17
222:11 223:5
247:24,24
**supervisory (...**
27:13 135:21
135:24 187:9
187:25
245:16
247:10
250:23 251:6
253:4 254:16
256:9
**supplement (1)**
156:19
**support (1)**
77:19
**supporting (1)**
84:19
**supposed (6)**
117:19 127:2,3
161:10
217:10,14
**suppressed (2)**
106:3 136:25
**suppression ...**
42:12
**Supreme (3)**
50:14,15 97:17
**sure (29)**
22:3 29:15
34:15 36:21
39:22 55:17
59:3 78:16
85:15,18
91:10 93:14

99:5 131:15
131:21
132:18
133:12
173:20 192:2
199:12 210:8
218:19 221:2
228:19
243:22 255:6
260:7,13
261:19
**surfaces (1)**
136:21
**suspect (23)**
76:25 77:6,11
77:11,16 78:4
80:12 82:15
84:7,15 95:25
98:19 101:11
102:18
103:23
108:25
140:13,15,16
153:18
252:17,18,21
**suspected (1)**
80:4
**suspects (2)**
66:17 79:11
**suspicion (13)**
68:18 71:21
78:13 84:20
85:5,6 96:24
99:8,17 102:3
102:12
103:22
108:11
**SWAT (3)**
54:8,9 56:4
**sway (1)**
118:16
**swear (1)**
7:11
**sworn (9)**

3:12,14 4:14
7:13,15
262:13
266:12 267:1
267:23
**syringe (2)**
80:14 98:25
**syringes (2)**
79:19 98:21
**system (7)**
105:19 197:19
197:21
200:14,24
204:5 255:5

———————
**T**
———————

**T (4)**
3:2,2 7:14,14
**table (1)**
153:18
**tactical (1)**
174:22
**tactics (11)**
140:10,11,21
141:2 147:6
147:21,23,24
148:3,5,23
**tag (1)**
251:21
**tagged (1)**
255:5
**take (17)**
8:15 40:18
67:8 78:18
85:13,16 86:7
95:23 136:9
139:3 140:18
143:11 180:4
180:11
197:12 242:7
243:18
**taken (19)**
1:17 44:8
53:14 67:25

68:17 71:10
85:25 90:15
91:20 123:23
135:20,25
141:4 158:2
192:6 201:25
242:13
260:17 267:2
**takes (2)**
27:23 218:18
**talk (18)**
9:2,7 45:6
118:10,12,17
118:20
121:20 127:3
151:2 154:7
155:7 174:25
222:23,25
223:3,4,6
**talked (5)**
55:15 123:12
126:4 147:20
231:13
**talking (15)**
17:6 98:23
112:21
113:15
115:15
119:12 120:7
121:3 123:13
135:2,3,4
199:10,11
252:23
**Tamburello-...**
257:9
**target (2)**
158:18 159:11
**tase (1)**
224:3
**tased (1)**
160:4
**Taser (78)**
13:25 14:2,5
18:6,10,10,13

18:19,24 19:2
19:7,11,19,20
19:22 139:13
139:14,24
154:23,24,25
155:4 157:20
158:4,9,10,13
158:15,16,24
159:8,16,17
159:23 160:9
160:19
161:19,21,22
162:12,14
164:12 165:3
165:9 166:12
167:21,25
168:4,20,21
168:23
169:13,17
170:2 223:12
223:19,21,24
223:25 224:3
224:7,12,12
224:16,22,25
225:2,8,10,13
225:16 226:4
226:9,11,11
226:14,22
263:19

**Tasers (9)**
155:8 157:3,15
158:7 161:17
162:3 168:10
168:14 169:8

**tasked (1)**
222:9

**taught (38)**
27:11 29:25
61:11 91:15
98:3 139:15
147:5,21,24
149:4,15,18
149:19
150:13 151:4

151:16,19,20
152:20,22
153:25
172:12,17
173:2,15
174:12,15,17
175:3,9,13,17
186:15,21
189:13
227:18
231:25 232:5

**teach (11)**
24:20,23 25:19
25:23 60:19
61:17 93:20
95:24 98:5,8
150:7

**teaches (1)**
62:5

**team (4)**
54:8,9 56:4,5

**technician's ...**
136:18

**teeth (1)**
149:23

**tell (19)**
11:5,17,22
15:18 20:13
22:22 23:17
24:9 66:19
86:13 112:6
125:9 139:5
149:3 150:19
215:11 227:4
258:16 259:8

**telling (2)**
9:4,10

**ten (4)**
12:22 217:7,21
218:13

**tenure (2)**
16:15 32:25

**term (1)**
100:19

**terms (9)**
9:20 27:2
34:10 39:25
52:7 184:13
195:18
215:12
243:21

**Terrigino (2)**
257:16,16

**test (1)**
182:24

**testified (21)**
7:16 51:12,16
56:17 59:23
91:21 100:13
101:10,19
113:2 114:2
126:10 145:2
145:15 166:2
169:6 205:10
211:3 218:9
224:21
234:11

**testify (34)**
9:24 10:4 11:8
11:13,18
13:19 17:17
17:22 19:4,6
19:12,17
20:14 21:5
51:23 52:13
52:18 61:23
62:14 66:20
92:5,22 102:4
104:6 112:16
128:24
129:24 139:6
161:11 167:7
215:5,6
222:19
235:23

**testifying (3)**
70:24 117:17
130:6

**testimony (36)**
8:17 9:3,8 19:8
28:24 37:3
45:21 46:3,21
86:11,24
87:23 88:3
92:3,10,20
101:3,20
104:4 110:17
112:23 116:6
117:4,6,20,25
118:7,13,16
118:21 119:7
192:15
242:20
266:11,14
267:3

**testing (8)**
25:10,13,15,17
25:17 162:18
181:23
183:18

**thank (19)**
7:8 9:13,18
20:2 22:4
67:11 85:17
89:10 90:9
115:18 116:4
124:3 162:19
177:6 183:25
202:5 260:21
261:7,15

**that'd (1)**
213:24

**they'd (1)**
187:5

**thing (5)**
59:15,16 98:14
152:18 177:9

**things (15)**
27:11 36:22
59:14,20,21
61:7 62:20
64:14 79:19

118:5 122:9
132:9 136:11
152:25 154:7

**think (44)**
17:6,19 18:2,3
62:10 83:2
84:16 110:4
110:11,16
112:22
113:15,17
116:6 120:6
120:14 126:2
127:6,10
128:11
131:25 134:4
140:21
171:11 172:3
173:13 187:2
187:20
191:13
199:17
200:10 201:8
201:13,19
211:11 224:9
224:15,19
233:19
234:15
254:10
259:24
260:24 261:3

**third (4)**
81:20 153:21
157:13
217:25

**Thomas (3)**
256:11,11,12

**thorough (1)**
212:25

**thought (4)**
17:2 194:12,12
234:5

**threat (30)**
149:8,22 150:3
150:25 151:2

151:13
153:18
169:23 170:9
170:11,14,16
170:18 171:3
171:8,12,17
171:21,24
172:2 183:10
185:9,11,23
186:17,25
187:3 232:20
232:23 233:9
**threatened (1)**
149:10
**threatening (8)**
150:4 151:14
182:20
183:11
187:20,22
188:7,13
**three (6)**
12:20 55:18
87:20 139:6
176:10
217:24
**threshold (1)**
149:10
**ticket (1)**
68:24
**time (165)**
1:19 3:10 6:11
14:18 16:24
17:25 18:5,22
20:5 26:13
27:16,25 28:5
28:9,10,13
32:19 39:21
45:9,17 46:8
46:18 47:5
53:12 56:11
57:2 58:2
66:11 73:4,17
73:22,22
74:25 80:20

81:9,10,21
83:21 84:13
85:13,16,23
86:3 87:3
93:15 94:14
95:12 99:2
101:10
102:18 111:7
112:7,11
113:15
114:17
115:17,23
116:2 119:11
123:14,16,22
123:25
128:15 135:7
135:11
141:18
151:25 153:3
154:6,14,15
155:25
167:23 170:9
170:23 175:7
179:9 180:2,3
180:6,8,11,24
187:10,11
188:2,3,22
189:7,9 192:5
192:8 196:17
196:19,21
197:7,13
201:24 202:3
207:10
208:17 216:4
216:7,19
217:9,19
218:3,22
219:6,9,22,25
220:6,8,19
221:3,4,7,21
222:3 224:2
225:3 228:24
229:5,17
230:24 231:8

231:15,21
233:13
234:24
235:18
236:19,24
237:7,13,14
237:15,18
238:13,19
239:6 240:24
241:3,24
242:12,15
243:3 244:3
244:10 245:3
245:10,20
246:12,14
250:7,14
256:7 258:21
258:25 260:2
260:16,19
262:8
**timeframe (1)**
217:16
**times (11)**
26:11 32:13
64:14 87:20
107:6 218:17
218:18 240:2
247:23
250:21
252:20
**Timothy (3)**
254:13,15
257:19
**tin (1)**
238:8
**title (1)**
121:11
**titled (2)**
10:12 219:5
**today (46)**
7:23 9:25
13:19 22:18
27:2,4 28:24
30:9 37:3,12

44:21 45:21
46:3,21 49:18
50:11 52:17
54:4 57:10
59:18 61:4,6
70:25 87:23
88:3 91:10
104:6,10,11
110:18
112:23
120:19
132:25
134:21
143:14 144:7
177:23
189:24 215:6
219:24
220:10 221:6
221:17
222:18
225:22
259:25
**today's (14)**
6:12 11:19
12:5,18 13:4
13:11 49:16
52:4 72:6
138:16 139:7
223:8 260:22
263:18
**told (4)**
51:11,15 98:10
168:17
**tool (5)**
153:20 224:5,8
225:13,23
**tools (6)**
145:4 147:2
148:10 153:5
153:13,15
**top (6)**
43:8 63:17
122:3 162:12
162:17 163:7

**topic (40)**
20:8,15,22
21:6 44:18
45:6,6 46:23
48:20,22
59:12 65:12
66:10 72:23
91:12 104:16
110:9,12
124:7 128:5
131:22
134:25
138:10
146:11
194:24 199:2
207:8 208:25
215:2,6,14,19
215:20
216:10,11
220:9,17
221:2 227:10
227:14
**topics (37)**
10:5 11:14
17:12 26:10
43:21 45:15
49:11 61:14
63:24 64:6,9
64:10 65:15
66:13,21
87:12,18,21
105:8,12
110:3 121:16
132:5,7 134:7
137:13
138:16,21
139:7 140:7,8
215:23 223:2
223:5 227:6
227:15
228:11
**total (1)**
13:3
**totality (13)**

25:18 82:8,17
83:14 140:22
141:5 170:13
171:22
172:10 174:2
179:18,22
183:23
**touch (8)**
26:20 64:10
87:18 105:9
105:11,16
108:11 219:6
**touched (13)**
45:7 48:20
58:11 64:3
132:7 140:7,9
215:19,20
216:10
222:16 230:9
232:6
**touches (3)**
45:15 49:11
87:17
**touching (2)**
58:10 136:19
**track (12)**
198:19,22
199:15,25
200:3,12,14
200:21,22
201:5,11
228:12
**tracked (1)**
203:25
**tracking (7)**
199:4,18
201:15,17
204:19 205:4
205:18
**tracks (3)**
200:16 201:7
202:7
**train (10)**
44:15 73:2

146:22
154:19 155:4
155:22 162:4
164:11
179:20
234:20
**trained (44)**
30:4,7 98:15
98:20 149:7
149:11
150:20,22
151:15,19,20
152:7 153:6,7
153:11,13
155:8,12,14
156:2 161:19
164:9 172:21
172:22 173:7
178:7 180:3
181:3 220:6,7
220:7 221:22
223:2 224:24
227:15,15
236:20
237:15,22,23
240:14,15,25
248:22
**training (514)**
1:9 13:25
14:13,15,23
14:23 15:8,16
18:6 21:19,20
22:5,8,10,12
23:6,8,10,19
23:25 24:2,6
25:3,5,8,16
25:18 26:6,14
26:18,22,24
27:2,5,11,15
27:17,20,21
28:2,11,15,18
28:19,20,25
29:2,9,17,19
29:24 31:10

31:14,15,17
31:20 32:15
36:13 38:4,7
38:11,14
39:10,13,19
45:10,12,14
45:18,22,24
46:10,15,25
47:13,22 48:3
48:4,13,16,24
49:11 58:4,10
58:12,13,15
58:19 59:13
59:14,15,16
59:24 60:5,9
60:15 61:8
63:2,4,8 64:4
64:4,5,8,9,13
65:8,9,10,23
66:22,23
71:24 72:11
72:14,15,16
72:18,23,24
72:25 73:4,7
73:11,18,18
73:19,20 74:3
74:5,7,14,25
75:7,14,16,16
87:11,17,19
88:12,17,20
88:23 90:13
90:13,17,18
90:19,22
91:22 92:14
96:6,9,10,11
96:14 100:15
100:20,22,23
101:2,7,9
103:19
104:22 105:2
105:10,16,24
106:6,7,17,18
106:22 107:2
107:8,16,24

109:4 110:5
113:25 114:3
114:8,9,13,14
114:23 115:2
116:16
119:14,16
120:9,16
121:17 122:5
122:22
124:11 125:2
125:4,16,18
130:8,11,20
132:3,6,8,10
132:11
133:12 136:6
136:8,21,23
137:5,6,9,10
137:11,12,15
137:16,18,21
138:2,5,12,15
139:9,11,12
139:13,15,23
139:24,25
140:5,7,8
141:9,15,19
141:25 142:4
142:5 143:5,6
143:9,10,13
143:19,21
144:3,4,23
145:3,7,10,11
145:19,22
146:3,5,6,11
146:12,13,15
146:16,19,20
147:13,18
148:17,18,19
148:23,24,25
149:4,6,14,17
149:20 150:2
150:12,14,18
152:6,19
153:17,23
156:10

157:10,14,19
157:24,25
158:2,6,8,21
158:24
159:11,13
160:18
161:17
164:20,22
165:2,3,14,16
167:21,24
168:4 169:22
171:2 172:4
175:6 176:3,4
176:5,6,7,21
177:2 179:7
179:14
180:10
182:11,17
190:25
191:10
192:20,25
193:8,13,25
194:3,9,13,18
195:2,8 196:4
198:3,11,17
198:20,23
199:16 200:2
200:4 206:2,6
206:7,11,15
206:17,18
207:4 215:2
215:13,16,18
215:18,20
216:5,8,9,9
216:15,18,20
216:21,24
217:2,9,14,16
217:18,18,20
218:2,4,10,13
218:16,22,23
219:2,4,8,8
219:10,18,19
219:23 220:2
220:8,12,12

220:13,17,19
220:25 221:7
221:11,13,18
222:4,7,10,12
222:24,25
223:3,6,20
224:12 225:6
225:7,10
226:4,4,9,11
226:14 227:5
227:7,8,10,12
227:12,13,14
227:18 229:2
229:8,19,22
230:7,9,12,20
230:21,25
231:5,6,8,12
231:15,17,24
232:2,6
233:16,17,20
234:7,15,15
234:18,22,25
235:6,7,19,20
235:21,23
236:3,5,10,19
236:22,25
237:2,8,13
238:2,5,14,16
238:20,23
239:7,11,15
239:16,17,18
239:19,22,23
239:24,25
240:10,13,19
241:2,3,15,17
241:25 242:2
242:5,5
246:19
263:20 264:7
264:20
**trainings (55)**
26:9,24 27:9
27:10 28:22
44:21,25 45:2

45:3,7 46:14
46:16 48:21
48:22 49:4,5
59:5,10 72:13
72:14,15,17
72:19 87:13
87:16,22 88:2
88:8 90:17
91:3,4,13
105:7,10
106:24
108:15,17
139:21,22
143:3 144:17
161:12
167:16
215:23,25
217:4 222:14
222:17,19
223:10
226:23 241:7
241:8,9
264:13
**trains (1)**
62:21
**transcript (4)**
261:10,13
266:13 267:2
**traveled (1)**
81:15
**traverse (1)**
42:20
**traversed (8)**
53:22 54:17,23
55:10,24
56:12,17
57:14
**traverses (1)**
84:14
**traversing (1)**
52:19
**treating (1)**
204:16
**trend (1)**

136:17
**Trenton (4)**
215:11 216:2
222:3 257:12
**trespass (2)**
227:2 229:14
**trespassed (1)**
40:24
**trespassing (3)**
41:8,16 264:5
**Trevor (1)**
238:25
**trial (3)**
3:10 8:10,13
**trick (2)**
114:12 148:6
**true (63)**
23:12,22 24:3
24:7 31:10,12
32:9 33:17
41:25 42:9
47:2,15 49:24
50:9 52:14,22
53:12,18,24
54:20,25
55:11,19
57:23 58:7
65:25 67:13
75:12 76:7,12
80:25 81:25
83:8 85:10,11
91:13 92:3
94:22 96:22
99:20 100:5
101:21 103:9
103:16 133:6
133:8,9
139:17
147:10
152:10 157:3
157:15
159:18,19,21
159:22,24
179:25

181:16
210:11
220:14
222:21
266:13
**try (7)**
46:22 89:9
149:18
167:10
174:25
183:17
217:22
**trying (10)**
69:3 81:18
112:7,11,12
114:12 148:6
174:22
182:10
200:10
**two (33)**
12:22 22:17
31:23 57:21
68:16 69:4
71:11,16
87:14,19
90:11,16 91:2
99:8 112:21
116:13
136:11
142:25 143:2
143:16
154:21
158:23
159:15
182:14 186:8
186:12
187:23
188:11,14,15
188:20
215:10
217:24
**two-hour (5)**
63:21 87:15
90:14 145:3

145:10
**two-page (1)**
218:6
**type (4)**
16:12 140:17
173:23 218:7
**typed-up (1)**
15:3
**types (6)**
69:4 88:22
105:6 136:25
172:12,23
**typically (1)**
164:2

———————
**U**
———————

**U (3)**
3:2 7:14,14
**U.S (4)**
50:13 52:3
97:16,17
**U2 (2)**
162:13,18
**ultimate (2)**
122:21 202:21
**ultimately (4)**
33:4 125:16
136:6 255:6
**unarmed (1)**
55:3
**unauthorize...**
4:19
**unavailable (1)**
116:11
**unaware (15)**
28:13,13 29:24
49:19 72:20
92:17 95:12
133:17
137:18
168:16
179:17
197:12 206:5
206:15

215:24
uncertain (2)
165:15 220:8
undergo (4)
46:9,24 47:12
103:4
understand (...
8:2,8,12,15
9:23 10:3
21:14 25:11
25:13 27:6
29:15 34:15
36:21 50:20
50:24 52:5
64:17 112:24
120:15 129:9
129:12
135:13
144:16
147:18
understandi...
9:15 39:23
40:4 51:8
70:25 71:7,19
92:12,23 93:2
118:22
124:18
187:12
218:20
234:11
understood (4)
8:5,5 118:24
218:12
unholstered ...
233:11
unintentiona...
212:4
uninvolved (2)
81:20 245:6
union (4)
249:6,8,8,15
unit (11)
107:11 136:17
136:18

249:19,24
255:10
258:21 259:5
259:13,14,18
United (4)
1:2 6:17 50:13
150:15
units (1)
259:12
universe (2)
139:25 140:5
unlawful (17)
46:5,11,25
47:14 105:17
106:12 108:3
220:20,23
226:25
229:10,11
232:9,12
239:4 240:8
241:21
unlawfully (...
27:18 28:3,15
29:12 53:4
104:24 105:4
107:22
119:16,19
120:2,13,18
120:23
121:19,23
122:14,15,18
123:2 124:13
124:21 125:9
125:25
126:15,18
127:17,20
128:10 129:5
129:17 130:3
130:22 137:8
138:6 263:23
264:16,23
unoccupied (1)
153:14
unquote (1)

96:12
unreasonabl...
215:12 216:13
229:13
232:10
unsuccessful ...
163:25
unsure (8)
132:19,25
147:18
210:22 214:3
219:24 244:9
245:2
unsuspected ...
98:17
unsuspecting...
79:24
unusual (5)
70:7,11,14
71:14,16
update (5)
219:21 234:7
239:12 252:4
254:23
updated (11)
72:13,15,23
74:13 176:24
184:9 206:10
211:13 255:2
255:4,7
updates (4)
90:20 108:18
191:21 235:5
upload (1)
243:16
uploaded (4)
243:23 245:25
250:10 253:5
uploading (2)
250:4 257:25
upright (1)
158:18
use (57)
8:9,13 18:24

33:25 36:2
48:24 64:22
70:6 71:13
81:11 99:12
105:20
138:25
140:17
147:22
148:14
149:11
150:21 151:6
151:16 152:5
153:4,7
154:25 155:5
155:8,12,15
155:22
158:13,14,17
160:21
161:20
167:21 170:3
170:5 175:24
182:7,7,9,13
182:16 183:4
184:4,15,18
186:5 188:9
196:23,25
211:21
224:13
225:17,20,23
233:9
User (1)
162:13
uses (1)
141:6
usually (4)
40:3 136:10,21
163:21
utilize (17)
81:11 150:22
151:15 152:6
153:12,14
154:16 155:4
159:14
164:11

167:25
168:10 169:8
189:6,12
240:16 241:3
utilized (13)
148:5 164:20
164:22
165:16
168:13,20,21
169:13,17
170:3,6
195:10
217:17
utilizing (1)
172:11

_____

V

v (1)
66:23
VanBredero...
226:25 227:5
227:22
228:25
257:25 259:2
variety (1)
45:15
various (1)
228:15
vary (1)
26:10
vehicle (8)
174:24,25
175:10
178:22,25
179:3,9,11
vehicles (1)
156:10
verbal (29)
27:21 28:7
31:19,24 32:8
32:12,22
33:13,22
34:10,19 35:8
35:18,24 36:3

36:6 37:5
45:5 48:23
53:14 72:19
124:25
130:10,19
137:15 138:3
138:8 169:25
264:19
**verbally (2)**
64:25 125:12
**version (8)**
162:13,15
165:10
176:25 177:4
226:17,19,20
**versions (1)**
226:22
**versus (13)**
6:16 42:7
91:25 152:7
156:4 160:4
173:3,18
175:12
186:22
204:17 209:5
209:10
**viable (3)**
151:6 169:24
223:21
**vicinity (1)**
252:20
**Victoria (2)**
241:19 255:13
**video (48)**
4:2 6:13,21
8:13 89:6
90:7 164:14
164:18,18,21
164:25 166:9
166:11,19,20
166:21,24
167:2,3,4,10
167:12,15,19
167:23 168:3

168:5,6 196:7
196:13,16
223:19 224:2
225:6,9 226:3
226:5,10,11
226:12,13,20
244:12 247:8
249:9 254:24
257:6 260:23
**video-record...**
261:25
**Videoconfer...**
4:8,11,16 5:5
**videographe...**
2:14,15 6:10
6:21 7:8
85:19,22 86:3
88:24,25
89:10,14,19
89:20,21,22
115:20,22
116:2 123:21
123:25 192:4
192:8 201:23
202:3 242:11
242:15
260:15,19
261:20,24
**videos (2)**
194:16 195:5
**VIDEOTAP...**
1:16
**view (8)**
189:17 245:8
245:11
246:16,23
249:9 250:10
252:8
**viewed (13)**
197:24 226:3
226:12
243:24 244:2
246:15 249:8
250:5,13,20

251:10,12
256:20
**viewing (5)**
167:23 243:19
247:8 256:22
257:25
**views (5)**
244:6 245:12
246:25
250:23
255:25
**violate (2)**
27:14 131:6
**violated (2)**
133:23 168:22
**violating (6)**
27:17 29:11
53:4 131:16
181:8 263:22
**violation (16)**
4:19 54:25
55:11 102:8
102:16
122:10
124:22
169:14,21,21
179:2,7,13
198:6 213:25
232:25
**violations (2)**
31:3 196:5
**violence (3)**
172:24 173:4
173:19
**visual (7)**
178:23,24
179:4,12,24
181:4,4
**voice (1)**
6:23
**voluntarily (2)**
35:8,10
**volunteered ...**
17:13

_____
**W**
_____
**wait (3)**
113:7,9 260:11
**waive (1)**
8:24
**waived (2)**
3:7 86:24
**walk (10)**
49:22 50:6
51:13 80:20
178:22 180:6
180:8,11,24
181:3
**walked (1)**
52:7
**walking (6)**
41:22 42:8
47:23 48:17
49:6 50:3
**want (34)**
8:24 9:17 10:8
20:4 35:23
36:23 66:10
71:23 85:15
99:5 104:16
115:10 135:5
138:18,20
141:7 142:11
151:3 153:18
160:7 162:5
165:4 171:17
176:14
181:11 189:9
189:18 199:8
232:14 242:8
243:4 247:25
260:10,21
**wanted (7)**
39:11 73:10
90:5 95:13
111:21
135:13 168:9
**wants (1)**
261:9

**warrant (41)**
20:12 26:3
41:24 42:3
43:12,12,12
49:23 50:7
51:15 52:8,20
53:23 55:3,5
55:14,19,23
56:7,10,15
57:5 60:23,23
68:5 76:2
82:25 83:7
94:24 95:10
95:11 99:2,4
99:9,12,13,24
100:3,7 154:7
176:12
**warrantless (...**
21:11,22 23:3
23:11,14,21
25:7 26:19
68:23 69:7,9
71:25 75:11
82:21 94:10
94:21 96:2,15
216:11 218:5
219:20
231:18
236:16,17
**warrants (2)**
176:2,3
**wasn't (3)**
125:6 167:2
235:25
**waste (4)**
17:25 87:3
112:7,11
**wasting (3)**
111:6 123:14
135:7
**watched (3)**
223:18,19
224:2
**way (15)**

31:25 33:14
34:16 136:7
136:25
140:14
149:16
167:11
173:14
174:15
176:25
178:14
206:16
240:13
266:18

**we'll (13)**
21:16 71:23
87:4 141:7
151:2 157:5
160:7 164:15
165:4 229:9
232:7 256:24
259:20

**we're (38)**
8:4 9:15 14:3
22:17 59:20
84:12 95:15
98:23 99:5
104:18 105:9
110:14
111:24
112:11,12
113:21 115:6
115:7,17
117:22
118:25
119:12 120:7
121:3 123:19
126:7 128:17
130:17 135:4
162:5 168:7
192:20
193:17
202:11 212:5
214:20
240:25 261:4

**we've (16)**
104:24 105:2
108:17
112:21
120:12
165:15 249:2
250:2 255:14
255:14 256:5
256:24
257:18,21,24
259:2

**weapon (11)**
78:6,25 102:13
158:16,19
159:2 162:15
164:12 170:2
170:5 252:19

**weapons (4)**
79:7 101:14
102:10
153:16

**weather (1)**
174:4

**web (3)**
73:9,13 75:6

**week (3)**
217:22,24,25

**weeks (3)**
137:11 157:8
163:4

**welcome (1)**
242:17

**went (4)**
17:15 89:20
241:12 245:8

**weren't (4)**
15:22 47:10
93:10 232:23

**Western (2)**
1:2 6:18

**Wetzel (2)**
259:3,12

**when's (1)**
229:17

**WHEREOF ...**
266:20

**whichever (1)**
234:8

**Whitney (2)**
225:2 250:3

**widespread (2)**
136:4 191:3

**Wild (3)**
256:11,11,12

**Williams (3)**
248:2 254:20
257:22

**window (3)**
235:4 252:17
252:18

**wires (1)**
163:23

**withdraw (8)**
47:19 63:6
95:7 149:2
152:17
169:11
192:22
210:15

**witness (35)**
1:17 4:9,14,14
4:24,25 5:3
6:4,8 7:12,13
7:15 12:4
17:17,22
18:21 19:5,17
62:8 63:3
67:7,11
117:20 126:9
129:13
134:20 161:6
163:5 246:8
260:8 261:3
263:4,17
266:20
267:23

**witness's (1)**
4:15

**witness(es) (2)**
266:11,15

**word (18)**
45:13 50:21,24
51:9 59:14,14
64:13,13 91:8
91:11 95:4
96:13 100:21
101:6 131:24
133:16
237:19,19

**words (6)**
50:21 59:19
101:8 237:16
237:16 240:2

**workers (1)**
244:4

**works (5)**
34:17 62:11
167:11
199:21
257:17

**wouldn't (5)**
28:8 136:7
160:2 218:14
219:5

**writing (10)**
12:7 14:9
29:15 41:20
58:24 88:10
129:8 130:25
203:23 211:8

**written (15)**
4:18 8:9 23:10
23:20 51:4
100:5 128:7
132:11 133:6
141:2 145:22
175:21 176:7
176:10
209:19

**wrong (1)**
233:24

**wrote (2)**

116:19 118:8

---
**X**

**X (2)**
1:3,11

**X2 (3)**
162:14,17,19

**X26P (2)**
165:9,15

---
**Y**

**yard (12)**
42:20,20,22
43:2 48:18
99:18 131:4
179:11,19,20
180:10,13

**yards (1)**
49:22

**yeah (10)**
120:5 141:21
190:16
191:23 200:9
214:20 245:2
254:10 260:6
261:17

**year (8)**
14:20,21 16:19
87:20 230:13
236:5 251:12
251:14

**yearly (4)**
27:9 35:16,25
44:25

**years (5)**
61:11 160:17
204:21
205:11
235:11

**yesterday (4)**
9:5 13:8,10
211:3

**York (30)**
1:2,12,22 2:5,5
2:10 6:9,19

50:14,15,16
50:18 52:3
53:9 66:23
68:10 69:17
71:21 97:13
97:17,18,19
99:25 100:12
103:19
109:17
234:21,21
266:4,10

**Z**

**Zanni (1)**
253:18
**Zenelovic (1)**
258:20
**zoom (9)**
1:12 21:25
43:14 72:8
160:14 177:5
184:22
189:25
243:12

**0**

**08/22/2023 (1)**
267:2

**1**

**1 (19)**
10:8 20:5,10
66:11,15
69:19 104:21
112:19
119:24
122:15,24
124:5 138:19
138:23
162:16 187:7
214:25 262:6
263:11
**1-A (5)**
20:8,15,22
21:6 185:22

**1-B (2)**
66:13,21
**1-C (1)**
66:21
**1-D (4)**
104:18 119:12
135:2,3
**1-E (1)**
138:21
**1-J (1)**
199:7
**1-K (1)**
207:8
**1:09 (2)**
123:24 124:2
**10 (12)**
86:8 165:5
166:14
196:24
219:17 220:2
220:18
223:12,20
225:6 226:7
242:9
**10- (1)**
65:13
**10/7 (1)**
235:16
**10:54 (1)**
86:2
**10:56 (1)**
85:23
**100 (1)**
112:22
**10016 (1)**
2:5
**11 (1)**
176:16
**11:05 (1)**
86:2
**11:07 (1)**
86:4
**11:46 (1)**
115:23

**12 (6)**
87:16 90:13
91:3 184:2
211:25
263:16
**12:40 (1)**
116:3
**12:49 (2)**
123:22,24
**128 (1)**
264:14
**13 (1)**
189:19
**130 (1)**
264:19
**135 (1)**
165:19
**136 (1)**
165:20
**137 (2)**
166:8 226:8
**14 (7)**
165:10 242:18
243:8 259:21
262:6 263:11
263:19
**14-page (1)**
243:14
**14614 (2)**
2:10 6:9
**15 (1)**
217:15
**157 (2)**
165:20 166:9
**157-page (2)**
165:19 226:8
**16 (2)**
137:11 176:22
**16-page (1)**
184:11
**16-week (2)**
65:13,14
**18 (1)**
235:11

**185 (1)**
6:8
**19 (1)**
243:17
**192 (1)**
2:5
**1932 (1)**
150:14
**1996 (4)**
235:16,20
236:12
237:11
**1997 (10)**
72:3,12 216:2
221:2,14,17
235:20
236:11,18
237:12

**2**

**2 (8)**
21:17 186:4
187:7,7,12,16
218:5 231:19
**2:46 (2)**
192:5,7
**20 (5)**
91:20 110:15
162:13,15
267:24
**20-CV-6780 ...**
1:6 6:17
**2000 (1)**
236:6
**2003 (1)**
160:10
**2004 (1)**
216:3
**2007 (2)**
238:8,16
**2008 (2)**
238:9,16
**2013 (23)**
20:10 27:2,4

30:8 44:21
46:8 47:19,21
53:12 59:18
65:20,23
66:16 104:21
110:7 112:19
119:24
122:15,24
138:24 140:2
203:24 206:3
**2014 (16)**
14:22 139:10
139:12,22
141:9,13,18
141:22
143:10 145:3
145:11
148:18
190:24
229:23
230:22
238:23
**2015 (1)**
227:9
**2016 (3)**
162:16 231:14
231:16
**2017 (12)**
60:17 176:22
176:25 184:8
184:9 230:5,6
230:7,21
231:16,24
239:3
**2018 (29)**
22:20 53:23
54:18,24
55:10 56:18
57:15 60:17
110:15
219:14,17
220:2,18
223:12
229:18,23

230:8,23
231:14 232:8
233:14,21
234:2,2,6
235:3 238:18
243:17
248:11
**2019 (35)**
14:22 21:9
22:15,25 24:6
24:23 29:18
49:21 50:5,11
50:18 51:12
52:6 58:3
59:24 90:23
96:5 139:10
139:22 142:5
142:6 143:19
143:21 144:2
148:18
165:10
216:21 218:5
218:21
220:12 229:7
231:20
233:19
239:10 242:2
**2021 (4)**
229:6 233:19
234:6 252:16
**2022 (3)**
16:20 226:18
251:25
**2023 (6)**
1:13 6:12
226:17 262:3
262:13
266:21
**203 (1)**
265:4
**209 (1)**
163:12
**21 (1)**
165:10

**22 (4)**
1:13 6:12
253:17 262:3
**222-page (1)**
163:12
**22nd (1)**
266:21
**24-page (1)**
142:19
**259 (1)**
263:11
**29 (3)**
166:21 184:8
263:20

___ 3 ___

**3 (9)**
43:7 67:4
68:11 95:14
114:15,16
135:3 181:12
184:11
**3-A (1)**
185:19
**3-B (2)**
186:6 213:9
**3:01 (2)**
192:7,9
**3:14 (2)**
201:24 202:2
**3:29 (2)**
202:2,4
**30 (7)**
2:10 68:11
89:15 90:4,9
204:21
231:20
**30(b)(6) (10)**
10:14 12:4
62:11 104:17
113:22 191:6
199:24 260:8
262:2 263:16
**3113(d) (1)**

4:7
**34 (2)**
160:21 161:25
**340 (2)**
184:5 211:22
**350 (1)**
162:2
**37 (4)**
160:18,20
161:25 162:6

___ 4 ___

**4 (7)**
71:24 73:5
114:13,15,21
236:17,23
**4:30 (2)**
242:12,14
**4:44 (2)**
242:14,16
**40 (1)**
63:24
**400A (1)**
2:10
**41 (1)**
264:4
**415 (16)**
24:14 43:8,10
44:17 54:25
55:11 67:22
94:3 95:14
97:5 99:20
103:14
109:12
110:13 131:6
133:23
**45 (1)**
148:10
**49 (1)**
244:22

___ 5 ___

**5 (8)**
141:8 142:10
142:11,22

148:8 193:22
194:6,24
**5-C (1)**
194:25
**5/30/2019 (1)**
21:20
**5:09 (2)**
260:16,18
**5:16 (2)**
260:18,20
**5:17 (2)**
262:4,8
**51-page (1)**
142:15
**53 (4)**
103:8,12
244:17,21
**54 (1)**
244:24
**58 (1)**
264:7

___ 6 ___

**6 (10)**
53:23 54:18,24
55:10 56:18
57:15 142:3
142:12,18
181:12
**6-year-old (1)**
171:14
**6/10/2018 (1)**
246:16
**61 (1)**
244:21

___ 7 ___

**7 (5)**
157:6 163:13
166:4 257:24
263:5
**7/31/2000 (1)**
235:10
**7016 (1)**
163:10

**7237 (1)**
163:10

___ 8 ___

**8 (3)**
160:8,10 212:3
**802 (1)**
2:5
**88 (1)**
264:11

___ 9 ___

**9 (2)**
162:8 165:23
**9/22/2015 (1)**
227:24
**9/24/2018 (1)**
241:23
**9/25/2017 (1)**
239:3
**9:10 (2)**
1:14 6:12
**90 (1)**
161:22
**911 (2)**
178:13,15
**92 (1)**
160:22
**99-year-old (1)**
171:15