UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

------------------------------------------------x

CHARLES DEMPSEY, Individually, and
L.D., by Her Father and Natural
guardian, CHARLES DEMPSEY,

             Plaintiffs,

                        Case No.

  - against -               6:19-cv-6780


THE CITY OF ROCHESTER, a Municipal
Entity, JAVIER ALGARIN, "JOHN DOE"
RPD Officer Responsible For Training
Javier Algarin,

             Defendants.

------------------------------------------------x

                Zoom Recorded Videoconference
                May 31, 2023
                10:01 a.m.


     RECORDED VIA ZOOM - EXAMINATION
BEFORE TRIAL of RENO DiDOMENICO, taken by
Plaintiffs, pursuant to Article 31 of the
Civil Practice Law and Rules of Testimony,
and Order, held at the above-noted time and
place, before Michelle Conero, a Stenotype
Reporter and Notary Public within and for the
State of New York.

**A P P E A R A N C E S:**

    ROTH & ROTH, LLP
        Attorneys for Plaintiff
        192 Lexington Avenue, Suite 802
        New York, New York  10016
        Phone:  212-425-1020
        E-mail:  eshields@rothandrothlaw.com
    BY: ELIOT DOLBY SHIELDS, ESQ.


    CITY OF ROCHESTER LAW DEPARTMENT
        Attorneys for the Defendants
        30 Church Street, Room 400a
        Rochester, New York 14614-1224
        Phone:  585-428-7992
        E-mail:  peachie.jones@cityofrochester.gov
    BY: PEACHIE L. JONES, ESQ.



**A L S O   P R E S E N T:**
    **JAMES CROSBY**
    **BLESSING IKWUNZE**

FEDERAL STIPULATIONS


IT IS HEREBY STIPULATED AND AGREED by and between (among) counsel for the respective parties herein, that filing and sealing being the same are hereby waived.

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be sworn to and signed before any officer authorized to administer an oath, with the same force and effect as if signed and sworn to before the Court.

oOo

VIDEO STIPULATIONS

IT IS HEREBY STIPULATED AND AGREED by and between counsel for all parties present that this deposition is being conducted by Videoconference, that the Court Reporter, all counsel, and the witness are all in separate remote locations and participating via Videoconference Zoom meeting under the control of Lexitas Court Reporting Service, that the witness shall be sworn in remotely by the Court Reporter after confirming the witness's identity.

IT IS FURTHER STIPULATED that exhibits may be marked by the attorney presenting the exhibit to the witness, and that a copy of any exhibit presented to a witness shall be e-mailed to or otherwise in possession of all counsel prior to any questioning of a witness regarding the exhibit in question. All parties shall bear their own costs in the conduct of this deposition by Videoconference.

OOO

RENO DiDOMENICO

THE REPORTER: Good morning. Today is May 31, 2023. The time is 10:01 a.m. We're on the record.

If counsel would state their appearances, please.

MR. SHIELDS: Eliot Shields of Roth & Roth, LLP for the Plaintiff, Charles Dempsey and his daughter, L.D.

MS. JONES: Peachie Jones for the City of Rochester and all named Defendants.

R E N O   D i D O M E N I C O, having first been duly sworn by the Notary Public, was examined and testified as follows:

THE REPORTER: If you would state your full name, please.

THE WITNESS: Reno DiDomenico.

THE REPORTER: And what is your business address?

THE WITNESS: 99 Victor Road, Fairport, New York 14450.

**RENO DiDOMENICO**

THE REPORTER: Thank you.

We have the Federal stips today, Counsel?

MR. SHIELDS: Yes.

EXAMINATION BY

**MR. SHIELDS:**

Q    Good morning, Officer DiDomenico.

**A    Good morning.**

Q    My name is Eliot Shields. I represent numerous people whose dogs were shot by Rochester Police Department officers. I'm going to be asking you some questions today.

First, have you ever had your deposition taken before in a civil case?

**A    Yes.**

Q    Okay. When was that?

**A    I've had a couple over my career. I think the last one, I don't know, probably twenty-five years ago.**

Q    Okay. So the first thing I'm going to do is just go over some ground rules for the deposition since it's been awhile. Okay?

**A    Mm'hm'.**

**RENO DiDOMENICO**

Q     So the first thing is, can you please just tell me if you don't understand my question?  One other rule is, for the court reporter, to give all of your answers verbally. You can't just shake your head because she can't get that on the record.  Okay?

**A     Okay.**

Q     And will you tell me if you find my question confusing?

**A     Yes, I will.**

Q     Okay.  And can you tell me if I've assumed a fact in a question that's incorrect?

**A     Yeah, I'll correct you on anything.**

Q     Okay.  And then it's also important for you to tell me if you don't know the answer to my question.  Okay?

**A     Yes.**

Q     All right.  And then if there's anything you don't understand, please say so and I'll gladly rephrase the question for you. Okay?

**A     Okay.**

Q     All right.  Before we get into the meat of the questions, can you just kind of

RENO DiDOMENICO

tell me anything that you did to prepare for today's deposition?

A        Besides talking to yourself, nothing really.

Q        Okay.  And just for the record, can you remind us of what we talked about, you and I?

A        You just wanted to know about my lesson and to send the material to you, including some videos I used during my lesson.

Q        Okay.  And did you ever speak with the City Attorney, Ms. Jones?

A        Not in a long conversation.  Just briefly to let her know that you called me.

Q        Okay.  And did you ever send Ms. Jones or anyone else at the City any materials?

A        Just this morning.

Q        Okay.  And what did you send them this morning?

A        The same stuff that I sent you.

Q        Okay.  And so would that be the three videos and the lesson?

A        Correct.

Q        And there were --

RENO DiDOMENICO

A     And a handout.

Q     And a handout.  So the handout was the lesson with the lines to write on the side --

A     Yes.

Q     -- the notes on the side?

A     Yes.

Q     And then there was the dog posture handout also?

A     Correct.

Q     Anything else or was that it?

A     That was it.

Q     Okay.  And did you review any other documents or was that it?

A     That was it.

Q     Okay.  All right.  So I want to ask some background questions.  I'll start with your educational background.  Can you tell me what your highest level of education was?

A     I have a two-year associate's degree in criminal justice.

Q     Okay.  And where did you get that from?

A     Monroe Community College.

**RENO DiDOMENICO**

Q     Okay.  And what year did you graduate from MCC?

A     8 -- '85.

Q     Okay.  And give me one second. I've got a copy of your resume that was provided by the City and I want to put that up as Exhibit 1.  My question about that -- my first question is going to be, did you provide a copy of your resume to the City?

A     I don't remember doing so.

Q     Okay.  One second and I'll --

A     It's possible, but -- maybe when I first started the lessons.  I'm not sure.

(Whereupon, Plaintiff's Exhibit 1 was marked for identification as of this date.)

Q     Okay.  Officer, on the screen do you see a copy of your resume right now?

A     Yes.

Q     Okay.  And so this isn't something that you provided to the City recently, at least, is what you're saying?

A     Correct.  Like I said, it might have been when I was teaching the course or

**RENO DiDOMENICO**

**shortly thereafter, --**

Q    Okay.

A    -- or in regards to another case. I'm not sure.

Q    Okay.  So just looking at the resume briefly, there are some dates here. We've got some March 2018 dates.  So this would have been a resume that was updated after March 2018, obviously.  Right?

A    Most likely.  Well, it would have been, yeah.  It would have been -- if I understand the question correctly, you're asking if it was probably 2018 I sent it.  Most likely, yeah.

Q    Yeah.  I guess my question is, do you have a more updated resume than this resume that has a date from 2018 as the most recent date on it?

A    I would have to check.  Probably I do.

Q    Okay.

A    I -- I don't have a -- my resumes aren't -- I don't send out a lot of them.  I'm pretty happy here.  And I don't get -- I don't

**RENO DiDOMENICO**

**get called in to testify that often, so --**

Q    Sure.  Is this something that you might have -- let me withdraw that.  Do you have a recollection of updating this resume and adding these March 2000 and April 2018 trainings that you did?

**A    I mean, if I updated -- if it's on there, that's when I updated it basically.  If I understand your question, I haven't -- I might have an updated one, I'd have to check my files, but this is the one that the City has.**

Q    Sure.  So I guess my question is, do you know if you updated this resume to send to the City for the purposes of this litigation or do you send your resumes, for example, if you give a training somewhere so that they know all of your credentials and qualifications?

**MS.  JONES:   Objection.**

**A    This is -- again, I'm not sure exactly when I sent this or how I sent this. It's possible I updated it when they asked me for one in regards to a different case.**

Q    Okay.

**A    Back probably in 2018.  And again,**

**RENO DiDOMENICO**

**I don't even know the circumstances of this case. It could be the same case. I don't know when this took place or -- I don't know -- even know the circumstances involved.**

Q Sure. So let me ask you, as of 2018, is everything on this resume completely updated and accurate?

**A To the best of my knowledge, yes.**

Q Okay. You've listed, for example, all of the various relevant trainings that you've attended?

**A Correct.**

Q Okay. Any like certifications you might have?

**A Correct.**

Q Okay. So I'm going to just take this down for now, but I might have a few questions on that a little bit later. Okay?

**A Okay.**

Q Can you give me an overview of your work experience as it relates to law enforcement?

**A I was a sheriff's deputy for twenty-two years in Monroe County. In 2007 I**

**RENO DiDOMENICO**

**retired and came to the Humane Society to work as a humane law enforcement officer.**

Q    Okay.  Can you explain what your role is at the Humane Society as a humane law enforcement officer?

**A    We investigate reports of animal cruelty, so we're actually the SPCA division for the Humane Society Greater Rochester.  So we go out and investigate the reports of animal cruelty.  We're not dog control.  We do not do dog control services.  Basically we're strictly investigation.**

Q    Okay.  So you said you do strictly investigations of animal cruelty?

**A    Correct.**

Q    And so the Humane Society, it's a private organization.  Is that right?

**A    Yes.**

Q    Okay.  So are you designated as a peace officer under New York law?

**A    Yes.**

Q    Okay.  And how is that different from being designated as a police officer under the law?

RENO DiDOMENICO

A    There really isn't too much different except for in the Criminal Procedure Law there's two categories, one is police officer and one is peace officer.  Arrest powers, investigative powers are pretty much similar.  The only real difference that I've seen over the last fifteen, almost sixteen years I've been here is by statute we are not allowed to serve an arrest warrant.  We can apply for an arrest warrant, but we're not allowed to be the ones to serve it.  It has to go to a police officer.  That's pretty much the only difference I've seen.  And of course training hours.  But we're -- you know, I'm overqualified for the peace officer training.

Q    Okay.  So let me back up.  So you were just saying the peace officer training. When you --

A    Correct.

Q    And when you went to the Humane Society, did you have to go to like a peace officer academy like you did --

A    No.

Q    No?

RENO DiDOMENICO

A    No.  You send in a waiver to the Department of Criminal Justice Services and they basically say, well, you have over a thousand hours of training, because you're a police officer, compared to, at that time it was only like fifty hours for a peace officer. So they've upped it since then, but basically just send in a waiver and they take you out of the police registry and put you in the peace officer registry.

Q    And when you began working with the Monroe County Sheriff's Office, you went to the police academy at that point.  Right?

A    Correct.

Q    Okay.  Was that at the Public Safety Training Facility?

A    Yes.

Q    Okay.  And it was like six months, forty hours a week?

A    Well, the first time I went through as a part-time officer, it was two times a week and all day on Saturdays, and then when I -- they made me full time, you had to go back through the academy which was five days a week,

RENO DiDOMENICO

eight hours a day.

Q   Okay.  So you've done the academy twice?

A   Correct.

Q   Okay.

A   Until they realized it was budgetarily not good for them and they decided to drop the two times to the academy.

Q   But they didn't do that until after you went through it twice?

A   Yes.  Two years after.

Q   When you were at the Monroe County Sheriff's Office, what were your roles in the sheriff's office?

A   I was a road patrol deputy, I was a field training officer, I was a police instructor.  I taught there.  I started the sheriff's bicycle unit.  Those are pretty much the highlights of --

Q   Did you have any special roles or assignments having to do with anything related to animals?

A   No.

Q   Okay.  So you weren't a K9 officer

RENO DiDOMENICO

or anything like that?

A     No.

Q     Okay.  And so what made you decide to retire from the sheriff's office and join the Humane Society?

A     It's kind of a long story, but basically I used to work as a patrol officer -- as a patrol officer, I worked with our domestic violence counselor.  In the late '90s a study came out between the human violence link and animals.  At that time Animal Planet was very popular, including Animal Precinct.  The state at that time decided to offer training in animal cruelty investigation, and because of the link between child abuse and domestic violence and serial killers, I asked my captain to go to that, that training.  They sent me to that training, I think it's on my resume, 2006, 2007.  And at the same time I was also working for a German shepherd rescue group, so I kind of got involved with animal welfare there.  After I had the training, there was an opening here and I came.

Q     So if I understand you right, you

RENO DiDOMENICO

became aware of this link between domestic violence and animal abuse, and you were also working for an organization, did you say with German Shepherds?

A    Yes.  It was a not-for-profit German shepherd rescue group.

Q    Okay.  And so I'm assuming also you were an animal lover before then?

A    Yes.

Q    So all of those things kind of came together and then the opportunity presented itself?

A    Yup.  It pretty much kind of like all fell into place within like three -- three years.

Q    Got it.

A    And the other -- I'll just throw this in, too.  Where my primary district was, which was the Town of Perinton, is where Lollypop Farm was housed, or is, so I was very familiar with Lollypop Farm.

Q    You mean when you were a patrol officer?

A    Right.

**RENO DiDOMENICO**

Q    Got it.  And so going back to your role at Lollypop Farm and the Humane Society.  So that's a private organization and your salary is paid from Lollypop Farm, not from like local police or the sheriff's office?

**A    We're donation based only.**

Q    Okay.

**A    Of course, we do get some government grants every once in awhile, but we do not get any tax dollars directly to budget.**

Q    Okay.  And earlier you said that your role at Lollypop is primarily investigating animal cruelty incidents.  Correct?

**A    Correct.**

Q    Do you do anything else in your role as, I believe it's -- let me -- let me withdraw that.  You've had two different roles at -- since joining Lollypop Farm.  Is that right?

**A    Right.  Yeah.  It's basically -- I mean, they moved -- I started off as a regular officer, then they moved me to supervisor within six months, and then, you know, they**

RENO DiDOMENICO

kept changing titles.  They moved me to director and now I'm a vice president.

Q    Okay.  Have your role and your duties remained the same or have they changed?

A    I would say they're pretty much the same, except I'm not really in the field as much anymore.  I'm more of a senior manager here, so my job is not only to oversee the law enforcement division but to also help run operations.

Q    Okay.  And so do you oversee other officers who help investigate --

A    Yes.

Q    -- animal cruelty incidents?

A    Yes.

Q    Okay.  In addition to investigating animal cruelty incidents, do you have any other roles or does your job include anything else related to animals?

A    Well, the whole job is -- basically it's an animal welfare agency.  But yeah, there's other things.  Another primary role that I have is I oversee our disaster team, our emergency response team.  If there is a natural

**RENO DiDOMENICO**

**disaster of some sort, we work with the county emergency management and we respond to either local or national disasters.**

Q    And so your role would be helping to save animals if there was some sort of disaster.  Is that right?

**A    Yes.  Either saving and/or setting up a temporary shelter.  If people are displaced, we set up a temporary shelter for those animals.**

Q    Got it.  And as a peace officer, do you carry a firearm?

**A    Yes.**

Q    Okay.  Do you have to do like a firearm certification every year?

**A    Yes.**

Q    Okay.  Are there any other trainings or certifications that you have to do on a yearly basis?

**A    Yeah.  We have to do some sort of training in defensive tactics.  So whether it's covering Article 35, you know, in a classroom or going over our, you know, weapons.  We carry a baton and we also carry pepper spray.**

**RENO DiDOMENICO**

Q    Do you carry a taser?

**A    No.**

Q    Okay.  And so we're here to talk about this training that you provided to the RPD in 2014.  Correct?

**A    Yes.**

**(Whereupon, Plaintiff's Exhibit 2 was marked for identification as of this date.)**

Q    Okay.  I'm just going to put up the training as Exhibit 2, and I'm going to bounce around and I'm going to ask you some questions, and then I'm going to ask you some more specific questions about the PowerPoint. Okay?

**A    Okay.**

Q    So, first, I'm just going to put up the PowerPoint and confirm that we're all on the same page.

Officer, do you see the PowerPoint on your screen right now entitled Dog Bite Prevention For Law Enforcement?

**A    Yes.**

Q    And this is the PowerPoint that you put together for presenting this to the RPD?

RENO DiDOMENICO

A     Yes.

Q     Okay.  So, first, I'm just going to go back and ask a bunch of questions and then I'll put that back up.  Okay?

A     Okay.

Q     Okay.  My first question is, what qualifications or experience do you have in dog behavior?

A     **Just from what I've learned here over the years.**

Q     Okay.  So what you would have learned in your role as a deputy with the sheriff's department and your time at Lollypop Farm?

A     **Yeah.  Being a pet owner myself, being part of the German shepherd rescue, and then here at Lollypop, when you come in, they kind of tell you about, you know, animal behavior, et cetera.**

Q     Okay.  Are you certified by any organizations to be a professional dog trainer?

A     **No.**

Q     Okay.  I'm going to go through some organizations, and can you just tell me if

RENO DiDOMENICO

you're either a member of those organizations or certified by any of them?

A       Okay.

Q       Okay.  So the first one is the -- are you certified by the certificate -- are you certified as a certified animal behavior consultant?

A       No.

Q       Okay.  Are you a certified professional dog trainer?

A       No.

Q       Are you a certified behavior consultant canine?

A       No.

Q       Are you a certified applied animal behaviorist?

A       No.

Q       Are you an American Kennel Club certified evaluator for the Canine Good Citizen program?

A       No.

Q       Okay.  Now I'm going to go through a few organizations with you.  Okay.  Are you a member of any of the following organizations:

RENO DiDOMENICO

First, the Association of Professional Dog Trainers?

**A       No.**

Q       Two, the International Association of Canine Professionals?

**A       No.**

Q       Three, the Pet Professional Guild?

**A       No.**

Q       Four, the Animal Behavior Society?

**A       No.**

Q       Five, the International Veterinary Forensic Science Association?

**A       No.**

Q       Six, the American Academy of Forensic Scientists?

**A       No.**

Q       And seven, the certified animal welfare -- are you a certified animal welfare administrator?

**A       No.**

Q       Okay.  Now, as part of your role with the Humane Society, does it include providing training to law enforcement?

**A       Yes.**

**RENO DiDOMENICO**

Q    Okay.  And so we talked about that PowerPoint being something that you put together for the Rochester Police Department in 2014.  Right?

**A    Correct.**

Q    Okay.  So I'm going to ask you just some general questions about the training first.  When you put together the training, did you consult with any experts in dog behavior, when you designed the training?

**A    Yes.**

Q    Okay.  And who was that?

**A    Rebecca Lohnes.  She was our behaviorist here.  As a matter of fact, most of the pictures in there came from her.**

Q    Okay.  Could you spell her last name for me?

**A    I think it's L-O -- don't hold me to it.  She hasn't been here in a few years. L-O-H -- let me write it.  L-O-H-E-S -- O-S, I think.**

Q    L-O-H-E-S?

**A    I think there's an O in there. L-O-H-E-O-S, I think.**

RENO DiDOMENICO

Q     Thank you.  So you said she was an employee of Lollypop Farm?

A     Yes.

Q     Anyone else?

A     Not in the -- there was a behaviorist -- outside behaviorist when we first sat down with the sheriff's office, but that was it.  She was there for one meeting and she was not involved with the actual writing of anything.

Q     Okay.  So you said when you first sat down with the sheriff's office.  So is this a training that you put together for law enforcement generally?

A     Yes.

Q     Okay.

A     You want the story on that?

Q     Yeah.  That would be great.  Thanks.

A     Okay.  So in 2013, 2012 -- 2013 the sheriff's office approached me and asked me to do a training because they were -- just got out of a lawsuit for shooting a dog on a warrant, and they just had shot a dog again in the Town

**RENO DiDOMENICO**

**of Perinton, and they wanted to do some training for their officers, so there was a civilian group who came to the sheriff and asked them to put on some sort of training for the officers. That's where this other behaviorist was part of. We sat down with them, they told us what we wanted -- they wanted. We said we could do it. So I worked with the commander of the sheriffs at the time, Dave Phelps, who also was a -- some type of tactics instructor, and with the help of Rebecca, myself and him, we put together this PowerPoint, and then it was given to the sheriff's office first and then the city police.**

Q    Okay. You said one name from the sheriff's office, a commander. Dave Phelps you said?

**A    Dave Phelps. Yup.**

Q    F-E-L-T-S?

**A    P-H-E-L-P-S.**

Q    Great. Thanks. Okay. So -- and do you remember if that lawsuit was Carroll versus the County of Monroe?

RENO DiDOMENICO

A    Yes, that was it.

Q    Okay.  So you said after Carroll, then another dog was shot, and that's when they came and asked for the training?

A    Yup.

Q    Okay.  All right.  And do you remember when you first gave the training to the sheriff's office?

A    It was, I think, November and December of '13.

Q    '13?

A    I don't have it in front of me, so --

Q    Okay.  The training, the first page is titled 2014.  So I don't know if that helps you remember at all.

A    Well, no -- well, it was before the City, and the City -- that was the updated one for the City in 2014.

Q    Okay.  Yeah.  I believe the City was November 2014, if that sounds right.

A    Yup.

Q    Okay.

A    So basically the only difference

**RENO DiDOMENICO**

**between the sheriff's version and that version is I added implied immunity.**

Q You added the slides about immunity?

**A Yes.**

Q Okay. I'm going to go back up and ask you some more kind of background questions about that stuff. In addition to what you already told me, did you use any other resources to learn about dog behavior to design the training?

**A Yes.**

Q Okay. What was that?

**A Commander Phelps and myself actually attended a training down at Alfred University that was given by Randall Lockwood from the ASPCA, and it was a seminar for law enforcement and first responders on how to recognize dog behavior.**

Q Okay. And who is Randall Lockwood?

**A Well, at the time he was the head behaviorist for the ASPCA. He's the one who pretty much in the animal world was the expert in animal behavior, especially shelter animals,**

**RENO DiDOMENICO**

**but they also did the -- he did a program for law enforcement and first responders.**

Q     Okay.  You said that program was at Alfred?

**A     Correct.**

Q     And did that program -- was it specific to dogs or did it include other animals as well?

**A     It was pretty much dogs, if I remember correctly.  I mean, you're talking like the summer, maybe, of 2013.**

Q     Okay.  Did you attend any other trainings about dog behavior?

**A     For this course, no.**

Q     Okay.  Did you use any other resources, like written materials or research?

**A     Yeah.  Well, the only other thing was the Department of Defense was also pretty hot on teaching law enforcement about dog encounters and they came out with a handbook. Do you want the title of it?**

Q     That would be great, if you have it handy.

**A     It's The Problem of Dog-Related**

**RENO DiDOMENICO**

**Incidents and Encounters.**

Q    Okay.  And can you tell me about that?

A    It's just a handbook for law enforcement.  It discusses how to, you know -- why it's important to understand the importance of not just shooting a dog, that there's ways to calm a dog down.  They give statistics on -- some of those are in the PowerPoint, but they give statistics on, you know, how many dog bites there are and how many people actually die from dog bites a year.  So it's kind of trying to tell the officer, or whoever is reading the book, that, you know, it's not going to be the worst thing if you get bit by a dog.  It's basically a buildup of trying to change the mentality of officers from just shooting the dog and that there's other options you can do.

Q    And how did you incorporate that into the PowerPoint?

A    So in the first part -- so basically what I did -- and again, this was just an awareness course.  This isn't -- I'm

RENO DiDOMENICO

not going to make anybody an expert in dog behavior.  This was, hey, these are some things you can do out there.  It wasn't -- I say this right from the beginning, this is not a do not shoot the dog.  This is a there's options, because everyone is usually trained to just shoot dogs.  There are some options to think about.  So basically knowing cops, you have to make -- get them on the same page as you to make them reassured.  So that's how that was used.  So I used a portion of that pamphlet to show them that, you know, you're going to be encountering dogs out there, that there are dog bites out there and, you know, it's not going to be the worst thing in the world if you do get bit, but, you know, shooting a dog in a nonemergency-type situation is not beneficial for you.  There's other options you can do.

          Q     Did you -- so I have some follow-ups on that.  You said that usually everyone is just trained to just shoot the dog.  Is that what you said?

          A     Correct.

          Q     So is it your understanding that

RENO DiDOMENICO

that was your training at the sheriff's department?

A       Well, I mean, I shouldn't really have said that.  But basically that's the mentality.  The mentality is if there's a dog attacking or acting aggressive, you shoot it.  I mean, that's -- now, is that what actually happens out in the real world?  No.  Cops can use common sense.  But for certain situations -- like for myself and even some people that I've taught, they would say, I would take a bite before I shot a dog.  So, you know, not every cop thinks that way, but for the main part, you revert to training.  You're trained to do something.  If you're trained, hey, a dog comes at you or a dog attacks you, you shoot the dog.  My thing was, well, before that dog attacks you, there's things you can do before you shoot the dog.  So basically it's an awareness course for officers.  I'm not teaching them to be experts in dog behavior or handling dogs.  I'm teaching them how to be safe in the field.

Q       So basically you're teaching them

RENO DiDOMENICO

how to be safe in the field and tools for avoiding shooting the dog?

     A     Mm'hm'.  Correct.

          MS. JONES:  Objection.

     Q     Okay.  I'm going to come back to that a little more later.  Based on the trainings that you attended -- well, let me back up, actually.  I'll withdraw that.  Now, you said Department of Defense.  I think it might have been the Department of Justice.  Is that right?

     A     Yeah, probably.

     Q     Okay.  And did you ever watch the videos that the Department of Justice released with that --

     A     Yes.

     Q     -- encounter training?  Are those videos incorporated into your PowerPoint at all or any of your trainings?

     A     No.

     Q     Okay.  Do you give the handouts from the Department of Justice with any of your trainings?

     A     No.

RENO DiDOMENICO

Q     Okay.  Based on your trainings that you received before 2014, did you feel that you had a good understanding of dog behavior?

**A     Well, I understand dog behavior. What do you mean by good understanding?  Like an expert?  I'm not an expert in dog behavior. I'm an expert in police procedure.**

Q     Okay.

**A     My -- my -- this whole course was not -- again, not in dog behavior.  It's in police survival tactics.**

Q     Okay.  So police survival tactics, and police are already trained to shoot dogs, it's really a way to survive but also not kill the dog.  Is that fair to say?

**MS. JONES:  Objection.**

**A     Yes.**

Q     Okay.  And what aspects of dog behavior do you think are most important for officers to understand?

**MS. JONES:  Objection.**

**A     I can still answer.  Right?**

Q     Yeah, yeah.  Unless one of us says, don't answer that.

RENO DiDOMENICO

A    Repeat the question again.

Q    What aspects of dog behavior do you think are most important for police officers to understand?

MS. JONES:  Objection.

A    The most important is the first initial reaction, what they're observing when they first encounter the dog.  You know, what signs are they showing you.  There's a portion in the thing about loose and wiggly and stiff and still.  You have to identify what you're dealing with.  Okay.  And that's what's most important, because you can identify a playful dog if you use that little handout I give.  You can identify a playful dog and you can tell what dog is attacking you and being aggressive. It's the other ones, the other four that I have in there.  And again, there's many other postures a dog can give.  I'm not going to go into all that with them.  I'm doing basic.  So those other ones are what we talk about. Basically I usually refer to those dogs as more of a standoff.  It's kind of like having a person with a knife and you have a standoff

**RENO DiDOMENICO**

**with that person and you're going to try to talk that person down, is basically the same thing you're going to do with a dog. You're going to try to make them feel comfortable. Again, those are all -- what I teach is those are all nonemergency-type situations. If you're going into a domestic, or you're going after a robbery suspect, or you're, you know, doing a warrant entry and stuff like that, you do what you've got to do. Hopefully you don't shoot the dog, but if you don't have time to work with it, you've got to do what you've got to do.**

Q    So it sounds like you're saying the training mostly deals with situations that have more time for the officer to observe and react?

**A    Correct.**

Q    Okay.  There's one training on your resume I wanted to ask about, so let me put back up Exhibit 1.  One second.  Let's see.  In 2014, so I highlighted this one training, September 2014, animal behavior training, Kelly Bolland.  Is that a different training than the training you referenced before or is that the

RENO DiDOMENICO

same training?

A       Which training are you referring to that I referenced before?

Q       Before, you referenced the training with David Phelps, I believe, and you said that there was --

A       Yeah.  That was a different training.  This was -- this was a training by Kelly Bolland who is a person that Lollypop used as a reference to train our shelter staff, and they pretty much had everyone go to the training that was out here in our auditorium.  It's basically just, you know, how to use positive reinforcement instead of negative reinforcement, is basically what the training was.

Q       Okay.  Did you utilize this training in developing the PowerPoint or was this just like general shelter basics?

A       This is shelter basics.  It's not part -- it wasn't anything to do with, you know, this course at all.  It was just something they wanted everybody here to have, and so I went to that training.

**RENO DiDOMENICO**

Q    Got it.  Okay.  Actually, now that I'm looking at your resume again, let me put that back up.  Right above that --

A    **2013 April.  I saw that, too. That's the Randall Lockwood course.**

Q    Okay.  So that's the Randall Lockwood course?

A    **If you want to put it back up, I can definitely confirm it.**

Q    Let me put that back up so you can confirm that.  Okay.  So April 2013, Responding to Dog Fighting and Dangerous Dogs, Best Practices for Law Enforcement?

A    **Yup, that's the one.**

Q    Okay.  So that's the one that was incorporated into your training?

A    **Correct.**

Q    Okay.  Let me take that down.  I had some questions that you already answered.

A    **Sorry I jumped ahead.**

Q    No.  It's very helpful.  I was going to ask you what inspired you to design the training, but I guess my question will be, was there anything, in addition to the

RENO DiDOMENICO

sheriff's office reaching out to you and asking you to put together this training, that inspired you to put together the training?

A     Not -- no, not particularly.  I mean, basically it was just the sheriff's office saying, hey, we need your help.  I figured I'd help my whole department out.

Q     Okay.  And I'm just going back to that Randy Lockwood training.  It was entitled Responding to Dog Fighting and Dangerous Dogs. Was that focusing on dogfighting complaints or did it have --

A     There were two parts.  So one part was dealing with, you know, investigating dog-fighting, and then the other part was for, you know, the body language and tools, et cetera. Other ways to handle a dog, a defensive dog.

Q     Okay.  And when you say tools, do you mean like a baton and pepper spray?  Stuff like that?

A     Yeah.  I think they went into baton.  They also talked about umbrellas and fire extinguishers and other -- you know, they give you ideas and concepts, which, again, was

RENO DiDOMENICO

part of the stuff I used in my course.

Q    Got it.  And can you give us some more details about what your goals were when you created the training?

A    My goals were to reduce the dog shootings in Monroe County, and whether it was with the sheriff's office or the city police. Of course the City had more encounters at that time with dogs than the county did.  So my goal was to kind of change perception and training that they probably would have had in the past, but just reverting to pulling your gun and shooting a dog and trying to give them other options to do besides just shoot the dog.  The goal was to reduce the amount of shootings, which it did.  It did help.

Q    And did you feel that there was a lack of training or resources available to officers when it came to interacting with dogs?

MS. JONES:  Objection.

A    At that time I don't necessarily think there was a lack of training.  I think -- you know, I've been doing this, you know, since mid 2000, so fifteen, sixteen years, seventeen

RENO DiDOMENICO

years, if you count the rescue stuff. Perceptions of animals have changed and how people view animals. Again, during my lecture, I talk about how, you know, early on in history people didn't consider their pets as family members, and over the last twenty years or so how that has changed. Even when I wrote that, and I believe it's also in the Department of Justice, it says 61 percent of people view their pets as family members. That's now almost 90 percent. So even in that ten-year span, it's gone from 60 to 90. So I think perception has changed. I don't necessarily think there was a lack of training. I think that it was just new training that needed to be given, and that's what we tried to do.

Q    What training did you get as a sheriff's deputy about interacting with dogs?

A    Basically it was try to avoid them, call dog control. Again, if a dog attacks you, you have to shoot it. Again, I don't think necessarily that training has changed, and I don't think that training is bad. If a dog is charging you, you have to do everything you can

RENO DiDOMENICO

in your power to defend yourself. That's what I tell the officers. I also tell them about my personal experience with dogs being here, you know, and one being that I was actually attacked by two pit bulls and I defended myself with a baton and never shot them. So, you know, it goes to that. Again, each officer has to make their own decision, but they also have to -- just like anything else, they have to be able to justify their actions. That's why we also talk about that. That's why the implied immunity is in there. That's why the body postures are in there. They have to justify their action as to why they did what they did.

Q Have you ever heard of an officer being disciplined or required to get retraining as a result of an incident where they shot a dog?

A No, I have not.

Q You might have gone over this a little bit before, but was there anything else that you hoped officers would take away from the training?

A No. Not -- I mean, I think it

**RENO DiDOMENICO**

pretty much covered it. Like I said, it's an awareness course. I wanted them to rethink. I wanted them to think about not just shooting a dog because it's a pit bull. You know, we go over that too, different types of breeds. Just because you're dealing with a golden retriever doesn't mean that dog is not going to bite you. So, I mean, just -- again, like I said, it's an awareness course to give them things to think about. There's some officer safety stuff I put in there. That's what the Nampa video is. It's kind of like their final -- they call it final test, but -- because they have to tell me the danger signs and stuff that are in that video and things they could have done better after they've gone through the whole training. One of the things in that video is the backup officer is pointing a gun at the officer that's being attacked, because that guy reverts to his original training which is to pull a gun and point and shoot the dog. Again, across the country there's a number of incidents where officers have shot each other because they're shooting at a dog. So I try to send that

**RENO DiDOMENICO**

**message home with them, too, is that just because you were trained to do one thing doesn't mean it's always the best thing to do, and I'm trying to change that training. I'm trying to get that in their heads, that, you know, shooting a dog is -- to protect yourself, yes, but you don't always just pull a gun and just shoot a dog.**

Q    Okay.  So I'm going to have some more questions about that later, and I'll probably want to put up the video also.  It sounds like you're saying -- you're trying to teach them that shooting should be the last resort?

**MS. JONES:  Objection.**

**A    I wouldn't say -- I wouldn't say last resort.  What I'm saying is, you know, what you've been trained and what you've been told doesn't necessarily mean that's what you do.  It's to change perception.  And again, when -- when I started this, there was a lot of older officers.  In Monroe County there's a recruit class that goes through as well.  I also talk to local FBI here and the local ATF**

RENO DiDOMENICO

here, the marshal service.  They're all very receptive to this training because it does change their perception.  A lot of people come up to me and say, I never thought about this.  It's a lot of commonsense stuff that they just don't think about because no one's put it in their head.  Training is preparing yourself for when you're in that real situation.  So if you're going to revert to that training, what I'm trying to tell them is, hey, you pull a gun because you think that's what you do, you fire a round at a dog charging your partner, most likely you're going to hit your partner.  So they're going to think about that when it actually happens in real life.

Q     And one thing that you said was that the officers have to know how to justify their actions if they shoot the dog.  Correct?

MS. JONES:  Objection.

A     Well, it's not how to justify. It's like anything else.  You need to justify it to themselves.  So it's like -- it's like anything else in police work, what am I looking for, and you need to put names to it.  It's

RENO DiDOMENICO

just like defensive tactics.  There's names to different  -- you know, arm bars.  You know, I took this guy down by using a common peroneal.  I used -- you know, whatever it is.  You need that nomenclature so that you can write it out and sound professional, is basically the same thing.  What type of dog were you dealing with.  I'm dealing with an offensive, aggressive dog.  You know, why did you shoot it?  Because it was coming at me.  Instead of just, well, this dog ran off the porch and I shot it.  You need to identify what type of dog you're dealing with.

Q    Is the training more focused on preventing dog shootings or explaining the shooting after the fact?

A    Preventing dog shootings.  It's more on these are the tools you can use to not have to shoot the dog, but if you shoot it, you better be able to identify what you were shooting, because if you're shooting a playful dog, then I'm not going to defend you.

Q    When you designed the training, did you look at any other law enforcement agency's training materials on dog-related incidents?

RENO DiDOMENICO

A    No.  Pretty much at that time -- again, Commander Phelps was more in tune with the national trainings at the time.  He said there really was no training available in 2012, 2013.  So he said we're basically starting somewhat of a training.  Besides Randall Lockwood identifying things that he had, there was no official law enforcement training.

Q    Other than the Department of Justice training that we talked about that was published in 2011?

A    Yes.  But again, that's not an official training.  It's a booklet.  It's not really a training.

Q    It was a booklet that was published and freely available to law enforcement agencies across the country?

A    Correct.

Q    Were you aware of the policies and documents on dog encounters produced by the LAPD in 2007?

A    No.

Q    Did you rely on any specific laws or regulations when designing the training?

RENO DiDOMENICO

A    Basically what's written in the Ag & Markets Law about encountering dogs and shooting dogs.

Q    Okay.  And what does that say?

A    Well, that you can shoot a dog that's posing an imminent threat to a person or another animal.  That's basically what it is.  Euthanasia of a dog is only supposed to be through sodium pentobarbital under state law.  So those are the ones -- again, that was to let them know that, you know, you just can't go shoot a dog.  There's other options.

Q    And do you feel that the training emphasizes deescalation and avoidance of lethal force against dogs?

A    Yes.

Q    And that was your intention, right, to emphasize deescalation and avoidance of lethal force?

A    Correct.

MS. JONES:  Objection.

Q    And how do you think the training encourages officers to avoid using lethal force?

RENO DiDOMENICO

A       How does it encourage them?  I give them the material.  Whatever they take, they take.  Like I said, I have a lot of people who come up and compliment me on the course.  I've also had people in the course tell me, well, I'm going to -- I'm just going to shoot the dog.  I don't care what you're telling me.  So you're going to have those types of people no matter what.  I'm giving them the material, I'm telling them about implied immunity.  If you break that immunity, then it's on you.  And again, I can only be a trainer.  I can't tell them what to do in the field.  My hope is that the people I can reach, I reach, and the other ones, again, they're on their own.

Q       Do you give any feedback to the department if officers come up to you and, for example, say what you just said, I don't care what you told me, I'm just going to shoot the dog?  Do you ever reach out to their supervisors or commanders and tell them, hey, look, you know, you've got to talk to this guy?

A       I haven't really done that directly.  I have talked to -- I did talk to

RENO DiDOMENICO

some friends who were command officers and said, hey -- I didn't give names, but I said, you have some guys who just aren't receptive of this.  That was pretty much it.

Q     Did that happen after the training that you gave to the RPD in 2014 with any officers?

A     That officers tell me that?

Q     Correct.

A     I get that in every class.  Yeah.  There's just some people are afraid of dogs and they're just like I'm afraid -- deathly afraid of dogs, I was bit when I was younger.  You get that in every class.  Again, I've taught this to over a thousand officers in New York State, and I get it in every situation.

Q     Are there any specific slides or sections in the training that you feel are particularly important for deescalation or avoidance?

A     Any slides?  No.  I go through -- you know, being a former DARE officer, I'm kind of animated when I teach.  So when we get to the slide on how to deal with dogs and how to

**RENO DiDOMENICO**

**talk the dog down, it's just a slide with writing in it. It says asking what's appeasement and confidence, and I demonstrate how to avoid a dog by going through this little act.**

Q     And do you think the training could have done more to emphasize deescalation and avoidance of using lethal force?

**A     I don't think so.**

Q     How much of the training or what percentage of the training is devoted to the use of nonlethal force versus lethal force?

**A     It usually lasts anywhere between an hour and a half to two hours depending on questions, and I would say using nonlethal force is probably a good forty minutes of the training.**

Q     So about half?

**A     About half.  A little less maybe.**

Q     And just going back to what you were saying before about having provided the training to thousands of officers.  That's not something that you listed in your resume, is it?

RENO DiDOMENICO

A    No.

Q    Okay.  How often do you provide this training?

A    I probably do it -- I do it at two different academies, the Monroe County and Genesee Community College Regional Academy. For awhile -- before COVID, I was probably going around at least once a year doing in-service to other police departments or people invited me to conferences.

Q    And, I'm sorry, you said you did the police academy for Monroe County and there was another one?

A    Genesee Community College.  They have a regional police academy.

Q    And how long have you been doing the training at the Monroe County Police Academy?

A    They implemented it -- I don't have exact dates -- probably 2017-ish.  I don't know.  I should just say -- it was a couple years after I trained the City, so it was either '16 or '17.

Q    Okay.  So would that be every

RENO DiDOMENICO

recruit class from 2016 or '17, whenever it began, has gotten that training?

A    Yes.

Q    Okay.  And is it the same PowerPoint slide that we put up and reviewed that's been marked as Exhibit 2 for the deposition?

A    **It's pretty much the same.  Again, there's certain updates and stuff that have happened since then, but it's pretty much the same.**

Q    Okay.  And were there any recruit classes that were missed because of COVID?

A    **No.**

Q    Okay.  So you've done it in person for every recruit class since they started having you present to the academy?

A    **Yes.**

Q    Okay.  And so that's, you said, a one and a half to two hour block of training at the academy then?

A    **Yes.  It's actually four because I do the animal cruelty law portion first, which is mandated by the state, and then they give me**

**RENO DiDOMENICO**

**two more hours to do this dog encounter training.**

Q    Okay.  So the animal cruelty portion is mandated, and then --

**A    Mm'hm'.**

Q    -- the second portion that we're talking about with Exhibit 2 is not mandated?

**A    Correct.  By the state.**

Q    Got it.

**A    But it has been given to the Department of Criminal Justice Services.  They liked it, but they didn't want to implement it in the curriculum.**

Q    When you say -- okay.  So it was given to the New York State Department of Criminal Justice Services?

**A    Correct.**

Q    But they didn't officially adopt it and require it for all -- for statewide?

**A    Correct.**

Q    Did they give you any feedback about why they didn't want to implement it statewide?

**A    It wasn't so much feedback.  It was**

RENO DiDOMENICO

like they liked it, the issue is they just don't have enough time to fit everything in. Monroe County kind of does it because it's kind of homegrown, so they just do it. New York State, they don't want to implement it. Basically what they said is, we would be better off doing seminars than to try to implement it in academies across the state.

Q    That's what DCJS said?

A    Yes.  Scott Neff.  He was the -- he's the head of the training for the Department of Criminal Justice Services. N-E-F-F.

Q    And when he meant seminars, is that like a less formal training that --

A    Yeah.  It's an option.  You set up a seminar, you work with -- like we've had seminars here ourselves on different things for animal welfare, and it's just, hey, we're offering this for law enforcement, and you can go across the state and jump in on a seminar and teach it and would they recommend it.

Q    Got it.

A    But that's a lot of -- I was hoping

RENO DiDOMENICO

that I didn't have to travel.  I was hoping that they would just accept my curriculum, put it in the academy and then have other people like train-the-trainer-type situation.  They go teach it at different academies.

Q    So to date you haven't done that sort of train the trainer?

A    No.

Q    Okay.

A    No.  They've pretty much -- again, they pretty much told me that you can just get with these other groups, and if someone is having a seminar, try to jump in on their seminar.  I was like, well, I don't want to travel down to Albany and do a training.  If I can train someone in Albany, they can do the training.  Like I said, I'm just a police officer who has some knowledge in animal welfare and some basic behavior.  It's -- I'm trying to teach the law enforcement mind, I'm not trying to teach behavior.  So any other law enforcement officer with instructor developmental training given by the state could teach this.  Once they go through it and learn

**RENO DiDOMENICO**

**the curriculum, they can teach it, because you're teaching law enforcement tactics, you're not teaching behavior. You're showing recognition, but you're not teaching behavior.**

Q    Okay. I'll have some more questions on that. I have a couple of questions. You said earlier that you're not a dog behavior expert, you're an expert in police tactics. Right?

A    **Mm'hm'.**

**MS. JONES: Objection.**

Q    Have you ever been qualified as an expert on any topic in any court proceeding?

A    **Officially, no.**

Q    Like you've never been hired by a law --

A    **No.**

Q    -- enforcement agency to testify on their behalf as an expert?

A    **No.**

Q    And then regarding the "train the trainer" type of thing, have you ever trained anybody at any local law enforcement agencies, like the RPD, about how to train their officers

RENO DiDOMENICO

on interactions with dogs?

A    No.

Q    Okay.  Back to some questions about your training.  What nonlethal tools are discussed in the training?

A    Well, we talk about the baton.  We talk about -- well, flashlights and poles and sticks.  We talk about CapStun.  We talk about fire extinguishers.  What I really try to send home is the umbrella portion.  Again, that's a Randy Lockwood thing that I stole from him.  Basically the umbrella portion basically means barrier.  So what Randy Lockwood talked about was that they use an umbrella to set up a barrier between them and an aggressive dog, because animals don't go through barriers, they go around barriers.  We talk about umbrellas, but the umbrella portion is basically to let the officer know get something between you and the animal.  For instance -- if I'm talking too much, just let me know.  I went into the City a few years ago after I did this training, and we were at an abandoned house where there was possible dogs in the basement .  They weren't

RENO DiDOMENICO

sure if they were loose or not.  I told one of the officers to grab a door that was off its hinges.  He goes, what?  I go, grab that door, and he said, for what?  What is it?  He said, oh, it's a barrier.  So he remembered that portion of the training, that you use a barrier between you and the animal.  So we talk about that.  There's also -- we talk about taser and that it would work on a dog, but it's not recommended because basically you want the dog contained.  The dog recovers quicker from a taser blast than a human does, and then you just have either a more aggressive dog or you have a dog that's fearful and now it's running the neighborhood.  So we talk about that.  We talk about citronella spray.  We talk about -- there's all these things that we talk about that are nonlethal.

Q     And what do you teach them about using a baton?

A     To strike the dog or use it in front of a dog to keep the dog back.  A dog is going to bite the first thing that is put in its face , so instead of -- instead of the dog

**RENO DiDOMENICO**

**biting you, it's biting the baton. That's when I tell my story about me being attacked and that I defended myself from two pit bulls using a baton and not shooting the dogs. That's pretty much what we discuss. And then the other items, like the flashlight and the sticks and the poles, are basically, you know, if you can't get your baton, you have your flashlight in your hand, use the flashlight. Poles or sticks or brooms or whatever. Something that you can keep the animal back at bay with that item. Again, these are dogs that are in a standoff position. These aren't really attacking dogs. These are dogs showing aggression and fear, and you should use those items to get yourself out of that situation.**

Q   Another thing you mentioned before was CapStun. Is that also known as --

**A   Pepper spray.**

Q   -- pepper spray? Okay. Do you tell officers that pepper spray is effective on dogs?

**A   I tell them that, again, it's a standoff tool that if a dog is attacking you,**

RENO DiDOMENICO

pepper spray will not work. There are some studies on that. So basically if a dog is running at me and I spray a dog with pepper spray, it's going to bite me anyway and then realize it got sprayed. Pepper spray is used more in that standoff situation. A dog is barking at you, it's showing signs of aggression, you spray the dog and try to get him away from you.

Q    And what are the studies that have shown that pepper spray isn't effective if a dog is attacking you?

A    I don't have it in front of me right now. It's something I read. I believe it -- in one of the bigger police departments, either Detroit or Chicago, somebody did a study and they found that pepper spray will work on a dog, but in the situations that I discussed, it's not going to work on an attacking dog.

Q    Are you aware of the Baltimore study that only reviewed incidents where dogs were charging?

A    No.

Q    And are you aware that in that

RENO DiDOMENICO

study, pepper spray was a hundred percent effective for attacking dogs?

     A     Again, I'm not familiar with it, so I couldn't comment on it, but I'd like to probably read it and give my opinion on it.

     Q     Sure.  If you were hypothetically provided with that study, is that something that might change the way that you train officers?

          MS. JONES:  Objection.

     A     Again, I'd have to look at the study and discuss -- and look at what the situations were when it was used.

     Q     Are you aware of any specific instance where an officer tried to pepper spray a dog and it was sprayed but still ended up biting the officer?

     A     Am I aware of anything?  No.

     Q     Do you instruct officers on the use of catch poles?

     A     No.

     Q     And when you were talking about umbrellas earlier, you mentioned other items to use as a barrier.  Is an umbrella kind of a

RENO DiDOMENICO

general term that you were talking about for putting a barrier in between the officer, or umbrellas specifically, are they especially useful?

A    The umbrella, it's a learning technique.  Well, I use it as a learning technique.  When Randall Lockwood was talking about it, he was saying that in a controlled environment, they use umbrellas when they're dealing with an aggressive dog because if the dog becomes aggressive, they can pop open the umbrella, it kind of scares the dog and it forms a barrier.  If the dog tries to move around them, they can easily move the umbrella between them and the dog.  I do it so the officers remember barriers. I bring up umbrellas because I go into, hey, you get issued umbrellas, correct?  They all laugh, no. And I go, well, here's a thing, and I go into umbrellas and how -- the behavior issues with the umbrellas, and then I said, but if you don't have an umbrella, think about other items that you can use as a barrier, a chair, a door, a piece of wood -- a big piece of plywood.

RENO DiDOMENICO

Something to keep between you and the dog. Again, and then I revert back to those videos, like New York City, and I show them -- you know, I go back and I say, could they have used an umbrella. You don't think there were umbrellas in New York City on the street. I go, you use umbrellas to form barriers around that dog instead of trying to get people away from the dog. You've got a man that's down having a seizure, you want to contain that dog. You already have animal control coming. Contain that dog. Use umbrellas or whatever you can to form barriers around that dog. So we go over that. The same with the baton. Could they have used a baton in that situation. We'll go over that. Those videos, again as an instructor, I have to teach and make it sink in. The only way I can make it sink in is by using these little training techniques so that they remember, and that's how it's all put together.

Q    Are there any nonlethal tools you considered including but you didn't put in the training?

RENO DiDOMENICO

**A     I tried to use what we use here locally that most officers have.  As a matter of fact, I didn't even realize myself.  I don't know if it's changed since then.  In the sheriff's department we had fire extinguishers in our car.  I learned RPD does not carry fire extinguishers.  I tried to use the items that would be -- that we normally have here locally and that would be readily available to them in the field.  They're not issued items like a chair or something.**

Q     What other guidance does the training provide on how to use nonlethal force against dogs?  It sounds like before you were saying basically it's only appropriate in the situation where a dog isn't charging at you. Is that correct?

**A     For nonlethal?**

Q     Correct.

**A     You want to stand off.  Either you want to talk the dog down to make him friendly, or if you can't make him friendly, he's just a real aggressive dog, then you want to get your six out of there, so you want to back out of**

RENO DiDOMENICO

there and get out of there and use instruments to defend yourself or keep that standoff between you and that dog.  Does that answer your question?

Q      Yeah.  I think for the most part. You know, so I guess my follow-up to that would be, what kind of guidance does the training provide on using nonlethal force in the situation where a dog is charging at an officer?

A      Well, I tell my story about the baton, but what I teach is, like I said earlier, everyone goes home safe and uninjured. That's number one in police training, you go home at night uninjured.  So it's up to that individual officer to make the determination whether or not they're going to shoot that dog. A dog that's charging you and you shoot it, you can do it, but you better be able to justify why you did it.  So again, that's why we go over the body postures, what was that dog presenting prior to you shooting it, was it acting as an active appeasement.  What was it doing before it became an aggressive dog, and

RENO DiDOMENICO

then -- or was it aggressive right from the start and you had to shoot it. We talk about a fourth continuum, like animals, dogs and police officers. Police officers can start right at deadly force or they can start at, you know, nonlethal techniques. We talk about that. We talk about dogs have the same thing. They vocalize. They do inhibited reactions. They do aggressive reactions. Where are they on that continuum. Where are they. We talk about how to identify those behaviors, and the officer ultimately has to make that decision. I don't tell -- again, I don't tell them not to shoot the dog. I tell them, you need to identify what I'm teaching you so you can justify your actions. If you -- like I said, and that video out of Lubbock, Texas, I tell them right then and there, if you videotape yourself doing something stupid, you're on your own. I'm going to get on the stand and tell them you did something stupid, okay. I mean, I'm giving them the option to make that determination whether or not they're going to use deadly force on that dog. That's for them

**RENO DiDOMENICO**

**to make that decision. But if they shoot a dog that's twenty feet away that's acting aggressive because they were walking up to take a criminal mischief report, I don't think that's necessary. You're given tools how to back out of that situation.**

Q Do you talk about other considerations before shooting a dog? For example, use of force against a person, you've got to consider the totality of the circumstances. Correct?

**MS. JONES: Objection.**

**A Mm'hm'.**

Q Do you discuss similar considerations when an officer is confronted with a situation where they might shoot a dog?

**A Yeah. You've got to tell the story. Again, if you look at some of the lawsuits from that time, and even more recent, the Hell's Angel lawsuit is a big one where they went in on a search warrant and, you know, they shot a dog. Most lawsuits or reports of shooting dogs, the officer just basically writes, I'm walking up, dog charged me, so I**

RENO DiDOMENICO

shoot it. They're not identifying what the dog was doing in professional terms. It's just like an aggressive person. What was that person doing. Once I say that to them, they understand it. You know, was it a no person, was it a yes person. Was this dog a no dog or was it a yes dog. So they have to be able to determine that in their head when they shoot the dog. It's the same thing.

Q Have you ever been asked to review any incidents by local police departments where a dog was shot to determine whether it complied with your training?

A No, I haven't. I wish they had on some situations. But locally, no. And again, we don't -- I'm just speaking locally in Monroe County and the City of Rochester. Most of the incidents that I heard about were pretty much usually justified. The ones I've heard about. I don't know -- again, I'm not even sure what the circumstances were in this case at all, so --

Q Do you think that certain bite prevention tools are more effective than

RENO DiDOMENICO

others?

A       Depending on the -- it all depends on the circumstances.  I mean, like I said, if a dog is being really aggressive and within a few feet of me, a baton may work better or pepper spray may work better than a barrier. If I'm, you know, fifteen, twenty feet away from a dog, I can use a barrier instead.  It all depends on that situation.  I don't think any one is better than the other.  It's just like any tool.  You know, I'm going to use the proper tool for that situation.

Q       And do you think that the inclusion of those bite prevention tools encourages officers to avoid using lethal force?

MS. JONES:  Objection.

A       I can't say what goes on in their heads.  Again, as I said earlier, as a trainer I give them what they need to do.  Whether they use it or not, that's up to them.  So, I mean, I would hope that they would.  I would hope that they would use those tools.

Q       Have you ever gotten any feedback from officers after they received your training

RENO DiDOMENICO

and told you, you know, in a situation where I might have otherwise shot a dog, instead I used an umbrella or a baton or OC spray?

A    I haven't had that. I did have an officer recently tell me that he was dealing with a dog inside a house.  He didn't shoot the dog, but the dog bit him and he blamed himself. We talk about that, too, in the class.  We talk about victim behavior and why dogs bite. Sometimes it's the victim behavior.  He said basically this dog was abandoned in the house and didn't have any food.  He saw a bag of food, so he reached down to grab the bag of food, and when he reached down, the dog bit him.  He said, that was fully my fault.  That was a City police officer.  He said, it was totally my fault.

Q    Do you remember who that was?

A    No.  We run into officers here and there.  I do not remember who -- who it was.

Q    Okay.  So --

A    They're a lot younger than me now, and I don't know half of who they are anymore.

Q    So that would have been someone

RENO DiDOMENICO

that maybe took your academy training?

A    Yeah.  I would probably say yes.

Q    And how did they reach out to you to talk to you about that?

A    We passed each other.  You know, I don't take calls as much, but I still respond into the City.  I think this one was at the academy.  I was there for a meeting with the Monroe County chiefs of police, and it was in passing.

Q    And so can you talk a little more about what you teach officers about victim behavior and how -- in your slide you say -- well, let me just put it up so we're all on the same page here.

The PowerPoint, we're on slide 17 of 51.  So factors contributing to dog bites, and at the bottom it says, "Victim behavior."  Then these notes at the bottom, these are for you, right, --

A    Yes.

Q    -- when you're presenting?

A    Yeah.  They're also done as -- for -- they're done for me, but they're also done,

**RENO DiDOMENICO**

**like we talked about before, if anybody else wanted to teach this, they could read those notes so they could teach it.  I'm usually there, but what if something happened and they had it scheduled and, you know, I had an accident the day before, that someone else could go in and teach it.**

Q    Got it.  So down here it says, "Victim.  How person reads or responds to a dog's behavior is often the most important factor to determine whether a dog will attack or withdraw."

**A    Mm'hm'.**

Q    Is that something that you emphasize in the training?

**A    Yup.  What are you doing to cause the dog to react.**

Q    And so what are some of the things that you talk about that would cause a dog to react?

**A    Well, are you cornering the dog, are you acting fearful yourself to the dog, are you recognizing that the dog is afraid of you and you become afraid, turn around.  Once you**

RENO DiDOMENICO

turn your back on a dog that's aggressive, they can attack you. You know, trying to grab -- again, most likely trying to grab a dog that you think might be timid. When we talk about active appeasement or, you know, is that dog -- you think it's timid because it's down and it's crouched and you go up to it because you think you're going to save this dog and then you get bit because the dog is so afraid. What are your actions that you're doing. Are you trespassing on their property. That's another big one. Are you trespassing on their property. Why is the dog coming after you. Well, you're on their property. Stay off their property if you see it. So we talk about that. It's brief, but those are the things that are covered, not just on this slide but on other slides.

Q Okay. So do you tell officers anything else, like if they're -- they should yell at a dog if it starts to charge at them and that that might stop the dog from charging at them?

A Do I tell them that. Yes.

**RENO DiDOMENICO**

Q      So that would be, if we skip forward to the encounter --

**A      Mm'hm'.  543 I think it is.**

Q      Okay.  So on the next page, I think we're on slide 42 now, it says, "Communicate safety and appeasement.  If a dog approaches and is nonthreatening, allow him to investigate you.  Continue to speak to her.  Do not attempt to pet the dog."  The next one, "Communicate confidence or threat."  So if it's displaying threatening behavior, speak in a forceful voice.  Is that basically what we were talking about?

**A      Yes.**

Q      So -- and what kind of reactions do you get when you tell officers to do that?

**A      They just sit there and listen.  I don't know what -- there's really no reaction. We go over -- again, a lot of it is common sense.  So if I ask -- I tell them to say what their owner might say when the dog is behaving badly.  Bad dog.  You know, go sit down, go lay down.  Again, you want -- what I tell them, you want a standoff.  That dog is acting aggressive**

**RENO DiDOMENICO**

**because it's trying to size you up, right? Is this somebody I can go after or is this somebody being aggressive. We talk about, you know, don't stare at the dog, but you want the dog to feel a little unsure of you and to have that standoff so that you can back out.**

Q    I guess, you know, what I would consider the hardest part of being a police officer and interacting with a dog is they're going to charge at you, right? And so it sounds like what you were saying earlier is --

**A    Not true. Not all dogs that act aggressive are going to charge you.**

Q    Okay.

**A    So what you want is just like any -- it's like a person, you know. If I'm a police officer and I go in there timid and there's a guy acting aggressive, he's going to try to take advantage of me. It's the same thing. If a dog is in there -- if a dog is going to attack you, he's going to attack you. If there's a dog that's unsure and he's showing you warning signs that he's not comfortable with you being there and he's being aggressive,**

RENO DiDOMENICO

you want to be -- and he's not calming down by acting with safety and appeasement, then you have to become aggressive and tell that dog, hey, don't come near me either, and then you want to back out.  Not turn around, but you want to back out and get out of there.  Again, we talk with them about these are your routine -- nothing is routine, but your common nonthreatening-type calls.  I'm responding to a report.  I'm going for a request for information.  I'm walking a beat.  I'm whatever.  These aren't -- or you might get called for a stray dog.  These aren't there's a domestic in progress, there's a robbery in progress, I'm chasing a suspect through a backyard.  These are situations that are nonemergency in nature.  So if I can talk a dog down and get out of there, that's the best thing to do, and then you get a hold of animal control and have animal control deal with that dog.  That's what this is for.  It's not for the officer to go get a catch pole.  They're not animal control, they're police officers.  Their job is to protect the public.  If a dog

**RENO DiDOMENICO**

**becomes aggressive and charges them and they have to shoot it, then they have to shoot it. But again, they need to justify their actions.**

Q     Okay.  I've got a couple follow-ups to that.  So if we're talking about a situation that isn't an emergency and a dog approaches, the officer uses a verbal command, like sit or back off, or whatever, so that would be basically, I believe you talked about applying use of force continuum a few slides down.  Is that right?  Or maybe it's up.

**A     Mm'hm'.**

**MS. JONES:  Objection.**

Q     The verbal instructions would be in the beginning of the force continuum.  Right?

**MS. JONES:  Objection.**

Q     Is that fair to say?

**A     I'm sorry?**

Q     So --

**A     I was kind of --**

Q     One thing that you discuss in the training is the use of force continuum as it applies to dogs.  Correct?

**A     Yes.**

RENO DiDOMENICO

Q    And so talking to the dog, that would be the lowest level on the force continuum.  Right?  Giving it an instruction?

A    It depends on what instruction you're giving him.  If I'm saying to the dog -- if we go back to slide 42, if I'm saying to the dog, you know -- they might be just not real aggressive, maybe show teeth or barking at me because I'm at an open door to a house on a burglar alarm, I may be telling the dog, hey, where's your cookie, where's your bone, where's your ball, go find your ball, do you want to go for a walk, let's go for a walk.  Try to reduce that dog's -- you try to ease that dog's behavior.  Again, if the dog doesn't respond to those and continues to become aggressive, then maybe you say okay, it's time to back out, and now you might use the you stay there, bad dog, you stay there.  Again, you start -- you know, you start at lower level.  But if a dog is really aggressive, that doesn't mean that's where I start.  I mean, if it's really aggressive and maybe doing bluff charging and coming at me, I might be yelling at it and

**RENO DiDOMENICO**

telling it to stay where it is.

I have -- not to tell war stories, but that's just the way I am, but I had a -- I went to a house where a dog -- a German shepherd on a front porch, and I was able to walk up to the door and the dog was actively being aggressive until I yelled at it and told it to go lie in its bed. I was on the front porch. The dog went and lied in its bed and I was able to leave a tag on the door for the owner. When the owner called me, he wanted to know how I got on the porch, because he leaves the dog there so nobody comes on the porch. I just told him to go lie in his bed. So, I mean, that's how -- it's commonsense stuff. It's just telling the officer -- this whole thing, again, it's all commonsense stuff. It's just telling the officer and giving them those tools, because when they're in that situation, they're not thinking of it. Until you tell the officer these are some tools that you can use or these are some techniques or these are some speaking points you can use, they're not going to think of it on their own. That's what

**RENO DiDOMENICO**

**training is. Training is putting yourself in that situation before it happens so that when you get to that, you use it.**

Q So my question in these circumstances that you're describing are, you know, about the use of force continuum. So the next step up in the use of force continuum, if you give a verbal command, let's say the dog doesn't go and lay down in its bed, instead it's standing a few feet from you and barking, if you're going up the use of force continuum, would the next step be some sort of nonlethal bite prevention tool that you mentioned in the training?

**A If the dog is not attacking you, no. The next step is to get out of there. You just want that standoff. That's what I tell them in this slide, that it is -- you want to use those commands that are negative so that the dog stays away so you can get out. All right. Now, while you're backing out, it might be an idea to get a barrier, maybe pull your baton and keep it between you and the animal. Find a branch, find something to keep between**

**RENO DiDOMENICO**

**you and the animal.  I mean, those are the things that we go over.  Again, the officer is not going to think of that because he's not been in that situation.  The idea is to give them those ideas and tools, awareness so that they can defend themselves and try not to shoot the dog.  But again, if that dog then turns and -- let's say they're backing out, and as they're backing out, that dog charges them and becomes an offensive, aggressive dog and he has to shoot it, then I believe he's justified in doing so.**

Q     Do you teach officers, like you said, the second step would be trying to back out and get out of the situation.  Right? That's what you said?

**A     Mm'hm'.**

Q     So do you teach officers in that situation to take whatever bite prevention tool they might have?  Let's say they've got OC on their person, take out OC maybe with their non-shooting hand and as a backup to pull their firearm with their other hand and to try to use the OC first?

RENO DiDOMENICO

**MS. JONES:  Objection.**

Q     Is that something that you teach or no?

**A     No, I do not teach that.**

Q     Okay.  So -- but you do teach second-level verbal commands aren't working, dog is barking, you need to try to get out of there.  Your next option should be to try to use one of the bite prevention tools or non-lethal uses of force before resorting to a firearm?

**MS. JONES:  Objection.**

**A     As long as the dog is not charging. It's only if the dog is charging, then they should use deadly physical force.  Everything else is you use your improvised tools or your verbal commands.  That's the only thing you should be doing in a non-attacking dog situation.  And then, again, if it's to the point where you can't talk that dog down, then you need to get out of there and get somebody in there that knows how to handle a dog, or get the owner to handle the dog, which is even better.  Sometimes they get bit, too.**

**RENO DiDOMENICO**

Q    Okay.  So what guidance do you provide about when lethal force is appropriate? Only when a dog is charging or attacking?

A    Yes.

MS. JONES:  Objection.

A    Sorry.  Yes.

Q    Okay.  I want to back up and go through some of the other slides, because I believe there's a slide where you discuss that dogs sometimes run towards people for reasons other than aggression.  Is that correct?

MS. JONES:  Objection.

A    I don't know what slide you're referring to.  Are you talking about the behavioral slide that shows lunging?  Is that the one?

Q    So here we are on, I believe this is slide 16, animal force continuum.  So let's just back up and talk about this slide.  Can you explain what the animal force continuum means?

A    Mm'hm'.  So you're vocalizing, which is your -- again, I go through a whole little exercise.  But that dog that comes

RENO DiDOMENICO

running off the porch and starts doing that, pacing back and forth, barking, he's warning you to stay off his property. Inhibited bite might be as you're approaching the dog, he might be snapping at you, usually at a low level.  An uninhibited bite is a dog that's coming at you and bites you, okay.  And then a lethal is a dog that's trying to knock you down and get to your face and kill you.  That's what their continuum is.  I'm not telling the officer when to shoot at that point.  I'm telling them what the dog's continuum is in that situation.

Q     So what you say here in the last line at the bottom is that bluffing or threatening behavior is used in most encounters than actual attacks.  It sounds like more often times when a dog is expressing some kind of aggression, that it's not actually attacking. Is that what that means?

A     Yes, in certain terms.  Again, it talks about body language.  This kind of refers back to the New York City incident where -- this is all explained in the lecture, where the

RENO DiDOMENICO

dog turns and goes after the elderly woman. Never bit her, just bluff charged and snapped at her. Never bit her. And then he turned around, redirected his aggression to the officer, and basically did the same thing to the officer and charged him. Okay. And again, those are shown -- those videos were picked out purposely to show that, yes, he's justified in that situation to shoot that dog because the dog charged him. As somebody who is more familiar with dogs and just saw what that dog did, I might consider that a bluff charge. I may just use a baton, because a baton might work on that dog before shooting. So we -- all those videos I revert back to as learning exercises. Just because a dog is charging you doesn't necessarily mean that dog is going to attack you. It might be just telling you to back off, you're in my space, back off, this is my area. You have to be able to read that dog. If you feel that dog is going to attack and you shoot it, that's what you document and that's what you put down. But if you feel it's a bluff charge, you might end up getting bit.

RENO DiDOMENICO

Again, that's where a lot of officers say, I might take that bite, because they don't want to shoot the dog.

Q    Do you teach officers how to tell the difference between an attack and a bluff charge?

A    I can tell them, but it's perception. If I feel threatened -- it's just like any deadly physical force situation.  If I feel threatened at that point, I'm justified to shoot that person or dog, right.  It's the officer's perception.  I can tell them what to look for, but in that situation the officer has to make that determination.

Q    So just like any other deadly physical force situation except --

A    Right.

Q    -- the fact that -- well, let me back up.  Do you -- do you teach officers in your training that no police officer has ever been killed by a dog attack since 1913 in the entire United States?

A    Well, I don't teach them that, but I teach them about, just like I told you, from

RENO DiDOMENICO

the pamphlet, that, you know, there's so many dog bites a year and only fifteen people die per year on average from dog bites. So basically I'm telling them, if you get bit, it's not the worst thing in the world. Yeah, you're going to go to the hospital and probably get a sick day or two, but you're not going to end up in the hospital. You're not going to be mauled. Most likely you're just going to be bit. Again, we discuss the difference between uninhibited bites and lethal. Again, the dog is attacking you and trying to kill you, and that's when you shoot it. That's basically what I express to them. And then you go back to the Nampa video, when we were talking about that, and we discuss what type of dogs. They were lunging, charging dogs that were jumping on the officer, and we discuss that's a lethal dog so they see what a lethal dog looks like compared to the New York City dog that was coming in low and coming in at the officers and displaying bluff charging. So we discuss that.

Q    Okay. So those are the videos that you use to illustrate the differences?

RENO DiDOMENICO

        A       Correct.

        Q       Okay.  And earlier I said 1913, but it was actually, I believe, 1932, the last time an officer died as a result of being bitten by a dog.  I believe the officer died as a result of --

        A       Infection.

        Q       -- rabies or something.  Right?

        A       Yeah.

        Q       So it sounds like you do discuss that with officers.  You tell them, hey, look, the difference between a dog attacking you and, for example, a person attacking you with a knife or a gun is that this isn't actually a deadly physical force situation.  Right?

                        MS. JONES:  Objection.

        A       I don't use those terms, but basically what I tell them is not to worry about it.  So one of the things that a lot of my former colleagues tell me is, how do you deal with dogs, aren't you afraid of getting bit, and I say -- I tell them, if I'm worried about getting bit, then I'm going to get bit. Right.  So the idea is the bite's not going to

RENO DiDOMENICO

bother me, okay. I'm accepting that it's -- just like a police officer, hey, you're dealing with a guy with a gun and you're going to get shot. You don't deal with it, you just react. It's the same with a dog. If I worry about getting bit, I'm going to become timid and afraid and I'm going to end up getting bit. It's more survival. You deal with the situation as it comes. If you're worried about getting bit, then you're going to get bit.

MR. SHIELDS: What I'm going to do, and maybe it's a good time to take a break. I want to go over some slides and watch the videos after that. But maybe we can -- I don't know if anybody has a preference on how long. Ten, fifteen minutes, or if you want to take a longer break.

MS. JONES: I'd appreciate fifteen because I do need to eat something.

MR. SHIELDS: I was planning to grab a bite. Maybe we'll say 12:15. Take twenty.

MS. JONES: Sounds good.

RENO DiDOMENICO

THE REPORTER: We are going off the record. The time is 11:54 a.m.

(Whereupon, a recess was taken from 11:54 a.m. until 12:15 p.m.)

THE REPORTER: We are back on the record. The time is 12:15 p.m.

Q    And, Officer, we took a little twenty-minute break. Question: Is there anything that you thought about on the break, any questions you gave answers to that you want to either clarify or change your answer to?

A    Nothing that I said clarification, but I did look up your Baltimore statistics. As a matter of fact, it is in the -- I thought I saw that. It is in the Department of Justice, and those dogs weren't attacking, they were at a distance. They weren't attacking dogs. So your Baltimore statistic, and it was only twenty incidents, but the distance was three to eight feet and they were dogs that were posing dangers, they weren't attacking.

Q    Okay. Three to eight feet is what you said?

A    Three to eight feet were the

**RENO DiDOMENICO**

**distances.**

Q     Okay.

A     Basically that's what I teach.  I teach you can use it on a dog, but that's the only thing -- I was curious on that, so I looked it up.  Sorry.

Q     So basically your understanding is that if a dog is three to eight feet away and charging at you and you use pepper spray, that the pepper spray is effective from that distance.  That's what that Baltimore study showed?

**MS. JONES:  Objection.**

**MR. SHIELDS:  What are you objecting to?  He's answering a question about something he just read.**

**A     The way I'm reading it is if a dog is posing danger which is showing aggression. It's not a dog that's attacking.  It's showing aggression.  Like I said, pepper spray will work on a dog that's showing aggression.  On an attacking dog, he's going to go through it, bite you and then -- I don't have any incidence of that happening to prove that theory.  The**

**RENO DiDOMENICO**

**Baltimore study, as you've quoted, was, again, right out of the Department of Justice book, so -- and it just said posed a danger. It didn't say attacked.**

Q    Okay. And --

**A    I just -- I'm just clarifying what I teach. I teach attacking, not danger.**

Q    Got it. Is that consistent with what you train, that from three to eight feet, if a dog, let's say -- let's say a dog barks and you give a verbal command and the dog again barks, would that be a shooting situation if the dog is within three to eight feet, let's say?

**A    No. It has to show some further aggression than that.**

Q    Okay.

**A    I would -- again, at that point I would use -- I would use a pepper spray. When we go through the videos, I'll kind of go through that as well.**

Q    Okay, great. So what I want to do is just kind of go through some of the slides and then watch the videos as we get to those

RENO DiDOMENICO

slides.

A     Okay.

Q     So I'm going to put back up what we have marked as Exhibit 2, which is the PowerPoint presentation.  You know, I guess what I would ask, Officer, is as we go through it, you know, I kind of want to just run through some of the slides quickly, and then I guess some of them I'll have more questions about.

We're starting with -- I put up slide number 8 of 51.  My question is, in this third paragraph here, is that a quote from a statute or something, if you remember?

A     Yes.

Q     Okay.  And these ellipses here -- there's two sets of ellipses in the quote.  Do you remember what, if anything, was cut out in those ellipses?

A     It was just basically jumbo mumbo.  I mean, I can pull the section for you.  I believe it's 372 of Ag & Markets.  I can pull it if you want it.

Q     That was going to be my next

RENO DiDOMENICO

question.  372 of the Agriculture & Markets.

    **A     Maybe 374.  Yes, sir.  374.**

    Q     Okay.  374 of the Agriculture & Markets.  You were able to pull that up there?

    **A     Yup.  We're talking about by gunshot.**

    Q     That's okay. I don't think we need you to read it all into the record.

    **A     It's talking about the destruction of animals.  Right now I just can't find it.**

    Q     Okay.  But it is section -- excuse me a second.

    **A     It's a long section. I'm trying to find it.**

    Q     That's okay, Officer.  We can move on.  I just wanted to know where I can look up that section that was quoted.

    **A     Yeah.  It's under Article 7 of dangerous dogs, but it's in one of those, too. I mean, this kind of refers to it, but it's not the same verbiage.  That's what I'm running into here.**

    Q     So at the bottom it says, "Must know state laws regarding the taking of an

RENO DiDOMENICO

animal."  So can you -- do you teach officers at the training what the proper procedure is to take personal property, in this instance a dog?

A     When you say take, do you mean seizing the animal or shooting it?

Q     What do you talk about when this slide is up when you're talking about --

A     Basically I just quickly go over animals are considered property.  I'm trying to build up to the immunity portion.

Q     Okay.

A     So I'm basically letting them know that an animal is personal property and that it might -- by law, an owner can destroy their dog, euthanize their dog, and it has to be done using sodium pentobarbital.  Unjustifiable killing of a dog.  So it has to get done by that.  You just can't go shoot a dog.  This is general.  It's not just for officers, this is for everybody, all people.  I think part of this is from the dangerous dog section, the one that you have highlighted, but -- I know there's two sections that refer to imminent threat.  Again, this covers all people.  If a

RENO DiDOMENICO

dog or an animal is posing a threat, you can destroy it by gunfire. Basically that's all that is referring to. And then I go into the Fourth Amendment, because -- so now we know everybody is under, then we go into the Fourth Amendment. And again, a lot of officers are surprised that, you know, the destroying of an animal -- somebody's animal is considered personal property, or when you destroy an animal, you're basically seizing that animal because you're taking that animal away from a person, and that you could be in violation of someone's Fourth Amendment if you do that.

Q    When you discuss these two slides, or maybe further down, do you discuss any specific court rulings related to use of lethal force against a dog?

A    No.

Q    Okay.

A    I don't get that in depth with it. Again, I'm not trying to teach a law course. I'm not trying to teach -- I'm just trying to give them basically the reason why I'm here. The reason why I'm here is to prevent a dog

**RENO DiDOMENICO**

**from being shot that doesn't necessarily need to be shot, and I'm also there to give them the legal background that if you do, these are what can happen to you so that they pay attention, because I know cops. You've got to make sure that there's a reason for them to listen; otherwise, they're not going to pay attention.**

Q    And when you talk about immunity -- so this is just a quote. Right?

**A    Yeah.**

Q    And then -- what do you teach officers about immunity? So slides 10, 11 and 12. So --

**A    Mm'hm'.**

Q    -- municipal immunity and then individual officer immunity?

**A    Correct. So we go and I tell them basically what the federal statute is. Most of them kind of understand that or know it. And then I go into, again, the reason -- the reason why I'm teaching this and why this course was developed, is basically what I'm going over. So basically I talk about municipal immunity and then the officer's immunity. Basically**

RENO DiDOMENICO

municipal immunity talks about that the municipality, which in this case would be the City of Rochester, can be sued, as well as the officer, but in order to get rid of the City immunity, the City has to fail on two points. The two points are they are not providing training, right, and they don't have a policy. If the City provides training and they have a policy on how to destroy a dog or if you do destroy a dog, then they're covered under their immunity. And then if they're covered, then they're going to come after the officer, which is you, and that's a two-prong test as well, which is you have to violate a Constitutional right and then you go into reasonableness. Most officers, again if they know about deadly physical force, they know what reasonableness is. We discuss that.

Q     Okay. All right. If we go to slide 13, so this is the NYPD video that we discussed previously?

A     Correct.

Q     So in the course, that video would be imbedded right there in the slide?

RENO DiDOMENICO

A    Right.

Q    Right.  So let's watch that video which you shared with me.  So I'm going to put that up.  That video will be Exhibit 3, I guess, for this deposition.

(Whereupon, Plaintiff's Exhibit 3 was marked for identification as of this date.)

Q    Give me one second.  That's the one with the pit bulls on the street by the bus.  Right?

A    Yup.

Q    All right.  So I think, Officer, what I'd like to do is -- well, first, do you see the video on your screen right now?

A    Yes.

Q    Okay.  So what I would like to do is, I'm just going to play the video, and if you can just kind of do what you would do while you were presenting this video at the training, I think that would be most helpful.

A    So basically what I do is I play the video.  I give them instructions and say, you're going to watch a video take place in

**RENO DiDOMENICO**

**2012 in New York City. There's a homeless man on the ground, he's having a seizure. That's his dog. I want you to watch the video, tell me if you see any danger signs, what the officers could have done differently, and anything else that you would have done. Then I play the video for about, I think it's about a minute or two. It's a long video. It's like a nine, ten-minute video. I play it long enough so that the officers see what happens and also see the people's reactions, including the old lady's reaction, and then how much resources is brought in just over shooting a dog, and then usually that's when I stop the video. So I think it's about a minute, maybe a little more than a minute into it. I'll tell you when I usually stop it if you want.**

Q   Sure. I'll hit play and you can just give me any -- you know, narrate anything that you would normally narrate during the video as it plays. Go ahead and tell me when you stop it.

So I'm going to hit play.

(Video played.)

RENO DiDOMENICO

     A     Sometimes I use a laser pointer to point out the old lady.

     Q     I just heard you talk and I didn't hear what you said.

     A     I can't hear what's going on, so -- but usually at this point I point out the old lady with a laser pointer just to show that she was the one that initially -- and she's yelling at the cops as well.

     Q     The lady in the gray shirt right here?

     A     I'm sorry?

     Q     The lady in the gray shirt next to the fire hydrant?

     A     Yes.

     Q     Okay.

     A     She was the original woman who was -- the dog went after, but I usually use a laser pointer.

     Q     Okay.

     A     Then I continue to show more officers coming.

     Q     Okay.  So the only -- the only thing that you play the video for after this

RENO DiDOMENICO

point is to demonstrate how many additional police officers show up at the scene?

A     Correct.

Q     Okay.  So I'm going to stop sharing that for now.  And then if we go back to Exhibit 2, it says that -- then you hold a discussion, and so I'll just put that back up so we can all follow along together.

Do you see at the bottom it says, "Discussion - good or bad shot.  Any danger signs by the officers.  What could have been done to prevent the shooting."  So how do you go about, like, initiating that discussion?  Do you wait for -- do you pose a question to the officers first, or how does that go?

A     So I usually go into -- I go back to the beginning of the video and I just ask them -- I ask them, what do you think, was this a good or bad shoot, and the -- I get a mixed reaction sometimes, but most of the time people say good shoot.  You might -- you always get one of those people that either feel that's a bad shoot for real and they're just saying bad shoot because they think that's what I'm

RENO DiDOMENICO

looking for. So I just -- I just want your own opinion. Do you think it's a good or bad shoot. And I get, you know, mostly good shoot. And then I said, well, and then I talk to them, it's up to the individual officer, and that's when I kind of go into, you know, this isn't a do not shoot the dog course, this is an awareness course and we are here as individuals, because, as you can see from this room, there are mixed opinions. I say, I would consider it a good shoot because the dog charged at the officer. The officer, depending on his training, he doesn't know if that dog is going to bite him or not, so he shot the dog. At that point I would consider it a good shoot. Then I go into -- I go to the video and then I start talking about the situation, what do we have, right. We have a -- what is that dog displaying. Of course most people don't know because they haven't been taught anything yet. This video is basically to show that they don't know anything. Then I go into, you know, what's that dog displaying. Is that an aggressive dog or is that a nonaggressive dog,

**RENO DiDOMENICO**

**what's going on. Then we slowly go through. I say, the dog went after the old lady. Did it bite the old lady. You really can't tell, but later in the video I pointed out to you that she's yelling at the cop, just like the rest of the civilians were yelling at the cop, for shooting the dog. Then we go into, you know, was it smart that the officer shot at the dog with people standing around. What's his background. We go into that. We talk about that. Then we talk about what would you have done. Could you have prevented this shooting. Of course you get the, you know, I don't think so, I don't know. The answer is supposed to be I don't know because they haven't been trained. So that's what I tell them, you haven't been trained, you're not going to know. So at that point we have a little -- sometimes there's more discussion than others, and then we go on to the video.**

Q    Okay. And do you instruct the officers to what could have been done to prevent the shooting?

**A    Not at that point.**

RENO DiDOMENICO

Q    Okay.  So you said you go on to the second video?

A    Yes.

Q    So we go to the next slide.  This is the Lubbock, Texas video?

A    Correct.

Q    Okay.  So let's watch that video.  That one is a little shorter.

A    Yes.

MR. SHIELDS:  Okay.  So the Texas video, we will call that Exhibit 4 for this deposition.

(Whereupon, Plaintiff's Exhibit 4 was marked for identification as of this date.)

Q    Let me just put it up.  Okay.  Officer, do you see that video on your screen right now?

A    Yes.

Q    Okay.  I'm going to hit play.

(Video played.)

Q    So then you hold a similar discussion about that video?

A    Yeah.  So I do a preview to the

RENO DiDOMENICO

video. Basically I kind of tell them what -- I basically tell them, look, you know, in this video you're going to see an officer responding to a supermarket. The call was for two dogs inside the supermarket and this is what he sees, and then I play the video. Sometimes I do it simultaneously. And then we play the video, and of course you get all the gasps, oh, my God, I can't believe he shot the dog. And once the video is over, I have the discussion saying the same questions, and of course everyone is like, it's a bad shoot, it's a bad shoot. So then we discuss why it is a bad shoot. It's at that point I tell them, you know, if you shoot a dog -- I'm your instructor, and if you shoot a dog and you videotape yourself doing something stupid, you're going to be on your own on the stand. I'm not going to defend you. I'm letting them know right up front, you know, where I'm coming from as an instructor. But we talk about that case as well because it goes -- it reverts to policy. I ask them, what do you think happened to this officer, and most of them say, well,

RENO DiDOMENICO

hopefully he got fired. Of course there's the jokes about, well, it's Lubbock, Texas, probably nothing happened. So I say, well, that's not what happened. Basically we talk about -- because, again, go back to my preliminary in the beginning. We talk about how people view animals and we talk about, you know, this officer not being a very good investigator, he didn't talk to anybody. Remember, he was responding to two dogs inside the grocery store. These two dogs were outside the grocery store. He didn't talk to anybody, he just went up and kicked the dog. We talk about redirected aggression. We talk about that, you know, he kicked the dog and the dog doesn't do anything, he looks up at him and he shoots it. Then we get into what happened to him. Most people say he's fired, and I go, no, and we talk about policy. Basically what happened in Lubbock, Texas is they didn't have policy and their policy was if they felt that the animal is being a danger, the officers could shoot the dog. That was their policy. So we go into policy. I've actually had -- you

**RENO DiDOMENICO**

**know, I'm probably offering up too much information, but I actually had a police department in Buffalo, the lieutenant got up and ran out of the room. I go, where are you going? He goes, I've got to go write policy, because they didn't have policy.**

Q     Do you know that lieutenant's name?

**A     No.  I teach.  I get in and get out.  It was the Kenmore Police Department, I believe.**

Q     Did you say Kenmore?

**A     Yeah.**

Q     Okay.  And so I just want to make sure I understand you right.  In Lubbock, Texas the officer, because there was no policy or because their policy said --

**A     Their policy was bad.**

Q     A bad policy.  And so because it was a bad policy, that officer who shot the dog wasn't fired?

**A     Correct.**

Q     Do you know if the officer was either retrained or disciplined in any way?

**A     He wasn't disciplined.  Everything**

**RENO DiDOMENICO**

**that I found on it, he wasn't disciplined. The chiefs and the mayor had to -- it went viral and the news looked into it. Basically the chief and the mayor kind of had to explain why, and that they basically said, well, our policy said -- says that if the officer feels that the dog is being a danger to the public, he can shoot it, was their policy. That's what he wrote in his report, that he felt these two dogs were fighting and that he felt there was a danger to the public, so he shot him. But again, as a police supervisor myself, why did you only shoot one dog if they were both being aggressive. I mean, so --**

Q    Do you have any discussion with either one of these videos about the fact that both of the shootings took place in public where there were a lot of bystanders and somebody could have --

**A    Yes.**

Q    -- easily --

**A    We talk about it, yeah. We talk about it. I mean, at least the Lubbock guy kind of told everyone to back off, because he**

**RENO DiDOMENICO**

**was already predetermined in his mind what he was going to do, and you can tell that. He had the gun out as he walked up to the dog, you know. And again, we talk about what he could have done. Every once in awhile I'll get these, well, maybe they could have used pepper spray. I might get that from somebody at that point, even though we haven't discussed it yet. Most of the time, again, I get the, well, I'm not sure what I would have done in that situation as myself as an officer.**

Q    If someone says in that instance, well, he could have used pepper spray, what do you respond?

**A    I say, yeah, he probably could have used pepper spray at that instance to break up the animals.**

Q    Okay. And those are the two videos that you play at that point. Right?

**A    Correct.**

Q    All right. So let's just go through some more slides. I'm going to put Exhibit 2 back up and I'll just let you know if I have specific in-depth questions or if we

RENO DiDOMENICO

should just kind of talk about the slide more generally.

So this is -- this slide -- we talked about this slide after this, I believe. So why do dogs bite. Basically these things are what you list here in this slide 15 of 51. I guess my specific question, here at the bottom it says -- at the bottom of the actual slide itself it says, "Dangerous dog." Can you tell me, what do you tell the officers? What qualifies as a dangerous dog?

**A     Well, we don't get into that at that point. Basically I'm going over why dogs bite, you know, and I give kind of a brief scenario of each one of those that I talk about, and then I say, there's dangerous dogs. There's just dogs out there that are inherently dangerous, just like there's people who are dangerous, and some are just going to be very violent animals, and they're dangerous and they bite no matter what. Basically that's what I tell them.**

Q     But -- okay. So I guess my question is, dangerous dog, that's a legal

RENO DiDOMENICO

definition.  Right?  Where a dog has been found by a court to display certain behaviors.  So you're not using the legal definition there, you're just talking about --

A       I'm talking generically.  I'm not using the legal definition.  It's more about -- you know, like a sick or injured dog, a dog that's sick or injured, you go to pick it up, it's going to bite you.  If you try to help it, it's going to bite you.  It's not trying to be aggressive, it's just biting you because it's been injured.  Then we talk about there's dangerous dogs.  There are dogs that are just out there that are inherently dangerous.  They have a screw loose, there's something wrong with them, and they'll bite you for no reason whatsoever.  They're just going to bite you. They're just aggressive.  Just like there's people, no matter what you do, you can be the nicest officer in the world, okay, they're still going to fight you.  It's the same thing.

Q       Okay.  And so basically you move on and you say, look, you've got to be aware of that and prepared in these situations for how

RENO DiDOMENICO

to, hopefully, one, not get bitten, and two, hopefully avoid shooting the dog?

A     Mm'hm'.

Q     That's the point going forwards?

**MS. JONES:  Objection.**

Q     All right.  So on the next slide, 16, this is the one that we discussed briefly before, so the animal force continuum.  So this is about dogs themselves exhibiting behaviors.  Correct?

A     Yes.

Q     Okay.  And what -- let me back up for one second to the prior slide.  I guess the question that just popped into my head was, if you don't have any behavior training on dogs, you know, how do you have the conclusion that some dogs are "inherently dangerous"?

**A     I don't think you need to be a behaviorist to determine whether a dog is dangerous or not when you're dealing with animals on a regular basis.  So there are dogs that are -- especially in the animal welfare world, there are dogs that are to the point of you cannot help rehabilitate them and they are**

RENO DiDOMENICO

-- you know, they are dangerous to be put out in the public.  Are there people who own dogs like that?  Yeah, there are people out there who own dogs like that as well, and we've run into them here either on our calls or even at the Humane Society in general, because we will hold dogs for some dog control agencies and, you know, sometimes these dogs come in because they bit the owner two or three times.  The owner.  So there are dogs that are, from my experience, I can determine, a dangerous dog.  I don't need to be a behaviorist.

Q    Okay.  But you don't know if, for example, there was maybe a reason that the dog became dangerous.  Right?  Like you're not looking into that background to figure out if, for example, the owner beat the dog before it started to bite people.  Is that right?

MS. JONES:  Objection.

A    When I'm teaching the course, that's not -- you know, that's not something that the officer is going to know anyway, either.  It's just I'm giving them an idea why dogs bite, and there are dangerous dogs that

**RENO DiDOMENICO**

**are just out there. It doesn't mean -- it doesn't matter whether the owner beat it, the dog is just tied up to a backyard constantly with no interaction. There could be a number of reasons why a dog is dangerous. It could have a tumor. Dogs have been known to become aggressive after having a tumor, a brain tumor. So there's a number of reasons why. It's just basically there's something wrong with that dog, he's going to be aggressive no matter what.**

Q     And are there signs that you can look for? For example, it sounds like if a dog has a tumor, that's not something you can observe from the outside?

**A     No.**

Q     You know, if there are signs that the dog has been beaten or tied up --

**A     I'm not talking -- we're not even to the point of making a determination whether a dog is dangerous. We're just talking about reasons why dogs bite.**

Q     Got it. Okay. So if we go on to the next slide, we were talking about the force

RENO DiDOMENICO

continuum. Here you just basically discuss, it sounds like, the way that dogs interact with people and the reasons why. Is that fair to say?

MS. JONES: Objection.

A    It's basically -- again, I believe I got this from Randall Lockwood, and I probably should do better footnotes on here, but I thought it was kind of interesting. Again, I'm trying to identify with law enforcement officers their use of force continuum. I try to explain dogs have force continuums as well, and going through this scenario, I kind of like tell a little story of an officer approaching a house and, you know, seeing the verbal warnings and then seeing him inhibited by, and I kind of describe it, that the dog is coming in, you know, bluff charging, might be snapping at you. And again, most officers are going to back off at that point, but I talk about being a big, tough police officer and you're going to continue to the house, and now you get an uninhibited bite and that's going to be a dog that bites you and

**RENO DiDOMENICO**

**then backs off, it's going to be probably a little higher up on your leg, it's not going to be a normal bluff charge. You know, it's just -- then I go -- it's a little story I tell them just to keep their interest, and then I go into, you know, uninhibited bite, now they're hanging on, they're letting go and they're going to reassess you again. Again, they're trying to protect their property. Then we go into lethal, and then -- because you continue to walk on to the property and now they're lethal, now they're trying to knock you down, go at your face and go after your neck. So it's kind of the story I go through to teach them what we're talking about. Then I'll go into can they start in uninhibited? Yup. Can they start at lethal? Yeah. Can they start at vocal warnings? Yes. And you have to adjust to them, just like you do a person. That's basically it.**

Q    Do you emphasize on this slide that dogs usually aren't -- aren't approaching to attack?

**MS. JONES: Objection.**

RENO DiDOMENICO

A      Basically I don't need to emphasize it.  Most officers know what a force continuum is.  If they see -- if they see vocal warnings and inhibited biting and uninhibited biting, I go through those and tell them what they mean.  Again, we talk about, you know, that standoff type of situation.  At a vocal warning you're probably going to back off.  Inhibited biting, you're going to recognize that and you're going to back off and you're going to call for more help.  But we don't -- I don't emphasize that they're not going to be an attacking dog because they could turn attacking at any point.

Q      Yeah.  I guess, you know, my question earlier is just, I guess, at the end in the bottom part, in the notes, it just says, "Bluffing or threatening behavior is used in most encounters rather than an actual attack."  Right?  So I guess --

A      Mm'hm'.

Q      -- I'm just wondering what you explain about that.  Do you explain that, you know -- because you spoke earlier about how you're trying to change the perception of

RENO DiDOMENICO

officers when encountering a dog, right?  Is this a slide that you use to try to change that perception and let officers know, hey, look, a dog that's approaching you, that you might think is attacking you, it actually isn't really attacking you, it's just that you're on their property and you don't need to consider that to be threatening or aggressive behavior, instead, you know, hey, look, you're on their property and this is just a natural thing that dogs do?

        **MS. JONES:  Objection.**

     **A    I don't -- I don't emphasize it, but it's mentioned, if that answered your question.  I mean, I'm not going to sit there and berate it, but I'm -- like I said, I go through the story of what the continuum is for them and basically, you know, that the dog basically is trying to give you a warning to stay away.  Again, I talk about that verbal warning and that inhibited biting, that the dog is moving back and forth, he's trying to give you a warning, is what we talk about in that.**

     Q    Got it.  Okay.  If we go to the

RENO DiDOMENICO

next slide, factors that contribute to bites. I think we talked a little bit about, in the notes, number 4 down here. So I just wanted to ask a couple more questions about that. Now, do you do anything -- do you do anything to teach officers how to ensure that they don't provoke the dog to attack them or bite them?

**A    I don't necessarily teach them what to do. I'm basically -- well, we already kind of talked about that as well. Later on we talk about how to address those types of dogs. So I guess that would probably be a yes. At this point, again, I'm just giving them background information. I'm not going into what to do in those situations yet. I'm just telling them that the victim's behavior sometimes determines a dog to bite them.**

Q    Okay. So --

**A    That comes down to -- I mean, that discussion of what you're doing comes down the line when I'm talking about how they interact.**

Q    Okay. So you just mention it here and then later in the presentation you go into more specifics about --

RENO DiDOMENICO

A       Right.

Q       -- what behavior might provoke a dog to attack?

A       **Correct.  I talk about eye contact, sticking your hand out.  That type of stuff.**

Q       Okay.  All right.  So the next slide is the dog postures.  My first question is, this slide is the same slide as the handout that you give at the training.  Is that right?

A       **Yes.**

Q       Okay.  And now I think one thing you say at the bottom is, you talk about the dog's options when confronted by a stranger, I guess what -- and what behaviors a dog performs that help people anticipate if they're likely to attack, right?  So you talked a little bit earlier about, I think you said playful and offensive, aggressive are kind of like the two extremes.  Is that right?

A       **Mm'hm'.**

**MS. JONES:  Objection.**

Q       So playful, you're saying, hey, look, this isn't a dog that's showing any signs that it's going to attack you.  But offensive

RENO DiDOMENICO

aggression, that's showing all the signs that it's going to attack you. Is that right?

MS. JONES: Objection.

A     I'm showing them that the offensive, aggressive dog is showing you all the characteristics of a dog that is attacking. It's not going to. It is attacking.

Q     Okay. So in the offensive aggression picture, that would be a shoot situation?

A     Yes.

Q     Okay. Do you teach officers that even though that's a shoot situation, there's options to avoid shooting?

A     No, because usually when I discuss this, I tell them what the body language of that dog is and that they're usually charging you and running at you, and at that point they're justified to shoot that dog.

Q     Okay. And then the four other slides in between, those are what you said are kind of not clear one way or the other and it could go either way?

A     Yes. And I -- and I kind of tell

RENO DiDOMENICO

them, these are the ones that you could probably talk down. I'm not guaranteeing it, but you can try to use the techniques that I'm going to tell you in the next few slides how to deal with those types of dogs, to talk them down. We go over what each one is and the characteristics. I talk about that they could cross characterize. For instance, the defensive threat dog, I say it looks like the dog from New York City, but, however, in New York City that dog's tail was up. So they can cross -- you can have cross characteristics in the different -- in other words, nothing is a hundred percent.

Q So what you're saying is like the defensive threat dog, that's not necessarily a dog that's going to bite. Right?

A No, but he's showing you warning signs.

Q And so going forward, you'd say use the deescalation techniques, the bite prevention tools to try to deescalate that situation?

A Right. I'm basically teaching them

RENO DiDOMENICO

what these are so that when we go into those, I can kind of use them.  So like we'll talk about what a defensive -- like the ears are back. That means that the dog is being fearful.  He may not be showing all his teeth like an offensive, aggressive dog.  We go through what you're seeing so you can identify them at that point.  So we go through that.  You know, the passive appeasement dog, you know, I tell them, what do you think that dog is doing, and of course you get everybody, he wants his belly rubbed.  I say, well, no, that's not what he's telling you. He's basically telling you he doesn't want any part of it, he's giving up. He doesn't want you to go near him.  You go near him, now that could be a threatening situation where that dog may turn and bite you. We go through the different characteristics of what the dog is showing you so that they have it in their minds when we go and talk about how to deal with those dogs in the later slides, I refer back to those.  You have a defensive threat type of dog, how are you going to talk to them.  You have a confident, alert dog, how

**RENO DiDOMENICO**

**are you going to talk to him.  We talk about a wagging tail, what a wagging tail means. A wagging tail doesn't mean friendly.  He might be telling you he's excited.**

Q     So I have a question about the offensive aggression picture.  On the slide it doesn't say anything about that dog actually being in the act of attacking or charging. Correct?

**A     Yes.**

**MS. JONES:  Objection.**

Q     I'm sorry.  I missed your answer because she --

**A     Yes.**

Q     It doesn't say that.  Correct?

**A     It doesn't say that.**

Q     Okay.

**A     I say it.**

Q     Okay.  You say that verbally to the officers at the --

**A     Yes.**

Q     So let me ask you a question.  My question is, let's say a dog is not charging and it's not running at the officer, but it's

RENO DiDOMENICO

showing all of those signs.  Would that be a situation where an officer is justified in shooting?

     **A     I would say no at that point, because the dog is not charging them.  If that dog is charging you and it has these characteristics, that's an offensive, aggressive dog.**

     Q     Is there a difference in, let's say, the distance that a dog is approaching an officer from in terms of making the determination if that dog is charging or attacking?  For example, if an officer sees the dog coming at them from twenty feet away versus if the dog is coming at them from five feet away.

     **A     We don't talk about it.  I don't talk about it.  I basically just go into, if a dog is looking like that and it's charging you and you feel justified in shooting the dog, you have a justification to shoot that dog.**

     Q     Okay.  Is there any --

     **A     But, I mean, if you see that dog and it's twenty feet away and it ain't charging**

[Page 131]
May 31, 2023

**you, you have other options.**

Q     So if the dog is ten feet away and it looks like that and it's not charging and it barks, are you justified in shooting?

**MS. JONES:  Objection.**

**A     Again, it all depends on the officer and what he feels is a threat.  So my answer to them would be, you're still in a standoff mode.  If somebody asked me that question, I would tell them, you're still in a standoff mode.  When we talk about offensive, aggressive, I tell them, that dog is charging you, it's running at you.  I mean, that's why I kind of use that German shepherd picture compared to the others.  That dog looks like he's running at you.**

Q     Yeah.  What if a dog approaches you and stops and then barks and you yell at it and it barks again --

**A     Mm'hm'.**

Q     -- but it doesn't charge at you. Is that a shoot situation?

**MS. JONES:  Objection.**

**A     I'm going to go back to my answer**

Lexitas Court Reporting
800-678-0166

RENO DiDOMENICO

again. If someone in the class is asking me those questions, I would answer the question these are just basically -- we go back into the standoff mode. Playful dog, we're probably going to pat. An aggressive dog running at you, charging you, you're probably going to shoot. These other dogs. You can use other techniques. Basically I just want them to identify their body language is what we talk about so that they can identify them to justify themselves in a report. So in other words -- and we go into that as well. I'll tell them, if you can say, hey, like in New York City, hey, I'm with a defensive threat dog, I tried A, B and C to calm that dog down, it didn't work, it then turned into an offensive, aggressive dog, I know it was because it started charging at me, showing me its teeth, blah, blah, blah, you're showing that you had justification to shoot that dog. That's what I'm teaching them in these postures. You have to be able to identify. It's just like a use of force. Was this a no person, was this a yes person. Was this person clenching his fists

RENO DiDOMENICO

when you were talking to him or was he standing still. That's how I use this slide. What is this dog displaying to you. It's displaying defensive threat, it's displaying confident, alert, it's a confident dog, which means, you know, that dog is not afraid of anything, he's not -- he's challenging you. So we go into all that. What is this dog, what is it displaying. These dogs, these other four positions can turn into an offensive, aggressive dog. That's what I'm trying to get across to them at this point.

Q    Got it. So if a defensive dog is provoked into becoming an offensive dog by the officer's actions, is that now a shoot situation even though it's the officer's actions that caused that?

MS. JONES:  Objection.

A    I would say yes. It's still -- it's still -- it's a determination by the officer whether he wants to use deadly physical force at that point. Even if he provokes it, the dog -- again, the big problem with animals, and even in the animal cruelty -- I tried cases on animal cruelty, is animals can't talk.  They

**RENO DiDOMENICO**

**don't understand us and we don't really understand them. Everything is done off of the body language of us and the dog. I don't know what's going on in the dog's head. They can't communicate. If it turns offensive, aggressive, they're justified to shoot that dog even if it's the officer's actions from being on the property, or whatever caused the officer to -- this encounter to happen. If the officer turns that dog into offensive, aggressive, he's justified in shooting.**

Q    And wouldn't that go to the totality of the circumstances. Right? You've got to determine, is that something that you would talk about with your students saying, hey, look, a court reviewing this, you know, after the fact is going to review your body camera video and it might -- you know, we talked about earlier the victim's actions are one of the most important things to determine whether a dog attacks, and so if you caused this dog to go from a non-attacking dog to an attacking dog, that might play into that consideration of whether the use of force was

RENO DiDOMENICO

reasonable.  Is that part of your discussion or no?

            **MS. JONES:  Objection.**

      **A      No, because, again, you don't know what's -- you don't know what made that dog become offensive.**

      Q      Even though you had the discussion about how the victim's behavior is one of the most important things that causes dogs to attack?

            **MS. JONES:  Objection.**

      **A      Right.  Yes.  Because the victim's behavior, what you're doing, is going to cause a dog to bite you.  That doesn't necessarily mean it's going to cause the officer not to shoot the dog.  I mean, you don't know why that dog is coming at you.  Even if I'm the one who set that dog off and that dog now becomes aggressive towards me, I'm still in my rights to defend myself under the law -- under New York State law.  An imminent threat to a person bodily is justification to shoot the dog. That's under Dangerous Dog Law under Article 7.**

      Q      So what's the law?  If you're in

RENO DiDOMENICO

imminent danger of serious bodily injury or death?  Is that what the law says?

A     Yes.

Q     Okay.  So --

**A     It goes back to that other -- that other slide.**

Q     And so that's what you teach the officers, if they're in imminent danger of bodily injury or death, then they can shoot the dog?

**MS. JONES:  Objection.**

**A     What I teach the officers -- I don't use that -- well, I don't use that terminology directly.  It's in one of the slides.  What I teach the officers is, if there's a dog that's offensive, aggressive and it's charging you, you are justified to shoot that dog if you feel that's what's necessary. I also tell them, I may not shoot that offensive, aggressive dog.  It all depends. But I've got more experience than they do.  It all comes down to that individual officer's determination.  If he feels threatened, then he's justified to shoot that dog.**

**RENO DiDOMENICO**

Q    My question is, regardless of the officer's actions, they're always allowed to shoot a dog if they feel threatened.  Isn't that --

**MS. JONES:  Objection.**

Q    Isn't that sort of like jumping in front of a car and using that as an excuse to shoot the driver?

**MS. JONES:  Objection.**

**A    No.  I'm not saying that jumping in front of a car is the same.  What I'm saying is you're dealing with an animal that you can't reason with, that you can't talk to, you can't -- the only thing you can do is do the best you can.  If that dog becomes offensive, aggressive, then they're within their right to shoot that animal.**

Q    Even if the officer's own actions are the reasons that the dog became offensive, aggressive?

**MS. JONES:  Objection.**

**A    Well, you have to give me -- give me what you mean by that.  Are you talking about the officer being in an area where he's**

**RENO DiDOMENICO**

**not supposed to be in?  What are you referring**

**to?**

Q     Sure.  Let's say -- let's say there's a dog in a backyard and, you know, the officer is on the other side of the fence and he sees the dog in the backyard, the dog isn't offensive, aggressive, maybe he's confident, alert, and the officer thinks okay, you know, I can jump into this backyard and this dog isn't threatening me, but then the officer does jump into the backyard and the dog then charges at him.  Would that be -- that's a situation where, you know, he could have avoided having put himself in a situation where now he's in a situation to shoot the dog.  Right?  But because he put himself in that yard, now the dog is charging at him.

MS. JONES:  Objection.

**A     I need more content.  Again, if a dog is charging you and you're protecting yourself as an officer, I believe that the officer is justified in shooting that dog.  If -- I mean, is the officer there for a call?  What is he doing?  I mean, what are the**

RENO DiDOMENICO

circumstances involved with him?  Why is he jumping the fence?  Is he chasing somebody?  I mean, it all depends. Is he just walking foot patrol and decided to jump the fence?  Again, we go back to the implied immunity and we talk about what a reasonable officer would do. Would a reasonable officer in that situation shoot a dog that's charging him.  I would say yes.  I would say -- but if he's legally bound to be in that backyard, then he's legally bound to shoot that dog.  If he's not legally bound to shoot that dog -- or be in that backyard, then yeah, he could be at fault in that situation.  I think there's a case law out of Illinois on that as well where they were looking for a missing child.  But if a dog is attacking you, they still have a right to defend themselves and shoot that dog.  Again, according to New York State Agriculture & Market Law, it says right in there.  It doesn't say where that dog is being a danger.  It just says if a dog is an imminent threat of bodily -- of hurting a person, you have to shoot that dog.

**RENO DiDOMENICO**

Q    So one thing that you said in your answer is that if the officer is not lawfully present on the property, then they might be held --

A    Civilly held, yeah.  If he took somebody's property.  We go back to that implied immunity.

Q    So do you discuss anything about the lawful requirements for entering someone's property, like the curtilage to their home?  Is that something that you discuss at all in the training?

MS. JONES:  Objection.

A    If the topic comes up, I'll talk about it.  But we go back to that implied immunity.  We talk about what a reasonable officer would do in that situation.  I mean, you could do a lot of what-ifs in the world. Again, this is a two-hour awareness course to give them some tools.  If somebody asked me, well, what if I'm just walking through someone's backyard and the dog charges me. Well, why are you there?  Why are you walking through that backyard?  Do you have a legal or

**RENO DiDOMENICO**

**are you just trespassing like, you know, unlawfully?  I mean, I don't know.  Even so, if it is unlawful, in Ag & Markets you have the right to protect yourself.  Now, can you be sued?  That's for a court to determine.**

Q    Do you teach --

**A    I'm not talking as an officer. I'm talking as a general person.  If I'm walking through someone's backyard and I shoot someone's dog, I'm justified to shoot that dog. Am I legally responsible for the property being lost?  That's for a court to determine.  The court is to determine whether that property is -- I have to pay for that person's dog or his medical bills or whatever.  But I have a right to defend myself under the law.  That's basically what I'm teaching them.  I'm teaching them that if a dog charges you and you're justified in shooting it, you can shoot the dog.**

Q    Even if they're trespassing in someone's yard?

**MS. JONES:  Objection.**

**A    We're all -- I mean, I'm not a**

RENO DiDOMENICO

lawyer.  I try to play one, but I'm not a lawyer.  You know that that's determined in court.  Right?

Q    Well, let's just say -- let's just say the officer knows they don't have a legal basis -- let's just assume, okay, that the officer knows he's trespassing in someone's yard.  He decides to enter that person's yard anyways.  Maybe the court has already determined -- you know, this is, I guess, one of the scenarios that could come up at a training, right?  Officer trespassing in someone's backyard.  Maybe they're going through someone's backyard for convenience, okay, and then a dog runs at them.  Do you tell them in that situation, hey, look, because you were trespassing, you could be held liable for shooting the dog even if otherwise if you weren't trespassing you wouldn't be held liable for shooting the dog?

             MS. JONES:  Objection.

Q    Do you understand?

A    Right.  I think -- I think if that question was posed to me, I'd give them the

RENO DiDOMENICO

answer I just gave you, that you may be justified in shooting the dog, but you may be held in court responsible for destroying that dog. I would give that answer. I still think that a person has a right to defend themselves from an attacking dog, whether or not they're legally justified to be there. It's just like even animal on animal -- and I know Jim is listening, and I know Jim's reputation. Animal on animal, if a dog comes into my yard and my dog kills it, you know, my -- are they responsible for -- my dog attacks it and the other dog kills it, am I responsible for that dog that came into my yard, right. He's justified to defend himself of that attack. I think that would be what I'm trying to say, is I, as a person, if an animal attacks me, I'm justified to defend myself. Whether I was legally on someone's property at the time is for a court to decide and to determine, you know, whether it was unreasonable. Again, we go back to the implied immunity, would a reasonable officer have done the same thing.

Q    I guess my question is, you know,

RENO DiDOMENICO

you talk about the totality of the circumstances. Correct?

A Mm'hm'.

Q It's part of the Fourth Amendment analysis. So part of that Fourth Amendment analysis and the totality of the circumstances would be were you lawfully present on that property. Correct?

MS. JONES: Objection.

Q I think you said earlier that if you're not lawfully present on the property, maybe you're justified in the shooting, but you're still held liable for destruction of the dog. So is that something that you would --

A You could be. You could be held liable. Again, that's for a court to determine.

Q You could be held liable. That's something that you would discuss but only if it came up in the context of questioning?

A Correct.

MS. JONES: Objection.

THE WITNESS: Sorry. If I'm answering too quickly, let me know.

RENO DiDOMENICO

Q    That's good.  The only thing is the court reporter can't get down both you and I speaking at the same time, and I think we both have a tendency to speak quickly.

So one follow-up question about something you said.  You know, you emphasized a few times that it's only a short two-hour -- one and a half to two-hour training class.  So I guess my question is, do you think that the fact that it's only a two-hour awareness course, is that sufficient to provide competent guidance to police officers on how to lawfully interact with dogs?

MS. JONES:  Objection.

A    In this context, I say yes.  You're not trying to make them an expert, you're just trying to give them, again, some basic knowledge and some basic tools to use when dealing with dogs.  I don't expect them to be behaviorists.  I don't expect them to have knowledge in all aspects of animal body language.  I just think they need to be aware of what -- what there is present out there.

Q    And after you provided this

RENO DiDOMENICO

training in 2014, have you provided any follow-up training on this specific subject to the RPD?

A       No.

Q       And if I told you that every officer I've taken a deposition of who took the training in 2014 said that they couldn't specifically remember any of the slides other than the dog postures, do you think that the RPD should have additional retraining on these subjects?

**MS. JONES:  Objection.**

**A       I don't know how to answer that, because there's so much training that I've gone through that I could, you know -- there was one-time training and then I never was retrained in anything after that.  So I'm not sure.  I guess that's -- again, it's for administrative staff to make a determination, for someone else to make that determination.  I think that they were given tools.  I think they were given some knowledge.  I mean, to reinforce it -- I don't know what more you could do to reinforce it.  Maybe some video**

RENO DiDOMENICO

training on their part.  Maybe some roll call training on their part.  But they've already been given the awareness portion of it.  I don't know if there would be any -- what other additional training they would offer.  Again, I think that's up for the State Police council training -- police administrators to determine what needs to be retrained.

Q     But, for example, the RPD hasn't asked you to hold another in-service training since 2014?

A     No.  I already answered that.  No. Do I think they should?  I don't know, because I don't know what their level of -- I do know there's been a reduction in the amount of shootings from before I taught the course to after I taught the course almost by 60 percent.

Q     How do you know that?

A     For awhile after the course, I was asking for the number of dogs shot.  That was provided to me by the city police.  There was a reduction by almost 61 percent.

Q     And how did they tell you that? How did they report those statistics to you?

RENO DiDOMENICO

A       From their report from -- when they shoot a dog, they have to do a report.  That would be on file.

Q       Okay.  So do they just --

A       It's an internal thing.

Q       Did they send you the actual reports or did they just send you an e-mail and say, hey, last year there were 70 dogs that were shot and this year there were 50?

A       They sent me a spreadsheet.

Q       Okay.  Do you have a copy of that spreadsheet still?

A       No.  My computer -- I haven't collected it in probably four years, and a few years ago my computer hard drive went and I lost all that data.

MR. SHIELDS:  Okay.  So, Ms. Jones, to the extent that the City has that spreadsheet for any of the years it was shared with Officer DiDomenico, the Plaintiffs call for production of all of those spreadsheets.

MS. JONES:  Please follow up in writing.

RENO DiDOMENICO

MR. SHIELDS: The verbal demand is sufficient, but I'll follow up in writing.

Q    Officer, if you could -- well, let me back up. The way that they sent you these spreadsheets, that was by e-mail. Is that right?

A    Yes.

Q    Okay. Did you lose access to all of those e-mails as well or do you think that those might be archived in your e-mail server?

A    They may be archived.

Q    Okay. So if I asked you after our deposition if you could take a look in your e-mail server and see if you have any of those, would that be something you could do for me?

A    Yeah, I could do that.

Q    Okay. And do you remember how far back that those statistics went?

A    How far back before the training?

Q    Yeah. For example, you gave the training in 2014, so did they give you, for example, a spreadsheet that had 2010 to 2015, or do you remember the years?

RENO DiDOMENICO

A    No.  I think it was like maybe prior to the training.  So the year prior to the training.  So it would have been maybe 2012, maybe 2013.  Again, it was the end of '14 that I trained in, so it might have been those two.  And then we looked at maybe '15, '16, '17 I might have gotten them.  They would have -- they would have the data.

Q    Okay.  And as far as you know, what sorts of reports does the RPD complete when a dog is shot?

MS. JONES:  Objection.

A    I do not know for a fact what their actual policy is.  I do know that -- maybe they did send that to me.  It's so long ago.  I do know that the sergeants fill out a report supposedly, not the officer.  There's an investigation and a sergeant fills out a report.  I don't know -- again, that was ten years ago, so -- nine years ago, so I'm not sure.

Q    Did they ever consult with you about the review process at the RPD after a dog is shot?

RENO DiDOMENICO

A    No.

MS. JONES:  Objection.

Q    And did they ever send you any of the underlying reports or did they just send the spreadsheet?

MS. JONES:  Objection.

A    **They sent the spreadsheet.**

Q    And it sounds like they sent the spreadsheet on -- do you remember the amount of time between -- was it a yearly basis, every six months, something different?

A    **I have -- this was for my own benefit, so I would request the yearly stats and they would send it to me.**

Q    Okay.  And do you remember who you contacted at the department to request the statistics?

A    **He's retired now.  Steve something. I'd have to look it up.**

Q    And do you know if that officer was in their professional standards section?

A    **I think he was training.  The training section.  He was the one that I was dealing with for the training.**

RENO DiDOMENICO

Q     Okay.  And was Steve the person who would send you a copy of those spreadsheets?

A     I'd have to look at the e-mails.  I believe they were coming from him or he was forwarding me from someone else.

Q     Okay.

A     I don't know.  Like I said, I haven't looked at those in seven years, so --

Q     Do you remember what kind of data was kept in the spreadsheets?  For example, did it list how many shots were fired and what kind of dog it was, what kind of call for service the officer was responding to?

MS. JONES:  Objection.

A     I think it -- again, I can't remember.  I do know there was a list of incidents.  I think the location, what the incident was and then, you know, whether there were two dogs shot, one dog shot.  I don't know if they put the number of shots.  I can't remember.

Q     Okay.  And I think you said that the last year they sent you this information was something like 2017.  Is that right?

RENO DiDOMENICO

A    Yeah.  Somewhere around.

MS. JONES:  Objection.

A    Somewhere around '17, '18.  Yup.

Q    Okay.  So they sent you, it sounds like, this data for approximately three or four years?

A    Right.

MR. SHIELDS:  Okay.  So we're just going to call, again, for production of all of the data that was sent to Officer DiDomenico.  If the department continued to compile these statistics after they finished sending it to Officer DiDomenico in subsequent years, for all of that additional data in the form of a spreadsheet, or however else it was kept as well.

MS. JONES:  Please follow up in writing.

MR. SHIELDS:  Sure.  Again, you know, our position is that the verbal demand at the deposition is sufficient independent of whether or not we follow up in writing.

RENO DiDOMENICO

MS. JONES:  Please follow up in writing.  Are you going to follow up in writing?

MR. SHIELDS:  You have a duty to produce this information whether or not I follow up in writing, is our position.

MS. JONES:  Is that a no?

MR. SHIELDS:  That's our position, as I've explained to you before in letters.

MS. JONES:  I guess my question is, are you going to follow up in writing even if you don't think --

MR. SHIELDS:  I'm calling for production of this information and I would like for you to produce it, please, because I'm demanding it right now verbally at the deposition.

Q     Okay, Officer.  Let's continue to go through --

MS. JONES:  So just for the record, you know our position is that you have to follow up in writing.

MR. SHIELDS:  Stop talking, please.

RENO DiDOMENICO

MS. JONES: We request that you follow up in writing.

MR. SHIELDS: I'm not going to do that. You've got to produce it whether or not I follow up in writing.

Q So if we continue forward. Now, Officer, we're on slide 19. I just want to go through the rest of these. I guess my question here is, the things that are here, they're not always necessarily true. Right? Like, it's not always true that a stiff, still dog is going to be an attacking dog. Right?

MS. JONES: Objection.

Q For example --

A That's not what that slide is. Basically you're looking at -- so we talk about the positions, the postures, and then I basically just go into a little bit more in depth of body language for recognition again. So this slide basically is when you -- when you first encounter a dog, what are you looking at, right. What are you -- to give you a sign. So the first thing you're looking at is whether the dog is stiff and still or loose and wiggly.

**RENO DiDOMENICO**

**It has nothing to do with whether the dog is dangerous or not. It's just showing different types of body language that a dog might be showing. The first time you look at a dog, you want to be able to observe what am I dealing with. Am I dealing with a stiff and still dog. Why is he stiff and still, I don't know. He could be afraid. He could be aggressive. You want to, again, make a mental note, what am I seeing. Am I seeing a stiff and still dog or am I looking at a loose and wiggly dog.**

Q    Got you. If we go to the next slide. Now, on my version here this is blacked out. Is this a video or a picture that's usually here?

**A    Just a video that Rebecca gave me that she would use in some of her classes. It's basically just a video showing a dog stiff and still and loose and wiggly, is what it was. I don't even use the videos anymore because it takes up too much time.**

Q    Okay. That's fine.

**A    Back then I -- they were in that.**

Q    Okay. So that's -- I didn't miss

RENO DiDOMENICO

anything that's not a video you sent me. Right?

A    No.  I want to say I thought I sent you those videos, because I think you did ask for them and I did send them, I thought.

Q    There was a video from like CBS News.  Do you remember that one?

A    CNN.  No.  That's a different video.

Q    Okay.

A    These were videos that I think she took herself here in our shelter of animals.

Q    Okay.  I don't think you sent that video.  Is that something that you could send me after the deposition today?

A    Yup.

Q    Thank you.

THE WITNESS:  Ms. Jones, did you want that as well?

MS. JONES:  I was just about to ask for it.  That would be great.

Q    So if we go to the next slide here, 21, is this what you were talking about before, about the eye contact and other things, or is

RENO DiDOMENICO

the eye contact that you were talking about earlier something different?

     A     Well, these are just showing you again the nomenclature, the characteristics from the posturing thing. I'm stressing what it looks like.  Instead of using a drawing of an animal, it's kind of just showing you what a direct stare from a dog looks like, a freeze and stop, the tension in the dog's face.  As you can tell, these dogs, except for the one in the -- it would be my top right, kind of has his ears back, but everyone else is kind of giving you that stare with ears forward which is showing you that confident dog posture with the tail up.  Basically it's just giving you what that direct stare looks like.  Again, I don't spend a lot of time on this. It's just showing you those characteristics -- showing the officer what those characteristics look like on a real dog.

     Q     Okay.  So you don't, for example, talk about ways to engage with the dogs to deescalate?

     A     Not at this point, no.  This is

RENO DiDOMENICO

just what the dog is doing, direct eye contact, that staring and stiff body. I'm kind of showing them what I mean in those posture slides.

Q    Okay.  If we go on to the next one, it says, "Aggression:  Stop what you are doing."  So my question first is, what do you mean stop what you're doing?

A    Again, depending on what you're doing.  Whatever you're doing, stop what's making that dog act aggressive. So you're going to try to change the situation.  If I'm just walking onto the property and now the dog starts to growl at me, I'm going to stop and I'm going to start talking to the dog, right. Again, we go into that in the slides that are coming up.  We're just basically talking about, like it says at the bottom, you leave the yard, do not reach out to them, do not touch them or their people, whatever.  If there's a dog growling at you, it's a sign of aggression and you're going to have to use techniques to talk that dog down.  That's basically all that is telling you.  Stop whatever you're doing and

**RENO DiDOMENICO**

**recognize that the dog is being aggressive.**

Q     Got it.  So be mindful?

**A     Right.**

Q     Change what you're doing because you could be in danger?

**A     Yes.**

Q     Okay.  So then the next one, "Fear aggression."  So --

**A     This is another slide that shows -- a lot of people don't really know what hackles are.  It kind of shows it a little bit better. Again, it's just another slide.  I don't spend a lot of time on it.  Again, it's characteristics that are being shown to better make them understand what we're talking about.**

Q     Got it.  "Fear and aggression. Low body, all teeth showing, crouched/hunched posture, tail tucked."  This still wouldn't necessarily be a shoot situation unless this fearful, aggressive dog started to charge. Correct?

**A     Correct.**

Q     And again, this is just something that you show to demonstrate what fear

RENO DiDOMENICO

aggression looks like with a real dog?

A    Right.

Q    Okay.  Offensive aggression.  So this dog, unlike the dog in the slide above that we looked at in the offensive, aggressive position, is just standing.  Correct?

A    Yes.

MS. JONES:  Objection.

A    Sorry.

Q    So this wouldn't be a shoot situation yet.  Correct?

A    Correct.

MS. JONES:  Objection.

Q    Okay.  Do you train the officers that the only way that this becomes a shoot situation is if they charge at or run at the officer?

A    Repeat the question.

Q    So my question is, you know, let's say this dog is standing in the offensive, aggressive position and it's barking, it's growling, but it's not charging.  Would that be a shoot situation?

MS. JONES:  Objection.

**RENO DiDOMENICO**

        **A      That would not be a shoot situation.**

        Q      Okay.

        **A      Again, I emphasize charging them. So it has to be actively charging you.**

        Q      Got it.  Is there a -- is there a distance from the officer when the dog is charging that you say, hey, look, maybe it's charging at you, but it's ten feet away, you should wait until it's five feet away to shoot? Anything like that?

        **A      No.**

                **MS. JONES:  Objection.**

        Q      Okay.  So basically if it's charging, no matter how far away, you know, that's a dangerous situation and you can shoot?

                **MS. JONES:  Objection.**

        **A      Yes.**

        Q      Okay.

        **A      And again, if that is asked of me, I would explain that a dog runs a lot faster than you can probably pull your gun and shoot it, so it doesn't matter how close it is or how far away.  You know, if you feel you need to**

**RENO DiDOMENICO**

**shoot the dog, then you shoot the dog if it's**

**charging.**

Q    Mm'hm'.  Considering the totality
of the circumstances?

**A    Exactly.**

**MS. JONES:  Objection.**

Q    This is just another picture of
offensive, aggressive, but obviously not
charging because it's on the other side of the
fence?

**A    Correct.  I believe this -- again,**
**I don't -- like I said, I don't really use**
**these anymore.  I think that dog was actually**
**going at the fence.  That's why she used it.**

Q    Got it.

**MR. SHIELDS:  For the record, we're**
**on slide 26 of 51 right now.**

Q    Okay.  And then slide 27, that
looks like another blacked-out slide.  Is this
another video that you took out?

**A    Yup.**

Q    Okay.  And then -- okay.  28,
appeasement.  What's that one all about?

**A    Again, it's just showing that act**

**RENO DiDOMENICO**

**of appeasement where the dog is crouched and coming at you. It's just showing a different view to show the characteristics a little bit better to the officer. Again, I don't spend a lot of time on these. I'm just flipping through them. We talk about the lip licking, et cetera.**

Q We can keep flipping through them. The same thing with appeasement and fear. What you see above doesn't necessarily mean that it's friendly. It might mean that it wants to be left alone?

**A Right.**

Q Stressed, anxious, fearful, what do you talk about then? It's a dog you need to be careful of?

**A Yup.**

**MS. JONES: Objection.**

**A It's showing signs of stress when it's pacing back and forth. I actually revert back to the verbal warnings. When I talk about the verbal warnings and the force continuum, I talk about the dog that runs off the porch and starts to pace back and forth and bark at you.**

RENO DiDOMENICO

That's showing stress, anxious and fear, is that they are showing, hey, this is my property, this is my line. That's why they're doing what they're doing.

Q And do you discuss that it's natural for dogs to run at officers when they're on their property?

A I don't discuss that. I don't -- I don't necessarily believe it's natural.

Q Okay. Do you discuss at all about that's something that happens with frequency?

A I don't discuss that it's frequent. I just basically say that, you know, again, a dog is coming off a porch, you're going to look at the characteristics. Is it coming off in a playful manner, is it coming off in an aggressive manner, is it coming off, you know, in an alert type of situation. What -- that's what I'm saying. I don't necessarily think -- I've been to houses where dogs just laid on the porch and they didn't care I was there. I don't necessarily believe that all dogs come off the porch, but when they do, what's your first thing to do is you have to size up the

**RENO DiDOMENICO**

**dog, what am I dealing with is what I discuss. But --**

Q      And the only way to really be able to do that is to put yourself in that situation. Right?

**A      Yeah. I would have to be in the mind of the officer.**

Q      For example, an officer that responds to a scene and the very first time a dog runs at them and maybe the dog is, in reality, playful, but the dog -- the officer misinterprets that as the dog being aggressive. That's something the officer can only make that determination --

**A      Mm'hm'.**

Q      -- by putting themselves in that situation. Right?

**A      Right.**

**MS. JONES: Objection.**

Q      And so in that situation, if the dog is running at them and it's actually displaying signs of playfulness, would that be a justified shooting?

**MS. JONES: Objection.**

RENO DiDOMENICO

A    Me being an instructor, I would tell them, no, it's not a justified shooting.

Q    If they misinterpret the signs from the dog?

MS. JONES:  Objection.

Q    What if they -- what if the officer takes actions that changes the dog from being a playful dog to an aggressive dog?

MS. JONES:  Objection.

A    I'm not sure what you mean on that. The dog is playful and then he hits the dog and the dog becomes aggressive?

Q    That's a good example.  Yes.  Would that be a justified shooting in that situation?

MS. JONES:  Objection.

A    Why did he hit the dog?  It's just like any other police encounter, whether it's a person or an animal.  You know, if he has no justification to hit the dog or shoot the dog, then he's guilty of violating Fourth Amendment, he's guilty of violating civil rights and he's guilty of -- if it's animal cruelty, he's guilty of animal cruelty.  He has to be justified in his actions.

**RENO DiDOMENICO**

Q     So if a dog -- if an officer shoots a dog and it's not justified under the Agricultural & Markets Law, the officer would be in violation of that section that we looked at earlier?

**A     Sure.  It's just like if an officer does something illegally, no matter what it is, he still can be arrested.**

Q     Is that an arrestable offense, a violation of the Agriculture & Markets Law?

**A     Yup.  A misdemeanor.  We have A misdemeanors, E felonies of the Ag & Markets Law.**

Q     Are you aware of any officer ever being charged with a violation of the Agriculture & Markets Law for shooting a dog?

**MS. JONES:  Objection.**

**A     No.  Not myself.  Well, I think I know about a trooper downstate that got arrested, but he was off duty.**

Q     All right.  So let's keep going through the slides.  So we're on 30 of 51 right now.  If we go forward to 31, this is another blacked out.  So that's another video you took

RENO DiDOMENICO

out?

A    Yes.  Well, I don't know why they're not -- they were embedded, but the way Microsoft changes things, they might not be there anymore.

Q    Okay.  So after -- after this deposition, if I send you a copy of the PowerPoint, you can send Ms. Jones and I both copies of all the blacked-out video slides?

A    Yeah.  I have them on a disk.

Q    Okay.  That would be great.

So 31 and 32 are both two blacked-out video slides.  31 says, "Fear: Active appeasement."  32 says, "Fearful: Defensive threat."  Then we get to 33.

I have a question.  On the PowerPoint, if you can see below the little number 33 on the side there's a star.  Is that just if I hit the star and the -- would that be like to play a video or something if you were showing that?

A    No.  I just think it's -- what do you call it -- how the slide presents onto the screen.

RENO DiDOMENICO

MS. JONES:  Animation.

A     Yeah, the animation.

THE WITNESS:  Thank you.

Q     Got it.  Okay.

A     Again, these were her slides that she added, so she might have added animation in.  I don't really use animation.

Q     And when you say her --

A     Rebecca Lohnes, the behaviorist.

Q     Rebecca, the behaviorist.  Okay. So she's the one that added all these slides about how the dogs actually look?

A     Mm'hm'.

Q     And about dog behavior?

A     Yes.

Q     Okay.

A     At one point we were going to use hers, but -- to do this portion, but she says, I don't have time for it, so I basically did it.

Q     Got it.  She -- you and her got together, consulted about how to present the animal behavior slides, and then you ended up doing the presentation?

RENO DiDOMENICO

A     Yeah.

          MS. JONES:  Objection.

A     Yeah.  Not to get into that whole thing, but yeah.  She basically said, it's too much work for me, I'm not going to go and teach every day, you know, for two hours.  I don't have time for this.  So I ended up doing it.

Q     Got it.  And you had had some prior law enforcement experience in doing trainings for officers when you were --

A     Right.

Q     -- a deputy.  Correct?

A     Yes.

          MS. JONES:  Objection.

Q     Okay. If we keep going through these stress signals, these are just additional slides on animal behavior that you breeze through during the training?

A     Yup.  Yeah.  Basically on this one I'm just kind of showing you that direct stare and what a dog looks like once you approach with an open mouth, which is also used in the Department of Justice video.  They show that, too.

**RENO DiDOMENICO**

Q    Not this particular picture but a similar picture?

A    A video.  Yeah, a similar video in Chicago.  It's that same philosophy or the same thing.

Q    And I forget if I asked you before, but now that you mentioned the videos from Chicago and the Department of Justice, did you watch the videos as you put together this presentation?

MS. JONES:  Objection.

A    Yeah, I reviewed -- I reviewed some of them.  I didn't -- I don't want to say I didn't like them, but I -- I felt it could be done better.

Q    So is that one of the reasons why you didn't just show the Department of Justice videos instead?

A    Yes.

Q    Okay.

A    And again, I didn't want the presentation to be too long.

Q    Do you remember how long the Department of Justice videos were?

RENO DiDOMENICO

A    It depends on the video.  I think some are like 30 seconds and some are like a minute.

Q    If we keep going forwards, additional stress signals.  What do these show?  Stressed dogs?

A    Stress signs, that diverted gaze.  You may be talking to the dog, but the dog is going to look away from you or keep an eye on you.  Talking about watch the whites of the dog's eyes if they're stressed out.  You don't normally see the whites of a dog's eye unless they're stressed and their eyes are really wide, so we kind of go into that.

MR. SHIELDS:  Okay.  And for the record, that's slide 35 of 51.

Q    We'll go forward to 36.  Just other stress signals.  It says, "Shake off, scratching, yawning, excessively sniffing the ground."  Okay.  Anything else that you normally mention about that one?

A    No.  Just basically look for the signs.  Like if you're talking to a dog owner and it's starting to become -- your voices

**RENO DiDOMENICO**

**start to raise for whatever reason and you start seeing the dog doing that, keep an eye on the dog because he's getting stressed out from the activity that's going on.**

Q     Okay.  Going forward to 37.  So this looks like this is a discussion slide.  Is that right?

**A     Yes.  It's basically to make sure they're paying attention.  In instruction you constantly want to do a compensation -- comprehension check, are you paying attention to me, I'm going to give you a quick quiz, and basically it's, you know, do you approach these dogs in the same way and which one do you approach.**

Q     Okay.  And the answer is?

**A     None of them.  No.  No.**

Q     Okay.  And do you ask them like what signs they're displaying based on the previous slides about stress signals and stuff like that?

**A     Yes.  We talk about how they look very similar, that their ears are forward, they're giving you that direct stare, but you**

**RENO DiDOMENICO**

**can see that Baby's mouth is closed and showing signs of stress where Pepper is -- their mouth is open and they're more relaxed.**

Q    All right.  So the next slide, slide 38 of 51, this is a YouTube video.  Do you remember what the video is?

**A    I do not know what this is.**

Q    All right.  Let's see. I forget also.  Let's see if we can -- I'm going to take this down.

**A    Oh, I know what that is. It's just a fun video.  It's a video of -- for Monday Night Football --**

Q    Okay.

**A    -- that I show the officers to get a laugh to keep them relaxed.  Another instructor thing.**

MR. SHIELDS:  For the record, I attempted to open that YouTube video and it said that it was unavailable.

Q    So going back --

**A    This is usually a break point, so I kind of show the video and then I kind of give a little break.  It's about a dog control**

**RENO DiDOMENICO**

**officer going in -- so you know what it is. It's about a dog control officer going into somebody's house who has an unknown animal in the wall and he basically says, here, when that animal comes through, shoot it with this, and then they show the guy sitting at home watching Monday Night Football, is basically what the video was, so you know.**

Q    Got it.  Thank you.

**A    You're welcome.**

Q    So that's 38. You said it was a good break time there.

We go to 39, and it's sort of a change in topics, right?  "Best Practice for Approaching Dogs"?

**A    Right.  So, again, we talked about the signs and why dogs bite.  Now we need to discuss approaching the dog, how you deal with them and how you find the dog on the property. We look for -- you know, you've got to look for signs if there's a dog on the property.  It's just like approaching any -- you know, you're always in awareness, start looking for signs if there's an animal on the property, and those**

**RENO DiDOMENICO**

**are some examples.**

Q     I mean, do you talk about how some owners won't have these signs on the property, but there could still be a dog there?

**A     I don't talk to them directly, but yeah.  I mean, we talk about you look for signs of the dog on the property.  These are some examples.  There could be others.**

Q     Now, do you instruct officers that any time that they enter a property, before they do that, since such a large number of properties in Monroe County and in the City of Rochester have dogs, that they should look for signs like this before they enter?

**A     I don't -- again, I don't put it that way, but it's implied, I guess, that -- again, you go back to one of my first slides, I talk about one out of every three residents, you're going to run into a dog.  I also add that, you know, most places now have more than one dog.  So we talk about just because you see one dog doesn't mean there's not going to be more on the property.  So it's just -- again, it's just to be aware.  If you see a sign that**

**RENO DiDOMENICO**

**there's a dog, start taking precautions.**

Q      And that one in three number, maybe we discussed this earlier, I don't remember, do you remember where that one in three number came from?

**A      It was from the Department of Justice book.**

Q      Okay.  And do you know what percentage of properties in the City of Rochester have dogs?

**A      No.**

Q      Do you know if it's more or less than one third?

**MS. JONES:  Objection.**

**A      I don't know because I don't look at those statistics.  Again, we're not animal control.  I really don't -- if people have animals, then they're out of the shelter and they're in a home, so I'm happy about that.  I don't -- I don't know how many are in the City.**

Q      Do you have any --

**A      From what I know from animal control statistics, those are usually guesstimates because you can't really determine**

**RENO DiDOMENICO**

**how many because a lot of people don't register their dogs. So it's an estimate, but those numbers aren't usually very accurate.**

Q      If I told you that of the numerous police officers that I've deposed, they've estimated somewhere between one third and sixty percent of houses that they respond to have dogs, does that sound accurate to you?

**MS. JONES:  Objection.**

**A      Again, I can't make that determination, because every house I go to has a dog, so -- or a cat, depending on where I'm going. So I don't know. I really can't -- it wouldn't be surprising that that's what it is, but I don't know what the number is.**

Q      Okay. And last question on this. I guess, do you know if either the Humane Society or any other organizations take any kind of census of the number of households in the Rochester area that have dogs?

**A      We don't here. We rely on whatever the City provides us or the county provides us. It's really not the county, it's the independent towns. Sometimes they don't even**

**RENO DiDOMENICO**

**know when asked.  But that's why I'm saying it's -- in the animal welfare world, it's not something that's normally checked because it's not an accurate number.**

Q     Got it.

**A     The state and the towns want to know because they want to know how much tax money they're missing out from the licensing. We just want to make sure that there's -- the animals are being taken care of, so --**

Q     Got it.  Okay.  So moving on to slide 41.  So that goes on to the encounter. It begins with the arrival.  It lists several things to do.  It looks like these things are ways to alert a dog of your presence.  Is that fair to say?

**A     Correct. Yup.**

Q     And that's so, I'm assuming, you don't surprise the dog, because a surprised dog would be more likely to attack you.  Right?

**A     Correct.  Or come out at you or whatever.**

Q     Anything else you discuss with this slide?

RENO DiDOMENICO

A No. I just tell them my war stories and -- you know, again, we talk about -- because a lot of it is you're making noise. Again, I stress that these aren't those emergency situations where you need to be stealth. These are, again, your nonpriority, nonemergency-type calls.

Q Got it. Okay. So this is slide 42 of 51 and it says, "Talk to the dog. Communicate safety and appeasement." So basically, I guess my question on this slide is, it's -- you know, you approach a dog on the street -- for example, if you're walking down the sidewalk and you see a neighbor with a dog, usually you want to -- if you want to pet it, you talk to it in a friendly tone. Is that basically the advice that you're giving here?

A Yes.

Q Okay. And it says, "Demo if necessary." Is that kind of the demo you would show for the officers?

A Yeah. So basically what I'm -- again, I'm not really talking about the neighbor's dog. I'm talking about you're an

RENO DiDOMENICO

officer and you walk onto a property for whatever reason, and now you're confronted with a dog that's, you know, showing signs of appeasement, but they're still -- you're looking at the confident dog, confident, alert dog or whatever. You want to show that you're not threatened, so you want to stand sideways, you want to keep your hands on your side. If they're loose, you want them to come to you and sniff you. Don't put your hand out to them because, again, they're going to bite the first thing in their mouth. You talk to them nicely like you would your neighbor's dog and you start -- you know, like what I normally do with a loose dog that's coming -- that's loose and walking up to me, and I recognize that it's somewhat in an investigative, like who are you, I start talking to it nicely, and I usually say, let's go for a walk, because most dogs, when you say let's go for a walk, they go, oh, I'm going for a walk, and they know what that is. Again, when I say this to the officers and I'm looking at the audience, even though, if you ever teach in-service, it looks like no one

RENO DiDOMENICO

is paying attention to you. When I say that to the officers and I tell them let's go for a walk, everyone like starts to smile because they all know from their own dogs that when they say go for a walk, your dog usually goes nuts. I learned this as a deputy just by chance. When I went to a house one time and I used it, I said -- I got this German shepherd staring at me and it's loose and I basically said, hey, do you want to go for a walk, and the dog totally relaxed and walked all around the house. Even though the neighbor started yelling at me, hey, that dog is dangerous, the dog walked with me all around the house. I kind of learned that as a deputy, and I show that to them. The same thing with, like I said earlier, with a dog -- open door and a burglar alarm or a house that has an open door and there's a dog inside, I used to yell into it where's your biscuit, where's your treat, do you want a cookie. One of those is going to click with that dog, and usually they run to where the treat is because they know I'm getting a treat. Is it a hundred percent? No.

RENO DiDOMENICO

**Nothing is a hundred percent. That's what I talk to them about, this is how you talk to a dog. How about go for a ride. You've got a loose dog, a stray. Open up your back door to your patrol car and yell, hey, do you want to go for a ride. Most dogs run in. Not all. They run in and you shut the door. It's all commonsense stuff that they need to know -- to think about when they're in that situation.**

Q So I have a few follow-up questions.

**A I talked too much again, didn't I?**

Q You give me a lot of follow-up, for sure. So the first follow-up question I have is about what you mentioned there at the end. If you open up the door and say, you want to go for a ride, most dogs will hop in, is what you said. Have you ever seen the video from the Meridian Police Department where the officer does just that and the dogs hop in the back and he gets them to go for a ride with him?

**A No, I haven't seen that.**

Q Okay. So I want to just play that video.

RENO DiDOMENICO

MR. SHIELDS:  That will be Exhibit, I believe we're up to 5 for this deposition.

(Whereupon, Plaintiff's Exhibit 5 was marked for identification as of this date.)

Q     I'll just ask you what you think about this video.  Give me one second and I'll put it up for you.

Officer, do you see that video on your screen?

A     Yes.

Q     Okay.  So it's about four minutes long.  I don't think we'll play the whole video, but I'll hit play.  I might pause it and ask you your thoughts in the middle.  We'll do that as we go along.  Okay.

(Video played.)

Q     My first question is, right there, as the dogs approach him, would he have been justified in shooting the dogs at that point?

MS. JONES:  Objection.

A     Again, it goes back to it all depends what the officer felt at that point.

RENO DiDOMENICO

MR. SHIELDS: Okay. For the record, we paused it at 45 seconds into the 4 minute and 41 second video.

A And also, it says that he had prior training. So he might have felt a little bit more comfortable when they started coming at him. Again, I don't know.

Q I'm going to continue playing it and then ask you some more questions as we go along.

(Video played.)

Q Did you see him pepper spray the dog right there?

A I couldn't tell.

Q Okay.

A He pepper sprayed the black dog?

Q He pepper sprays the black dog. Look for the orange spray. I'm going to play it again. Be on the lookout for the orange. Right now I'm paused at 3 minutes and 2 seconds into the 4 minute and 41 second video.

(Video played.)

A Okay. I see it.

(Video played.)

**RENO DiDOMENICO**

Q    All right.  So I'm just going to pause again at 3 minutes and 17 seconds.  Does it look like that pepper spray was effective on that dog?

**A    Yup.  That's exactly the way I would teach it, too.  Not an attacking dog. Those aren't attacking dogs, though.  Those are dogs that are showing aggression,**

Q    Okay --

**A    -- so it would work.**

Q    So did you see what the dog went and did after he pepper sprayed it?

**A    Yup.**

Q    So can you just describe for the record what the dog went and did after it was pepper sprayed?

**A    It was kind of dark on mine, a little more blurry, but basically he went over and went into the grass, lied down, and it looked like he was rubbing his face a little bit.  Now it looks up the way you have it frozen.**

Q    It's 3 minutes and 17 seconds into the video.  I'm just going to go ahead and hit

RENO DiDOMENICO

play.

(Video played.)

Q       So I guess my first question -- I know you said that's the way you would have taught it also?

**A       Mm'hm'.**

Q       My first question is, at any point in that video did you ever think that the officer was likely to be bitten?

**A       At any point.  Again, looking at the dogs' body language, he could have been -- it could have turned at any point.  What the dogs were displaying, I didn't really see that. I saw dogs that were, again, being more aggressive and cautious due to fear and stress than they were being aggressive.**

Q       If an officer instead had shot one of those dogs as they were jumping at him, would that have been justified?

**MS. JONES:  Objection.**

**A       As stated earlier, it's what the officer perceives.  Again, this officer seems like he was pretty comfortable with the dogs. And again, I don't know what training he had,**

**RENO DiDOMENICO**

**but it said he had training.  So again, I don't know what's going on in the officer's head.  If he felt that at that time he needed to shoot the dog, then, again, he would have to be the one justifying it.**

Q    At various times in that video it looked to me like the dogs were charging at the officer.  Is that not what you saw?

**MS. JONES:  Objection.**

**A    I saw that the dogs were going up to the officer.  Again, I did not see an offensive aggression.  I saw barking.  But yeah, the dogs were going at the officer. Again, it's up to the officer's level of comfort.**

Q    Now, if you showed that video in your training, how would you differentiate between the dogs "going up to the officer" and dogs charging the officer?

**A    Well, as an instructor, I guess I would show the -- I would have to have a counter video and show what I mean by a dog that's being aggressive, which is, again, it's that Nampa video that will be at the end here.**

RENO DiDOMENICO

But, you know, that video there, that officer kind of did everything that I do in my training and what I tell these officers. He used nonlethal to get the dog away, because the one dog -- the black dog kept coming a little closer to him. Again, his comfort level at that point. He didn't feel comfortable, so he sprayed that dog. The boxer would back off. To be honest with you, the boxer was probably being more aggressive than that black dog was, in my opinion.

Q In the trainings that you do and the videos that you show in your trainings, does -- do you have something to contrast with the Nampa video to show the difference between when an officer is being charged at versus here where the dogs are just approaching the officer?

A I don't have anything like this video, but I would -- I kind of used that New York City video to be more of the bluff charge type of scenario. But I don't have something like that, no, which would probably be a good video to use. Thanks for showing it.

RENO DiDOMENICO

Q    It's a good video.  But you said in the New York City video, that's a shooting that you tell the officers was justified.  Correct?

MS. JONES:  Objection.

A    Yeah, because -- yes, because the officer felt that that's what needed to be done.  And if you know the background to that video, the officers weren't trained in any type of dog encounter, so their initial reaction was to shoot the dog.  He felt that he was in danger, even though he kind of missed that the dog did a bluff charge prior to the old lady.  That's why I use it, because I kind of tell the officer, well, you have to look at the dog's -- like you say, the totality of the circumstances.  You have to look at everything.  What did that dog do prior to them coming at you.  Can a dog turn at any time?  Yes, a dog can turn from defensive threat to an offensive, aggressive dog at any time.  It's up to the officer to make that determination.

Q    Do you know if those officers in the NYPD video were disciplined or retrained in any way?

RENO DiDOMENICO

A    The only background on that case was about the dog, Star.  I do not know if they were trained or retrained or -- my guess is, being in New York City, no, but -- and that was, you know, like 2012.  All that stuff was still not -- it wasn't a thing yet.

Q    So do you think that that shooting in New York City was reasonable under the totality of the circumstances?

A    Yes, I think it was reasonable, but what I kind of use in that is I kind of show that the dog was just trying to keep people away, and I talk about bluff charging.  I tell them the lady wasn't bit.  She moved into the dog's space, the dog just tried to back her out.  The lady didn't avoid the bite.  She could barely move, right.  So if the dog really wanted to bite her, it would have.  And then it turned its aggression on that officer and went after him.  Again, at that point the officer has to make a decision, is this dog coming at me to bite me or is this dog coming at me to back me off.  He has to make that decision.  But I discuss bluff charging.  I discuss that

**RENO DiDOMENICO**

**stuff throughout that video.**

Q    Wasn't the dog just trying to move the officer back if it was bluff charging?

**A    Yes.**

Q    Now, is what you're saying that if an officer is simply afraid, then that's enough to justify the shooting?

**A    If the officer is in fear of being injured, yes.  Imminent threat.**

Q    Even if that fear is unreasonable?

**MS. JONES:  Objection.**

**A    Under whose determination?  The officer or a court?  I mean, my thing as a police officer is we go home safe.  So if he reasonably fears for his safety and that this animal is posing an imminent threat to his safety, he can shoot it by New York State law.**

Q    Didn't you say earlier that the standard is imminent threat of serious bodily injury or death?

**MS. JONES:  Objection.**

**A    Yes.  Pretty much that's what the law says.**

Q    So he has to be more than just

RENO DiDOMENICO

fearful that he might be bitten?

A     Well, serious injury is serious injury.  I mean, you don't know what that dog is going to cause you until that dog attacks you.  So if he's in fear of serious physical injury, he's justified in shooting the dog.

Q     Now, are you aware of any RPD officers that have ever been seriously injured by a dog attack?

A     I don't know myself.  I know there's been officers who have been bitten and they've gone to the hospital, but I don't know the circumstances of their injuries.

Q     Are you aware of any other local police departments where an officer has been seriously injured or killed as a result of a dog attack?

A     Not that I know of, no.

Q     Is that something that you teach officers, that even if a dog bites you, you're not going to be seriously injured most likely?

A     Yeah.

MS. JONES:  Objection.

A     Yeah.  We talked about that

RENO DiDOMENICO

earlier.  I talk about how many dogs are in the country and how many people die.  I tell them that.

Q    So do you tell them that that's something they should consider when they are making a determination of whether their fear of being seriously injured is reasonable in making that determination before they decide to pull out their gun and shoot the dog?

MS. JONES:  Objection.

A    Do I tell them it's something that should be considered?  I don't necessarily say it that way.  Basically what I'm saying to them is that if you do get bit, it's not going to be the end of the world, is what I tell them.  I'm not saying, well, you should consider that if you get bit, you should just take the bite because most likely you're going to survive it. That's not what I'm telling them.  That's what you're kind of saying.  I'm not going to tell anybody that.  I'm going to tell them that if you're in fear of being bit or receiving an injury, you're justified in shooting that dog. That's what I tell them.  However, I also tell

**RENO DiDOMENICO**

**them, if you get bit, it's not the end of the world. Most likely you're going to survive it. That's what I tell them.**

Q Okay. So just to make sure I understand, you tell them basically, if you're going to -- if you're in fear of being bit, you can shoot the dog. Right? But you don't have to shoot the dog and maybe it should go into your determination of whether or not your fear of being seriously injured is reasonable because most people aren't seriously injured if a dog bites them?

MS. JONES: Objection.

**A Again, I don't necessarily think that's something that should be -- their mindset or their survival technique, and it's always been this way, is you go home safe at night uninjured. I'm not going to tell an officer to take a bite or think about whether or not you're going to be seriously injured before they react. I'm going to tell them, if you feel that this dog is going to bite you and you feel that you need to shoot it, you shoot it. If not and you want to use some other**

**RENO DiDOMENICO**

**calmer measure that I teach them during this course, than they can do that as well. We go back and we start talking about the improvised tools, we're going to go back and discuss what happened in New York City. Could he have used his baton. If he recognized that that dog was just bluff charging, could he have used his baton to back off that dog. Could they have used pepper spray. As a matter of fact, the cover officer in that New York video tried to use pepper spray.**

Q    So I just want to make sure I understand. In short, your training says if you're in fear that the dog is going to bite you, you can shoot it. Right? Correct?

**MS. JONES: Objection.**

**A    My training is that if you're being attacked by an offensive, aggressive dog, that you're in fear of being injured or bit by that dog, you can shoot it. That's my training.**

Q    Even if that fear is unreasonable?

**MS. JONES: Objection.**

**A    Again, unreasonableness is determined by a court, not at the time of the**

**RENO DiDOMENICO**

**-- at the time of the incident.  They can't determine unreasonableness until you get to the court.**

Q     Sure.  I mean, but what we talked about earlier was, for example, they could misinterpret the signs that the dog is displaying.  The dog could be displaying playful signs and not aggressive signs and they shoot that playful dog that's running at them and just wants to play.  They would be justified, under your training, to have shot that dog.  Is that right?

**MS. JONES:  Objection.**

Q     If they objectively feared that they were being attacked, even if they were wrong?

**MS. JONES:  Objection.**

**A     They would -- again, they would be -- their actions would be justified to themselves.  Again, a court would determine whether or not -- they would have to explain to the court and to everyone else why they shot that dog, even if it was a playful dog.  Right. If their fear, right, is that that dog is going**

RENO DiDOMENICO

to bite them, then they have a right to protect themselves. Whether or not their actions were appropriate at that point is up to either their bosses, the city or a court to determine whether their action was appropriate at that time. I'm teaching them what to look for and how to reduce them from shooting a dog. If they decide to shoot a playful dog, they're going to have to justify it. I can't stop them from doing that. I'm just an instructor giving them awareness and understanding and tools so that when they're in that situation, they can make that determination better. I'm not going to fix every officer that's out there from shooting a dog. It's not going to happen.

Q Part of your training is, if you get this wrong and you shoot a dog and it's not justified, you could be held liable in court. Right?

A Exactly.

Q Okay. And --

A That's why I included all that. I ended up reviewing that after I gave it to the sheriff's office. I ended up reviewing it and

said, hey, I found some stuff online in regards to that, and I said, this would be good to include it because, in reality, every police officer's action is always scrutinized. It's the court that determines reasonableness. If he or she acted inappropriately, that court or that department would make that determination at that point. But my job is to teach them how to protect themselves and how to recognize what a dog is to protect them from lawsuits, and that's what I'm hoping -- I'm hoping nobody would shoot a playful dog after taking my course. That was the idea. The idea was to reduce the number of dogs being shot in the City. That was the idea, because there probably were officers that were shooting playful dogs because they just happened to be pit bulls that were in a yard that they happened to be in and the dog came up to them and they shot them. There's a number of videos online, I'm sure you've seen them, where the dogs are pit bulls and they're just coming up to the officer and the officer shoots them. I don't necessarily think that that officer was

**RENO DiDOMENICO**

**right in doing that, but he's justified to protect himself if he's in fear. It's up to a court and their bosses to determine whether that was right or not.**

Q One thing that you said was you reviewed some stuff online, you added it to the training, and you reached out to the sheriff's department. Right. So did you follow up and train on that added information? Was that after you had provided the training initially to the sheriff's department?

**A The added information came in after the sheriff's department training. It only had to deal with the implied immunity.**

Q Okay. That's what you added before you gave it to Rochester?

**A Right. And you've got to understand, the sheriff's department -- in my twenty-two years in the sheriff's department, I only know of three dogs that were shot, okay. After I left, there was another one. So four, okay. The one that started the -- this whole process. So we don't shoot a lot of dogs in the county. But because of the close proximity**

**RENO DiDOMENICO**

**in the City of dogs and houses, there's a lot more incidents in the City because they are -- they weren't recognizing the body language of the dogs. They just saw pit bull, they saw this dog is coming up to me, and, like I said, we hope -- we hoped to reduce the number and we did. That was the goal. I think we achieved that goal. I think we're still achieving it. I don't think there's anywhere near the numbers they were when we started this.**

Q    When you started this, how many dogs per year were being shot?

**A    I think there were -- there were over twenty, if not like thirty. Close to thirty. Anywhere between twenty and thirty dogs. On average, over those years that we talked about earlier, they were looking at anywhere between ten and twelve dogs a year. So we reduced it.**

Q    So --

**A    A lot of those dogs -- a lot of those dogs that were shot in those ten or twelve were warrants. So they were shot there on a warrant execution.**

**RENO DiDOMENICO**

Q    So you're saying in about 2013 it was twenty to thirty, and then by 2017 it went down to about --

**A    About ten to twelve.**

Q    -- ten to twelve?  So those were the years you had the statistics for?

**A    Mm'hm'.**

Q    Have you followed up at all about what it was in the past few years?

**A    I have not.**

Q    Okay.

**A    Again, to be honest with you, being here, hearing the number of dogs that were shot before the training and now, we don't hear of a dog being shot as much in the City as we used to.  It's just not.  We would get the calls, we would get the complaints.  You know, it's -- I don't have statistics on it, but I'm not hearing that a lot of officers in the City are actually shooting dogs.  Not like they used to.**

Q    And do you attribute that drop to your training?

**A    Yup.  Well, I attribute it to training and I think attitudes of the officers**

**RENO DiDOMENICO**

**themselves that -- again, I think more people are more likely to try to help a dog than try to hurt it, and I think the officers are the same way. They're younger officers. They're used to all of that new family -- you know, pets are a family member, and I think that -- to be honest with you, I think most officers in the City right now would rather be bitten than shoot a dog.**

Q So what I want to do is I want to get back to some of these questions, but I want to finish the last few slides. So I'm going to put back up Exhibit 2, finish that up, and then go over some last questions.

So we were on page 42 of 51 of the PowerPoint. So we had talked about that. Then we go to the next slide, 43, "Talk to the dog." It says, "Communicate confidence or threat." So maybe we discussed this a little bit earlier, right, where you were talking about you've got to be assertive. The reason for that is the dog recognizes your body language. Right?

**MS. JONES:** Objection.

RENO DiDOMENICO

A      Yeah.  He's recognizing -- like I said in the previous line, you stand sidewise to make yourself look smaller.  Now you're going to stand straight on and make yourself look bigger.  You're not going to give direct eye contact, but you're going to be stern to that dog, you're going to give him commands.  You want that standoff, you want that dog to be thinking, okay, is this guy or girl going to -- is this going to be an easy prey or is this going to be a hard prey.  You want the standoff so that you can get out of there.  Again, if you yell bad dog, you know, go lie down, go to your bed, go sit down, stay there, a lot of times you've got enough, you have that standoff so you can back out of that situation.

Q      Can that standoff posture and the things you just discussed saying to the dog, can that work even when a dog is charging at you?

MS. JONES:  Objection.

A      Sorry.  If it's charging, at that point the officer is going to have to make that determination.  Is this dog charging to hurt me

**RENO DiDOMENICO**

**or not. If I feel the dog is charging to hurt me, I'm going to shoot it, so --**

Q It sounds like you have shared experiences where dogs have charged at you --

**A Yes.**

Q -- without shooting the dog. Correct?

**MS. JONES: Objection.**

**A In the next slide I go over that.**

Q Okay. In part of discussing the bite prevention tools, that's where you discuss that?

**A Yes.**

Q Is that what you were speaking about earlier with the baton that you used on the two pit bulls?

**A Yes.**

Q And --

**A Go ahead.**

Q That was the situation that happened at Lollypop Farm?

**A No.**

Q Okay. Where was that?

**A In the City of Rochester.**

RENO DiDOMENICO

Q    Okay.  Can you describe that for us, what happened?

A    Yeah.  So what I tell them is that I was investigating a report of cruelty at a home.  I was talking to the suspect and his wife.  We were standing in the driveway.  The two pit bulls from the neighbor's house came out.  The wife said they're usually not out without the owner.  She started to walk towards the dogs.  As the dogs -- as she walked towards the property line, the dogs charged her.  She turned and ran by me and I stepped in front of the dogs with my arms out and yelled stop, go back.  The dogs stopped, turned around and went back.  They then walked across the front yard and up the driveway.  And I'm telling the officers the whole story, right.  So I'm observing the body language of these dogs.  They were aggressive.  They were protecting their property.  Doesn't necessarily mean they were going to bite her, but you don't know.  They did stop when I yelled at them.  I go -- I told them, when I walked down the driveway into the middle of the street to find out where the

RENO DiDOMENICO

dogs went to, I asked them, why do you think I did that.  You usually get one smart guy saying, because you didn't walk on their property.  I say, correct.  I then tell them I looked down the neighbor's driveway and I see the two pit bulls and there's a little six year old girl holding the side door open.  I yelled to her, hey, are those your dogs, and then I yelled to her, where are your parents, and she gave out like a little -- I don't know if she was yelling, mom, but she gave a scream and slammed the door.  The two dogs saw me, came running down the driveway.  Again, putting everything together, as you say, I made an observation of those dogs.  They were coming at me.  I pulled my baton, I hit the first dog in the head with the baton, and then the second dog I tried to do a reverse strike on the dog.  Because the first dog yelped and ran, the second dog veered off and followed the other dog, and they both ran up the driveway and then the woman came out -- the mother came out -- the mother came out and put the dogs in the house, so -- and then I go into, you know, I

RENO DiDOMENICO

was able to defend myself with just the baton, but I looked at the body language and felt I was comfortable.  If the baton didn't work at that point, I probably would have went to my firearm and shot the dogs.  But it would look bad that an SPC officer shot the dogs first thing, so I used the baton.  So I tell them that.  I said, but if you feel comfortable that you can defend yourself with a baton, I would use the baton.  But myself, I would use it second.  Shoot the dog would be my second option in that scenario.  That's how I tell them how a baton would work for them.

Q    Got it.  All right.  So is there anything else you talk about on slide 44 with these bite prevention tools listed here?

A    Just go over them, flashlight, stick, a rolled-up magazine.  They're all something you can put to defend yourself and let the dog bite that.  A clipboard.  I don't even think they use clipboards, to be honest with you.  Everything is computerized.  Then of course road flares.  Then I go back and I talk about, could any of these things have been used

**RENO DiDOMENICO**

**in New York City. Could any of these things have been used in Lubbock, Texas. They're like, oh, yeah, you could have used a baton, you could have used umbrellas, you could have used -- they go over it.**

Q Okay. So if we go to the next slide, it's got three things, OC spray or citronella spray, the taser and then improvise the fire extinguisher. We talked a little bit about that earlier. So what do you tell them generally about the use of these things?

**A Again, I would talk about the OC spray. And, as a matter of fact, I do have it in the Baltimore study right there. But anyway, I tell them about the OC spray and how it won't work on a dog that's charging to bite you, but it will work on dogs in a standoff to keep the dog away from you. Or you could use it -- like in Lubbock, Texas, could you have sprayed those two dogs to determine what was going on with those dogs. Could you have used it in New York City to back the dog away from the guy who was having the medical issue to treat him. Everyone is like, oh, yeah, you**

RENO DiDOMENICO

don't have to necessarily shoot the dog. If you have these tools available to you, you can use them. Citronella spray, again, that was from Randy Lockwood. He said that the post office uses it. I don't know if they do or not, but I threw it in there. And then the electronic repellant. There's also electronic repellant because of the taser. But there are ultrasonic guns, stun guns, and we talk about taser and how a taser will work on a dog, but the dog recovers quicker. A taser is designed for a vertical electrical system and the dogs are horizontal, and that's why it's not as effective, but you can use a taser. In certain situations when the dog is contained, or -- because this way the dog is, you know -- or you have animal control there, or when the dog is down, you can secure the dog. Or if the dog is attacking your partner, you might want to use a taser instead of shooting at your partner. So we talk about taser there to reduce that. That's pretty much what we talk about.

Q    All right.

A    Fire extinguisher. Again, it was a

**RENO DiDOMENICO**

**commonsense thing. Again, that was from Randall Lockwood, his course. Again, I don't know where he's getting this stuff from, but he said you can use the fire extinguisher on a dog to disorient it. It's a dry chemical. It disorients them. That's pretty smart. You can. He started mentioning about entries, that some SWAT teams in New York City are using fire extinguishers at high-risk entries. Again, a lot of the lawsuits, like the Carroll incident, is that you knew there were dogs, you need to plan for those incidents. He said, this is a way you can get around it because you're planning for the dogs, you have a fire extinguisher. When we were developing this course, we decided that that's not an option for our area. We will never put -- in a high-risk entry, we would never put an officer standing there holding a fire extinguisher. So they're going to have to come up with something else.**

Q    Got it. I know RPD SWAT uses, or they say that they use, if they know there's a dog there, the catch pole. But that's not

RENO DiDOMENICO

something that you train on.  Right?

MS. JONES:  Objection.

A    I don't know what the SWAT team uses.  They've never talked to me about it.

Q    Okay.  So you've never done any training specifically with the Rochester Police Department SWAT team for interactions with dogs?

A    No.  Just what this training was. That was it.  But they have their own animal control unit, so they might have done it.  I didn't.

Q    Okay.  So then do you know what this slide is here?  Is that the --

A    That's the Nampa video.

Q    So let's watch the Nampa video.

A    I kind of tell them this is their test.

MR. SHIELDS:  So that will be Exhibit 6, Nampa video.

(Whereupon, Plaintiff's Exhibit 6 was marked for identification as of this date.)

Q    One second.  Nampa.  Right?

RENO DiDOMENICO

**A     Nampa, Idaho.**

Q     I meant to make the screen bigger.

(Video played.)

Q     My first question is, as we're paused at 10 seconds into the 1 minute and 31 second video, the officer hears the dogs barking at that point.  Is there anything that he could have done at that point?

**MS. JONES:  Objection.**

**A     That's part of the test.  Again, they watch the video after learning everything that I just taught them.  And again, you get reactions from the gallery, right.  When they hear that, they start kind of giggling because now they know, right, they've been enlightened, they've been -- and they start saying, oh, well, he probably shouldn't be standing there.**

Q     Okay.  So that's something that you do discuss?

**A     Yeah.  After they watch the video. We're going to go through -- I always play the video, then I ask those same questions and we go through the video.**

Q     Got it.  Okay.  So I'm going to

RENO DiDOMENICO

play it again.  So what's the answer?  What should he have done when he heard the dogs barking at that point?  Got out a nonlethal option, like pepper spray and --

MS. JONES:  Objection.

A     Well, yeah.  Again, we go through the video and, you know, a lot of people say he should hold the door, a lot of people say he should close the door.  When you hear the video, there's a lockbox on the door and you never see the bottom of the door.  I say, maybe he couldn't shut the door.  So they start -- you know, you go from the New York City video where they're saying I don't know what they could have done different, to you get to this video and now they're giving you all these answers because now they're thinking.  So they start going through what he could have done different.  Again, when you play this, you can hear him eventually say, sounds like big dogs, and then he stands right in front of the door.  He continues to stand there.  And we call that the fatal funnel.  So I tell them, where -- you know, where was he standing.  They all say, the

**RENO DiDOMENICO**

**fatal funnel. Is that a place to stand. No. Then I show them the garbage can. I say, what's the garbage can, and they go, that's a barrier. So they go through it and they catch everything that's in this video that I want them to catch. What a lot of them miss is the cover officer pointing the gun at him, you know, as he runs to his aid after he's being attacked by the dogs.**

Q    So it sounds like what you're saying is most of the things that he could have done differently are in the moments from where we're paused right now at 10 seconds into the video through and up until the dogs exit the door?

A    **Right.**

**MS. JONES:  Objection.**

**MR. SHIELDS:  Okay. So I'm going to hit play again. We're paused at 10 seconds into the 1 minute 31 second video.**

**(Video played.)**

Q    So it sounds like -- so that's now when you would proceed to the discussion.

RENO DiDOMENICO

Right?

A     Right.

Q     Okay.  And so is there anything else about the discussion that usually you would lead or ask of the officers after watching those videos that we didn't discuss earlier?

**A     No.  We just do those same questions.  We go over it.  We talk about the barrier.  We talk about the menacing from his partner.  And again, we -- a lot of people like to concentrate on that door.  Why didn't he shut the door.  We also talk about moving away and creating distance between the door, using the garbage can as a barrier.  You know, put the garbage can in front of the door and create distance.  Those are the things that we go through.**

Q     And do you talk about the officer basically having the time and opportunity to either give himself more distance back down the driveway or take out any of the other bite prevention tools?

**A     Right.**

**RENO DiDOMENICO**

Q     Okay.

A     You know, he had time.  He heard the dogs inside.  Nobody came to the door right away.  Start thinking, okay, I've got dogs in here, what do I got.

Q     And do you discuss how that could all be considered as part of the totality of the circumstances if a court is later reviewing the officer's actions?

A     Yes.  What did you do prior to shooting the dog.  It's a lot better to say, you know, I put a barrier up, I created distance than to stand in front of the door and get -- you know, to get attacked.  We also talked about -- at that point, too, I also ask them, you know, where on the force continuum are those dogs, and those are lethal dogs.  They're actively charging on him and attacking him.  So they're lethal dogs.

Q     So in the end, this is a situation where he could have done more to avoid it in the beginning, but despite the fact that he put himself in the fatal funnel, --

A     Right.

**RENO DiDOMENICO**

Q      -- it was a justified shooting because they were basically jumping up on the officer?

**A      Right.  It's justified, but could it have been prevented.  Yes.  But again, were those officers trained.  I don't think they were.  So that's the whole point of the training.  All right.  The whole point of the training is to let them make that reasonable decision.**

Q      Okay.  So we move on to the next slide, "Suggested practice."  We discussed the force continuum.  And so this is the force continuum as applied from the officer to the dog in these different interactions. Correct?

**A      Yeah.  So, you know, how they should interact with a dog when they first see it, what is the force continuum.  Again, the force continuum, it doesn't necessarily mean you have to follow from point A to point B. You can start anywhere.**

MR. SHIELDS:  I guess I'm not sharing my screen.  Just to -- so I'll be clear on the same page, let me put

**RENO DiDOMENICO**

**Exhibit 2 back up. There we go.**

**MS. JONES: Somebody came into my office. That wasn't about the deposition. I informed somebody I was still in the depo. I don't know if it came through on the mic.**

**MR. SHIELDS: We couldn't hear you.**

**MS. JONES: Never mind.**

**MR. SHIELDS: Okay. For the record, that was page 47 of 51 which was entitled "Suggested practice" and it discusses the use of force continuum.**

Q Let me just see. It looks like at the bottom here, you know, you advise the officers that it helps reduce injury and provides legal justification for the officers against lawsuits. That would be what you were discussing about the previous video. Right?

**A Right.**

Q Use a barrier, you do all these things to try to avoid the shooting. It shows, hey, look, this was inevitable, I did everything I could. Right? Okay.

**A Correct. I'm sorry. I'm nodding**

**RENO DiDOMENICO**

**my head.  Yes.  Correct.**

Q    So that's what you teach the officers, that you should do everything you can to avoid the shooting, but ultimately if it's necessary to avoid, you know, imminent serious bodily injury or death, then you're justified in shooting?

**MS. JONES:  Objection.**

Q    I saw you nod your head.  Was that a yes?

**A    I'm sorry.  Say that question again.**

Q    Sure.  The question was, based on these slides, what you teach officers in your training is you should do everything you can to avoid using lethal force, such as going through the force continuum, but ultimately if the officer reasonably believes that the dog is attacking and that they're in imminent danger of serious bodily injury or death, then they're justified in shooting the dog?

**MS. JONES:  Objection.**

**A    Yes.  Yes, basically.  Again, it's like anything else.  You have -- as a police**

**RENO DiDOMENICO**

**officer, sometimes you have to make things up because you weren't trained. Now that you have the training, you should be trying to use the steps before you take that lethal force.**

Q    Okay. So if we move on to slide 48. So this quick assessment, this is something that the officers would do when they arrive at a scene with a dog?

**A    Yes. Or prior. Like you're responding to a loose dog, you know, the dog is acting aggressively. You might ask the dispatcher, has he bitten anybody yet, where is the owner. You might be asking those questions, or when you arrive on scene.**

Q    Okay. We can move on to slide 49. This is just advice if the officer is bitten. Right?

**A    Yup.**

Q    We'll move on to slide 50. Okay. So is this a video that you sent us?

**A    Yes. That's the CNN video.**

Q    Okay. I don't think we need to watch that one. Can you just kind of describe what --

RENO DiDOMENICO

A      It's a wrap-up of -- basically it's also kind of an entertainment video, because, as I said, everything I just taught you for the last hour and a half, two hours, I could have just played this one-minute video and you would have gotten the whole thing. It's kind of a little laugh, because it does cover a lot of the stuff real quickly in it. It doesn't cover everything, of course, but it's a chuckle video, so --

Q      Okay. So now I kind of want to play it. We might as well just do that.

A      It's like a minute long. Not even.

Q      Okay.

A      Again, the chuckle video, listen to the reporter's name at the end.

MR. SHIELDS: Let me put it to the beginning. All right. So this video, for the record, will be Exhibit 7.

(Whereupon, Plaintiff's Exhibit 7 was marked for identification as of this date.)

MR. SHIELDS: I'm going to mark that for myself. All right. Let me

**RENO DiDOMENICO**

**share the screen.**

Q    Officer, can you see that video on your screen?

**A    Yes.**

Q    I have it -- here we go.

(Video played.)

Q    All right.  Okay.  So I see what you're saying, Holly Firfer.

**A    Holly Firfer.**

Q    So that's basically a quick little recap.  Right?

**A    Yes.**

Q    The body language.  Got it.  Okay. And then the last slide we don't need to put up, but that's just question/discussion. Right?

**A    Yes.**

Q    Now, is there anything that you always make sure to bring up in that question/ discussion period at the end?

**A    No.  Usually I open for questions. I might get a couple questions or somebody wants to clarify something, but there's nothing that I normally bring up unless somebody asks a**

**RENO DiDOMENICO**

**question for it.**

Q   Are there certain questions that always come up?

**A   Yeah.  If I run into a dog, I'm calling you.  That's what -- how do I call you when I run into a dog, basically.  But no. Usually they're pretty satisfied at that point.**

Q   Now, do you teach officers that if they respond to a scene and there's a loose dog or problems with dogs, that they should call animal control?  Is that anything that you discuss with them?

**A   Well, if they find the dogs on routine patrol on their own, yeah, they should call animal control, which they normally do. If a call comes into 911 in Monroe County, a call comes into 911 that it's a loose dog running loose, they always send a police and contact animal control.  They're always being dispatched anyway.  I'm talking about Monroe County.  In the City, it's the same way, but normally the city police are so busy, it's just animal control responding to check on that loose, stray dog.  Unless the animal control**

**RENO DiDOMENICO**

**officer gets there and it's a real aggressive dog that they might feel, you know, then they might wait for the police before they interact with it. But in the City, the city police don't normally go to loose dogs unless it's after hours, and then they respond.**

Q    Okay. Now I'm just going to go over some other questions, and we might have covered some of them earlier. Other than the videos that we discussed, do you talk about how to differentiate between a dog that's attacking versus simply bluffing or threatening?

**A    Like I said, I just mention it in that New York City video where the bluff charge is. I don't show a video. I don't show a picture. I don't -- I just basically explain to them what a bluff charge is.**

Q    Okay. Because in the videos that I've seen from the RPD, it seems like a lot of shootings happen in situations where officers are approaching a dog, and that would be an easy thing for officers to mistake. So I guess my question is, is that something that is really emphasized in the training, how to make

RENO DiDOMENICO

that differentiation and how to recognize when it's an appropriate shoot versus a don't shoot situation?

A     I wouldn't say it's emphasized at all, no.  I mean, it's talked about, but it's not emphasized.  It's just, again, be aware that some dogs will charge you or come up to you in a bluff charge.  That's pretty much what is discussed.  It's not, well, this is what a bluff charge looks like, this is how you react to it, because, again, I'm not that officer.  I may look at that and -- I may look at that and say, that's a bluff charge.  Another officer may look at that and say, that dog is attacking you.  We don't discuss it because I don't want them to say, well, he told me it was a bluff charge and I got, you know, three or four stitches in my leg because I didn't shoot the dog.  So we don't discuss it.  It's up to the officer.

Q     Okay.  And similarly, does the training discuss or emphasize how to differentiate between a dog that poses an actual imminent danger to an officer versus a

RENO DiDOMENICO

dog that does not but could be mistaken to be posing an actual imminent danger?

A    Again, it's kind of the same thing. I mean, it's what that officer is perceiving. I don't think you can teach it.  Again, I'm not a behaviorist.  Maybe there is a way to teach it.  But I don't think you can teach what somebody is perceiving.  You can tell them about it, you can give them some characteristics of what an animal may act like or may not act like, but not everything is a hundred percent, and I tell them that in the training as well.  Even though I'm telling you this is what this dog's characteristics are, that doesn't necessarily mean that's how the dog is going to behave.  You have to perceive it yourself, how you feel.

We had a dog here one time at Lollypop that would bark, wouldn't growl, it would just bite you.

You know, you -- it's -- the personality of a dog is just like the personality of a person.  You can't give every scenario of what can happen.  That person has

**RENO DiDOMENICO**

**to perceive it.**

Q    Sure.  So you don't teach objective things that can be observed to make that determination, because you're not a behaviorist.  Is that what you're saying?

**MS. JONES:  Objection.**

**A    I'm not going to teach somebody something that says, well, a dog always acts this way before it bites you, because that may not be a hundred percent correct.  That dog may still bite them.  That dog may still attack them.  I'm going to give them awareness.  I'm going to give them descriptions of what could happen, but they're the ultimate person that has to, say, make that decision on whether or not they need to shoot that dog or use a baton or retreat, or whatever they need to do with that dog.  I'm only giving them the knowledge and the tools.**

Q    Got it.  Now, we might have discussed this a little bit before.  Does the training address the legal requirements for entering and searching residential property?

**MS. JONES:  Objection.**

**RENO DiDOMENICO**

**A        No, but the officer should know that himself already in other training.**

Q        And does it similarly address the legal requirements for entering someone's yard where you might encounter a dog?

**A        No.   We're not -- we're not discussing search and seizure.**

Q        Does the training address the various kinds of situations, such as different types of service calls, where officers might encounter a dog?

**A        No.   You mean like specific -- like a stray dog or are you talking like a person with a medical condition and has a service dog?**

Q        Correct.   Like a call for a loose dog or, for example, calls about domestic incidents. Does it address, for example, that, you know, if you respond to a call of a domestic incident or family trouble, there's already a volatile situation, the dogs might already be excited and that would be something that you need to pay extra careful attention to when responding to a call like that?

**A        Yeah.   We discuss -- again, one of**

**RENO DiDOMENICO**

**those slides it should say request the dog to be put away. We kind of discuss that. Whether it's domestic or even if you're there to take, you know, a report for a criminal mischief, if you see that there's a dog there, my advice to them is always ask to have the dog put away. Can I force them to do that? No. Myself as a deputy, I sat at kitchen counters and pet dogs as I'm taking a report. But my advice to them as being their trainer is you ask to put the dog away.**

Q     Okay. And going back to the police academy training. You said that they asked you to start presenting to the Monroe Police Academy a couple of years after you presented the 2014 training. Correct?

**MS. JONES: Objection.**

**A     Yes. Again, I think -- I'm pretty sure it was 2016, 2017 maybe.**

Q     Do you update that training every year? Do you like review case law and --

**A     Yeah, I review it. I go over it and I look for any -- I'm constantly searching the internet and stuff for new incidents or**

**RENO DiDOMENICO**

**case law or whatever.  What's happening.**

Q    So, for example, those videos that we watched earlier, are they the same videos from 2014 --

**A    Yes.**

Q    -- still used today?

**A    Yes.**

Q    Have you ever been provided with any body camera videos of dog shooting incidents by the RPD?

**A    No.**

Q    Did you ever see the body camera video of Officer Algarin shooting my client's dog in this case that was posted on the internet by the Democrat & Chronicle?

**A    No.**

Q    I guess I just find that a little surprising.  You say you look on the internet for incidents like this, but you didn't see the Democrat & Chronicle article about the case?

**MS. JONES:  Objection.**

**A    You have to pay for the Democrat & Chronicle, and I don't pay for the Democrat & Chronicle on the internet.**

**RENO DiDOMENICO**

Q      That explains it.  Now, what kind of feedback did you get from the RPD after you presented the training?

**A      From the officers that I presented at the training, I got a lot of positive feedback.  A lot of positive feedback from the officers that were there.  The administrative staff that was there at the time, I did not get any real feedback from them at all.  That whole regime is gone anyway.  But from the officers themselves, I got a lot.  Again, most of those officers were also officers I worked with when I was a deputy as well, so I kind of knew most of them.  They're going to be honest with me. But even the ones that I didn't know, I had a lot of positive feedback.**

Q      Okay.  So the officers gave you positive feedback, but the administration didn't really give you any feedback?

**MS. JONES:  Objection.**

**A      Yes.  Correct.**

Q      Okay.  Did any officers or the administration express any concerns about anything from the training?

RENO DiDOMENICO

A       No.

MS. JONES:  Objection.

A       Sorry.  No.

Q       Did they express any suggestions for any additions or changes?

MS. JONES:  Objection.

A       No.

Q       Okay.  Did any officers report that they felt better prepared to handle dog-related incidents after the training?

A       To me, yes.

Q       And was that just like in passing, in conversation, or did anybody send you written notes or e-mails or anything like that?

A       No written notes or e-mails.  It was usually right after the lesson or if I ran into them out in the field, they would come up and say, hey, I had a dog encounter the other day and I did what you told me and it worked.

Q       After the training -- for example, when Ms. Jones and I have to take a continuing legal education course, one thing that's usually required at the end is to write feedback immediately after.  Is that something

RENO DiDOMENICO

that you have officers do after you provide them with the training?

A     You mean like an evaluation of the course?

Q     Correct.

A     We did at that time.  I didn't always get them back.  I did get some back.  Again, it was positive.

Q     Do you still have that written feedback that you received after the 2014 training that you gave to the RPD?

A     No.  I kept it for awhile and then I threw it away.

Q     Okay.  Is that something that would have only been provided to you or do you know if it would have been provided to -- like a copy to you and a copy to RPD as well?

A     It was something that I actually had come up with, because, again, we had just started this program, so we wanted to find out, you know, like you said, was there anything that we could have changed, not changed.  Also we wanted to show, because we wanted to try to get this out to other agencies as well to show

**RENO DiDOMENICO**

**the positive feedback.  Once we did that -- like I said, it took off right after the City locally here.  Like I said, the FBI asked for it, ATF, marshals, probation, parole.  A number of the local agencies.  A lot of the towns did not do it because it -- their in-service, but when it was discussed and put in the academy, the town was behind it, the town police department.  So that's what it was used for initially.  I think I kept them maybe two or three years and then I threw it out for space.**

Q     Other than the spreadsheets that we discussed earlier that you're going to look in your e-mail for, did the RPD provide any feedback on the effectiveness of the training?

**A     No.**

Q     Okay.  Do you have any idea, other than the spreadsheets, how the Rochester Police Department measured the effectiveness of the training?

**A     How they did it.  No.  I have no idea how they did.**

Q     Now, do you know if the training was officially approved by the Rochester Police

RENO DiDOMENICO

Department?

A     **The training from 2014?**

Q     Correct.

A     **It was part of their -- I think it was their winter in-service or fall in-service. So it was approved by the command staff.**

Q     So before you presented the training, did you have to give them a copy of materials or anything to review to approve it, prior to giving the training?

A     **I don't remember if I submitted it to their training department or not.  I do know we did go to and sit down with the chief at the time and talk about it with a couple of his deputy chiefs, and I kind of told them what we did with the sheriff's office, and then it was within a few months later is when they called me -- the training department called me.  I can't remember if I provided them the PowerPoint at that time or not.**

Q     And was that Ciminelli?

A     **Yeah. I think he was the one that approved it.  Or he was the deputy chief at the time.**

RENO DiDOMENICO

Q     Okay.  And were there any changes or feedback that any -- Ciminelli or any of the deputy chiefs or any of the supervisors gave to you?

A     No.

Q     Do you know if the training was mandatory for all officers?

A     I don't know.  Again, that's an internal thing with them.  It's part of -- like I said, it was part of their in-service.  It was almost -- like I said, almost every day for a month and a half.  I'm assuming it was mandatory training.  Whether everyone showed up, I don't know.  I'm pretty sure it was part of their yearly in-service training.

Q     Now, in 2019 the RPD gave a roll call training which was basically an abbreviated version of your PowerPoint presentation that contained only about half the number of slides.  Did the RPD ever reach out to you about doing that roll call training?

A     You said 2019?

Q     Correct.

A     I don't know anything about that

**RENO DiDOMENICO**

**training.**

Q       Okay.  So if the RPD presented an abbreviated version of your presentation at roll call and there were about 25 slides instead of 51, would those slides -- that would have been something that was called out or paired down by the RPD, not by you.  Is that right?

**A       Correct.**

Q       In the presentation that you provided to the police academy, that's the full PowerPoint that we went over that's about 51 slides.  Correct?

**A       Correct.**

Q       Other than the spreadsheets provided to you by the RPD, have any other departments provided you with any sort of evaluation of the effectiveness of the training?

**A       No.  Again, like I said, it's --
it's an awareness training.  It's something to
give officers an additional thing to think
about.  It's not really -- I don't think
anybody really measures it.  It's more of, hey,**

**RENO DiDOMENICO**

**this kind of teaches us a little bit about this topic so that we know about it. I don't think it's like they're taking statistics. Like I said, even -- even some of the rural police departments that I taught it to, they really don't get involved with a lot of dog shootings. They do a lot of dog encounters, they might run into the dogs, but they're not really doing a lot of shooting of dogs in the rural areas.**

Q    Why do you think that there's so many more dogs that are shot by the RPD than departments in rural areas?

**MS. JONES:  Objection.**

**A    This is my opinion.  It's not fact. I think it's because the owners of those dogs -- we go back to why dogs are -- why dogs bite, because they're not socialized properly, they're not trained properly. I think that's what happens more in a lower-income level area is they have dogs, but they're not -- it's the owners themselves that are creating the condition of more aggressive dogs than you would in a rural or county area.**

**RENO DiDOMENICO**

Q    It's not simply because RPD officers have more interactions with dogs than officers in outlying areas?

**MS. JONES:  Objection.**

**A    Yeah, I'm sure that they run into more dogs in a close area than, you know, in a county.  I don't necessarily think that they are running into more dogs.  I think that the close proximity.  If I'm in the county and I'm working out in -- I don't know if you're familiar with the area at all around here, but --**

Q    Oh, yeah.  I grew up in Rochester.

**A    Okay.  So if I'm out in the Town of Sweden and I'm at somebody's house that's two acres, you know, I have a lot of room when that dog first approaches me compared to I've got fifteen feet from the sidewalk to the front of the house. So it's the close proximity of the dogs and the officers compared to, you know, a seventy-five foot driveway.**

Q    So multiple factors is what it sounds like?

**A    There's a lot of factors, I think,**

**RENO DiDOMENICO**

**involved.  Me working both areas, being in the rural and working in the City --**

Q      The geography is one that you just discussed?

**A      Geography.  I think lack of training and knowledge of the owners is another.**

Q      So demographics.  Right?

**A      Demographics.  Yup.**

**MS. JONES:  Objection.**

Q      More poor people in the City. Right?  What about breeds of dogs.  Is there a different -- different people in the City have different types of breeds of dogs, generally, than people in rural areas?

**A      I think that it's -- it's all about the same.  There's people in the -- there's -- I don't want to say there's more pit bulls in the City, but breed of dog -- like in the lesson, breed of dog doesn't really have anything to do with aggression.  It's how they're -- how they're brought up, how they're trained, how they're raised.  A golden retriever can bite you just as easily as a pit**

**RENO DiDOMENICO**

bull. A Chihuahua can bite you probably more than a pit bull. The problem is, you don't hear about the Chihuahua bite because they're usually smaller than a pit bull bite. I think that there are maybe more pit bulls in the City and there's that stigma. Again, it's in my lesson, in my notes. There's a stigma for certain breeds, just like, you know, in the '70s it was German Shepherds and Rottweilers. Now it's pit bulls. I don't think pit bulls -- I run into a lot of pit bulls and they're not aggressive. I don't think that's -- but it's a perception. That's, again, one of the things that the course addresses. Just because you're dealing with a pit bull doesn't mean you're dealing with a dog that's aggressive. I think that's what also helps reduce the number of shootings, because the officers understood that, that, hey, I'm dealing with aggression, not breed.

Q Got it. So you try to dissuade them of the misperception that pit bulls are inherently aggressive and dangerous?

MS. JONES: Objection.

RENO DiDOMENICO

    A    Right.  In my opinion and stuff that I've read and seen, it's not the breed, it's usually the owner.

    THE REPORTER:  When it's a good time, can we take a break?

    MR. SHIELDS:  I am -- yeah, let's take a break now.  I'm getting pretty close here.  Five minutes?  Do you need longer?

    THE REPORTER:  That's perfect.

    We'll go off the record, and the time is 3:33 p.m.

    (Whereupon, a recess was taken from 3:33 p.m. until 3:41 p.m.)

    THE REPORTER:  We are back on the record, and the time is 3:41 p.m.

    Q    Officer DiDomenico, the same question as before after we took a break. Anything that was thought of during our break that you wanted to either clarify or change the answer to?

    A    (Inaudible.)

    Q    No?  You might be muted.  I couldn't hear you.  Yeah, you're on mute.

RENO DiDOMENICO

A       No.  I am -- nothing to clarify.

Q       Great.  Just a few more questions. After you gave the initial training in 2014, did the RPD ever ask you to help them craft any policies for the department regarding interactions with dogs?

A       No.

Q       Okay.  So they never asked you to do another training or to do any policies, but did they talk to you about providing the academy training?

MS. JONES:  Objection.

Q       How did that come about, that you began providing the academy training?

MS. JONES:  Objection.

A       The academy training, there's a group called the Law Enforcement Council in Monroe County, and it's made up of all the chiefs of police in the Monroe County area, including the federal agencies, and commander -- well, was he -- I'm trying to remember what he was at that time.  But anyway, I think it was -- he was chief deputy at the time, Phelps, and brought it up that the training should be

**RENO DiDOMENICO**

**put into the academy, and all the chiefs agreed to it. I continued to do that training for the sheriff's office post-academy to their officers. The -- it wasn't being done in the City after that point, so they brought it up to the Law Enforcement Council and the Law Enforcement Council agreed to do it, and this way everybody who goes through that, including the towns, would receive it.**

Q Have you provided additional in-service trainings to the sheriff's department?

**A I'm sorry?**

Q Since providing the initial training in 2014, have you continued through today to provide in-service training at the sheriff's department?

**A No. It was just the initial training, and then every recruit has been getting it since I did the training.**

**MR. SHIELDS: Just give me a second to review my notes here.**

**(Pause in the proceedings.)**

Q Do any other -- I'm sorry. Let me withdraw that. So you provide the academy

RENO DiDOMENICO

training, you said, to two police academies. Right? So Monroe County, and that's at the Public Safety Training Facility. Is that right?

A       Correct.

Q       And then you said it was Genesee. Is that right?

A       Genesee Community. Yes.

Q       Are there any other police departments or academies that you've presented the training to or that used that training?

A       Not that I know of, no. I mean, I teach at another academy, but again, their time is limited, so they don't give me a four-hour block, they only give me the two-hour block to do the law portion. I don't do the dog encounter then.

Q       Earlier you mentioned getting training at Alfred State University. Have you ever presented your training at Alfred State University?

A       The dog encounter training, no. That's the one that doesn't give me enough time to teach it. I go down to Alfred at their

**RENO DiDOMENICO**

**academy, and they only have so much time, so they only give me two hours to do the animal cruelty portion.**

Q     Other than this PowerPoint slide, have you ever participated in or designed any other dog bite prevention trainings?

**A     No.**

Q     Is there anything else about the training or about officers' use of force against dogs that we haven't discussed that you'd like to add?

**A     No.  I think that's good.**

**MR. SHIELDS:  Thank you, Officer. I have no further questions for you.  I don't know if Ms. Jones might have follow-up questions.**

**MS. JONES:  I do have a few questions.**

**EXAMINATION BY**
**MS. JONES:**

Q     You mentioned a few times that you provide this training on dogs at the Monroe County Academy?

**A     Yes.**

**RENO DiDOMENICO**

Q     What law enforcement agencies attend the academy in Monroe County that you're referring to?

**A     The majority of the police departments in Monroe County, but it's a regional academy, so anybody can send their officers to that academy. I've had officers from the surrounding counties also in there. Other police departments in there as well.  It depends on the size of the academy and who --**

Q     Does the Rochester Police Department send their recruits through that academy?

**A     Yes.**

Q     And earlier today you sent me an e-mail of the documents and videos that you had previously provided to Mr. Shields.  Is that right?

**A     Yes.**

Q     Did you modify any of the time or date stamps on the prior e-mail chain prior to sending it to me?

**A     No.**

**MS. JONES:  Okay.  Those are all**

**RENO DiDOMENICO**

the questions I have.

MR. SHIELDS:  All right.  Thank you, Officer. I have no follow-up questions to that, so we should be all set for today.  I appreciate your time.

THE REPORTER:  The time on the video screen is 3:49, and this concludes the deposition.

MS. JONES:  The City will only want an electronic copy.

MR. SHIELDS:  The same for the Plaintiff, please, Michelle.

(Time noted: 3:49 p.m.)

_____

RENO DiDOMENICO

Subscribed and sworn to before me this ____ day of _____, 20____

_____

Notary Public

I N D E X

TESTIMONY

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| Reno DiDomenico | Mr. Shields | 6 |
| | Ms. Jones | 248 |

EXHIBITS
PLAINTIFF

| EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Reno DiDomenico's resume | 10 |
| 2 | PowerPoint presentation | 23 |
| 3 | Video | 103 |
| 4 | Video | 109 |
| 5 | Video | 185 |
| 6 | Video | 213 |
| 7 | Video | 223 |

INSERTS

| DESCRIPTION | PAGE |
|---|---|
| (None) | |

REQUESTS

DESCRIPTION                                         PAGE

Production of the spreadsheets                       148

Production of additional statistics                  153
created by the department in
subsequent years

Production of video                                  157

Production of the blacked out videos                 169
in the PowerPoint

MARKED FOR RULING

DESCRIPTION                                         PAGE

(None)

CERTIFICATION

STATE OF NEW YORK    )

                     )  ss

COUNTY OF ORANGE     )


          I, Michelle Conero, a stenotype reporter and Notary Public within and for the State of New York, do hereby certify;

          That the witness whose Examination Before Trial is hereinbefore set forth was duly sworn by me;

          That such Examination Before Trial is a true and accurate record of the testimony given by said witness.

          I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

          IN WITNESS WHEREOF, I have hereunto set my hand this 10th day of June 2023.


          _____
          Michelle Conero

**ERRATA SHEET FOR: RENO DIDOMENICO**

RENO DIDOMENICO, being duly sworn, deposes and says: I have reviewed the transcript of my proceeding taken on 05/31/2023. The following changes are necessary to correct my testimony.

_____

PAGE LINE      CHANGE                      REASON

----|----|--------------------|--------------
----|----|--------------------|--------------
----|----|--------------------|--------------
----|----|--------------------|--------------
----|----|--------------------|--------------
----|----|--------------------|--------------
----|----|--------------------|--------------
----|----|--------------------|--------------
----|----|--------------------|--------------
----|----|--------------------|--------------
----|----|--------------------|--------------
----|----|--------------------|--------------
----|----|--------------------|--------------
----|----|--------------------|--------------
----|----|--------------------|--------------
----|----|--------------------|--------------
----|----|--------------------|--------------

         Witness Signature:_____

Subscribed and sworn to, before me

this ___ day of _____, 20 ___.

_____        _____

(NOTARY PUBLIC)             MY COMMISSION EXPIRES

**A**

**a.m (4)**
1:15 5:4 94:3,5
**abandoned (2)**
61:24 74:12
**abbreviated ...**
238:19 239:4
**able (12)**
45:11 49:20
69:20 72:8
83:6,11 89:21
98:5 132:23
156:6 166:4
209:2
**above-noted ...**
1:22
**abuse (2)**
18:16 19:3
**academies (5)**
55:6 58:9 59:6
247:2,11
**academy (32)**
15:23 16:14,25
17:3,9 26:15
55:7,13,16,19
56:18,22 59:4
75:2,9 231:14
231:16 236:8
239:12
245:12,15,17
246:2,25
247:14 248:2
248:24 249:3
249:7,8,11,14
**accept (1)**
59:3
**accepting (1)**
93:2
**access (1)**
149:10
**accident (1)**
76:7
**accurate (5)**
13:8 179:4,9

180:5 253:14
**achieved (1)**
202:8
**achieving (1)**
202:9
**acres (1)**
241:17
**act (7)**
54:6 79:13
129:9 159:12
163:25
228:11,12
**acted (1)**
200:7
**acting (8)**
35:7 69:24
71:3 76:23
78:25 79:19
80:3 222:12
**action (4)**
45:15 199:6
200:5 253:17
**actions (16)**
45:11 48:19
70:17 77:11
81:4 133:15
133:17 134:8
134:20 137:3
137:19 167:8
167:25
198:20 199:3
218:10
**active (3)**
69:24 77:6
169:14
**actively (3)**
83:7 162:6
218:19
**activity (1)**
174:5
**acts (1)**
229:9
**actual (8)**
28:10 88:18

115:9 122:19
148:7 150:15
227:25 228:3
**add (2)**
177:20 248:12
**added (9)**
31:3,4 170:7,7
170:12 201:7
201:10,13,16
**adding (1)**
12:6
**addition (3)**
21:17 31:9
41:25
**additional (9)**
106:2 146:11
147:6 153:16
171:17 173:6
239:23
246:11 252:5
**additions (1)**
234:6
**address (6)**
5:23 124:12
229:23 230:4
230:9,18
**addresses (1)**
243:15
**adjust (1)**
121:19
**administer (1)**
3:17
**administrati...**
233:19,24
**administrati...**
146:20 233:8
**administrato...**
26:20
**administrato...**
147:8
**adopt (1)**
57:19
**advantage (1)**
79:20

**advice (4)**
181:18 222:17
231:6,10
**advise (1)**
220:15
**afraid (11)**
53:12,13,13
76:24,25
77:10 92:22
93:8 133:7
156:9 193:7
**Ag (4)**
51:2 97:23
141:4 168:13
**agencies (7)**
50:18 60:24
118:8 235:25
236:6 245:21
249:2
**agency (2)**
21:22 60:19
**agency's (1)**
49:24
**aggression (2...**
63:16 64:9
87:12 88:20
89:5 95:19,21
95:22 96:17
111:15 126:2
126:10 129:7
159:7,22
160:9,17
161:2,4 187:9
189:13
192:20
242:22
243:20
**aggressive (75)**
35:7 38:17
49:9 61:16
62:14 66:11
66:12 68:24
69:25 70:2,10
71:4 72:4

73:5 77:2
78:25 79:4,14
79:19,25 80:4
81:2 82:9,17
82:22,24 83:8
85:11 107:25
113:15
116:12,19
119:8,11
123:9 125:19
126:6 128:7
130:9 131:13
132:6,18
133:11 134:7
134:11
135:20
136:17,21
137:17,21
138:8 156:9
159:12 160:2
160:21 161:6
161:22 163:9
165:18
166:13 167:9
167:13
188:16,17
189:24
190:11
191:21
197:19 198:9
207:20 226:2
240:24
243:13,17,24
**aggressively ...**
222:12
**ago (6)**
6:21 61:23
148:16
150:16,21,21
**agreed (6)**
3:4,9,14 4:3
246:2,8
**Agricultural ...**
168:4

Agriculture (...
98:2,4 139:20
168:11,17
ahead (4)
41:21 104:22
187:25
206:20
aid (1)
216:9
ain't (1)
130:25
alarm (2)
82:11 183:19
Albany (2)
59:16,17
alert (6)
128:25 133:6
138:9 165:19
180:16 182:6
Alfred (5)
31:16 32:5
247:20,21,25
Algarin (3)
1:10,11 232:14
allow (1)
78:8
allowed (3)
15:10,12 137:3
Amendment ...
100:5,7,14
144:5,6
167:21
American (2)
25:19 26:15
amount (3)
43:16 147:16
151:10
analysis (2)
144:6,7
and/or (1)
22:8
Angel (1)
71:21
animal (82)

14:7,10,15
18:12,13,15
18:22 19:3,9
20:14 21:15
21:18,22
24:19 25:7,16
26:10,18,19
31:24,25
39:23 51:8
56:24 57:4
58:20 59:19
61:21 62:8
63:12 67:12
80:20,21,24
84:24 85:2
87:19,21 99:2
99:6,14 100:2
100:9,9,11,11
100:12
111:23 117:9
117:23
133:24,25
137:13,18
143:9,9,10,11
143:18
145:22 158:8
167:19,23,24
170:24
171:18 176:4
176:6,25
178:17,23
180:3 193:17
211:18
213:11
225:12,16,20
225:24,25
228:11 248:3
animals (22)
17:23 18:12
21:20 22:6,11
31:25 32:9
44:3,4 61:17
70:4 98:11
99:10 111:8

114:18
115:21
117:22
133:23,25
157:13
178:19
180:11
animated (1)
53:24
animation (4)
170:2,3,7,8
answer (17)
7:16 37:23,25
69:4 94:12
108:15
129:13 131:9
131:25 132:3
140:3 143:2,5
146:14
174:17 215:2
244:22
answered (3)
41:20 123:15
147:13
answering (2)
95:16 144:25
answers (3)
7:5 94:11
215:18
anticipate (1)
125:16
anxious (2)
164:15 165:2
anybody (11)
34:2 60:24
76:2 93:16
111:10,13
195:22
222:13
234:14
239:25 249:7
anymore (5)
21:8 74:24
156:21

163:14 169:6
anyway (6)
64:5 118:23
210:16
225:21
233:11
245:23
anyways (1)
142:10
appearances ...
5:6
appeasement...
54:4 69:24
77:6 78:7
80:3 128:10
163:24 164:2
164:10
169:15
181:11 182:5
applied (2)
25:16 219:15
applies (1)
81:24
apply (1)
15:11
applying (1)
81:10
appreciate (2)
93:20 250:6
approach (5)
171:22 174:14
174:16
181:13
185:21
approached ...
28:22
approaches (4)
78:7 81:7
131:18
241:18
approaching...
88:5 120:16
121:23 123:5
130:11

176:16,19,23
190:18
226:22
appropriate ...
68:16 87:3
199:4,6 227:3
approve (1)
237:10
approved (3)
236:25 237:7
237:24
approximate...
153:6
April (3)
12:6 41:5,12
archived (2)
149:12,13
area (9)
89:21 137:25
179:21
212:18
240:21,25
241:7,12
245:20
areas (5)
240:11,14
241:4 242:2
242:16
arm (1)
49:3
arms (1)
207:14
arrest (3)
15:5,10,11
arrestable (1)
168:10
arrested (2)
168:9,21
arrival (1)
180:14
arrive (2)
222:9,15
article (5)
1:20 22:23

98:19 135:24
232:21
**asked (17)**
12:22 18:17
28:22 29:5
30:5 72:11
131:10
140:21
147:11
149:14
162:21 172:7
180:2 208:2
231:14 236:4
245:9
**asking (7)**
6:14 11:14
42:2 54:3
132:2 147:21
222:14
**asks (1)**
224:25
**ASPCA (2)**
31:18,23
**aspects (3)**
37:19 38:3
145:22
**assertive (1)**
204:22
**assessment (1)**
222:7
**assignments ...**
17:22
**associate's (1)**
9:21
**Association (3)**
26:2,5,13
**assume (1)**
142:7
**assumed (1)**
7:13
**assuming (3)**
19:8 180:19
238:13
**ATF (2)**

47:25 236:5
**attack (21)**
76:12 77:3
79:22,22
89:19,22 90:6
90:22 121:24
122:19 124:8
125:4,17,25
126:3 135:11
143:16
180:21
194:10,18
229:12
**attacked (8)**
45:6 46:20
63:3 96:5
197:19
198:16
216:10
218:15
**attacking (38)**
35:7 38:17
63:15,25
64:13,20 65:3
84:16 87:4
88:20 91:13
92:13,14
94:17,18,22
95:20,23 96:8
122:13,14
123:6,7 126:7
126:8 129:9
130:14
134:24
139:18 143:7
155:13 187:7
187:8 211:20
218:19
221:20
226:12
227:15
**attacks (8)**
35:17,19 44:21
88:18 134:22

143:13,18
194:5
**attempt (1)**
78:9
**attempted (1)**
175:20
**attend (2)**
32:13 249:3
**attended (3)**
13:12 31:16
36:8
**attention (6)**
101:5,8 174:10
174:12 183:2
230:23
**attitudes (1)**
203:25
**attorney (2)**
4:14 8:13
**Attorneys (2)**
2:4,10
**attribute (2)**
203:22,24
**audience (1)**
182:24
**auditorium (1)**
40:13
**authorized (1)**
3:16
**available (5)**
43:19 50:5,17
68:10 211:3
**Avenue (1)**
2:5
**average (2)**
91:4 202:17
**avoid (12)**
44:20 51:24
54:5 73:16
117:3 126:15
192:17
218:22
220:22 221:5
221:6,17

**avoidance (4)**
51:15,19 53:21
54:9
**avoided (1)**
138:14
**avoiding (1)**
36:3
**aware (13)**
19:2 50:20
64:21,25
65:15,19
116:24
145:23
168:15
177:25 194:8
194:15 227:7
**awareness (13)**
33:25 35:21
46:3,10 85:6
107:9 140:20
145:11 147:4
176:24
199:12
229:13
239:22
**awhile (6)**
6:24 20:10
55:8 114:6
147:20
235:13

_____

**B**

_____

**B (2)**
132:16 219:21
**Baby's (1)**
175:2
**back (95)**
12:25 15:17
16:24 20:2
24:4,5 31:7
36:6,9 39:21
41:4,9,11
42:9 54:21
61:4 62:23

63:12 67:3,5
68:25 71:7
77:2 79:7
80:6,7 81:9
82:7,18 85:15
87:8,20 88:3
88:24 89:16
89:20,20
90:20 91:15
94:6 97:4
106:6,8,17
111:6 113:25
114:24
117:13
120:21 122:9
122:11
123:23 128:4
128:23
131:25 132:4
136:6 139:6
140:7,16
143:23 149:6
149:20,21
156:24
158:13
164:21,22,25
175:22
177:18 184:5
184:21
185:24 190:9
192:16,24
193:4 197:4,5
197:9 204:12
204:14
205:17
207:15,16
209:24
210:23
217:22 220:2
231:13 235:8
235:8 240:18
244:16
**background ...**
9:18,19 31:8

101:4 108:11
118:17
124:14 191:8
192:2
**backing (3)**
84:22 85:9,10
**backs (1)**
121:2
**backup (2)**
46:18 85:23
**backyard (13)**
80:17 119:4
138:5,7,10,12
139:11,13
140:23,25
141:10
142:14,15
**bad (16)**
44:24 78:23
82:19 106:11
106:20,24,24
107:3 110:13
110:13,14
112:18,19,20
205:14 209:7
**badly (1)**
78:23
**bag (2)**
74:13,14
**ball (2)**
82:13,13
**Baltimore (6)**
64:21 94:14,19
95:12 96:2
210:15
**barely (1)**
192:18
**bark (2)**
164:25 228:20
**barking (9)**
64:8 82:9
84:11 86:8
88:3 161:22
189:13 214:8

215:4
**barks (5)**
96:11,13 131:5
131:19,20
**barrier (16)**
61:14,16 62:6
62:7 65:25
66:3,14,24
73:7,9 84:23
216:5 217:11
217:16
218:13
220:21
**barriers (5)**
61:17,18 66:17
67:8,14
**bars (1)**
49:3
**based (5)**
20:7 36:7 37:2
174:20
221:14
**basement (1)**
61:25
**basic (4)**
38:21 59:20
145:18,19
**basically (110)**
12:9 14:12
16:4,8 18:8
20:22 21:21
30:25 33:17
33:24 34:9
35:5,20,25
38:23 39:3
40:14,16 42:6
44:20 49:7
50:6 51:2,8
58:7 61:13,13
61:19 62:11
63:8 64:3
68:16 71:24
74:12 78:13
81:10 89:6

91:5,14 92:19
95:4,8 97:21
99:9,13 100:3
100:11,24
101:19,23,24
101:25
103:23
107:22 110:2
110:3 111:5
111:20 113:4
113:6 115:6
115:14,22
116:23
119:10 120:2
120:7 121:21
122:2 123:19
123:20
124:10
127:25
128:14
130:19 132:4
132:9 141:18
155:17,19,21
156:19
158:16
159:18,24
162:15
165:14
170:20 171:5
171:20
173:23 174:9
174:14 176:5
176:8 181:12
181:18,23
183:10
187:19
195:14 196:6
217:21 219:3
221:24 223:2
224:11 225:7
226:17
238:18
**basics (2)**
40:20,21

**basis (4)**
22:20 117:22
142:7 151:11
**baton (30)**
22:25 42:20,23
45:7 61:7
62:21 63:2,5
63:9 67:15,16
69:13 73:6
74:4 84:24
89:14,14
197:7,9
206:16
208:17,18
209:2,4,8,10
209:11,14
210:4 229:17
**bay (1)**
63:12
**bear (1)**
4:19
**beat (3)**
80:12 118:18
119:3
**beaten (1)**
119:19
**becoming (1)**
133:14
**bed (5)**
83:9,10,15
84:10 205:15
**began (3)**
16:12 56:3
245:15
**beginning (6)**
34:5 81:16
106:18 111:7
218:23
223:19
**begins (1)**
180:14
**behalf (1)**
60:20
**behave (1)**

228:17
**behaving (1)**
78:22
**behavior (43)**
24:9,20 25:7
25:13 26:10
27:10 31:11
31:20,25
32:14 34:3
35:22 37:4,5
37:7,11,20
38:3 39:23
59:20,22 60:4
60:5,9 66:21
74:10,11
75:14,19
76:11 78:12
82:16 88:17
117:16
122:18 123:9
124:17 125:3
135:9,14
170:15,24
171:18
**behavioral (1)**
87:16
**behaviorist (...**
25:17 27:15
28:7,7 29:7
31:23 117:20
118:13
170:10,11
228:7 229:6
**behaviorists ...**
145:21
**behaviors (4)**
70:12 116:3
117:10
125:15
**believe (22)**
20:18 30:21
40:6 44:9
64:15 81:10
85:12 87:10

87:18 92:4,6
97:23 110:10
112:11 115:5
120:7 138:22
152:5 163:12
165:10,23
185:3
**believes (1)**
221:19
**belly (1)**
128:12
**beneficial (1)**
34:18
**benefit (1)**
151:14
**berate (1)**
123:17
**best (6)**
13:9 41:13
47:4 80:19
137:15
176:15
**better (16)**
46:16 49:20
58:7 69:20
73:6,7,11
86:25 120:9
160:12,15
164:5 172:16
199:14
218:12
234:10
**bicycle (1)**
17:19
**big (6)**
66:25 71:21
77:13 120:22
133:23
215:21
**bigger (3)**
64:16 205:6
214:3
**bills (1)**
141:16

**biscuit (1)**
183:21
**bit (40)**
13:19 33:16
34:17 45:22
53:14 74:8,15
77:10 86:25
89:3,4,25
91:5,11 92:23
92:24,24 93:7
93:8,11,11
118:10 124:3
125:17
155:19
160:12 164:4
186:6 187:22
192:15
195:15,18,23
196:2,7
197:20
204:20
210:10
229:22 240:2
**bite (60)**
23:21 35:13
46:8 62:24
64:5 72:24
73:15 74:10
84:14 85:20
86:10 88:4,7
90:3 93:23
95:24 107:15
108:4 115:6
115:15,22
116:10,11,17
116:18
118:19,25
119:23
120:24 121:7
124:8,18
127:18,22
128:18
135:15
176:18

182:12
192:17,19,23
195:18
196:20,23
197:15 199:2
206:12
207:22
209:17,21
210:17
217:23
228:21
229:12
240:18
242:25 243:2
243:4,5 248:7
**bite's (1)**
92:25
**bites (13)**
33:12,13 34:15
75:18 88:8
91:3,4,12
120:25 124:2
194:21
196:13
229:10
**biting (8)**
63:2,2 65:18
116:12 122:5
122:5,9
123:22
**bitten (8)**
92:5 117:2
188:10 194:2
194:12 204:9
222:13,17
**black (4)**
186:17,18
190:6,11
**blacked (3)**
156:14 168:25
252:8
**blacked- (1)**
169:13
**blacked-out ...**

163:20 169:10
**blah (3)**
132:20,20,20
**blamed (1)**
74:8
**blast (1)**
62:13
**BLESSING (...**
2:19
**block (3)**
56:21 247:16
247:16
**blood (1)**
253:18
**bluff (20)**
82:24 89:3,13
89:25 90:6
91:23 120:19
121:4 190:22
191:13
192:14,25
193:4 197:8
226:15,18
227:9,11,14
227:17
**bluffing (3)**
88:16 122:18
226:13
**blurry (1)**
187:19
**bodily (7)**
135:23 136:2
136:10
139:23
193:20 221:7
221:21
**body (21)**
42:17 45:13
69:22 88:23
126:17
132:10 134:4
134:18
145:22
155:20 156:4

159:3 160:18
188:12 202:4
204:23
207:19 209:3
224:14
232:10,13
**Bolland (2)**
39:24 40:10
**bone (1)**
82:12
**book (3)**
33:15 96:3
178:8
**booklet (2)**
50:14,16
**bosses (2)**
199:5 201:4
**bother (1)**
93:2
**bottom (12)**
75:19,20 88:16
98:24 106:10
115:9,9
122:17
125:13
159:19
215:12
220:15
**bounce (1)**
23:12
**bound (3)**
139:10,11,12
**boxer (2)**
190:9,10
**brain (1)**
119:8
**branch (1)**
84:25
**break (13)**
52:12 93:14,19
94:9,10
114:17
175:23,25
176:13 244:6

244:8,19,20
**breed (4)**
242:20,21
  243:21 244:3
**breeds (4)**
46:6 242:13,15
243:9
**breeze (1)**
171:18
**brief (2)**
77:17 115:15
**briefly (3)**
8:15 11:7
117:8
**bring (3)**
66:17 224:20
224:25
**brooms (1)**
63:11
**brought (4)**
104:14 242:23
  245:25 246:6
**budget (1)**
20:11
**budgetarily (1)**
17:8
**Buffalo (1)**
112:4
**build (1)**
99:11
**buildup (1)**
33:17
**bull (6)**
46:5 202:5
  243:2,3,5,16
**bulls (14)**
45:6 63:4
  103:11
  200:19,23
  206:17 207:8
  208:7 242:19
  243:6,11,11
  243:12,23
**bunch (1)**

24:4
**burglar (2)**
82:11 183:18
**bus (1)**
103:11
**business (1)**
5:23
**busy (1)**
225:23
**bystanders (1)**
113:19

———————
**C**

**C (3)**
2:2 5:14
  132:16
**call (23)**
44:21 46:13
  109:12 110:5
  122:11
  138:24 147:2
  148:22
  152:13
  153:10
  169:24
  215:23 225:6
  225:11,16,17
  225:18
  230:16,19,24
  238:18,22
  239:5
**called (8)**
8:15 12:2
  80:14 83:12
  237:18,19
  239:7 245:18
**calling (2)**
154:15 225:6
**calls (7)**
75:7 80:10
  118:6 181:8
  203:17
  230:11,17
**calm (2)**

33:9 132:16
**calmer (1)**
197:2
**calming (1)**
80:2
**camera (3)**
134:19 232:10
  232:13
**canine (3)**
25:14,20 26:6
**CapStun (2)**
61:9 63:19
**captain (1)**
18:17
**car (4)**
68:7 137:8,12
  184:6
**care (4)**
52:8,19 165:22
  180:11
**career (1)**
6:19
**careful (2)**
164:17 230:23
**Carroll (3)**
29:24 30:3
  212:11
**carry (5)**
22:13,24,25
  23:2 68:7
**case (15)**
1:7 6:16 11:4
  12:23 13:3,3
  72:22 102:3
  110:23
  139:15 192:2
  231:22 232:2
  232:15,21
**cases (1)**
133:24
**cat (1)**
179:13
**catch (5)**
65:21 80:23

212:25 216:5
  216:7
**categories (1)**
15:4
**cause (5)**
76:17,20
  135:14,16
  194:5
**caused (3)**
133:17 134:9
  134:22
**causes (1)**
135:10
**cautious (1)**
188:16
**CBS (1)**
157:7
**census (1)**
179:20
**certain (8)**
35:10 56:10
  72:24 88:22
  116:3 211:15
  225:3 243:9
**certificate (1)**
25:6
**certification ...**
22:16 253:2
**certifications...**
13:14 22:19
**certified (11)**
24:21 25:3,6,7
  25:7,10,13,16
  25:20 26:18
  26:19
**certify (2)**
253:9,16
**cetera (3)**
24:20 42:17
  164:8
**chain (1)**
249:22
**chair (2)**
66:24 68:12

**challenging (1)**
133:8
**chance (1)**
183:8
**change (14)**
33:18 43:11
  47:5,21 48:4
  65:9 94:12
  122:25 123:3
  159:13 160:5
  176:15
  244:21 254:5
**changed (8)**
21:5 44:3,8,14
  44:23 68:5
  235:23,23
**changes (5)**
167:8 169:5
  234:6 238:2
  254:3
**changing (1)**
21:2
**characteristi...**
126:7 127:8,13
  128:19 130:8
  158:5,19,20
  160:15 164:4
  165:16
  228:11,15
**characterize ...**
127:9
**charge (19)**
77:22 79:11,14
  89:13,25 90:7
  121:4 131:22
  160:21
  161:17
  190:22
  191:13
  226:15,18
  227:8,9,11,14
  227:18
**charged (9)**
71:25 89:3,7

89:11 107:13 168:16 190:17 206:5 207:12

**charges (5)** 81:2 85:10 138:12 140:23 141:19

**charging (52)** 44:25 48:13 64:23 68:17 69:10,19 77:23 82:24 86:14,15 87:4 89:17 91:18 91:23 95:10 120:19 126:18 129:9 129:24 130:6 130:7,13,20 130:25 131:4 131:13 132:7 132:19 136:18 138:18,21 139:9 161:23 162:5,6,9,10 162:16 163:3 163:10 189:8 189:20 192:14,25 193:4 197:8 205:20,23,25 206:2 210:17 218:19

**Charles (3)** 1:4,5 5:9

**chasing (2)** 80:16 139:3

**check (4)** 11:20 12:11 174:12 225:24

**checked (1)** 180:4

**chemical (1)** 212:6

**Chicago (3)** 64:17 172:5,9

**chief (4)** 113:5 237:14 237:24 245:24

**chiefs (6)** 75:10 113:3 237:16 238:4 245:20 246:2

**Chihuahua (2)** 243:2,4

**child (2)** 18:16 139:17

**Chronicle (4)** 232:16,21,24 232:25

**chuckle (2)** 223:10,16

**Church (1)** 2:11

**Ciminelli (2)** 237:22 238:3

**circumstanc...** 13:2,5 71:12 72:22 73:4 84:6 134:14 139:2 144:3,7 163:5 191:17 192:10 194:14 218:9

**Citizen (1)** 25:20

**citronella (3)** 62:17 210:9 211:4

**city (70)** 1:9 2:10 5:11 8:13,17 10:7 10:10,22

12:12,15 29:15 30:19 30:19,20,21 43:8,9 55:23 61:22 67:4,7 72:18 74:17 75:8 88:24 91:21 102:4,5 102:6,9 104:2 127:11,12 132:14 147:22 148:19 177:13 178:10,21 179:23 190:22 191:3 192:5,9 197:6 199:5 200:16 202:2,3 203:16,20 204:9 206:25 210:2,23 212:9 215:14 225:22,23 226:5,5,15 236:3 242:3 242:12,14,20 243:6 246:6 250:10

**civil (3)** 1:21 6:16 167:22

**civilian (1)** 29:4

**civilians (1)** 108:7

**Civilly (1)** 140:6

**clarification ...** 94:13

**clarify (4)** 94:12 224:24 244:21 245:2

**clarifying (1)** 96:7

**class (8)** 47:24 53:11,15 56:2,17 74:9 132:2 145:9

**classes (2)** 56:14 156:18

**classroom (1)** 22:23

**clear (2)** 126:23 219:25

**clenching (1)** 132:25

**click (1)** 183:23

**client's (1)** 232:14

**clipboard (1)** 209:21

**clipboards (1)** 209:22

**close (8)** 162:24 201:25 202:15 215:10 241:7 241:10,20 244:9

**closed (1)** 175:2

**closer (1)** 190:7

**Club (1)** 25:19

**CNN (2)** 157:9 222:22

**colleagues (1)** 92:21

**collected (1)** 148:15

**College (3)** 9:25 55:7,15

**come (18)** 24:18 36:6

48:4 52:5,18 80:5 102:13 118:9 142:12 165:23 180:22 182:10 212:21 225:4 227:8 234:18 235:20 245:14

**comes (12)** 35:17 83:14 87:25 93:10 124:20,21 136:23 140:15 143:11 176:6 225:17,18

**comfort (2)** 189:16 190:7

**comfortable ...** 39:5 79:24 186:7 188:24 190:8 209:4,9

**coming (29)** 49:11 67:12 77:14 82:25 88:8 91:22,22 105:23 110:21 120:19 130:15,16 135:18 152:5 159:18 164:3 165:15,16,17 165:18 182:16 186:7 190:6 191:18 192:22,23 200:23 202:6 208:16

**command (5)** 53:2 81:8 84:9 96:12 237:7

commander ...
29:10,18 31:15
50:3 245:21
commanders...
52:22
commands (4)
84:20 86:7,18
205:8
comment (1)
65:5
COMMISSI...
254:25
common (4)
35:10 49:4
78:20 80:9
commonsens...
48:6 83:16,18
184:9 212:2
communicat...
78:6,10 134:6
181:11
204:19
Community ...
9:25 55:7,15
247:9
compared (5)
16:6 91:21
131:16
241:18,21
compensatio...
174:11
competent (1)
145:12
compile (1)
153:13
complaints (2)
42:12 203:18
complete (1)
150:11
completely (1)
13:7
complied (1)
72:13
compliment ...

52:5
comprehensi...
174:12
computer (2)
148:14,16
computerize...
209:23
concentrate (...
217:13
concepts (1)
42:25
concerns (1)
233:24
concludes (1)
250:8
conclusion (1)
117:17
condition (2)
230:15 240:24
conduct (1)
4:19
conducted (1)
4:5
Conero (3)
1:23 253:7,24
conferences (...
55:11
confidence (3)
54:4 78:11
204:19
confident (7)
128:25 133:5,6
138:8 158:15
182:6,6
confirm (3)
23:18 41:10,12
confirming (1)
4:11
confronted (3)
71:16 125:14
182:3
confusing (1)
7:10
consider (9)

44:6 71:11
79:9 89:13
107:12,16
123:8 195:6
195:17
consideratio...
134:25
consideratio...
71:9,16
considered (5)
67:24 99:10
100:9 195:13
218:8
Considering ...
163:4
consistent (1)
96:9
constantly (3)
119:4 174:11
231:24
Constitution...
102:15
consult (2)
27:10 150:23
consultant (2)
25:8,14
consulted (1)
170:23
contact (6)
125:5 157:25
158:2 159:2
205:7 225:20
contacted (1)
151:17
contain (2)
67:11,13
contained (3)
62:12 211:16
238:20
content (1)
138:20
context (2)
144:21 145:16
continue (7)

78:9 105:22
120:23
121:11
154:20 155:7
186:9
continued (3)
153:12 246:3
246:15
continues (2)
82:17 215:23
continuing (1)
234:22
continuum (...
70:4,11 81:11
81:16,23 82:4
84:7,8,12
87:19,21
88:11,13
117:9 120:2
120:13 122:3
123:18
164:23
218:17
219:14,15,19
219:20
220:13
221:18
continuums (...
120:14
contrast (1)
190:15
contribute (1)
124:2
contributing ...
75:18
control (20)
4:9 14:11,12
44:21 67:12
80:21,21,24
118:8 175:25
176:3 178:18
178:24
211:18
213:12

225:12,16,20
225:24,25
controlled (1)
66:9
convenience ...
142:15
conversation...
8:14 234:14
cookie (2)
82:12 183:22
cop (3)
35:14 108:6,7
copies (1)
169:10
cops (4)
34:9 35:9
101:6 105:10
copy (11)
4:15 10:6,10
10:19 148:12
152:3 169:8
235:18,18
237:9 250:11
cornering (1)
76:22
correct (74)
7:14 8:24 9:11
10:24 13:13
13:16 14:16
15:20 16:15
17:5 20:15,16
23:6 27:6
32:6 34:24
36:4 39:18
41:18 48:19
50:19 51:21
53:10 57:9,18
57:21 66:19
68:18,20
71:12 81:24
87:12 92:2
101:18
102:23 106:4
109:7 112:22

114:21
117:11 125:5
129:10,16
144:3,9,22
160:22,23
161:7,12,13
163:12
171:13
180:18,22
191:4 197:16
206:8 208:5
219:16
220:25 221:2
229:11
230:16
231:17
233:22 235:6
237:4 238:24
239:10,14,15
247:6 254:3

**correctly (2)**
11:13 32:11

**costs (1)**
4:19

**council (4)**
147:7 245:18
246:7,8

**counsel (6)**
3:5 4:4,6,17
5:5 6:4

**counselor (1)**
18:10

**count (1)**
44:2

**counter (1)**
189:23

**counters (1)**
231:9

**counties (1)**
249:9

**country (3)**
46:23 50:18
195:3

**county (30)**

13:25 16:13
17:13 22:2
29:25 43:7,10
47:23 55:6,13
55:18 58:4
72:18 75:10
177:13
179:23,24
201:25
225:17,22
240:25 241:8
241:10
245:19,20
247:3 248:24
249:3,6 253:5

**couple (8)**
6:19 55:22
60:7 81:5
124:5 224:23
231:16
237:15

**course (42)**
10:25 15:14
20:9 32:15
33:25 35:21
37:10 40:23
41:6,8 43:2,9
46:3,10 52:5
52:6 100:22
101:22
102:24 107:8
107:9,20
108:14 110:9
110:12 111:2
118:21
128:12
140:20
145:12
147:17,18,20
197:3 200:14
209:24 212:3
212:17
223:10
234:23 235:5

243:15

**court (30)**
1:2 3:19 4:6,9
4:11 7:4
60:14 100:17
116:3 134:17
141:6,13,14
142:4,10
143:4,21
144:17 145:3
193:14
197:25 198:4
198:21,23
199:5,19
200:6,7 201:4
218:9

**cover (4)**
197:11 216:8
223:8,9

**covered (5)**
46:2 77:18
102:11,12
226:10

**covering (1)**
22:23

**covers (1)**
99:25

**COVID (2)**
55:8 56:14

**craft (1)**
245:5

**create (1)**
217:17

**created (3)**
43:5 218:13
252:5

**creating (2)**
217:15 240:23

**credentials (1)**
12:18

**criminal (8)**
9:22 15:3 16:3
57:12,17
58:13 71:5

231:5

**CROSBY (1)**
2:18

**cross (3)**
127:9,13,13

**crouched (2)**
77:8 164:2

**crouched/hu...**
160:18

**cruelty (15)**
14:8,11,15
18:15 20:14
21:15,18
56:24 57:4
133:24,25
167:23,24
207:5 248:4

**curious (1)**
95:6

**curriculum (3)**
57:14 59:3
60:2

**curtilage (1)**
140:11

**cut (1)**
97:19

───────────
**D**
───────────

**D (3)**
5:14,14 251:2

**danger (17)**
46:15 95:19
96:4,8 104:5
106:11
111:23 113:8
113:12 136:2
136:9 139:22
160:6 191:12
221:20
227:25 228:3

**dangerous (26)**
41:13 42:11
98:20 99:22
115:10,12,17

115:19,20,21
115:25
116:14,15
117:18,21
118:2,12,16
118:25 119:6
119:22
135:24 156:3
162:17
183:14
243:24

**dangers (1)**
94:22

**DARE (1)**
53:23

**dark (1)**
187:18

**data (6)**
148:17 150:9
152:10 153:6
153:11,16

**date (11)**
10:17 11:18,19
23:10 59:7
103:9 109:16
185:7 213:24
223:23
249:22

**dates (3)**
11:7,8 55:21

**daughter (1)**
5:9

**Dave (3)**
29:11,18,20

**David (1)**
40:6

**day (10)**
16:23 17:2
76:7 91:8
171:7 234:20
238:12
250:22
253:21
254:24

**days (1)**
16:25
**DCJS (1)**
58:10
**deadly (8)**
70:6,25 86:16
90:10,16
92:16 102:17
133:21
**deal (9)**
53:25 80:21
92:22 93:5,9
127:6 128:22
176:19
201:15
**dealing (19)**
38:13 42:15
46:7 49:8,9
49:13 66:11
74:6 93:3
117:21
137:13
145:20
151:25 156:6
156:7 166:2
243:16,17,20
**deals (1)**
39:16
**death (5)**
136:3,10
193:21 221:7
221:21
**deathly (1)**
53:13
**December (1)**
30:11
**decide (4)**
18:4 143:21
195:9 199:9
**decided (4)**
17:8 18:14
139:5 212:17
**decides (1)**
142:9

**decision (7)**
45:9 70:13
71:2 192:22
192:24
219:11
229:16
**deescalate (2)**
127:23 158:24
**deescalation ...**
51:15,19 53:20
54:8 127:22
**defend (14)**
45:2 49:22
69:3 85:7
110:20
135:21
139:19
141:17 143:6
143:16,19
209:2,10,20
**Defendants (3)**
1:12 2:10 5:12
**defended (2)**
45:6 63:4
**Defense (2)**
32:19 36:10
**defensive (12)**
22:22 42:18
49:2 127:10
127:17 128:4
128:23
132:15 133:5
133:13
169:15
191:20
**definitely (1)**
41:10
**definition (3)**
116:2,4,7
**degree (1)**
9:22
**demand (2)**
149:2 153:23
**demanding (1)**

154:18
**demo (2)**
181:20,21
**Democrat (4)**
232:16,21,23
232:24
**demographic...**
242:9,10
**demonstrate ...**
54:4 106:2
160:25
**Dempsey (3)**
1:4,5 5:9
**department (...**
2:10 6:13 16:3
24:14 27:4
32:19 35:3
36:10,11,15
36:23 42:8
44:9 50:10
52:18 57:12
57:16 58:13
68:6 94:16
96:3 112:4,10
151:17
153:12
171:24 172:9
172:18,25
178:7 184:20
200:8 201:9
201:12,14,19
201:20 213:8
236:10,20
237:2,13,19
245:6 246:12
246:17
249:13 252:5
**departments...**
55:10 64:16
72:12 194:16
239:18 240:6
240:14
247:11 249:6
249:10

**depending (5)**
54:15 73:3
107:13
159:10
179:13
**depends (9)**
73:3,10 82:5
131:7 136:21
139:4 173:2
185:25
249:11
**depo (1)**
220:6
**deposed (1)**
179:6
**deposes (1)**
254:1
**deposition (18)**
3:15 4:5,20
6:16,24 8:3
56:8 103:6
109:13 146:7
149:15
153:23
154:19
157:16 169:8
185:4 220:5
250:9
**depth (2)**
100:21 155:20
**deputy (13)**
13:24 17:16
24:13 44:19
171:13 183:7
183:16 231:9
233:14
237:16,24
238:4 245:24
**describe (4)**
120:18 187:15
207:2 222:24
**describing (1)**
84:6
**DESCRIPTI...**

251:10,22
252:3,12
**descriptions ...**
229:14
**design (2)**
31:11 41:23
**designated (2)**
14:20,24
**designed (4)**
27:11 49:23
211:12 248:6
**designing (1)**
50:25
**despite (1)**
218:23
**destroy (5)**
99:15 100:3,10
102:10,11
**destroying (2)**
100:8 143:4
**destruction (2)**
98:10 144:14
**details (1)**
43:4
**determinatio...**
69:17 70:24
90:15 119:21
130:13
133:20
136:24
146:20,21
166:15
179:12
191:22
193:13 195:7
195:9 196:10
199:14 200:8
205:25 229:5
**determine (19)**
72:9,13 76:12
117:20
118:12
134:15,21
141:6,13,14

143:21
144:18 147:8
178:25 198:3
198:21 199:5
201:4 210:21
**determined (3)**
142:3,11
197:25
**determines (2)**
124:17 200:6
**Detroit (1)**
64:17
**developed (1)**
101:23
**developing (2)**
40:19 212:16
**development...**
59:24
**devoted (1)**
54:12
**DiDOMENI...**
1:19 5:1,21 6:1
6:9 7:1 8:1
9:1 10:1 11:1
12:1 13:1
14:1 15:1
16:1 17:1
18:1 19:1
20:1 21:1
22:1 23:1
24:1 25:1
26:1 27:1
28:1 29:1
30:1 31:1
32:1 33:1
34:1 35:1
36:1 37:1
38:1 39:1
40:1 41:1
42:1 43:1
44:1 45:1
46:1 47:1
48:1 49:1
50:1 51:1

52:1 53:1
54:1 55:1
56:1 57:1
58:1 59:1
60:1 61:1
62:1 63:1
64:1 65:1
66:1 67:1
68:1 69:1
70:1 71:1
72:1 73:1
74:1 75:1
76:1 77:1
78:1 79:1
80:1 81:1
82:1 83:1
84:1 85:1
86:1 87:1
88:1 89:1
90:1 91:1
92:1 93:1
94:1 95:1
96:1 97:1
98:1 99:1
100:1 101:1
102:1 103:1
104:1 105:1
106:1 107:1
108:1 109:1
110:1 111:1
112:1 113:1
114:1 115:1
116:1 117:1
118:1 119:1
120:1 121:1
122:1 123:1
124:1 125:1
126:1 127:1
128:1 129:1
130:1 131:1
132:1 133:1
134:1 135:1
136:1 137:1
138:1 139:1

140:1 141:1
142:1 143:1
144:1 145:1
146:1 147:1
148:1,21
149:1 150:1
151:1 152:1
153:1,12,14
154:1 155:1
156:1 157:1
158:1 159:1
160:1 161:1
162:1 163:1
164:1 165:1
166:1 167:1
168:1 169:1
170:1 171:1
172:1 173:1
174:1 175:1
176:1 177:1
178:1 179:1
180:1 181:1
182:1 183:1
184:1 185:1
186:1 187:1
188:1 189:1
190:1 191:1
192:1 193:1
194:1 195:1
196:1 197:1
198:1 199:1
200:1 201:1
202:1 203:1
204:1 205:1
206:1 207:1
208:1 209:1
210:1 211:1
212:1 213:1
214:1 215:1
216:1 217:1
218:1 219:1
220:1 221:1
222:1 223:1
224:1 225:1

226:1 227:1
228:1 229:1
230:1 231:1
232:1 233:1
234:1 235:1
236:1 237:1
238:1 239:1
240:1 241:1
242:1 243:1
244:1,18
245:1 246:1
247:1 248:1
249:1 250:1
250:18 251:6
254:1,1
**DiDomenico'...**
251:11
**die (3)**
33:13 91:3
195:3
**died (2)**
92:5,6
**difference (8)**
15:7,14 30:25
90:6 91:11
92:13 130:10
190:16
**differences (1)**
91:25
**different (25)**
12:23 14:23
15:3 20:19
39:24 40:8
46:6 49:3
55:6 58:19
59:6 127:14
128:19
151:12 156:3
157:9 158:3
164:3 215:16
215:20
219:16
230:10
242:14,14,15

**differentiate ...**
189:18 226:12
227:24
**differentiati...**
227:2
**differently (2)**
104:6 216:13
**direct (6)**
158:9,17 159:2
171:21
174:25 205:6
**directly (4)**
20:11 52:25
136:15 177:6
**director (1)**
21:3
**disaster (3)**
21:24 22:2,7
**disasters (1)**
22:4
**disciplined (5)**
45:17 112:24
112:25 113:2
191:24
**discuss (39)**
63:6 65:13
71:15 81:22
87:10 91:11
91:17,19,23
92:11 100:15
100:16
102:19
110:14 120:2
126:16 140:9
140:12
144:20 165:6
165:9,11,13
166:2 176:19
180:24
192:25,25
197:5 206:12
214:20 217:7
218:7 225:13
227:16,20,23

230:25 231:3
**discussed (16)**
61:6 64:19
102:22 114:9
117:8 178:4
204:20
205:19
219:13
226:11
227:10
229:22 236:8
236:14 242:5
248:11
**discusses (2)**
33:6 220:13
**discussing (3)**
206:11 220:19
230:8
**discussion (14)**
106:8,11,14
108:20
109:24
110:11
113:16
124:21 135:2
135:8 174:7
216:25 217:5
224:21
**disk (1)**
169:11
**disorient (1)**
212:6
**disorients (1)**
212:7
**dispatched (1)**
225:21
**dispatcher (1)**
222:13
**displaced (1)**
22:10
**display (1)**
116:3
**displaying (13)**
78:11 91:23

107:20,24
133:4,4,5,9
166:23
174:20
188:14 198:8
198:8
**dissuade (1)**
243:22
**distance (9)**
94:18,20 95:12
130:11 162:8
217:15,18,22
218:14
**distances (1)**
95:2
**district (3)**
1:2,2 19:19
**diverted (1)**
173:8
**division (2)**
14:8 21:10
**document (1)**
89:23
**documents (3)**
9:15 50:21
249:17
**DOE (1)**
1:10
**dog (657)**
9:9 14:11,12
23:21 24:8,22
25:11 26:2
27:10 28:24
28:25 30:4
31:11,20
32:14,20 33:8
33:9,11,13,17
33:19 34:2,6
34:14,17,22
35:6,13,16,17
35:18,18,20
35:22 36:3
37:4,5,7,11
37:16,19 38:3

38:9,15,16,17
38:20 39:4,12
41:13 42:11
42:18,18 43:6
43:14,15
44:21,21,24
45:19 46:5,8
46:22,25 47:7
47:9 48:13,19
49:8,9,11,13
49:15,17,19
49:22 50:21
51:6,9,13
52:8,21 54:2
54:5 57:2
60:9 61:16
62:10,11,12
62:14,15,22
62:23,23,23
62:25 63:25
64:3,4,7,9,13
64:19,20
65:17 66:11
66:12,13,14
66:16 67:2,9
67:10,11,13
67:14 68:17
68:22,24 69:4
69:10,18,19
69:22,25
70:15,25 71:2
71:9,17,23,25
72:2,7,7,8,10
72:13 73:5,9
74:3,7,8,8,12
74:15 75:18
76:12,18,20
76:22,23,24
77:2,4,6,9,10
77:14,22,23
78:7,10,22,23
78:25 79:5,6
79:10,21,21
79:23 80:4,14

80:18,22,25
81:7 82:2,6,8
82:11,16,19
82:21 83:5,7
83:10,14 84:9
84:16,21 85:8
85:8,10,11
86:8,14,15,19
86:21,23,24
87:4,25 88:5
88:7,9,19
89:2,10,11,12
89:15,17,18
89:21,22 90:4
90:12,22 91:3
91:4,12,20,20
91:21 92:6,13
93:6 95:5,9
95:18,20,22
95:23 96:11
96:11,12,14
99:4,16,16,18
99:19,22
100:2,18,25
102:10,11
104:4,14
105:19 107:8
107:12,14,15
107:19,24,25
107:25 108:3
108:8,9
110:10,16,17
111:14,16,16
111:24
112:20 113:8
113:14 114:4
115:10,12,25
116:2,8,8
117:3,20
118:8,12,15
118:18 119:4
119:6,11,14
119:19,22
120:19,25

122:13 123:2
123:5,19,22
124:8,18
125:4,8,15,24
126:6,7,18,20
127:10,11,17
127:18 128:5
128:7,10,11
128:18,20,24
128:25 129:8
129:24 130:6
130:7,9,11,13
130:15,16,20
130:21,22,24
131:3,13,16
131:18 132:5
132:6,15,16
132:18,21
133:4,6,7,9
133:11,13,14
133:22 134:4
134:7,11,22
134:23,23,24
135:6,15,17
135:18,19,19
135:23,24
136:11,17,19
136:21,25
137:4,16,20
138:5,7,7,10
138:12,16,18
138:21,23
139:9,12,13
139:17,19,22
139:23,25
140:23
141:11,11,15
141:19,21
142:16,19,21
143:3,5,7,11
143:12,13,14
143:15
144:15
146:10 148:3

150:12,24
152:13,20
155:12,13,22
155:25 156:2
156:4,5,7,11
156:12,19
158:9,15,21
159:2,12,14
159:16,21,24
160:2,21
161:2,5,5,21
162:8,22
163:2,2,14
164:2,16,24
165:15 166:2
166:11,11,12
166:13,22
167:5,8,9,9
167:12,12,13
167:17,20,20
168:2,3,17
170:15
171:22 173:9
173:9,24
174:3,4
175:25 176:3
176:19,20,22
177:5,8,20,22
177:23 178:2
179:13
180:16,20,20
181:10,13,15
181:25 182:4
182:6,7,14,16
183:6,12,14
183:15,18,20
183:23 184:4
184:5 186:14
186:17,18
187:5,7,12,16
189:5,23
190:5,6,6,9
190:11
191:10,11,13

191:18,19,19
191:21 192:3
192:13,16,18
192:22,23
193:3 194:4,5
194:7,10,18
194:21
195:10,24
196:8,9,13,23
197:7,9,15,19
197:21 198:7
198:8,10,13
198:24,24,25
199:8,9,16,18
200:11,13,20
202:6 203:16
204:3,10,18
204:23 205:8
205:9,14,19
205:20,25
206:2,7
208:17,19,19
208:20,21,22
209:12,21
210:17,19,23
211:2,11,12
211:16,17,18
211:19,19
212:5,25
218:12
219:16,18
221:19,22
222:9,11,11
225:5,7,10,18
225:25 226:3
226:12,22
227:15,20,24
228:2,17,19
228:23 229:9
229:11,12,17
229:19 230:6
230:12,14,15
230:17 231:2
231:6,7,12

232:10,15
234:19 240:7
240:8 241:18
242:20,21
243:17
247:17,23
248:7
**dog's (13)**
76:11 82:15,15
88:13 125:14
127:12 134:5
158:10
173:12,13
191:15
192:16
228:15
**dog- (1)**
42:15
**dog-related (3)**
32:25 49:25
234:10
**dogfighting (1)**
42:12
**dogs (187)**
6:12 32:8,10
34:8,14 35:23
37:14 38:23
41:13 42:11
43:10,20
44:19 45:4
51:3,4,16
53:12,14,25
61:2,25 63:5
63:13,15,15
63:23 64:22
65:3 68:15
70:4,8 71:24
74:10 79:13
81:24 87:11
89:12 91:17
91:18 92:22
94:17,19,21
98:20 110:5
111:11,12

113:11 115:6
115:14,17,18
116:14,14
117:10,16,18
117:22,24
118:3,5,8,9
118:11,25,25
119:7,23
120:3,13
121:23
123:12
124:12 127:6
128:22 132:8
133:10
135:10
145:14,20
147:21 148:9
152:20
158:11,23
165:7,21,23
170:13 173:7
174:15
176:16,18
177:14
178:11 179:3
179:9,21
182:20 183:5
184:7,18,21
185:21,22
187:8,9
188:14,15,19
188:24 189:8
189:11,14,19
189:20
190:18 195:2
200:15,18,23
201:21,24
202:2,5,13,17
202:19,22,23
203:14,21
206:5 207:11
207:11,12,14
207:15,19
208:2,9,13,16

208:24 209:6
209:7 210:18
210:21,22
211:13
212:12,15
213:9 214:7
215:3,21
216:10,15
218:4,5,18,18
218:20
225:11,14
226:6 227:8
230:21 231:9
240:9,10,13
240:17,18,18
240:22,24
241:3,7,9,21
242:13,15
245:7 248:11
248:23
**dogs' (1)**
188:12
**doing (39)**
10:11 38:21
39:9 43:24
55:9,17 58:8
69:25 70:20
72:3,5 76:17
77:11 82:24
85:13 86:19
88:2 110:18
124:21
128:11
135:14
138:25 159:2
159:8,9,11,11
159:25 160:5
165:5,5
170:25 171:8
171:10 174:3
199:11 201:2
238:22
240:10
**DOLBY (1)**

2:7
**dollars (1)**
20:11
**domestic (8)**
18:9,16 19:2
39:8 80:15
230:17,20
231:4
**donation (1)**
20:7
**door (26)**
62:3,4 66:24
82:10 83:7,11
183:18,19
184:5,8,17
208:8,13
215:9,10,11
215:12,13,22
216:16
217:13,14,15
217:17 218:4
218:14
**downstate (1)**
168:20
**drawing (1)**
158:7
**drive (1)**
148:16
**driver (1)**
137:9
**driveway (8)**
207:7,17,24
208:6,14,22
217:23
241:22
**drop (2)**
17:9 203:22
**dry (1)**
212:6
**due (1)**
188:16
**duly (3)**
5:15 253:11
254:1

**duties (1)**
21:5
**duty (2)**
154:5 168:21

———————
**E**
———————
**E (8)**
2:2,2,17,17
5:14,14
168:13 251:2
**e-mail (9)**
2:6,12 148:8
149:7,12,16
236:15
249:17,22
**e-mailed (1)**
4:16
**e-mails (4)**
149:11 152:4
234:15,16
**earlier (30)**
20:12 60:8
65:24 69:14
73:19 79:12
92:3 122:16
122:24
125:18
134:20
144:11 158:3
168:6 178:4
183:18
188:22
193:19 195:2
198:6 202:18
204:21
206:16
210:11 217:8
226:10 232:4
236:14
247:19
249:16
**early (1)**
44:5
**ears (4)**

128:4 158:13
158:14
174:24
**ease (1)**
82:15
**easily (3)**
66:15 113:22
242:25
**easy (2)**
205:11 226:23
**eat (1)**
93:21
**education (2)**
9:20 234:23
**educational (1)**
9:19
**effect (1)**
3:18
**effective (7)**
63:22 64:12
65:3 72:25
95:11 187:4
211:15
**effectiveness ...**
236:16,20
239:19
**eight (7)**
17:2 94:21,23
94:25 95:9
96:10,14
**either (19)**
22:3,8 25:2
55:24 62:14
64:17 68:21
80:5 94:12
106:23
112:24
113:17 118:6
118:24
126:24
179:18 199:4
217:22
244:21
**elderly (1)**

89:2
**electrical (1)**
211:13
**electronic (3)**
211:8,8 250:11
**Eliot (3)**
2:7 5:7 6:11
**ellipses (3)**
97:17,18,20
**embedded (1)**
169:4
**emergency (4)**
21:25 22:3
81:7 181:6
**emphasize (9)**
51:19 54:8
76:16 121:22
122:2,12
123:14 162:5
227:23
**emphasized (...**
145:7 226:25
227:5,7
**emphasizes (1)**
51:15
**employee (1)**
28:3
**encounter (14)**
36:18 38:9
57:2 78:3
134:10
155:22
167:18
180:13
191:10 230:6
230:12
234:19
247:18,23
**encountering...**
34:14 51:3
123:2
**encounters (7)**
32:21 33:2
43:9 50:21

88:17 122:19
240:8
**encourage (1)**
52:2
**encourages (2)**
51:24 73:15
**ended (5)**
65:17 170:24
171:8 199:24
199:25
**enforcement ...**
13:23 14:3,6
21:10 23:22
26:24 28:15
31:19 32:3,20
33:6 41:14
49:24 50:9,17
58:21 59:21
59:23 60:3,19
60:24 120:12
171:10
245:18 246:7
246:8 249:2
**engage (1)**
158:23
**enlightened (1)**
214:16
**ensure (1)**
124:7
**enter (3)**
142:9 177:11
177:15
**entering (3)**
140:10 229:24
230:5
**entertainme...**
223:3
**entire (1)**
90:23
**entitled (3)**
23:21 42:10
220:12
**Entity (1)**
1:10

entries (2)
212:8,10
entry (2)
39:10 212:19
environment...
66:10
ERRATA (1)
254:1
eshields@rot...
2:6
especially (3)
31:25 66:4
117:23
ESQ (2)
2:7,13
estimate (1)
179:3
estimated (1)
179:7
et (3)
24:20 42:17
164:8
Euthanasia (1)
51:9
euthanize (1)
99:16
evaluation (2)
235:4 239:19
evaluator (1)
25:20
eventually (1)
215:21
everybody (5)
40:24 99:21
100:6 128:12
246:9
exact (1)
55:21
exactly (4)
12:21 163:6
187:6 199:21
Examination...
1:18 6:7
248:20 251:5

253:10,13
examined (1)
5:16
example (23)
12:16 13:10
52:19 71:10
92:14 118:15
118:18
119:14
130:14
147:10
149:22,24
152:11
155:15
158:22 166:9
167:14
181:14 198:6
230:17,18
232:3 234:21
examples (2)
177:2,9
excessively (1)
173:20
excited (2)
129:5 230:22
excuse (2)
98:12 137:8
execution (1)
202:25
exercise (1)
87:25
exercises (1)
89:17
exhibit (26)
4:14,15,18
10:8,15 23:8
23:12 39:21
56:7 57:8
97:5 103:5,7
106:7 109:12
109:14
114:24 185:2
185:5 204:14
213:21,22

220:2 223:20
223:21
251:10
exhibiting (1)
117:10
exhibits (2)
4:13 251:9
exit (1)
216:15
expect (2)
145:20,21
experience (6)
13:22 24:8
45:4 118:12
136:22
171:10
experiences (1)
206:5
expert (10)
31:24 34:2
37:7,7,8 60:9
60:9,14,20
145:17
experts (2)
27:10 35:22
EXPIRES (1)
254:25
explain (9)
14:4 87:21
113:5 120:13
122:23,23
162:22
198:22
226:17
explained (2)
88:25 154:10
explaining (1)
49:15
explains (1)
233:2
express (3)
91:15 233:24
234:5
expressing (1)

88:19
extent (1)
148:19
extinguisher ...
210:10 211:25
212:5,16,20
extinguisher...
42:24 61:10
68:6,8 212:10
extra (1)
230:23
extremes (1)
125:20
eye (8)
125:5 157:25
158:2 159:2
173:10,13
174:3 205:7
eyes (2)
173:12,14

—————————
F
—————————
F-E-L-T-S (1)
29:21
face (5)
62:25 88:10
121:14
158:10
187:21
Facility (2)
16:17 247:4
fact (14)
7:13 27:15
49:16 68:4
90:19 94:15
113:17
134:18
145:11
150:14
197:10
210:14
218:23
240:16
factor (1)

76:12
factors (4)
75:18 124:2
241:23,25
fail (1)
102:6
fair (4)
37:16 81:18
120:4 180:17
Fairport (1)
5:25
fall (1)
237:6
familiar (4)
19:22 65:4
89:12 241:12
family (5)
44:6,11 204:6
204:7 230:20
far (5)
149:19,21
150:10
162:16,25
Farm (8)
19:21,22 20:3
20:5,20 24:15
28:3 206:22
faster (1)
162:22
fatal (3)
215:24 216:2
218:24
Father (1)
1:4
fault (3)
74:16,18
139:14
FBI (2)
47:25 236:4
fear (20)
63:16 160:8,17
160:25
164:10 165:2
169:14

188:16 193:9
193:11 194:6
195:7,23
196:7,10
197:15,20,22
198:25 201:3
**feared (1)**
198:15
**fearful (7)**
62:15 76:23
128:5 160:21
164:15
169:15 194:2
**fears (1)**
193:16
**federal (4)**
3:2 6:3 101:19
245:21
**feedback (16)**
52:17 57:22,25
73:24 233:3,7
233:7,10,17
233:19,20
234:25
235:11 236:2
236:16 238:3
**feel (22)**
37:3 39:5
43:18 51:14
53:19 79:6
89:22,24 90:9
90:11 106:23
130:21
136:19 137:4
162:25 190:8
196:23,24
206:2 209:9
226:3 228:18
**feels (3)**
113:7 131:8
136:24
**feet (17)**
71:3 73:6,8
84:11 94:21

94:23,25 95:9
96:10,14
130:15,16,25
131:3 162:10
162:11
241:19
**fell (1)**
19:15
**felonies (1)**
168:13
**felt (11)**
111:22 113:10
113:11
172:15
185:25 186:6
189:4 191:7
191:11 209:3
234:10
**fence (5)**
138:6 139:3,5
163:11,15
**field (7)**
17:17 21:7
35:24 36:2
52:14 68:11
234:18
**fifteen (7)**
15:8 43:25
73:8 91:3
93:17,20
241:19
**fifty (1)**
16:7
**fight (1)**
116:22
**fighting (4)**
41:13 42:11,16
113:11
**figure (1)**
118:17
**figured (1)**
42:8
**file (1)**
148:4

**files (1)**
12:12
**filing (1)**
3:6
**fill (1)**
150:17
**fills (1)**
150:19
**final (2)**
46:13,14
**find (11)**
7:9 82:13
84:25,25
98:11,15
176:20
207:25
225:14
232:18
235:21
**fine (1)**
156:23
**finish (2)**
204:13,14
**finished (1)**
153:14
**fire (12)**
42:24 48:12
61:10 68:6,7
105:15
210:10
211:25 212:5
212:9,15,20
**firearm (5)**
22:13,16 85:24
86:12 209:6
**fired (4)**
111:2,19
112:21
152:12
**Firfer (2)**
224:9,10
**first (47)**
5:15 6:15,22
7:2 10:9,14

16:21 23:17
24:3,7 25:5
26:2 27:9
28:8,12 29:15
30:8,15 31:19
32:3 33:23
38:7,9 56:24
62:24 85:25
103:15
106:16 125:8
155:22,24
156:5 159:8
165:25
166:10
177:18
182:12
184:15
185:20 188:4
188:8 208:17
208:20 209:7
214:5 219:18
241:18
**fists (1)**
132:25
**fit (1)**
58:3
**five (5)**
16:25 26:12
130:16
162:11 244:9
**fix (1)**
199:15
**flares (1)**
209:24
**flashlight (4)**
63:7,9,10
209:18
**flashlights (1)**
61:8
**flipping (2)**
164:6,9
**focused (1)**
49:14
**focusing (1)**

42:12
**follow (14)**
106:9 148:24
149:3 153:19
153:24 154:2
154:3,7,13,24
155:3,6 201:9
219:21
**follow- (2)**
34:20 146:2
**follow-up (7)**
69:7 145:6
184:11,14,15
248:17 250:4
**follow-ups (1)**
81:5
**followed (2)**
203:9 208:21
**following (2)**
25:25 254:2
**follows (1)**
5:17
**food (3)**
74:13,14,15
**foot (2)**
139:4 241:22
**Football (2)**
175:14 176:8
**footnotes (1)**
120:9
**force (51)**
3:17 51:16,20
51:25 54:9,13
54:13,17
68:14 69:9
70:6,25 71:10
73:16 81:11
81:16,23 82:3
84:7,8,12
86:11,16 87:3
87:19,21
90:10,17
92:16 100:18
102:18 117:9

119:25
120:12,13
122:3 132:24
133:21
134:25
164:23
218:17
219:14,14,19
219:20
220:13
221:17,18
222:5 231:8
248:10
**forceful (1)**
78:12
**Forensic (2)**
26:13,16
**forget (2)**
172:7 175:9
**form (4)**
3:10 67:8,14
153:16
**formal (1)**
58:16
**former (2)**
53:23 92:21
**forms (1)**
66:14
**forth (5)**
88:3 123:23
164:21,25
253:11
**forty (2)**
16:20 54:17
**forward (8)**
78:3 127:21
155:7 158:14
168:24
173:18 174:6
174:24
**forwarding (1)**
152:6
**forwards (2)**
117:5 173:5

**found (4)**
64:18 113:2
116:2 200:2
**four (10)**
26:10 38:18
56:23 126:21
133:10
148:15 153:6
185:14
201:22
227:18
**four-hour (1)**
247:15
**fourth (7)**
70:4 100:5,6
100:14 144:5
144:6 167:21
**freely (1)**
50:17
**freeze (1)**
158:9
**frequency (1)**
165:12
**frequent (1)**
165:13
**friendly (5)**
68:22,23 129:4
164:12
181:17
**friends (1)**
53:2
**front (14)**
30:13 62:23
64:14 83:6,9
110:21 137:8
137:12
207:13,16
215:22
217:17
218:14
241:19
**frozen (1)**
187:23
**full (3)**

5:20 16:24
239:12
**fully (1)**
74:16
**fun (1)**
175:13
**funnel (3)**
215:24 216:2
218:24
**further (7)**
3:9,14 4:13
96:16 100:16
248:15
253:16

---

### G

**gallery (1)**
214:14
**garbage (4)**
216:3,4 217:16
217:17
**gasps (1)**
110:9
**gaze (1)**
173:8
**general (6)**
27:8 40:20
66:2 99:20
118:7 141:9
**generally (4)**
28:15 115:3
210:12
242:15
**generically (1)**
116:6
**Genesee (4)**
55:7,15 247:7
247:9
**geography (2)**
242:4,6
**German (8)**
18:21 19:5,7
24:17 83:5
131:15 183:9

243:10
**getting (12)**
89:25 92:22,24
93:7,8,11
174:4 183:25
212:4 244:8
246:20
247:19
**giggling (1)**
214:15
**girl (2)**
205:10 208:8
**give (59)**
7:5 10:5 12:17
13:21 33:9,11
36:22 38:15
38:20 42:25
43:3,14 46:10
52:2,17 53:3
56:25 57:22
65:6 73:20
84:9 85:5
96:12 100:24
101:3 103:10
103:24
104:20
115:15
123:20,23
125:10
137:23,23
140:21
142:25 143:5
145:18
149:23
155:23
174:13
175:24
184:14 185:9
205:6,8
217:22
228:10,24
229:13,14
233:20 237:9
239:23

246:21
247:15,16,24
248:3
**given (11)**
29:14 31:17
44:17 57:11
57:16 59:24
71:6 146:22
146:23 147:4
253:15
**giving (16)**
52:10 70:23
82:4,6 83:19
118:24
124:14
128:15
158:14,16
174:25
181:18
199:11
215:17
229:19
237:11
**gladly (1)**
7:21
**go (183)**
6:23 14:10
15:13,22
16:24 18:18
24:4,24 25:23
31:7 38:20
40:12 46:5
51:12 53:22
58:22 59:5,25
61:17,18 62:4
66:18,20,20
67:5,8,15,17
69:15,21 76:8
77:8 78:20,23
78:23 79:3,18
80:23 82:7,13
82:13,14 83:9
83:15 84:10
85:3 87:8,24

91:7,15 93:14
95:23 96:21
96:21,24 97:7
99:9,19 100:4
100:6 101:18
101:21
102:16,20
104:22 106:6
106:14,16,17
106:17 107:7
107:17,17,23
108:2,8,11,20
109:2,5 111:6
111:19,25
112:5,6
114:22 116:9
119:24 121:5
121:6,8,10,14
121:14,15,16
122:6 123:17
123:25
124:24
126:24 127:7
128:2,7,9,16
128:16,19,21
130:19
131:25 132:4
132:13 133:8
134:13,23
139:6 140:7
140:16
143:23
154:21 155:8
155:19
156:13
157:23 159:6
159:17
168:24 171:6
173:15,18
176:14
177:18
179:12
182:20,21,21
183:3,6,11

184:4,7,17,22
185:18
186:10
187:25
193:15 196:9
196:18 197:3
197:5 204:15
204:18
205:14,14,15
206:10,20
207:14,23
208:25
209:18,24
210:6,7
214:22,24
215:7,14
216:4,5
217:10,18
220:2 224:6
226:6,8
231:23
237:14
240:18
244:12
247:25

**goal (4)**
43:10,16 202:8
202:9

**goals (2)**
43:4,6

**God (1)**
110:10

**goes (13)**
45:8 47:24
62:4 69:14
73:18 89:2
110:23 112:6
136:6 180:13
183:6 185:24
246:9

**going (217)**
6:14,22 10:9
13:17 20:2
22:24 23:11

23:12,13,14
23:17 24:3,24
25:23 27:7
31:7 33:16
34:2,13,15
36:6 38:20
39:2,4,5,8,8
41:23 42:9
46:8 47:10
48:10,14,15
49:22 52:7,7
52:9,20 54:5
54:21 55:9
62:24 64:5,20
69:18 70:21
70:24 73:12
77:9 79:11,14
79:19,22,22
80:11 83:24
84:12 85:4
89:18,22 91:7
91:8,9,10
92:24,25 93:4
93:7,8,11,12
94:2 95:23
97:4,25 101:8
101:23
102:13 103:4
103:19,25
104:24 105:6
106:5 107:15
108:2,18
109:21 110:4
110:19,20
112:6 114:3
114:23
115:14,20
116:10,11,18
116:22 117:5
118:23
119:11
120:14,21,23
120:25 121:2
121:3,9 122:9

122:10,10,11
122:13
123:16
124:15
125:25 126:3
126:8 127:5
127:18,21
128:24 129:2
131:25 132:6
132:7 134:5
134:18
135:14,16
142:14
153:10 154:3
154:13 155:4
155:13
159:12,15,16
159:23
163:15
165:15
168:22
170:18 171:6
171:16 173:5
173:10 174:5
174:6,13
175:10,22
176:2,3
177:20,23
179:14
182:12,22
183:22 186:9
186:19 187:2
187:25 189:3
189:11,14,19
194:5,22
195:15,19,21
195:22 196:3
196:7,19,21
196:22,23
197:5,15
198:25
199:10,14,16
204:13 205:5
205:6,7,8,10

205:11,12,24
206:3 207:22
210:22
212:21
214:22,25
215:19
216:19
221:17
223:24 226:8
228:17 229:8
229:13,14
231:13
233:15
236:14

**golden (2)**
46:7 242:24

**good (26)**
5:2 6:9,10 17:8
25:20 37:4,6
54:17 93:13
93:25 106:11
106:20,22
107:3,4,12,16
111:9 145:2
167:14
176:13
190:24 191:2
200:3 244:5
248:13

**gotten (4)**
56:3 73:24
150:8 223:7

**government ...**
20:10

**grab (6)**
62:3,4 74:14
77:3,4 93:23

**graduate (1)**
10:3

**grants (1)**
20:10

**grass (1)**
187:20

**gray (2)**

105:11,14
**great (7)**
28:19 29:23
32:23 96:23
157:22
169:12 245:3
**Greater (1)**
14:9
**grew (1)**
241:14
**grocery (2)**
111:12,13
**ground (3)**
6:23 104:3
173:21
**group (4)**
18:21 19:7
29:4 245:18
**groups (1)**
59:13
**growl (2)**
159:15 228:20
**growling (2)**
159:22 161:23
**guaranteeing...**
127:3
**guardian (1)**
1:5
**guess (31)**
11:16 12:13
41:24 69:7
79:8 97:6,10
103:6 115:8
115:24
117:14
122:15,16,20
124:13
125:15
142:11
143:25
145:10
146:19
154:12 155:9
177:17

179:18
181:12 188:4
189:21 192:4
219:23
226:23
232:18
**guesstimates...**
178:25
**guidance (4)**
68:13 69:8
87:2 145:13
**Guild (1)**
26:8
**guilty (4)**
167:21,22,23
167:24
**gun (11)**
43:13 46:19,21
47:8 48:11
92:15 93:4
114:4 162:23
195:10 216:8
**gunfire (1)**
100:3
**guns (2)**
211:10,10
**gunshot (1)**
98:7
**guy (10)**
46:20 49:4
52:23 79:19
93:4 113:24
176:7 205:10
208:3 210:24
**guys (1)**
53:4

_____

**H**
_____

**hackles (1)**
160:11
**half (9)**
54:15,19,20
56:21 74:24
145:9 223:5

238:13,20
**hand (6)**
63:10 85:23,24
125:6 182:11
253:21
**handbook (2)**
32:21 33:5
**handle (4)**
42:18 86:23,24
234:10
**handling (1)**
35:23
**handout (6)**
9:2,3,3,10
38:15 125:9
**handouts (1)**
36:22
**hands (1)**
182:9
**handy (1)**
32:24
**hanging (1)**
121:8
**happen (7)**
53:6 101:5
134:10
199:16
226:21
228:25
229:15
**happened (12)**
56:11 76:5
110:24 111:4
111:5,18,21
197:6 200:18
200:20
206:22 207:3
**happening (2)**
95:25 232:2
**happens (6)**
35:9 48:16
84:3 104:11
165:12
240:21

**happy (2)**
11:25 178:20
**hard (2)**
148:16 205:12
**hardest (1)**
79:9
**head (11)**
7:6 31:22 48:8
58:12 72:9
117:15 134:5
189:3 208:18
221:2,10
**heads (2)**
47:6 73:19
**hear (9)**
105:5,6 203:15
214:15
215:10,21
220:8 243:4
244:25
**heard (6)**
45:16 72:19,20
105:4 215:3
218:3
**hearing (2)**
203:14,20
**hears (1)**
214:7
**held (10)**
1:22 140:5,6
142:18,20
143:4 144:14
144:16,19
199:19
**Hell's (1)**
71:21
**help (12)**
21:10,13 29:12
42:7,8 43:17
116:10
117:25
122:12
125:16 204:3
245:5

**helpful (2)**
41:22 103:22
**helping (1)**
22:5
**helps (3)**
30:16 220:16
243:18
**hereinbefore...**
253:11
**hereunto (1)**
253:21
**hey (31)**
34:3 35:16
42:7 48:11
52:22 53:3
58:20 66:18
80:5 82:11
92:12 93:3
123:4,10
125:23
132:14,15
134:17
142:17 148:9
162:9 165:3
183:11,14
184:6 200:2
208:9 220:23
234:19
239:25
243:20
**high-risk (2)**
212:10,19
**higher (1)**
121:3
**highest (1)**
9:20
**highlighted (2)**
39:22 99:23
**highlights (1)**
17:20
**hinges (1)**
62:4
**hired (1)**
60:16

history (1)
44:5
hit (11)
48:14 104:19
104:24
109:21
167:17,20
169:20
185:16
187:25
208:17
216:20
hits (1)
167:12
hold (7)
27:19 80:20
106:7 109:23
118:8 147:11
215:9
holding (2)
208:8 212:20
Holly (2)
224:9,10
home (10)
47:2 61:11
69:14,16
140:11 176:7
178:20
193:15
196:18 207:6
homegrown ...
58:5
homeless (1)
104:2
honest (5)
190:10 203:13
204:8 209:22
233:15
hop (2)
184:18,21
hope (4)
52:14 73:22,22
202:7
hoped (2)

45:23 202:7
hopefully (4)
39:11 111:2
117:2,3
hoping (4)
58:25 59:2
200:12,12
horizontal (1)
211:14
hospital (3)
91:7,9 194:13
hot (1)
32:20
hour (3)
54:15 56:21
223:5
hours (11)
15:15 16:5,7
16:20 17:2
54:15 57:2
171:7 223:5
226:7 248:3
house (17)
61:24 74:7,12
82:10 83:5
120:16,24
176:4 179:12
183:8,13,15
183:19 207:8
208:25
241:16,20
housed (1)
19:21
households (1)
179:20
houses (3)
165:21 179:8
202:2
human (2)
18:11 62:13
humane (12)
14:2,3,5,5,9,17
15:21 18:6
20:3 26:23

118:7 179:18
hundred (6)
65:2 127:15
183:25 184:2
228:13
229:11
hurt (3)
204:4 205:25
206:2
hurting (1)
139:24
hydrant (1)
105:15
hypotheticall...
65:7

————————
I
————————
Idaho (1)
214:2
idea (9)
84:23 85:5
92:25 118:24
200:14,14,16
236:18,23
ideas (2)
42:25 85:6
identificatio...
10:16 23:9
103:8 109:15
185:6 213:23
223:22
identify (12)
38:12,14,16
49:13,20
70:12,16
120:11 128:8
132:10,11,23
identifying (2)
50:8 72:2
identity (1)
4:12
IKWUNZE (1)
2:19
illegally (1)

168:8
Illinois (1)
139:16
illustrate (1)
91:25
imbedded (1)
102:25
immediately ...
234:25
imminent (13)
51:7 99:24
135:22 136:2
136:9 139:23
193:10,17,20
221:6,20
227:25 228:3
immunity (20)
31:3,5 45:13
52:11,12
99:11 101:9
101:13,16,17
101:24,25
102:2,6,12
139:6 140:8
140:17
143:23
201:15
implement (4)
57:13,23 58:6
58:8
implemented...
55:20
implied (9)
31:3 45:12
52:11 139:6
140:8,16
143:23
177:17
201:15
importance (1)
33:7
important (10)
7:15 33:7
37:20 38:4,7

38:14 53:20
76:11 134:21
135:10
improvise (1)
210:9
improvised (2)
86:17 197:4
in- (1)
246:11
in-depth (1)
114:25
in-service (9)
55:10 147:11
182:25 236:7
237:6,6
238:11,16
246:16
inappropriat...
200:7
Inaudible (1)
244:23
incidence (1)
95:24
incident (6)
45:18 88:24
152:19 198:2
212:11
230:20
incidents (18)
20:14 21:15,18
33:2 46:23
49:25 64:22
72:12,19
94:20 152:18
202:3 212:13
230:18
231:25
232:11,20
234:11
include (4)
21:19 26:23
32:8 200:4
included (1)
199:23

including (6)
8:11 18:13
  67:24 104:12
  245:21 246:9
inclusion (1)
73:14
incorporate (...
33:21
incorporated...
36:19 41:17
incorrect (1)
7:13
independent ...
153:24 179:25
individual (4)
69:17 101:17
  107:6 136:23
Individually ...
1:4
individuals (1)
107:10
inevitable (1)
220:23
Infection (1)
92:8
information ...
80:12 112:3
  124:15
  152:24 154:6
  154:16
  201:10,13
informed (1)
220:5
inherently (4)
115:18 116:15
  117:18
  243:24
inhibited (6)
70:9 88:4
  120:18 122:5
  122:9 123:22
initial (5)
38:8 191:10
  245:4 246:14

246:18
initially (3)
105:9 201:11
  236:11
initiating (1)
106:14
injured (12)
116:8,9,13
  193:10 194:9
  194:17,22
  195:8 196:11
  196:12,21
  197:20
injuries (1)
194:14
injury (10)
136:2,10
  193:21 194:3
  194:4,7
  195:24
  220:16 221:7
  221:21
INSERTS (1)
251:21
inside (5)
74:7 110:6
  111:11
  183:20 218:4
inspired (2)
41:23 42:4
instance (6)
61:21 65:16
  99:4 114:13
  114:17 127:9
instruct (3)
65:20 108:22
  177:10
instruction (3)
82:4,5 174:10
instructions ...
81:15 103:24
instructor (10)
17:18 29:12
  59:23 67:18

110:17,22
167:2 175:18
189:21
199:11
instruments ...
69:2
intention (1)
51:18
interact (5)
120:3 124:22
  145:14
  219:18 226:4
interacting (3)
43:20 44:19
  79:10
interaction (1)
119:5
interactions ...
61:2 213:8
  219:16 241:3
  245:7
interest (1)
121:6
interested (1)
253:19
interesting (1)
120:10
internal (2)
148:6 238:10
Internationa...
26:5,12
internet (4)
231:25 232:16
232:19,25
investigate (4)
14:7,10 21:13
  78:8
investigating...
20:14 21:17
  42:15 207:5
investigation...
14:13 18:15
  150:19
investigation...

14:15
investigative ...
15:6 182:18
investigator ...
111:10
invited (1)
55:11
involved (6)
13:5 18:22
  28:10 139:2
  240:7 242:2
issue (2)
58:2 210:24
issued (2)
66:19 68:11
issues (1)
66:21
item (1)
63:13
items (6)
63:7,17 65:24
  66:23 68:8,11

───────────
J
───────────
JAMES (1)
2:18
Javier (2)
1:10,11
Jim (1)
143:9
Jim's (1)
143:10
job (5)
21:9,19,21
  80:25 200:9
JOHN (1)
1:10
join (1)
18:5
joining (1)
20:20
jokes (1)
111:3
Jones (133)

2:13 5:10,10
  8:13,17 12:19
  36:5 37:17,22
  38:6 43:21
  47:16 48:20
  51:22 60:12
  65:11 71:13
  73:17 81:14
  81:17 86:2,13
  87:6,13 92:17
  93:20,25
  95:14 117:6
  118:20 120:6
  121:25
  123:13
  125:22 126:4
  129:12 131:6
  131:24
  133:18 135:4
  135:12
  136:12 137:6
  137:10,22
  138:19
  140:14
  141:24
  142:22
  144:10,23
  145:15
  146:13
  148:18,24
  150:13 151:3
  151:7 152:15
  153:3,19
  154:2,8,12,22
  155:2,14
  157:19,21
  161:9,14,25
  162:14,18
  163:7 164:19
  166:20,25
  167:6,10,16
  168:18 169:9
  170:2 171:3
  171:15

172:12
178:15
179:10
185:23
188:21
189:10 191:5
193:12,22
194:24
195:11
196:14
197:17,23
198:14,18
204:25
205:22 206:9
213:3 214:10
215:6 216:18
220:3,9 221:9
221:23 229:7
229:25
231:18
232:22
233:21 234:3
234:7,22
240:15 241:5
242:11
243:25
245:13,16
248:16,18,21
249:25
250:10 251:6

**jumbo (1)**
97:21
**jump (5)**
58:22 59:14
138:10,11
139:5
**jumped (1)**
41:21
**jumping (6)**
91:18 137:7,11
139:3 188:19
219:3
**June (1)**
253:21

**justice (17)**
9:22 16:3
36:11,15,23
44:10 50:11
57:12,17
58:13 94:17
96:3 171:24
172:9,18,25
178:8
**justification ...**
130:22 132:21
135:23
167:20
220:17
**justified (38)**
72:20 85:12
89:9 90:11
126:20 130:3
130:21 131:5
134:7,12
136:18,25
138:23
141:11,20
143:3,8,16,19
144:13
166:24 167:3
167:15,25
168:3 185:22
188:20 191:4
194:7 195:24
198:12,20
199:19 201:2
219:2,5 221:7
221:22
**justify (11)**
45:11,14 48:18
48:21,22
69:20 70:17
81:4 132:11
193:8 199:10
**justifying (1)**
189:6

_____
K
_____

**K9 (1)**
17:25
**keep (17)**
62:23 63:12
67:2 69:3
84:24,25
121:6 164:9
168:22
171:16 173:5
173:10 174:3
175:17 182:9
192:13
210:19
**Kelly (2)**
39:23 40:10
**Kenmore (2)**
112:10,12
**Kennel (1)**
25:19
**kept (6)**
21:2 152:11
153:17 190:6
235:13
236:11
**kicked (2)**
111:14,16
**kill (3)**
37:15 88:10
91:13
**killed (2)**
90:22 194:17
**killers (1)**
18:17
**killing (1)**
99:18
**kills (2)**
143:12,14
**kind (78)**
7:25 18:7,21
19:11,14
24:19 31:8
33:13 38:24
43:11 46:13
53:23 58:4,4

65:25 66:13
69:8 78:16
81:21 88:19
88:23 96:21
96:24 97:8
98:21 101:20
103:20 107:7
110:2 113:5
113:25 115:2
115:15
120:10,15,18
121:15
124:10
125:19
126:23,25
128:3 131:15
152:10,12,13
158:8,12,13
159:3 160:12
171:21
173:15
175:24,24
179:20
181:21
183:16
187:18 190:3
190:21
191:12,14
192:12,12
195:21
213:18
214:15
222:24 223:3
223:7,12
228:4 231:3
233:2,14
237:16 240:2
**kinds (1)**
230:10
**kitchen (1)**
231:9
**knew (2)**
212:12 233:14
**knife (2)**

38:25 92:15
**knock (2)**
88:9 121:13
**know (282)**
6:20 7:16 8:9
8:15 12:14,17
13:2,3,4,5
15:15 20:25
22:23,24
24:19 30:16
33:6,11,15
34:13,15,17
35:13 38:9
39:9 40:14,23
42:15,17,24
43:24,24 44:5
45:5,8 46:5
47:7,18 48:18
49:3,3,5,10
51:12,12
52:23 53:23
55:22 61:20
61:22 63:8
67:5 68:5
69:7 70:6
71:22 72:6,21
73:8,12 74:2
74:24 75:6
76:6 77:3,6
78:19,23 79:5
79:8,17 82:8
82:20 83:13
84:7 87:14
91:2 93:16
97:6,8 98:17
98:25 99:13
99:23 100:5,8
101:6,20
102:17,18
104:20 107:4
107:7,14,20
107:23,23
108:8,14,15
108:16,18

110:3,16,21
110:21 111:9
111:16 112:2
112:8,23
114:5,24
115:15 116:8
117:17 118:2
118:9,14,22
118:23
119:18
120:16,19
121:4,7 122:3
122:7,15,24
123:4,10,19
128:9,10
132:18 133:7
134:4,17,19
135:5,6,17
138:5,9,14
141:2,3 142:3
142:11 143:9
143:10,12,22
143:25
144:25 145:7
146:14,16,24
147:5,14,15
147:15,19
150:10,14,15
150:17,20
151:21 152:8
152:17,19,20
153:22
154:23 156:8
160:11
161:20
162:16,25
165:14,18
167:19
168:20 169:3
171:7 174:14
175:8,12
176:2,9,21,23
177:21 178:9
178:13,16,21

178:23
179:14,16,18
180:2,8,8
181:3,13
182:4,15,22
183:5,24
184:9 186:8
188:5,25
189:3 190:2
191:8,23
192:3,6 194:4
194:11,11,13
194:19
201:21
203:18 204:6
205:14
207:22
208:11,25
211:6,17
212:4,23,24
213:4,14
214:16 215:8
215:14,15,25
216:9 217:16
218:3,13,15
218:17
219:17 220:6
220:15 221:6
222:11 226:3
227:18
228:22 230:2
230:19 231:5
233:16
235:16,22
236:24
237:13 238:7
238:9,15,25
240:3 241:7
241:11,17,21
243:9 247:13
248:16
**knowing (1)**
34:9
**knowledge (7)**

13:9 59:19
145:19,22
146:23
229:19 242:7
**known (2)**
63:19 119:7
**knows (3)**
86:23 142:6,8

---

**L**

**L (2)**
2:13,17
**L-O (1)**
27:19
**L-O-H (1)**
27:21
**L-O-H-E-O-...**
27:25
**L-O-H-E-S (2)**
27:21,23
**L.D (2)**
1:4 5:9
**lack (4)**
43:19,23 44:15
242:6
**lady (9)**
105:3,8,11,14
108:3,4
191:13
192:15,17
**lady's (1)**
104:13
**laid (1)**
165:21
**language (14)**
42:17 88:23
126:17
132:10 134:4
145:23
155:20 156:4
188:12 202:4
204:23
207:19 209:3
224:14

**LAPD (1)**
50:22
**large (1)**
177:12
**laser (3)**
105:2,8,20
**lasts (1)**
54:14
**late (1)**
18:10
**laugh (3)**
66:19 175:17
223:8
**law (54)**
1:21 2:10
13:22 14:3,5
14:21,25 15:4
21:9 23:22
26:24 28:14
31:18 32:3,20
33:5 41:14
49:24 50:9,17
51:3,10 56:24
58:21 59:21
59:22 60:3,17
60:24 99:15
100:22
120:11
135:21,22,24
135:25 136:3
139:15,21
141:17 168:4
168:11,14,17
171:10
193:18,24
231:22 232:2
245:18 246:7
246:7 247:17
249:2
**lawful (1)**
140:10
**lawfully (4)**
140:3 144:8,12
145:13

**laws (2)**
50:24 98:25
**lawsuit (3)**
28:24 29:24
71:21
**lawsuits (5)**
71:20,23
200:11
212:11
220:18
**lawyer (2)**
142:2,3
**lay (2)**
78:23 84:10
**lead (1)**
217:6
**learn (2)**
31:11 59:25
**learned (5)**
24:10,13 68:7
183:7,16
**learning (4)**
66:6,7 89:16
214:12
**leave (2)**
83:11 159:19
**leaves (1)**
83:13
**lecture (2)**
44:4 88:25
**left (2)**
164:13 201:22
**leg (2)**
121:3 227:19
**legal (10)**
101:4 115:25
116:4,7
140:25 142:6
220:17
229:23 230:5
234:23
**legally (6)**
139:10,11,12
141:12 143:8

143:20
**lesson (7)**
8:10,11,23 9:4
234:17
242:21 243:8
**lessons (1)**
10:14
**let's (29)**
39:21 82:14
84:9 85:9,21
87:19 96:11
96:11,14
103:3 109:8
114:22
129:24
130:10 138:4
138:4 142:5,5
142:7 154:20
161:20
168:22 175:9
175:10
182:20,21
183:3 213:17
244:7
**lethal (20)**
51:15,20,24
54:9,13 73:16
86:11 87:3
88:9 91:12,19
91:20 100:17
121:11,13,18
218:18,20
221:17 222:5
**letters (1)**
154:11
**letting (3)**
99:13 110:20
121:8
**level (8)**
9:20 82:3,21
88:7 147:15
189:15 190:7
240:21
**Lexington (1)**

2:5
**Lexitas (1)**
4:9
**liable (6)**
142:18,20
144:14,17,19
199:19
**licensing (1)**
180:9
**licking (1)**
164:7
**lie (3)**
83:9,15 205:14
**lied (2)**
83:10 187:20
**lieutenant (1)**
112:4
**lieutenant's (...**
112:8
**life (1)**
48:16
**liked (2)**
57:13 58:2
**limited (1)**
247:15
**line (6)**
88:16 124:22
165:4 205:3
207:12 254:5
**lines (1)**
9:4
**link (3)**
18:11,16 19:2
**lip (1)**
164:7
**list (3)**
115:7 152:12
152:17
**listed (3)**
13:10 54:24
209:17
**listen (3)**
78:18 101:7
223:16

**listening (1)**
143:10
**lists (1)**
180:14
**litigation (1)**
12:15
**little (37)**
13:19 36:7
38:15 45:22
54:5,20 67:20
75:12 79:6
87:25 94:8
104:16
108:19 109:9
120:15 121:3
121:5 124:3
125:17
155:19
160:12 164:4
169:18
175:25 186:6
187:19,21
190:6 204:20
208:7,11
210:10 223:8
224:11
229:22
232:18 240:2
**LLP (2)**
2:4 5:8
**local (8)**
20:6 22:4
47:25,25
60:24 72:12
194:15 236:6
**locally (5)**
68:3,9 72:16
72:17 236:4
**location (1)**
152:18
**locations (1)**
4:7
**lockbox (1)**
215:11

**Lockwood (12)**
31:17,21 41:6
41:8 42:10
50:8 61:12,14
66:8 120:8
211:5 212:3
**Lohnes (2)**
27:14 170:10
**Lollypop (12)**
19:21,22 20:3
20:5,13,20
24:14,18 28:3
40:10 206:22
228:20
**long (13)**
8:14 18:7
55:17 86:14
93:17 98:14
104:9,10
150:16
172:23,24
185:15
223:14
**longer (2)**
93:18 244:10
**look (48)**
49:24 52:23
65:12,13
71:19 90:14
92:12 94:14
98:17 110:3
116:24
119:14 123:4
123:10
125:24
134:17
142:17
149:15
151:20 152:4
156:5 158:20
162:9 165:15
170:13
173:10,23
174:23

176:21,21
177:7,14
178:16
186:19 187:4
191:15,17
199:7 205:4,6
209:6 220:23
227:13,13,15
231:24
232:19
236:14
**looked (10)**
95:7 113:4
150:7 152:9
161:6 168:5
187:21 189:8
208:6 209:3
**looking (16)**
11:6 41:3
48:24 107:2
118:17
130:20
139:17
155:17,22,24
156:12
176:24 182:6
182:24
188:11
202:18
**lookout (1)**
186:20
**looks (17)**
91:20 111:17
127:10 131:4
131:16 158:7
158:9,17
161:2 163:20
171:22 174:7
180:15
182:25
187:22
220:14
227:11
**loose (18)**

38:11 62:2
116:16
155:25
156:12,20
182:10,16,16
183:10 184:5
222:11
225:10,18,19
225:25 226:6
230:16
**lose (1)**
149:10
**lost (2)**
141:13 148:17
**lot (46)**
11:24 47:22
48:4,6 52:4
58:25 74:23
78:20 90:2
92:20 100:7
113:19
140:19
158:18
160:11,14
162:22 164:6
179:2 181:4
184:14
201:24 202:2
202:22,22
203:20
205:15
212:11 215:8
215:9 216:7
217:12
218:12 223:8
226:20 233:6
233:7,12,17
236:6 240:7,8
240:10
241:17,25
243:12
**lover (1)**
19:9
**low (3)**

88:6 91:22
160:17
**lower (1)**
82:21
**lower-incom...**
240:21
**lowest (1)**
82:3
**Lubbock (8)**
70:18 109:6
111:3,21
112:15
113:24 210:3
210:20
**lunging (2)**
87:16 91:18

_____
**M**
_____

**M (1)**
5:14
**magazine (1)**
209:19
**main (1)**
35:14
**majority (1)**
249:5
**making (6)**
119:21 130:12
159:12 181:4
195:7,8
**man (2)**
67:10 104:2
**management...**
22:3
**manager (1)**
21:8
**mandated (3)**
56:25 57:5,8
**mandatory (2)**
238:8,14
**manner (2)**
165:17,18
**March (3)**
11:8,9 12:6

**mark (1)**
223:24
**marked (11)**
4:14 10:16
23:9 56:7
97:5 103:8
109:15 185:6
213:23
223:22
252:11
**Market (1)**
139:21
**Markets (9)**
51:3 97:23
98:2,5 141:4
168:4,11,13
168:17
**marriage (1)**
253:18
**marshal (1)**
48:2
**marshals (1)**
236:5
**material (3)**
8:10 52:3,10
**materials (4)**
8:17 32:17
49:25 237:10
**matter (14)**
27:15 52:10
68:3 94:15
115:22
116:20 119:3
119:11
162:16,24
168:8 197:10
210:14
253:19
**mauled (1)**
91:10
**mayor (2)**
113:3,5
**MCC (1)**
10:3

**mean (65)**
12:8 19:23
20:23 32:11
35:4,8 37:6
42:6,20 45:25
46:8,9 47:4
47:20 70:22
73:4,21 82:22
82:23 83:16
85:2 89:18
97:22 98:21
99:5 113:15
113:24 119:2
122:6 123:16
124:20 129:4
130:24
131:14
135:16,17
137:24
138:24,25
139:4 140:18
141:3,25
146:23 159:4
159:9 164:11
164:12
167:11 177:3
177:7,23
189:23
193:14 194:4
198:5 207:21
219:20 227:6
228:5,16
230:13 235:4
243:16
247:13
**means (6)**
61:13 87:22
88:21 128:5
129:3 133:6
**meant (2)**
58:15 214:3
**measure (1)**
197:2
**measured (1)**

236:20
**measures (1)**
239:25
**meat (1)**
7:25
**medical (3)**
141:16 210:24
230:15
**meeting (3)**
4:8 28:9 75:9
**member (3)**
25:2,25 204:7
**members (2)**
44:7,11
**menacing (1)**
217:11
**mental (1)**
156:10
**mentality (3)**
33:18 35:6,6
**mention (3)**
124:23 173:22
226:14
**mentioned (8)**
63:18 65:24
84:14 123:15
172:8 184:16
247:19
248:22
**mentioning (1)**
212:8
**Meridian (1)**
184:20
**message (1)**
47:2
**mic (1)**
220:7
**Michelle (4)**
1:23 250:13
253:7,24
**Microsoft (1)**
169:5
**mid (1)**
43:25

middle (2)
185:17 207:25
mind (4)
59:21 114:2
166:8 220:9
mindful (1)
160:3
minds (1)
128:21
mindset (1)
196:17
mine (1)
187:18
minute (9)
104:9,16,17
173:4 186:4
186:22 214:6
216:21
223:14
minutes (7)
54:17 93:18
185:14
186:21 187:3
187:24 244:9
mischief (2)
71:5 231:5
misdemeano...
168:12
misdemeano...
168:13
misinterpret ...
167:4 198:7
misinterpret...
166:13
misperceptio...
243:23
missed (3)
56:14 129:13
191:12
missing (2)
139:17 180:9
mistake (1)
226:23
mistaken (1)

228:2
mixed (2)
106:20 107:11
Mm'hm' (21)
6:25 36:4 57:6
60:11 71:14
76:14 78:4
81:13 85:18
87:23 101:15
117:4 122:21
125:21
131:21 144:4
163:4 166:16
170:14 188:7
203:8
mode (3)
131:10,12
132:5
modify (1)
249:21
mom (1)
208:12
moments (1)
216:13
Monday (2)
175:13 176:8
money (1)
180:9
Monroe (23)
9:25 13:25
16:13 17:13
29:25 43:7
47:23 55:6,13
55:18 58:4
72:17 75:10
177:13
225:17,21
231:15
245:19,20
247:3 248:23
249:3,6
month (1)
238:13
months (4)

16:19 20:25
151:12
237:18
morning (5)
5:2 6:9,10 8:18
8:20
mother (2)
208:23,24
mouth (4)
171:23 175:2,3
182:13
move (10)
66:14,15 98:16
116:23
192:18 193:3
219:12 222:6
222:16,20
moved (4)
20:23,24 21:2
192:15
moving (3)
123:23 180:12
217:14
multiple (1)
241:23
mumbo (1)
97:21
municipal (4)
1:9 101:16,24
102:2
municipality...
102:3
mute (1)
244:25
muted (1)
244:24

_____
N
_____
N (5)
2:2,17 5:14,14
251:2
N-E-F-F (1)
58:14
name (6)

5:20 6:11
27:18 29:17
112:8 223:17
named (1)
5:11
names (3)
48:25 49:2
53:3
Nampa (9)
46:12 91:16
189:25
190:16
213:16,17,21
213:25 214:2
narrate (2)
104:20,21
national (2)
22:4 50:4
natural (5)
1:4 21:25
123:11 165:7
165:10
nature (1)
80:18
near (4)
80:5 128:16,17
202:10
necessarily (...
43:22 44:14,23
47:20 89:18
101:2 124:9
127:17
135:15
155:11
160:20
164:11
165:10,20,23
195:13
196:15
200:25
207:21 211:2
219:20
228:16 241:8
necessary (5)

71:6 136:19
181:21 221:6
254:3
neck (1)
121:14
need (32)
42:7 48:22,25
49:5,12 70:15
73:20 81:4
86:8,22 93:21
98:8 101:2
117:19
118:13 122:2
123:8 138:20
145:23
162:25
164:16
176:18 181:6
184:9 196:24
212:12
222:23
224:15
229:17,18
230:23 244:9
needed (3)
44:16 189:4
191:7
needs (1)
147:9
Neff (1)
58:11
negative (2)
40:15 84:20
neighbor (2)
181:15 183:13
neighbor's (4)
181:25 182:14
207:8 208:6
neighborhoo...
62:16
never (13)
45:7 48:5
60:16 89:3,4
146:17

212:18,19
213:5,6
215:12 220:9
245:9
**new (37)**
1:2,25 2:5,5,11
5:25 14:21
44:16 53:16
57:16 58:5
67:4,7 88:24
91:21 104:2
127:11,11
132:14
135:21
139:20
190:21 191:3
192:5,9
193:18 197:6
197:11 204:6
210:2,23
212:9 215:14
226:15
231:25 253:4
253:9
**news (2)**
113:4 157:8
**nicely (2)**
182:13,19
**nicest (1)**
116:21
**night (4)**
69:16 175:14
176:8 196:19
**nine (2)**
104:10 150:21
**nod (1)**
221:10
**nodding (1)**
220:25
**noise (1)**
181:4
**nomenclatur...**
49:6 158:5
**non- (2)**

85:22 86:10
**non-attackin...**
86:19 134:23
**nonaggressiv...**
107:25
**nonemergen...**
80:18
**nonemergen...**
34:18 39:7
181:8
**nonlethal (12)**
54:13,16 61:5
62:19 67:23
68:14,19 69:9
70:7 84:13
190:5 215:4
**nonpriority (1)**
181:7
**nonthreateni...**
78:8
**nonthreateni...**
80:10
**normal (1)**
121:4
**normally (10)**
68:9 104:21
173:13,22
180:4 182:15
224:25
225:16,23
226:6
**not-for-profi...**
19:6
**Notary (5)**
1:24 5:16
250:25 253:8
254:25
**note (1)**
156:10
**noted (1)**
250:14
**notes (9)**
9:7 75:20 76:4
122:17 124:4

234:15,16
243:8 246:22
**November (2)**
30:10,22
**number (22)**
46:23 69:15
97:13 119:5,9
124:4 147:21
152:21
169:19
177:12 178:3
178:5 179:16
179:20 180:5
200:15,21
202:7 203:14
236:5 238:21
243:18
**numbers (2)**
179:4 202:10
**numerous (2)**
6:12 179:5
**nuts (1)**
183:7
**NYPD (2)**
102:21 191:24

---

**O**

**O (5)**
2:17 5:14,14
5:14 27:24
**O-S (1)**
27:21
**O0O (1)**
4:23
**oath (1)**
3:17
**objecting (1)**
95:16
**Objection (1...**
12:19 36:5
37:17,22 38:6
43:21 47:16
48:20 51:22
60:12 65:11

71:13 73:17
81:14,17 86:2
86:13 87:6,13
92:17 95:14
117:6 118:20
120:6 121:25
123:13
125:22 126:4
129:12 131:6
131:24
133:18 135:4
135:12
136:12 137:6
137:10,22
138:19
140:14
141:24
142:22
144:10,23
145:15
146:13
150:13 151:3
151:7 152:15
153:3 155:14
161:9,14,25
162:14,18
163:7 164:19
166:20,25
167:6,10,16
168:18 171:3
171:15
172:12
178:15
179:10
185:23
188:21
189:10 191:5
193:12,22
194:24
195:11
196:14
197:17,23
198:14,18
204:25

205:22 206:9
213:3 214:10
215:6 216:18
221:9,23
229:7,25
231:18
232:22
233:21 234:3
234:7 240:15
241:5 242:11
243:25
245:13,16
**objections (1)**
3:10
**objective (1)**
229:3
**objectively (1)**
198:15
**observation (...**
208:16
**observe (3)**
39:17 119:16
156:6
**observed (1)**
229:4
**observing (2)**
38:8 207:19
**obviously (2)**
11:10 163:9
**OC (7)**
74:4 85:21,22
85:25 210:8
210:13,16
**offense (1)**
168:10
**offensive (28)**
49:9 85:11
125:19,25
126:6,9 128:7
129:7 130:8
131:12
132:17
133:11,14
134:6,11

135:7 136:17
136:21
137:16,20
138:8 161:4,6
161:21 163:9
189:13
191:20
197:19

**offer (2)**
18:14 147:6

**offering (2)**
58:21 112:2

**office (19)**
16:13 17:14,15
18:5 20:6
28:8,13,22
29:15,18 30:9
42:2,7 43:8
199:25 211:6
220:4 237:17
246:4

**officer (194)**
1:10 3:16 6:9
10:18 14:3,6
14:21,24 15:5
15:5,13,16,18
15:23 16:6,7
16:11,22
17:17,25 18:8
18:9 19:24
20:24 22:12
23:20 33:14
39:17 45:8,16
46:11,19,19
53:23 59:19
59:23 61:20
65:16,18 66:3
69:11,17
70:13 71:16
71:24 74:6,17
79:10,18
80:23 81:8
83:17,19,22
85:3 88:12

89:6,7 90:14
90:21 91:19
92:5,6 93:3
94:8 97:7
98:16 101:17
102:5,13
103:14 107:6
107:13,13
108:9 109:18
110:4,25
111:9 112:16
112:20,23
113:7 114:12
116:21
118:23
120:16,23
129:25 130:3
130:12,14
131:8 133:20
134:9,10
135:16
137:25 138:6
138:9,11,22
138:23,24
139:7,8 140:3
140:18 141:8
142:6,8,13
143:24 146:7
148:21 149:5
150:18
151:21
152:14
153:11,14
154:20 155:8
158:20
161:18 162:8
164:5 166:8,9
166:12,14
167:7 168:2,4
168:7,15
176:2,3 182:2
184:20
185:11,25
188:10,18,23

188:23 189:9
189:12,14,19
189:20 190:2
190:17,19
191:7,15,22
192:20,21
193:4,7,9,14
193:15
194:16
196:20
197:11
199:15
200:24,24,25
205:24 209:7
212:19 214:7
216:8 217:20
219:4,15
221:19 222:2
222:17 224:3
226:2 227:12
227:14,21,25
228:5 230:2
232:14
244:18
248:14 250:4

**officer's (12)**
90:13 101:25
133:15,16
134:8 136:23
137:3,19
189:3,15
200:5 218:10

**officers (122)**
6:13 21:13
29:3,6 33:18
35:21 37:21
38:4 43:20
45:3,23 46:24
47:23 48:18
51:24 52:18
53:2,8,9,16
54:23 60:25
62:3 63:22
65:10,20

66:17 68:3
70:5,5 73:16
73:25 74:20
75:13 77:20
78:17 80:24
85:14,19 90:2
90:5,20 91:22
92:12 99:2,20
100:7 101:13
102:17 104:6
104:11
105:23 106:3
106:12,16
108:23
111:23
115:11
120:12,21
122:3 123:2,4
124:7 126:13
129:21 136:9
136:13,16
145:13
161:15 165:7
171:11
175:16
177:10 179:6
181:22
182:23 183:3
190:4 191:4,9
191:23 194:9
194:12,21
200:17
203:20,25
204:4,5,8
207:18 217:6
219:7 220:16
220:17 221:4
221:15 222:8
225:9 226:21
226:23
230:11 233:5
233:8,11,13
233:13,18,23
234:9 235:2

238:8 239:23
241:3,4,21
243:19 246:5
249:8,8

**officers' (1)**
248:10

**official (2)**
50:9,14

**officially (3)**
57:19 60:15
236:25

**oh (8)**
62:6 110:9
175:12
182:21 210:4
210:25
214:17
241:14

**okay (282)**
6:18,22,24 7:7
7:8,12,15,17
7:22,23 8:6
8:12,16,19,22
9:14,17,23
10:2,5,12,18
10:21 11:3,6
11:22 12:24
13:10,14,17
13:19,20 14:4
14:14,20,23
15:17 16:16
16:19 17:3,6
17:25 18:4
19:8 20:8,12
21:4,12,17
22:15,18 23:4
23:11,15,16
24:3,5,6,7,12
24:21,24 25:4
25:5,10,23,24
26:22 27:2,7
27:13,17
28:12,17,21
29:17,23 30:3

30:7,15,21,24
31:7,14,21
32:4,13,16
33:3 36:6,14
36:22 37:2,9
37:13,19
38:13 39:19
40:18 41:2,7
41:12,16,19
42:9,19 47:10
51:5 55:3,25
56:5,13,16,20
57:4,15 59:10
60:6 61:4
63:21 70:22
74:22 77:20
78:5 79:15
81:5 82:18
86:6 87:2,8
88:8 89:7
91:24 92:3
93:2 94:23
95:3 96:6,18
96:23 97:3,17
98:4,8,12,16
99:12 100:20
102:20
103:18
105:17,21,24
106:5 108:22
109:2,8,11,17
109:21
112:14
114:19
115:24
116:21,23
117:13
118:14
119:24
123:25
124:19,23
125:7,12
126:9,13,21
129:18,20

130:23 136:5
138:9 142:7
142:16 148:5
148:12,18
149:10,14,19
150:10
151:16 152:2
152:7,23
153:5,9
154:20
156:23,25
157:11,14
158:22 159:6
160:8 161:4
161:15 162:4
162:15,20
163:19,23,23
165:11 169:7
169:12 170:5
170:11,17
171:16
172:21
173:16,21
174:6,17,19
175:15 178:9
179:17
180:12 181:9
181:20
184:24
185:14,18
186:2,16,24
187:10 196:5
199:22
201:16,21,23
203:12
205:10
206:11,24
207:2 210:7
213:6,14
214:19,25
216:19 217:4
218:2,5
219:12
220:10,24

222:6,16,20
222:23
223:12,15
224:8,14
226:8,19
227:22
231:13
233:18,23
234:9 235:15
236:18 238:2
239:3 241:15
245:9 249:25

**old (7)**
104:12 105:3,7
 108:3,4
 191:13 208:8

**older (1)**
47:23

**once (9)**
20:10 55:9
 59:25 72:5
 76:25 110:11
 114:6 171:22
 236:2

**one's (1)**
48:7

**one-minute (1)**
223:6

**one-time (1)**
146:17

**ones (8)**
15:12 38:18,22
 51:11 52:16
 72:20 127:2
 233:16

**online (3)**
200:2,22 201:7

**open (11)**
66:12 82:10
 171:23 175:4
 175:20
 183:18,19
 184:5,17
 208:8 224:22

**opening (1)**
18:23

**operations (1)**
21:11

**opinion (5)**
65:6 107:3
 190:12
 240:16 244:2

**opinions (1)**
107:11

**opportunity ...**
19:12 217:21

**option (6)**
58:17 70:23
 86:9 209:13
 212:17 215:5

**options (9)**
33:19 34:6,8
 34:19 43:15
 51:13 125:14
 126:15 131:2

**orange (3)**
186:19,20
 253:5

**order (2)**
1:22 102:5

**organization...**
14:18 19:4
 20:4

**organization...**
24:22,25 25:2
 25:24,25
 179:19

**original (2)**
46:21 105:18

**outcome (1)**
253:19

**outlying (1)**
241:4

**outside (3)**
28:7 111:12
 119:16

**overqualifie...**
15:16

**oversee (3)**
21:9,12,24

**overview (1)**
13:21

**owner (14)**
24:16 78:22
 83:12,12
 86:24 99:15
 118:10,11,18
 119:3 173:24
 207:10
 222:14 244:4

**owners (4)**
177:4 240:17
 240:23 242:7

_____

**P**

**P (3)**
2:2,2,17

**P-H-E-L-P-S...**
29:22

**p.m (7)**
94:5,7 244:13
 244:15,15,17
 250:14

**pace (1)**
164:25

**pacing (2)**
88:3 164:21

**page (14)**
23:19 30:15
 34:10 75:16
 78:5 204:16
 219:25
 220:11 251:5
 251:10,22
 252:3,12
 254:5

**paid (1)**
20:5

**paired (1)**
239:8

**pamphlet (2)**
34:12 91:2

**paragraph (1)**
97:14
**parents (1)**
208:10
**parole (1)**
236:5
**part (27)**
24:17 26:22
29:7 33:23
35:15 40:22
42:14,16 43:2
69:6 79:9
99:21 122:17
128:15 135:2
144:5,6 147:2
147:3 199:17
206:11
214:11 218:8
237:5 238:10
238:11,15
**part-time (1)**
16:22
**participated ...**
248:6
**participating...**
4:8
**particular (1)**
172:2
**particularly ...**
42:5 53:20
**parties (4)**
3:6 4:4,19
253:17
**partner (5)**
48:13,14
211:20,21
217:12
**parts (1)**
42:14
**passed (1)**
75:6
**passing (2)**
75:11 234:13
**passive (1)**

128:10
**pat (1)**
132:6
**patrol (7)**
17:16 18:8,9
19:23 139:5
184:6 225:15
**pause (3)**
185:16 187:3
246:23
**paused (5)**
186:3,21 214:6
216:14,20
**pay (6)**
101:5,8 141:15
230:23
232:23,24
**paying (3)**
174:10,12
183:2
**peace (8)**
14:21 15:5,16
15:18,22 16:7
16:10 22:12
**Peachie (2)**
2:13 5:10
**peachie.jone...**
2:12
**pentobarbita...**
51:10 99:17
**people (48)**
6:12 22:9
33:12 35:11
44:4,6,10
48:4 52:4,6,9
52:15 53:12
55:11 59:4
67:9 87:11
91:3 99:21,25
106:21,23
107:20
108:10 111:8
111:19
115:19

116:20 118:3
118:4,19
120:4 125:16
159:21
160:11
178:18 179:2
192:13 195:3
196:12 204:2
215:8,9
217:12
242:12,14,16
242:18
**people's (1)**
104:12
**pepper (30)**
22:25 42:20
63:20,21,22
64:2,4,6,12
64:18 65:2,16
73:7 95:10,11
95:21 96:20
114:7,14,17
175:3 186:13
186:17,18
187:4,13,17
197:10,12
215:5
**perceive (2)**
228:17 229:2
**perceives (1)**
188:23
**perceiving (2)**
228:5,9
**percent (11)**
44:10,12 65:2
127:15
147:18,23
179:8 183:25
184:2 228:13
229:11
**percentage (2)**
54:12 178:10
**perception (9)**
43:11 44:14

47:21 48:4
90:9,13
122:25 123:4
243:14
**Perceptions (...**
44:3
**perfect (1)**
244:11
**performs (1)**
125:15
**Perinton (2)**
19:20 29:2
**period (1)**
224:21
**peroneal (1)**
49:4
**person (32)**
38:25 39:2,3
40:10 51:7
56:16 71:10
72:4,5,6,7
76:10 79:17
85:22 90:12
92:14 100:13
121:20
132:24,25,25
135:22
139:24 141:9
143:6,18
152:2 167:19
228:24,25
229:15
230:14
**person's (2)**
141:15 142:9
**personal (4)**
45:4 99:4,14
100:10
**personality (2)**
228:23,24
**pet (5)**
24:16 26:8
78:10 181:16
231:9

**pets (3)**
44:6,11 204:7
**Phelps (7)**
29:11,18,20
31:15 40:6
50:3 245:24
**philosophy (1)**
172:5
**Phone (2)**
2:6,12
**physical (7)**
86:16 90:10,17
92:16 102:18
133:21 194:6
**pick (1)**
116:9
**picked (1)**
89:8
**picture (8)**
126:10 129:7
131:15
156:15 163:8
172:2,3
226:17
**pictures (1)**
27:16
**piece (2)**
66:25,25
**pit (20)**
45:6 46:5 63:4
103:11
200:19,23
202:5 206:17
207:8 208:7
242:19,25
243:3,5,6,11
243:11,12,16
243:23
**place (6)**
1:23 13:4
19:15 103:25
113:18 216:2
**places (1)**
177:21

**Plaintiff (4)**
2:4 5:8 250:13
251:10
**Plaintiff's (7)**
10:15 23:8
103:7 109:14
185:5 213:22
223:21
**Plaintiffs (3)**
1:6,20 148:22
**plan (1)**
212:13
**Planet (1)**
18:12
**planning (2)**
93:22 212:15
**play (25)**
103:19,23
104:8,10,19
104:24
105:25
109:21 110:7
110:8 114:20
134:24 142:2
169:21
184:24
185:15,16
186:19 188:2
198:11
214:22 215:2
215:20
216:20
223:13
**played (11)**
104:25 109:22
185:19
186:12,23,25
188:3 214:4
216:23 223:6
224:7
**playful (16)**
38:14,16 49:21
125:18,23
132:5 165:17

166:12 167:9
167:12 198:9
198:10,24
199:9 200:13
200:18
**playfulness (1)**
166:23
**playing (1)**
186:9
**plays (1)**
104:22
**please (10)**
5:6,20 7:3,20
148:24
153:19 154:2
154:17,25
250:13
**plywood (1)**
66:25
**point (52)**
16:14 46:22
86:21 88:12
90:11 96:19
105:3,7,7
106:2 107:16
108:19,25
110:15 114:9
114:20
115:14 117:5
117:24
119:21
120:21
122:14
124:14
126:19 128:9
130:5 133:12
133:22
158:25
170:18
175:23
185:22,25
188:8,11,13
190:8 192:21
199:4 200:9

205:24 209:5
214:8,9 215:4
218:16 219:8
219:9,21,21
225:8 246:6
**pointed (1)**
108:5
**pointer (3)**
105:2,8,20
**pointing (2)**
46:19 216:8
**points (3)**
83:24 102:6,7
**pole (2)**
80:23 212:25
**poles (4)**
61:8 63:8,10
65:21
**police (70)**
6:13 14:24
15:4,13 16:6
16:10,14
17:17 20:6
27:4 29:16
37:8,12,13,14
38:4 43:8
48:24 55:10
55:13,16,18
59:18 60:9
64:16 69:15
70:4,5 72:12
74:17 75:10
79:9,18 80:24
90:21 93:3
106:3 112:3
112:10
113:13
120:22
145:13 147:7
147:8,22
167:18 179:6
184:20
193:15
194:16 200:4

213:7 221:25
225:19,23
226:4,5
231:13,15
236:9,19,25
239:12 240:5
245:20 247:2
247:10 249:5
249:10,12
**policies (3)**
50:20 245:6,10
**policy (18)**
102:8,10
110:24
111:20,22,22
111:24,25
112:6,7,16,17
112:18,19,20
113:6,9
150:15
**poor (1)**
242:12
**pop (1)**
66:12
**popped (1)**
117:15
**popular (1)**
18:13
**porch (10)**
49:12 83:6,10
83:13,14 88:2
164:24
165:15,22,24
**portion (14)**
34:12 38:10
56:24 57:5,7
61:11,13,19
62:7 99:11
147:4 170:19
247:17 248:4
**pose (1)**
106:15
**posed (2)**
96:4 142:25

**poses (1)**
227:24
**posing (6)**
51:7 94:22
95:19 100:2
193:17 228:3
**position (7)**
63:14 153:22
154:7,9,23
161:7,22
**positions (2)**
133:10 155:18
**positive (7)**
40:15 233:6,7
233:17,19
235:9 236:2
**possession (1)**
4:17
**possible (3)**
10:13 12:22
61:25
**post (1)**
211:5
**post-academ...**
246:4
**posted (1)**
232:15
**posture (5)**
9:9 158:15
159:4 160:19
205:18
**postures (7)**
38:20 45:14
69:22 125:8
132:22
146:10
155:18
**posturing (1)**
158:6
**power (1)**
45:2
**PowerPoint (...**
23:15,18,20,24
27:3 29:14

33:10,22
36:19 40:19
56:6 75:17
97:6 169:9,18
204:17
237:21
238:19
239:13 248:5
251:13 252:8
**powers (2)**
15:6,6
**practice (4)**
1:21 176:15
219:13
220:12
**Practices (1)**
41:14
**precautions (...**
178:2
**Precinct (1)**
18:13
**predetermin...**
114:2
**preference (1)**
93:17
**preliminary ...**
111:7
**prepare (1)**
8:2
**prepared (2)**
116:25 234:10
**preparing (1)**
48:8
**presence (1)**
180:16
**present (7)**
4:4 56:18
140:4 144:8
144:12
145:24
170:23
**presentation ...**
97:6 124:24
170:25

172:11,23
238:20 239:4
239:11
251:13
**presented (9)**
4:15 19:12
231:16 233:4
233:5 237:8
239:3 247:11
247:21
**presenting (6)**
4:14 23:25
69:23 75:23
103:21
231:15
**presents (1)**
169:24
**president (1)**
21:3
**pretty (28)**
11:25 15:6,13
17:19 19:14
21:6 31:24
32:10,19
40:12 46:2
50:2 53:5
56:9,11 59:11
59:12 63:6
72:19 188:24
193:23
211:23 212:7
225:8 227:9
231:19
238:15 244:8
**prevent (3)**
100:25 106:13
108:24
**prevented (2)**
108:13 219:6
**preventing (2)**
49:15,17
**prevention (...**
23:22 72:25
73:15 84:14

85:20 86:10
127:23
206:12
209:17
217:24 248:7
**preview (1)**
109:25
**previous (3)**
174:21 205:3
220:19
**previously (2)**
102:22 249:18
**prey (2)**
205:11,12
**primarily (1)**
20:13
**primary (2)**
19:19 21:23
**prior (14)**
4:17 69:23
117:14 150:3
150:3 171:9
186:5 191:13
191:18
218:11
222:10
237:11
249:22,22
**private (2)**
14:18 20:4
**probably (32)**
6:20 11:14,20
12:25 36:13
43:12 47:12
54:17 55:5,8
55:21 65:6
75:3 91:7
111:4 112:2
114:16 120:9
121:2 122:9
124:13 127:3
132:5,7
148:15
162:23

190:10,24
200:17 209:5
214:18 243:2
**probation (1)**
236:5
**problem (3)**
32:25 133:23
243:3
**problems (1)**
225:11
**procedure (3)**
15:3 37:8 99:3
**proceed (1)**
216:25
**proceeding (2)**
60:14 254:2
**proceedings ...**
246:23
**process (2)**
150:24 201:24
**produce (3)**
154:6,17 155:5
**produced (1)**
50:21
**production (7)**
148:22 153:10
154:16 252:4
252:5,7,8
**professional ...**
24:22 25:11
26:2,8 49:7
72:3 151:22
**Professionals...**
26:6
**program (5)**
25:21 32:2,4,7
235:21
**progress (2)**
80:15,16
**proper (2)**
73:13 99:3
**properly (2)**
240:19,20
**properties (2)**

177:13 178:10
**property (37)**
77:12,14,15,16
88:4 99:4,10
99:14 100:10
121:10,12
123:8,11
134:9 140:4,7
140:11
141:12,14
143:20 144:9
144:12
159:14 165:4
165:8 176:20
176:22,25
177:4,8,11,24
182:2 207:12
207:21 208:5
229:24
**protect (8)**
47:7 80:25
121:10 141:5
199:2 200:10
200:11 201:3
**protecting (2)**
138:21 207:20
**prove (1)**
95:25
**provide (11)**
10:9 55:3
68:14 69:9
87:3 145:12
235:2 236:15
246:16,25
248:23
**provided (18)**
10:7,22 23:5
54:22 65:8
145:25 146:2
147:22
201:11 232:9
235:16,17
237:20
239:12,17,18

246:11
249:18
**provides (4)**
102:9 179:23
179:23
220:17
**providing (5)**
26:24 102:7
245:11,15
246:14
**provoke (2)**
124:8 125:3
**provoked (1)**
133:14
**provokes (1)**
133:22
**proximity (3)**
201:25 241:10
241:20
**public (12)**
1:24 5:16
16:16 80:25
113:8,12,18
118:3 247:4
250:25 253:8
254:25
**published (2)**
50:12,16
**pull (10)**
46:21 47:8
48:11 84:23
85:23 97:22
97:23 98:5
162:23 195:9
**pulled (1)**
208:17
**pulling (1)**
43:13
**purposely (1)**
89:9
**purposes (1)**
12:15
**pursuant (1)**
1:20

**put (59)**
10:7 16:10
23:11,17,25
24:5 27:3,9
28:14 29:5,13
39:20 41:3,9
41:11 42:3,4
46:11 47:12
48:7,25 56:6
59:3 62:24
67:21,24
75:15 89:24
97:4,12 103:4
106:8 109:17
114:23 118:2
138:15,17
152:21 166:5
172:10
177:16
182:11
185:10
204:14
208:24
209:20
212:18,19
217:16
218:13,23
219:25
223:18
224:15 231:3
231:7,11
236:8 246:2
**putting (4)**
66:3 84:2
166:17
208:14

**Q**

**qualification...**
12:18 24:8
**qualified (1)**
60:13
**qualifies (1)**
115:12

**question (57)**
3:11 4:18 7:4
7:10,13,17,21
10:8,9 11:13
11:16 12:10
12:13 24:7
38:2 41:24
69:5 84:5
94:9 95:16
97:13 98:2
106:15 115:8
115:25
117:15
122:16
123:16 125:8
129:6,23,24
131:11 132:3
137:2 142:25
143:25 145:6
145:10
154:12 155:9
159:8 161:19
161:20
169:17
179:17
181:12
184:15
185:20 188:4
188:8 214:5
221:12,14
225:2 226:24
244:19
**question/ (1)**
224:20
**question/disc...**
224:16
**questioning (2)**
4:17 144:21
**questions (38)**
6:14 7:25 9:18
13:19 23:13
23:15 24:4
27:8 31:8
41:20 47:11

54:16 60:7,8
61:4 94:11
97:10 110:12
114:25 124:5
132:3 184:12
186:10
204:12,15
214:23
217:10
222:15
224:22,23
225:3 226:9
245:3 248:15
248:17,19
250:2,5
**quick (3)**
174:13 222:7
224:11
**quicker (2)**
62:12 211:12
**quickly (5)**
97:9 99:9
144:25 145:5
223:9
**quiz (1)**
174:13
**quote (3)**
97:14,18
101:10
**quoted (2)**
96:2 98:18

**R**

**R (3)**
2:2,17 5:14
**rabies (1)**
92:9
**raise (1)**
174:2
**raised (1)**
242:24
**ran (6)**
49:12 112:5
207:13

208:20,22
234:17
**Randall (8)**
31:17,21 41:6
41:7 50:7
66:8 120:8
212:3
**Randy (4)**
42:10 61:12,14
211:5
**reach (6)**
52:15,15,21
75:4 159:20
238:21
**reached (3)**
74:14,15 201:8
**reaching (1)**
42:2
**react (6)**
39:17 76:18,21
93:5 196:22
227:11
**reaction (5)**
38:8 78:19
104:13
106:21
191:10
**reactions (5)**
70:9,10 78:16
104:12
214:14
**read (7)**
64:15 65:6
76:3 89:21
95:17 98:9
244:3
**readily (1)**
68:10
**reading (2)**
33:15 95:18
**reads (1)**
76:10
**real (12)**
15:7 35:9 48:9

48:16 68:24 82:8 106:24 158:21 161:2 223:9 226:2 233:10

**reality (2)** 166:12 200:4

**realize (2)** 64:6 68:4

**realized (1)** 17:7

**really (36)** 8:5 15:2 21:7 35:4 37:15 50:5,15 52:24 61:10 63:14 73:5 78:19 82:22,23 108:4 123:7 134:2 160:11 163:13 166:4 170:8 173:14 178:18,25 179:14,24 181:24 188:14 192:18 226:25 233:20 239:24,25 240:6,10 242:21

**reason (12)** 100:24,25 101:7,21,21 116:17 118:15 137:14 174:2 182:3 204:22 254:5

**reasonable (...** 135:2 139:7,8 140:17 143:24 192:9

192:11 195:8 196:11 219:10

**reasonablene...** 102:16,18 200:6

**reasonably (2)** 193:16 221:19

**reasons (7)** 87:11 119:6,9 119:23 120:4 137:20 172:17

**reassess (1)** 121:9

**reassured (1)** 34:11

**Rebecca (5)** 27:14 29:13 156:17 170:10,11

**recap (1)** 224:12

**receive (1)** 246:10

**received (3)** 37:3 73:25 235:11

**receiving (1)** 195:23

**receptive (2)** 48:3 53:4

**recess (2)** 94:4 244:14

**recognition (2)** 60:5 155:20

**recognize (6)** 31:20 122:10 160:2 182:17 200:10 227:2

**recognized (1)** 197:7

**recognizes (1)** 204:23

**recognizing (3)** 76:24 202:4 205:2

**recollection (...** 12:5

**recommend ...** 58:23

**recommende...** 62:11

**record (17)** 5:4 7:7 8:6 94:3,7 98:9 154:22 163:17 173:17 175:19 186:2 187:16 220:11 223:20 244:12,17 253:14

**Recorded (2)** 1:14,18

**recovers (2)** 62:12 211:12

**recruit (5)** 47:24 56:2,13 56:17 246:19

**recruits (1)** 249:13

**redirected (2)** 89:5 111:15

**reduce (9)** 43:6,16 82:14 199:8 200:15 202:7 211:22 220:16 243:18

**reduced (1)** 202:20

**reduction (2)** 147:16,23

**refer (3)** 38:23 99:24

128:23

**reference (1)** 40:11

**referenced (3)** 39:25 40:4,5

**referring (5)** 40:3 87:15 100:4 138:2 249:4

**refers (2)** 88:23 98:21

**regarding (4)** 4:18 60:22 98:25 245:6

**regardless (1)** 137:2

**regards (3)** 11:4 12:23 200:2

**regime (1)** 233:11

**regional (3)** 55:7,16 249:7

**register (1)** 179:2

**registry (2)** 16:10,11

**regular (2)** 20:23 117:22

**regulations (1)** 50:25

**rehabilitate (...** 117:25

**reinforce (2)** 146:24,25

**reinforceme...** 40:15,16

**related (4)** 17:22 21:20 100:17 253:17

**relates (1)** 13:22

**relaxed (3)**

175:4,17 183:12

**released (1)** 36:15

**relevant (1)** 13:11

**rely (2)** 50:24 179:22

**remained (1)** 21:5

**remember (28)** 10:11 29:24 30:8,17 32:11 66:17 67:21 74:19,21 97:15,19 111:11 146:9 149:19,25 151:10,16 152:10,17,22 157:8 172:24 175:7 178:4,5 237:12,20 245:22

**remembered...** 62:6

**remind (1)** 8:7

**remote (1)** 4:7

**remotely (1)** 4:11

**Reno (253)** 1:19 5:1,21 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1

28:1 29:1
30:1 31:1
32:1 33:1
34:1 35:1
36:1 37:1
38:1 39:1
40:1 41:1
42:1 43:1
44:1 45:1
46:1 47:1
48:1 49:1
50:1 51:1
52:1 53:1
54:1 55:1
56:1 57:1
58:1 59:1
60:1 61:1
62:1 63:1
64:1 65:1
66:1 67:1
68:1 69:1
70:1 71:1
72:1 73:1
74:1 75:1
76:1 77:1
78:1 79:1
80:1 81:1
82:1 83:1
84:1 85:1
86:1 87:1
88:1 89:1
90:1 91:1
92:1 93:1
94:1 95:1
96:1 97:1
98:1 99:1
100:1 101:1
102:1 103:1
104:1 105:1
106:1 107:1
108:1 109:1
110:1 111:1
112:1 113:1
114:1 115:1

116:1 117:1
118:1 119:1
120:1 121:1
122:1 123:1
124:1 125:1
126:1 127:1
128:1 129:1
130:1 131:1
132:1 133:1
134:1 135:1
136:1 137:1
138:1 139:1
140:1 141:1
142:1 143:1
144:1 145:1
146:1 147:1
148:1 149:1
150:1 151:1
152:1 153:1
154:1 155:1
156:1 157:1
158:1 159:1
160:1 161:1
162:1 163:1
164:1 165:1
166:1 167:1
168:1 169:1
170:1 171:1
172:1 173:1
174:1 175:1
176:1 177:1
178:1 179:1
180:1 181:1
182:1 183:1
184:1 185:1
186:1 187:1
188:1 189:1
190:1 191:1
192:1 193:1
194:1 195:1
196:1 197:1
198:1 199:1
200:1 201:1
202:1 203:1

204:1 205:1
206:1 207:1
208:1 209:1
210:1 211:1
212:1 213:1
214:1 215:1
216:1 217:1
218:1 219:1
220:1 221:1
222:1 223:1
224:1 225:1
226:1 227:1
228:1 229:1
230:1 231:1
232:1 233:1
234:1 235:1
236:1 237:1
238:1 239:1
240:1 241:1
242:1 243:1
244:1 245:1
246:1 247:1
248:1 249:1
250:1,18
251:6,11
254:1,1

**Repeat (2)**
38:2 161:19
**repellant (2)**
211:8,9
**rephrase (1)**
7:21
**report (13)**
71:5 80:11
113:10
132:12
147:25 148:2
148:3 150:17
150:20 207:5
231:5,10
234:9
**reporter (16)**
1:24 4:6,11 5:2
5:19,22 6:2

7:5 94:2,6
145:3 244:5
244:11,16
250:7 253:8
**reporter's (1)**
223:17
**Reporting (1)**
4:9
**reports (6)**
14:7,10 71:23
148:8 150:11
151:5
**represent (1)**
6:12
**reputation (1)**
143:10
**request (5)**
80:11 151:14
151:17 155:2
231:2
**REQUESTS ...**
252:2
**require (1)**
57:20
**required (2)**
45:17 234:24
**requirement...**
140:10 229:23
230:5
**rescue (4)**
18:21 19:7
24:17 44:2
**research (1)**
32:17
**reserved (1)**
3:11
**residential (1)**
229:24
**residents (1)**
177:19
**resort (2)**
47:15,18
**resorting (1)**
86:11

**resources (4)**
31:11 32:17
43:19 104:13
**respective (1)**
3:6
**respond (8)**
22:3 75:7
82:16 114:15
179:8 225:10
226:7 230:19
**responders (2)**
31:19 32:3
**responding (9)**
41:12 42:11
80:10 110:4
111:11
152:14
222:11
225:24
230:24
**responds (2)**
76:10 166:10
**response (1)**
21:25
**responsible (5)**
1:10 141:12
143:4,13,14
**rest (2)**
108:6 155:9
**result (4)**
45:18 92:5,6
194:17
**resume (15)**
10:6,10,19
11:7,9,17,17
12:5,14 13:7
18:19 39:20
41:3 54:24
251:12
**resumes (2)**
11:23 12:16
**rethink (1)**
46:3
**retire (1)**

18:5
**retired (2)**
14:2 151:19
**retrained (5)**
112:24 146:18
147:9 191:24
192:4
**retraining (2)**
45:17 146:11
**retreat (1)**
229:18
**retriever (2)**
46:7 242:25
**reverse (1)**
208:19
**revert (5)**
35:15 48:10
67:3 89:16
164:21
**reverting (1)**
43:13
**reverts (2)**
46:20 110:23
**review (8)**
9:14 72:11
134:18
150:24
231:22,23
237:10
246:22
**reviewed (6)**
56:6 64:22
172:13,13
201:7 254:2
**reviewing (4)**
134:17 199:24
199:25 218:9
**rid (1)**
102:5
**ride (4)**
184:4,7,18,22
**right (168)**
7:19,24 9:17
10:19 11:10

14:18 16:14
18:25 19:25
20:21,22 22:7
23:21 27:5
30:7,22 34:5
36:12 37:23
41:4 51:18
60:10 64:15
70:2,5,19
75:21 79:2,11
81:12,16 82:4
84:22 85:16
90:12,18 92:9
92:16,25 96:3
98:11 101:10
102:8,16,20
102:25 103:2
103:3,12,14
103:16
105:11
107:19
109:19
110:21
112:15
114:20,22
116:2 117:7
118:16,19
122:20 123:2
125:2,7,10,17
125:20 126:3
127:18,25
134:14
135:13
137:17
138:16
139:18,21
141:5,16
142:4,13,24
143:6,15
149:8 152:25
153:8 154:18
155:11,13,23
157:3 158:12
159:16 160:4

161:3 163:18
164:14 166:6
166:18,19
168:22,23
171:12 174:8
175:5,9
176:15,17
180:21
185:20
186:14,21
187:2 192:18
196:8 197:16
198:13,24,25
199:2,20
201:2,5,9,18
204:9,21,24
207:18
209:15
210:15
211:24 213:2
213:25
214:14,16
215:22
216:14,17
217:2,3,25
218:4,25
219:5,9
220:19,20,24
222:18
223:19,25
224:8,12,17
234:17 236:3
239:9 242:9
242:13 244:2
247:3,5,8
249:19 250:3
**rights (2)**
135:20 167:22
**road (3)**
5:24 17:16
209:24
**robbery (2)**
39:9 80:15
**Rochester (19)**

1:9 2:10,11
5:11 6:13
14:9 27:4
72:18 102:4
177:14
178:11
179:21
201:17
206:25 213:7
236:19,25
241:14
249:12
**role (9)**
14:5 20:3,13
20:18 21:4,23
22:5 24:13
26:22
**roles (4)**
17:14,21 20:19
21:19
**roll (4)**
147:2 238:17
238:22 239:5
**rolled-up (1)**
209:19
**room (4)**
2:11 107:11
112:5 241:17
**Roth (4)**
2:4,4 5:8,8
**Rottweilers (1)**
243:10
**round (1)**
48:13
**routine (3)**
80:8,9 225:15
**RPD (27)**
1:10 23:6,25
53:7 60:25
68:7 146:4,11
147:10
150:11,24
194:8 212:23
226:20

232:11 233:3
235:12,18
236:15
238:17,21
239:3,8,17
240:13 241:2
245:5
**rubbed (1)**
128:13
**rubbing (1)**
187:21
**rule (1)**
7:4
**rules (2)**
1:21 6:23
**RULING (1)**
252:11
**rulings (1)**
100:17
**run (16)**
21:10 74:20
87:11 97:8
118:5 161:17
165:7 177:20
183:23 184:7
184:8 225:5,7
240:9 241:6
243:12
**running (14)**
62:15 64:4
88:2 98:22
126:19
129:25
131:14,17
132:6 166:22
198:10
208:14
225:19 241:9
**runs (5)**
142:16 162:22
164:24
166:11 216:9
**rural (6)**
240:5,11,14,25

242:3,16

**S**

**S (3)**
2:2,17,17
**safe (5)**
35:24 36:2
69:14 193:15
196:18
**safety (8)**
16:17 46:11
78:7 80:3
181:11
193:16,18
247:4
**salary (1)**
20:5
**sat (4)**
28:8,13 29:7
231:9
**satisfied (1)**
225:8
**Saturdays (1)**
16:23
**save (2)**
22:6 77:9
**saving (1)**
22:8
**saw (12)**
41:5 74:13
89:12 94:16
188:15 189:9
189:11,13
202:5,5
208:13
221:10
**saying (33)**
10:23 15:18
39:15 42:7
47:13,18
54:22 66:9
68:16 79:12
82:6,7 106:24
110:12

125:23
127:16
134:16
137:11,12
165:20 180:2
193:6 195:14
195:17,21
203:2 205:19
208:4 214:17
215:15
216:12 224:9
229:6
**says (32)**
37:24 44:10
54:3 75:19
76:9 78:6
98:24 106:7
106:10 113:7
114:13 115:9
115:10
122:17 136:3
139:21,23
159:7,19
169:14,15
170:19
173:19 176:5
181:10,20
186:5 193:24
197:14
204:19 229:9
254:2
**scares (1)**
66:13
**scenario (5)**
115:16 120:15
190:23
209:13
228:25
**scenarios (1)**
142:12
**scene (5)**
106:3 166:10
222:9,15
225:10

**scheduled (1)**
76:6
**Science (1)**
26:13
**Scientists (1)**
26:16
**Scott (1)**
58:11
**scratching (1)**
173:20
**scream (1)**
208:12
**screen (11)**
10:18 23:21
103:16
109:18
169:25
185:12 214:3
219:24 224:2
224:4 250:8
**screw (1)**
116:16
**scrutinized (1)**
200:5
**sealing (1)**
3:7
**search (2)**
71:22 230:8
**searching (2)**
229:24 231:24
**second (20)**
10:5,12 39:21
57:7 85:15
98:13 103:10
109:3 117:14
185:9 186:4
186:22
208:18,21
209:12,12
213:25 214:7
216:21
246:21
**second-level ...**
86:7

**seconds (8)**
173:3 186:3,21
187:3,24
214:6 216:14
216:21
**section (8)**
97:22 98:12,14
98:18 99:22
151:22,24
168:5
**sections (2)**
53:19 99:24
**secure (1)**
211:19
**see (41)**
10:19 23:20
39:21 77:16
91:20 103:16
104:5,11,12
106:10
107:10
109:18 110:4
122:4,4
130:24
149:16
164:11
169:18
173:13 175:2
175:9,10
177:22,25
181:15
185:11
186:13,24
187:12
188:14
189:12 208:6
215:12
219:18
220:14 224:3
224:8 231:6
232:13,20
**seeing (6)**
120:17,17
128:8 156:11

156:11 174:3
**seen (7)**
15:8,14 184:19
184:23
200:22
226:20 244:3
**sees (3)**
110:7 130:14
138:7
**seizing (2)**
99:6 100:11
**seizure (3)**
67:11 104:3
230:8
**seminar (5)**
31:18 58:18,22
59:14,15
**seminars (3)**
58:8,15,19
**send (25)**
8:10,16,19
11:24 12:14
12:16 16:2,9
46:25 61:10
148:7,8
150:16 151:4
151:5,15
152:3 157:6
157:15 169:8
169:9 225:19
234:14 249:7
249:13
**sending (2)**
153:14 249:23
**senior (1)**
21:8
**sense (2)**
35:10 78:21
**sent (17)**
8:21 11:14
12:21,21
18:18 148:11
149:6 151:8,9
152:24 153:5

153:11 157:2
157:4,14
222:21
249:16
**separate (1)**
4:7
**September (1)**
39:23
**sergeant (1)**
150:19
**sergeants (1)**
150:17
**serial (1)**
18:17
**serious (7)**
136:2 193:20
194:3,3,6
221:6,21
**seriously (7)**
194:9,17,22
195:8 196:11
196:12,21
**serve (2)**
15:10,12
**server (2)**
149:12,16
**service (6)**
4:10 48:2
152:13
230:11,15
246:12
**services (5)**
14:12 16:3
57:12,17
58:13
**set (7)**
22:10 58:17
61:15 135:19
250:6 253:11
253:21
**sets (1)**
97:18
**setting (1)**
22:8

**seven (2)**
26:18 152:9
**seventeen (1)**
43:25
**seventy-five ...**
241:22
**shake (2)**
7:6 173:19
**share (1)**
224:2
**shared (3)**
103:4 148:21
206:4
**sharing (2)**
106:5 219:24
**SHEET (1)**
254:1
**shelter (8)**
22:9,10 31:25
40:11,20,21
157:13
178:19
**shepherd (6)**
18:21 19:7
24:17 83:6
131:15 183:9
**Shepherds (2)**
19:5 243:10
**sheriff (1)**
29:4
**sheriff's (31)**
13:24 16:13
17:14,15,19
18:5 20:6
24:14 28:8,13
28:22 29:15
29:18 30:9
31:2 35:2
42:2,6 43:8
44:19 68:6
199:25 201:8
201:12,14,19
201:20
237:17 246:4

246:12,17
**sheriffs (1)**
29:10
**Shields (38)**
2:7 5:7,7 6:5,8
6:11 93:12,22
95:15 109:11
148:18 149:2
153:9,21
154:5,9,15,25
155:4 163:17
173:16
175:19 185:2
186:2 213:20
216:19
219:23 220:8
220:10
223:18,24
244:7 246:21
248:14
249:18 250:3
250:12 251:6
**shirt (2)**
105:11,14
**shoot (120)**
34:6,8,22 35:7
35:17,20
37:14 39:11
43:15 44:22
46:22 47:9
48:19 49:10
49:19,19 51:6
51:13 52:7,20
69:18,19 70:3
70:15 71:2,17
72:2,9 74:7
81:3,3 85:7
85:12 88:12
89:10,23 90:4
90:12 91:14
99:19 106:20
106:22,24,25
107:4,4,8,12
107:16

110:13,14,15
110:16,17
111:24 113:9
113:14
126:10,14,20
130:22
131:23 132:8
132:21
133:15 134:7
135:17,23
136:10,18,20
136:25 137:4
137:9,18
138:16 139:9
139:12,13,19
139:24
141:10,11,20
148:3 160:20
161:11,16,24
162:2,11,17
162:23 163:2
163:2 167:20
176:6 189:4
191:11
193:18
195:10 196:8
196:9,24,24
197:16,21
198:10 199:9
199:18
200:13
201:24
204:10 206:3
209:12 211:2
227:3,3,19
229:17
**shooting (64)**
28:24 33:8,19
34:17 36:3
43:14 46:4,25
47:7,14 49:16
49:21,21 51:4
63:5 69:23
71:9,24 85:23

89:15 96:13
99:6 104:14
106:13 108:8
108:13,24
117:3 126:15
130:4,21
131:5 134:12
138:23
141:20
142:19,21
143:3 144:13
166:24 167:3
167:15
168:17
185:22 191:3
192:8 193:8
194:7 195:24
199:8,16
200:17
203:21 206:7
211:21
218:12 219:2
220:22 221:5
221:8,22
232:10,14
240:10
**shootings (9)**
43:7,16 49:15
49:17 113:18
147:17
226:21 240:8
243:19
**shoots (3)**
111:18 168:2
200:24
**short (2)**
145:8 197:14
**shorter (1)**
109:9
**shortly (1)**
11:2
**shot (40)**
6:12 28:25
30:4 35:13

45:7,18 46:24
49:12 71:23
72:13 74:3
93:5 101:2,3
106:11
107:15 108:9
110:10
112:20
113:12
147:21
148:10
150:12,25
152:20,20
188:18
198:12,23
200:15,21
201:21
202:13,23,24
203:14,16
209:6,7
240:13

**shots (2)**
152:12,21

**show (30)**
34:13 67:4
82:9 89:9
96:16 105:8
105:22 106:3
107:22
160:25 164:4
171:24
172:18 173:6
175:16,24
176:7 181:22
182:7 183:16
189:22,23
190:14,16
192:12 216:3
226:16,16
235:24,25

**showed (3)**
95:13 189:17
238:14

**showing (39)**

38:10 60:4
63:15 64:8
79:23 95:19
95:20,22
125:24 126:2
126:5,6
127:19 128:6
128:20 130:2
132:19,20
156:3,5,19
158:4,8,15,19
158:19 159:4
160:18
163:25 164:3
164:20 165:2
165:3 169:22
171:21 175:2
182:4 187:9
190:25

**shown (3)**
64:12 89:8
160:15

**shows (4)**
87:16 160:10
160:12
220:22

**shut (3)**
184:8 215:13
217:14

**sick (3)**
91:8 116:8,9

**side (7)**
9:5,7 138:6
163:10
169:19 182:9
208:8

**sidewalk (2)**
181:15 241:19

**sideways (1)**
182:8

**sidewise (1)**
205:3

**sign (3)**
155:23 159:22

177:25

**signals (4)**
171:17 173:6
173:19
174:21

**Signature (1)**
254:23

**signed (2)**
3:16,18

**signs (29)**
38:10 46:15
64:8 79:24
104:5 106:12
119:13,18
125:24 126:2
127:20 130:2
164:20
166:23 167:4
173:8,24
174:20 175:3
176:18,22,24
177:4,7,15
182:4 198:7,9
198:9

**similar (6)**
15:7 71:15
109:23 172:3
172:4 174:24

**similarly (2)**
227:22 230:4

**simply (3)**
193:7 226:13
241:2

**simultaneous...**
110:8

**sink (2)**
67:18,19

**sir (1)**
98:3

**sit (6)**
78:18,23 81:8
123:16
205:15
237:14

**sitting (1)**
176:7

**situation (65)**
34:18 48:9
53:17 59:5
63:17 64:7
67:16 68:17
69:10 71:7,17
73:10,13 74:2
81:6 83:20
84:3 85:5,16
85:20 86:20
88:14 89:10
90:10,14,17
92:16 93:10
96:13 107:18
114:12 122:8
126:11,14
127:24
128:18 130:3
131:23
133:16
138:13,15,16
139:8,15
140:18
142:17
159:13
160:20
161:12,17,24
162:3,17
165:19 166:6
166:18,21
167:15
184:10
199:13
205:17
206:21
218:21 227:4
230:21

**situations (13)**
35:10 39:7,16
64:19 65:14
72:16 80:17
116:25

124:16 181:6
211:16
226:21
230:10

**six (6)**
16:19 20:25
26:15 68:25
151:12 208:7

**sixteen (2)**
15:8 43:25

**sixty (1)**
179:7

**size (3)**
79:2 165:25
249:11

**skip (1)**
78:2

**slammed (1)**
208:13

**slide (67)**
53:25 54:2
56:6 75:14,17
77:18 78:6
82:7 84:19
87:10,14,16
87:19,20
97:13 99:8
102:21,25
109:5 115:2,4
115:5,7,10
117:7,14
119:25
121:22 123:3
124:2 125:8,9
125:9 129:7
133:3 136:7
155:8,16,21
156:14
157:23
160:10,13
161:5 163:18
163:19,20
169:24
173:17 174:7

175:5,6
180:13,25
181:9,12
204:18
206:10
209:16 210:8
213:15
219:13 222:6
222:16,20
224:15 248:5
**slides (36)**
31:4 53:18,22
77:19 81:11
87:9 93:14
96:24 97:2,9
100:15
101:13
114:23
126:22 127:5
128:22
136:16 146:9
159:5,17
168:23
169:10,14
170:6,12,24
171:18
174:21
177:18
204:13
221:15 231:2
238:21 239:5
239:6,14
**slowly (1)**
108:2
**smaller (2)**
205:4 243:5
**smart (3)**
108:9 208:3
212:7
**smile (1)**
183:4
**snapped (1)**
89:3
**snapping (2)**

88:6 120:20
**sniff (1)**
182:11
**sniffing (1)**
173:20
**socialized (1)**
240:19
**Society (11)**
14:2,5,9,17
15:22 18:6
20:3 26:10,23
118:7 179:19
**sodium (2)**
51:10 99:17
**somebody (16)**
64:17 79:3,4
86:22 89:11
113:20 114:8
131:10 139:3
140:21 220:3
220:5 224:23
224:25 228:9
229:8
**somebody's (4)**
100:9 140:7
176:4 241:16
**someone's (11)**
100:14 140:10
140:23
141:10,11,23
142:8,14,15
143:20 230:5
**somewhat (2)**
50:7 182:18
**sorry (15)**
41:21 55:12
81:19 87:7
95:7 105:13
129:13
144:24
161:10
205:23
220:25
221:12 234:4

246:13,24
**sort (9)**
22:2,6,21 29:5
59:8 84:13
137:7 176:14
239:18
**sorts (1)**
150:11
**sound (2)**
49:7 179:9
**sounds (17)**
30:22 39:15
47:13 68:15
79:12 88:18
92:11 93:25
119:14 120:3
151:9 153:5
206:4 215:21
216:11,24
241:24
**space (3)**
89:20 192:16
236:12
**span (1)**
44:13
**SPC (1)**
209:7
**SPCA (1)**
14:8
**speak (4)**
8:12 78:9,12
145:5
**speaking (4)**
72:17 83:24
145:4 206:15
**special (1)**
17:21
**specific (10)**
23:15 32:8
50:24 53:18
65:15 100:17
114:25 115:8
146:3 230:13
**specifically (3)**

66:4 146:9
213:7
**specifics (1)**
124:25
**spell (1)**
27:17
**spend (3)**
158:18 160:13
164:5
**spoke (1)**
122:24
**spray (35)**
22:25 42:20
62:17 63:20
63:21,22 64:2
64:4,5,6,9,12
64:18 65:2,16
73:7 74:4
95:10,11,21
96:20 114:8
114:14,17
186:13,19
187:4 197:10
197:12 210:8
210:9,14,16
211:4 215:5
**sprayed (7)**
64:6 65:17
186:17
187:13,17
190:9 210:21
**sprays (1)**
186:18
**spreadsheet ...**
148:11,13,20
149:24 151:6
151:8,10
153:17
**spreadsheets...**
148:23 149:7
152:3,11
236:13,19
239:16 252:4
**ss (1)**

253:4
**staff (4)**
40:11 146:20
233:9 237:7
**stamps (1)**
249:22
**stand (9)**
68:21 70:21
110:19 182:8
205:3,5
215:23 216:2
218:14
**standard (1)**
193:20
**standards (1)**
151:22
**standing (9)**
84:11 108:10
133:2 161:7
161:21 207:7
212:20
214:18
215:25
**standoff (18)**
38:24,25 63:14
63:25 64:7
69:3 78:25
79:7 84:18
122:7 131:10
131:12 132:5
205:9,12,16
205:18
210:18
**stands (1)**
215:22
**star (3)**
169:19,20
192:3
**stare (6)**
79:5 158:9,14
158:17
171:21
174:25
**staring (2)**

159:3 183:10
**start (26)**
9:18 70:3,5,6
82:20,21,23
107:18
121:17,18,18
159:16 174:2
174:3 176:24
178:2 182:15
182:19 197:4
214:15,17
215:13,19
218:5 219:22
231:15
**started (16)**
10:14 17:18
20:23 47:22
56:17 118:19
132:19
160:21
183:13 186:7
201:23
202:11,12
207:10 212:8
235:21
**starting (3)**
50:6 97:12
173:25
**starts (5)**
77:22 88:2
159:15
164:25 183:4
**state (23)**
1:25 5:5,19
18:13 51:10
53:16 56:25
57:9,16 58:6
58:9,22 59:24
98:25 135:22
139:20 147:7
180:7 193:18
247:20,21
253:4,9
**stated (1)**

188:22
**States (2)**
1:2 90:23
**statewide (2)**
57:20,24
**statistic (1)**
94:19
**statistics (13)**
33:9,11 94:14
147:25
149:20
151:18
153:13
178:17,24
203:7,19
240:4 252:5
**stats (1)**
151:14
**statute (3)**
15:9 97:15
101:19
**stay (7)**
77:15 82:19,20
83:2 88:4
123:21
205:15
**stays (1)**
84:21
**stealth (1)**
181:7
**stenotype (2)**
1:23 253:7
**step (4)**
84:8,13,17
85:15
**stepped (1)**
207:13
**steps (1)**
222:5
**stern (1)**
205:7
**Steve (2)**
151:19 152:2
**stick (1)**

209:19
**sticking (1)**
125:6
**sticks (3)**
61:9 63:7,11
**stiff (8)**
38:11 155:12
155:25 156:7
156:8,11,19
159:3
**stigma (2)**
243:7,8
**stips (1)**
6:3
**STIPULAT...**
3:4,9,14 4:3,13
**STIPULATI...**
3:2 4:2
**stitches (1)**
227:19
**stole (1)**
61:12
**stop (15)**
77:23 104:15
104:18,23
106:5 154:25
158:10 159:7
159:9,11,15
159:25
199:10
207:14,23
**stopped (1)**
207:15
**stops (1)**
131:19
**store (2)**
111:12,13
**stories (2)**
83:3 181:3
**story (10)**
18:7 28:18
63:3 69:12
71:19 120:15
121:5,15

123:18
207:18
**straight (1)**
205:5
**stranger (1)**
125:14
**stray (4)**
80:14 184:5
225:25
230:14
**street (5)**
2:11 67:7
103:11
181:14
207:25
**stress (10)**
164:20 165:2
171:17 173:6
173:8,19
174:21 175:3
181:5 188:16
**stressed (5)**
164:15 173:7
173:12,14
174:4
**stressing (1)**
158:6
**strictly (2)**
14:12,14
**strike (2)**
62:22 208:19
**students (1)**
134:16
**studies (2)**
64:3,11
**study (9)**
18:10 64:17,22
65:2,8,13
95:12 96:2
210:15
**stuff (23)**
8:21 31:9
39:10 42:20
43:2 44:2

46:11,15 48:6
56:10 83:16
83:18 125:6
174:21 184:9
192:6 193:2
200:2 201:7
212:4 223:9
231:25 244:2
**stun (1)**
211:10
**stupid (3)**
70:20,22
110:18
**subject (1)**
146:3
**subjects (1)**
146:12
**submitted (1)**
237:12
**Subscribed (2)**
250:21 254:23
**subsequent (2)**
153:15 252:6
**sued (2)**
102:4 141:6
**sufficient (3)**
145:12 149:3
153:23
**Suggested (2)**
219:13 220:12
**suggestions (1)**
234:5
**Suite (1)**
2:5
**summer (1)**
32:12
**supermarket...**
110:5,6
**supervisor (2)**
20:24 113:13
**supervisors (2)**
52:22 238:4
**supposed (3)**
51:9 108:15

138:2
**supposedly (1)**
150:18
**sure (32)**
10:14 11:5
12:3,13,20
13:6 62:2
65:7 72:21
101:6 104:19
112:15
114:11 138:4
146:19
150:22
153:21
167:11 168:7
174:9 180:10
184:15 196:5
197:13 198:5
200:22
221:14
224:20 229:3
231:20
238:15 241:6
**surprise (1)**
180:20
**surprised (2)**
100:8 180:20
**surprising (2)**
179:15 232:19
**surrounding ...**
249:9
**survival (4)**
37:12,13 93:9
196:17
**survive (3)**
37:15 195:19
196:3
**suspect (3)**
39:9 80:16
207:6
**SWAT (4)**
212:9,23 213:4
213:8
**Sweden (1)**

241:16
**sworn (8)**
3:15,18 4:10
5:15 250:21
253:12 254:1
254:23
**system (1)**
211:13

————————
**T**
————————
**T (1)**
2:17
**tactics (7)**
22:22 29:12
37:12,13 49:2
60:3,10
**tag (1)**
83:11
**tail (6)**
127:12 129:3,3
129:4 158:16
160:19
**take (30)**
13:17 16:9
35:12 41:19
45:23 52:3,4
71:4 75:7
79:20 85:20
85:22 90:3
93:13,18,24
99:4,5 103:25
149:15
175:10
179:19
195:18
196:20
217:23 222:5
231:4 234:22
244:6,8
**taken (7)**
1:19 6:16 94:4
146:7 180:11
244:14 254:2
**takes (2)**

156:22 167:8
**talk (121)**
23:4 38:22
39:3 44:5
45:12 47:25
52:23,25 54:2
61:7,8,9,9,18
62:8,9,16,17
62:17,18
68:22 70:3,7
70:8,11 71:8
74:9,9 75:5
75:12 76:20
77:5,16 79:4
80:8,18 86:21
87:20 99:7
101:9,24
105:4 107:5
108:11,12
110:22 111:5
111:7,8,10,13
111:14,15,20
113:23,23
114:5 115:2
115:16
116:13
120:22 122:7
123:21,24
124:11 125:5
125:13 127:3
127:6,8 128:3
128:21,24
129:2,2
130:18,19
131:12
132:10
133:25
134:16
137:14 139:6
140:15,17
144:2 155:17
158:23
159:23 164:7
164:16,22,24

174:23 177:3
177:6,7,19,22
181:3,10,17
182:13 184:3
184:3 192:14
195:2 204:18
209:16,24
210:13
211:10,22,23
217:10,11,14
217:20
226:11
237:15
245:11
**talked (23)**
8:7 27:2 42:23
50:11 52:25
61:14 76:2
81:10 115:5
124:3,11
125:17
134:20
176:17
184:13
194:25 198:5
202:18
204:17
210:10 213:5
218:16 227:6
**talking (44)**
8:4 32:11 57:8
61:21 65:23
66:2,8 78:13
81:6 82:2
87:15 91:16
98:6,10 99:8
107:18 116:5
116:6 119:20
119:22,25
121:16
124:22 133:2
137:24 141:8
141:9 154:25
157:24 158:2

159:16,18
160:16 173:9
173:11,24
181:24,25
182:19 197:4
204:21 207:6
225:21
230:14
**talks (2)**
88:23 102:2
**taser (11)**
23:2 62:9,13
210:9 211:9
211:11,11,12
211:15,21,22
**taught (10)**
17:18 35:12
53:15 107:21
147:17,18
188:6 214:13
223:4 240:6
**tax (2)**
20:11 180:8
**teach (58)**
39:6 47:14
53:24 58:23
59:6,21,22,25
60:2 62:20
67:18 69:13
75:13 76:3,4
76:8 85:14,19
86:3,5,6 90:5
90:20,24,25
95:4,5 96:8,8
99:2 100:22
100:23
101:12 112:9
121:15 124:7
124:9 126:13
136:8,13,16
141:7 171:6
182:25 187:7
194:20 197:2
200:9 221:3

221:15 225:9
228:6,7,8
229:3,8
247:14,25
**teaches (1)**
240:2
**teaching (16)**
10:25 32:20
35:22,23,25
60:3,4,5
70:16 101:22
118:21
127:25
132:22
141:18,18
199:7
**team (4)**
21:24,25 213:4
213:8
**teams (1)**
212:9
**technique (3)**
66:7,8 196:17
**techniques (7)**
67:20 70:7
83:23 127:4
127:22 132:9
159:23
**teeth (4)**
82:9 128:6
132:19
160:18
**tell (103)**
7:3,9,12,16 8:2
9:19 24:19,25
33:3,14 38:16
45:3,3 46:14
48:11 52:6,13
52:22 53:9
63:3,22,24
69:12 70:14
70:14,15,18
70:21 71:18
74:6 77:20,25

78:17,21,24
80:4 83:3,21
84:18 90:5,8
90:13 92:12
92:19,21,23
101:18 104:4
104:17,22
108:4,17
110:2,3,15
114:3 115:11
115:11,23
120:15 121:5
122:6 126:17
126:25 127:5
128:10
131:11,13
132:13
136:20
142:16
147:24
158:11 167:3
181:2 183:3
186:15 190:4
191:4,14
192:14 195:3
195:5,12,16
195:21,22,25
195:25 196:4
196:6,19,22
207:4 208:5
209:8,13
210:11,16
213:18
215:24 228:9
228:13
**telling (18)**
52:8,11 82:11
83:2,17,19
88:11,13
89:19 91:5
124:16
128:14,14
129:5 159:25
195:20

207:17
228:14
**temporary (2)**
22:9,10
**ten (8)**
93:17 131:3
150:20
162:10
202:19,23
203:5,6
**ten-minute (1)**
104:10
**ten-year (1)**
44:12
**tendency (1)**
145:5
**tension (1)**
158:10
**term (1)**
66:2
**terminology ...**
136:15
**terms (4)**
72:3 88:22
92:18 130:12
**test (4)**
46:14 102:14
213:19
214:11
**testified (1)**
5:17
**testify (2)**
12:2 60:19
**testimony (4)**
1:21 251:4
253:14 254:3
**Texas (8)**
70:18 109:6,11
111:3,21
112:15 210:3
210:20
**Thank (7)**
6:2 28:2
157:18 170:4

176:10
248:14 250:3
**Thanks (3)**
28:20 29:23
190:25
**theory (1)**
95:25
**thing (56)**
6:22 7:2 32:18
33:16 34:16
35:18 38:11
39:4 47:3,4
48:17 49:8
60:23 61:12
62:24 63:18
66:20 70:8
72:10 79:21
80:20 81:22
83:18 86:18
89:6 91:6
95:6 105:25
116:22
123:11
125:12
137:15 140:2
143:24 145:2
148:6 155:24
158:6 164:10
165:25 171:5
172:6 175:18
182:13
183:17 192:7
193:14 201:6
209:8 212:2
223:7 226:23
228:4 234:23
238:10
239:23
**things (33)**
19:11 21:23
34:3 35:19
46:10,16,18
50:8 58:19
62:18 76:19

77:17 85:3
92:20 115:6
134:21
135:10
155:10
157:25 169:5
180:15,15
205:19
209:25 210:2
210:8,12
216:12
217:18
220:22 222:2
229:4 243:14
**think (134)**
6:20 18:19
27:19,22,24
27:25 30:10
34:8 36:10
37:20 38:4
42:22 43:23
43:23 44:13
44:15,15,22
44:24 45:25
46:4,10 48:7
48:12,15
51:23 54:7,10
66:23 67:6
69:6 71:5
72:24 73:10
73:14 75:8
77:5,7,9 78:4
78:5 83:25
85:4 98:8
99:21 103:14
103:22 104:8
104:16
106:19,25
107:3 108:14
110:24
117:19 123:6
124:3 125:12
125:18
128:11

139:15
142:24,24
143:5,17
144:11 145:4
145:10,23
146:10,22,22
147:7,14
149:11 150:2
151:23
152:16,18,23
154:14 157:5
157:12,14
163:14
165:20
168:19
169:23 173:2
184:10 185:8
185:15 188:9
192:8,11
196:15,20
200:25 202:8
202:9,10,14
203:25 204:2
204:4,7,8
208:2 209:22
219:7 222:23
228:6,8
231:19
236:11 237:5
237:23
239:23,24
240:3,12,17
240:20 241:8
241:9,25
242:6,17
243:5,11,13
243:17
245:23
248:13
**thinking (4)**
83:21 205:10
215:18 218:5
**thinks (2)**
35:14 138:9

**third (3)**
97:14 178:14
179:7
**thirty (4)**
202:15,16,16
203:3
**thought (7)**
48:5 94:10,15
120:10 157:4
157:6 244:20
**thoughts (1)**
185:17
**thousand (2)**
16:5 53:16
**thousands (1)**
54:23
**threat (18)**
51:7 78:11
99:25 100:2
127:10,17
128:24 131:8
132:15 133:5
135:22
139:23
169:16
191:20
193:10,17,20
204:19
**threatened (5)**
90:9,11 136:24
137:4 182:8
**threatening (7)**
78:12 88:17
122:18 123:9
128:17
138:11
226:13
**three (19)**
8:23 19:15,15
26:8 94:21,23
94:25 95:9
96:10,14
118:10 153:6
177:19 178:3

178:5 201:21
210:8 227:18
236:12
**threw (3)**
211:7 235:14
236:12
**throw (1)**
19:18
**tied (2)**
119:4,19
**time (67)**
1:22 3:11 5:3
16:6,21,24
18:12,14,20
24:14 29:10
31:22 39:12
39:17 43:10
43:22 50:2,4
58:3 71:20
82:18 92:4
93:13 94:3,7
106:21
114:10
143:20 145:4
151:11 156:5
156:22
158:18
160:14 164:6
166:10
170:20 171:8
176:13
177:11 183:8
189:4 191:19
191:21
197:25 198:2
199:7 217:21
218:3 228:19
233:9 235:7
237:15,21,25
244:6,13,17
245:23,24
247:14,24
248:2 249:21
250:6,7,14

**times (8)**
16:22 17:9
88:19 118:10
145:8 189:7
205:16
248:22
**timid (4)**
77:5,7 79:18
93:7
**title (1)**
32:22
**titled (1)**
30:16
**titles (1)**
21:2
**today (8)**
5:3 6:3,14
157:16 232:7
246:16
249:16 250:6
**today's (1)**
8:3
**told (17)**
29:8 31:10
47:20 52:20
59:12 62:2
74:2 83:8,15
90:25 113:25
146:6 179:5
207:24
227:17
234:20
237:16
**tone (1)**
181:17
**tool (5)**
63:25 73:12,13
84:14 85:20
**tools (26)**
36:2 42:17,19
49:18 61:5
67:23 71:6
72:25 73:15
73:23 83:20

83:22 85:6
86:10,17
127:23
140:21
145:19
146:22 197:5
199:12
206:12
209:17 211:3
217:24
229:20
**top (1)**
158:12
**topic (3)**
60:14 140:15
240:3
**topics (1)**
176:15
**totality (8)**
71:11 134:14
144:2,7 163:4
191:16
192:10 218:8
**totally (2)**
74:18 183:12
**touch (1)**
159:20
**tough (1)**
120:22
**town (5)**
19:20 28:25
236:9,9
241:15
**towns (4)**
179:25 180:7
236:6 246:10
**train (10)**
40:11 59:8,17
60:22,25 65:9
96:10 161:15
201:10 213:2
**train-the-tra...**
59:5
**trained (18)**

34:7,22 35:15
35:16 37:14
47:3,19 55:23
60:23 108:16
108:18 150:6
191:9 192:4
219:7 222:3
240:20
242:24
**trainer (7)**
24:22 25:11
52:13 59:8
60:23 73:19
231:11
**Trainers (1)**
26:3
**training (217)**
1:10 12:17
15:15,16,18
16:5,17 17:17
18:14,18,19
18:23 22:22
23:5,12 26:24
27:8,9,11
28:14,23 29:3
29:5 30:5,8
30:15 31:12
31:16 35:2,15
36:18 39:16
39:19,22,23
39:24,25 40:2
40:3,5,9,9,13
40:16,19,25
41:17,24 42:3
42:4,10 43:5
43:11,19,23
44:15,16,18
44:23,24
45:24 46:17
46:21 47:5
48:3,8,10
49:14,23,25
50:5,7,9,11
50:14,15,25

51:14,23 53:6
53:19 54:7,11
54:12,18,23
55:4,18 56:3
56:21 57:3
58:12,16
59:16,18,24
61:5,6,23
62:7 67:20,25
68:14 69:8,15
72:14 73:25
75:2 76:16
81:23 84:2,2
84:15 90:21
99:3 102:8,9
103:21
107:14
117:16
125:10
140:13
142:13 145:9
146:2,3,8,15
146:17 147:2
147:3,6,8,11
149:21,23
150:3,4
151:23,24,25
171:19 186:6
188:25 189:2
189:18 190:3
197:14,18,21
198:12
199:17 201:8
201:11,14
203:15,23,25
213:7,10
219:9,10
221:16 222:4
226:25
227:23
228:14
229:23 230:3
230:9 231:14
231:17,21

233:4,6,25
234:11,21
235:3,12
236:16,21,24
237:3,9,11,13
237:19 238:7
238:14,16,18
238:22 239:2
239:20,22
242:7 245:4
245:10,12,15
245:17,25
246:3,15,16
246:19,20
247:2,4,12,12
247:20,21,23
248:10,23
**trainings (14)**
12:7 13:11
22:19 32:14
36:8,20,24
37:2 50:4
171:10
190:13,14
246:12 248:7
**transcript (1)**
254:2
**travel (2)**
59:2,16
**treat (4)**
183:21,24,25
210:25
**trespassing (8)**
77:12,13 141:2
141:22 142:8
142:13,18,20
**trial (4)**
1:19 3:12
253:11,13
**tried (9)**
44:17 65:16
68:2,8 132:15
133:24
192:16

197:11
208:19
**tries (1)**
66:14
**trooper (1)**
168:20
**trouble (1)**
230:20
**true (4)**
79:13 155:11
155:12
253:14
**try (27)**
39:2,5 44:20
46:25 58:8
59:14 61:10
64:9 79:20
82:14,15 85:7
85:24 86:8,9
116:10
120:13 123:3
127:4,23
142:2 159:13
204:3,3
220:22
235:24
243:22
**trying (36)**
33:14,17 43:14
47:5,6,13
48:11 59:21
59:22 67:9
77:3,4 79:2
85:15 88:9
91:13 98:14
99:10 100:22
100:23,23
116:11
120:11
121:10,13
122:25
123:20,23
133:12
143:17

145:17,18
192:13 193:3
222:4 245:22
**tucked (1)**
160:19
**tumor (4)**
119:7,8,8,15
**tune (1)**
50:3
**turn (8)**
76:25 77:2
80:6 122:14
128:18
133:10
191:19,20
**turned (6)**
89:4 132:17
188:13
192:20
207:13,15
**turns (4)**
85:8 89:2
134:6,11
**twelve (4)**
202:19,24
203:5,6
**twenty (10)**
44:7 71:3 73:8
93:24 94:20
130:15,25
202:15,16
203:3
**twenty-five (1)**
6:21
**twenty-minu...**
94:9
**twenty-two (2)**
13:25 201:20
**twice (2)**
17:4,11
**two (42)**
15:4 16:22
17:9,12 20:19
26:5 42:14

45:6 54:15
55:5 56:21
57:2 63:4
91:8 97:18
99:24 100:15
102:6,7 104:9
110:5 111:11
111:12
113:10
114:19 117:2
118:10
125:19 150:7
152:20
169:13 171:7
206:17 207:8
208:7,13
210:21 223:5
236:11
241:16 247:2
248:3
**two-hour (5)**
140:20 145:8,9
145:11
247:16
**two-prong (1)**
102:14
**two-year (1)**
9:21
**type (11)**
29:11 49:8,13
60:23 91:17
122:8 125:6
128:24
165:19
190:23 191:9
**types (7)**
46:6 52:9
124:12 127:6
156:4 230:11
242:15

———————
U
———————
**ultimate (1)**
229:15

**ultimately (3)**
70:13 221:5,18
**ultrasonic (1)**
211:10
**umbrella (11)**
61:11,13,15,19
65:25 66:6,13
66:15,23 67:6
74:4
**umbrellas (13)**
42:23 61:18
65:24 66:4,10
66:18,19,21
66:22 67:7,8
67:13 210:5
**unavailable (1)**
175:21
**underlying (1)**
151:5
**understand (...**
7:3,20 11:13
12:10 18:25
33:7 37:5,21
38:5 72:6
101:20
112:15 134:2
134:3 142:23
160:16 196:6
197:14
201:19
**understandi...**
34:25 37:4,6
95:8 199:12
**understood (1)**
243:19
**uninhibited (6)**
88:7 91:12
120:24 121:7
121:17 122:5
**uninjured (3)**
69:14,16
196:19
**unit (2)**
17:19 213:12

**United (2)**
1:2 90:23
**University (3)**
31:17 247:20
247:22
**Unjustifiable...**
99:17
**unknown (1)**
176:4
**unlawful (1)**
141:4
**unlawfully (1)**
141:3
**unreasonabl...**
143:22 193:11
197:22
**unreasonabl...**
197:24 198:3
**unsure (2)**
79:6,23
**update (1)**
231:21
**updated (9)**
11:9,17 12:8,9
12:11,14,22
13:8 30:19
**updates (1)**
56:10
**updating (1)**
12:5
**upped (1)**
16:8
**ups (1)**
34:21
**use (94)**
31:10 32:16
35:10 38:15
40:14 49:18
54:13 61:15
62:7,22 63:10
63:16 65:20
65:25 66:7,10
66:24 67:8,13
68:2,2,8,14

69:2 70:25
71:10 73:9,12
73:21,23
81:11,23
82:19 83:22
83:24 84:4,7
84:8,12,20
85:24 86:10
86:16,17
89:14 91:25
92:18 95:5,10
96:20,20
100:17 105:2
105:19
120:12 123:3
127:4,21
128:3 131:15
132:8,23
133:3,21
134:25
136:14,14
145:19
156:18,21
159:23
163:13 170:8
170:18
190:25
191:14
192:12
196:25
197:12
209:11,11,22
210:12,19
211:4,15,20
212:5,24
220:13,21
222:4 229:17
248:10
**useful (1)**
66:5
**uses (5)**
81:8 86:11
211:6 212:23
213:5

**usually (32)**
34:7,21 38:23
54:14 72:20
76:4 88:6
104:15,18
105:7,19
106:17
121:23
126:16,18
156:16
175:23
178:24 179:4
181:16
182:19 183:6
183:23 207:9
208:3 217:5
224:22 225:8
234:17,24
243:5 244:4
**utilize (1)**
40:18

———————
V
———————
**various (3)**
13:11 189:7
230:10
**veered (1)**
208:21
**verbal (12)**
81:8,15 84:9
86:7,18 96:12
120:17
123:21 149:2
153:22
164:22,23
**verbally (3)**
7:5 129:20
154:19
**verbiage (1)**
98:22
**version (5)**
31:2,2 156:14
238:19 239:4
**versus (7)**

29:25 54:13
130:15
190:17
226:13 227:3
227:25
**vertical (1)**
211:13
**Veterinary (1)**
26:12
**vice (1)**
21:3
**victim (5)**
74:10,11 75:13
75:19 76:10
**victim's (4)**
124:17 134:20
135:9,13
**Victor (1)**
5:24
**video (132)**
4:2 46:12,16
46:18 47:12
70:18 91:16
102:21,24
103:3,5,16,19
103:21,24,25
104:4,8,9,10
104:15,22,25
105:25
106:18
107:17,22
108:5,21
109:3,6,8,12
109:18,22,24
110:2,4,7,9
110:11
134:19
146:25
156:15,17,19
157:2,7,10,15
163:21
168:25
169:10,14,21
171:24 172:4

172:4 173:2
175:6,7,13,13
175:20,24
176:9 184:19
184:25 185:9
185:11,16,19
186:4,12,22
186:23,25
187:25 188:3
188:9 189:7
189:17,23,25
190:2,16,21
190:22,25
191:2,3,9,24
193:2 197:11
213:16,17,21
214:4,7,12,21
214:23,24
215:8,11,14
215:17 216:6
216:15,22,23
220:19
222:21,22
223:3,6,11,16
223:19 224:3
224:7 226:15
226:16
232:14 250:8
251:14,15,16
251:17,18
252:7
**Videoconfer...**
1:14 4:5,8,20
**videos (31)**
8:11,23 36:15
36:19 67:3,17
89:8,16 91:24
93:15 96:21
96:25 113:17
114:19
156:21 157:5
157:12 172:8
172:10,19,25
190:14

200:21 217:7
226:11,19
232:3,4,10
249:17 252:8
**videotape (2)**
70:19 110:18
**view (4)**
44:4,10 111:8
164:4
**violate (1)**
102:15
**violating (2)**
167:21,22
**violation (4)**
100:13 168:5
168:11,16
**violence (4)**
18:10,11,17
19:3
**violent (1)**
115:21
**viral (1)**
113:3
**vocal (3)**
121:19 122:4,8
**vocalize (1)**
70:9
**vocalizing (1)**
87:23
**voice (1)**
78:13
**voices (1)**
173:25
**volatile (1)**
230:21

_____

### W

**wagging (3)**
129:3,3,4
**wait (3)**
106:15 162:11
226:4
**waived (1)**
3:7

**waiver (2)**
16:2,9
**walk (13)**
82:14,14 83:7
121:12 182:2
182:20,21,22
183:4,6,11
207:10 208:4
**walked (6)**
114:4 183:12
183:15
207:11,16,24
**walking (10)**
71:4,25 80:12
139:4 140:22
140:24 141:9
159:14
181:14
182:17
**wall (1)**
176:5
**want (77)**
9:17 10:7
28:18 32:22
41:9 47:12
57:13,23 58:6
59:15 62:11
67:11 68:21
68:22,24,25
78:24,25 79:5
79:16 80:2,6
80:7 82:13
84:18,19 87:8
90:3 93:14,18
94:11 96:23
97:8,24 104:4
104:18 107:2
112:14
128:15,16
132:9 155:8
156:6,10
157:4,20
172:14,22
174:11 180:7

180:8,10
181:16,16
182:7,8,9,10
183:11,22
184:6,17,24
196:25
197:13
204:11,11,12
205:9,9,12
211:20 216:6
223:12
227:16
242:19
250:10
**wanted (17)**
8:9 29:2,8,9
39:20 40:24
46:3,4 76:3
83:12 98:17
124:4 192:19
235:21,24,24
244:21
**wants (5)**
128:12 133:21
164:12
198:11
224:24
**war (2)**
83:3 181:2
**warning (7)**
79:24 88:3
122:8 123:20
123:22,24
127:19
**warnings (5)**
120:17 121:19
122:4 164:22
164:23
**warrant (6)**
15:10,11 28:24
39:10 71:22
202:25
**warrants (1)**
202:24

**wasn't (11)**
34:4 40:22
  57:25 112:21
  112:25 113:2
  192:7,15
  193:3 220:4
  246:5
**watch (13)**
36:14 93:15
  96:25 103:3
  103:25 104:4
  109:8 172:10
  173:11
  213:17
  214:12,21
  222:24
**watched (1)**
232:4
**watching (2)**
176:7 217:7
**way (30)**
35:14 37:15
  65:9 67:19
  83:4 95:18
  112:24 120:3
  126:23,24
  149:6 161:16
  166:4 169:4
  174:15
  177:17 187:6
  187:22 188:5
  191:25
  195:14
  196:18 204:5
  211:17
  212:14
  225:22 228:7
  229:10 246:9
  253:18
**ways (4)**
33:8 42:18
  158:23
  180:16
**we'll (8)**

67:17 93:23
  128:3 173:18
  185:15,17
  222:20
  244:12
**we're (39)**
5:4 14:8,11,12
  15:11,15 20:7
  23:4,18 50:6
  57:7 58:20
  75:15,17 78:6
  81:6 97:12
  98:6 119:20
  119:22
  121:16 132:5
  141:25 153:9
  155:8 159:18
  160:16
  163:17
  168:23
  178:17 185:3
  197:5 202:9
  214:5,22
  216:14,20
  230:7,7
**we've (3)**
11:8 58:18
  118:5
**weapons (1)**
22:24
**week (3)**
16:20,22,25
**welcome (1)**
176:11
**welfare (8)**
18:22 21:22
  26:19,19
  58:20 59:20
  117:23 180:3
**went (27)**
15:21 16:13,21
  17:11 40:25
  42:22 61:22
  71:22 83:5,10

105:19 108:3
  111:14 113:3
  148:16
  149:20 183:8
  187:12,16,19
  187:20
  192:20 203:3
  207:15 208:2
  209:5 239:13
**weren't (9)**
17:25 61:25
  94:17,18,22
  142:20 191:9
  202:4 222:3
**WESTERN (...**
1:2
**what-ifs (1)**
140:19
**whatsoever (1)**
116:18
**WHEREOF ...**
253:20
**whites (2)**
173:11,13
**wide (1)**
173:15
**wife (2)**
207:7,9
**wiggly (4)**
38:11 155:25
  156:12,20
**winter (1)**
237:6
**wish (1)**
72:15
**withdraw (5)**
12:4 20:19
  36:9 76:13
  246:25
**witness (15)**
4:7,10,15,16
  4:18 5:21,24
  144:24
  157:19 170:4

251:5 253:10
  253:15,20
  254:23
**witness's (1)**
4:12
**woman (3)**
89:2 105:18
  208:23
**wondering (1)**
122:22
**wood (1)**
66:25
**words (2)**
127:14 132:12
**work (24)**
13:22 14:2
  18:8 22:2
  39:12 48:24
  58:18 62:10
  64:2,18,20
  73:6,7 89:15
  95:22 132:17
  171:6 187:11
  205:20 209:4
  209:14
  210:17,18
  211:11
**worked (4)**
18:9 29:9
  233:13
  234:20
**working (7)**
16:12 18:20
  19:4 86:7
  241:11 242:2
  242:3
**world (10)**
31:24 34:16
  35:9 91:6
  116:21
  117:24
  140:19 180:3
  195:16 196:3
**worried (2)**

92:23 93:10
**worry (2)**
92:19 93:6
**worst (3)**
33:16 34:16
  91:6
**wouldn't (9)**
47:17,17
  134:13
  142:20
  160:19
  161:11
  179:15 227:5
  228:20
**wrap-up (1)**
223:2
**write (5)**
9:4 27:21 49:6
  112:6 234:24
**writes (1)**
71:25
**writing (13)**
28:10 54:3
  148:25 149:4
  153:20,25
  154:3,4,7,13
  154:24 155:3
  155:6
**written (5)**
32:17 51:2
  234:15,16
  235:10
**wrong (4)**
116:16 119:10
  198:17
  199:18
**wrote (2)**
44:8 113:10

—————— **X** ——————
**x (3)**
1:3,13 251:2

—————— **Y** ——————
**yard (10)**

138:17
141:23 142:9
142:9 143:11
143:15
159:19
200:19
207:16 230:5
**yawning (1)**
173:20
**yeah (70)**
7:14 11:12,15
11:16 20:22
21:22 22:21
24:16 28:19
30:21 32:18
36:13 37:24
37:24 40:8
42:22 53:11
58:17 69:6
71:18 75:3,24
91:6 92:10
98:19 101:11
109:25
112:13
113:23
114:16 118:4
121:18
122:15
131:18
139:14 140:6
149:18,22
153:2 166:7
169:11 170:3
171:2,4,5,20
172:4,13
177:7 181:23
189:14 191:6
194:23,25
205:2 207:4
210:4,25
214:21 215:7
219:17 225:5
225:15
230:25

231:23
237:23 241:6
241:14 244:7
244:25
**year (14)**
10:2 22:16
33:13 55:9
91:3,4 148:9
148:10 150:3
152:24
202:13,19
208:7 231:22
**yearly (4)**
22:20 151:11
151:14
238:16
**years (28)**
6:21 13:25
15:9 17:12
19:16 24:11
27:20 43:25
44:2,7 55:23
61:23 148:15
148:16,20
149:25
150:21,21
152:9 153:7
153:15
201:20
202:17 203:7
203:10
231:16
236:12 252:6
**yell (5)**
77:22 131:19
183:20 184:6
205:14
**yelled (5)**
83:8 207:14,23
208:8,10
**yelling (6)**
82:25 105:9
108:6,7
183:14

208:12
**yelped (1)**
208:20
**York (34)**
1:2,25 2:5,5,11
5:25 14:21
53:16 57:16
58:5 67:4,7
88:24 91:21
104:2 127:11
127:12
132:14
135:22
139:20
190:22 191:3
192:5,9
193:18 197:6
197:11 210:2
210:23 212:9
215:14
226:15 253:4
253:9
**younger (3)**
53:14 74:23
204:5
**YouTube (2)**
175:6,20
**Yup (21)**
19:14 29:20
30:6,23 41:15
76:17 98:6
103:13
121:17 153:4
157:17
163:22
164:18
168:12
171:20
180:18 187:6
187:14
203:24
222:19
242:10

**_____ Z _____**
**Zoom (3)**
1:14,18 4:8

**_____ 0 _____**
**05/31/2023 (1)**
254:2
**0O0 (1)**
3:23

**_____ 1 _____**
**1 (6)**
10:8,15 39:21
214:6 216:21
251:11
**10 (5)**
101:13 214:6
216:14,20
251:11
**10:01 (2)**
1:15 5:4
**10016 (1)**
2:5
**103 (1)**
251:14
**109 (1)**
251:15
**10th (1)**
253:21
**11 (1)**
101:13
**11:54 (2)**
94:3,5
**12 (1)**
101:14
**12:15 (3)**
93:23 94:5,7
**13 (3)**
30:11,12
102:21
**14 (1)**
150:5
**14450 (1)**
5:25

**14614-1224 (1)**
2:11
**148 (1)**
252:4
**15 (2)**
115:7 150:7
**153 (1)**
252:5
**157 (1)**
252:7
**16 (4)**
55:24 87:19
117:8 150:7
**169 (1)**
252:8
**17 (7)**
55:24 56:2
75:17 150:7
153:4 187:3
187:24
**18 (1)**
153:4
**185 (1)**
251:16
**19 (1)**
155:8
**1913 (2)**
90:22 92:3
**192 (1)**
2:5
**1932 (1)**
92:4

**_____ 2 _____**
**2 (11)**
23:8,12 56:7
57:8 97:5
106:7 114:24
186:21
204:14 220:2
251:13
**20 (2)**
250:23 254:24
**2000 (2)**

18:19
**2007 (3)**
13:25 18:20
50:22
**2010 (1)**
149:24
**2011 (1)**
50:12
**2012 (5)**
28:21 50:5
104:2 150:5
192:6
**2013 (8)**
28:21,21 32:12
41:5,12 50:6
150:5 203:2
**2014 (19)**
23:6 27:5
30:16,20,22
37:3 39:22,23
53:7 146:2,8
147:12
149:23
231:17 232:5
235:11 237:3
245:4 246:15
**2015 (1)**
149:24
**2016 (2)**
56:2 231:20
**2017 (3)**
152:25 203:3
231:20
**2017-ish (1)**
55:21
**2018 (7)**
11:8,10,14,18
12:6,25 13:7
**2019 (2)**
238:17,23
**2023 (3)**
1:15 5:3
253:21
**21 (1)**

157:24
**212-425-102...**
2:6
**213 (1)**
251:17
**223 (1)**
251:18
**23 (1)**
251:13
**248 (1)**
251:6
**25 (1)**
239:5
**26 (1)**
163:18
**27 (1)**
163:19
**28 (1)**
163:23

_____
**3**
_____
**3 (6)**
103:5,7 186:21
187:3,24
251:14
**3:33 (2)**
244:13,15
**3:41 (2)**
244:15,17
**3:49 (2)**
250:8,14
**30 (3)**
2:11 168:23
173:3
**31 (8)**
1:15,20 5:3
168:24
169:13,14
214:6 216:21
**32 (2)**
169:13,15
**33 (2)**
169:16,19
**35 (2)**

22:23 173:17
**36 (1)**
173:18
**37 (1)**
174:6
**372 (2)**
97:23 98:2
**374 (3)**
98:3,3,4
**38 (2)**
175:6 176:12
**39 (1)**
176:14

_____
**4**
_____
**4 (6)**
109:12,14
124:4 186:3
186:22
251:15
**400a (1)**
2:11
**41 (3)**
180:13 186:4
186:22
**42 (4)**
78:6 82:7
181:9 204:16
**43 (1)**
204:18
**44 (1)**
209:16
**45 (1)**
186:3
**47 (1)**
220:11
**48 (1)**
222:7
**49 (1)**
222:16

_____
**5**
_____
**5 (3)**
185:3,5 251:16
**50 (2)**

148:10 222:20
**51 (12)**
75:18 97:13
115:7 163:18
168:23
173:17 175:6
181:10
204:16
220:11 239:6
239:13
**543 (1)**
78:4
**585-428-799...**
2:12

_____
**6**
_____
**6 (4)**
213:21,22
251:6,17
**6:19-cv-6780...**
1:7
**60 (2)**
44:13 147:18
**61 (2)**
44:10 147:23

_____
**7**
_____
**7 (5)**
98:19 135:24
223:20,21
251:18
**70 (1)**
148:9
**70s (1)**
243:10

_____
**8**
_____
**8 (2)**
10:4 97:13
**802 (1)**
2:5
**85 (1)**
10:4

_____
**9**
_____

**90 (2)**
44:12,13
**90s (1)**
18:10
**911 (2)**
225:17,18
**99 (1)**
5:24