UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF NEW YORK

MARIANNE ANNISZKIEWICZ,            )
                                   )
    Plaintiff,                     )
                                   )
    v.                             )    Case No. 6:20-cv-6629-GWC
                                   )
THE CITY OF ROCHESTER, a municipal )
entity, Police Officer BRIAN CALA, )
Sergeant JENNIFER TRENTON,         )
                                   )
    Defendants.                    )

**OPINION AND ORDER**
**(Docs. 72, 80)**

Marianne Anniszkiewicz filed this suit under 42 U.S.C. § 1983 against Defendants the

City of Rochester (the City), Police Officer Brian Cala, and Sergeant Jennifer Trenton,[1] alleging

that they "entered her fenced-in property on June 10, 2018, . . . and shot and killed her dog,

Sampson." (Doc. 1 ¶ 1.) Ms. Anniszkiewicz asserts three claims: (1) a *Monell* claim against the

City alleging deficient policy, training, and discipline; (2) "unreasonable search of curtilage";

and (3) "unlawful seizure of personal property"—i.e., her dog, Sampson. (*Id.* ¶¶ 64–161.) For

relief, Ms. Anniszkiewicz seeks compensatory and punitive damages.

Previously in this case, the court denied Defendants' motion to dismiss. (*See* Doc. 12.)

Defendants have now moved for summary judgment on all of Ms. Anniszkiewicz's claims.

(Doc. 72.) They seek summary judgment on Count 2 on the basis that there was no "search,"

and that Ms. Anniszkiewicz authorized the officers to enter her yard. (*Id.* at 2.) They seek

---

[1] Trenton was promoted to the rank of sergeant in January 2020—after the events of this
case. (Doc. 76-6 at 17–18, 66.) The court refers to her sergeant rank here because that is the
rank she held at the time of her deposition in December 2022. It appears that Trenton and Cala
both held the same rank at the time of the events in this case.

summary judgment on Count 3, asserting that the totality of the circumstances does not support liability, and that Officer Cala is entitled to qualified immunity. (*Id.*) As to the *Monell* claim based on the seizure, the City asserts that there is no liability without an underlying constitutional violation; that Ms. Anniszkiewicz is not pursuing liability based on any "policy"; that there is no custom of unlawful seizure; and that Plaintiff cannot establish deliberate indifference. (*Id.*) Finally, as to the *Monell* claim based on the alleged search, the City again contends that there is no underlying constitutional violation; asserts that Ms. Anniszkiewicz has abandoned any claim based on a "policy"; and that she cannot prove deliberate indifference or ratification. (*Id.* at 3.)

Ms. Anniskiewicz has filed her own motion as to the *Monell* claim. She asserts that the jury verdict against the City in *Dempsey v. City of Rochester*, No. 19-cv-6780 (W.D.N.Y. Jan. 30, 2026), collaterally estops the City from relitigating whether it maintained an unconstitutional policy, custom, or practice regarding the seizure of dogs during police encounters and whether the City failed to adequately train its officers regarding dog encounters. (Doc. 80.) The City opposes that motion. (Doc. 83.) The court heard argument on both motions on May 18, 2026, and has considered the parties' post-hearing submissions (Docs. 88, 90).

## Background

The following facts are undisputed except where noted. They are drawn from the parties' Rule 56 statements and from the court's review of the record. The court's review is aided to some extent by the available body camera audio and video evidence in the record: Sgt. Trenton's body-worn camera ("Trenton BWC," Doc. 72-4), and Officer Cala's body-worn camera ("Cala BWC," Doc. 72-3). However, as the court previously observed in this case, "the body worn footage does not show much." (Doc. 12 at 8.) Most of the critical moments occur in a matter of

2

seconds, and—as described in more detail below—the video provides only a few glimpses of Sampson before he was shot.  Additional facts are set forth as necessary below.

Plaintiff Marianne Anniszkiewicz lived in her home at the corner of Belknap and Hollis Streets in June 2018.  (Anniszkiewicz Dep., Doc. 76-14 at 32.)  Her daughter-in-law Kaylie Wright and Ms. Wright's uncle Michael Scherbyn were at the home on the morning of June 10, 2018, helping to set up an above-ground pool.  (Cala BWC at 11:52:49–53:55; *see also* Doc. 76-14 at 18, 27; Doc. 76-15 at 26.)  Ms. Wright's three children were also present, either outside in the yard near (or in) the pool or inside the home with Ms. Anniszkiewicz.  (*See* Doc. 76-15 at 28, 30 (Mr. Scherbyn's testimony that Ms. Wright's children were "[r]unning around" or in the pool, and the youngest child was in the house with Ms. Anniszkiewicz).)

Ms. Anniszkiewicz lived at the residence with five indoor cats and three dogs: Sampson, Angelina ("Angel"), and Sonny.  (Doc. 76-14 at 39–40.)  She acquired Sonny as a puppy in 2007; he was a black and tan Shepherd Rottweiler mix who weighed between 80 and 90 pounds in June 2018.  (*Id.* at 40–41.)  Sonny was not able to walk very well.  (Cala BWC at 11:51:12–14.)  Angel was six years old in 2018; she was a "chocolate and white" color pit bull weighing about 65 pounds.  (Doc. 76-14 at 41.)  Ms. Anniszkiewicz acquired Sampson as a puppy in about 2015.  (*Id.* at 40.)  He was a fluffy black Tibetan Mastiff Chow Shar-Pei mix about the same size as Sonny.  (*Id.* at 43; *see also* Doc. 72-19 at 4 (still photograph of Sampson at age three).)

The yard at the residence contained high bushes, trees, and shrubs that partially obscured the view from the street into the yard.  (*See* Docs. 76-16, 76-17, 76-18.)  A chain-link fence enclosed the yard.  (Doc. 76-14 at 35.)  The fence was approximately four feet high with an additional 18 inches of metal wiring or garden fence attached to the top rail.  (Cala Dep., Doc. 76-5 at 51; *see also* Doc. 76-14 at 37 (discussing fence "extension").)  The fence included

3

three gates for access, which Ms. Anniszkiewicz referred to as the "[g]arage gate, side gate, and front gate." (Doc. 76-14 at 82.) The "side gate" opened on the Hollis Street (south) side to a path leading north through the yard to the home's "side door." (*Id.* at 39.) The "front gate" opened on the Belknap Street (west) side and led east via a path to a porch and the home's "front door." (*See id.*; *see also* Doc. 72-22 (image of the residence as seen looking north from Hollis Street); Doc. 76-18 (image of the residence as seen looking east from Belknap Street.)

Ms. Anniszkiewicz called 911 for assistance on the morning of June 10, 2018. She reported that her neighbor was attempting to run over her and a loose dog with her (the neighbor's) car. She did not tell the 911 call-taker that she also had a dog. (Doc. 76-14 at 46.) Rochester Police Department (RPD) Officer Brian Cala and RPD Sergeant Jennifer Trenton responded to Ms. Anniszkiewicz's residence in separate vehicles. (Doc. 76-6 at 95.) They were dispatched at 11:39 a.m. and they both arrived on the scene at 11:40 a.m. (Doc. 76-6 at 171–73.)

Sergeant Trenton was not familiar with Ms. Anniszkiewicz's address before this incident. (Doc. 76-6 at 54.) In addition to her service firearm, Sergeant Trenton carried pepper spray, a baton, and a Taser. (Doc. 76-6 at 169.) Officer Cala was accompanied by Delaney Glaze, a law student who was interning that summer with the county prosecutor's office. (*See* Doc. 72-5 ¶¶ 2–3.) In addition to his service firearm, Officer Cala carried pepper spray and a baton; he was wearing a bulletproof vest. (Doc. 76-5 at 25, 60.) Officer Cala was not aware whether animal control had responded to the scene. (*Id.* at 43.)

Sergeant Trenton did not ask the dispatcher whether animal control had been dispatched to the scene. (Doc. 76-6 at 88.) She did not communicate with animal control before going to the scene. (*Id.* at 90–91.) She observed an animal control vehicle in the neighborhood as she was arriving in the general area of Ms. Anniszkiewicz's home. (Doc. 76-6 at 111.) At the time,

4

she was not aware of any animal control job concurrent with the police response to Ms. Anniszkiewicz's 911 call. (*Id.*) She did not know whether the presence of the animal control vehicle was related to Ms. Anniszkiewicz's 911 call, and she did not attempt to contact animal control to inquire. (*Id.* at 111–12.) No one told her before she arrived at the scene that animal control had already taken the loose dog away. (*Id.* at 91.)

Sergeant Trenton parked her vehicle on Belknap Street and approached the gate that separated Ms. Anniszkiewicz's yard from Belknap Street (the "front" gate, as Ms. Anniszkiewicz described it). (Doc. 76-6 at 96.) Officer Cala parked his vehicle and "visually inspected the area" as he approached Ms. Anniszkiewicz's residence on foot. (Doc. 76-5 at 44.) As the officers approached the gate, Sgt. Trenton remarked, "I don't know if this dog is deaf or not."[2] (Trenton BWC at 11:41:48–49.)[3]

Sergeant Trenton grasped and shook the fence door for approximately one second. (*Id.* at 11:41:49–50.) Plaintiff asserts that Sgt. Trenton and Officer Cala then "immediately" entered the yard "without providing any time for a dog or person to respond to the sound." (Doc. 76-1 ¶ 5.) Sergeant Trenton maintains that she "waited to see if a dog would appear" and that, "[s]eeing and hearing nothing, I entered the yard." (Doc. 72-18 ¶ 4; *see also* Doc. 76-6 at 102.) The bodycam footage shows that Sgt. Trenton began opening the gate within about four seconds of shaking the gate, and that she was starting to enter the yard about six seconds after she shook

---

[2] Plaintiff asserts that this statement indicates that Sgt. Trenton saw a dog in the yard. (Doc. 76-1 ¶ 5.) Sgt. Trenton's testimony, however, is that she "did not see any signs of a dog" at that time. (Doc. 72-18 ¶ 4.) That testimony is consistent with her remark about whether "this dog is deaf or not" if that remark was referring to the loose dog reported in the 911 call.

[3] The court cites the time stamps on the videos for ease in synchronizing the events captured on the two different cameras. The total time elapsed from Sgt. Trenton's entrance through the gate to the moment Officer Cala fired his weapon was less than 30 seconds.

the gate. (*See* Trenton BWC at 11:41:49–53; *see also* Doc. 76-5 at 39; Doc. 76-6 at 107.) Before entering the yard, Sgt. Trenton and Officer Cala had not devised any formal plan about what to do if they encountered a dog in the yard. (Doc. 72-18 ¶ 5; Doc. 76-5 at 55.) Sergeant Trenton did not yell to announce her presence or call Ms. Anniszkiewicz to come and meet her. (Doc. 76-6 at 102, 104.)

Sergeant Trenton entered the yard; Officer Cala and Ms. Glaze followed her. (Cala BWC at 11:41:52–55); *see also* Doc. 72-5 ¶ 13; Doc. 76-5 at 36.) Ms. Glaze attempted to stay behind the officers "to ensure that I was not in their way." (Doc. 72-5 ¶ 14.) It is undisputed that the officers did not conduct a search of the yard. (*See* Doc. 72-35 ¶¶ 6–7; Doc. 76-1 ¶¶ 6–7.)

Sergeant Trenton walked east along a path through the yard and up some steps on the west end of a porch. (Cala BWC at 11:41:55–42:04.) She turned north (to her left), ascending a step or steps to approach a door to the residence "to attempt to make contact with somebody in the house." (Doc. 76-6 at 112; *see also* Cala BWC at 11:42:02–04.) At that point, Sgt. Trenton had not observed any people or dogs in the yard. (Doc. 76-6 at 113.)

As Sgt. Trenton was moving toward the door, Officer Cala was on the porch behind her. (Cala BWC at 11:42:03.) Facing east toward the garage, he spotted Sampson approaching and stated: "There it is. There it is!" (*Id.* at 11:42:04–05.) According to Officer Cala's later testimony, he believed at that moment that "it" (Sampson) was the stray dog that was the subject of the 911 call. (Doc. 76-5 at 35.) According to Ms. Glaze, two dogs were "hurling" towards the officers "at a fast pace." (Doc. 72-5 ¶ 16; *see also* Doc. 72-20 (screenshots from BWC video showing two dogs approaching the porch); Doc. 72-24 at 32 (Officer Cala's testimony that two dogs were "rapidly closing distance"); Doc. 76-5 at 149 (Officer Cala's testimony that two dogs were "advancing at a rapid pace and barking").)

6

The court previously stated that Sampson was "trotting" as he approached the officers. (Doc. 12 at 2.)  Similarly, after reviewing the body-worn camera footage in this case, Plaintiff's expert, James W. Crosby, Ph.D., opined that Sampson was "trotting and wagging his tail in a friendly manner." (Doc. 76-3 at 5.)  Consistent with those statements, Plaintiff asserts that the video evidence shows that Sampson "'trotted', and did not approach 'rapidly'." (Doc. 76-1 ¶ 8.) The video evidence speaks for itself, but it appears from the court's review that Sampson advanced perhaps 30 feet in about three seconds.  Sampson's tail is visible in only a few frames of the video.

At about the same time, Sgt. Trenton observed a "[l]arge, long-haired, black dog" (Sampson) coming to the porch just as she was about to knock on the door.  (Doc. 76-6 at 114.) Nervous, she took a step back and moved toward the door as Sampson "charge[d] past" her.  (*Id.*; *see also id.* at 164 (testimony that Sampson "charged at" Officer Cala).)  She tried to stay against the door without moving to avoid startling the dog.  (*Id.* at 115.)  As Sampson passed by, Sgt. Trenton also saw another dog (Angel) approaching.  (*Id.*)

As Sampson approached the porch, Officer Cala drew his firearm and backed down the west steps, stating: "back up out of here." (Cala BWC at 11:42:05–07.)  Seeing that Officer Cala was drawing his firearm, Sgt. Trenton advised him: "I'm stopped." (*Id.* at 11:42:07.)  Officer Cala trained his weapon on Sampson as the dog climbed the east steps to the porch and approached him.  (*Id.* at 11:42:07–08.)  Ms. Glaze also moved back (west) toward the gate through which she and the officers had entered the yard; she "quickly found [her] way out of the fenced in yard." (Doc. 72-5 ¶¶ 18–19.)

Sampson paused near the west end of the porch.  (*Id.* at 11:42:08–09; *see also* Doc. 72-5 ¶¶ 20, 22 (Ms. Glaze's testimony that the dogs "stopped just feet away from the Officers" and

that "[f]or a moment, it appeared that the dogs were not going to move any closer to the officers"); Doc. 72-24 (Officer Cala's testimony that Sampson "did take a pause"); Doc. 76-5 at 67 (Officer Cala's testimony that Sampson "took a short pause").) According to Ms. Glaze, "[t]he dogs were not presenting in a submissive, curious, or nice way," but were instead "presenting in what I deemed to be an aggressive manner." (Doc. 72-5 ¶ 21.)

Officer Cala testified that Sampson was "barking and showing teeth" both before and after pausing near the west end of the porch. (Doc. 72-24 at 33; Doc. 76-5 at 100.) Plaintiff asserts that Sampson did not bark at Officer Cala until *after* Sampson paused near the west end of the deck. (*See* Doc. 76-1 ¶¶ 8–9.) As to whether Sampson was barking before that moment, Plaintiff asserts that "Officer Cala's body-worn camera video shows Sampson approaching the officers without barking." (Doc. 76 at 13.) The court agrees that the audio from the footage does not include the sound of any barking until after Sampson paused near the west end of the deck. Defendants do not dispute that, but they assert that "[i]t is not necessarily true that the dog was [silent], because the dog's barking or other sounds were not captured" on the recording. (Doc. 77 at 4.) Indeed, another RPD officer testified in a different case that RPD body-worn cameras do not "capture all of the sounds in a given situation." (Doc. 77-2 at 4.) The video evidence does not show Sampson displaying any teeth, although Sampson's face is obscured during some parts of the video.[4]

With his weapon still trained on Sampson, Officer Cala commanded, "back," and Sampson barked. (Cala BWC at 11:42:09–10.) According to Officer Cala, Sampson also

---

[4] Mr. Scherbyn testified that, after the shooting, he told Officer Cala that Sampson "didn't have any teeth." (Doc. 76-15 at 45.) The court cannot reasonably infer that Sampson literally had no teeth. At least based on the video evidence, Mr. Scherbyn's precise words were that the dogs "don't bite" (Cala BWC at 11:47:41–45), and that Sampson "never would have bit you" (*id.* at 11:54:45–46).

8

"crouched down." (Doc. 76-5 at 67.)  Officer Cala testified that in that moment he believed the dog was going to attack him because the dog "looked as though [it] was going to lunge towards my direction." (*Id.* at 70.)  Sampson then moved toward Officer Cala, barking.  (Cala BWC at 11:42:10–11.)  According to Ms. Glaze, Sampson "lunged aggressively" toward Officer Cala. (Doc. 72-5 ¶ 22.)  Officer Cala stepped back and fired a single shot at Sampson, killing him. (Cala BWC at 11:42:10–11.)  The gunshot caused the second dog (Angel) to retreat away from the officers.  (Doc. 76-5 at 149; Doc. 76-6 at 115.)

Ms. Anniszkiewicz was inside the home at the time and did not see the shooting.  Mr. Scherbyan and his niece Ms. Wright also did not see the shooting.  The three eyewitnesses to the shooting were the two officers and Ms. Glaze.

It is undisputed that in 2014—four years before the events of this case—the City held a department-wide in-service training entitled "Dog Bite Prevention for Law Enforcement." (*See* Doc. 72-6 (PowerPoint presentation, 51 slides).)  The presenter for the training was Reno DiDomenico, the Director of Law Enforcement for the Humane Society of Greater Rochester. (*Id.* at 2.)  Sergeant Trenton and Officer Cala both testified that they remembered attending the "Humane Society training." (Doc. 76-5 at 71; Doc. 76-6 at 8–9.)  Before Mr. DiDomenico's training, the United States Department of Justice's Community Oriented Policing Services ("COPS") made training videos and manuals available to law enforcement regarding how to safely interact with dogs while engaging in law enforcement activities.  (Doc. 1 ¶ 87; Doc. 13 ¶ 1.)

At the time of the events of this case in 2018, RPD General Order 340, regarding the "Use of Deadly Physical Force," was in effect. (Doc. 72-17.)  That General Order stated, in pertinent part, that RPD officers "may use firearms against animals" when the animals are

9

"1. Attacking or presenting an imminent danger to any person" or "2. Destructive, injured, or threatening, with supervisory approval when there is time to obtain it." (*Id.* at 3.) Officer Cala testified that there are also other factors that he was required to consider before firing his weapon at a dog, including "[t]he surrounding area and whether or not you can make a safe shot." (Doc. 76-5 at 24.)

## Summary Judgment Standard

"The summary judgment standards are well established." *Lewis v. Siwicki*, 944 F.3d 427, 431 (2d Cir. 2019). Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, a court must "constru[e] the evidence in the light most favorable to the non-moving party and draw[] all reasonable inferences in [its] favor." *Edwards v. Arocho*, 125 F.4th 336, 346 (2d Cir. 2024) (quoting *Williams v. N.Y.C. Hous. Auth.*, 61 F.4th 55, 68 (2d Cir. 2023)). Where, as here, a defendant seeks summary judgment based on the qualified-immunity defense, "the defendant[] bear[s] the burden of showing that the challenged act was objectively reasonable in light of the law existing at that time." *Vasquez v. Maloney*, 990 F.3d 232, 238 n.5 (2d Cir. 2021) (quoting *Tellier v. Fields*, 280 F.3d 69, 84 (2d Cir. 2000)).

## Analysis

Defendants seek summary judgment on each of the three claims in the complaint. (*See* Doc. 72-1.) Ms. Anniszkiewicz does not oppose dismissal of the unreasonable "entry" or "search" claim in Count 2. (*See* Doc. 76 at 6.) The court considers the arguments for summary judgment on the remaining two counts, in reverse order.

10

## I.     Unreasonable Seizure Claim (Count 3)

"[T]he unreasonable killing of a companion animal constitutes an unconstitutional 'seizure' of personal property under the Fourth Amendment." *Carroll v. County of Monroe*, 712 F.3d 649, 651 (2d Cir. 2013) (per curiam).

> To determine whether a seizure is unreasonable, a court must "balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interest alleged to justify the intrusion" and determine whether "the totality of the circumstances justified [the] particular sort of . . . seizure."

*Id.* (alterations in original; quoting *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985)). "[T]he plaintiff has the burden to prove that a seizure was unreasonable." *Id.*

The Second Circuit has held—and Defendants do not dispute—that killing a plaintiff's pet dog is "a severe intrusion given the emotional attachment between a dog and an owner." *Id.* As the court stated previously in this case: "private interests in dogs—and family pets especially—are highly significant since dogs have aptly been labeled 'Man's Best Friend,' and certainly the bond between a dog owner and his pet can be strong and enduring." (Doc. 12 at 8 (quoting *Ray v. Roane*, 948 F.3d 222, 227 (4th Cir. 2020).) "[W]hen a dog is seized—and especially, as here, where it is killed, not merely injured or detained—the intrusion on the owner weighs heavily in favor of finding the seizure unreasonable . . . ." (*Id.* (quoting *Matteson v. Hall*, No. 18-CV-6772, 2019 WL 2192502, at *7 (W.D.N.Y. May 21, 2019).)

On the other hand, "ensuring officer safety" is a "particularly significant governmental interest[]"; thus "courts have held that, at least in some circumstances, it is reasonable for an officer to shoot a dog that he believes poses a threat to his safety." *Carroll*, 712 F.3d at 651.[5]

---

[5] The court has considered evidence elicited at Officer Cala's deposition that, in his 24 years of experience, he had not heard of an officer dying or sustaining "serious" physical injury in a dog attack. (Doc. 76-5 at 142.) He was aware of some officers sustaining dog bites but was not aware of such injuries requiring officers to be absent from duty for a "significant"

The objective reasonableness of the seizure is evaluated based on the totality of the circumstances. *Graham v. Connor*, 490 U.S. 386, 397 (1989). The officer's "use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396.

In cases involving use of force against pet dogs, courts have considered multiple relevant factors, including: "the breed of the dog involved, the location of the dog at the time of the shooting—whether it was in a home or running free in public—the availability of non-lethal options to control the dog, and whether the dog posed a danger to the officer or the public." *Cox v. City of Rochester*, No. 22-CV-6207, 2025 WL 50340, at *4 (W.D.N.Y. Jan. 8, 2025), *argued*, No. 25-254 (2d Cir. Dec. 10, 2025); *see also Gursslin v. City of Rochester*, No. 20-CV-6508, 2025 WL 26669, at *10 (W.D.N.Y. Jan. 3, 2025) (listings factors; also relevant is "whether the owner was available and willing to assert control over the dog"); *Newsome v. Bogan*, 617 F. Supp. 3d 133, 148 (W.D.N.Y. 2022) (listing factors; also relevant is "whether there was time to devise a plan [for] control of the dog before the seizure"); *Strong v. Perrone*, No. 17-CV-6183, 2020 WL 1445877, at *3 (W.D.N.Y. Mar. 25, 2020) (analyzing context of the shooting, the dog's behavior, and the opportunity for non-lethal alternatives). "If a dog is showing signs of aggression such as baring teeth, ears back, tail straight, lunging, growling, snarling, barking, or charging, courts regularly find that it is reasonable for officers to defend themselves." *Cox*, 2025 WL 50340, at *4.

Some of the relevant circumstances are undisputed. Sampson was a Tibetan Mastiff Chow Shar-Pei mix weighing about 80–90 pounds. Angel, a pitbull weighing about 65 pounds,

---

period of time. (*Id.*) The court accepts this as some evidence that dog attacks may not be among the highest risks to officer safety. On the other hand, *Carroll* establishes that dog attacks do implicate concerns of officer safety. Officer Cala's testimony does not contradict that principle.

was following Sampson as the two dogs approached the porch. Plaintiff concedes that pitbulls are among the breeds of dogs that "can be known for fighting or aggressive behavior." (Doc. 76 at 14.) Sergeant Trenton and Officer Cala had been advised of a loose dog in the neighborhood but encountered Sampson and Angel inside Ms. Anniszkiewicz's gated residential yard. Ms. Glaze—the law student—was also present with the officers inside the yard, at least initially.

Although controlling a dog without delay is sometimes necessary to avoid the destruction of evidence, *see Carroll*, 712 F.3d at 651, that government interest is not at issue in this case. The presence of Ms. Glaze—a civilian—was part of the safety calculus. (*See* Doc. 76-5 at 151 (Officer Cala's testimony that he wanted to be "even more careful" to ensure Ms. Glaze was not injured).) That the events occurred inside a gated yard distinguish this case somewhat from a situation where a dog is "running free in a manner that could potentially threaten officers or any member of the public." *Newsome*, 617 F. Supp. 3d at 148. But the officers also believed there was a loose dog in the area, and—at least based on what the officers knew at the time—it was possible that the loose dog had found its way into the gated yard.

In its April 2021 decision denying the motion to dismiss, the court identified a need for discovery to address issues that could not be definitively resolved by reference to the bodycam footage, including "whether Sampson was acting aggressively and whether Cala and Trenton could have taken mitigating steps." (Doc. 12 at 9.) The available bodycam video has not changed since that prior ruling. The three eyewitnesses to the relevant events have since provided testimony. (*See* Doc. 72-5 (Ms. Glaze's affidavit); Doc. 76-5 (Officer Cala's deposition); Doc. 72-18 (Sgt. Trenton's interrogatory responses); Doc. 76-6 (Sgt. Trenton's deposition).) The record also now includes Dr. Crosby's expert report dated April 8, 2024 (Doc. 76-3) and his testimony from his deposition on June 12, 2024 (Docs. 72-28, 76-27).

13

## A.    Personal Involvement—Sergeant Trenton's Conduct

Before proceeding to the detailed analysis of the evidence on the relevant factors, the court considers Sergeant Trenton's argument that she is entitled to summary judgment "because she did not, by her own actions, seize the dog." (Doc. 88 at 4.) She also contends that qualified immunity applies in her favor and that there is no basis for liability on a failure-to-intervene theory. (*Id.* at 4–6.) Plaintiff asserts that these arguments mischaracterize her theory. She states that she "does not contend that Officer Trenton is liable as a supervisor of Officer Cala, nor on a failure-to-intervene theory." (Doc. 90 at 5.) Instead, Plaintiff views Sergeant Trenton as "a direct participant in the unreasonable seizure of Sampson through her own actions." (*Id.*)

"To be held liable under § 1983, a defendant must have violated the plaintiff's constitutional rights 'through the official's own individual actions.'" *Gursslin*, 2025 WL 26669, at *11 (quoting *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020)); *see also, e.g., Steele-Warrick v. Microgenics Corp.*, 671 F. Supp. 3d 229, 243 (E.D.N.Y. 2023) ("[T]he Court must make its assessment separately for each of the . . . Defendants because liability under § 1983 depends on each defendant's personal involvement in a constitutional violation."). Still, liability in seizure cases is not categorically limited to the individual who used force to effect the seizure. "[P]lanners may be liable under section 1983 to the extent that a plan for a search or seizure, as formulated and approved by those defendants, provides for and results in an unconstitutionally excessive use of force." *Terebse v. Torreso*, 764 F.3d 217, 234 (2d Cir. 2014).

Here, only Officer Cala drew his weapon and shot Sampson. But Plaintiff asserts that Sgt. Trenton "personally devised and executed the entry on the scene." (Doc. 90 at 11.) And Plaintiff maintains that her claim against Sgt. Trenton is based on a "failure-to-plan" theory just as in *Gursslin*. (Doc. 90 at 13.) In that case, the court held that a police commander and

14

lieutenant who oversaw a SWAT operation leading to fatal shooting of foster dog were not entitled to summary judgment on unlawful-seizure claim even though neither officer was present in the yard during the allege seizure because "[a] reasonable juror could conclude that Rivera and Springer were directly involved in the plan to use Plaintiff's yard without her knowledge or consent, and without confirming that no pets lived in the home or were likely to be encountered in the yard." *Gursslin*, 2025 WL 26669, at *12.

This case differs from *Gursslin* in some important respects. Sgt. Trenton was not commanding or supervising a Special Weapons and Tactics team, and unlike in *Gursslin* her mission did not involve "execution of a High-Risk Search Warrant ('HRSW')." *Id.* at *1. While the court would expect fairly significant and more formalized planning by police in that context, this case is different. The facts of this case indicate that Sgt. Trenton was dispatched in response to a 911 call about a neighbor attempting to run over Ms. Anniszkiewicz and a loose dog, and that about one minute elapsed between Sgt. Trenton being dispatched and her arrival at the scene. The need and opportunity for planning were significantly less in this case than in *Gursslin*.

On the other hand, the factors relevant to a dog-seizure claim include consideration of planning for control of the dog, and this factor is relevant for both highly orchestrated police operations as in *Gursslin* and for more impromptu police responses as in this case. Although Sgt. Trenton did not draw her weapon or fire a shot during the events of this case, she was personally involved in the events immediately preceding the shooting that shaped the use-of-force options. Thus, like the court in *Gursslin*, the court in this case cannot grant summary judgment to Sgt. Trenton for lack of personal involvement because a reasonable juror could conclude that she was directly involved in the entry to Ms. Anniszkiewicz's yard and the related

15

decisions, actions, and omissions that led to the use of force. The court analyzes qualified immunity as to each officer in the discussion below.

### B.   Sampson's Conduct; Danger to Officers or Others

As to how Sampson behaved and appeared in the critical seconds before the shooting, the eyewitness testimony favors the defense. Sergeant Trenton described Sampson as "charg[ing]" past her. (Doc. 76-6 at 114.) Officer Cala testified that, before Sampson paused at the west end of the porch, he was barking and showing teeth as he approached the officers. Officer Cala also testified that, after pausing, Sampson crouched down, barked and showed his teeth, and it appeared that he was going to lunge toward Officer Cala. Ms. Glaze has stated that both dogs were "presenting in what I deemed to be an aggressive manner." (Doc. 72-5 ¶ 21.) She further stated that, just before the shooting, Sampson "lunged aggressively" toward Officer Cala. (*Id.* ¶ 22.)

Dr. Crosby was not an eyewitness to the shooting. Instead, based on his review of materials in this case, he composed a "summary" of the incident. (Doc. 76-3 at 4.) In that summary, Dr. Crosby stated that Sampson "walked" past Sgt. Trenton and that, as he approached the officers, "he was not barking, growling, snarling, lowering his head, hunching shoulders," or exhibiting other signs of aggression. (Doc. 76-3 at 5.) According to Dr. Crosby, "[t]he body worn camera video shows that Sampson was trotting and wagging his tail in a friendly manner." (*Id.*)

However, Plaintiff cannot rely upon Dr. Crosby's "summary" as evidence. That portion of Dr. Crosby's report is not "made on personal knowledge." Fed. R. Civ. P. 56(c)(4). And, as an expert in this case, Dr. Crosby cannot appropriately "act as a vehicle to present a factual narrative of interesting or useful documents for a case, in effect simply accumulating and putting

16

together one party's 'story.'" *Scentsational Techs., LLC v. Pepsi, Inc.*, No. 13-cv-8645, 2018 WL 1889763, at \*4 (S.D.N.Y. Apr. 18, 2018). An expert "goes too far" when he attempts to characterize primary materials "for the purposes of having the fact finder accept that interpretation as fact." *Id.*; *see also Highland Cap. Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005) ("[A]n expert cannot be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence."). Although Ms. Anniszkiewicz is entitled to a construction of the evidence in the light most favorable to her, Dr. Crosby's "summary" does not constitute part of the evidence.

There is a potential inconsistency between Officer Cala's testimony that Sampson was barking before he paused and the absence of any sounds of barking before that time on the bodycam recording. The court accepts that the body-worn cameras do not "capture all of the sounds in a given situation." (Doc. 77-2 at 4.) On the other hand, the audio recording captures a variety of sounds, including the chain-link fence rattling as the officers passed through the gate (Cala BWC, Doc. 72-3, at 11:41:54–55), the sound of wild birds chirping (*e.g.*, *id.* at 11:41:55–42:05), and the sounds of the officers' (and maybe also Sampson's) steps ringing on the deck boards (*id.* at 11:42:00–08). Later portions of the audio also capture the sounds of vehicles on the nearby road (*e.g.*, *id.* at 11:43:13–14), Officer Cala's conversations with other people on the scene, and aircraft (*id.* at 11:56:16–45; 11:58:13–40; 11:59:50–12:00:20).

This inconsistency might be a basis for a jury to discount Officer Cala's testimony about Sampson's barking, and potentially also on other issues. The summary judgment procedure requires the court "to disregard all evidence favorable to the moving party that a jury would be entitled to disbelieve." *Knox v. CRC Mgmt. Co.*, 134 F.4th 39, 47 (2d Cir. 2025) (quoting *Moll v. Telesector Res. Grp., Inc.*, 94 F.4th 218, 248 (2d Cir. 2024)). If the jury disbelieved the parts

17

of Officer Cala's testimony regarding Sampson's conduct in the seconds before the shooting, then the remaining evidence on that point would consist mainly of the bodycam footage and the testimony of Sgt. Trenton and Ms. Glaze. As the court observed in the April 2021 decision, the footage from Officer Cala's body-worn camera "does not show much at all" regarding Sampson's behavior, and the footage from Sgt. Trenton's camera "is even less helpful" on that issue. (Doc. 12 at 8–9.)

With such "ambiguous" or otherwise inconclusive video evidence, the court applies the usual summary judgment standards and construes the evidence in Ms. Anniszkiewicz's favor. *Cox*, 2025 WL 50340, at *1. As the court concluded in this case five years ago, the video evidence does not "decisively establish[] that Cala's action was appropriate." (Doc. 12 at 8.)

### C. Planning and Mitigating Steps

Discovery in this case has produced a significant body of evidence about training for RPD officers regarding dog encounters and about available alternative actions that might have avoided the use of deadly force against Sampson. The court also considers the time available to the officers to formulate a plan to handle an encounter with a dog and "whether there were appreciable efforts to develop a plan to *avoid a shooting altogether*." *Flint v. City of Milwaukee*, 91 F. Supp. 3d 1032, 1048 (E.D. Wis. 2015); *see also Carroll*, 712 F.3d at 652 ("[F]ailure to plan adequately for the presence of dogs" can "contribute to a Fourth Amendment violation under certain circumstances."); *Newsome*, 617 F. Supp. 3d at 148.

The evidence on this issue is largely uncontroverted. As to available time, the officers had about one minute of time between being dispatched and arriving at the scene. Sergeant Trenton and Officer Cala both knew that they were responding to a 911 call involving a dog, so they both knew that they might encounter a dog in the area. (Doc. 76-5 at 53, 56; Doc. 76-6

18

at 84.) The time that Sergeant Trenton took to shake the fence gate before entering the yard is further evidence that the officers knew they might encounter a dog. As noted above, it is undisputed that, before entering the yard, Sgt. Trenton and Officer Cala had not devised any formal plan about what to do if they encountered a dog in the yard. (Doc. 72-18 ¶ 5; Doc. 76-5 at 55.)

In response to a question about what she did to prepare to safely interact with any dogs she might encounter, Sgt. Trenton testified:

> [I]n the back of my mind, entering any yard, whether fenced or not fenced, while I'm on duty, I'm looking for cues from the dog whether—is the dog going to roll over in front of you and want, you know, attention; or is the dog charging at you, barking, you know, hair's raised? I'm looking for those cues from dogs if I encounter—if I were to encounter them.

(Doc. 76-6 at 134.) Officer Cala testified that "[w]e encounter dogs frequently"; that "[m]any things on this job change rapidly"; and that there was no need for a formal "ops" (operations) plan. (Doc. 76-5 at 57.)

There is also little dispute about the evidence regarding possible alternative actions that the officers could have taken. Sergeant Trenton candidly listed multiple alternatives:

> [S]haking the fence longer, announcing our presence as loud as possible given the location, attempting to make contact with Animal Services somehow, . . . addressing the person who called and taking time to drive to where they were and see what the situation was. Or trying to follow up with them on the radio would have been the other option if we couldn't make contact face to face with them.

(Doc. 76-6 at 156.) Officer Cala testified that, on the day in question, he had a baton and pepper spray available to him as non-lethal weapons. (Doc. 76-5 at 25.)

As noted above, the use of force in this case "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. At the same time, the totality-of-the-circumstances inquiry includes consideration of the efforts to avoid any shooting, *Flint*, 91 F. Supp. 3d at 1048, and of the

19

"opportunity to employ non-lethal alternatives." *Strong v. Perrone*, No. 17-CV-6183, 2020 WL 1445877, at *3 (W.D.N.Y. Mar. 25, 2020). The court concludes that the variety of possible alternative actions in this case constitute significant evidence in support of meeting Plaintiff's burden to prove that the seizure was unreasonable.

## D.    Qualified Immunity

"The doctrine of qualified immunity shields government officials from civil damages liability unless 'the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct.'" *Cox*, 2025 WL 50340, at *9 (quoting *Soto v. Gaudett*, 862 F.3d 148, 156 (2d Cir. 2017)). "To determine whether a defendant is entitled to qualified immunity, courts ask whether the facts shown make out a violation of a constitutional right and whether the right at issue was clearly established at the time of defendant's alleged misconduct." *Id.* (internal quotation marks omitted). "Because qualified immunity is an affirmative defense, "[i]t is for the official to claim that his conduct was justified by an objectively reasonable belief that it was lawful." *Linton v. Zorn*, 135 F.4th 19, 30–31 (2d Cir. 2025) (alteration in original; quoting *Gomez v. Toledo*, 446 U.S. 635, 640 (1980)), *rev'd on other grounds*, 146 S. Ct. 926 (2026) (per curiam).

Here, as in *Cox*, the court concludes for the reasons discussed above that Plaintiff "has provided sufficient evidence of a violation of a constitutional right." *Cox*, 2025 WL 50340, at *9. The court therefore focuses on the "clearly established" prong. "The Supreme Court has repeatedly told courts not to define clearly established law at a high level of generality, instead emphasizing that clearly established law must be particularized to the facts of the case." *Clark v. Valletta*, 157 F.4th 201, 209 (2d Cir. 2025) (quoting *Francis v. Fiacco*, 942 F.3d 126, (2d Cir. 2019)). "We do not require a case directly on point, but existing precedent must have placed the

20

statutory or constitutional question beyond debate." *Id.* (quoting *Taylor v. Barkes*, 575 U.S 822, 825 (2015)).

Defendants argue that *Carroll* clearly establishes that it is reasonable for an officer to use deadly force against "a dog displaying aggressive behavior—or that the officer believes to be a threat to himself or the community." (Doc. 72-1 at 13.) But this definition is at a very high level of generality without being particularized to the facts of the case. The court is not persuaded that Defendants have properly defined the relevant clearly established law. And *Carroll* indicates that cases like this involve a fact-intensive inquiry into the "totality of the circumstances." *Carroll*, 712 F.3d at 651 (quoting *Garner*, 471 U.S. at 9). As described above, the video evidence of Sampson's conduct is ambiguous or inconclusive. And the evidence regarding planning or mitigating steps supports a conclusion that the seizure in this case was unreasonable. The court concludes that Defendants are not entitled to summary judgment on their qualified immunity defense.

This conclusion applies equally for Sgt. Trenton. She contends that her actions consisted of "standing back against the door and letting the dog pass" and that this was "neither an unlawful seizure nor clearly established as a seizure." (Doc. 88 at 5.) But that characterization does not account for the other facts that are relevant to Plaintiff's "failure-to-plan" theory. (Doc. 90 at 13.) Sergeant Trenton asserts that she "did not plan or provide for an unlawful seizure of a dog when responding to the call." (Doc. 88 at 5.) The court is not persuaded on that point because there are disputes of fact as to the reasonableness of the planning (or lack of planning) in the minutes before the shooting. *See Carroll*, 712 F.3d at 652 ("[F]ailure to plan adequately for the presence of dogs" can "contribute to a Fourth Amendment violation under certain circumstances."); *see also Gursslin*, 2025 WL 26669, at *11 (summary judgment on

21

qualified immunity was not warranted where there were "genuine issues of material fact regarding whether [the dog] was acting in a way that would have caused a reasonable officer to believe that the shooting was justified").[6]

## II.    *Monell* Claim (Count 1)

Defendants also seek summary judgment on the *Monell* claim in Count 1, arguing that: (A) there is no underlying constitutional violation; (B) Plaintiff abandoned her *Monell* claim; and (C) Plaintiff cannot prove elements of deliberate indifference or ratification. (Doc. 72-1 at 23.) On January 30, 2026—after the parties completed their summary judgment briefing—a jury returned its verdict in *Dempsey v. City of Rochester*, No. 19-cv-6780 (W.D.N.Y.). That case involved shots fired by RPD Officer Javier Algarin on October 19, 2018, that killed Charles Dempsey's black labrador retriever, Tesla, in the backyard of the Rochester home that Mr. Dempsey shared with his minor child. *See Dempsey v. City of Rochester*, 761 F. Supp. 3d 607, 614 (W.D.N.Y. 2025) (Wolford, C.J.). On its verdict sheet, the *Dempsey* jury found that Officer Algarin violated the plaintiff's Fourth Amendment rights by shooting Tesla, and that the City "violate[d] Plaintiffs' Fourth Amendment rights by maintaining an unconstitutional policy, custom, or practice regarding dog seizures" and "by failing to properly train regarding dog encounters." (Doc. 80-3 at 2–3.)[7]

---

[6] After the *Gursslin* court declined to grant summary judgment on qualified immunity grounds, the case proceeded and trial was scheduled for June 2026. That trial was "adjourned without future date" after the parties advised the court that they had resolved the matter. Text Order, *Gursslin*, No. 20-cv-6508 (W.D.N.Y. May 26, 2026), ECF No. 181.

[7] The City of Rochester has taken an appeal from the judgment following the jury's January 2026 verdict and from the court's January 2025 decision denying the defendants' summary judgment motion. Notice of Appeal, *Dempsey v. City of Rochester*, No. 26-528 (2d Cir. Mar. 6, 2026), ECF No. 1. That appeal remains pending.

Based on the *Dempsey* jury's verdict, Plaintiff has filed a motion to apply collateral estoppel and to preclude the City from relitigating its liability on two *Monell* theories: (1) "that the City maintained an unconstitutional policy, custom, or practice regarding the seizure of dogs during police encounters"; and (2) "that the City failed to adequately train its officers on dog encounters." (Doc. 80 at 1.) The City opposes that motion (Doc. 83) and Plaintiff has filed a reply (Doc. 84). The court begins with this collateral-estoppel issue.

## A.    Collateral Estoppel

The parties do not dispute the applicable law of collateral estoppel.[8] In general, collateral estoppel (also called issue preclusion) "bars 'successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment,' even if the issue recurs in the context of a different claim." *Wyly v. Weiss*, 697 F.3d 131, 140 (2d Cir. 2012) (quoting *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008)); *see also, e.g., Carroll v. Trump*, 151 F.4th 50, 68 (2d Cir. 2025) (doctrine prohibits relitigating "an issue when (1) the identical issue necessarily was decided in the prior action and is decisive of the present action, and (2) the party to be precluded from relitigating the issue had a full and fair opportunity to litigate the issue in the prior action" (quoting *Phoenix Light SF Ltd. v. Bank of N.Y. Mellon*, 66 F.4th 365, 369 (2d Cir. 2023))).

---

[8] Because *Dempsey* was a case in federal court under federal question jurisdiction, the court "appl[ies] federal law in determining the preclusive effect of [that] federal judgment." *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002); *see also Wyly v. Weiss*, 697 F.3d 131, 140 (2d Cir. 2012) ("The preclusive effect of a federal court's judgment issued pursuant to its federal-question jurisdiction is governed by the federal common law of preclusion."). However, the analysis under federal law is the same as under New York law. *See Marvel*, 310 F.3d at 286 ("[T]here is no discernable difference between federal and New York law concerning res judicata and collateral estoppel."). The court therefore refers to authorities applying New York law on this topic, as well.

23

Here, Ms. Anniszkiewicz seeks to use issue preclusion offensively and "non-mutually," i.e., as a plaintiff seeking to "preclude a defendant from litigating an issue the defendant has previously litigated and lost to another plaintiff." *Faulkner v. Nat'l Geographic Enters. Inc.*, 409 F.3d 26, 37 (2d Cir. 2005). A plaintiff invoking nonmutual offensive collateral estoppel must satisfy four conditions:

> (1) the issues in both proceedings must be identical,
>
> (2) the issue in the prior proceeding must have been actually litigated and actually decided,
>
> (3) there must have been a full and fair opportunity for litigation in the prior proceeding, and
>
> (4) the issue previously litigated must have been necessary to support a valid and final judgment on the merits.

*Bifolck v. Philip Morris USA Inc.*, 936 F.3d 74, 79–80 (2d Cir. 2019) (quoting *Faulkner*, 409 F.3d at 37). "Additionally, in order to blunt the fear that nonmutual offensive collateral estoppel may be unfair to a defendant or fail to promote judicial economy, district courts must ensure that application of the doctrine is not unfair." *Id.* at 80. "The party asserting collateral estoppel bears the burden of demonstrating that it is entitled to this relief." *May Ship Repair Contracting Corp. v. Barge Columbia New York*, 160 F. Supp. 2d 594, 599 (S.D.N.Y. 2001).

Ms. Anniszkiewicz argues that all four elements are satisfied and that application of estoppel is not unfair in this case. (Doc. 80-1 at 11–22.) Although the City's pending appeal reflects disagreement with the outcome in *Dempsey*, the City does not contest that there was a full and fair opportunity for litigation in that case. Nor does the City contest the presence of the fourth condition for offensive collateral estoppel. Instead, the City argues that: (A) the *Dempsey* jury did not "actually decide" municipal liability for unconstitutional seizures because the jury instructions "conflated excessive force with unlawful seizure"; (B) the deliberate-indifference

24

issues are not identical; (C) granting estoppel would not serve judicial efficiency because the *Dempsey* jury instructions were erroneous; (D) granting estoppel would be unfair; and (E) Ms. Anniszkiewicz is improperly invoking issue preclusion for an entire theory of municipal liability. (Doc. 83 at 4–14.)

The court begins by identifying the precise issues on which Ms. Anniszkiewicz seeks a preclusion ruling. In the introductory paragraph of her opening memorandum, she asserts that she is asking to preclude the City "from relitigating its *Monell* liability on Plaintiff's First Claim for Relief in the Complaint (ECF 1), the Fourth Amendment municipal liability claims regarding the unconstitutional seizure of her dog, Sampson." (Doc. 80-1 at 4.) From that broad introductory language,[9] the City infers that Ms. Anniszkiewicz is seeking an estoppel "encompass[ing] all aspects of multiple theories of municipal liability, not individual discrete issues." (Doc. 83 at 13.) In the City's view, Ms. Anniszkiewicz is seeking to prevent the City "from litigating the entire municipal liability claim." (*Id.* at 14.)

Of course, issue preclusion can have the effect of resolving entire claims "where the issue precluded is an essential element of that claim." *Montesa v. Schwartz*, No. 12-CV-6057, 2016 WL 8140048, at *2 (S.D.N.Y. Jan. 13, 2016). However, even though issue preclusion and claim preclusion are "related" doctrines, *Curtis v. Citibank, N.A.*, 226 F.3d 133, 139 (2d Cir. 2000), they are distinct. Preclusion against relitigating an *issue* does not necessarily dispose of an entire *claim*. And where a plaintiff seeks to use issue preclusion offensively, the doctrine would not resolve an entire claim in her favor unless preclusion favors the plaintiff on all of the contested essential elements of the claim and all of the defenses.

---

[9] And, somewhat confusingly, also from language in the briefing on a motion to preclude filed on February 19, 2026, in a different case in this court: *Preston v. City of Rochester*, No. 22-CV-6525.

Here, Ms. Anniszkiewicz is not invoking offensive issue preclusion to attempt to prevail as a matter of law on an entire claim. To the contrary, she identifies two "issues" in her motion on which she seeks an estoppel ruling: (a) whether [the City] maintained an unconstitutional policy, custom, or practice regarding the seizure of dogs during police encounters"; and (b) whether [the City] failed to adequately train its officers regarding dog encounters, including whether the City was deliberately indifferent to the need for such training." (Doc. 80-1 at 23.) She does not seek preclusion on (and concedes that she would still be required to prove): (c) "that Officer Cala's shooting of Sampson violated the Fourth Amendment" and (d) "that the City's unconstitutional policy or failure to train was the moving force behind Officer Cala's unconstitutional conduct." (*Id.*) The court therefore rejects the City's contention that Ms. Anniszkiewicz's motion seeks issue preclusion for any entire theory of *Monell* liability. With this clarification about the "issues" at hand, the court proceeds to consider the remaining contested elements of the collateral estoppel inquiry.

### 1.    Identity of Issues

Ms. Anniszkiewicz asserts that the two issues on which she seeks preclusion—issues (a) and (b) above—are the same as those that were "tried to a jury and decided in *Dempsey*." (Doc. 80-1 at 17.) She contends that the *Dempsey* jury instructions and verdict form establish the identity of these issues, and that the evidence supporting the *Monell* claims in *Dempsey* is "substantially the same" as the evidence in this case. (*See id.* at 18–19 (noting consolidated *Monell* discovery across both cases" and a "unified evidentiary record").)

Although the City argues that the *Dempsey* jury did not "actually decide" the relevant issues, *see infra*, the City does not appear to dispute that one of the issues raised in *Dempsey* was issue (a), above: whether the City maintained an unconstitutional policy, custom, or practice

26

regarding the seizure of dogs during police encounters. Instead, on the identity-of-issues element, the City focuses only on issue (b): the "deliberate indifference/failure-to-train theory of municipal liability." (Doc. 83 at 8.) On that issue, the City asserts that "the relevant facts and evidence are not identical." (*Id.*)

Based on the record presently before the court, it appears that the facts relevant to the City's provision of training for dog encounters are the same in most respects for the events involving the shooting of Sampson in June 2018 and the shooting of Tesla four months later in October 2018. The parties have not identified any significant changes or updates in trainings between those dates. However, the City relies on a factual difference between this case and *Dempsey*: in this case, the officers responded to a 911 call about a stray dog, whereas in *Dempsey* the officers did not know in advance that a dog was present. (Doc. 83 at 8.)

According to the City, that difference in facts also implicates a difference in training. Before the incidents in this case and in *Dempsey*, RPD issued a six-page Training Bulletin P-59-09, effective May 16, 2017, regarding "Patrol Officers Duties When Responding to Animal Scenes." (Doc. 89-1.) That bulletin advised that "officers must assess the situation upon arriving on any scene at which an animal is present" and that "[t]he first priority is the safety of the citizens and of the responding officers." (*Id.*) The bulletin provided guidance for responses to animal scenes in general and to specific types of calls for service, including for situations involving loose dogs. (*Id.* at 2–3.) Page six of the bulletin included a diagram of "Dog Postures" with six drawings of dogs in postures labeled "playful"; "defensive threat"; "passive submissive"; "active submissive"; "aggressive-dominant"; and "stressed." (*Id.* at 6.)

At the time that officers Trenton and Cala were dispatched, they knew that the 911 caller's report included a concern about a loose dog. They were therefore responding to a likely

27

"animal scene" as described in the training bulletin.  In contrast, the officers in *Dempsey* were responding to a 911 call about open-air drug sales without any mention of dogs or animals at the scene.  *Dempsey*, 761 F. Supp. 3d at 615.  The shooting in *Dempsey* occurred when Tesla exited the plaintiffs' home into the yard where officers were present in connection with apprehending the suspects and searching the yard for a gun that the suspects might have thrown there during the pursuit.

Citing *Kluppelberg v. Burge*, 276 F. Supp. 3d 773, 777 (N.D. Ill. 2017), Plaintiff contends that "[t]he identity-of-issues requirement does not demand that every background fact be identical—it requires that the legal issue be the same." (Doc. 84 at 8.)  In her view, the factual differences between this case and *Dempsey* make no difference to the collateral estoppel analysis because "[t]he question is not what the officers knew about the dog before arriving at the scene; it is whether the City's training program equipped officers to handle dog encounters lawfully, regardless of the circumstances under which they encountered the dog." (*Id.*)

The Second Circuit has provided guidance on this issue consistent with the statement in *Kluppelberg* that the "identity" element can be satisfied even where the background facts are not strictly identical.  "Use of collateral estoppel 'must be confined to situations where the matter raised in the second suit is identical in all respects with that decided in the first proceeding and where the *controlling facts* and applicable legal rules remain unchanged.'" *Faulkner*, 409 F.3d at 37 (emphasis added) (quoting *Comm'r v. Sunnen*, 333 U.S. 591, 599–600 (1948)).  Thus, a difference in facts between the first and second lawsuits does not necessarily prevent application of collateral estoppel.  The "identity of issues" requirement is not satisfied, however, if the *controlling facts* are different as between the two cases. *See Envtl. Defense v. EPA*, 369 F.3d 193, 202 (2d Cir. 2004) ("When the facts essential to a judgment are distinct in the two cases, the

28

issues in the second case cannot properly be said to be identical to those in the first, and collateral estoppel is inapplicable.").

Applying this guidance, the court concludes that the controlling facts as to municipal liability on the failure-to-train theory involve both the training that the City provided and the circumstances that the officers encountered. As noted above, the training provided is essentially the same as between this case and the *Dempsey* case. The circumstances of the dog encounters in this case and in *Dempsey* are certainly different, but the only potentially relevant difference in applicable training is that Training Bulletin P-59-09 was directly implicated at the moment officers Trenton and Cala were dispatched to address a situation involving a loose dog. That training bulletin was implicated in the events in *Dempsey*, if at all, only after Tesla exited the home into the yard that the officers were searching.

Critically, the City does not identify how any of the instructions in Training Bulletin P-59-09 impacted any of the officers' decisions or actions in this case or in the *Dempsey* case. Indeed, to the extent that the training bulletin was part of the material facts in the summary judgment filings from 2024, it was cited only tangentially in connection with evidence that officers in other cases remembered receiving the training bulletin. (*See* Doc. 76-1 ¶¶ 111, 156.) The court therefore concludes that the facts that control the outcome of the failure-to-train theory of *Monell* liability are sufficiently identical in this case and in *Dempsey*.

Considering the effect of the *Dempsey* verdict in a more recent dog-shooting case involving RPD, this court in *Preston* concluded that the plaintiff had failed to meet her burden on the "identity of issues" element as to her deliberate indifference/failure to train theory. *Preston v. City of Rochester*, No. 22-CV-6525, 2026 WL 890399, at *3 (W.D.N.Y. Apr. 1, 2026). Noting that the City had provided an additional training in December 2019 before the

February 2020 shooting in that case, the court rejected the plaintiff's contention that the 2019 training was a mere "refresher." The court reasoned:

> [B]ecause the *Dempsey* jury heard no evidence regarding the December 2019 training, and because Preston has not presented evidence showing that the December 2019 [training] was substantively indistinguishable from the training of which the *Dempsey* jury was aware, she has failed to meet [her] burden on the deliberate indifference/failure to train issue.

*Id.* As in *Dempsey*, the material facts in this case are unlikely to include the December 2019 training, since that training occurred after Sampson was shot in 2018. Plaintiff's burden in this case therefore does not include a burden to show that the December 2019 training was indistinguishable from the training of which the *Dempsey* jury was aware. The conclusion in *Preston* on this point is therefore distinguishable.

### 2.    "Actually Litigated and Actually Decided"

The second condition for collateral estoppel is that "the issue in the prior proceeding must have been actually litigated and actually decided." *Bifolck*, 936 F.3d at 79.[10] "In determining whether this condition has been satisfied, a court conducts 'a detailed examination of the record in the prior . . . case, including the pleadings, the evidence submitted and the jury instructions[.]'" *Preston*, 2026 WL 890399, at *3 (alterations in original; quoting *Sullivan v. Gagnier*, 225 F.3d 161, 166 (2d Cir. 2000)). Plaintiff contends that this condition for collateral estoppel is satisfied because the *Monell* claims in *Dempsey* "were tried over a multi-week jury trial, at which both sides presented evidence, examined and cross-examined witnesses, and

---

[10] As noted above, the City has taken an appeal in *Dempsey* and that appeal remains pending. Notice of Appeal, *Dempsey v. City of Rochester*, No. 26-528 (2d Cir. Mar. 6, 2026), ECF No. 1. There is no dispute that the pending, undecided appeal has no impact on the issue-preclusion analysis. *See* 18A Charles Allan Wright et al., Federal Practice and Procedure: Jurisdiction § 4433 (3d ed. updated Apr. 2026) ("[T]he preclusive effects of a lower court judgment cannot be suspended simply by taking an appeal that remains undecided.").

30

argued the issues" and because the jury "rendered a unanimous verdict finding the City liable on both *Monell* theories." (Doc. 80-1 at 19.) The City disagrees, asserting that the *Dempsey* jury did not "actually decide" the *Monell* theories for two reasons. (Doc. 83 at 4.) Both of these reasons focus on the jury instructions in *Dempsey*; the court considers them in turn.

### a.     Excessive Force vs. Seizure

The City contends that the jury instructions in *Dempsey* "repeatedly conflated excessive force and unlawful seizure." (Doc. 83 at 5.) Plaintiff disagrees, asserting that the jury instructions in *Dempsey* asked "whether the City maintained policies and training regarding officers' use of force against dogs" and that this "necessarily encompassed the seizure question because an officer's decision to shoot a dog is both the application of force and the effectuation of the seizure." (Doc. 84 at 5.) The court agrees with Plaintiff on this point. The *Dempsey* instructions specifically identified the "seizure" at issue for both *Monell* theories as the "us[e] [of] lethal force." (Doc. 80-7 at 50, 52.) The *Dempsey* jury decided the *Monell* questions with reference to that definition of a "seizure" as it applied in that case, and the same definition applies in this case, as well.

### b.     Disjunctive "Policy, Custom, or Practice"

The City's second argument on the "actually litigated and decided" condition is its assertion that "[t]he relevant municipal liability question was presented to the jury in disjunctive form: 'a policy, custom, *or* practice.'" (Doc. 83 at 6 (quoting *Dempsey* jury instructions, Doc. 80-7 at 49–50).) The City notes the same disjunctive phrasing on the *Dempsey* verdict sheet. (*See* Doc. 80-3 at 1.) According to the City, "the parties and the Court cannot with certainty state that the issue of the policy theory of municipal liability was in fact decided by the *Dempsey* jury." (Doc. 83 at 7.) Plaintiff asserts that the *Dempsey* jury was asked to consider

31

both "policy" and "custom" theories, and that she is proceeding on both of those theories in this case, too. (*See* Doc. 84 at 6–7.)

On this point, the court adopts the analysis in *Preston*. As the court explained in that case, the instructions in *Dempsey* did not ask the jury to consider "policy," "custom," or "practice" as "three distinct theories of liability." *Preston*, 2026 WL 890399, at *4. Instead, "the operative question was always whether the City had 'a policy, custom, or practice for purposes of § 1983,' and that is the question the *Dempsey* jury actually and necessarily decided." *Id.* Ms. Anniszkiewicz asks for a decision on the same question in this case. As in *Preston*, "the Court finds that the second requirement for offensive collateral estoppel is satisfied with respect to the custom, policy, or practice issue." *Id.* at *5.

### 3.    Fairness Analysis

Plaintiff argues that there are no factors suggesting any unfairness in applying preclusion here. (Doc. 80-1 at 21.) The City asserts two arguments in opposition, plus an argument about judicial economy. (Doc. 83 at 9–13.) The court considers each of those arguments here.

#### a.    *Cox* as an "Inconsistent Prior Judgment"

As the Supreme Court has noted: "Allowing offensive collateral estoppel may . . . be unfair to a defendant if the judgment relied upon as a basis for the estoppel is itself inconsistent with one or more previous judgments in favor of the defendant." *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 330 (1979). The City argues that it would be unfair to give preclusive effect to the *Dempsey* verdict against the City on the deliberate-indifference theory because "the Western District has also *granted* summary judgment for Defendants on deliberate indifference for a dog seizure in *Cox v. City of Rochester*." (Doc. 83 at 10.) Plaintiff maintains that the *Cox* summary judgment ruling is not an inconsistent prior judgment. (Doc. 84 at 9.)

32

The City's argument on this point does not appear to extend to the "policy, custom, or practice" theory. In any case, *Cox*—which involved an RPD officer's non-lethal shooting of a dog in February 2021—does not create an unfairness issue as to that theory for the reasons stated in *Preston*:

> The *Cox* court did not find that City did not have a custom, policy, or practice regarding dog seizures. The *Cox* court found that the plaintiff in that case had failed to marshal sufficient evidence to prove the existence of such a custom, policy, or practice. The *Dempsey* jury was presented with additional evidence, and concluded that such a custom, policy, or practice did exist. These conclusions are not in conflict, and so the *Cox* decision does not counsel against application of offensive collateral estoppel as to the custom, policy, or practice issue.

*Preston*, 2026 WL 890399, at *6. Similar reasoning applies as to the deliberate-indifference/failure-to-train theory. Ruling on summary judgment, the *Cox* court found that the plaintiff had failed to adduce sufficient evidence "to show that [the] municipality's failure to train amounts to deliberate indifference." *Cox*, 2025 WL 50340, at *8. According to the *Cox* court, the evidence about training was inadequate to meet the deliberate-indifference standard because the plaintiff's only objections were "to the content and the duration of the training, which are just arguments that the training is not in the precise form that Plaintiff would prefer." *Id.*

The evidence regarding training in *Cox* was substantially similar to the evidence in this case, referencing the 2014 training provided by Reno DiDomenico and the earlier COPS training videos and manuals. But judging the adequacy of the training goes beyond simply inspecting the content and duration of the training. The real-world results of interactions implicating that training are also highly relevant. And, as explained in *Preston*, the *Dempsey* jury considered more evidence on other RPD dog-shooting incidents than the evidence reviewed in *Cox*. *Preston*, 2026 WL 890399, at *5–6. Considering that additional evidence, the *Dempsey* jury concluded that the City had failed to properly train its police officers regarding dog encounters.

33

That conclusion is not in conflict with the *Cox* court's finding on summary judgment that the plaintiff in that case had not adduced sufficient evidence on the failure-to-train theory.

### b.     Application of Collateral Estoppel to Municipalities

Next, the City argues that it would be unfair to apply collateral estoppel because "courts are divided on whether collateral estoppel applies to municipalities." (Doc. 83 at 12.) The City raised precisely the same argument in *Preston*, and the *Preston* court rejected it. *Preston*, 2026 WL 890399, at *6. The court adopts the reasoning in *Preston* on this point and similarly rejects the City's argument here.

### c.     Judicial Economy

Finally, the fairness analysis includes consideration of "whether applying collateral estoppel will increase the efficiency of the proceedings." *Preston*, 2026 WL 890399, at *1 (citing *Bifolck*, 936 F.3d at 84). The City argues that applying collateral estoppel based on the *Dempsey* verdict would be uneconomical because that verdict was "based on facially erroneous jury instructions." (Doc. 83 at 9.) The City alleges two flaws in the *Dempsey* jury instructions: (1) failure to "require the jury to find that a specific policymaker was deliberately indifferent"; and (2) instructing the jury, in derogation of a "totality of the circumstances" inquiry, to "limit their analysis to whether officers used lethal force without an objective (or any) determination that the dog posed an imminent threat 'of serious bodily harm.'" (Doc. 83 at 9.) Plaintiff disagrees on both points. (Doc. 84 at 12.)

The court recognizes that alleged flaws in the *Dempsey* jury instructions may be an issue in the pending appeal to the Second Circuit. Nevertheless, absent a ruling from the appellate

34

court, the inquiry here requires this court to conduct its own analysis. The court begins with the issue of the absent policymaker identification.[11]

The *Dempsey* court's instructions on the deliberate-indifference/failure-to-train theory began with an overview of the four requirements for showing that a municipality's failure to train amounted to deliberate indifference. (Doc. 80-7 at 51.) The court instructed that the first requirement was that "the municipal policymaker must know to a moral certainty that employees will confront a given situation." (*Id.*) However, in the following explanation of "What Plaintiffs Must Prove" on the failure-to-train theory, the *Dempsey* court did not mention a "municipal policymaker." (*Id.* at 52.) The City contends that the *Dempsey* court erroneously failed to "require the jury to find that a specific policymaker was deliberately indifferent." (Doc. 83 at 9.)

The *Dempsey* court rejected the City's argument on this point. Ruling on summary judgment, the *Dempsey* court reasoned:

> [A] police department itself may serve as a municipal policymaker for purposes of a claim of deliberate indifference in failing to train. *See Feerick v. Sudolnik*, 816 F. Supp. 879, 887 (S.D.N.Y. 1993) (stating that the New York Police Department was "undoubtedly" a municipal policymaker where it was alleged to have inadequately trained its officers), *aff'd*, 2 F.3d 403 (2d Cir. 1993). Plaintiffs were not required to name a specific individual policymaker within the RPD.

*Dempsey*, 761 F. Supp. 3d at 626. The court did not alter its conclusion when ruling on the City's subsequent motion for reconsideration. *Dempsey*, No. 19-CV-6780, 2025 WL 1132847, at *3 (W.D.N.Y. Apr. 16, 2025). This court finds no basis for a different conclusion on that point.

---

[11] The City raised this same issue in *Preston*, but the *Preston* court did not rule on that issue because it relates to collateral estoppel on the deliberate-indifference theory, as to which the *Preston* court determined that the City was not collaterally estopped due to the factual difference of the City's December 2019 training. *See Preston*, 2026 WL 890399, at *3, 7. As discussed above, that factual difference is not an issue in this case because the shooting occurred before that training.

The City cites *Board of County Commissioners of Bryan County v. Brown* for the proposition that deliberate indifferences "require[s] proof that a *municipal actor* disregarded a known or obvious consequence of his action." 520 U.S. 397, 410 (1997) (emphasis added). That case involved deliberate-indifference claims against a county based on the hiring and training decisions of the county sheriff as a policymaker. But *Brown*'s reference to a "municipal actor" does not specify that the actor must be an individual, natural person. To the contrary, the Supreme Court in its *Monell* decision viewed a school board itself as a policymaker. *Monell*, 436 U.S. 658. The *Brown* decision did not disturb that reasoning. If a school board can be a municipal policymaker for purposes of a deliberate-indifference claim, then so, too, can a police department. The *Feerick* decision supports that conclusion, and the City has identified no basis to reach a different conclusion.

Citing *Carroll v. County of Monroe*, 712 F.3d 649 (2d Cir. 2013) (per curiam), the City also asserts that the *Dempsey* jury instructions were flawed for failing to articulate a "totality of the circumstances" inquiry for both *Monell* theories. (Doc. 83 at 9.) But the "totality of the circumstances" inquiry described in *Carroll* is used "[t]o determine whether a seizure is unreasonable." *Carroll*, 712 F.3d at 651. The *Dempsey* court expressly instructed the jury under that standard for purposes of the unreasonable-seizure claim in that case. (Doc. 80-7 at 10, 36.) The City cites no authority, however, for the proposition that the instructions on the *Monell* claim were erroneous for failure to include the "totality of the circumstances" language.

### 4.    Collateral Estoppel—Conclusion

For the reasons above, the court concludes that Ms. Anniszkiewicz has met her burden on all of the elements of nonmutual offensive collateral estoppel on the two issues she has identified: (a) whether the City maintained an unconstitutional policy, custom, or practice

36

regarding the seizure of dogs during police encounters; and (b) whether the City failed to adequately train its officers regarding dog encounters, including whether the City was deliberately indifferent to the need for such training. The jury in *Dempsey* answered both questions in the affirmative. (Doc. 80-3 at 2–3.) The court has rejected the City's arguments that the issues in *Dempsey* and in this case were not identical and that those issues were not actually litigated and decided in *Dempsey*. The City has not challenged the third and fourth conditions for offensive collateral estoppel, and, like the court in *Preston*, 2026 WL 890399, at *5, the court has reviewed Plaintiff's submissions and concludes that she has met her burden as to those conditions, also. The fairness analysis does not weigh against applying collateral estoppel in this case.

As to the policy, custom, or practice theory, the court adopts the preclusion as articulated in *Preston*: "At the trial in this matter, the City will be collaterally estopped from arguing that it did not have a custom, policy, or practice of authorizing its officers to use lethal force against dogs encountered during police operations without first assessing the actual threat posed by the dog." *Preston*, 2026 WL 890399, at *7. As to the deliberate indifference/failure-to-train theory of municipal liability, the court holds that the City will be collaterally estopped from arguing that it did not fail to adequately train its officers regarding dog encounters, and from arguing that it was not deliberately indifferent to the need for such training.

## B.    Sufficiency of *Monell* Claims

The collateral estoppel analysis above does not resolve the *Monell* claims because, as noted above, there are other essential elements of those claims that are noted precluded, including: whether Officer Cala's shooting of Sampson violated the Fourth Amendment, and whether the City's unconstitutional policy or failure to train was the moving force behind Officer

37

Cala's unconstitutional conduct. The court therefore returns to the City's arguments for summary judgment on the *Monell* claim. (*See* Doc. 72-1 at 23.)[12]

### 1.   Underlying Constitutional Violation

First, the City argues that the court should dismiss "any municipal liability claim based on dog seizures if/when the Court enters summary judgment and dismisses Plaintiff's unlawful seizure claim." (Doc. 72-1 at 14.) For the reasons discussed above, the court has concluded that summary judgment on the unreasonable-seizure claim is not appropriate on either the merits or on the issue of qualified immunity.

### 2.   Abandonment of "Policy" Theory

In a third set of interrogatories dated February 1, 2022, Defendants asked Plaintiff to "[i]dentify any/all written policy that Plaintiff alleges authorized or caused the (allegedly unconstitutional) shooting of dog Sampson." (Doc. 47-3 at 3.) Plaintiff responded with objections on March 2, 2023, stating that her pleadings "do not allege that the unconstitutional actions of defendants were caused by a formal written policy." (Doc. 47-4 at 3.) Instead, she asserted that "the actions were caused by the City's deliberate indifference to the longstanding and widespread unconstitutional conduct of officers shooting dogs, and the City's failure to respond by instituting appropriate policies, training or discipline." (*Id.*) Defendants contend that Plaintiff's interrogatory response constitutes abandonment of a claim that the City has an

---

[12] Plaintiff has argued that the summary judgment motion as to the *Monell* claims should be denied for non-compliance with the applicable procedural rules for failure to include any facts concerning the *Monell* claims. (Doc. 76 at 19–20.) The plaintiff in *Cox* made the same argument and did not prevail on that point. *Cox*, 2025 WL 50340, at *5 n.2. Here, Ms. Anniszkiewicz's Rule 56 statement *does* include statements of fact regarding the *Monell* claims. (Doc. 72-35 ¶¶ 18–23.) In any case, like the court in *Cox*, the court in this case would not deny the summary judgment motion on this ground.

unconstitutional policy regarding when an officer may permissibly shoot a dog. (Doc. 72-1 at 14–15.)

In opposition, Plaintiff asserts that the City has a "shoot first" policy; she maintains that she has presented "substantial evidence of an unwritten custom or policy of permitting officers to shoot dogs with alarming frequency, without sufficient justification, in situations where non-lethal alternatives are available and effective." (Doc. 76 at 21.) In reply, Defendants insist that, based on Plaintiff's March 2023 interrogatory responses, she "should be estopped from making any argument regarding unconstitutional policies." (Doc. 77 at 9.)

The court has already ruled that the *City* is precluded from arguing that it did not have a custom, policy, or practice of authorizing its officers to use lethal force against dogs encountered during police operations without first assessing the actual threat posed by the dog. "Policy" is plainly part of the precluded issue. Ms. Anniszkiewicz has affirmed that she pleaded an unlawful "policy" and that she relies on that as part of her *Monell* theory. (Doc. 84 at 7.) Her interrogatory responses in March 2023 disclaim only a "policy" argument based on a "formal written policy." (Doc. 47-4 at 3.) That does not abandon a claim based on less formal "policy." *See Kern v. City of Rochester*, 93 F.3d 38, 44 (2d Cir. 1996) ("The policy or custom need not be memorialized in a specific rule or regulation.").

### 3.    "Custom" and Deliberate Indifference

Finally, the City asserts that Ms. Anniszkiewicz cannot establish that the City has a "custom" of unlawfully seizing dogs and that she cannot establish the deliberate indifference requirement. The court rejects these arguments because it has concluded that the *Dempsey* verdict precludes the City from arguing that it did not have a custom, policy, or practice of authorizing its officers to use lethal force against dogs encountered during police operations

39

without first assessing the actual threat posed by the dog, and also from arguing that it did not fail to adequately train its officers regarding dog encounters, and from arguing that it was not deliberately indifferent to the need for such training.

## Conclusion

Defendants' Motion for Summary Judgment (Doc. 72) is MOOT insofar as it seeks judgment on the claim in Count 2 for unreasonable "entry" or "search," because Plaintiff has abandoned that claim. The motion is otherwise DENIED.

Plaintiff's Motion to Apply Collateral Estoppel (Doc. 80) is GRANTED.

Dated this 7th day of July, 2026.

Geoffrey W. Crawford, Judge
United States District Court